FILED

DEC 3 0 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

By _____

Deputy
pnc

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

GCI COMMUNICATION CORP., d/b/a )
GENERAL COMMUNICATION, INC., )
d/b/a GCI, )
)
Petitioner and )
Cross Petition Respondent, )
)
-vs- )    Case No. A05-003 CV (RRB)
)
KATE GIARD, in her official capacity as )
Chairwoman of the Regulatory Commission )
Of Alaska; )
DAVE HARBOUR, in his official capacity as )
Commissioner of the Regulatory Commission )
Of Alaska; )
MARK K. JOHNSON, in his official capacity as )
Commissioner of the Regulatory Commission )
Of Alaska; )
ANTHONY PRICE, in his official capacity as )
Commissioner of the Regulatory Commission )    **ACS OF ANCHORAGE, INC.'S**
Of Alaska; )    **OPPOSITION AND CROSS-**
JAMES S. STRANDBERG, in his official )    **PETITION BRIEF RE:**
capacity as Commissioner of the Regulatory )    **FINAL RATES AND TERMS**
Commission Of Alaska, )
)
Respondents and )
Cross Petition Respondents, )
)
and )
)
ACS OF ANCHORAGE, INC., d/b/a )
ALASKA COMMUNICATIONS SYSTEMS, )
ACS LOCAL SERVICE, and ACS, )
)
Respondent and )
Cross Petitioner. )
_____ )

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1

## TABLE OF CONTENTS

Table of Authorities.............................................................................................................vi

I. Introduction......................................................................................................................1

II. The Telecommunications Act of 1996............................................................................1

    A. Competition in Local Telephone Service...................................................................1

    B. State Commission Arbitration....................................................................................2

    C. UNE Rates: TELRIC Methodology............................................................................2

    D. Federal Court Review................................................................................................4

III. Procedural History.........................................................................................................5

    A. The Original Arbitration and Interconnection Agreement..........................................5

    B. ACS' Request for Final Rates....................................................................................5

    C. ACS' Arbitration Case...............................................................................................7

    D. GCI's Arbitration Case..............................................................................................9

    E. The RCA's Arbitration Decision and the Final UNE Loop Rate...............................10

IV. Standards of Review....................................................................................................11

    A. Determining Compliance with Federal Law.............................................................11

    B. Reviewing Rate Methodology..................................................................................12

V. Cost of Capital and Depreciation..................................................................................15

    A. Introduction.............................................................................................................15

    B. FCC Standards........................................................................................................16

    C. Procedural History...................................................................................................17

        1. ACS's Case.......................................................................................................17

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

-i-

2. The *Verizon Virginia Order*....................................................................18

3. GCI's Case.............................................................................................19

4. The RCA's Decision: Order No. 42........................................................20

5. GCI's Petition for Reconsideration.........................................................21

D. GCI's Challenges to the RCA's Cost of Capital Decision
   Should be Rejected....................................................................................21

1. The RCA's Decision Was Consistent with ACS' Request....................21

2. The RCA Committed No Error in Using a Hypothetical
   Capital Structure.....................................................................................23

3. The RCA Properly Determined the Cost of Debt....................................25

4. The RCA Adopted an Appropriate Size Premium Adjustment..............27

5. The RCA Properly Factored in the Risk of "Stranded
   Investment"..............................................................................................29

6. The RCA Properly Relied Upon its Own Judgment and
   Expertise.................................................................................................30

7. Conclusion..............................................................................................31

E. Any Adjustment in the Cost of Capital Would Also Require an
   Adjustment in Depreciation Rates.............................................................32

VI. The RCA Appropriately Refused to Amend the UNE Loop and Switching
    Rates to Reflect an Increased Cost of Capital for Switching.................33

A. Introduction..................................................................................................33

B. RCA Procedural Background and the FCC's Evolving
   Approach to Switching................................................................................34

1. The FCC's Original Impairment Findings...............................................34

2. The FCC's Revised Impairment Findings..............................................34

3. The FCC's Third Impairment Findings....................................................35

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

-ii-

4. ACS' Position Re: Switching..............................................................35

5. The RCA's Arbitration Rulings and ACS' Petition for
    Reconsideration..........................................................................36

6. The FCC's Interim Rules....................................................................37

7. GCI's First Proposal to Recalculate the UNE Loop Rate.....................38

8. The RCA's Ruling.............................................................................39

9. GCI's Second Proposal to Recalculate the UNE Loop Rate...............40

10. The FCC's Revised Rules................................................................40

C. This Court's Focus Should be on GCI's Original Position, Not Its
    Position on Reconsideration.................................................................41

1. GCI's Changing Positions....................................................................41

2. GCI's Proposal Was Inherently Inconsistent........................................42

3. GCI's Proposal Was Irrational and Violated TELRIC...........................42

4. GCI's Proposal Would Have Produced Instability and
    Uncertainty.................................................................................43

5. The RCA's Decision Was Not Arbitrary and Capricious.......................44

D. GCI's Current Challenges to the Switching and Loop Rates are
    Meritless.............................................................................................44

1. The RCA's Determination of Switching Rates Has Been
    Preempted...................................................................................44

2. GCI's Claim is Founded on an Incorrect Legal Premise.......................45

3. By Mandating Switching Rates, the FCC Severed Any
    Connection Between the Loop and Switching Rates....................45

4. GCI's Claim is Based on a Revised, Unapproved
    Switching Model...........................................................................46

5. The Adopted Loop Rate is TELRIC-Compliant.....................................47

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

-iii-

6. GCI's Request for Recalculation of the Loop Rate Was
    Untimely.......................................................................................47

VII. The RCA's Decision Respecting Structure Sharing Was Not Arbitrary
    and Capricious.................................................................................49

A. Introduction and Procedural Background...........................................49

B. No Specific Legal Standards Apply....................................................50

C. The RCA Made a Reasoned Decision Supported by the Evidence................51

VIII. The RCA's Decisions Respecting the Rates for Non-Recurring Costs
    Were Not Arbitrary and Capricious.......................................................55

A. Introduction..................................................................................55

B. The RCA Appropriately Selected ACS' Proposed NRC Model.......................55

C. The RCA Properly Refused to Calculate NRC Rates Based on
    the Electronic OSS Interface Proposed by GCI.......................................59

1. A "Non-electronic" Rate Menu is Required............................................59

2. The RCA Based Rates on the Appropriate Electronic OSS
    Technology....................................................................................63

D. The RCA Appropriately Rejected the 100% DIP/DOP Assumption................66

E. Conclusion....................................................................................67

IX. GCI Waived its Challenge to the Number Portability Charges...................67

X. The RCA Correctly Calculated the Wholesale Discount Rate.....................68

XI. The RCA Erred in Finding that Only 53% of Feeder Plant Would Be
    Placed in the Road Prism..................................................................73

A. Introduction..................................................................................73

B. The Parties' Cases..........................................................................74

C. The RCA's Decision..........................................................................76

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

D. The RCA's Decision Was Not Supported by Substantial Evidence................77

XII. Conclusion and Prayer for Relief..........................................................................79

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1

## TABLE OF AUTHORITIES

2

**Cases**

3

4 AT&T Commun. of Cal., Inc. v. Pacific Bell Tel. Co.,
228 F.Supp.2d 1086 (N.D. Cal. 2002)..............................................................52

5

6 AT&T Commun. of Ill., Inc. v. Illinois Bell Telephone Co.,
349 F.3d 402 (7th Cir. 2003).......................................................................14, 15

7 AT&T Communications of the South Central States, Inc. v.
BellSouth Telecommunications, Inc., 20 F.Supp.2d 1097 (E.D. Ky. 1998).....................61
8

9 AT&T Corp. v. FCC, 220 F.3d 607 (D.C. Cir. 2000)..........................................14

10 AT&T Corp. v. Iowa Utilities Board, 525 U.S. 366, 119 S.Ct. 721 (1999)........................34

11 Bustamante v. Massanari, 262 F.3d 949 (9th Cir. 2001)....................................................12

12

Duquesne Light Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609 (1989)..............................13
13

14 FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281 (1944)..........................13, 47

15 FPC v. Natural Gas Pipeline Co. of America, 315 U.S. 575 62 S.Ct. 736 (1942)...........13

16 GTE South Inc., v. Morrison, 6 F.Supp.2d 517 (E.D. Va. 1998).....................................42

17 GTE South, Inc. v. Morrison, 199 F.3d 733 (4th Cir. 1999).......................................12, 30

18

19 Iowa Utilities Board v. FCC, 219 F.3d 744 (8th Cir. 2000)................................................68

20 MCI Commun. Corp. v. Bellsouth Telecommun., Inc.,
112 F.Supp.2d 1286 (N.D. Fla. 2000)..............................................................12

21

22 New York v. United States, 331 U.S. 284, 67 S.Ct. 1207 (1947).....................................30

23 Palmer v. Municipality of Anchorage, 65 P.3d 832 (Alaska 2003)....................................68

24 Peterson v. Highland Music, Inc., 140 F.3d 1313 (9th Circuit 1998)................................42

25 Qwest Corp. v. FCC, 258 F.3d 1191 (10th Cir. 2001).......................................................12

26

Re: Cook Inlet Pipeline, 8 APUC 401 (1988).............................................................28, 41

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1  Reid v. Engen, 765 F.2d 1457 (9th Cir. 1985)....................................................68

2  Southwestern Bell Tel. Co. v. FCC, 168 F.3d 1344 (D.C. Cir. 1999)................................12

3
   United States Telecom Ass'n v. FCC, 290 F.3d 415 (D.C. Cir. 2002)............................35
4

5  United States Telecom Ass'n v. FCC, 359 F.3d 554 (D.C. Cir. 2004)...........................35-
   37
6
   U.S. West Commun., Inc. v. Jennings, 46 F.Supp.2d 1004 (D. Ariz. 1999)............12, 30
7

8  U.S. West Commun., Inc. v. Jennings, 304 F.3d 950 (9th Cir. 2002)..............................11

9  U.S. West Commun. v. MFS Internet, Inc., 193 F.3d 1112 (9th Cir. 1999)......................11

10 Verizon California, Inc. v. Peevey, 413 F.3d 1069 (9th Cir. 2005)......................................4

11 Verizon Communications, Inc. v. FCC, 535 U.S. 467,
12 122 S.Ct. 1646 (2002).............................................................................3, 14-18, 23, 69

13 Weiler v. United States, 364 F.Supp.2d 1057 (D. Alaska 2005)....................................68

14 WorldCom, Inc. v. FCC, 308 F.3d 1 (D.C. Cir. 2002).......................................................14

15
16 **Statutes and Regulations**

17 47 U.S.C. § 251..............................................................................................1, 2, 13, 34

18 47 U.S.C. § 252.......................................................................................2, 3, 4, 10, 63, 68

19 Former 47 C.F.R. § 317(b)(4) (65 Fed. Reg. 2551, Jan. 18, 2000)................................34

20 Former 47 C.F.R. § 319 (65 Fed. Reg. 2551, Jan. 18, 2000)..........................................34

21
22 Former 47 C.F.R. § 51.319 (62 Fed. Reg. 45587, Aug. 28, 1997)..................................34

23 47 C.F.R. § 51.503..........................................................................................................3

24 47 C.F.R. § 51.505(b)....................................................................................................3, 4

25 47 C.F.R. § 51.609.........................................................................................................68

26
   3 AAC 48.105................................................................................................................47

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

-vii-

1

**FCC Orders**

2

In the Matter of Implementation of the Local Competition Provisions
3   in the Telecommunications Act of 1996, First Report and Order,
CC Docket No. 96-98, 11 FCC Rcd 15,499 (released Aug. 8, 1996)
4   ("Local Competition Order").......3, 4, 7, 14, 15, 17, 18, 30, 32, 45, 52, 63, 64, 68, 70, 72

5

In the Matter of Federal-State Joint Board on Universal Service,
6   Tenth Report and Order, CC Docket No. 96-45, 14 FCC Rcd 20,156
(released Nov. 2, 1999)("USF Inputs Order")....................................................................51
7

8   In the Matter of Implementation of the Local Competition Provisions
of the Telecommunications Act of 1996, Third Report and Order
9   and Fourth Further Notice of Proposed Rulemaking, CC Docket No. 96-98,
5 FCC Rcd 3,696 (released Nov. 5, 1999).........................................................................4
10

11  In the Matter of Review of the Section 251 Unbundling Obligations
of Incumbent Local Exchange Carriers, Report and Order and Order
12  on Remand and Further Notice of Proposed Rulemaking,
CC Docket Nos. 01-338, 96-98, 98-147, 18 FCC Rcd 19,020
13  (released Aug. 21, 2003)("Triennial Review Order")........7, 15, 17, 30, 32, 35, 45, 59, 64

14
In the Matter of Petition of WorldCom, Inc. Pursuant to Section
15  252(e)(5) of the Communications Act for Preemption of the Jurisdiction
of the Virginia State Corporation Commission Regarding Interconnection
16  Disputes with Verizon Virginia, Inc., and for Expedited Consideration,
Memorandum Opinion and Order, CC Docket Nos. 00-218, 00-251,
17  18 FCC Rcd 17,722 (released Aug. 29, 2003)
18  ("Virginia Arbitration Order")....................................10, 15, 18, 19, 23, 24, 51, 57, 58, 60

19
In the Matter of Review of the Commission's Rules Regarding the
20  Pricing of Unbundled Network Elements and the Resale of Service
by Incumbent Local Exchange Carriers, Notice of Proposed
21  Rulemaking, WC Docket No. 03-173, 18 FCC Rcd 18, 945
(released Sept. 15, 2003)("NPRM")......................................4, 14, 15, 47, 50, 51, 64, 68
22

23  In the Matter of Unbundled Access to Network Elements, Order
and Notice of Proposed Rulemaking, WC Docket No. 04-313,
24  CC Docket No. 01-338, 19 FCC Rcd 16783 (released Aug. 20, 2004)
("Order and Notice")..................................................................................................37, 43
25

26

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

In the Matter of Unbundled Access to Network Elements, Order
on Remand, WC Docket No. 04-313, CC Docket No. 01-338,
20 FCC Rcd 2,533 (released Feb. 4, 2005)("*Remand Order*")..........................40, 41, 44

**State Commission Decisions**

In re: Generic Proceeding to Establish "Permanent" Prices for
BellSouth Interconnection and Unbundled Network Elements,
Docket No. 97-AD-544 (Miss. PSC, Aug. 25, 1998)...........................................60, 65, 66

In the Matter of the Interconnection Agreement Between General
Communication, Inc. and PTI Communications of Alaska, Inc.,
Arbitration Decision on Wholesale Discount, Dockets
U-99-141/142/143 (June 7, 2000); Order No. 9 (RCA, Aug. 24, 2000)...........................71

In the Matter of the Pricing Proceeding for Interconnection,
Unbundled Elements, Transport and Termination, and Resale
for US West  Communications, Inc., Docket N. UT-960369,
17th Supp. Order, (Wash. UTC, Sept. 23, 1999)................................................................61

Re: Ameritech Ohio, 2001 WL 1563354 (Ohio PUC, Oct. 4, 2001)..........................65, 66

Re: BellSouth Telecommunications, Inc., 186 P.U.R. 4th 185,
1998 WL 406786 (SCPSC, June 1, 1998)..................................................................61, 65

Re Myrtle Beach Telephone, Order No. 1999-714, 1999 WL 1317907
(S.C. P.S.C., Oct. 11, 1999)..............................................................................................71

Re New England Telephone and Telegraph Co., 1996 WL 773772,
(Vt. P.S.B., Dec. 4, 1996)..................................................................................................71

Re Pricing Proceeding for Interconnection, Unbundled Elements,
Transport and Termination, and Resale, 8th Suppl. Order,
1998 WL 992033 (Wash. U.T.C., Apr. 16, 1998).............................................................72

Re: Unbundled Network Elements, 1998 WL 995837 (NCUC, Dec. 10, 1998).......61, 65

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

# I.  INTRODUCTION.

Under the pro-competition provisions of the Telecommunications Act of 1996, respondent ACS is obligated to make its local telephone network available to competing carriers, either by selling local phone service to competitors at wholesale rates or by allowing competitors to interconnect with and lease access to the components of ACS' network. Petitioner GCI has brought this action to challenge selected aspects of the Regulatory Commission of Alaska's (RCA) arbitration of the rates and terms governing its access to ACS' network.

GCI's challenges to the RCA's arbitration of final rates and terms should be denied in all respects. Contrary to GCI's various claims, the RCA properly interpreted the Telecommunications Act and the FCC's implementing regulations, and the challenged decisions were fully supported by the evidence and were not arbitrary and capricious.

However, pursuant to its cross-petition, ACS seeks a correction in the feeder construction cost component of the loop rate calculation and requests that the case be remanded to the RCA for a recalculation of the loop rate based on that correction.

## II. THE TELECOMMUNICATIONS ACT OF 1996.

### A. Competition in Local Telephone Service.

In 1996, Congress passed amendments to the Communications Act of 1934 designed to permit the introduction of competition into local telephone service. 47 U.S.C. § 251, et seq. ("the Act"). Since it would be prohibitively expensive for fledgling competitors to build entire telephone networks before entering the market, the Act

1

1    provides two mechanisms to make competitive entry possible. First, a competitor can

2    purchase phone services from the existing carrier (incumbent local exchange carrier, or

3    "ILEC") at wholesale rates for resale. 47 U.S.C. § 251(c)(4). Second, a competitor can

4
5    lease access to the individual components of the ILEC's network (so-called unbundled

6    network elements, or "UNEs"). 47 U.S.C. § 251(c)(2) and (3).

7        UNEs include the various components of the ILEC's network (e.g., loop,

8    switching, and transport), as well as services provided by the ILEC (e.g., the one-time

9
10   costs of processing and provisioning the competitor's orders for service to individual

11   customers, billed as Non-Recurring Costs, or "NRCs"). In simplified terms, the loop is

12   that portion of the ILEC's network that carries local phone traffic from the ILEC's wire

13   centers (or switches) to the customers' premises. On the other side of the wire centers,

14   traffic is carried between the wire centers via transport.

15
16   **B. State Commission Arbitration.**

17       When a competing carrier seeks to provide service either through resale or the

18   lease of UNEs, it and the ILEC are free to agree upon the applicable rates and terms.

19   47 U.S.C. § 252(a)(1). If the parties are not able to reach a voluntary agreement, either

20   may petition the state commission to arbitrate any open issues. 47 U.S.C. § 252(b)(1).

21   Under the deadlines prescribed by the Act, the arbitration must be completed no later

22
23   than nine months after the competing carrier first requested services from the ILEC. 47

24   U.S.C. § 252(b)(4).

25   **C.  UNE Rates: TELRIC Methodology.**

26       The Act provides that the rates for interconnection must be "just and reasonable."

2

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

47 US.C. § 252(d)(1). However, in a departure from traditional utility ratemaking, the Act further provides that rates shall be based on the cost of providing the interconnection "determined without reference to a rate-of-return or other rate-based proceeding." 47 U.S.C. § 252(d)(1)(A)(i). Thus, the Act "appears to be an explicit disavowal of the familiar public-utility model of rate regulation." Verizon Communications, Inc. v. FCC, 535 U.S. 467, 489, 122 S.Ct. 1646, 1661 (2002).

Under traditional ratemaking, rates are based on the utility's reasonable historical costs of providing the service in question. By contrast, given the pro-competition goals of the Act, the aim of UNE pricing is to replicate the cost of entering a competitive market today.[1] Since the ILEC's historical costs may not be representative of the current costs of entering the market, a different pricing standard is required.

To implement the statutory pricing standard, the FCC promulgated regulations requiring that rates be based on TELRIC (total element long run incremental cost) methodology. 47 C.F.R. §§ 51.503 and 505(b). Under TELRIC, rates are to be based on "the forward-looking cost over the long run of the total quantity of facilities and functions that are directly attributable to, or reasonably identifiable as incremental to, such element." 47 C.F.R. § 51.505(b). Rather than basing rates on the historical cost of building the ILEC's actual network (as is the case with traditional ratemaking), TELRIC rates are based on the forward-looking cost of building an efficiently configured

[1]     In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, CC Docket No. 96-98, 11 FCC Rcd 15499, at ¶ 679 (released Aug. 8, 1996)(hereinafter "Local Competition Order").

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

3

network (limited only by the ILEC's existing wire center locations) using the most efficient technology currently available. 47 C.F.R. § 51.505(b). In other words, UNE rates are to be based on the forward-looking cost of building a hypothetical network.

As between the ILEC and competitive carriers, the Act is intended to be neutral, being pro-competition rather than pro-competitor. *Local Competition Order*, at ¶¶ 679, 705.[2] Accordingly, the mandated UNE rates should not subsidize competitors. "Competition does not typically demand that firms **subsidize** their competitors....Nor does the Act suggest otherwise." Verizon California, Inc. v. Peevey, 413 F.3d 1069, 1078, n.3 (9th Cir. 2005)(concurring opinion; emphasis in original). At the same time, since the ultimate goal of the Act is to promote the development of true facilities-based competition in which competitors provide service over their own networks, UNE pricing rules "should not create incentives for carriers to avoid investments in facilities."[3]

## D. Federal Court Review.

47 U.S.C. § 252(e)(6) provides for federal district court review to determine

---

[2]    Note that at page 7 of its brief, GCI misreads ¶ 705 to state that the FCC's pricing methodology should be "pro-competitor." In fact, that paragraph states that the methodology should be "pro-competition."

[3]    In the Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, Notice of Proposed Rulemaking, Notice of Proposed Rulemaking, WC Docket 03-173, 18 FCC Rcd 18,945, at ¶ 3 (released Sept. 15, 2003)(hereinafter "*NPRM*"). See also In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Third Report and Order and Fourth Further Notice of Proposed Rulemaking, CC Docket No. 96-98, 15 FCC Rcd 3,696, at ¶¶ 6-7 (released Nov. 5, 1999).

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

whether state commission decisions meet the requirements of the Act.[4]

## III. PROCEDURAL HISTORY.[5]

### A. The Original Arbitration and Interconnection Agreement.

This proceeding commenced on July 29, 1996, more than nine years ago, when GCI petitioned the Alaska Public Utilities Commission ("APUC") for arbitration of an interconnection agreement with ACS' predecessor, Anchorage Telephone Utility ("ATU"). [Box 1, at 45.] In January 1997, following arbitration, the APUC approved an interconnection agreement and adopted a UNE loop rate of $13.85 per month. [Record 12867, 12800, 12831.] Because neither party had completed cost studies that complied with the TELRIC methodology, the APUC expressly declared that all prices in the agreement were "temporary" and would require later revision based upon a cost methodology to be determined by the Commission at a later date. [Record 12831 (Arbitrator's Award, 12869 (Order No. 9).]

### B. ACS' Request for Final Rates.

In January 2000, following its purchase of ATU, ACS filed a motion with the

---

[4] 47 U.S.C. § 252(e)(6) provides,

In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section.

[5] Almost all of the administrative record has been filed with this court on a single CD-ROM disc containing seven PDF files (or boxes). Citations to that portion of the record are to the PDF files and to the PDF pages within each file, e.g., Box 1, at 45. Those portions of the record filed in hard copy are cited by the stamped record page, e.g., Record 12867.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

APUC's successor, the Regulatory Commission of Alaska ("RCA"), to establish final UNE rates. [Box 1, at 218.] ACS asserted that the UNE rates in effect did not comply with TELRIC, that the rates were underpriced, and that ACS was subsidizing GCI as a result. [Box 1, at 224-28.] For the next three-and-one-half years, ACS endeavored vainly to obtain a final rate order. The RCA denied ACS' repeated motions to set a deadline to complete the proceeding or to provide meaningful interim relief, and the proceeding languished in a procedural quagmire with little progress being made. The RCA's failure to act in a timely fashion or to implement adequate interim relief during that period of delay are the subjects of ACS' cross-petition issues addressed in the companion brief to this, also filed on this date. [ACS of Anchorage, Inc.'s Cross-Petition Brief Re: Delay and Interim Rate Issues.]

Frustrated by the Commission's failure to appreciably advance the docket, ACS filed a motion in June 2001 requesting the adoption of an interim UNE loop rate of $24. [Box 01, at 927-28.] Based in part on GCI's concession that a UNE loop rate of $14.92 fell within the range of reasonable rates, the Commission partially granted ACS' motion and adopted $14.92 as the interim rate. [Box 01, at 2698, 2705 (Order No. 23); see Box 01, at 991-92 (GCI Opp.)] In April 2003, the Commission denied ACS' second motion for an interim loop rate of $24.48. [Box 01, at 3259 (ACS' Motion); Box 02, at 1578 (Order No. 31).]

Finally, in June 2003, the Commission took cognizance of the unreasonably slow pace of the proceedings and issued an order taking the case from the assigned arbitrator and directing that the arbitration be conducted before the Commission itself.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

6

[Box T-1, at 2242-46.] In accordance with that order, the arbitration hearing was held on November 3-12, 2003. [Box T-1, at 2404-3420; BoxT-2, at 1-536.]

### C. ACS' Arbitration Case.

In contrast to the original temporary UNE loop rate of $13.85 and the subsequent interim rate of $14.92, ACS proposed the adoption of a rate of $25.88. [Box 03, at 747 (Blessing Test.), 1460 (Wilks Test.)] ACS founded its proposal on its loop cost model, ACS 7.2, which based rates on a hypothetical, efficient redesign of representative portions of the Anchorage network as performed by ACS' own engineers. [Box 03, at 889-90 (Schmid Test.), 1329-30 (Cinelli Test.)] ACS validated the results of that loop cost model with a run of the FCC-HCPM model (using Anchorage cost inputs), which had previously been modified and approved by the Commission in a UNE arbitration between GCI and the ACS companies serving Fairbanks and Juneau. [Box 03, at 1447-48, 1460-61, 1465 (Wilks Test.)] ACS also validated both the ACS 7.2 and FCC-HCPM models by demonstrating that the loop costs predicted by those models were less than the actual costs GCI incurred in recently constructing loop plant to serve two subdivisions in Anchorage. [Box 03, at 743-45, 754, 756-59 (Blessing Test.), 1461-65 (Wilks Test.)] ACS' proposed loop rate of $25.88 was also consistent with the loop rates of $24 and $24.48 that it had previously requested be imposed on an interim basis.

Consistent with the FCC's mandate that UNE rates reflect the risks associated with a fully competitive market and the impacts of facilities-based competition,[6] ACS'

---

[6]     *Local Competition Order*, at ¶¶ 686-87, 702-03; In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Report and Order and Order on Remand and Further Notice of Proposed

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ᴺᴰ AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

7

proposed loop rate also factored in GCI's unprecedented level of market capture and its announced plans to transfer its UNE customers to its own cable telephony network. In violation of TELRIC, GCI had been afforded an opportunity by virtue of the improperly low temporary and interim rates to lease UNEs from ACS for less than ACS' forward-looking costs of providing them. The effect was a substantial loss of revenue to ACS and a corollary subsidy to GCI. [Box 03, at 769, 772 (Blessing Test.)] Based on the final UNE loop rate adopted in this proceeding ($18.64), GCI received almost $11 million in subsidies from ACS from January 2000 through June 2004.[7]

As a consequence of its ability to lease UNEs at below-cost rates, GCI was able to lower its customer rates, undercut ACS in the marketplace, and lure customers away from ACS. The result was a level of competitive market penetration unprecedented anywhere else in the United States. Where competitors nationwide had only been able to capture about 13% of the local phone service market, GCI had captured 44% of the Anchorage market in less than six years and was adding new lines every month. [Box 03, 746, 777 (Blessing Test.), 1398-99, 1414 (Meade Test.)] Factoring in other carriers, ACS had lost 50% of the local market. [Box 03, at 1398, 1413 (Meade Test.)]

Rulemaking, CC Docket Nos. 01-338, 96-98, 98-147, 18 FCC Rcd 19,020, at ¶¶ 671, 680, 683, 689, 691 (released Aug. 21, 2003)(hereinafter "*Triennial Review Order*").

[7]    The spreadsheet included in the Appendix to this brief as Exhibit 1 is based on the loop count data presented by ACS at the arbitration. [Box 03, at 795.] The spreadsheet compares the amounts that GCI actually paid to lease UNE loops from ACS with the amounts it should have paid and calculates the difference. The calculation is conservative because the same loop count for March 2003 is used through June 2004, even though the number of loops leased by GCI actually increased during that period.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

8

The adverse impact of GCI's market capture was multiplied by its announced plans to begin providing local phone service to its customers over its own cable telephony network and moving 60,000 customers off ACS' network by the end of 2006. [Box 03, at 746 (Blessing Test.), 1404-05, 1422-23 (Meade Test.), 1448 (Wilks Test.); Box T1, at 2907-09 (Mercer Test.)] The resultant migration of GCI's customers from ACS' network would have the dual effect of reducing ACS' revenues (no more UNE lease payments from GCI) and leaving nearly one-third of ACS' network vacant. [Box 03, at 1404-05 (Meade Test.)] ACS would be left in the position of having to generate sufficient funds from its remaining customers to maintain its entire network.[8]

Consistent with the FCC's directives, ACS factored the demand decreases resulting from GCI's market capture and cable telephony plans into ACS' forward-looking costs of providing UNEs to GCI. Specifically, ACS adjusted the cost of capital and depreciation components of its UNE loop rate calculation. [Box 03, at 747-48 (Blessing Test.), 1406-09 (Meade Test.)]

**D. GCI's Arbitration Case.**

For its part, GCI proposed a UNE loop rate of only $7.08 based on its run of the FCC model (using different cost inputs than those used by ACS). [Box 03, at 8 (Mercer Test.)] Additionally, based on a revised version of ACS' loop cost model (ACS 7.2-G), GCI calculated a loop rate of $4.84. [Box 03, at 9 (Mercer Test.)]

_____

[8]     As the ILEC, ACS continues to bear the responsibility as "carrier-of-last-resort" to ensure that its network remains available to provide local phone service to all customer locations in Anchorage, regardless of whether those customers actually subscribe to ACS for that service.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

9

In response, ACS pointed out that GCI's proposed rate was more than 50% lower than the $14.92 interim rate that GCI had previously conceded fell within the range of reasonable UNE loop rates. [Box 03, at 2748 (Wilks Test.); see Box 01, at 991-92 (GCI Opp.)] ACS also noted that GCI's proposed rate was lower than virtually any rate adopted anywhere in the country. [Box T1, at 2495-96 (Blessing Test.)] ACS further argued that GCI's proposed rate made absolutely no sense when compared with the $14.43 loop rate recently adopted by the FCC's Wireline Competition Bureau for Verizon Virginia, the largest ILEC in the country and a company that faces considerably less competition and market risk than ACS.[9] [Box 01, at 2455, 2475-78 (Blessing Test.); Box T1, at 2489 (Blessing Test.)] ACS concluded that "GCI's proposals are clear indicators that they are not interested in the adoption of UNE rates that will approach the true forward-looking cost of providing these elements in Anchorage." [Box 01, at 2449-50 (Blessing Test.)]

**E. The RCA's Arbitration Decision and the Final UNE Loop Rate.**

On June 25, 2004, the RCA issued a seventy-seven page order resolving all issues. [Box 04, at 1321-1408 (Order No. 42).] The RCA adopted a compromise UNE loop rate of $19.15. [Box 04, at 1371, 1399.] In dissent, Commissioner Strandberg

---

[9] In the Matter of Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia, Inc., and for Expedited Consideration, Memorandum Opinion and Order, CC Docket Nos. 00-218, 00-251, 18 FCC Rcd 17,722 (released Aug. 29, 2003) (hereinafter "Virginia Arbitration Order"). Pursuant to the authority granted it under 47 U.S.C. § 252(e)(5), the FCC (through its Wireline Competition Bureau) conducted the arbitration between Verizon Virginia and its competitors when the Virginia state commission declined to do so.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

10

asserted that the Commission had erred in rejecting ACS' position that 89.7% of the feeder route portion of the loop would be constructed in paved roadways. [Box 04, at 1401-05.] Correcting for that error, he concluded that a UNE loop rate of $20.32 should have been adopted. [Box 04, at 1405.]

Following the issuance of the RCA's order, GCI filed two motions for reconsideration on various grounds and ACS sought reconsideration of its obligation to provide switching and transport. [Box 04, at 1409, 1420, 1967.] Excepting for two computational errors in the UNE loop rate calculation, the RCA denied the parties' motions. [Box 04, at 1834, 1956, 2000 (Order Nos. 46, 49, and 50).] Correcting for the computational errors, the RCA reduced the UNE loop rate fifty-one cents to $18.64. [Box 04, at 1834-35 (Order No. 46).]

Thereafter, the Commission approved the final interconnection agreement incorporating the arbitration rulings and closed the docket. [Box 04, at 2150, 2447.]

## IV. STANDARDS OF REVIEW.

### A. Determining Compliance With Federal Law.

The determination of whether the RCA properly interpreted the Telecommunications Act and any implementing regulations poses a question of federal law that is reviewed *de novo*. U.S. West Commun. v. MFS Internet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999). All other issues are reviewed under the arbitrary and capricious standard. U.S. West Commun., Inc. v. Jennings, 304 F.3d 950, 958 (9th Cir. 2002). Findings of fact are reviewed for substantial evidence. Id.

Provided that they have correctly interpreted the Act, "state commissions have

11

1   broad discretion reviewable only under the arbitrary and capricious standard." MCI

2   Commun. Corp. v. Bellsouth Telecommun., Inc., 112 F.Supp.2d 1286, 1290 (N.D. Fla.

3   2000). A court is not to sit as "a surrogate public utilities commission to second-guess
4
5   the decisions made by the state agency to which Congress has committed primary

6   responsibility for implementing the Act...." U.S. West Commun., Inc. v. Jennings, 46

7   F.Supp.2d 1004, 1008-09 (D. Ariz. 1999), rev'd in part on other grounds, 304 F.3d 950

8   (9th Cir. 2002). "In applying the substantial evidence standard, a 'court is not free to

9   substitute its judgment for the agency's...; it must uphold a decision that has "substantial
10
11   support in the record as a whole" even if it might have decided differently as an original

12   matter.'" GTE South, Inc. v. Morrison, 199 F.3d 733, 746 (4th Cir. 1999)(citations

13   omitted). "Substantial evidence is defined as 'more than a mere scintilla but less than

14   a preponderance.'" Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001)(citation
15
16   omitted).

17   **B. Reviewing Rate Methodology.**

18   Courts have traditionally afforded administrative agencies substantial latitude in

19   applying rate-making methodologies. "Because agency ratemaking is far from an exact

20   science and involves policy determinations in which the agency is acknowledged to have

21   expertise, courts are particularly deferential when reviewing ratemaking orders." Qwest
22
23   Corp. v. FCC, 258 F.3d 1191, 1206 (10th Cir. 2001), quoting Southwestern Bell Tel. Co.

24   v. FCC, 168 F.3d 1344, 1352 (D.C. Cir. 1999).

25   Rather than embroiling themselves in alleged deficiencies in particular aspects
26
     of the rate-setting calculations, courts focus on the final rate to determine whether it

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

12

satisfies applicable legislative or constitutional standards.

> Agencies...are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances....**If the Commission's order,** as applied to the facts before it and **viewed in its entirety, produces no arbitrary result, our inquiry is at an end.**

FPC v. Natural Gas Pipeline Co. of America, 315 U.S. 575, 586, 62 S.Ct. 736, 743 (1942)(emphasis added). Thus, in the landmark case of FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287-88 (1944), the Supreme Court stated,

> Under the statutory standard of 'just and reasonable' **it is the result reached not the method employed which is controlling. It is not the theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [Natural Gas] Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.** [Citations omitted; emphasis added.]

Because Congress "provided no formula by which the 'just and reasonable' rate is to be determined," "the question is whether [the Commission's rate] order 'viewed in its entirety' meets the requirements of the Act."[10] Id., 320 U.S. at 600-02, 64 S.Ct. at 287 (citations omitted). More recently, the Supreme Court reiterated these principles of rate review and declared,

> The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result....Errors to the detriment of one party may well be canceled out by countervailing errors or allowances in another part of the rate proceeding.

Duquesne Light Co. v. Barasch, 488 U.S. 299, 314, 109 S.Ct. 609, 619 (1989).

> These principles have been recognized and applied in the context of the

---

[10]    Note that 47 U.S.C. § 251(d)(1) establishes the "just and reasonable" rate standard under the Telecommunications Act.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

Telecommunications Act and the FCC's mandated TELRIC methodology. Both courts and the FCC have recognized that "enormous flexibility is built into TELRIC." AT&T Corp. v. FCC, 220 F.3d 607, 616 (D.C. Cir. 2000). "TELRIC is a framework rather than a formula; there is considerable play in the joints." AT&T Commun. of Ill., Inc. v. Illinois Bell Telephone Co., 349 F.3d 402, 405 (7th Cir. 2003)(citations omitted). Thus, the FCC has declared that "a reasonable application of TELRIC principles" can produce a "range" of acceptable results. NPRM, at ¶ 26. See also Local Competition Order, at ¶ 54. "TELRIC is not a single rate but a ratemaking methodology that may yield a rather broad range of rates." WorldCom, Inc. v. FCC, 308 F.3d 1, 7 (D.C. Cir. 2002).

Accordingly, state commissions are afforded a good deal of discretion in determining rates under TELRIC. AT&T Commun. of Ill., Inc., 349 F.3d at 411. The Act forges a partnership between state and federal regulators with the FCC establishing basic, broad pricing principles and the state commissions using their own discretion in applying them. Local Competition Order, at ¶¶ 1, 22, 41, 618. See also Verizon Commun., Inc. v. FCC, 535 U.S. at 489, 122 S.Ct. at 1661. The FCC has made clear that "under the national pricing rules that we adopt for interconnection and unbundled network elements, states will retain flexibility to consider local technological, environmental, regulatory, and economic conditions." Local Competition Order, at ¶ 114.

Given the flexibility and discretion afforded state commissions under TELRIC, the FCC has recognized that "**an error in one component of a pricing decision does not necessarily mean that UNE prices do not comply with TELRIC**." NPRM, at ¶ 27 (emphasis added). "Congress provided for judicial review of **rates** set by state

14

<sup>1</sup> commissions; it did not provide for review of individual factors that influence those

<sup>2</sup> rates." AT&T Commun. of Ill., Inc., 349 F.3d at 408 (emphasis in original). For example,

<sup>3</sup>
<sup>4</sup> a rate calculation component that elevates the rate may be offset by other factors that

<sup>5</sup> depress it. Id. As long as the final rate comports with TELRIC, the role played by

<sup>6</sup> particular intermediate factors is not important. Id. "TELRIC requires that the **rate** reflect

<sup>7</sup> the costs of efficient production, not that each ingredient of the formula do so

<sup>8</sup> independently." Id., at 411(emphasis in original).

<sup>9</sup>
## V. COST OF CAPITAL AND DEPRECIATION.
<sup>10</sup>

<sup>11</sup> **A. Introduction.**

<sup>12</sup>      Cost of capital and depreciation are two of the cost components that factor into

<sup>13</sup> the TELRIC pricing of UNEs. Verizon Commun., Inc. v. FCC, 535 U.S. at 496, 122 S.Ct.

<sup>14</sup>
<sup>15</sup> at 1664; Local Competition Order, at ¶ 703. Cost of capital reflects the rate of return

<sup>16</sup> required to attract shareholder investment (equity) and pay interest on the borrowing

<sup>17</sup> (debt) required to support the network elements being priced. NPRM, at ¶ 13. [Box 04,

<sup>18</sup> at 1336 (Order No. 42).] The weighted average cost of capital ("WACC") is a function

<sup>19</sup> of the company's capital structure, which is the respective proportions of company

<sup>20</sup>
<sup>21</sup> funding financed through equity and debt. See Virginia Verizon Order, at ¶ 64.

<sup>22</sup> Depreciation reflects the decline in the value of assets over time. NPRM, at ¶ 12.

<sup>23</sup>      The FCC has declared that both the cost of capital and depreciation rates may

<sup>24</sup> be adjusted to account for the increased business risk arising from a competitive market

<sup>25</sup> and facilities-based competition. Local Competition Order, at ¶¶ 686-87, 702-03;
<sup>26</sup>
Triennial Review Order, at ¶¶ 671, 675, 680-81, 685, 689. Consistent with this directive,

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

15

1   ACS proposed that GCI's capture of 44% of the local phone service market and GCI's

2   announced plans to begin serving its customers over its own cable telephony network

3
4   be factored into both the cost of capital and depreciation rates. Instead, the RCA

5   decided to factor all the resultant risk into the cost of capital, rather than reflect it in

6   depreciation rates as well. In so ruling, the RCA made a reasoned judgment supported

7   by the record.

8       GCI now challenges the RCA's determination of the cost of capital on numerous

9
10  grounds. As elaborated below, none of GCI's many arguments has any merit. The RCA

11  followed the FCC's guidance, it did not violate any legal standard, and it acted fully

12  within its discretion. The adopted cost of capital did not overstate the competitive risk

13  faced by ACS. The RCA's cost of capital decision should be affirmed.

14      However, if this court were to conclude that the RCA erred in determining the cost

15
16  of capital, then a remand would be required to permit an adjustment to the depreciation

17  rates as well. Given the relationship between the RCA's cost of capital and depreciation

18  decisions, any invalidation of the adopted cost of capital would also require a

19  compensating adjustment in the depreciation rates.

20  **B. FCC Standards.**

21
22      In <u>Verizon Commun., Inc. v. FCC</u>, 535 U.S. at 519, 122 S.Ct. at 1676-77, the

23  Supreme Court rejected as a "false premise" the notion that "the TELRIC rules limit the

24  depreciation and capital costs that ratesetting commissions may recognize."

25      TELRIC itself prescribes no fixed percentage rate as risk-adjusted capital
26      costs and recognizes no particular useful life as a basis for calculating
        depreciation costs. On the contrary, **the FCC committed considerable**

16

1    **discretion to state commissions on these matters**.

2    Id. (emphasis added). The FCC has provided only very broad guidance on these issues.

3
     It has stated that "the currently authorized rate of return at the federal or state level is
4

5    a reasonable starting point for TELRIC calculations." *Local Competition Order*, at ¶ 702.

6    See also Verizon Commun., Inc., 535 U.S. at 519-22, 122 S.Ct. at 1677-78. The FCC

7    has also stated that the cost of capital and depreciation rates may be adjusted to

8
     account for the risks arising from the ILEC's sunk investments in facilities, increases in
9

10   the level of competition, and the loss of customers to facilities-based competitors. *Local*

11   *Competition Order*, at ¶¶ 686-87, 702; *Triennial Review Order*, at ¶¶ 671, 680-81, 688-

12   91. Within these general guidelines, "TELRIC rates leave plenty of room for differences

13   in the appropriate depreciation rates and risk-adjusted capital costs...." Verizon

14   Commun., Inc., 535 U.S. at 521, 122 S.Ct. at 1678.

15
16   **C. Procedural History.**

17       **1. ACS' Case.** Consistent with the FCC's guidance, ACS sought to factor GCI's

18   competitive market capture and its cable telephony plans into the cost of capital. [Box

19   03, at 747-48 (Blessing Test.), 1404-06 (Meade Test.)] GCI's migration of customers to
20
     its own network poses a substantial risk that a significant portion of ACS' loops would
21

22   become idle. [Box 03, at 1405-06.] As a result of that increased risk, a higher rate of

23   return is required to attract investment in ACS. [Box 03, at 1406.]

24       Also consistent with the FCC's guidance, ACS used the currently authorized rates
25
     of return at the federal and state levels as the starting points for its analysis. At the
26
     federal level, the FCC established 11.25% as the starting point for determining the cost

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

17

of capital. *Local Competition Order*, at ¶ 702. In 2001, the Supreme Court validated that rate as "a 'reasonable starting point' for return on equity calculations based on the current lack of significant competition in local-exchange markets." <u>Verizon Commun., Inc. v. FCC</u>, 535 U.S. at 521, 122 S.Ct. at 1678. By contrast, given the significant competition in the Anchorage market, as well as ACS' high level of debt, ACS contended that 11.25% was not sufficient to account for the company's risk. [Box 03, at 781-82 (Blessing Test.)]

At the state level, the RCA had recently adjudicated in ACS' rate case a cost of capital of 11.16% based on a hypothetical capital structure of 45% debt and 55% equity, a cost of debt of 6.6%, and a cost of equity of 13.25%. [<u>Id.</u>] In this proceeding, ACS proposed a 200 basis point (2%) risk premium adjustment to the cost of equity to account for the increased risks faced as a result of GCI's market capture and cable telephony plans. [<u>Id.</u>] That adjustment yielded a Cost of capital of 12.26%. [<u>Id.</u>] ACS validated the reasonableness of its proposal by running calculations using different analytical models and approaches. [Box 03, at 783, 808-825 (Blessing Test.); Box T1, at 2504-05 (Blessing Test.)] For example, an analysis using ACS' current capital structure and updated debt and equity costs yielded costs of capital ranging from 12.25% to 13.25%, for an average of 12.75%. [Box 03, at 783, 823, 832-33 (Blessing Test.)]

**2. The *Virginia Arbitration Order*.** On August 29, 2004, the same day the parties filed their prefiled direct testimony in this proceeding, the FCC's Wireline Competition Bureau issued its decision in the UNE arbitration involving Verizon Virginia.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

18

As GCI's counsel acknowledged at the arbitration hearing in this case, "we all got blind-sided" by that decision. [Box T2, at 525.] Whereas ACS had proposed a Cost of capital of 12.26%, the Wireline Competition Bureau adjudicated a Cost of capital of 12.95% for Verizon Virginia.[11] *Virginia Arbitration Order*, at ¶ 104. In view of that decision, ACS asserted that its initial proposal was low and that its cost of capital should be equal to or greater than Verizon's. [Box 03, at 2455, 2474-75 (Blessing Test.); Box T1, at 2530-2537 (Blessing Test.)] Not only is Verizon the largest local phone company in the country with over 60 million access lines and all the economies of scope, scale, and buying power associated with that size, it does not face anywhere near the competitive risk faced by ACS, which had already lost 50% of the market and faced the migration of its customers to GCI's cable telephony network. [Box 03, at 2455, 2473-74 (Blessing Test.)]

**3. GCI's Case.** In contrast to both ACS' initial proposal (12.26%) and the *Virginia Arbitration Order* (12.95%), GCI argued for the adoption of a Cost of capital of only 8.02%. [Box 03, at 160 (Murray Test.)] In response, ACS asserted that GCI's proposal was significantly lower than any relevant benchmark (the ACS rate case, the FCC-authorized rate, the *Virginia Arbitration Order*, the Fairbanks/Juneau UNE arbitration, and the cost of capital used by GCI to calculate the interim UNE loop rate). [Box 04, at 120-21 (Blessing Test.)] ACS argued that GCI's proposal (8.02%) was unreasonable

---

[11]    In fact, the Wireline Competition Bureau calculated a WACC of 13.068%, but under the rule of "baseball" arbitration governing that proceeding (which requires the selection of one party's proposal or the other), the Bureau adopted Verizon's proposal of 12.95% as the closest. *Virginia Arbitration Order*, at ¶ 104.

19

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

since it would not permit ACS to cover its actual interest obligations on its current debt (10.33%). [Box 03, at 2449, 2469-70 (Blessing Test.)] Moreover, since equity is more risky than debt, GCI's proposal would not allow for a sufficient rate of return to attract investors. [Box 03, at 2469.]

**4. RCA Order No. 42.** Citing both the *Triennial Review Order* and the *Virginia Arbitration Order*, the RCA recognized,

> The FCC requires states to establish a cost of capital that 'reflects the competitive risks associated with participating in the type of market that TELRIC assumes' and therefore, the TELRIC model 'must reflect the risks of a market...which...faces facilities-based competition.'

[Box 04, at 1336-37 (Order No. 42)(citations omitted).] Consistent with that mandate and in conformity with the FCC's guidance, the RCA began with the Cost of capital adopted in the recent ACS rate case (11.16%) and increased the component costs of debt and equity to reflect the increased risk arising from GCI's market penetration and its plans for facilities-based competition. [Box 04, at 1335-37.] Since 11.16% represented a "traditional cost of capital without the impact of TELRIC-style competition," the RCA adopted a WACC of 14.28% for this proceeding. [Box 04, at 1338.] The RCA later reduced that figure to 13.89% to correct for a computational error. [Box 04, at 1836 (Order No. 46).]

The RCA also compared that cost of capital to the 12.95% cost of capital adopted in the *Virginia Arbitration Order* and concluded that the "drastically different market conditions" in Anchorage justified an increase over that figure. [Box 03, at 1339 (Order No. 42).] The RCA noted that ACS retained only 50% of the market share it had

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

previously held as a monopoly provider and that facilities-based competition was likely to occur in the near term. [Id.]

**5. GCI's Petition for Reconsideration.** Following the issuance of the RCA's arbitration order, GCI filed a petition seeking reconsideration of the cost of capital decision based on many of the arguments presented in this suit. [Box 04, at 1420-50.] ACS opposed the petition, and with the exception of the computational correction noted above, the RCA denied it in a detailed order. [Box 04, at 1467-95 (ACS Opp.), 1834-70 (Order No. 46).] The substance of the RCA's answers to GCI's challenges will be addressed below.

**D. GCI's Challenges to the RCA's Cost of Capital Decision Should Be Rejected.**

**1. The RCA's Decision Was Consistent with ACS' Request.** GCI first argues that the RCA acted unreasonably by adopting a Cost of capital (13.89%) greater than that originally proposed by ACS (12.26%). [GCI Brief, at 26-28.] GCI's argument should be rejected on numerous grounds. First, GCI is wrong in arguing that ACS did not propose a Cost of capital higher than 12.26%. Following the issuance of the *Virginia Arbitration Order*, which shed new light on the issue, ACS witness David Blessing testified that the cost of capital should be "equal to or greater than what Verizon Virginia received." [Box T1, at 2531.] Given the difference in risk due to the level of competition in ACS' market and Verizon's size and market dominance, the *Virginia Arbitration Order* provided the precedent for granting a higher cost of capital in this case. [Box 03, at 2477 (Blessing Test.); Box T1, at 2531-37 (Blessing Test.)] The RCA agreed, both in its original arbitration order and in its denial of GCI's petition for reconsideration. [Box 04,

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

at 1338-50 (Order No. 42), 1838-43 (Order No. 46).] A cost of capital of 13.89% for ACS is not out of line with the 12.95% cost of capital adopted in Verizon Virginia for a much larger company with much more market power and much less risk.

Second, GCI misconstrues ACS' cost of capital proposal by viewing it in isolation from other related aspects of ACS' UNE loop rate proposal. Contrary to GCI's claim, ACS did not factor all the risks of competition into the cost of capital. Instead, ACS proposed adjustments to both the cost of capital and depreciation rates to reflect competitive risk. [Box 03, at 747-48 (Blessing Test.), 1406-09 (Meade Test.), 1373-76, 2780-81 (Cooney Test.), 1230 (Cellupica Test.);  2550-52 (Weinert Test.), Box 04, at 323-29 (Cellupica Test.); Box T1, at 2452-54 (Shelanski Test.)] Together, those adjustments yielded a loop rate higher than that adopted by the RCA.  The RCA chose a different approach, electing to consolidate competitive risk into only the cost of capital and leaving depreciation alone. [Box 04, at 1335 (Order No. 42), 1838-40, 1846 (Order No. 46.] Thus, by focusing only on the cost of capital, GCI overlooks other compensating aspects of ACS' case which were rejected by the RCA, and it fails to recognize that the RCA adopted a loop rate lower than that proposed by ACS. Accordingly, GCI has no basis for claiming that the RCA granted ACS more than it asked for.

Finally, GCI's argument is based on the erroneous premise that the RCA was somehow bound to strictly follow one of the parties' advocacy positions. To comply with the mandates of federal law and further the public interest, the RCA is neither bound nor limited by the parties' proposals. Rather, the Commission is free – indeed obligated –

22

1 to exercise its independent judgment and make the best decision based on the record

2 before it. As is clear from the its detailed orders, the RCA gave careful thought to the

3 cost of capital issue and made a reasoned decision, amply supported by the record.

4

5 [Box 04, at 1336-50 (Order No. 42), 1835-50 (Order No. 46).]

6 **2. The RCA Committed No Error in Using a Hypothetical Capital Structure.**

7 GCI argues that it was improper for the RCA to calculate a cost of capital using a

8 hypothetical capital structure with ACS' actual cost of debt. [GCI Brief, at 29-31.] Again,

9

10 GCI is wrong for many reasons. First, GCI's argument is founded on the faulty

11 assumption that there is some required methodology for determining cost of capital.

12 There is not. As detailed in Part V.B., above, the FCC has accorded considerable

13 discretion to state commissions in determining cost of capital. Consistent with the FCC's

14

15 guidance, the RCA started with the cost of capital previously approved in ACS' rate case

16 (which was based on a hypothetical capital structure) and made reasoned adjustments

17 to both the cost of debt and equity to reflect TELRIC-style competition and the impacts

18 of GCI's cable telephony plans. [Box 04, at 1336-50 (Order No. 42).]

19 Second, the RCA's approach was consistent with that followed in the Virginia

20 Arbitration. Just as the Wireline Competition Bureau "select[ed]between the parties'

21

22 proposals for each of the relevant components," *Virginia Arbitration Order*, at ¶ 64, the

23 RCA followed the same approach and "selected the components of the cost of capital

24 from those proposed by the parties."[12] [Box 04, at 1838 (Order No. 46).] Cf., Verizon

25

26 [12]    In the Virginia Arbitration, the competitor (AT&T/WorldCom) proposed a cost of debt of 7.86% and a capital structure with 34.5% debt and 65.5% equity. To calculate the cost of capital, the Wireline Competition Bureau accepted that

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

23

1    Commun., Inc., 535 U.S. at 522, 122 S.Ct. at 1678 (state commissions customarily

2    determine TELRIC rates "based on some predictions from one model and others from

3    its counterpart").

4

5        Third, the RCA's approach was consistent with basic financial theory which posits

6    that increased company risk translates into a higher cost of capital. [Box 03, at 810,

7    2475-77 (Blessing Test.); Box T1, at 2518-19, 2549-50 (Blessing Test.)] GCI's proposal

8    turned that financial theory on its head. In the Virginia Arbitration, the Wireline

9    Competition Bureau adopted a weighted average cost of capital of 12.95% based on a

10   cost of debt of 7.86%, a cost of equity of 14.37%, and a capital structure with 20% debt

11   and 80% equity. Virginia Arbitration Order, at ¶ 104. Nonetheless, despite proposing a

12   capital structure with much more debt and much more risk (50.21% debt and 49.79%

13   equity), GCI proposed lower costs of both debt (5.84%) and equity (10.22%). [Box 03,

14   at 203 (Murray Test.); 2475-76 (Blessing Test.)] Again, given the large disparity in risk

15   between ACS and Verizon, the RCA properly rejected GCI's proposed costs of debt and

16   equity and its proposed cost of capital of only 8.02%.

17

18

19       Similarly, GCI's proposal was inconsistent with the cost of capital approved in

20   ACS' rate case and used by the RCA as the starting point for its analysis. In the rate

21   case, the RCA adopted a cost of capital of 11.16% based on a cost of debt of 6.6%, a

22   cost of equity of 13.25%, and a capital structure with 45% debt and 55% equity. [Box 03,

23

24

25   cost of debt, but matched it with a capital structure with 20% debt and 80%
26   equity. Id., at ¶ 104. Applying GCI's logic, the Wireline Competition Bureau
     should have reduced the cost of debt to reflect the lower proportion of debt in the
     capital structure it adopted.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

24

1  at 781-82 (Blessing Test.)] Since the RCA found that cost of capital did not reflect the
2  risks of TELRIC-style competition, it follows that in this proceeding the costs of debt and
3
4  equity should both be increased to reflect that risk, and the RCA adjusted those costs
5  accordingly. [Box 04, at 1338 (Order No. 42).] GCI, however, proposes lower costs of
6  debt and equity.

7       At bottom, GCI's argument is founded on the false premise that risk is solely a
8  function of capital structure. While capital structure and the degree of a company's
9
10  leverage (debt) are relevant, other considerations also determine risk, e.g., competition.
11  If capital structure were determinative of the costs of debt and equity, then the simple
12  determination of the capital structure would be all that was required to calculate the cost
13  of capital. Under this theory, all companies with the same capital structure would have
14  the same cost of capital, regardless of the unique risks they faced in their markets.
15
16  Indisputably, that is not the case.

17       **3. The RCA Properly Determined the Cost of Debt.** To calculate the cost of
18  capital, the RCA elected to use ACS' actual cost of debt of 10.33%. [Box 04, at 1341
19  (Order No. 42).] The RCA reasoned that since ACS "operates in a sufficiently
20  competitive environment and will operate in a true facilities-based competitive market
21  in the near future, that the actual cost of debt more closely approximates the costs
22  associated with operating in TELRIC markets." [Id.; see also Box 04, at 1846-48 (Order
23
24  No. 46).] The RCA also rejected GCI's proposed cost of debt of 5.84%, finding its
25  analysis unpersuasive for several reasons, most notably, because GCI's proposal was
26  based on generic utility bond rates that were not reflective of utilities facing TELRIC-

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

25

1 style, facilities-based competition. [Box 04, at 1342-43 (Order No. 42).]

2 GCI now argues that the RCA ignored evidence of recent declines in interest

3
4 rates and ignored ACS' recent debt restructure. [GCI Brief, at 31-32.] GCI is wrong. ACS

5 witness David Blessing testified that, even with its recent debt restructure and despite

6 "historically low interest rates," ACS was required to pay an aggregate cost of

7 approximately 10.5% on its debt. [Box 03, at 746.] Thus, rather than suggesting that the

8 RCA erred in adopting a cost of debt of 10.33%, ACS' debt restructure validated that

9
10 finding.

11 GCI also argues that the RCA misconstrued the term "facilities-based"

12 competition when it decided to increase the cost of debt to 10.33% from the 8.6% used

13 to determine the cost of capital in ACS' prior rate case. [GCI Brief, at 35-38.] GCI argues

14
15 that, since it was already providing its own switching and transport facilities (which it

16 used in conjunction with the UNE loops leased from ACS), it was a facilities-based

17 carrier and that risk had already been factored into the 8.6% cost of debt. In making this

18 argument, however, GCI fails to recognize that there are different degrees of facilities-

19 based competition with different degrees of risk.

20
21 While it is one thing for GCI to provide switching and transport over its own

22 facilities while leasing UNE loops from ACS, facilities-based competition rises to another

23 level when GCI bypasses ACS' network completely and provides service over its own

24 loops (or cable telephony network) as well. In the latter circumstance, GCI retains all the

25 revenue from the customers its serves and ACS faces much greater financial risk. Thus,

26 the RCA reasoned,

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

26

> Facilities-based competition...is far different from the competition ACS currently experiences because of the potential for substantial decrease in cash flow generated from ACS' plant....We, therefore, decided that there was an increased financing risk in a TELRIC competitive market, because ACS' cashflow would be substantially lowered, after losing GCI as its largest customer.

[Box 04, at 1847 (Order No. 46).] The RCA concluded that the 8.6% cost of debt "would need to be adjusted to reflect this risk." [Id.] Although GCI may disagree, it has no basis for claiming either that the RCA's conclusion was not supported by the evidentiary record or that it was arbitrary and capricious.

**4. The RCA Adopted an Appropriate Size Premium Adjustment.** The RCA factored a size premium adjustment into the calculation of the cost of equity. [Box 04, at 1354-57 (Order No. 42).] The purpose of a size premium adjustment is to account for the greater risk associated with small companies. [Box 04, at 1355, 1357.] While GCI argued against the use of any adjustment at all and made no proposal for one [Box 04, at 1355], the RCA adopted the premium of 3.53% proposed by ACS. [Box 04, at 1357.] The RCA specifically found that "ACS is the type of smaller firm for which the premium adjustment was developed." [Id.] In contrast to Verizon, which has a market capitalization exceeding $94 billion, ACS' market capitalization is only $126.3 million. [Box 04, at 1355 (Order No. 42), 1475, n.5 (ACS' Opp. to GCI's Pet. to Reconsider).]

GCI now argues that the RCA should have adopted a size premium adjustment of only 1.52%. [GCI Brief, at 32-34.] It contends that the RCA erred by selecting a premium based on ACS' actual market capitalization, instead of on a market capitalization derived from the hypothetical capital structure. GCI's argument should be

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

27

1    rejected for two reasons.

2    First, GCI's proposal contradicts the position it took at the arbitration. Having
3
4    made no proposal for an adjustment at the arbitration hearing, it is too late for GCI to
5    propose one after the fact. By failing to properly raise the issue in the proceedings
6    below, GCI waived the right to raise the issue now.[13]

7    Second, even considered on its merits, GCI's challenge is without foundation. As
8    the RCA found in denying GCI's petition for reconsideration on this point, GCI has cited
9
10    no authority or legal precedents establishing that its counter-proposal is a generally
11    accepted method of applying the size premium adjustment. [Box 04, at 1850 (Order No.
12    46).] Nor did GCI establish that the RCA applied the size premium in an improper
13    manner. [Id.]

14    While GCI argues that the size premium adjustment is inconsistent with the
15
16    hypothetical capital structure adopted by the RCA, the two factors are not related. The
17    size premium is designed to compensate for the tendency to underestimate the market
18    volatility of smaller firms. [Box 04, at 1348-49 (Order No. 42).] Therefore, it is the actual
19    market capitalization of the firm, not that of a hypothetical firm, that is relevant. ACS
20    established that its market capitalization is $126.3 million, less than a third of the
21
22    hypothetical market capitalization $421.8 million proposed by GCI. [Box 04, at 1348.]

23    A comparison to the cost of capital adopted in the Virginia Arbitration validates
24    the size premium adjustment used by the RCA in this proceeding. Assuming that

25

26    [13]    GCI did raise the issue in its petition for reconsideration, but that was not
an appropriate vehicle for making new arguments that could have been made at
the arbitration hearing. Re: Cook Inlet Pipeline, 8 APUC 401, 402 (1988).

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

28

Verizon Virginia and ACS face similar market risks, and further assuming that the only difference between them is size, application of the 1.52% size premium adjustment proposed by GCI to the 12.95% cost of capital adopted for Verizon yields a cost of capital of 14.28% (as compared to 13.89% adopted by the RCA). [Box 04, at 1475 (ACS' Opp. to GCI's Pet. to Reconsider).] Since that adjustment does not account for the significant risk differential between Verizon and ACS, it follows that the adjustment was understated and that the 13.89% cost of capital adopted in this proceeding constitutes a conservative estimate.

**5. The RCA Properly Factored in the Risk of "Stranded Investment."** As part of its evaluation of the risk faced by ACS, the RCA considered the adverse financial impact on ACS resulting from GCI's migration of customers to its cable telephony network. [Box 04, at 1838-39 (Order No. 46).] GCI argues that was improper because ACS' network would not actually become "stranded" or obsolete as a result of that migration, but would remain available for future use in the event ACS wins back its lost customers. [GCI Brief, at 38-40.]

In making this argument, however, GCI is merely quibbling over the meaning of "stranded," while ignoring the actual impact on ACS. Regardless of whether ACS' loops are rendered obsolete by the loss of customers, they nonetheless sit unused – and are effectively stranded – while those customers are being served over GCI's own network. As ACS witness Jerome Weinert testified at the arbitration hearing, "[W]hen GCI or any other customer can provide physical facilities and take voice customers off of the ACS network...those lines will be essentially stranded." [Box T1, at 2806 (Weinert Test.); see

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

also Box T1, at 2456 (Shelanski Test.)] As ACS' loops sit unused, they no longer generate revenue, and the value of its plant will decline. [Box 04, at 1334-35 (Order No. 42).] The RCA's decision to factor this impact into the cost of capital determination was fully consistent with the FCC's directive that the cost of capital may be adjusted to account for the loss of customers to facilities-based competitors. *Triennial Review Order*, at ¶ 680.

**6. The RCA Properly Relied Upon its Own Judgment and Expertise.** Finally, GCI accuses the RCA of relying on its "judgment" as a "guise" for making arbitrary and capricious decisions. [GCI Brief, at 40-41] GCI's accusation is meritless. "While an administrative agency's decision must be based upon the record, that does not mean the agency is required to ignore its own expertise and knowledge." U.S. West Commun., Inc. v. Jennings, 46 F.Supp.2d at 1010. In fact, there is a "presumption that the agency has special expertise and knowledge regarding the industry that it regulates, and will apply that expertise and knowledge in its decisionmaking process...." Id. Accordingly, state commissions are afforded broad discretion under the Act "to consider local technological, environmental, regulatory, and economic conditions." *Local Competition Order*, at ¶ 114. This discretion extends particularly to cost calculations.

> 'The appraisal of cost figures is itself a task for agency expertise, since these costs involve many estimates and assumptions and, unlike a problem in calculus, cannot be proved right or wrong. They are, indeed, only guides to judgment. Their weight and significance require expert appraisal.'

GTE South, Inc. v. Morrison, 199 F.3d at 745, *quoting* New York v. United States, 331 U.S. 284, 328, 67 S.Ct. 1207 (1947).

30

1    Provided that the RCA's decisions are supported by the evidentiary record, which

2  they are, GCI should not be heard to complain that the RCA used its judgment and

3  expertise in determining a TELRIC-compliant cost of capital.

4

5    **7. Conclusion.** As set forth in Part V.B., above, neither the Act nor the FCC

6  mandates the use of any particular formula for determining cost of capital. Instead, the

7  FCC has offered only general guidelines, stating that the cost of capital may reflect

8  competitive risk and that currently authorized rates of return may be used as the starting

9  point for TELRIC analysis. Indisputably, the RCA complied with those directives in this

10 case. It started with the cost of capital approved in ACS' recent rate case and made

11

12 reasoned adjustments to the component costs of debt and equity to reflect the added

13 risk arising from competition and GCI's announced migration of customers to its cable

14 telephony network.

15

16    At bottom, GCI is arguing about those adjustments, not about the RCA's failure

17 to follow the law. However, it makes no sense to argue that ACS' cost of capital should

18 be: 1) lower than the 11.16% adopted in the ACS rate case, which did not reflect

19 TELRIC-style competition, or 2) lower than the 12.95% adopted for Verizon Virginia, a

20 company that is many times larger than ACS, that faces no significant competition, and

21

22 that remains the dominant carrier in its market. The cost of capital adopted by the RCA

23 did not overstate the competitive risk faced by ACS and it did not overcompensate ACS.

24 The RCA did not act arbitrarily and capriciously in determining the appropriate cost of

25 capital, and its decision was fully supported by the record. GCI's challenges to the cost

26 of capital decision should be rejected.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

31

**E. Any Adjustment in the Cost of Capital Would Also Require an Adjustment in Depreciation Rates.**

The FCC stated that the risks arising from competition and the loss of customers to facilities-based competitors may be factored into both the cost of capital and depreciation rates. *Local Competition Order*, at ¶¶ 686-87, 702; *Triennial Review Order*, at ¶¶ 671, 680-81, 688-91. In accordance with this authority, ACS proposed adjustments to both the cost of capital and depreciation rates, yielding a proposed UNE loop rate of $25.88. [Box 03, at 747-48 (Blessing Test.), 1406-09 (Meade Test.), 1373-76, 2780-81 (Cooney Test.), 1230 (Cellupica Test.); 2550-52 (Weinert Test.), Box 04, at 323-29 (Cellupica Test.); Box T1, at 2452-54 (Shelanski Test.)] Since GCI's planned deployment of cable telephony will remove a significant number of ACS' loops from service, shorter service lives than traditionally associated with depreciation calculations are dictated in order to ensure the full recovery of ACS' investment. [Box 03, at 1398-99 (Meade Test.), 1375 (Cooney Test.), 1230 (Cellupica Test.), 2549-52 (Weinert Test.); Box T1, at 2452 (Shelanski Test.)] The RCA, however, elected to factor all competitive risk into the cost of capital, rather than factor it throughout the model, and adopted a final UNE loop rate of $18.64. [Box 04, at1335 (Order No. 42), 1839-40 (Order No. 46).]

Given this approach, it would not be fair to adjust the cost of capital without allowing for compensating adjustments in depreciation rates as well. To preclude an unfair, one-sided adjustment to the UNE rate calculation, ACS has pled a cross-petition challenge to the RCA's determination of depreciation rates. In the event this court were to conclude that the RCA committed reversible error in determining the cost of capital,

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1  the court should also direct the RCA on remand to revisit depreciation rates as well.

2  Since the two issues are directly interrelated, it follows that any adjustment in the cost

3  of capital may necessitate a compensating adjustment in depreciation rates.

4

5      While it remains ACS' basic position that all of the RCA's cost of capital and

6  depreciation rate decisions should be affirmed, the relationship between those decisions

7  cannot be ignored. GCI should not be permitted to invalidate those aspects of the RCA's

8  decision that increase the UNE loop rate without allowance being made for

9  compensating adjustments in related aspects of the loop rate calculus.

10

11                    **VI. THE RCA APPROPRIATELY REFUSED**
                     **TO AMEND THE UNE LOOP AND SWITCHING RATES**
12       **TO REFLECT AN INCREASED COST OF CAPITAL FOR SWITCHING.**

13  **A. Introduction.**

14

15      Based on the contention that the models for determining the loop and switching

16  rates are linked, GCI argues that the RCA erred by failing to input the adopted cost of

17  capital into the switching model and then run both models in tandem. GCI concludes

18  that "the rates for both loop and switching do not conform to the RCA's own TELRIC

19  rulings from the arbitration." [GCI Brief, at 49.] As detailed below, GCI's claim for relief

20  should be rejected for numerous reasons. Among others: GCI improperly focuses its

21  appeal on its revised position instead of the original position it presented to the RCA;

22  GCI's claim for a revision of the switching rate has been preempted by the FCC rules

23  establishing a mandatory rate for that element and eliminating the obligation to provide

24  UNE access to that element; the FCC's adoption of a switching rate severed any

25  connection between the arbitrated loop and switching models; and the adopted UNE

26

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

33

1    loop rate is TELRIC-compliant. This court should find that the RCA did not act arbitrarily

2    and capriciously in rejecting GCI's proposed loop and switching rate recalculation

3    exercise.

4

5    **B. RCA Procedural Background and the FCC's Evolving Approach to Switching.**

6        **1. The FCC's Original Impairment Findings.** In the Telecommunications Act,

7    Congress delegated authority to the FCC to determine which network elements should

8    be made available as UNEs based on a consideration of: 1) whether access to the

9    particular element was "necessary" (in the case of proprietary elements), and 2) whether

10   the failure to provide access to any element would "impair" the ability of competing

11   carriers to provide services. 47 U.S.C. § 251(d)(2). Pursuant to that authority, the FCC

12   promulgated a regulation requiring all incumbent carriers to provide unbundled access

13   to switching and transport (among other elements). Former 47 C.F.R. § 51.319 (as

14   amended at 62 Fed. Reg. 45587, Aug. 28, 1997). However, the Supreme Court vacated

15   that regulation, finding that "the FCC did not adequately consider the 'necessary and

16   impair' standards when it gave blanket access to these network elements...." AT&T

17   Corp. v. Iowa Utilities Board, 525 U.S. 366, 387-92, 119 S.Ct. 721, 734-36 (1999).

18       **2. The FCC's Revised Impairment Findings.** In response to the Supreme

19   Court's ruling, the FCC revisited the issue and again made a blanket determination,

20   mandatorily applicable to the states, that access to switching and transport would be

21   required. Former 47 C.F.R. §§ 317(b)(4) and 319 (65 Fed. Reg. 2551, Jan. 18, 2000).

22   In 2002, the D.C. Circuit Court of Appeals remanded these findings as well, concluding

23   that it was improper to adopt a uniform national rule "without regard to the state of

34

competitive impairment in any particular market." <u>United States Telecom Ass'n v. FCC</u>, 290 F.3d 415, 422 (D.C. Cir. 2002).

**3. The FCC's Third Impairment Findings.** In response to this ruling, the FCC revised its definition of "impairment" and again made nationwide impairment findings with respect to mass market switching[14] and dedicated transport,[15] but this time the FCC made its findings provisional and delegated authority to state commissions to make impairment findings for their own markets. *Triennial Review Order*, at ¶¶ 84, 190-96, 359-60, 419. Once again, however, the FCC's actions failed to pass judicial review. In an opinion issued on March 2, 2004, the D.C. Circuit vacated the national impairment findings regarding switching and transport. <u>United States Telecom Ass'n v. FCC</u>, 359 F.3d 554, 568-71, 573-74 (D.C. Cir. 2004) (<u>USTA II</u>). The court also ruled that the FCC could not subdelegate to the states its authority to make impairment findings. <u>Id.</u>, at 568.

**4. ACS' Position Re: Switching.** Since GCI possessed its own switching and transport facilities and had never leased those elements as UNEs from ACS [Box 03, at 1131 (Carroll Test.), 2824 (Tindall Test.); Box T1, at 2940 (Mercer Test.), 3103 (Tindall Test.)], it was ACS' basic position, asserted repeatedly throughout the course of this proceeding, that GCI was not impaired by the lack of access to those elements

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

---

[14]     The "mass market" consists of residential and small business users. *Triennial Review Order*, at ¶ 430.

[15]     "Dedicated transport" refers to "the transmission facilities between incumbent LEC switches." *Triennial Review Order*, at ¶ 366.

35

1    and that ACS should not be obligated to provide unbundled access to them.[16] [Box 03,

2    at 1309-12, 2634 (Pratt Test.); Box 04, at 254-57 (Pratt Test.)]

3

4    **5. The RCA's Arbitration Rulings and ACS' Petition for Reconsideration.** On

5    June 25, 2004, the RCA issued its arbitration rulings. [Box 04, at 1321-1408 (Order No.

6    42).] Based on GCI's revised version of ACS' loop cost model (ACS 7.2-G), the RCA

7    adopted a definitive UNE loop rate of $19.15 (later reduced to $18.64 to correct for two

8    mathematical errors). [Box 04, at 1371, 1399 (Order No. 42), 1835 (Order No. 46).] With

9    respect to switching and transport, the RCA adopted GCI's proposed cost model with

10

11   some revisions, and it directed the parties to run the model with those changes to

12   recompute those rates. [Box 04, at 1374 (Order No. 42).]

13       ACS then petitioned for reconsideration, again arguing that the RCA did not have

14   the legal authority to require ACS to provide switching and transport, and it asked the

15

16   [16]    Prior to the November 2003 arbitration hearing, ACS argued (both in a

17   motion and in opposition to a GCI motion) that new rates for switching and
transport should not be arbitrated until after the RCA ruled on the impairment

18   issues in a separate docket (RCA Docket R-03-07). [Box 03, at 3276-79; Box 04,
at 638-41.] The RCA denied ACS' request, ruling that it was required to set rates

19   until it had concluded its own proceeding to rebut the FCC's national impairment

20   findings. [Box 04, at 771 (Electronic Order).]

21       On March 16, 2004, following the vacation of the FCC's impairment

22   findings in USTA II, but prior to the RCA's arbitration rulings, ACS filed a motion
asking that the determination of switching and transport rates be stayed. [Box 04,

23   at 821-27.] The RCA denied the motion, since the federal court's mandate itself
had been stayed. [Box 04, at 857-62 (Order No. 39).]

24

25       Two months later, on June 10, 2004, ACS notified the RCA that the
court's ruling in USTA II had become final. [Box 04, at 1309-10.] ACS argued

26   that the FCC's national impairment findings had been vacated and that the RCA
had no authority either to decide impairment issues or to require ACS to provide
GCI with UNE access to switching and transport. [Id.]

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

36

RCA to delete that portion of its order addressing switching and transport. [Box 04, at 1409-18.]

**6. The FCC's Interim Rules.** On August 20, 2004, the FCC issued an order seeking comment on how to respond to the D.C. Circuit's decision in <u>USTA II</u>.[17] As an interim measure pending its adoption of new rules, the FCC adopted a two-phase plan: 1) For the first six months following September 13, 2004,[18] ILECs would be required to provide UNE access to switching and dedicated transport at the same rates provided in their interconnection agreements as of June 15, 2004 (<u>i.e.</u>, prior to the RCA's arbitration rulings). *Order and Notice*, at ¶ 29.  2) For the six months after that, ILECs would be required to provide access to transport at defined rates, but would only be required to provide switching as a component of "UNE platform,"[19] also at defined rates.[20] <u>Id.</u> Further, ILECs would only be required to provide switching and transport to serve the competitors' existing customers, <u>i.e.</u>, competitors would not be permitted to add new customers at these rates. <u>Id.</u>

---

[17]    In the Matter of Unbundled Access to Network Elements, Order and Notice of Proposed Rulemaking, WC Docket No. 04-313, CC Docket No. 01-338, 19 FCC Rcd 16783 (released Aug. 20, 2004) (hereinafter "*Order and Notice*").

[18]    The *Order and Notice* specified a six-month period beginning with the Federal Register publication of the order. *Order and Notice*, at ¶ 29. That publication date was September 13, 2004. 69 Fed. Reg. 55,128 (2004).

[19]    UNE platform, or UNE-P, is a complete package of UNEs that allows the competitor to provide service without using any of its own facilities.

[20]    For transport, rates were set at the higher of 115% of the rate in effect on June 15, 2004,  or 115% of any rate adopted thereafter. <u>Id.</u> For switching, rates were set at the higher of the UNE-P rate in effect on June 15, 2004, plus one dollar, or any UNE-P rate adopted thereafter, plus one dollar. <u>Id.</u>

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

The FCC's stated purposes in adopting these interim rules was to "stabilize the market" and address "the pressing need for market certainty." Id., at ¶¶ 1, 16.

**7. GCI's First Proposal to Recalculate the Loop Rate.** The RCA asked the parties to comment on the impact of the FCC's new interim rules. [Box 04, at 1909-12 (Order No. 47).] In their responses, both ACS and GCI agreed that the FCC's new rules preempted the RCA's arbitration rulings on switching and transport rates, since ACS was now required to provide those elements at the pre-arbitration rates. [Box 04, at 1917, 1924-26.]

GCI, however, asserted that because of the linkages between the loop and switching rate models, the loop rate must be recalculated to reflect both: 1) the cost values associated with the pre-arbitration switching rate now mandated by the FCC, and 2) the cost inputs arbitrated in this proceeding (e.g., cost of capital). [Box 04, at 1927-28 & n.8, 1942-45.] GCI proposed that the parties' modeling personnel meet to see if they could agree on the model runs. [Box 04, at 1928.] GCI further argued that the loop rate would have to be changed to reflect any future changes in the switching rate. [Box 04, at 1926, n.5, 1945 & n.3.]

ACS opposed GCI's proposal to recalculate the loop rate on numerous grounds. Among other things, ACS argued that the switching rate now mandated by the FCC did not have any relationship to the loop rate arbitrated by the RCA and that there was no rational way to recalculate a TELRIC-compliant loop rate based on the old non-TELRIC-compliant switching rate. [Box 04, at 1933-35.] Since the mandated pre-arbitration switching rate was not calculated with either the model or the cost inputs adopted in this

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

proceeding, any relationship that may have existed between the loop and switching rates in this proceeding had been severed. [Box 04, at 1933-34.] ACS also observed that GCI's proposed approach would require repeated recalculation and re-arbitration of the loop rate as the switching rate continued to evolve. [Box 04, at 1936.]

**8. The RCA's Ruling.** In view of the FCC's interim rules and the parties' agreement on the issue, the RCA denied ACS' petition for reconsideration of its obligation to provide UNE access to switching and transport and ruled that the switching and transport rates in effect on June 15 would remain in effect. [Box 04, at 1956-59 (Order No. 49).] The RCA also denied GCI's request to modify the adopted UNE loop rate. [Box 04, at 1959-62.] The RCA reasoned that the FCC's interim rules did not require a recalculation of all other rates that may be indirectly affected by changes to the switching and transport rates. [Box 04, at 1961.] The RCA was also concerned that the switching rate was subject to future changes by either the FCC or the courts. [Id.] Accordingly, the RCA concluded, "We believe that it is appropriate at this time to provide some stability in the loop rate by decoupling it from further fluctuations in switching and transport that may occur from developments outside of our control." [Id.] The RCA further noted that it had adopted GCI's switching and transport model virtually intact, with all cost inputs (including cost of capital), and that GCI had failed to object to that portion of the order during the reconsideration period. [Id.] Given the FCC's preemption of the arbitrated switching and transport rates, the RCA also found that there would be little benefit in re-running that model since the only usable rates that would be generated would be for signaling. [Box 04, at 1961-62.] Instead, the RCA adopted the signaling

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1   rates proposed by GCI in its direct case. [Box 04, at 1962.]

2       **9. GCI's Second Proposal to Recalculate the UNE Loop Rate.** GCI petitioned

3   for reconsideration of the RCA's order and again asked that the loop rate be

4
5   recalculated. [Box 04, at 1967-74.] However, abandoning its previous argument that the

6   loop rate should be recalculated to reflect the pre-arbitration switching rate mandated

7   by the FCC, GCI argued only that the loop rate should be recalculated to reflect the

8   switching cost inputs as determined in this proceeding. [Box 04, at 1967 & n.1] GCI

9
10  noted that the loop rate would fall twenty-two cents to $18.42 if this exercise were

11  followed. [Box 04, at 1969.]

12      Again, ACS opposed GCI's request on a variety of grounds, and the RCA denied

13  it, finding that it was untimely and concluding that GCI had failed to show that the RCA's

14  decision was unreasonable, erroneous, unlawful, or otherwise defective. [Box 04, at

15  1975-94 (ACS' Opp.), 2000-02 (Order No. 50).]
16

17      **10. The FCC's Revised Rules.** On February 4, 2005, the FCC issued a new

18  order and adopted revised rules providing for the transition away from the use of mass

19  market switching.[21] The FCC ruled that ILECs have no obligation to provide unbundled

20  access to that element, but provided for a twelve-month transition period (beginning

21
22  March 11, 2005) during which switching would remain available as a component of

23

24

25

26  [21]    In the Matter of Unbundled Access to Network Elements, Order on
    Remand, WC Docket No. 04-313, CC Docket No. 01-338, 20 FCC Rcd 2,533, at
    ¶ 5 (released Feb. 4, 2005) (hereinafter "*Remand Order*").

40

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

UNE-platform for twelve months after March 11, 2005, at defined rates.[22] *Remand Order*, at ¶¶ 5, 235.

## C. This Court's Focus Should be on GCI's Original Position, Not its Position on Reconsideration.

**1. GCI's Changing Positions.** When the RCA asked for the parties' positions respecting the impact of the FCC's August 2004 interim rules, GCI took the position that the loop rate must be recalculated to reflect both: 1) "the investment and cost values associated with the switching rate in the existing Anchorage agreement," i.e., the FCC-mandated rate, and 2) the cost input decisions (including cost of capital) made in this arbitration. [Box 04, at 1927-28 & n.8, 1942-45.] When the RCA rejected that proposal [Box 04, at 1961 (Order No. 49)], GCI moved for reconsideration and proposed that the loop rate be amended to reflect only the investment inputs arbitrated in this proceeding. [Box 04, at 1967-74.] This is the position that GCI now takes in this action.

By focusing on its revised position on this issue, GCI seeks to divert this court from its original position and the reasonableness of the RCA's decision with respect to that original position. However, the focus of this appeal should be on the decision made by the RCA in response to GCI's original position. Under the RCA's rules, a petition for reconsideration is not a vehicle for presenting a new position, much less for presenting a position that contradicts the party's prior position. Re: Cook Inlet Pipeline Co., 8 APUC 401, 402 (1988). In this instance, GCI's reconsideration position was fundamentally

---

[22]    Switching rates for this transition period were set at the higher of the UNE-P rate in effect on June 15, 2004, plus one dollar, or any UNE-P rate adopted thereafter, plus one dollar. *Remand Order*, at ¶ 5.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

different from its original position. Having taken one position before the RCA and lost, GCI should not be permitted to revise that position on reconsideration and then ignore its original position on appeal. See Peterson v. Highland Music, Inc., 140 F.3d 1313, 1318 (9th Circuit 1998)(recognizing that a party may waive a position by "sandbagging"). Cf., GTE South Inc., v. Morrison, 6 F.Supp.2d 517, 529 (E.D. Va. 1998)(party waived argument in favor of historical costs when it advocated a forward-looking cost measure before the state commission). GCI is not entitled to a second bite at the apple.

**2. GCI's Proposal Was Inherently Inconsistent.** In taking its original position that the loop rate should be amended to reflect **both** the cost values associated with the FCC-mandated switching rate **and** the cost values arbitrated in this arbitration, GCI was proposing the use of two different sets of costs for the same inputs. GCI never explained how two mutually exclusive sets of cost values could be used to populate a single set of inputs. Its proposed approach was confusing and apparently irrational.

**3. GCI's Proposal Was Irrational and Violated TELRIC.** GCI's proposal to determine cost input values based on the FCC-mandated switching rate was defective for other reasons. Since that rate was based on the rate that existed prior to the arbitration, it was not produced with either the model or the cost inputs arbitrated in this proceeding. Thus, there was no relationship between the calculation of the required switching rate and the arbitrated loop rate, and there was no rational way to synchronize them. [See Box 04, at 1943-45 (ACS' Reply to GCI's Response).]

Additionally, as set forth in more detail in ACS' companion Cross-Petition Brief Re: Delay and Interim Rate Issues, also filed on this date, the pre-existing switching rate

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

42

1  was not TELRIC-compliant because it was not produced using a TELRIC methodology.

2  Therefore, any attempt to amend the loop rate based on cost inputs derived from the

3  switching rate would only produce a non-TELRIC-compliant loop rate. [Id.]

4

5  **4. GCI's Proposal Would Have Produced Instability and Uncertainty.**

6  Additionally, GCI originally took the position that the loop rate would have to be revised

7  to reflect future changes in the switching rate arising as a result of either court action or

8  the FCC's modification of its rules. [Box 04, at 1926, n.5, 1945 & n.3.] While GCI now

9  faults the RCA for "decoupling" the loop rate from the switching rate, that decision was

10

11  reasonable in view of GCI's proposal and the FCC's ever-evolving approach to

12  switching. Given the long history of the FCC's changing approach to switching, the

13  interim nature of the FCC's August 2004 rules, and the prospect of yet more changes,

14  it was reasonable for the RCA to conclude in September 2004 that the loop rate should

15

16  be determined separately from the switching model and rate.

17  The RCA's decision was fully consistent with the FCC's goals in adopting the

18  August 2004 interim rules. In view of the courts' repeated rejections of its switching and

19  transport rules, the FCC adopted the interim rules to "stabilize the market" and address

20  "the pressing need for market certainty." *Order and Notice*, at ¶¶ 1, 16. The FCC did not

21  intend to introduce instability and uncertainty into other rates by requiring that they be

22

23  recalculated to reflect the new switching rates. Consistent with the FCC's goals, the

24  RCA reasonably concluded that it was "appropriate at this time to provide some stability

25  in the loop rate by decoupling it from further fluctuations in switching and transport."

26  [Box 04, at 1961 (Order No. 49).] The RCA was expressly concerned about further

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

43

1  federally mandated changes to the switching and transport rates arising from future FCC

2  or court action. [Id.] The wisdom of the RCA's decision to separate the loop from the

3
4  switching rate is validated by the fact that the FCC later (in February 2005) adopted new

5  temporary switching rates and completely eliminated the obligation to provide switching

6  following a transition period. *Remand Order*, at ¶¶ 5, 235.

7      **5. The RCA's Decision Was Not Arbitrary and Capricious.** At bottom, GCI's

8  original proposal to modify the loop rate was confusing, inherently inconsistent,

9
10 irrational, and contrary to the goals of stability and certainty. Given these problems, it

11 was not arbitrary and capricious for the RCA to reject GCI's original proposal to modify

12 the arbitrated loop rate.

13 **D. GCI's Current Challenges to the Switching and Loop Rates Are Meritless.**

14     **1. The RCA's Determination of Switching Rates Has Been Preempted.**

15
16 Beginning in March 2006, the FCC has eliminated ACS' obligation to provide any UNE

17 access to switching. For the periods prior to that, it has limited the type of switching

18 access that must be provided, it has limited the customers GCI may serve with UNE

19 switching, and it has mandated the UNE rates that may be charged. By virtue of these

20 actions, the FCC has preempted the RCA's authority over switching rates, thereby

21 rendering GCI's claim moot. Moreover, since GCI previously agreed that the RCA's

22
23 authority over switching rates had been preempted by the FCC's August 2004 interim

24 rules, GCI has waived any right to now argue that the RCA should revise the switching

25 rates. [Box 04, at 1924-26 (GCI's Response to Order No. 47).] Additionally, since GCI

26 has never leased UNE switching from ACS, recalculation of the switching rate would be

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

44

pointless. [Box 03, at 1131 (Carroll Test.)]

**2. GCI's Claim is Founded on an Incorrect Legal Premise.** Contrary to the premise of GCI's argument, there is no requirement that the same cost of capital be used for determining loop and switching rates. As a general matter, the cost inputs for loop and switching differ dramatically given the different network components, competitive risks, and economies of scale and scope pertinent to those elements. Accordingly, the FCC has stated that "the risk-adjusted cost of capital need not be uniform for all elements."[23] *Local Competition Order*, at ¶ 702. See also *Triennial Review Order*, at ¶ 683 (reaffirming that principle).

**3. By Mandating Switching Rates, the FCC Severed Any Connection Between the Loop and Switching Rates.** GCI's claim for relief is based on the premise that there is a linkage between the investments used to calculate the loop and switching rates. However, the FCC severed whatever connection may have existed between those rates by mandating new switching rates (UNE and UNE-P). Since the mandated rates are based on the rates that existed prior to this arbitration, they were not calculated using the same methodology used to determine the loop rate. Moreover, since the switching rates are not based on a TELRIC-compliant methodology, their

[23]    While GCI asserts that ACS' investment in switching is more risky than investment in loop facilities because of the competition from GCI's own switch, it would not be unreasonable to ascribe a lower cost of capital to switching as compared to loop. Since GCI has never used ACS' switching [Box 03, at 1131 (Carroll Test.)], that risk had already been absorbed into ACS' business and the cost of capital proposed by GCI for that element. By contrast, a higher cost of capital was appropriate for loop investment since ACS was facing the new risk of a substantial migration of customers from its loops to GCI's cable telephony network.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1  connection to the loop rate is further attenuated. Given the required use of the FCC-
2  mandated rates, it makes little sense to try to synchronize the loop rate with the
3  investment associated with an arbitrated switching rate that is not even being charged.
4
5      In mandating new switching rates, the FCC was not concerned about any linkage
6  with loop or other UNE rates, and it did not direct any corollary changes to other UNE
7  rates. Instead, it was focused on the goals of stability and market certainty. Accordingly,
8  the RCA concluded that the FCC's interim rules do "not require a recalculation of all
9  other rates that may be indirectly affected." [Box 04, at 1961 (Order No. 49).] The RCA's
10
11  conclusion was reasonable.
12      **4. GCI's Claim is Based on a Revised, Unapproved Switching Model.** With
13  minor revisions, the RCA adopted GCI's proposed loop and switching cost models. [Box
14  04, at 1328-32, 1374 (Order No. 42).] However, following the arbitration, GCI submitted
15  a revised version of its switching model that included additional modifications beyond
16
17  those ordered by the RCA. [Box 04, at 1982, 1988, 1992-94 (ACS' Opp. to Pet. for
18  Recon.)] Those modifications, which included links so that the models could be run in
19  tandem,  were not subject to the arbitral process and have never been approved by the
20  RCA.
21
22      Moreover, when GCI sought to add those links, its revisions were not clear and
23  ACS was unable to verify GCI's changes or duplicate the revised model results. [Id.]
24  Therefore, the revision of GCI's switching model posed an issue of unresolved dispute
25  and continuing controversy. To avoid yet more rounds of arbitration and bring this long-
26  protracted proceeding to a conclusion, it was reasonable for the RCA to decide not to

46

1    re-open the loop rate issue.

2         **5. The Adopted Loop Rate is TELRIC-Compliant.** In its pleadings before the
3
4    RCA, GCI stated that a revision of the loop rate to reflect the arbitrated cost inputs
5    would result in a twenty-two cent decrease of that rate from $18.64 to $18.42, or slightly
6    more than 1%. [Box 04, at 1969 (GCI's Pet. for Recon.)] Given the fundamentally
7    imprecise nature of the hypothetical TELRIC methodology, a 1% margin of error is well
8    within the acceptable range of reasonable accuracy.

9         In accordance with the standards of review set forth in Part IV.B., above, there
10
11   is no basis for reversing the RCA's refusal to recalculate the loop rate. When reviewing
12   rate determinations, the question is whether the final rate satisfies the governing
13   standards. "The fact that the method employed to reach that result may contain
14   infirmities is not then important." FPC v. Hope Natural Gas Co., 320 U.S. at 591, 64
15   S.Ct. at 288. As the FCC recognized, "a reasonable application of TELRIC principles"
16
17   can produce a "range" of acceptable results. NPRM, at ¶ 26. Applying these standards,
18   this court should find that the loop rate complies with TELRIC, and it should reject the
19   claim that the RCA acted arbitrarily and capriciously in refusing to modify that rate.
20
21        **6. GCI's Request for Recalculation of the Loop Rate Was Untimely.** GCI did
22   not ask the RCA to revise the loop rate based on any alleged linkage to the switching
23   rate until almost four months after the RCA issued its arbitration rulings, when GCI filed
24   its response to the RCA's request for comments on the FCC's interim rules. [Box 04, at
25   1924.] The RCA rejected that request, in part finding that  GCI had failed to raise that
26   objection during the reconsideration period. [Box 04, at 1961 (Order No. 49).] See 3

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

47

1  AAC 48.105 (a petition for reconsideration must be filed within fifteen days).

2  GCI then sought reconsideration of that decision based on the position now
3
4  asserted in this appeal. [Box 04, at 1967-74.] The RCA also rejected that request on
5  timeliness grounds (among others), reasoning, "Our required changes to the UNE
6  switching model were clear and specific....It is regrettable that GCI nonetheless
7  assumed that additional unspecified changes would need to be made." [Box 04, at 2001
8  (Order No. 50).]
9
10  GCI now argues that the RCA should not have rejected its claim as untimely, but
11  its arguments are without merit. GCI failed to raise the issue by means of a specific
12  timely request. Although GCI filed a timely motion for reconsideration on a variety of
13  grounds, it did not raise the issue posed here. [Box 04, at 1420-42.]

14  GCI nonetheless argues that its request was not untimely since a final order
15  approving the interconnection agreement had not yet issued. However, the RCA's
16
17  arbitration order and rulings were indisputably final. The fact that GCI filed a motion for
18  reconsideration of other aspects of the RCA's order testifies to the finality of that order.

19  GCI's argument that it expected that both the loop and switching models would
20  be re-run is also ill-founded. While "regrettable" that GCI assumed additional changes
21  would be made [Box 04, at 2001 (Order No. 50)], the RCA adopted a definitive UNE
22
23  loop rate in its arbitration order. [Box 04, at 1371, 1397 (Order No. 42).] In that order,
24  the RCA made no provision for a revision of that rate or a re-run of the loop model.

25  The RCA is free to order its own procedures, and there is no basis for federal
26  court interference with the RCA's procedural decisions. The RCA's refusal to revise the

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

48

1  loop rate served the broader goals of stability and certainty, which were particularly

2  important in this proceeding given that it took almost eight years to arbitrate a TELRIC-

3
4  compliant UNE loop rate. This court should find no error in the RCA's rejection of GCI's

5  untimely request to modify the loop rate.

6  ## VII. THE RCA'S DECISION RESPECTING STRUCTURE
## SHARING WAS NOT ARBITRARY AND CAPRICIOUS.

7

8  ### A. Introduction and Procedural Background.

9  "Structure sharing" refers to the sharing of outside plant structures, such as poles

10  and trenches, by different utilities to place their lines and facilities. In this case, the

11  parties made very different proposals with respect to both the sharing and the size of

12
13  feeder trenches.[24] While ACS proposed the use of wide sloped trenches (thirteen feet

14  wide at the top) with no sharing of the structure costs, GCI proposed narrow vertical

15  trenches (two feet wide) with 35% of the trenching costs shared by other utilities. [Box

16  03, at 1334 (Cinelli Test.), 2838-40, 2846 (Fassett Test.); Box 04, at 1365 (Order No.

17  42); Box T2, at 80 (Fassett Test.); Ex. G to the Appendix filed with GCI's brief.] The RCA

18
19  charted a middle course, declaring,

20  > For purposes of this loop model, we found that trenches should be
designed to 6.6 feet at the top and 42 inches deep. They are therefore two
21  > feet wide at the bottom, leaving little room for the placement of other
equipment. We therefore assume that none of the construction costs of
22  > this network will be shared with other utilities.

23  [Box 04, at 1365-66 (Order No. 42).]

24

25  [24]    In simplified terms, local phone traffic is carried from the company's wire
26  centers (or switches) via feeder lines. The feeder lines are then transitioned into
smaller distribution lines which carry the traffic to the customer neighborhoods
and premises. [Box 04, at 1852-53 (Order No. 46, diagram).]

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

49

1    GCI petitioned for reconsideration of the RCA's ruling, asserting that it was not

2    supported by the evidence and was contrary to municipal ordinance, and ACS opposed

3    the petition. [Box 04, at 1434-37, 1481-85.] The RCA denied GCI's petition. After reciting

4

5    ACS' opposition arguments in detail, the RCA declared that it agreed with ACS, then

6    further elaborated on the municipal ordinance issue. [Box 04, at 1856-59 (Order No.

7    46).]

8    GCI now renews its challenge to the RCA's structure sharing decision. Though

9    it has abandoned its argument based on the municipal ordinance, GCI asserts that the

10

11   RCA's decision is arbitrary and without evidentiary support. GCI's arguments are without

12   merit. The RCA made a reasoned decision to use a single uniform trench size for

13   purposes of modeling the hypothetical network and reasonably concluded based on the

14   evidence before it that there was insufficient room in a trench of that size for structure

15

16   sharing. The RCA's decision on this issue should be affirmed.

17   **B. No Specific Legal Standards Apply.**

18   "Structure sharing has been a consistently difficult issue for state commissions

19   to resolve, particularly with respect to buried and underground plant," *NPRM*, at ¶ 71,

20

21   and the FCC has not given any definitive guidance on the matter. "The *Local*

22   *Competition Order* provides no guidance on this practical issue." *NPRM*, at ¶ 75.

23   Though the FCC adopted structure sharing percentages based on national averages for

24   purposes of calculating universal service support, it specifically cautioned against the

25

26

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

50

1  use of those values in other proceedings.[25] The FCC stated,

> The Commission has not considered what type of input values, company-specific or nationwide, nor what specific input values, would be appropriate for any other purposes. The federal cost model was developed for the purpose of determining federal universal service support, and it may not be appropriate to use nationwide values for other purposes, such as determining prices for unbundled network elements. We caution parties from making any claims in other proceedings based upon the input values we adopt in this Order.

Id. The FCC later noted that "[g]iven the divergence of opinion on the extent of structure sharing opportunities in the future, the Commission expressly anticipated revisiting this issue at a later date," and it requested further comment on the issue. *NPRM*, at ¶¶ 71-72, n.114. In view of this absence of definitive FCC guidance, the RCA was free to exercise its discretion on the structure sharing issue.[26]

**C. The RCA Made a Reasoned Decision Supported by the Evidence.**

GCI argues that the RCA's finding that there was no room for feeder sharing was both arbitrary and unsupported by the evidence. GCI further argues that the RCA should have adopted its feeder sharing assumption since ACS failed to carry its burden of proof on the issue. GCI is wrong on all counts.

---

[25]   In the Matter of Federal-State Joint Board on Universal Service, Tenth Report and Order, CC Docket No. 96-45, 14 FCC Rcd 20,156, at ¶ 32 (released Nov. 2, 1999)(hereinafter "*USF Inputs Order*").

[26]   GCI cites to the structure sharing decisions made in the *Verizon Virginia Order* [GCI Brief, at 54], however, that decision is of limited precedential value insofar as the Wireline Competition Bureau found that neither party had made a sufficient showing on the issue and (pursuant to the rule of baseball arbitration applied in that proceeding) simply adopted the party's proposal that was closest to the values adopted in the *USF Inputs Order*. *Virginia Arbitration Order*, at ¶¶ 284, 287-88.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

51

1    With respect to the burden of proof, GCI mischaracterizes the issue and

2   misconstrues the parties' respective obligations. Paragraph 680 of the FCC's *Local*

3   *Competition Order* states that "incumbent LECs [e.g., ACS] must prove to the state
4
5   commission the nature and magnitude of any forward-looking cost that it seeks to

6   recover in the prices of interconnection and unbundled network elements." As detailed

7   below, ACS satisfied that burden by presenting its feeder network design and

8   quantifying the costs of constructing that network. To the extent that GCI believes that
9
10  ACS' proposed costs should be adjusted to reflect greater structure sharing

11  opportunities, GCI bore the burden of offering sufficient evidence to support its own

12  sharing assumptions. GCI cannot just raise the issue, then demand the adoption of its

13  own feeder sharing assumptions without presenting evidence to support it. Thus, the

14  ultimate question is whether the RCA's decision finds support in the record. See AT&T
15
16  Commun. of Cal., Inc. v. Pacific Bell Tel. Co., 228 F.Supp.2d 1086, 1099 n.11 (N.D. Cal.

17  2002), *rev'd in part on other grounds*, 375 F.3d 894 (9th Cir. 2004)(an argument that the

18  ILEC failed to respond to the competitor's challenge to its costs raises a question of the

19  substantive merits of each party's argument, not a burden of proof issue).

20
     In this instance, this court should find that the RCA's decision was supported by
21
22  the record. ACS' proposed feeder network design and construction costs were based

23  on accepted civil engineering standards. [Box 03, at 1338-40 (Cinelli Test.)] On a

24  forward-looking basis, ACS produced the "real costs that are actually incurred by ACS

25  for this type of construction." [Box 03, at 1339.] In support of its proposed design, ACS
26
    presented an engineer's drawing of a typical two-foot wide trench section containing two

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

ducts (or conduits). [Box 04, at 316.] ACS engineer Greg Schmid testified that one duct is placed for cable and the other is placed for a maintenance spare. [Box 03, at 891-92.] ACS proposed that none of the feeder structure costs be shared with other utilities. [Box 04, at 1365 (Order No. 42); Ex. G to the Appendix filed with GCI's brief.]

ACS further proposed that feeder network be constructed using wide sloped trenches (thirteen feet wide at the top). [Box 03, at 1334 (Cinelli Test.).] By contrast, GCI proposed the use of vertical trenches that were only two feet wide. [Box 03, at 2838-40 (Fassett Test.); Box T2, at 80 (Fassett Test.)] Finding that feeder trenches were not always thirteen feet wide or always two feet wide, the RCA rejected both parties' proposals and instead modeled the hypothetical TELRIC network using an average feeder trench 6.6 feet wide at the top, two feet wide at the bottom, and forty-two inches deep. [Box 04, at 1359, 1365-66 (Order No. 42).] Given these contours, the RCA reasonably concluded that there would not be sufficient room to allow for sharing and the placement of other equipment. [Box 04, at 1366.]

In addition to the evidence presented by ACS, the RCA's decision was further supported by the engineer's drawings submitted by GCI. [Box 04, at 1450.] The drawing details depicting multiple utility conduits also showed the use of Lamson and Sessions conduit spacers and concrete encasement. [Id.; Box 04, at 1494-95 (Cinelli Aff.)] That type of construction is considerably more expensive ($60.96 to $91.44 per linear foot) than the trenching assumed by the RCA for modeling purposes ($37.65 per linear foot). [Box 04, at 1494-95.] Thus, while multiple conduits can be placed in narrow trenching using that type of construction, the costs would be more expensive than the costs used

53

1 for calculating the loop rate even with sharing factored in.

2 GCI's drawings also show that the placement of multiple conduits requires a
3
4 trench depth of forty-six inches. [Box 04, at 1450.] Since the RCA adopted a standard
5 trench depth of only forty-two inches, there would be inadequate room to accommodate
6 additional conduit and sharing.

7 For its part, GCI did not offer a compelling case in support of its claim that 35%
8 of feeder construction costs should be shared by other utilities. Its witness on this issue
9
10 testified only that "it is not uncommon to have three or more utilities share the trench."
11 [Box 03, at 2845 (Fassett Test.)] Based on that conclusory statement, "GCI assumed
12 the telephone company would be responsible for 65% of buried and underground
13 structure cost." [Box 03, at 2846.] GCI offered no concrete evidence to quantify the
14 amount of sharing that actually occurs, for example, by identifying either the feeder
15 routes where sharing would be likely or the utilities that would share the trenches. To
16
17 say that up to three utilities may share a trench tells nothing about how often that
18 sharing would actually occur.

19 Based on the record before it and its own expertise, the RCA made a reasoned
20 trade-off between the costs associated with feeder trench size and structure sharing.
21 The effect of the RCA's chosen approach was to achieve cost savings through the use
22
23 of less expensive, narrow trenches, as opposed to achieving those savings through
24 sharing the costs of constructing more expensive, wide trenches. The RCA's decision
25 was supported by the evidence and was not arbitrary and capricious.
26

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

54

## VIII. THE RCA'S DECISIONS RESPECTING THE RATES FOR
## NON-RECURRING COSTS WERE NOT ARBITRARY AND CAPRICIOUS.

### A. Introduction.

Non-recurring costs, or "NRCs," refer to the one-time expenses incurred by ACS to process and fill a competitor's orders for service. [Box 03, at 902-03 (Eldred Test.); Box 04, at 1375 (Order No. 42). These costs would not be incurred by ACS but for the competitor's orders. [Box 03, at 913-14 (Eldred Test.)] In simple terms, NRCs are a function of the tasks that need to be performed to process the service orders and the time it takes to complete those tasks. [see Box 03, at 902-03 (Eldred Test.)]

GCI now challenges the determination of NRC rates on three grounds. GCI argues that the RCA erred by: 1) using ACS' proposed model to calculate the rates instead of GCI's; 2) failing to calculate NRC rates based on the assumption that service orders would be processed using an electronic Operation Support Systems ("OSS") interface between the two companies; and 3) failing to calculate rates based on the assumption of 100% dedicated inside and outside plant ("DIP/DOP"). As detailed below, all of GCI's arguments are meritless. The RCA did not act arbitrarily and capriciously in determining the NRC rates and its decisions should be upheld.

### B. The RCA Appropriately Selected ACS' Proposed NRC Model.

Both parties proposed models for the calculation of NRC rates, and the RCA chose to use ACS' model.[27] [Box 04, at 1375-76 (Order No. 42).] The RCA found that

---

[27]     ACS proposed a model that it had developed, referred to in the testimony as the Non-Recurring Cost Study, or NRCS. GCI proposed the AT&T/WorldCom Non-Recurring Cost Model, or NRCM.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1   GCI's model was not well-supported in the record and that it incorporated inappropriate

2   assumptions regarding the level of automation and the degree of DIP/DOP. [Id.] GCI's

3
    claim that the RCA erred in selecting ACS' model should be rejected for the following
4

5   reasons:

6       First, the question of model selection is not the real issue. Both of the models

7   proposed by the parties are simply sets of spreadsheets, and the key issues concern

8   the inputs and assumptions to be incorporated into the chosen model. [Box 03, at 1452
9
    (Wilks Test.), 2526 (Eldred Test.); Box T1, at 576-77, 656, 985, 1470-71 (Hrg. Tr.)]
10

11  Thus, the determinative issues here concern the assumptions that should be made

12  respecting the OSS interface and level of DIP/DOP, not the choice of models.

13      Second, consistent with the fact that it is the inputs and assumptions that are key,

14
    GCI stipulated to the use of ACS' model. In a hearing held in February 2003, the parties
15

16  presented evidence on their respective models and GCI agreed to the use of ACS'

17  model. [Box T1, at 565-68, 1470 (Hrg. Tr.); Box 02, at 1339, 1348 (GCI Post-Hrg. Brief;

18  Box 03, at 1446, 1452 (Wilks Test.), 2533-35 (Eldred Test.)] Pursuant to that stipulation,

19  ACS modified its model spreadsheets to incorporate the work functions from GCI's

20
    model, thereby allowing the ACS model to incorporate whichever inputs and
21

22  assumptions were ultimately arbitrated by the RCA. [Box T1, at 567-68 (Hrg. Tr.); Box

23  03, at 2534 (Eldred Test.); Box 04, at 69 (Weiss Test.)] Though GCI sought to renege

24  on its stipulation at the arbitration, it should be held to its agreement.[28] [Box 04, 69-70.]

25

26  [28]     As detailed in ACS' companion Cross-Petition Brief Re: Delay and Interim
    Rate Issues, also filed on this date, the arbitration hearing was preceded by
    years of proceedings supervised by an appointed arbitrator. The NRC model

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

Third, considered on its merits, GCI's proposed model was inferior to ACS' in many ways. [see generally Box 03, at 1227-28, 1247-1275 (Cellupica Test.)] For example, GCI's model is a "black box." [Box 03, at 2522-26 (Eldred Test.)] Its calculations are concealed from view, and many of its work elements and assumptions, including its assumption of 100% DIP/DOP, are hard-coded, i.e., cannot be changed. [Id.] By contrast, ACS' model is transparent and all of its inputs can be changed. [Box 03, at 2525-26.] GCI's model also omits some rate elements and cannot be adjusted to add them, and no costs are calculated for 104 of the 202 work activities in the model. [Box 03, at 2519-21.] Additionally, many of the work function time estimates included in GCI's model are unrealistic and are based on subjective opinion, for which no verification or source documentation was provided. [Box 03, 2526-27 (Eldred Test.), 1274-75, 2604 (Cellupica Test.); Box 04, at 168 (Eldred Test.)] See *Virginia Arbitration Order*, at ¶¶ 570-71. By contrast, ACS' time estimates were based on concrete data such as time and motion studies and time records. [Box 03, at 1219 (Cellupica Test.), 2527 (Eldred Test.)] GCI also made undisclosed changes to the default time estimates used in its generic model. [Box 03, at 1205-07 (Cellupica Test.); Box 04, at 168 (Eldred Test.)]

Fourth, GCI's model was designed for large telephone companies, and it

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

stipulation was reached during the course of those proceedings in February 2003. Finally recognizing the lack of progress, the RCA took control of the proceedings in June 2003 and ordered an arbitration hearing before the Commission itself to resolve any "disputed" issues. [Box T-1, at 2244.] Nothing in that order authorized the parties to renege on stipulations already reached. The model selection issue should be deemed resolved.

produces rates based on assumptions, inputs, and processes inappropriate for medium and small companies like ACS. [Box 03, at 1217, 1219, 1226, 2602-03 (Cellupica Test.)]

In the face of this record, GCI argues that the RCA erred in finding that its model was not well-documented or supported since it had submitted a 165-page NRC Model Technical Assumptions Binder. However, GCI failed to include the disclaimer that the Binder was only a "Working Draft in Progress" that had not been updated in years. [Box 03, at 2606 (Cellupica Test.)] Given the strong evidence against GCI's model, the RCA was not obligated to accept it based only on the Binder.

GCI also argues that its proposed model had been adopted in the Virginia Arbitration and by the RCA in the Fairbanks/Juneau UNE arbitration. However, as set forth below in Parts VIII.C.2. and D., the model has also been rejected by a number of state commissions on very sound grounds. With respect to the Virginia Arbitration, the Wireline Competition Bureau accepted the model as the lesser of two evils, finding that the other proposed model was more complex and difficult to analyze and was plagued by methodological errors. *Virginia Arbitration Order*, at ¶¶ 570-80. With respect to the Fairbanks/Juneau arbitration, the acceptance of GCI's model was founded on the arbitrator's inability to determine whether the model proposed by ACS – which was different than the model proposed in this proceeding -- complied with the FCC's forward-looking cost methodology. [Ex. F to the Appendix filed with GCI's brief, at 6.] The RCA was obligated to decide this case based on the record presented in this case, and it was not constrained by any deficiencies in an evidentiary presentation made years ago in another docket by other ACS companies. It is also inconsistent for GCI to argue that it

58

1 is not bound by the model stipulation entered in this case but that ACS should be bound

2 by a decision made in another docket.

3       Based on the models and evidence presented in this proceeding, the RCA had

4 reasonable grounds for choosing ACS' model to calculate NRC rates. While GCI may

5

6 disagree with that decision, it has no basis for claiming that the RCA acted arbitrarily

7 and capriciously.

8 **C. The RCA Properly Refused to Calculate NRC Rates Based on the Electronic**

9 **OSS Interface Proposed by GCI.**

10      The RCA calculated two menus of NRC rates: one based on the assumption that

11 service orders would be processed using an electronic Operation Support Systems

12

13 ("OSS")[29] interface between the companies and one based on the assumption that

14 orders would be processed non-electronically.[30] [Box 4, at 2037-39 (Interconnection

15 Agree. Price Schedule).] GCI now challenges this decision on two grounds. First, it

16 argues that the RCA should have adopted only one menu of NRC rates based on an

17
assumed electronic OSS interface. Second, it argues that the RCA based the electronic

18
rate menu on the wrong interface. GCI is wrong on both counts.

19

20      **1. A "Non-electronic" Rate Menu is Required.** Contrary to GCI's claim, non-

21 electronic rates are required for two reasons. First, even with a fully-electronic OSS

22 interface, both parties agreed that some orders will "fall out," requiring manual

23

24 [29]     OSS refers to the systems and data required to provide basic NRC

25 functions such as ordering and provisioning. *Triennial Review Order*, at ¶ 561.

26 [30]     In fact, the "non-electronic" rates are based on the use of some electronic
systems currently used by ACS. [Box 03, at 904-05 (Eldred Test.), 1219
(Cellupica Test.)]

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

59

intervention and processing. [Box 03, at 904-06 (Eldred Test.); 3220 (Weiss Test.) (proposing fallout rates of 5% for simple orders and 20% for complex orders).] "Fall out" can occur for a variety of reasons, including: problems with the competitor's software and hardware, errors in ACS' software, and the competitor's operational inefficiency. [Box 03, at 904-06.] Additionally, all services cannot be ordered and provisioned using an electronic interface, e.g., complex business orders and orders involving special access circuits. [Box 03, at 904-05 (Eldred Test.), 1220-21 (Cellupica Test.)] Non-electronic rates are required to price service orders in these instances.[31]

Second, non-electronic rates are required for those competitors who do not choose to deploy and use an electronic OSS interface. [Box 03, at 1220-21, 1265 (Cellupica Test.)] In order to take advantage of lower electronic NRC rates, an electronic OSS interface must be purchased and deployed. Since the interface is for the competitor's benefit, the competitor must bear the implementation costs. Thus, in the Virginia Arbitration, the Wireline Competition Bureau ruled that the competitors were responsible for paying the initial development costs to allow their access to Verizon's OSS. *Virginia Arbitration Order*, at ¶¶ 528, 538, 543. Similarly, a number of state commissions have required competitors to pay the costs of developing and deploying OSS.[32] In re: Generic Proceeding to Establish "Permanent" Prices for BellSouth

---

[31]    The parties' NRC models factor fallout into rates in two different ways. ACS' model produces separate menus of electronic and non-electronic rates, with the latter applied in cases of fallout. GCI's model blends the two types of rates into a single menu of weighted average rates applicable to all orders.

[32]    For the convenience of the court, copies of the cited state commission decisions are included in the Appendix to this brief.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

Interconnection and Unbundled Network Elements, Docket No. 97-AD-544, at 13 (Miss. PSC, Aug. 25, 1998)(competitors should pay for the OSS interfaces); Re: Unbundled Network Elements, 1998 WL 995837, at *75 (NCUC, Dec. 10, 1998)(development costs for new OSS should be recovered through recurring rates to users of the OSS); Re: BellSouth Telecommunications, Inc., 186 P.U.R. 4th 185, 1998 WL 406786, at 25 (SCPSC, June 1, 1998)(costs of implementing electronic interfaces should be shared among all parties who benefit from them); In the Matter of the Pricing Proceeding for Interconnection, Unbundled Elements, Transport and Termination, and Resale for US West Communications, Inc., Docket N. UT-960369, 17th Supp. Order, at 3, 25, 29 (Wash. UTC, Sept. 23, 1999)(competitors should pay costs of modifying OSS; interim prices for both manual and electronic interfaces adopted pending determination of OSS costs). As one federal court stated,

> The FCC regulations only state that ILECs must cooperate with competitors and make available access to their OSS, but **FCC regulations do not state that access to an ILEC's OSS must be subsidized by the ILEC**. The PSC correctly notes that '[o]ne would not argue he was denied access to a concert on the basis that he was required first to buy a ticket.' **Because the electronic interfaces only benefit the CLECs, the ILECs, like BellSouth, should not have to subsidize them....AT&T is the cost causer, and it should be the one bearing all the costs**....

AT&T Communications of the South Central States, Inc. v. BellSouth Telecommunications, Inc., 20 F.Supp.2d 1097, 1104-05 (E.D. Ky. 1998)(emphasis added).

In view of the significant hardware and software costs, some competitors choose not to deploy OSS interfaces. [Box 03, at 1220-21, 1265 (Cellupica Test.)] In this case,

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

ACS proposed an electronic interface that would cost GCI almost $220,000 in start-up expenses, as well as annual maintenance expenses of $41,000, plus licensing fees. [Box 03, at 1280-82 (Monnig Test.)] Arguing that it lacked sufficient information to evaluate the interface, GCI objected to it and proposed that the RCA supervise a process for the exchange of information required to define and implement an OSS. [Box 03, at 1178-79 (Engel Test.); Box 04, at 1039-40 (GCI's proposed Interconnection Agree.)] GCI proposed that "the OSS access that GCI presently has and relies on today shall remain in full force and effect until such access is replaced or modified." [Box 04, at 1040.] In view of GCI's objections, the RCA did not order the implementation of the OSS interface proposed by ACS, but instead directed the parties to evaluate the options and present any negotiated settlement for approval. [Box 04, at 1489 (Order No. 42).] In the meantime, the RCA ordered ACS to provide preordering and ordering information to GCI in the same manner it provides the information to itself and it adopted GCI's proposed contract language, which required ACS to provide a non-electronic method to process orders. [Box 04, at 1489-90 (Order No. 42), 2383 (Final Interconnection Agree.)]

Given that an electronic OSS interface has not been implemented, a non-electronic rate menu is required. GCI has no right to demand that NRC rates be based on an assumed electronic interface that is not actually in place. In effect, GCI wants the benefit of low electronic NRC rates without paying for the cost of implementing the interface that would make the electronic processing of orders possible. Since, without the interface, ACS must still incur the costs of processing GCI's orders non-

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

electronically, the NRC rates should permit the recovery of those costs, and the non-electronic rate menu does just that. See 47 U.S.C. § 252(d)(1)(A)(i)(UNE rates shall be based on the cost of providing the network element).

**2. The RCA Based Rates on the Appropriate OSS Technology.** GCI also argues that the "electronic" rates adopted by the RCA are not based on the most efficient technology currently available. GCI's challenge should be rejected for the following reasons:

First, as a matter of law, the FCC has provided no specific guidance with respect to the types of OSS that should be assumed for purposes of calculating NRC rates. In its initial *Local Competition Order*, the FCC rejected the competitors' request that incumbents be required "to provide access to their operation support systems through real-time 'electronic interfaces," and instead opted to require only that ILECs provide competitors with nondiscriminatory access to the OSS they themselves employ. *Local Competition Order*, at ¶¶ 507, 523. The FCC stated,

> Such nondiscriminatory access necessarily includes **access to the functionality of any internal gateway systems the incumbent employs** in performing the above functions for its own customers....Obviously, an incumbent that provisions network resources electronically does not discharge its obligation under section 251(c)(3) by offering competing providers access that involves human intervention....

Id., at ¶ 523 (emphasis added). The implication is clear that ILECs need not provide electronic provisioning to competitors if it does employ such a system itself. The FCC confirmed the point, declaring, "**Our requirement of nondiscriminatory access to operations support systems recognizes that different incumbent LECs possess**

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

63

1  **different existing systems.**" Id., at ¶ 526 (emphasis added). In its later *Triennial*

2  *Review Order*, the FCC "recognize[d] the wide variety of systems and databases that

3
   comprise the OSS of incumbent LECs" and acknowledged that "**the specific systems,**
4
5  **databases and personnel used to provide OSS functions may vary by incumbent**

6  **LEC and by state.**" *Triennial Review Order*, at ¶¶ 565-66 (emphasis added). In its

7  *NPRM*, the FCC again made clear that the assumptions respecting the capability of

8
   ILECs' OSS remained an open issue, subject to further comment. *NPRM*, at ¶¶ 116-19.
9
10 Thus, apart from ensuring that ACS afforded GCI nondiscriminatory access to its OSS,

11 the RCA was under no obligation in this proceeding to base rates on any particular

12 system or interface.

13     Second, as a matter of fact, ACS' model assumes the most forward-looking,
14
   efficient, state-of-the-art OSS technology available. [Box 03, at 903, 908-09, 2518, 2532
15
16 (Eldred Test.); 1224 (Cellupica Test.)] For example, the model assumes an electronic

17 ordering interface that will permit GCI to process service orders without having to

18 interface with an ACS employee (except in cases of fallout and complex orders), and

19 it also assumes the use of CAFÉ III to eliminate redundant data entry.[33] [Box 03, at 908-
20
   09.]
21

22     By contrast, GCI's proposed model unreasonably assumes the theoretical

23 efficiencies of a conceptual, "futuristic" architecture (including fully automated OSS) that

24 is not currently deployed by any ILEC and will not be attainable in the foreseeable

25

26  [33]    CAFÉ III links ACS' facility tracking/provisioning system (MARTENS) with
   its customer care/billing system platform (Siebel). [Box 03, at 908 (Eldred Test.)]

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

64

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1   future. [Box 03, at 1228, 1252-53, 1269-71, 2601-02 (Cellupica Test.)] Consistent with

2   ACS' position and the RCA's decision, a number of state commissions rejected the

3   same NRC model proposed by GCI in this proceeding on the grounds that it reflected

4   unreasonable technology assumptions. In re: Generic Proceeding to Establish

5   "Permanent" Prices for BellSouth Interconnection and Unbundled Network Elements,

6   Docket No. 97-AD-544, at 12 (unsupported assumptions about DOP and automatic flow-

7   through of orders); Re: Unbundled Network Elements, 1998 WL 995837, at *66

8   (unsupported assumptions about the ILEC's real-world network design and electronic

9   OSS interfaces); Re: Ameritech Ohio, 2001 WL 1563354, at *10 (Ohio PUC, Oct. 4,

10  2001)(unreasonable assumption of 100% DIP/DOP and the most efficient electronic

11  OSS technology); Re: BellSouth Telecommunications, Inc., 1998 WL 406786, at 25 (no

12  evidence the architecture had been fully developed or deployed anywhere).

13      Based on the evidence before it, the RCA concluded that "ACS-AN's model more

14  accurately describes the way the network would be built if recreated today." [Box 04, at

15  1376 (Order No. 42).] The RCA committed no error in refusing to base rates on the

16  futuristic technology proposed by GCI.

17      Third, GCI's proposal for electronic NRC rates is also defective in that it bases

18  those rates on the assumption that certain technologies (such as 100% DIP/DOP) will

19  be in place without making any provision in the recurring cost (loop) model to recover

20  the costs of implementing those technologies. [Box 03, at 2516-17, 2524-25 (Eldred

21  Test.), 1215-16, 1270, 2607 (Cellupica Test.); Box 04, at 206-07, 213-14 (Cellupica

22  Test.)] In other words, GCI is seeking to reap the benefit of lower NRC rates without

having to pay for the costs of the systems that would make those rates possible.[34]

## D. The RCA Appropriately Rejected the 100% DIP/DOP Assumption.

Dedicated inside plant/dedicated outside plant (DIP/DOP) refers to the degree to which customer lines are pre-connected at the ILEC's switch (inside plant) and at the customers' premises (outside plant). With 100% DIP/DOP, all lines would already be fully connected at both ends, so no actions would be required to provision a service order. GCI's argument that 100% DIP/DOP should be assumed for purposes of calculating NRC rates should be rejected for two reasons.

First, 100% DIP/DOP is not possible in the real world, and it is unrealistic to assume a field technician never has to go to the field to provision a service order. [Box 03, at 2524-25 (Eldred Test.), 1266-68, 2607 (Cellupica Test.)] Consistent with that testimony, the RCA specifically found the 100% DIP/DOP assumption "does not reflect the reality of ACS' network." [Box 04, at 1376 (Order No. 42).] The RCA's rejection of that assumption accords with decisions from other state commissions. In re: Generic Proceeding to Establish "Permanent" Prices for BellSouth Interconnection and Unbundled Network Elements, Docket No. 97-AD-544, at 12; Re: Ameritech Ohio, 2001 WL 1563354, at *10.

---

[34]    GCI also argues that the electronic rates are unreasonable because they are based on an electronic interface that the RCA did not adopt. This argument is founded on the faulty assumption that the rates were specifically tied to the rejected interface. In fact, the electronic rates are based on the assumed elimination of certain manual functions, not on the particular interface that permits those functions to be eliminated. GCI's argument also poses a largely theoretical issue since it has not implemented any electronic interface and, therefore, is not taking advantage of the lower electronic rates.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1    Second, 100% DIP/DOP is not assumed in the recurring cost model, so the cost

2    of configuring the network to implement that assumption is not recovered. [Box 03, at

3    2524-25 (Eldred Test.), 1270, 2607 (Cellupica Test.)] Again, GCI wants to reap the

4

5    benefit of lower NRC rates without making any provision for paying for the network

6    modifications required to support those rates.

7    **E. Conclusion.**

8    For the reasons stated, the RCA's determination of NRC rates was not arbitrary

9
10   and capricious.

11                    **IX. GCI WAIVED ITS CHALLENGE**
                     **TO THE NUMBER PORTABILITY CHARGES.**
12

13   The RCA established non-recurring cost charges for porting telephone

14   numbers.[35] [Box 4, at 2039, at § 2.1.4 (Interconnection Agree. Price Schedule).] In the

15   arbitration, GCI took the position that no charges for porting numbers should be

16   imposed since both parties perform that function. [Box 03, at 2969-70 (Hitz Test.)] GCI

17   proposed a "bill and keep" arrangement where neither party would bill the other porting

18
19   charges. [Id.] GCI presents a very different argument in this proceeding. It argues that

20   the FCC's regulations do not permit the imposition of a UNE rate for number portability,

21   but instead provide that the costs of providing portability may be recovered only through

22   federally tariffed charges.

23   This court should find that GCI waived any right to challenge the number

24
25   portability charges on the grounds alleged. Under both federal and state law, a party

26   ─────────────────────
     [35]    "Porting" refers to the ability of customers to keep their phone numbers
     when they change providers.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1  cannot bring a court challenge to an administrative decision based on an argument that

2  was not raised before the administrative agency itself. Reid v. Engen, 765 F.2d 1457,

3
4  1460 (9th Cir. 1985); Weiler v. United States, 364 F.Supp.2d 1057, 1063 (D. Alaska

5  2005); Palmer v. Municipality of Anchorage, 65 P.3d 832, 838 n.16 (Alaska 2003). GCI's

6  current challenge, which is based on its reading of the federal regulations, is

7  fundamentally different from the argument it made below, which was based solely on

8  considerations of administrative convenience. This court should find that GCI waived the

9  argument it now presents.
10

11
## X. THE RCA CORRECTLY CALCULATED
## THE WHOLESALE DISCOUNT RATE.

12

13  As an alternative to leasing UNEs, GCI may also provide service by purchasing

14  ACS' services at wholesale rates for resale to its own customers. Wholesale rates are

15  based on the application of a discount factor (expressed as a percentage) applied to

16  ACS' retail rates. In turn, the discount factor is based on the costs that ACS actually

17  avoids when it sells services by wholesale, as opposed to retail.[36] 47 U.S.C. § 252(d)(3);

18
19  Iowa Utilities Board v. FCC, 219 F.3d 744, 754-56 (8th Cir. 2000), rev'd in part on other

20  grounds, Verizon Commun., Inc. v. FCC, 535 U.S. 467, 122 S.Ct. 1646 (2002). The

21  theory is that ACS will be able to eliminate some of the costs associated with its retail

22  sales when it sells services by wholesale instead. The discount factor (or rate) is

23

24  [36]    The FCC originally adopted a "reasonably avoidable" cost standard, 47
25  C.F.R. § 51.609; see Local Competition Order, at ¶ 911, but the Iowa Utilities
    Board court vacated and remanded that regulation in favor of an "actually
26  avoided" cost standard. The FCC has not yet revised the regulation. See NPRM,
    at ¶ 25 (the FCC has not conducted any further rulemaking to clarify the avoided
    cost standard mandated by the Eighth Circuit).

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

determined by dividing the avoided costs by revenue. Expressed as a fraction:

DISCOUNT RATE = $\frac{\text{AVOIDED COSTS}}{\text{REVENUE}}$

In this case, the RCA adopted a wholesale discount rate of 24.62%. [Box 04, at 1382 (Order No. 42).]

GCI challenges this decision on the grounds that the RCA improperly calculated the discount rate on the basis of "separated" local service costs, as opposed to total company costs. For purposes of determining a company's interstate, intrastate, and local phone service rates, its regulated costs are "separated" (or allocated) between those three "jurisdictions." GCI argues that the discount rate should be based on unseparated, or total, company costs and local revenue. Expressed as a fraction:

DISCOUNT RATE = $\frac{\text{AVOIDED \textbf{TOTAL COMPANY} COSTS}}{\textbf{LOCAL} \text{ REVENUE}}$

By contrast, ACS advocated and the RCA ruled that the discount rate should be based on separated local costs and local revenue. [Box 04, at 1378 (Order No. 42).] Expressed as a fraction:

DISCOUNT RATE = $\frac{\text{AVOIDED \textbf{LOCAL} COSTS}}{\textbf{LOCAL} \text{ REVENUE}}$

GCI's challenge to the discount rate should be rejected. In the first place, GCI expressly waived at least part of the argument it now makes. In the proceedings before the RCA, GCI took the position that no adjustment should be made for any separation of costs between the intrastate and interstate jurisdictions. [Box 03, at 972-75, 3055-56 (Cabe Test.)] Instead, it argued that only the separation of costs between the local and

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

69

intrastate jurisdictions should be factored into the discount rate calculation. [Box 03, at 977-78 (Cabe Test.)] Having specifically limited its position on the separations issue below, GCI should not be permitted to expand that position now.

Considered on its merits, the basic problem with GCI's proposal is that it uses inconsistent values for the numerator and denominator in the discount rate fraction. By proposing the use of total company costs in the numerator but only local revenues in the denominator, GCI seeks to artificially inflate the discount rate.

The FCC has accorded state commissions "broad latitude" in selecting the methodologies to be used in determining wholesale discount rates. *Local Competition Order*, at ¶ 909. However, it also declared, "Ideally, a state would use a study methodology that is consistent with the manner in which it sets retail rates." Id., at ¶ 915. GCI's proposed methodology violates that standard. Since ACS' local rates are based on the separated costs allocated to the local jurisdiction, its local revenue reflects that separation as well. Therefore, to be consistent, local revenue should be matched with separated local costs.

In this case, both parties agree that local revenue should be used in calculating the discount rate. It follows that avoided local costs should also be used, not total company costs. Thus, the RCA concluded: "Because the wholesale discount only applies to local retail service, the use of separated costs is appropriate." [Box 04, at 1378 (Order No. 42).] By contrast, mixing total company costs and local revenue creates a mismatch that improperly increases the discount rate.

As noted in the RCA's order, the adopted methodology is consistent with its

1  decision in the Fairbanks/Juneau arbitration between GCI and the ACS companies

2  serving those areas. [Id.] In that proceeding, the arbitrator rejected GCI's argument,

3
4  reasoning,

5      It is undisputed in this arbitration that local retail rates are set using
       separated local company costs. As only local company costs may be
6      recovered from local retail rates, consistency dictates that only local
       company costs should be avoided when setting a wholesale discount rate
7      for local retail services. The use of total company (Interstate, Intrastate,
8      and Local) avoided costs risks an artificially inflated discount rate.

9  In the Matter of the Interconnection Agreement Between General Communication, Inc.

10 and PTI Communications of Alaska, Inc., Arbitration Decision on Wholesale Discount,

11 Dockets U-99-141/142/143 (June 7, 2000); Order No. 9 (RCA, Aug. 24, 2000)(accepting

12 arbitrator's decision).[37]
13

14     Other state commissions have also found it appropriate to base the discount rate

15 on both separated costs and revenue. In Re Myrtle Beach Telephone, Order No. 1999-

16 714, 1999 WL 1317907, at *6 (S.C. P.S.C., Oct. 11, 1999), the South Carolina

17 commission adopted a methodology of "Local Retail Avoidable Costs divided by Local
18
19 Retail Revenue." Similarly, the Vermont commission found that the use of separated

20 data is required by the Telecommunications Act and concluded "that it is appropriate to

21 calculate the discounts using separated data for both revenues and expenses." Re New

22 England Telephone and Telegraph Co., 1996 WL 773772, at *14, 37 (Vt. P.S.B., Dec.
23
24 4, 1996), The commission reasoned,

25     It is axiomatic that NYNEX's retail rates are set based upon its intrastate costs.
       Any expenses NYNEX incurs that are allocated to the interstate jurisdiction by
26

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

---

[37]    The cited orders are included in the Appendix to this brief.

71

the separations process are excluded from the Board's rate-setting process. Thus, no portion of marketing, billing, and other expenses allocated to the interstate jurisdiction are in any way attributable to the retail rate. Following Section 252(d)(3)'s directions, the interstate portion of these expenses is not part of the avoided cost calculation.

Id., at *37. See also Re Pricing Proceeding for Interconnection, Unbundled Elements, Transport and Termination, and Resale, 8th Suppl. Order, 1998 WL 992033, at *36 (Wash. U.T.C., Apr. 16, 1998)(requiring the use of separated data to calculate the discount rate). Since ACS' retail rates are based on the costs allocated to the local jurisdiction, mathematical consistency requires that the wholesale discount be calculated on that same basis.[38]

By mismatching total company costs with separated local revenue, GCI seeks to artificially inflate the discount rate (and thereby lower the price it must pay ACS for wholesale services). In its Local Competition Order, at ¶ 32, the FCC established a default discount rate range of 17-25%. GCI's proposed rate of 33.3% significantly exceeds the upper end of that range. [Box 03, at 959 (Cabe Test.)] The rate of 24.62% adopted by the RCA falls within the default range and is more than fair to GCI. Based

---

[38]     To support its argument that the wholesale discount rate should be based on unseparated costs, GCI notes that UNE rates are based on unseparated costs. GCI is comparing apples and oranges. Wholesale rates and UNE rates are separate matters. When GCI leases a UNE loop, it receives the intrastate and interstate access revenues associated with that loop in addition to the local service revenues. Accordingly, it is appropriate to base the UNE rates on all the costs associated with that loop, not just the costs allocated to the local jurisdiction. By contrast, when GCI purchases a line for resale at wholesale rates, it only receives the revenue associated with local service and ACS continues to incur costs and receive the revenue for providing access service associated with the resold line. Local Competition Order, at ¶ 980. In that context, it makes no sense to base the wholesale rate on unseparated costs.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

72

1  as it is on inconsistent cost and revenue values, GCI's proposed methodology is

2  contrary to both law and logic. The RCA acted within its broad discretion, and its

3  decision was not arbitrary and capricious.

### XI. THE RCA ERRED IN FINDING THAT
### ONLY 53% OF FEEDER PLANT
### WOULD BE PLACED IN THE ROAD PRISM.

#### A. Introduction.

For purposes of designing a TELRIC-compliant telephone network, a key issue

is the percentage of feeder plant that must be placed in the road prism, i.e., under

paved surface. Since construction costs are substantially higher in the road prism than

out of it, the decision on this issue has a significant impact on the final UNE loop rate.

In this case, two of the three commissioners sitting on the arbitration panel accepted

GCI's position that only 53% of the feeder system would be constructed in the road

prism, thereby rejecting ACS' proposal of 89.7%. [Box 04, at 1360 (Order No. 42).] The

majority reasoned that ACS' estimate was based only on a review of plans, whereas

GCI's estimate was based on a visual field inspection, which was likely to be more

accurate. [Id.] Commissioner Strandberg dissented from the majority's ruling, concluding

that GCI's mere surface inspection of the feeder routes was inadequate to establish the

credibility of its proposal. [Box 04, at 1403 (Order No. 42, Dissent).]

The RCA's finding respecting the percentage of road prism construction is not

reasonably supported by the evidence. The majority's reasoning is founded on a

mischaracterization of ACS' presentation, which was not based only on a review of

plans. Additionally, the RCA's decision is also inconsistent with GCI's own analysis and

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

73

1  estimate of the road prism construction percentage. Based on the record presented, this

2  court should find that the RCA's decision on this issue was not supported by substantial

3  evidence.

4

5  **B. The Parties' Cases.**

6      To design the feeder portion of its hypothetical network, ACS contracted with an

7  outside engineering firm which worked in conjunction with ACS' planning department.

8  [Box T1, at 2671 (Schmid Test.)] Their design was based on the most efficient routes,

9
   giving consideration to zoning, land use, and the engineers' knowledge of the areas
10
11  being studied. [Box 03, at 890, 895 (Schmid. Test.)] The team's route design was then

12  reviewed by Steven Cinelli, a registered professional engineer employed by ACS with

13  substantial experience in the planning, design, and construction of nearly forty major

14  roadway projects in Anchorage and across Alaska. [Box 03, at 1325, 1328.] Cinelli
15
16  reviewed the routes to determine whether they were feasible and legally available,

17  taking into account obstructions, buildings, private property, and rights of way. [Box 03,

18  at 1328-30.] Cinelli not only reviewed the design team's plans, but he also conducted

19  field inspections of all sites with which he was not familiar. [Box 03, at 1340.] He

20  identified viable alternative routes where appropriate, and those changes were
21
22  incorporated into the final design. [Box 03, at 1330-31, 1354-57.]

23      A variety of practical constraints limit construction outside the road prism. [Box

24  03, at 1331 (Cinelli Test.)] For example, in well-developed areas, there is insufficient

25  space outside the road prism to do construction without getting into or damaging private

26  property. [Box 03, at 1331-32 (Cinelli Test.)] Assuming the landowners are willing to

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

grant the needed easements in the first place, construction on private property requires the negotiation and purchase of the easements, as well as restoration of the property after construction, all of which is expensive. [Box 03, at 1334-35 (Cinelli Test.)] Other constraints on the location of construction include the existence of other utilities adjacent to the roadway, which make it too expensive to construct there, and above-ground obstructions such as light and traffic signal poles. [Box 03, at 1332-33 (Cinelli Test.); Box T1, at 2665 (Schmid Test.).] While some areas adjacent to the road prism may be theoretically available for construction, it is not practical to move in and out of the road prism to take advantage of those areas since the L-turns would prevent pulling cable through the conduits. [Box 03, at 1333 (Cinelli Test.)] Factoring in these types of constraints, ACS' proposed design incorporated construction outside the road prism wherever possible. [Box 03, at 1331-32 (Cinelli Test.)] In Ex. SDC-4, ACS presented a detailed, segment-by-segment analysis of the feeder routes, identifying the types of construction constraints present in each segment and quantifying the percentage of road prism construction required. [Box 03, at 1354-57.]

For its part, GCI proposed an alternative feeder route design that included substantially less road prism construction (53%) than included in ACS' design (89.7%). GCI personnel determined their design by walking the routes, and it presented photographs depicting those routes. [Box 03, at 2691-3044; Box T1, at 3288 (Fassett Test.)] GCI's conclusion that feeder plant could be placed without impinging on the road prism was based on the assumption that all feeder trenching would only be two feet wide. [Box 03, at 2834, 2838-40; Box 04, at 508, 511; Box T1, at 80, 87-88 (Fassett

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1 Test.)

2     After reviewing and evaluating GCI's proposed feeder routes, Cinelli observed

3
4 that GCI had assumed that open grassy areas were available for feeder construction

5 without recognizing that the "vast majority" of the non-road prism construction proposed

6 by GCI required construction on private property. [Box 03, at 2656, 2658, 2660-61,

7 2677-82] Cinelli testified, "Simply assuming that these areas are available to ACS, and

8
9 not accounting for the costs associated with acquiring the necessary easements, is not

10 in compliance with the currently accepted standard of engineering practice and makes

11 no sense." [Box 03, at 2658.] Cinelli also identified other defects in GCI's feeder route

12 design. [Box 03, at 2677-82.]

13 **C. The RCA's Decision.**

14     The RCA accepted GCI's estimate of 53% road prism construction, declaring,

15

16     We are persuaded that GCI's estimate is more accurate because their
experts conducted a visual field inspection of each feeder route. ACS-AN
17     witness Cinelli's estimate was based on a review of plans. We find that
the visual field inspection is more likely to be more accurate.
18

19 [Box 04, at 1360 (Order No. 42).] Based on the different costs of construction inside and

20 outside the road prism, the RCA adopted a weighted average cost of feeder trenching

21 of $63.50 per foot. [Id.]

22     James Strandberg, the sole engineer on the RCA, dissented from this ruling. He

23
24 found that GCI had not presented "enough data to conclude that the feeders can

25 actually be placed outside the road prism." [Box 04, at 1403 (Order No. 42, Dissent).]

26 He noted that GCI had not shown the physical limit of the rights of way (i.e., private

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

76

property boundaries) and had not shown that non-road prism construction would be feasible given the location of existing buried utilities. [Id.] He disagreed with the majority's reliance on GCI's visual inspection, reasoning that "the surface visual inspection without specific assessment of the presence of buried utilities or realistic viewing of the utility routing are in my opinion inadequate to establish that GCI's proposal is credible." [Id.] Commissioner Strandberg concluded, "I find inadequate record to conclude that the GCI alignments are workable and will actually result in cost savings." [Id.] He, therefore, found that 89.7% of feeder construction would be in the paved areas of the roadways and recalculated the UNE loop rate accordingly. [Box 04, at 1303-04. Thereafter, Commissioner Strandberg reaffirmed his dissent in ruling on GCI's petition for reconsideration from various aspects of the RCA's arbitration rulings, and Commissioner Mark Johnson added his agreement to that dissent. [Box 04, at 1864-67 (Order No. 46, Concurring Statements).]

**D. The RCA's Decision Was Not Supported by Substantial Evidence.**

The RCA based its decision on the finding that ACS' estimate of road prism construction was based only on a review of plans. [Box 04, at 1360 (Order No. 42).] That characterization of ACS' case was clearly erroneous, and it understated the degree of analysis that went into ACS' feeder route design. As established by the testimony of its witnesses, ACS employed a team to design the most efficient feeder routes possible. Far from being based on only a review of plans, that design was based on field inspections, the engineers' knowledge of the feeder routes, and a careful consideration of the constraints that limit construction outside the road prism. ACS also reviewed and

77

1  analyzed GCI's photos and proposed routes. ACS' design analysis was documented in

2  Ex. SDC-4, which identified the constraints requiring road prism construction on each

3
4  of the feeder route segments. [Box 03, at 1354-57.] The RCA erred by mischaracterizing

5  ACS' evidence on this issue and basing its decision on that mischaracterization.

6      The RCA also had no reasonable basis for favoring GCI's evidence over ACS'.

7  As found by Commissioner Strandberg in his dissent, GCI had not shown the limit of the

8  rights of way and had not accounted for the location of existing utilities. By contrast, Ex.

9
10  SDC-4 specifically addressed those issues and detailed the conditions present on each

11  segment of the feeder routes.

12      Additionally, the RCA's finding that only 53% of the feeder routes would require

13  road prism construction was not consistent with GCI's own analysis. In proposing that

14  percentage, GCI's estimate was based on the assumption that all feeder trenches would

15
16  be only two feet wide at the top. With very narrow trenches, less construction would

17  impinge on private property and less construction would have to be shifted to the road

18  prism. The RCA, however, rejected GCI's proposed trench width and adopted a width

19  of 6.6 feet (at the top). [Box 04, at 1365-66 (Order No. 42).] Given the rejection of GCI's

20  assumed two-foot trench width, it follows that more construction would be required in

21  the road prism and that GCI's original 53% estimate would have to be increased. The

22
23  RCA erred by failing to adjust that percentage consistent with the wider trench width it

24  adopted.

25      For the reasons stated, this court should find that the RCA's decision respecting

26  the percentage of road prism construction was not supported by substantial evidence,

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

and the matter should be remanded to the RCA for redetermination of the road prism construction percentage and recalculation of the UNE loop rate.

## XII. CONCLUSION AND
## PRAYER FOR RELIEF.

GCI's challenges to the RCA's decisions should be rejected in all respects. Pursuant to ACS' claim respecting the percentage of feeder route road prism construction, the case should be remanded to the RCA for recalculation of the UNE loop rate.

DATED at Anchorage, Alaska, this 30th day of December, 2005.

TINDALL BENNETT & SHOUP
Attorneys for Respondent ACS
of Anchorage, Inc.

By: _____
Richard W. Maki
ABA No. 8211126

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

79