

FILED

DEC 3 0 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

GCI COMMUNICATION CORP., d/b/a )
GENERAL COMMUNICATION, INC., )
d/b/a GCI, )
                         )
         Petitioner and )
         Cross Petition Respondent, )
                         )
       -vs- )         Case No. A05-003 CV (RRB)
                         )
KATE GIARD, in her official capacity as )
Chairwoman of the Regulatory Commission )
Of Alaska; )
DAVE HARBOUR,  in his official capacity as )
Commissioner of the Regulatory Commission )
Of Alaska; )
MARK K. JOHNSON, in his official capacity as )
Commissioner of the Regulatory Commission )
Of Alaska; )
ANTHONY PRICE, in his official capacity as )
Commissioner of the Regulatory Commission )    **ACS OF ANCHORAGE, INC.'S**
Of Alaska; )                         **CROSS-PETITION BRIEF**
JAMES S. STRANDBERG, in his official )   **RE: DELAY AND**
capacity as Commissioner of the Regulatory )   **INTERIM RATE ISSUES**
Commission Of Alaska, )
                         )
         Respondents and )
         Cross Petition Respondents, )
                         )
and )
                         )
ACS OF ANCHORAGE, INC., d/b/a )
ALASKA COMMUNICATIONS SYSTEMS, )
ACS LOCAL SERVICE, and ACS, )
                         )
         Respondent and )
         Cross Petitioner. )
_____ )

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1

## TABLE OF CONTENTS

Table of Authorities......................................................................................................iii

I. Introduction...............................................................................................................1

II. The Telecommunications Act of 1996.......................................................................2

    A. Network Interconnection...................................................................................2

    B. Arbitration.........................................................................................................3

    C. The TELRIC Rate Methodology........................................................................3

    D. Federal Court Review.......................................................................................5

III. A Note on UNE Loop Cost Models...........................................................................5

IV. Statement of Facts: Chronology...............................................................................7

    A. Introduction......................................................................................................7

    B. The Initial Arbitration: March 1996 to January 1997........................................7

    C. ACS' Motion to Establish Final UNE Rates and its First Request to
       Establish a Hearing Schedule: January to March 2000...............................9

    D. ACS' Second Request for a Schedule: March to October 2000......................10

    E. ACS' Continuing Requests for a Prompt Rate Decision: October
       2000 to February 2001.............................................................................11

    F. The RCA Revisits the Cost Model Selection Issue: May to July 2001.............13

    G. ACS' First Request for Interim Relief: June to October 2001..........................15

    H. The RCA Requests Additional Information on Cost Methodologies:
       February to June 2002..............................................................................16

    I. ACS' Third Request to Establish a Hearing Schedule and the RCA's
       Selection of the ACS 7.2 Model: June to July 2002..................................17

    J. ACS' Fourth Request to Establish a Schedule: August to December
       2002..........................................................................................................19

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

K. ACS' Second Motion for Interim Relief: October 2002 to April 2003...............21

L. ACS' Fifth Request to Establish a Deadline: February to April 2003...............22

M. ACS' Sixth Request to Set a Deadline: April to June 2003............................24

N. The Arbitration and Decision: November 2003 to June 2004..........................26

O. Summary.........................................................................................................27

V. Standards of Review.................................................................................................28

VI. The RCA Unreasonably Delayed the Determination of a Final, Legal
    UNE Loop Rate........................................................................................................28

A. Introduction......................................................................................................28

B. Standards of Timeliness for Administrative Decisionmaking...........................29

C. The RCA Violated the Federal Statutory Deadline..........................................31

D. The RCA Violated the Act by Failing to Complete the Arbitration
    Within A Reasonable Time.............................................................................33

VII. The Temporary and Interim UNE Loop Rates Did Not Comply with
     Federal Law...........................................................................................................36

A. Introduction......................................................................................................36

B. The Original "Temporary" Rate........................................................................36

C. ACS' First Request for Interim Relief..............................................................37

D. ACS' Second Request for Interim Relief..........................................................41

E. The RCA Violated the Act by Refusing to Grant Meaningful
    Interim Relief..................................................................................................44

VII. Conclusion and Prayer for Relief.............................................................................49

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

-ii-

# TABLE OF AUTHORITIES

## Cases

A.J. Industries, Inc. v. Alaska Public Serv. Comm'n, 470 P.2d 537
(Alaska 1970)...........................................................................................38, 39, 43, 48

APUC v. Greater Anchorage Area Borough, 534 P.2d 549
(Alaska 1975)...................................................................................................38, 47

AT&T Commun. of Ill., Inc. v. Ill. Bell Tel. Co., 349 F.3d 402
(7th Cir. 2003)...........................................................................................................5

AT&T Commun. of the South Central States, Inc. v. Bellsouth
Telecommun., Inc., 20 F. Supp.2d 1097 (E.D. Ky. 1998)...............................34

AT&T Corp. v. Iowa Utilities Board, 525 U.S. 366, 119 S.Ct. 721(1999).........................8

Independence Mining Co., Inc. v. Babbitt, 105 F.3d 502 (9th Cir. 1997).........................34

Iowa Utilities Board v. FCC, 109 F.3d 418 (8th Cir. 1996)...............................................8

Iowa Utilities Board v. FCC, 120 F.3d 753 (8th Cir. 1997)...............................................8

Iowa Utilities Board v. FCC, 219 F.3d 744 (8th Cir. 2000)
(Iowa Utilities II)........................................................................................13, 15, 16, 19

MCI Telecommun. Corp. v. FCC, 627 F.2d 322 (D.C. Cir. 1980)................30, 31, 33, 46

Public Citizen Health Research Group v. Auchter, 702 F.2d 1150
(D.C. Cir. 1983).......................................................................................................29

Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21
(D.C. Cir. 1984).................................................................................................29, 30

Re Municipality of Anchorage dba Municipal Light and Power Dept.,
7 APUC 514 (1986)...........................................................................................39, 46

Re Yukon Telephone Co., Inc., 7 APUC 355 (1986).......................................................39

Sierra Club v. Thomas, 828 F.2d 783 (D.C. Cir. 1987)...........................................29, 33

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

*Telecommunications Research and Action Center v. FCC,*
750 F.2d 70 (D.C. Cir. 1984)..........................................................................34

*U.S. West Commun., Inc. v. MFS Internet, Inc.,* 193 F.3d 1112
(9th Cir. 1999)................................................................................................28

*US West Commun., Inc. v. Jennings,* 304 F.3d 950 (9th Cir. 2002)..................28

*Verizon California, Inc. v. Peevey,* 413 F.3d 1069 (9th Cir. 2005) .......................5, 36, 48

*Verizon Commun., Inc. v. FCC,* 535 U.S. 467, 122 S.Ct. 1646 (2002)......................4, 13

**Statutes**

AS 42.04.080(a) ...........................................................................................20

AS 42.05.175.................................................................................................20

47 U.S.C. § 251.........................................................................................1-3, 34

47 U.S.C. § 252.................................................................................3, 5, 28-32, 34

47 C.F.R. §§ 51.503..........................................................................................4

47 C.F.R. § 51.505(b)..................................................................................4, 13

**FCC Orders**

*In the Matter of Implementation of the Local Competition Provisions
in the Telecommunications Act of 1996,* First Report and Order,
CC Docket No. 96-98, 11 FCC Rcd 15499 (released Aug. 8,
1996)(*"Local Competition Order"*)..............................................................4, 40

*In the Matter of Federal-State Joint Board on Universal Service,*
Tenth Report and Order, CC Docket No. 96-45, 14 FCC Rcd 20,
156 (released Nov. 2, 1999)(*"USF Inputs Order"*).....................................6, 40

*In the Matter of Review of the Commission's Rules Regarding the
Pricing of Unbundled Network Elements and the Resale of Service
by Incumbent Local Exchange Carriers,* Notice of Proposed
Rulemaking, WC Docket No. 03-173, 18 FCC Rcd 18, 945
(released Sept. 15, 2003)..............................................................................38

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

-iv-

# I. INTRODUCTION.

In 1996, Congress passed new laws designed to open up local telephone service to competition. 47 U.S.C. § 251 et seq. The new laws sought to achieve that goal in part by requiring existing local phone companies to lease access to the elements of their networks to competing companies until the competitors could provide services over their own facilities. State utilities commissions were granted the authority to arbitrate applicable rates and terms of network interconnection in the event the companies could not reach agreement. Congress established a nine-month deadline for the completion of any such arbitration.

In this case, GCI Communication Corp. requested interconnection with ACS of Anchorage's network in 1996. While the predecessor of the Regulatory Commission of Alaska ("RCA") promptly completed the arbitration of most interconnection terms, final rates were not adopted. Instead, because of the acknowledged inadequacy of the rate methodology used, the commission adopted "temporary" rates subject to later revision.

On January 24, 2000, ACS formally asked the RCA to adopt final rates. From that point, it took the RCA **four-and-one-half years** -- until June 25, 2004 -- to complete the rate-setting process. In the meantime, the RCA required ACS to lease its network to GCI at temporary or interim rates that did not comply with federal law and that were too low to compensate ACS for the costs of making its network available. Despite numerous motions by ACS either to set a schedule for the timely determination of a final rate or to adopt a sufficient interim rate, the RCA denied ACS any meaningful relief.

As a result of the unfairly low temporary and interim rates, ACS lost almost $11

1

# I. **INTRODUCTION.**

In 1996, Congress passed new laws designed to open up local telephone service to competition. 47 U.S.C. § 251 et seq. The new laws sought to achieve that goal in part by requiring existing local phone companies to lease access to the elements of their networks to competing companies until the competitors could provide services over their own facilities. State utilities commissions were granted the authority to arbitrate applicable rates and terms of network interconnection in the event the companies could not reach agreement. Congress established a nine-month deadline for the completion of any such arbitration.

In this case, GCI Communication Corp. requested interconnection with ACS of Anchorage's network in 1996. While the predecessor of the Regulatory Commission of Alaska ("RCA") promptly completed the arbitration of most interconnection terms, final rates were not adopted. Instead, because of the acknowledged inadequacy of the rate methodology used, the commission adopted "temporary" rates subject to later revision.

On January 24, 2000, ACS formally asked the RCA to adopt final rates. From that point, it took the RCA **four-and-one-half years** -- until June 25, 2004 -- to complete the rate-setting process. In the meantime, the RCA required ACS to lease its network to GCI at temporary or interim rates that did not comply with federal law and that were too low to compensate ACS for the costs of making its network available. Despite numerous motions by ACS either to set a schedule for the timely determination of a final rate or to adopt a sufficient interim rate, the RCA denied ACS any meaningful relief.

As a result of the unfairly low temporary and interim rates, ACS lost almost $11

1

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1  million (based on the rate finally adopted by the RCA in June 2004). Moreover, as a
2  result of the low rates, GCI was able to lower its customer prices and capture almost
3
4  45% of the retail local phone service market, an extraordinary level of competitive entry
5  unprecedented anywhere else in the United States.

6  By means of the cross-petition issues addressed in this brief, ACS asks this court
7  to find that the RCA violated the Telecommunications Act by failing either to determine
8  a final loop rate within a reasonable time or to impose meaningful interim relief (a
9
10 sufficient interim rate or the adoption of a true-up mechanism). ACS seeks entry of an
11 order remanding this matter to the RCA with directions: 1) to calculate the amount that
12 GCI should have paid ACS from August 9, 2000, through June 24, 2004, and 2) to
13 require GCI to compensate ACS for the difference from the rate actually charged during
14 that period.[1]

15
16 ## II. THE TELECOMMUNICATIONS ACT OF 1996.

17 ## A. Network Interconnection.

18 In 1996, Congress amended the Communications Act of 1934 by adding new
19 provisions intended to permit the introduction of competition into local telephone service.
20 47 U.S.C. § 251, et seq. ("the Act"). Since the cost of building a telephone network
21 poses the greatest barrier to a competitor's entry into the market, the Act obligates
22
23 existing local phone companies (so-called incumbent local exchange carriers, or
24 "ILECs") to lease access to the individual components of their networks (unbundled
25

26 [1]  ACS' cross-petition issues relating to the final rates and terms adopted by
the RCA in June 2004 will be addressed in ACS' brief in opposition to GCI's
petition, also filed on this date.

2

network elements, or "UNEs") to requesting competitors. 47 U.S.C. § 251(c)(2) and (3). The focus of the issues addressed in this brief is the UNE loop, which is that portion of the network that connects customer premises with ACS' wire centers (or switches). The loop is sometimes referred to as "the last mile" of the phone network.

## B. Arbitration.

When a competitor requests interconnection from an ILEC, the companies are free to negotiate the terms for that interconnection. 47 U.S.C. § 252(a)(1). However, in the event the companies are not able to agree to terms on their own, either company may petition a state commission to arbitrate any open issues. 47 U.S.C. § 252(b)(1). The request for arbitration must be made "[d]uring the period from the 135th to the 160th day (inclusive) after the date on which the incumbent local exchange carrier receives a request for negotiation." Id. "The State commission...shall conclude the resolution of any unresolved issues **not later than 9 months after the date on which the local exchange carrier received the request**." 47 U.S.C. § 252(b)(4)(C) (emphasis added). In other words, **the statute mandates that the arbitration be completed** within 110 to 135 days after arbitration is requested, or **within four-and-one-half months at most**.

## C. The TELRIC Rate Methodology.

47 U.S.C. § 252(d)(1) provides that the rates for interconnection must be "just and reasonable." Because the Act also provides that rates shall be based on the cost of providing the interconnection "determined without reference to a rate-of return or other rate-based proceeding," 47 U.S.C. § 252(d)(1)(A)(i), it is "radically unlike" other

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1  ratemaking statutes. <u>Verizon Commun., Inc. v. FCC</u>, 535 U.S. 467, 489, 122 S.Ct. 1646,

2  1661 (2002). "The Act thus appears to be an explicit disavowal of the familiar public-

3  utility model of rate regulation...." <u>Id.</u>

4

5      To implement the statutory pricing standard, the FCC promulgated regulations

6  requiring that UNE rates be based on TELRIC (total element long run incremental cost)

7  methodology. 47 C.F.R. §§ 51.503 and 505(b). Under TELRIC, rates are to be based

8  on "the forward-looking cost over the long run of the total quantity of facilities and

9  functions that are directly attributable to, or reasonably indentifiable as incremental to,

10

11 such element." 47 C.F.R. § 51.505(b).  Since the aim of the pricing standard is to

12 replicate the conditions of a competitive market,[2] TELRIC rates are not based on the

13 historical cost of building the ILEC's actual network (as is the case with traditional

14 ratemaking). Instead, they are based on the forward-looking cost of building an

15
16 efficiently configured network (limited only by the ILEC's existing wire center locations)

17 using the most efficient technology currently available. 47 C.F.R. § 51.505(b)(1). <u>See</u>

18 <u>also</u> *Local Competition Order*, at ¶ 685. In other words, UNE rates are to be based on

19 the forward-looking cost of building a hypothetical network.

20

21      "'Federal law requires that any rate for unbundled network elements, adopted by

22 a state commission, comply with TELRIC when adopted.' No provision is made by this

23 law for any rate to be established in a different way." <u>Verizon California, Inc. v. Peevey</u>,

24

25 [2]   In the Matter of Implementation of the Local Competition Provisions in the
   Telecommunications Act of 1996, First Report and Order, CC Docket No. 96-98,
26 11 FCC Rcd 15499, at ¶ 679 (released Aug. 8, 1996)(hereinafter "*Local
   Competition Order*"). The cited paragraphs from the FCC orders are included in
   an Appendix filed with this brief.

4

413 F.3d 1069, 1073 (9th Cir. 2005), *quoting* AT&T Commun. of Ill., Inc. v. Ill. Bell Tel. Co., 349 F.3d 402, 411 (7th Cir. 2003). "It is important to note that, in setting forth these requirements, neither the Act nor the FCC regulations distinguishes between 'interim' rates and 'final' rates." Id., at 1071. Thus, **both final and interim rates must comply with TELRIC**. "[T]he possibility of repair in the future is no warrant for promulgating today a rate that deviates from the TELRIC standard. Federal law requires that **any** rate for unbundled elements, adopted by a state commission, comply with TELRIC when adopted." AT&T Commun. of Ill., Inc., 349 F.3d at 412 (emphasis added).

**D. Federal Court Review.**

47 U.S.C. § 252(e)(6) provides for federal district court review to determine whether state commission decisions meet the requirements of the Act.

**III. A Note on UNE Loop Cost Models.**

Cost models are used to calculate forward-looking, TELRIC-compliant UNE rates. Different models are used for determining the various costs that factor into the rates for different UNEs (e.g., loop cost model, switching and transport cost model, and non-recurring cost model). For purposes of this brief, the UNE loop rate, and thus the loop cost model, are the centers of concern.

A loop model is essentially a series of spreadsheets used to quantify the costs attributable to the loop portion of the ILEC's network. That cost is a function of many factors, including such things as the quantity of physical components necessary to construct the loop network (cable, etc.), the cost of those components, and the cost of constructing and operating the network. The model assumes a network design, then

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

5

1  produces a monthly per loop rate based on the costs that are inputted into the model.

2  Viewed in this manner, the components pertinent to the calculation of UNE rates may

3
4  be broken down into two broad categories: 1) those respecting the model and the

5  hypothetical network it assumes, and 2) those respecting the cost inputs to be plugged

6  into the chosen model.

7      Numerous competing loop models have been developed for use in UNE

8  proceedings across the country. In this case, the RCA ultimately adopted a model

9
10  developed by ACS (the ACS 7.2 model) that based rates on a hypothetical, efficient

11  redesign of representative portions of the Anchorage network as performed by ACS'

12  own engineers. [Box 03, at 889-90 (Order No. 42); Box 04, at 1328-29 (Schmid

13  Testimony).] Other loop models, such as the Hatfield (or HAI) 5.1 or 5.2a proposed by

14  GCI or the FCC model initially accepted by the RCA, are generic, one-size-fits-all

15
16  models that base costs on a purely hypothetical network design that does not reflect the

17  unique geographical characteristics of any particular ILEC's service area.[3]

18

19

20  [3]    The FCC model, also known as the FCC Synthesis Model or the Hybrid

21  Cost Proxy Model ("HCPM"), was developed for the very different purpose of
    calculating federal universal service support. As such, it has been criticized as
22  inappropriate for use in UNE proceedings, and even the FCC cautioned against
    its use for UNE purposes. In the Matter of Federal-State Joint Board on
23  Universal Service, Tenth Report and Order, CC Docket No. 96-45, 14 FCC Rcd
    20,156, at ¶¶ 31-32 (released Nov. 2, 1999)(hereinafter "USF Inputs Order").
24  [See Box 01, at 1205, 1220-23, 1268-70, 1273-74 (Blessing Affidavit).]
    (Universal service support is a subsidy mechanism through which a portion of the
25  rates charged for phone service in low cost areas is used to support service in
26  high cost areas, thereby permitting all customers to pay comparable, reasonable
    rates.)

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

6

1

## IV. STATEMENT OF FACTS: CHRONOLOGY.[4]

2

### A. Introduction.

3

4       The cross-petition issues addressed in this brief are founded on the premise that

5    the RCA violated the requirements of the Act by: 1) failing to determine a final UNE loop

6    rate in a timely fashion, and 2) failing to adopt an interim relief mechanism sufficient to

7    protect both parties from loss (either a sufficient interim and refundable rate or a true-up

8    mechanism that would allow a reconciliation of UNE loop payments based on the final

9    rate). As detailed in the following chronology, the RCA denied repeated requests by

10   ACS for meaningful relief from the unfairly low temporary and interim rates. Rather than

12   address and resolve the rate issues in a timely fashion, the RCA and GCI forced ACS

13   to run a meandering and seemingly interminable procedural course. It took **four-and-**

14   **one-half years** from January 24, 2000, when ACS first moved for the adoption of a final

15   loop rate, to June 25, 2004, when the RCA finally issued an arbitration decision

16

17   determining that rate. By the time the final rate was adopted, ACS had sustained almost

18   $11 million in losses as a result of underpayments from GCI. Given the protracted time

19   frame in issue, the chronology is unavoidably lengthy, but it demonstrates that ACS is

20   entitled to relief.

21

### B. The Initial Arbitration: March 1996 to January 1997.

22

23       March 15, 1996. By letter dated March 15, 1996, GCI asked ACS' predecessor

24

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

25   ---
     [4]   Almost all of the administrative record has been filed with this court on a
     single CD-ROM disc containing seven PDF files (or boxes). Citations to that
26   portion of the record are to the PDF files and to the PDF pages within each file,
     e.g., Box 01, at 45. Those portions of the record filed in hard copy are cited by
     the stamped record page, e.g., Record 12867.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 276-8533
FAX (907) 276-8536

1  (Anchorage Telephone Utility, or ATU) to begin negotiations towards voluntary

2  agreement for interconnection. [Box 01, at 59-67.]

3

4      July 29, 1996. On July 29, 1996, after the parties were unable to reach

5  agreement, GCI petitioned the Alaska Public Utilities Commission ("APUC") for

6  arbitration, and this docket was opened. [Box 01, at 45-57.]

7      November 20, 1996. Following a hearing, the arbitrator appointed by the APUC

8  recommended the adoption of GCI's proposal of a UNE loop rate of $13.85 per month.

9

10  [Record 12831.] In making that recommendation, the arbitrator specifically noted, "**The**

11  **parties have not yet developed forward looking cost studies and instead have**

12  **offered rates which admittedly are imperfect attempts to approximate forward**

13  **looking costs.**"[5] [Id. (emphasis added).]

14

15      January 14, 1997. The APCU accepted that recommendation [Record 12780-81,

16  12785], and on January 14, 1997, it issued an order approving the arbitrated

17  interconnection agreement. [Record 12867 (Order No. 9).] The Commission made clear:

18  "[A]ll prices in the arbitrated interconnection agreement are **temporary** in nature and will

19  require a full study based upon a cost methodology to be determined by this

20

21  Commission at a later date." [Record 12869 (emphasis added).]

22

23

---

24  [5]    During this time, the status of the FCC's pricing rules was uncertain. In

25  October 1996, the Eighth Circuit Court of Appeals stayed those rules, then later
invalidated them as beyond the FCC's jurisdiction. Iowa Utilities Board v. FCC,

26  109 F.3d 418 (8th Cir. 1996); Iowa Utilities Board v. FCC, 120 F.3d 753, 800 (8th
Cir. 1997). The United States Supreme Court reversed the Eighth Circuit. AT&T
Corp. v. Iowa Utilities Board, 525 U.S. 366, 385, 119 S.Ct. 721, 733 (1999).

8

**C. ACS' Motion to Establish Final UNE Rates and its First Request to Establish a Hearing Schedule: January to March 2000.**

November 9, 1999. The next phase of the proceeding commenced on November 9, 1999, when shortly after its purchase of ATU, ACS wrote to GCI inviting it to negotiate an amendment or replacement of the existing interconnection agreement and rates. [Box 01, at 233-34.] In response, GCI took the position that renegotiation should await the determination of an appropriate cost methodology in the pending Fairbanks/Juneau arbitration (a parallel UNE proceeding between GCI and the ACS companies serving those areas). [Box 01, at 235-36.]

January 24, 2000. Given GCI's rebuff, ACS filed a motion asking the RCA to begin the process of determining a forward-looking cost methodology and establishing "non-temporary" UNE rates for Anchorage. [Box 01, at 218-30.] ACS noted that the existing temporary rates were founded "essentially on embedded costs, a basis expressly disapproved by the FCC,"[6] and ACS declared its concern that it was subsidizing GCI by means of underpriced UNEs. [Box 01, at 220, 224-28.] As part of its motion, ACS asked the Commission to establish a hearing schedule. [Box 04, at 228.]

March 6, 2000. Six weeks later, the RCA granted ACS' motion to begin the new rate-setting process and asked for briefing on the cost model to be used in setting rates. [Box 01, at 260-63 (Order No. 13).] However, the Commission denied ACS's request for a hearing, declaring that it would issue a procedural schedule after it had established

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

---

[6] As opposed to the forward-looking costs upon which UNE rates are to be based, "embedded" costs refer to the utility's historical costs which provide the basis for traditional ratemaking.

9

1  a forward-looking cost model. [Box 01, at 262.] In its order, the RCA specifically

2  acknowledged that "[w]hen the arbitrated agreement was accepted by the Commission,

3
4  **the pricing of unbundled network elements was not based upon an accepted**

5  **forward-looking cost methodology**." [Box 01, at 261 (emphasis added); see also Box

6  02, at 1584, n.17 (Order No. 31 -- recognizing that rates were based on "embedded

7  costs").]

8  **D. ACS' Second Request for a Schedule: March to October 2000.**

9
10  March 31, 2000. In response to the Commission's first request for briefing on the

11  appropriate cost methodology, ACS again proposed that a schedule be adopted and it

12  specifically asked that rates be finalized within four months. [Box 01, at 279, 281-82.]

13
14  ACS declared that "replacement of non forward looking prices should be considered a

legal and economic imperative to bring the agreement into conformance with the law."

15
16  [Box 01, at 284-85.]

17  While noting that arbitration of an entire agreement was not necessary to

18  establish new prices, ACS stated there was no reason why a new agreement could not

19  be put into effect expeditiously as well. [Box 01, at 284.] To that end, it submitted a

20  proposed interconnection agreement, but made clear that the Commission should act

21
22  promptly upon prices first in the event it were determined that reaching a new

23  agreement would be more time consuming. [Box 01, at 284, 287-377.]

24  In its briefing, GCI initially took the position that a cost model and inputs should

25  be developed as "expeditiously as possible" [Box 01, at 443], but when ACS proposed

26  a schedule, GCI opposed it. [Box 01, at 446-50.] In reply, ACS asserted that GCI only

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

10

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

opposed the schedule because it benefitted financially from every day of delay. [Box 01, at 454.] ACS affirmed that "[t]he prices are not forward looking [and] do not comply with federal law." [Box 01, at 455.]

May 30, 2000. On May 30, 2000, following its selection of a modified version of the FCC model in the Fairbanks/Juneau arbitration, the RCA mandated the use of that same model in the Anchorage proceeding.[7] [Box 01, at 462 (Order No. 14).] The RCA also appointed an arbitrator and directed that a prehearing conference be held to establish a schedule for determining the cost inputs to be used in the model. [Box 01, at 463.] The conference was to be held ten business days after the RCA's adoption of an interconnection agreement in the Fairbanks/Juneau proceeding. [Id.]

Since the RCA did not approve the Fairbanks/Juneau agreement until October 5,[8] the prehearing conference was not held until October 19, 2000, almost five months after the May 30 order. [Box T1, at 1.]

**E. ACS' Continuing Requests for a Prompt Rate Decision: October 2000 to February 2001.**

October 19, 2000. At the October 19 conference before the arbitrator, ACS declared its goal to have new rates in effect by the end of the year, asserting that the temporary rates, which were more than three-and-one-half years old, were not forward

---

[7]    In the Fairbanks/Juneau arbitration, ACS proposed a model it had developed (ACS 6.2, an earlier version of ACS 7.2) and GCI proposed the Hatfield 5.1 model. The RCA opted instead to follow the recommendation of its consultant and selected the FCC model. [RCA Docket U-99-141, Order No. 5 (Apr. 18, 2000): http://www.state.ak.us/rca/orders/utils/1999/u99141_5.pdf.]

[8]    RCA Dockets U-99-141/142/143, Order No. 10 (Oct. 5, 2000): http://www.state.ak.us/rca/orders/utils/1999/u99141_10.pdf.

11

1    looking and did not conform to the law. [Box T1, at 4.] To that end, ACS stated that it

2    would strenuously oppose any delay in the arbitration of UNE rates to accommodate any

3    proposal by GCI to expand the scope of the arbitration. [Box T1, at 19.] The arbitrator

4    

5    continued the conference to allow the parties to raise various issues with the

6    Commission.[Box T1, at 2, 19-20.]

7    December 6, 2000. On December 6, 2000, the Commission convened a hearing

8    to address the scope of the issues to be decided. [Box T1, at 22-23.] Consistent with the

9    position it took in prior briefing, GCI asserted that the entire interconnection agreement

10   should be arbitrated. [Box 01, at 551; Box T1, at 41, 44.] In response, ACS asserted that

11   

12   GCI had not requested arbitration of a new agreement and that, in any case, resolution

13   of the pricing issue should come first. [Box T1, at 59-60.] ACS argued that the

14   temporary rates were now four years old, that they constituted a subsidy to GCI, and

15   

16   that they needed to be brought into compliance with the law. [Box T1, at 39, 65, 68, 71,

17   110.]

18   Respecting the applicability of the nine-month arbitration deadline set forth in 47

19   U.S.C. § 252(b)(4)(C), ACS stated that this case posed an anomaly since it only

20   involved the revision of existing interim prices to conform to federal law, and it

21   

22   acknowledged that the deadline did not technically apply because this was not a new

23   negotiation or arbitration. [Box T1, at 65-67.] Nonetheless, ACS asserted that the

24   Commission still had an obligation to conform the prices to the Act "expeditiously." [Id.]

25   January 8, 2001. One month after the hearing, the Commission issued an order

26   finding that "arbitration of a new interconnection agreement will be required," yet

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

12

1    concluding that the statutory deadlines did not apply since a new request for negotiation

2    or petition for arbitration had not occurred. [Box 01, at 567 & nn.15-16 (Order No. 15).]

3    The Commission also asked for briefing on the scope of the arbitration and invited the

4

5    parties to propose modifications to the FCC model. [Box 01, at 567-68.]

6        February 23, 2001. In its briefing in response, ACS asserted that **the Act's**

7    **deadlines would apply** if the arbitration were expanded beyond the issue of rates to

8    encompass a new agreement. [Box 01, at 615.] ACS further asserted that it "has

9

10   consistently advised the Commission that there is an immediate, existing obligation to

11   replace the interim prices...as soon as practicable." [Box 01, at 614.]

12       Respecting modifications to the FCC model, ACS pointed out that continued use

13   of both that model and its default cost inputs was prohibited by the Eighth Circuit Court

14
     of Appeals' decision in Iowa Utilities Board v. FCC, 219 F.3d 744, 751-54 (8th Cir. 2000)
15

16   (Iowa Utilities II). [Box 01, at 602-04.] In that case, the court had upheld the FCC's

17   requirement that UNE rates be based on a forward-looking methodology, but had

18   vacated and remanded the FCC rule – 47 C.F.R. § 51.505(b)(1) – that requires that

19
     UNE rates be based on a hypothetical network.[9] Id., at 751-54.
20

21   **F. The RCA Revisits the Cost Model Selection Issue: May to July 2001.**

22       May 11, 2001. Ten weeks after receiving the parties' briefing, the RCA issued an

23   order, declaring that "further inquiry into the alternative methods for determining

24   interconnection prices...is appropriate" and requesting briefing on "any and all forward-

25   _____

26   [9]    The United States Supreme Court later reversed the Eighth Circuit's
     invalidation of the hypothetical network rule. Verizon Commun., Inc. v. FCC, 535
     U.S. 467, 523, 122 S.Ct. 1646, 1679 (2002).

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

13

looking cost studies or methodologies" the parties wished the Commission to consider. [Box 01, at 784, 791 (Order No. 20).] The RCA acknowledged that it had "an obligation to reset the prices of the 1997 agreement consistent with a forward-looking methodology," and it encouraged the parties to examine what other states had done to formulate their forward-looking costs. [Box 01, at 787, 789.]

Respecting the scope of the arbitration, the RCA declared that, rather than only arbitrating rates, it would conduct "one consolidated proceeding" to address the agreement "as a whole." [Box 01, at 788-89.] Procedurally, the RCA stated that it would hear and decide the appropriate cost methodology, then assign the application of that methodology to a hearing examiner or arbitrator. [Box 01, at 786.]

May 18 – June 29, 2001. In compliance with the RCA's directive to provide the other party with any cost models they wanted considered, GCI served a copy of the Hatfield 5.2a model and ACS served its ACS 7.2 model (an updated version of its earlier 6.2 model). [Box 01, at 795, 804.] Along with its model, ACS filed a request asking that it be allowed until June 29 to file a new model that would comply with Iowa Utilities II, and it asked that the deadline for briefing on the cost methodologies be extended a month to July 27. [Box 01, at 795-801.] The RCA granted that motion, and ACS filed its new ACS 8.0 model. [Box 01, at 1034 & n.1; Box 01, at 1113-16 (Order No. 21).] GCI proposed the use of the FCC model, rather than the Hatfield 5.2a model. [Box 01, at 1198-99.]

July 27, 2001. On July 27, 2001, the parties filed their briefs evaluating the various cost models. In its brief, ACS took the position that its 8.0 model should be

14

adopted since it complied with <u>Iowa Utilities II</u>. [Box 01, at 1155, 1176.] ACS also proposed that the Commission take evidence on ACS 7.2 so that a new hearing would not be needed in the event that <u>Iowa Utilities II</u> were reversed. [<u>Id.</u>] As for the FCC model proposed by GCI, ACS explained through expert affidavits the many reasons why neither the model nor its default cost inputs should be used for UNE rate purposes.[10] For its part, GCI objected to the use of ACS' proposed models on numerous grounds. [Box 01, at 1514, 1528.]

**G. ACS' First Request for Interim Relief: June to October 2001.**

<u>June 8, 2001.</u> On June 8, 2001, ACS filed its first request for the immediate establishment of an interim and refundable loop rate, asking that the monthly rate be increased from $13.85 to $24. [Box 01, 927-64.] In support of its request, ACS argued that for eighteen months it had made "consistent, good faith efforts to have the existing temporary and interim rates revised," but that those efforts had produced no action. [Box 01, at 937.] ACS again asserted that the existing rates violated the Act. [Box 01, at 942.] In its reply to GCI's opposition, ACS argued that the "temporary" rate which had been in effect for four-and-one-half years had become *de facto* permanent. [Box 01, at 1067.]

---

[10]     Among other things, the model was developed for the different purpose of calculating federal universal service support; the safeguards that protected against erroneous results in that context did not function when used for UNE purposes; and in a survey of other states, none had used a generic model like the FCC model for UNE loop rate purposes, opting instead for company-specific models. [Box 01, at 1172-84, 1205, 1221, 1229, 1262, 1268-70.] ACS also explained that the default cost inputs used in the FCC model were based on the national average costs of large, lower-48 carriers, that the defaults did not represent appropriate costs for Anchorage, and that no state in the survey had used default inputs for UNE purposes. [Box 01, at 1172, 1175, 1220-23; 1306-10. See also Footnote 3, above.]

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

15

As an alternative to an increased interim rate, ACS also proposed the implementation of a true-up mechanism by which GCI would be required to compensate ACS for any underpayments once a final loop rate was determined. [Box 01, at 1085]

October 25, 2001. Based on a run of the FCC model presented by GCI, the RCA entered an order on October 25, 2001, adopting an interim and refundable monthly loop rate of $14.92. [Box 01, at 2698 (Order No. 23); see Box 01, at 974 (GCI's Opp. to ACS' Requests for Interim and Refundable Rates).]

## H. The RCA Requests Additional Information on Cost Methodologies: February to June 2002.

February 8, 2002. Six months after the parties had submitted their briefing on the competing cost models, the Commission issued another order declaring it needed additional information before it could select a cost methodology. [Box 01, at 2712-24.] The Commission noted that, in choosing a model, it would take its guidance from the Telecommunications Act, rather than Iowa Utilities II, which it construed as being internally inconsistent. [Box 01, at 2716-19.] The RCA further found that it could not further delay its interpretation of the Act in the hopes of getting clearer guidance from the Supreme Court. [Box 01, at 2719.] Accordingly, the Commission calendared a hearing for one week later to allow the parties and their experts to explain and answer questions respecting their proposed models. [Box 01, at 2724.]

February 15, 2002. At the hearing, ACS spoke in favor of the ACS 7.2 model as the only model that complied with the TELRIC standards as construed by the RCA in its most recent order. [Box T1, at 252.] ACS also respectfully requested the Commission

16

to set a schedule so that it could be known when this proceeding would end. [Box T1, at 253, 349-50.] ACS noted that the temporary and interim rates had been in place for five years, and it submitted that final UNE rates should be in place by the fourth quarter of the year. [Id.] To facilitate progress in the case, ACS also offered to make its staff available at an informal workshop where GCI's experts could ask any questions they had about ACS' proposed loop cost model (ACS 7.2). [Box T1, at 254, 348-49.]

April 8, 2002. Almost two months later, the RCA ordered the parties to participate in the workshop. [Box 01, at 2735-45 (Order No. 25).]

May 1, 2002. The workshop, moderated by the appointed arbitrator, was held on May 1, 2002. Though three days had been set aside, GCI's experts exhausted their questions in less than a day, and the workshop was adjourned. [Box 01, at 2750 (ACS' Report on Workshop); Box 01, at 2773-2940 (Workshop Transcript).] Despite the fact that it had had the model for almost a year, GCI was not prepared at the workshop to propose any changes to the model. [Box. 01, at 2810.] Therefore, in an effort to speed the process along, ACS invited GCI to advise it of any proposed changes so that ACS could determine which issues could be resolved by stipulation. [Box 01, at 2808, 2811, 2815.] GCI never responded to that invitation. [Box T1, at 1032, 1101-06 (Arbitration Conference Transcript).]

**I. ACS' Third Request to Establish a Hearing Schedule and the RCA's Selection of the ACS 7.2 Model: June to July 2002.**

June 12, 2002. On June 12, 2002, ACS filed a motion asking for the establishment of a definitive hearing schedule. [Box 01, 3110-32.] ACS argued that the

17

1  temporary and interim rates had been in place for five-and-one-half years and that two-

2  and-one-half years had passed since ACS moved for the establishment of final rates.

3
4  [Box 01, at 3112.] ACS further argued that the rates had never complied with the FCC's

5  pricing regulations and that GCI had been permitted to obtain unprecedented market

6  penetration based on interim rates below any rational measure of cost. [Box 01, at 3112-

7  13.]

8
        June 25, 2002. Predictably, GCI opposed ACS' motion. [Box 01, at 3134-44.]
9
10  Though it stated in one breath that it did not oppose a schedule, it argued in the next

11  that no schedule should be set until the Commission decided what cost models should

12  be used. [Box 01, at 3134.] Acknowledging that the proceedings had been "stuck in a

13  modeling vortex," GCI attempted to blame ACS for the problem since it had proposed
14
    the use of its own model in lieu of the FCC model originally chosen by the Commission.
15
16  [Box 01, at 3141-42.] In reply, ACS asserted that GCI was continuing to "obscure the

17  simplicity and utility" of the proposed ACS 7.2 model and ignoring the "arcane and

18  complex issues" posed by trying to use the purely hypothetical FCC modeling process

19  to design an efficient Anchorage network. [Box 01, at 3155-56.]

20
        July 29, 2002. On July 29, 2002, the RCA entered an order selecting the ACS 7.2
21
22  model, subject to challenge and revision by GCI, and adopting a two-phase procedure

23  for the completion of the arbitration. [Box 01, at 3158-65 (Order No. 26).] Changes to

24  the model would be arbitrated in Phase 1, and cost inputs and final rates would be

25  arbitrated in Phase 2. [Box. 01, at 3164-65.] The Commission further directed the
26
    arbitrator to meet with the parties to set a schedule for the completion of Phase 1, but

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ᴺᴰ AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

18

1    ruled that the schedule for Phase 2 would not be established until after Phase 1 was

2    completed. [Box 01, at 3158-59.]

3        The Commission denied ACS' request to adopt a more specific schedule,

4    asserting that ACS would have to live with the delays involved in using the 7.2 model

5    

6    since it was the party that proposed its use. [Box 01, at 3162-63.] The Commission also

7    stated that the delays to date in adopting new rates had been due, in part, to ACS's

8    advocacy of the 7.2 model over the FCC model. [Id.] To support that conclusion, the

9    

10   RCA cited to ACS' February 23, 2001, response to the RCA's own request for briefing

11   regarding modifications to the FCC model. [Id.] In that briefing, ACS simply pointed out

12   that the Eighth Circuit's invalidation of the hypothetical network rule in Iowa Utilities II

13   prohibited the use of the FCC model (which assumed a hypothetical network) and its

14   

15   hypothetical default cost inputs. [Box 01, at 604.] It was not fair to fault ACS for raising

16   that legal issue in response to the RCA's own request for briefing.

17       Respecting the selection of the ACS 7.2 model, the RCA reasoned that 7.2 was

18   preferable to the FCC model because it was based on a network design specific to

19   Anchorage. [Box 01, at 3160-61.] The Commission also found that none of the many

20   problems raised by GCI was fatal to the 7.2 approach. [Box 01, at 3163.] Respecting

21   changes to the model, the Commission repeatedly made clear that "GCI will be

22   permitted to advocate for modifications to the v7.2 model, and ACS-AN will make any

23   required changes." [Box 01, at 3158, 3163-64.]

24   

25   **J. ACS' Fourth Request to Establish a Schedule: August to December 2002.**

26       August 22, 2002. On August 22, 2002, the parties convened before the arbitrator

19

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1   for a scheduling conference. [Box T1, at 353-415.] However, contrary to the

2   Commission's express directive in its July 29 order, the arbitrator failed to set a Phase

3
4   1 schedule. When ACS asked for a schedule, GCI asserted that matters had to be taken

5   "step-by-step." [Box T1, at 386-87.] While GCI said it could come up with a timeline for

6   the first part of Phase 1, it could not do so for the remaining parts. [Box T1, at 388.]

7   When ACS asked GCI for at least a list of its proposed changes to ACS 7.2, GCI said

8   it was premature to do that. [Box T1, at 369, 375-76, 409.] When ACS asserted that GCI
9
10  was describing a two-to-three year process, GCI stated that six months was "a realistic

11  minimum" to get "all the way to a final decision." [Box T1, at 383-85.]

12      September 9, 2002. Frustrated by the arbitrator's failure to set a schedule, ACS

13  filed another motion seeking a definitive schedule. [Box 01, at 3188-95.] Relying both

14  on recent state legislation that established deadlines for certain Commission actions,[11]
15
16  as well as on the Commission's general statutory authority,[12] ACS asked for "a firm

17  deadline for the completion of this docket and the adoption of a final UNE loop rate."

18  [Box 01, at 3194.] Noting that the docket had been open for more than six years, ACS

19  argued that "[f]or more than two years, the Commission has issued a series of evolving

20  orders without ever reaching a final decision as to the model to be used in determining
21
22  the loop rate." [Box 01, at 3192, 3194.] ACS further argued that it was losing money as

23  a result of the low UNE loop rate, GCI was benefiting from an unfair subsidy, and the

24

25  [11]   AS 42.05.175.

26
    [12]   See AS 42.04.080(a) (requiring the Commission to "establish standards of
    timeliness for the types of cases that come before the commission").

20

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1    public's interest was being frustrated. [Box 01, at 3194.]

2    GCI again opposed the motion, repeating the refrain that most of the delays were
3
4    attributable to ACS' request to use its loop cost model in lieu of the FCC model. [Box 01,
5    3213-24.] In reply, ACS pointed out that it had simply proposed the 7.2 model in
6    response to Commission orders requesting briefing on the choice of an appropriate
7    model. [Box 01, at 3229-30.] ACS argued that it should not be forced to choose
8    between: 1) a fair and accurate determination of the UNE loop rate, using the most
9
10    appropriate model, and 2) a speedy determination of that rate. [Id.] Finally, ACS argued
11    that the issue was not who was responsible for past delay, but how much longer ACS
12    and the public had to wait for fair rates. [Id.] Given that Congress established a nine-
13    month deadline for initial UNE arbitrations, there was no reason why it should take
14    longer to finalize a subsequent interconnection agreement. [Id.]
15
16    December 11, 2002. Almost three months after briefing was completed, the RCA
17    denied ACS' motion to establish a deadline. [Box 02, at 178-99 (Order No. 27).] In so
18    ruling, the RCA found that neither the new state statutory deadlines nor the nine-month
19    federal deadline applied to this proceeding. [Box 02, at 195-96.] The Commission again
20    accepted GCI's accusations, unfairly finding that ACS had authored most of the delays
21    by proposing the use of its 7.2 model. [Box 02, at 197.] The Commission concluded that
22
23    GCI must be given sufficient time to understand the 7.2 model and correct it. [Id.]

24    **K. ACS' Second Motion for Interim Relief: October 2002 to April 2003.**

25    October 24, 2002. On October 24, 2002, one year after being granted a minimal
26    increase in the temporary UNE loop rate to $14.92, and with no appreciable progress

21

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

having been made toward the establishment of a final rate, ACS filed a second motion asking that the interim rate be increased to $24.48. [Box 01, at 3259-3357.] In part, ACS based its motion on the discovery that GCI had unfairly manipulated the run of the FCC model that had produced the $14.92 rate previously adopted by the Commission. [Box 01, at 3266-67, 3276-81.] ACS also argued that GCI had been able to use the unfairly low loop rate to capture 42% of the Anchorage local phone market (as compared to 10.2% competitive market capture nationwide). [Box 01, at 3270.] Based on the number of loops leased by GCI, ACS was losing over $55,000 a month for every dollar that the loop rate was understated. [Box 02, at 3269.]

November 22, 2002. GCI opposed ACS' motion and filed its own cross-motion asking for a decrease in the interim loop rate to $10.88. [Box 02, at 142-68.] Despite its consistent opposition to every effort by ACS to set a schedule or deadline, GCI continued to blame ACS for the delays, and ironically, it complained that "[t]his process will continue with no immediate end in sight" and that it "has waited too long for this proceeding to be completed." [Box 02, at 157, 165.]

April 14, 2003. Four months after the briefing was complete on the parties' cross-motions, the RCA refused to adjust the interim rate. [Box 02, at 1578-87 (Order No. 31).]

**L. ACS' Fifth Request to Establish a Deadline: February to April 2003.**

February 6, 2003. On February 6, 2003, the parties convened before the arbitrator to address a couple of issues, including scheduling. [Box T1, 498-500.] Despite ACS' assertion that the proceeding would still be ongoing a year from then unless a deadline were set or something was done to move it along, no action was

22

1  taken to set any kind of schedule. [Box T1, at 554-57.]

2  March 17, 2003. Still with no schedule in hand, even for Phase 1 of the
3
4  proceeding as directed more than seven months previous in the RCA's July 29 order,
5  ACS filed a motion on March 17, 2003, asking that the arbitrator be required to issue
6  proposed decisions on all outstanding issues by June 30. [Box 02, at 1201-20.] Given
7  its obvious financial incentive to forestall the adoption of a final UNE loop rate higher
8  than the interim rate, GCI had resisted every effort by ACS to set deadlines or a
9
10  schedule. [Box 02, at 1208.] As a result, progress had been glacial. Seven months after
11  the RCA had mandated the two-phase procedure, the parties were still not even half-
12  way through the first phase. [Id.]

13  Predictably, GCI opposed the motion, characterizing it as "frivolous." [Box 02, at
14  1280-81.] Even though GCI claimed it had "every incentive and motivation to complete
15  the arbitration expeditiously" since it was allegedly overpaying ACS over $210,000 a
16  month, GCI still asserted that the case was too complicated to be resolved in a few
17  months. [Box 02, at 1280-81, 1285-88.]
18

19  In reply, ACS reaffirmed that there was "no justification for the snail's pace" that
20  had typified the proceeding to date. [Box 02, at 1325.] ACS noted that it had been
21  common for other states to use models developed by the ILEC for use in determining
22
23  UNE rates and that the commissions in those states had been able to establish rates
24  without the delay experienced here. [Id.]

25  April 28, 2003. In an order dated April 28, 2003, the Commission denied ACS'
26  request to set a deadline, but it did direct the arbitrator to meet with the parties and set

23

a realistic schedule for completing the arbitration and issuing a proposed final order. [Box 02, at 1600-02 (Order No. 32).] The Commission ordered the arbitrator to submit a proposed schedule by May 20, 2003. [Box 02, at 1601.]

**M. ACS' Sixth Request to Set a Deadline: April to June 2003.**

April 29, 2003. On April 29, 2003, nine months after the RCA entered its order adopting the ACS 7.2 model, the arbitrator finally convened a hearing to address GCI's challenges to the model. [Box T1, at 1021.] Upon cross-examination of GCI's experts, however, it became apparent that GCI was completely unprepared to present evidence as to any specific changes that it wanted to make to the model. [Box T1, at 1038, 1040-43, 1052, 1065-69, 1077-78, 1081-85 (Hearing Transcript); Box 02, at 1694-98 (ACS' Objections to Arbitration Order).] Instead, on issue after issue, GCI's witnesses simply sought to make the generic case that there were design issues they would like to look at for purposes of determining whether they wanted to propose any specific changes. [Id.] For example, as one GCI expert witness testified when questioned about any specific changes to SAI placement, "I didn't come here prepared for that kind of detail today....Because it was my understanding that we were coming here to...arbitrate the right for us to evaluate these changes as we move forward with the redesign." [Box T1, at 1078; see also Box 02, at 1697-98.]

In the face of this testimony, ACS observed that the RCA had long ago granted GCI the clear right to propose model changes, and now that GCI could not do so, this entire process was a waste of time. [Box T1, at 1101-11.] ACS declared that it had asked GCI at least half-a-dozen times to provide a list of proposed model changes, but

24

1 | that GCI still could not identify any specifics. [Id.]

2 | 
3 |      May 19, 2003. On May 19, 2003, the arbitrator issued an order finding that GCI
4 | was entitled to challenge the ACS 7.2 model design. [Box 02, at 1665-71.] In so ruling,
5 | the arbitrator noted that GCI indicated the redesign could take up to six months. [Box
6 | 02, at 1670.]

7 |      May 20, 2003. The next day, the arbitrator issued a proposed arbitration
8 | schedule. [Box 02, at 1675-78.] However, rather than presenting a complete schedule,
9 | he proposed only a partial one. With the exception of challenges and changes to the
10 | ACS 7.2 model, he proposed that the arbitration be completed by September 30 with
11 | 
12 | his recommended decisions to be completed by October 31. [Box 02, at 1677-78.] He
13 | stated that the arbitration of changes to the model was not included in the proposed
14 | because they could not be completed by the October 31 deadline. [Box 02, at 1678.]
15 | 
16 |      May 29, 2003. On May 29, 2003, ACS filed objections to both of the arbitrator's
17 | orders. Regarding the order granting GCI the right to challenge ACS 7.2,  ACS argued
18 | that the arbitrator's order had done nothing but restate the right already granted to GCI
19 | by the Commission in its July 29, 2002, order. [Box 02, at 1690.] ACS argued that the
20 | arbitrator, by simply recapitulating the RCA's prior order, had allowed GCI to stall the
21 | 
22 | arbitration for nine months for no purpose. [Box 02, at 1691.] Based on GCI's failure to
23 | present any evidence to support any model changes at the April 29 hearing, ACS asked
24 | the Commission to find that GCI had failed to carry its burden of proving that any
25 | changes should be made and order the parties to proceed directly to the arbitration of
26 | cost inputs and complete this proceeding. [Box 02, at 1691-92, 1700-03.] ACS argued

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

25

1  that GCI had acted in bad faith by intentionally delaying completion of the arbitration and

2  that the arbitrator had acquiesced to that strategy of delay. [Box 02, at 1700-02.]

3
4          Regarding the arbitrator's proposed schedule, ACS declared that the arbitrator

5  had violated the Commission's clear order to submit a schedule to complete the

6  arbitration and issue a proposed final order. [Box 02, at 1810.] ACS asked that all

7  proceedings before the arbitrator be completed no later than August 15 with all

8  proposed decisions submitted to the Commission by August 29. [Box 02, at 1811.] ACS

9  noted that, in stark contrast to the Telecommunications Act, which allotted four-and-

10 one-half months for the actual arbitration of an interconnection agreement, three-and-

11

12 one-half years had now passed since it had asked the Commission to arbitrate final

13 UNE rates. [Box 02, at 1816.]

14         June 20, 2003. On June 20, 2003, the Commission convened to issue an oral

15

16 bench ruling. [Box T-1, at 2242-46.] Finding that the process it had established was "not

17 proceeding at a reasonable pace," the RCA took the case from the arbitrator and

18 mandated that the arbitration be conducted before the Commission, commencing five

19 months hence on November 3, 2002. [Id.]

20
**N. The Arbitration and Decision: November 2003 to June 2004.**
21

22         November 3-11, 2003. The arbitration hearing before the Commission was

23 conducted on November 3-12, 2003. [Box T1, at 2404-3420; Box T2, at 1-536.]

24         June 18, 2004. Seven months after the hearing, with no arbitration rulings having

25 yet been made, ACS respectfully requested the Commission to issue its post-arbitration

26 order. [Box 04, at 1317-18.]

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

26

1    <u>June 25, 2004.</u> One week later, the RCA finally issued its order resolving all

2    outstanding issues. [Box 04, at 1321-1405 (Order No. 42).] For purposes of determining

3    the loop rate, the Commission used the ACS 7.2 model incorporating a few changes

4    proposed by GCI. [Box 04, at 1328-31.]

5

6    By a two-to-one majority, the Commission adopted a monthly rate of $19.15 per

7    UNE loop. [Box 04, at 1399.] The dissenting commissioner found that the rate should

8    be $20.32. [Box 04, at 1401-05.] On reconsideration, the Commission reduced the loop

9    rate to $18.64 to correct for two computational errors in the calculation. [Box 04, at

10   1834-35 (Order No. 46).] The rate was made effective June 25, 2004. [Box 04, at 1949

11   (Order No. 48).]

12

13   **O. Summary.**

14

15   From the time that ACS first asked for the determination of final UNE rates on

16   January 24, 2000, it took **four-and-one-half years** (until June 25, 2004) to issue an

17   arbitration decision and implement a final UNE loop rate.

18   As a result of the illegally low temporary and interim loop rates, ACS lost almost

19   **$11 million** in direct revenue from GCI during that four-and-one-half-year period (based

20   on the final UNE loop rate of $18.64), and GCI received a corresponding windfall.[13]

21

22

23   [13]    The spreadsheet included in the Appendix to this brief as Exhibit 1 is

24   based on the loop count data presented by ACS at the arbitration. [Box 03, at
     795.] The spreadsheet compares the amounts that GCI actually paid to lease

25   UNE loops from ACS with the amounts it should have paid and calculates the
     difference. The calculation is conservative because the same loop count for

26   March 2003 is used through June 2004, even though the number of loops leased
     by GCI actually increased during that period.

27

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

# V. STANDARDS OF REVIEW.

47 U.S.C. § 252(e)(6) provides,

In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section.

The determination of whether the RCA properly interpreted the Telecommunications Act and any implementing regulations, both as to substantive and procedural matters, poses a question of federal law that is reviewed *de novo*. U.S. West Commun., Inc. v. MFS Internet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999). All other issues are reviewed under the arbitrary and capricious standard. US West Commun., Inc. v. Jennings, 304 F.3d 950, 958 (9th Cir. 2002). Findings of fact are reviewed for substantial evidence. Id.

# VI. THE RCA UNREASONABLY DELAYED THE DETERMINATION OF A FINAL, LEGAL UNE LOOP RATE.

## A. Introduction.

Beginning in January 2000, when ACS first moved for a determination of final UNE rates, GCI and the RCA consistently opposed and rebuffed ACS' repeated efforts to establish a schedule for the timely completion of this docket. The RCA ruled that the deadline specified in 47 U.S.C. § 252(b)(4)(C) did not apply and it refused to implement any reasonable schedule apart from that deadline. As a result, as compared to the **four-and-one-half-month** arbitration period provided for in the statute, it took **four-and-one-half years** to determine a final loop rate.

As a matter of law, this court should find that the RCA misconstrued and violated

28

the Act by failing to apply the statutory deadline and by failing to conclude the arbitration in a reasonable time. Accordingly, the case should be remanded to the RCA for a precise calculation of the amount that GCI should pay ACS to compensate for the almost $11 million in underpayments arising from the illegal UNE loop rate.

**B. Standards of Timeliness for Administrative Decisionmaking.**

While the problem of delay in administrative proceedings has proved to be a difficult one, "courts are certainly not without power to address the interests of a regulatory beneficiary...when unwarranted delay prejudices those interests." Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21, 32 (D.C. Cir. 1984). "[T]he law does provide means by which the interests of regulatory beneficiaries can be protected from the adverse effects of delays in agency action." Id. "In some circumstances agency delay may be so egregious that it constitutes unreasonable delay...as a matter of law." Id., at 34 (citation omitted).

"[T]he reasonableness of the delay 'must be judged "in the context" of the statute' which authorizes the agency's action." Id. (citations omitted); see also Public Citizen Health Research Group v. Auchter, 702 F.2d 1150, 1158, n.30 (D.C. Cir. 1983). In some cases, the relevant substantive statute may impose a specific deadline for agency action. Sierra Club v. Thomas, 828 F.2d 783, 794-95 (D.C. Cir. 1987). Absent a specific standard, the statutory scheme may implicitly contemplate final action within a reasonable amount of time. Id.

In this instance, the Telecommunications Act establishes a specific maximum of four-and-one-half months for the completion of arbitrations. 47 U.S.C. § 252(b)(4)(C).

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ᴺᴰ AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

29

Additionally, the Act's requirement of "just and reasonable" rates – 47 U.S.C. § 252(d)(1)

– implies a "rule of reason" for determining the permissible length of proceedings. With

respect to the tariff provisions of the Act, the D.C. Circuit Court of Appeals declared,

> In our view, the entire ratemaking procedure in the 1934 Communications
> Act revolves around a 'rule of reason' as to how long the FCC may take
> between the filing of tariff revisions and its final decision. **It assumes that
> rates will be finally decided within a reasonable time encompassing
> months, occasionally a year or two, but not several years or a
> decade. The standard of 'just and reasonable' rates is subverted
> when the delay continues for several years.** Ratemaking theories may
> change; new information may become relevant; one proceeding may have
> to take account of another. But there must be some reasonably prompt
> decisionmaking point at which the FCC says: 'To the best of our
> knowledge and expertise at this time, the rates are just and reasonable.'

MCI Telecommun. Corp. v. FCC, 627 F.2d 322, 340 (D.C. Cir. 1980)(emphasis added).

> In deciding whether the pace of decision is unreasonably delayed, the
> court should consider the nature and extent of the interests prejudiced by
> delay, the agency justification for the pace of decision, and the context of
> the statutory scheme out of which the dispute arises.

Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d at 35.

"[D]elay in the resolution of administrative proceedings can...deprive regulated

entities, their competitors or the public of rights and economic opportunities without the

due process the Constitution requires." MCI Telecommun. Corp., 627 F.2d at 341

(footnote omitted). "'Property may be as effectively taken by long-continued and

unreasonable delay in putting an end to confiscatory rates as by an express affirmance

of them.'" Id., at 341, n.95 (citation omitted). The public interest is not served by

"endless regulatory meandering." Id., at 331.

"[T]here must be some limit to the time tariffs unjustified under the law can

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

30

1  remain in effect....Otherwise, the regulatory scheme Congress has crafted becomes

2  anarchic...." Id., at 325. "Complex regulation must still be credible regulation," and "[i]t

3
4  corrupts the statutory scheme to keep in place, for several years, rates" that are not just

5  and reasonable. Id., at 340, 342.

6          There comes a point when what has been designated a 'temporary
           measure' lasts for so long, and shows so little sign of being terminated in
7          the foreseeable future, that to continue to categorize it as 'temporary' is
           to ignore the realities of the situation....'**There comes a point when**
8          **relegating issues to proceedings that go on without conclusion in**
           **any kind of reasonable time frame is tantamount to refusing to**
9          **address the issues at all – and the result is a denial of justice.**'
10

11  Id., at 344 (emphasis added).

12  **C. The RCA Violated the Federal Statutory Deadline.**

13          As a matter of law, the RCA misconstrued the Act by refusing to apply the
14
15  statutory deadline of 47 U.S.C. § 252(b)(4)(C). The instant UNE proceeding was

16  undertaken under § 252(b), which provided the only statutory authority for the RCA's

17  arbitration of interconnection agreements. Subparagraph (4)(C) establishes a clear nine-

18  month deadline for the completion of the arbitration, measured from the request for

19  negotiation.
20
            In this case, ACS asked GCI to negotiate a new interconnection agreement on
21
22  November 9, 1999, but GCI rebuffed that request. [Box 01, at 233-36.] Accordingly, ACS

23  asked the RCA to revise the existing "temporary" rates to bring them into conformity with

24  federal law. [Box 01, at 218-30.] So postured, ACS initially took the position that the

25  statutory deadline did not technically apply since a new agreement was not being
26
    arbitrated. [Box T1, at 65-67.] However, once GCI insisted [Box 01, at 551; Box T1, at

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

31

41, 44; see also Box 01, at 630-31] and the RCA ruled [Box 01, at 567 (Order No. 15); see also Box 01, at 788 (Order No. 20)] that the proceeding would have to be expanded to encompass the arbitration of an entire new agreement, ACS asserted that the statutory deadline would apply. [Box 01, at 615.] Despite this clear statement of ACS' position, the RCA consistently refused to abide by the statutory deadline or establish any other reasonable schedule for the completion of the arbitration.

The RCA violated § 252(b)(4)(C) by failing to complete the arbitration within the prescribed deadline. Since ACS requested negotiation of a new interconnection agreement on November 9, 1999, the nine-month deadline period should have begun running on that date and the arbitration should have been completed by August 9, 2000.

The RCA was wrong when it concluded that the statutory deadline did not apply since a new request for negotiation or a petition for arbitration had not occurred. [Box 01, at 567 & nn.15-16 (Order No. 15).] ACS did ask GCI to negotiate a new interconnection agreement, and though GCI rebuffed that request, GCI later insisted (once ACS initiated this proceeding) that a new agreement would have to be arbitrated. Under those circumstances, the RCA should have applied the statutory deadline once it ruled that a new agreement would be arbitrated. By deciding otherwise, the RCA placed form over substance, and it permitted GCI to take advantage of its own refusal to negotiate as a means of avoiding the application of the statutory deadline and delaying the proceeding.

By enacting an express mandatory deadline, Congress clearly intended that UNE arbitrations be concluded promptly. Compliance with that deadline was especially

32

important in this case, given that the temporary UNE loop rate that had been in place since January 1997 never complied with the pricing provisions of the Act. As a result of the inadequacy of that rate and the RCA's failure to abide by the congressionally mandated deadline, GCI was allowed to go on leasing access to ACS' loops for a fraction of the proper rate. Over the four-and-one-half years it took to arbitrate a final UNE loop rate, ACS suffered almost $11 million dollars of losses and GCI gained a corollary windfall. To remedy this loss resulting from the violation of the Act, this court should remand this case to the RCA with directions: 1) to calculate the loss suffered by ACS from August 9, 2000 (the expiration of the nine-month deadline), through June 24, 2004, and 2) to order GCI to compensate ACS for that loss.[14]

## D. The RCA Violated the Act by Failing to Complete the Arbitration Within a Reasonable Time.

Apart from the express statutory deadline, this court should also find that the RCA violated the Act by failing to adopt a final UNE loop rate within a reasonable time. Even where statutes do not establish express deadlines, the statutory scheme may implicitly contemplate final action within a reasonable amount of time. Sierra Club v. Thomas, 828 F.2d at 794-95. Thus, in MCI Telecommun., Inc. v. FCC, 627 F.2d at 340, the court held that the tariff provisions of the Communications Act, by virtue of their mandate of "just and reasonable" rates, imply a "rule of reason" to limit the duration of

---

[14]     GCI was also able to use its unfair subsidy and the underpriced loop rate to maintain artificially low prices and capture new customers at a rate unprecedented anywhere else in the United States. While ACS seeks here to establish its right to recoup the direct loss resulting from the underpriced loop rate, there is nothing this court can do to remedy the loss of customers to GCI resulting from its unfair UNE pricing advantage.

33

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

proceedings. "[W]here Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason." Telecommunications Research and Action Center v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984)(citations omitted). See also Independence Mining Co., Inc. v. Babbitt, 105 F.3d 502, 507 n.7 (9th Cir. 1997).

As in MCI, the provisions of the Communications Act at issue here also mandate "just and reasonable" rates, thereby implying the application of a "rule of reason." 47 U.S.C. § 252(d)(1). See also 47 U.S.C. § 251(c)(2)(D). The express deadlines set forth in § 252(b)(1) and (4)(C) provide concrete context for determining the limits of reasonable delay. If an entire arbitration, from initial request for negotiation through a final state commission decision, must be completed in nine months, then the arbitration in this case should have been completed within the same time. Other provisions of the Act (establishing deadlines for approval of negotiated or arbitrated interconnection agreements and mandating FCC preemption where state commissions fail to act) further support the conclusion that "time is clearly of the essence" when it comes to state commissions carrying out their duties. AT&T Commun. of the South Central States, Inc. v. Bellsouth Telecommun., Inc., 20 F.Supp.2d 1097, 1102 (E.D. Ky. 1998), citing 47 U.S.C. §§ 252(e)(4) and 252(e)(5).

ACS repeatedly asked for the establishment of a reasonable schedule or deadline for completing this arbitration. GCI consistently opposed every request, presenting one excuse or another as to why a schedule could not be established and blaming ACS for the delay. In response, ACS just as consistently argued that GCI was

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1  intentionally seeking delay because it was receiving a substantial subsidy at ACS'

2  expense for every day that the underpriced UNE loop rate remained in place. A review

3  of the entire procedural record amply validates the point.

4

5  Unfortunately, the RCA enabled GCI's strategy of delay. For years, both the

6  Commission and its appointed arbitrator refused to impose any reasonable time

7  constraints. To take but one salient example (detailed above): At a hearing held in April

8  2003, nine months after the RCA had ruled that GCI could challenge any aspect of the

9  ACS 7.2 model, GCI was completely unprepared to identify any needed changes, but

10  instead sought only to make the case that it should have the right to challenge the

11  model. However, rather than hold GCI responsible for its lack of preparedness, the

12  arbitrator simply issued an order re-granting GCI the right to challenge the model -- the

13  same right that had already been granted it ten months before. When ACS lodged its

14  objections to the Commission, it also refused to hold GCI responsible for failing to carry

15  its burden of proof and directed that the whole hearing process be begun all over again

16  -- three-and-one-half years after the proceeding had begun the first time. From that

17  point, it still took a full year before an arbitration decision was issued.

18

19  By any standard of decision, the delay in this case was unreasonable. In contrast

20  to the four-and-one-half-month arbitration period provided for in the Act, it took the RCA

21  four-and-one-half years to determine a final UNE loop rate. Instead of establishing any

22  sort of reasonable schedule, the RCA acquiesced to GCI's strategy of delay and forced

23  ACS to run a meandering procedural course until finally, after three-and-one-half years,

24  it started the whole process all over again. As a matter of law, this court should find that

25

26

35

1  the RCA misconstrued and violated the Act by failing to complete the arbitration within

2  a reasonable time, and this court should remand the matter to the RCA for recalculation

3  of GCI's UNE loop rate obligation from August 9, 2000, through June 24, 2004.

4

5  ### VII. THE TEMPORARY AND INTERIM UNE LOOP
   ### RATES DID NOT COMPLY WITH FEDERAL LAW.

6

7  **A. Introduction.**

8  Under the Act and the implementing regulations, all UNE rates – including both

9  final and interim rates – must comply with the TELRIC methodology. Verizon California,

10 Inc. v. Peevey, 413 F.3d 1069,1073 (9th Cir. 2005). In this case, the temporary and

11 interim UNE loop rates in place prior to the adoption of a final rate in June 2004 did not

12

13 comply with TELRIC. Instead, the RCA implemented unfairly low loop rates that left ACS

14 to suffer the loss once the higher final rate was determined. By contrast, GCI bore no

15 risk since it would have been entitled to a refund of any overpayment in the event the

16 final rate were determined to be lower than the interim rate. Nothing in the Act permitted

17 the RCA to impose the entire onus of an illegal rate on ACS, either on a permanent or

18 an interim basis. This court should find that the temporary and interim rates were illegal

19

20 as a matter of law, and consistent with the statutory deadline for the completion of

21 arbitrations, this court should remand the matter to the RCA for recalculation of the

22 proper UNE loop rate from August 2000 through June 2004.

23

24 **B. The Original "Temporary" Rate.**

25 The original "temporary" UNE loop rate of $13.85 was in place from January 1997

26 through October 25, 2001, when the RCA adopted a revised interim rate. The

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

36

1  "temporary" rate did not comply with TELRIC, and the arbitrator recognized that when

2  he recommended the rate's adoption, declaring that it was not based on a forward-

3
4  looking cost study. [Record 12831.] The Commission similarly acknowledged that the

5  rate was not based on an accepted forward-looking cost methodology as required under

6  the Act and the implementing regulations. [Box 01, at 261 (Order No. 13); see also Box

7  02, at 1584, n.17 (Order No. 31 -- recognizing that rates were based on "embedded

8  costs").] The Commission, therefore, made clear when it adopted the arbitrator's

9
10  recommendation that the rate was "temporary" and would "require a full study based

11  upon a cost methodology to be determined...at a later date." [Record 12869.] From ACS'

12  perspective, the overriding point of this whole proceeding was to correct the illegal loop

13  rate and replace it with one that complied with federal law.

14  **C. ACS' First Request for Interim Relief.**

15
16      On June 8, 2001, eighteen months after it had first asked for final rates and with

17  little progress having been made toward that end, ACS moved for the adoption of an

18  interim and refundable UNE loop rate of $24. [Box 01, at 927-28.] ACS asserted a

19  revised rate was necessary since the current temporary rate violated the Act, was not

20  based on any recognized definition of cost, and was not forward looking. [Box 01, at

21  942.] ACS based its request on its ACS 7.2 model, which produced a loop rate of

22
23  $24.59. [Box 01, at 962.] ACS validated the results of that model with the results from

24  its earlier ACS 6.2 model and from the FCC model using Anchorage-specific cost inputs.

25  [Box 01, at 960-62.]

26
        By proposing that the rate be refundable, thereby providing for reimbursement

37

1  to GCI in the event the final rate were lower than the interim rate, ACS sought to ensure

2  that all parties would be protected against loss. [Box 01, at 932.] ACS noted that both

3
4  the FCC and the National Association of Regulatory Utility Commissions had endorsed

5  refunds or true-ups as a means of affording retroactive adjustments to UNE rates. [Box

6  01, at 947-48.] As the FCC argued before the Eighth Circuit in seeking to stay that

7  court's invalidation of the FCC's pricing rules,

8
9
10
11
> [T]he parties (or the state commissions acting as arbitrators) could easily avoid any possible prejudice from that short-term delay [attributable to Supreme Court review] by including, in any interconnection agreements adopted in the interim, provision for refunds or 'true ups' in the event that the current methodology ultimately needs to be altered.

12  [Box 01, at 947, *quoting* FCC Motion for Partial Stay of Mandate Pending the Filing of

13  a Petition for Writ of Certiorari, Eighth Circuit Court of Appeals Case No. 96-332, at 3,

14
15  11 (August 30, 2000).] Similarly, in its more recent Notice of Proposed Rulemaking, the

16  FCC stated, "We have recognized in several contexts that the use of interim rates

17  subject to true-up is an appropriate means of protecting all parties' interest when

18  permanent rates under the governing cost methodology have not yet been set."[15]

19    ACS argued that the requested relief was mandated under equitable principles.

20  [Box 01, at 949-50.] Analogizing to the standards for granting preliminary injunctive

21
22  relief,[16] ACS argued that interim rate relief should be granted upon a showing of: 1)

23

24  [15]  In the Matter of Review of the Commission's Rules Regarding the Pricing
25  of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, Notice of Proposed Rulemaking, WC Docket No. 03-173, 18 FCC Rcd 18945, at ¶ 151 (released Sept. 15, 2003).

26  [16]  APUC v. Greater Anchorage Area Borough, 534 P.2d 549, 554 (Alaska 1975). See also A.J. Industries, Inc. v. Alaska Public Serv. Comm'n, 470 P.2d

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

38

1  irreparable harm to the moving party; 2) adequate protection to the opposing party; and

2  3) serious and substantial questions going to the merits of the case, i.e., the issues

3
   raised cannot be frivolous or obviously without merit. [Box 01, at 1083-84.]
4

5        Alternatively, applying the Commission's five-prong "balance of hardships" test

6  for interim tariff relief,[17] ACS argued: 1) the current rate was confiscatorily low; 2) the

7  current rate has and will remain in effect for an unreasonably long time; 3) ACS would

8  suffer irreparable harm if relief were not granted; 4) GCI could be adequately protected

9
   through refunds; and 5) the request was not frivolous or obviously without merit.[18] Re
10
11 Yukon Telephone Co., Inc., 7 APUC 355 (1986); see also APUC v. Greater Anchorage

12 Area Borough, 534 P.2d at 554, 557. [Box 01, at 950-58, 1083.]

13        GCI opposed ACS' motion, claiming that the current rate was lawful and arguing

14 that ACS' cost models and the proposed interim rate were inconsistent with the FCC's
15
   pricing rules. Box 01, at 969-74.] Based on a run of the FCC model (allegedly) using
16
17 Anchorage customer and wire center information and using cost inputs from the

18 ────────────────────────

19 537, 540-41 (Alaska 1970).

20 [17]   Since a UNE rate is not a tariff, ACS maintained that equitable principles
   should govern rather than the standards for interim tariff relief. [Box 01, at 949-
21 50.]

22 [18]   In contrast to the "balance of hardships" test, the Commission will apply
   the stricter "probable success" test where "a final decision is likely within a
23 reasonable period." Re Municipality of Anchorage dba Municipal Light and Power
24 Dept., 7 APUC 514, 517 (1986). Under the "probable success" test, the movant
   must demonstrate "that it will more likely than not prevail on final hearing." Id. As
25 a benchmark for determining whether a final decision will be rendered within a
   reasonable period, the Commission has recognized that the requirement is
26 satisfied where a hearing on the matter is expected within six months of the initial
   filing. Id.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

39

Fairbanks arbitration, GCI produced a loop rate for Anchorage of $14.92 and argued that the current rate of $13.85 fell within the "zone of reasonableness." [Box 01, at 971, 974.]

In reply, ACS argued its proposed $24 rate was based on a model and company-specific cost inputs that complied with the FCC's pricing rules. [Box 01, at 1070, 1073.] By contrast, the cost inputs used in the GCI run of the FCC model were default inputs, based on national averages and developed only for universal service purposes. As the FCC warned in its universal service proceeding,

> The federal cost model was developed for the purpose of determining federal universal service support, and **it may not be appropriate to use nationwide values for other purposes, such as determining prices for unbundled network elements. We caution parties from making any claims in other proceedings based upon the input values we adopt in this Order.**

*USF Inputs Order*, at ¶ 32 (emphasis added). [Box 01, at 1074-75; 1205, 1220-23, 1229, 1262, 1268-70, 1273-74.] The FCC requires that rates reflect "costs that incumbents actually expect to incur in making network elements available to new entrants." *Local Competition Order*, at ¶ 685.

ACS reaffirmed its request for an interim and refundable rate and asked "in the alternative, for an express and specific order for retrospective true-up of UNE revenues (upon the establishment of proper forward looking economic cost-based UNE rates in the near future)." [Box 01, at 1085.] ACS argued that since "such an order would not require any present cash flow change from GCI, it would minimize any alleged competitive harm while forcing GCI to contemplate true competitive activity in the

40

1   Anchorage market – activity not dependent upon the existing arbitrage circumstance."

2   [Box 01, at 1082.]

3
4         Following oral argument, the Commission adopted a new interim UNE loop rate

5   of $14.92. [Box 01, at 2698 (Order No. 23).]  In refusing to grant a higher rate, the

6   Commission applied the "probability of success" test and concluded that it would not

7   order interim rates based on an unapproved methodology or cost inputs. [Box 01, at

8   2703, 2706-07.] Nonetheless, despite the fact that the RCA had not yet made its final

9
10  model decision in this docket and had not arbitrated any Anchorage cost inputs, it

11  based its order on the rate produced by GCI's run of the FCC model using cost inputs

12  from the Fairbanks proceeding. [Box 01, at 2699, 2705.] In effect, the RCA accepted the

13  $14.92 rate as a concession on GCI's part. The Commission also found that GCI could

14  not be protected by a refund mechanism since a high interim rate could render GCI's

15  competitive service unviable. [Box 01, at 2703.] The Commission did not address ACS'

16

17  alternative request for a true-up mechanism.

18  **D. ACS' Second Request for Interim Relief.**

19        One year later, on October 24, 2002, ACS filed a second motion for an interim

20  and refundable loop rate. Since the RCA had recently mandated the use of the ACS 7.2

21  model (subject to challenge and possible revision), ACS proposed a rate of $24.48

22  based on that model using Anchorage-specific cost inputs. [Box 01, at 3259-60, 3269.]

23

24  ACS also relied on the fact that it had discovered that GCI had improperly skewed the

25  FCC model run used to calculate the current $14.92 rate by manipulating the line counts

26  used in that calculation. [Box 01, at 3267-68.] To further validate the inadequacy of the

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

41

current rate, ACS also noted that the 7.2 model produced a loop rate of $19.52 when used with the cost inputs approved in the Fairbanks/Juneau arbitration. [Box 01, at 3260.]

Cast in terms of the five-prong "balance of hardships" test, ACS argued:

1) The current rate was confiscatory because it allowed ACS to recover only a fraction of the true forward-looking costs of the loops used by GCI. ACS was losing over $55,000 a month for every dollar that the loop rate was understated. [Box 01, at 3270.]

2) The rate had been and would be in place for an unreasonably long time, certainly longer than the six-month benchmark for using the "balance of hardships" test. [Box 01, at 3265, 3271-72.]

3) The harm to ACS would be irreparable since it was anticipated that GCI would later argue that the RCA was prohibited from ordering retroactive payments from GCI upon the adoption of an increased final loop rate. [Box 01, at 3272.] Additionally, no RCA order could remedy ACS' unprecedented loss of customers to GCI made possible by the unfairly low loop rate.

4) The proposed refund mechanism would adequately protect GCI in the event the Commission adopted a final rate that was lower than the interim rate. [Box 01, at 3273.] In answer to the RCA's concern that GCI might not be able to compete if the loop rate were too high, ACS pointed to GCI's unprecedented capture of 42% of the local Anchorage market, which contrasted starkly with the nationwide rate of competitive market capture of only 10.2%. [Box 01, at 3271, 3273.] GCI was able to take advantage of the low loop rate to undercut ACS' prices in the market and capture customers that

42

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

1  it would not have been able to attract if it had to charge a truly competitive rate. [Box 01,

2  at 3271.] ACS also asserted that the public was actually being harmed by the current

3
4  interim rate, since it discouraged ACS from investing in new infrastructure and

5  technologies. [Box 01, at 3274.]

6      5) ACS' motion raised serious and substantial questions. Given GCI's

7  manipulation of its previous FCC model run and the RCA's adoption of the 7.2 model,

8  ACS' challenge to the sufficiency of the current interim rate was not "frivolous or

9
10 obviously without merit." A.J. Industries, Inc., 470 P.2d at 541. [Box 01, at  3267-70.]

11     GCI opposed ACS' motion and filed its own cross-motion, asking that the loop

12 rate be reduced. [Box 02, at 142.] Based on the ACS 7.2 model (with three changes)

13 and using the Fairbanks cost inputs, GCI argued the loop rate should be $10.88. [Box

14
15 02, at 163-64.] With regard to its prior manipulated run of the FCC model, GCI did not

16 contest that it had used inaccurate line counts, but it shifted ground and argued that

17 additional changes needed to be made to that model as well. [Box 02, at 165.] While

18 GCI made no effort to show that its cross-motion satisfied either the "balance of

19 hardships" or "probability of success" tests, it did agree that this proceeding had dragged

20 on for too long and that there was "no immediate end in sight." [Box 012, at 157, 165.]

21
22     Six months after ACS' motion was filed, the RCA denied both parties' requests

23 for an adjustment to the interim loop rate, declaring that it would not order interim rates

24 based on a model that had not been adopted or on cost inputs that had not been subject

25 to scrutiny. [Box 01, at 1578, 1583 (Order No. 31).] Beyond that, the Commission did

26 not mention or base its rulings on either the "balance of hardships" or "probability of

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

43

success" tests.

As a result of the RCA's denial of meaningful interim relief, ACS was placed in the incongruous position of being denied a sufficient interim rate because no model or cost inputs had been approved, while at the same time, the approval of either a final model or cost inputs was still nowhere in sight. [Box 02, at 1623.] Accordingly, ACS moved for reconsideration of the RCA's order. [Box 02, at 1617.] The Commission denied the motion for reconsideration without additional comment. [Box 02, at 1680 (Order No. 33).]

**E. The RCA Violated the Act by Refusing to Grant Meaningful Interim Relief.**

For a period of seven-and-one-half years – from January 1997 through June 2004 – ACS was required to lease UNE loops to GCI at rates that did not comply with the Act and the FCC's implementing pricing methodology. The original "temporary" rate of $13.85 was not based on an accepted methodology, but instead was founded on embedded costs. The subsequent interim rate of $14.92 also was not based on either a cost model or cost inputs approved in this proceeding. Rather, the rate was only adopted because GCI – the party opposing the interim rate motion – effectively conceded the point by producing the rate through its own run (albeit manipulated) of the FCC model.

In addition to the fact that the temporary and interim rates were not calculated using approved methodologies or inputs, the final loop rate of $18.64 validates the legal inadequacy of those rates. While application of TELRIC methodology can yield a reasonable range of compliant rates, the temporary and interim rates fell well below any

44

1    acceptable range. Respectively, the interim ($14.92) and temporary ($13.85) rates were

2    almost $4 and $5 less than the final rate. As a result of the improperly low rates, GCI

3    was permitted to underpay ACS by almost $11 million from January 2000 (when ACS

4

5    first asked for a final loop rate) through June 2004 (when a final rate was finally

6    established). [See Footnote 12, above, and Ex. 1 to the Appendix to this brief]

7        To avoid that result, ACS should have been granted interim relief either in the

8    form of a sufficient interim and refundable rate or the adoption of a true-up mechanism

9

10   that would have required GCI to satisfy the shortfall in its lease payments once a final

11   loop was adopted. Instead, the Commission's approach left ACS in a frustrating

12   position. On the one hand, the Commission refused to implement a sufficient interim

13   rate because no cost model or cost inputs had yet been approved. On the other hand,

14   it unreasonably delayed the decision on the cost model and inputs. That course of

15   procedural inaction effectively left ACS without any remedy at all.

16

17       While adopting a course that fully protected GCI against any financial loss, the

18   Commission left ACS to bear all the risk of loss. By making the interim rate refundable,

19   the RCA ensured that GCI would receive full reimbursement from ACS in the event the

20   final adopted rate were lower than the interim rate. However, by failing either to set the

21   interim rate sufficiently high or to adopt a true-up mechanism, the RCA left ACS to bear

22

23   the full loss in the event the final rate were higher than the interim rate. The RCA

24   exacerbated that inequity by failing to make a final rate decision in a reasonable time.

25   The result is an almost $11 million loss to ACS and a windfall in the same amount to

26   GCI. Nothing in either the Act or the FCC's regulations required that ACS bear all the

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

45

1  financial risk arising from the RCA's delay in determining a final rate.

2       As was the case in <u>MCI Telecommun. v. FCC</u>, 627 F.2d at 327-29, where the

3
4  FCC refused to adopt just and reasonable rates because it lacked the data to do so, the

5  RCA refused to adopt a TELRIC-compliant rate on either an interim or final basis

6  because it had not approved the cost model and inputs needed to calculate the rate. In

7  <u>MCI</u>, however, the court found that rates that were not finally determined to be either

8  just and reasonable or unjust and unreasonable could only avoid the stigma of

9
10  unlawfulness "for a reasonable time." <u>Id.</u>, at 338. The court declared,

11       [T]here must be some limit to the time tariffs unjustified under the law can
        remain in effect (even if the FCC is in no position to decide whether they
12      are actually unlawful). Otherwise, the regulatory scheme Congress has
        crafted becomes anarchic and whatever tariff rates the 'regulated' entity
13      files become, for all practical purposes, the accepted rates.

14  <u>Id.</u>, at 325.

15
16       In this case, the RCA effectively abdicated its responsibility under the Act by

17  refusing either to decide final rates on a timely basis or to adopt some mechanism to

18  protect both parties from the financial costs of its delay. Applying either general

19  equitable standards or its own five-prong test for interim tariff relief, the RCA should

20  have granted ACS' requests for either a sufficient interim and refundable rate or an

21
22  effective true-up mechanism:

23       1. When the RCA denied ACS' motions, it was apparent that the rates then in

24  effect were likely to remain in place for an unreasonably long time and for much longer

25  than the six-month benchmark enunciated in <u>Re Municipality of Anchorage dba</u>

26  <u>Municipal Light and Power Dept.</u>, 7 APUC at 517. No schedule had been adopted, no

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

deadline had been set, and ACS' repeated motions to establish such a schedule or deadline were consistently opposed by GCI and denied by the RCA. A final UNE loop rate was not determined until more than three years after ACS' first motion for interim relief and twenty months after ACS' second motion.

2. The temporary and interim rates were confiscatory. "Rates which do not afford a reasonable return on the value of property used in the public service have been held to be confiscatory." APUC v. Greater Anchorage Area Borough, 534 P.2d at 558, n.26. In this instance, given the final rate that was adopted, it is indisputable that the temporary and interim rates were not sufficient to compensate ACS for the forward-looking costs of leasing its loops to GCI, and ACS lost almost $11 million as a result.

3. ACS suffered irreparable harm. Not only did ACS lose millions of dollars as a result of the underpayments from GCI, it lost customers at an unprecedented rate, thereby losing the past and future revenue that would have been earned by serving those customers.

4. GCI could have been adequately protected. Since the interim rate was refundable, GCI would have recouped any overpayment and would have been fully protected from any financial loss in the event the final rate was lower than the interim rate. Given its unprecedented market capture, there was no realistic risk that GCI would not have been a viable competitor. GCI had captured approximately 35% of the market as of the time ACS filed its first motion for interim relief in the summer of 2001, and that had increased to 42% a year later, shortly before ACS filed its second motion. [Box 01, at 1156, 3270.] Alternatively, the RCA could have adopted a true-up mechanism that

47

1  would have ensured that GCI's viability as a competitor was not affected and avoided

2  any overpayments resulting from an interim rate that was too high.

3

4      5. ACS' requests for interim relief raised serious and substantial questions. The

5  questions raised need only be "not frivolous or obviously without merit." A.J. Industries,

6  Inc., 470 P.2d at 541. "[I]t will ordinarily be enough that the plaintiff has raised questions

7  going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair

8  ground for litigation and thus for more deliberate investigation." Id., at 540. There can

9  be little doubt that this criterion was satisfied. The calculation of a TELRIC-compliant

10 UNE loop rate posed a complex and multifaceted task, and ACS made a substantial

11 showing in favor of its claim for an increase in the loop rate. The RCA's own inability to

12 definitively resolve the rate issue on an interim basis demonstrated that ACS had raised

13 substantial issues respecting the proper rate. The fact that the RCA ultimately adopted

14 the cost model proposed by ACS (subject to minimal modifications) and increased the

15 loop rate almost $4 unequivocally validates the substantiality of ACS' claim that the

16 temporary and interim rates were illegally low.

17

18     The Ninth Circuit Court of Appeals has made clear that all UNE rates, both

19 interim and final, must comply with the FCC's TELRIC methodology. Verizon California,

20 Inc. v. Peevey, 413 F.3d at 1073. The temporary and interim loop rates in issue here

21 failed that standard as a matter of law. The RCA acknowledged that the original

22 temporary rate was based on embedded costs, which is impermissible under the Act.

23 Similarly, the subsequent interim rate was not based on an approved methodology or

24 cost inputs.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 276-8533
FAX (907) 276-8536

Absent a willingness to determine a final loop rate within a reasonable time, the RCA should have granted ACS' request for interim relief by either adopting a sufficient interim and refundable rate or by adopting a true-up mechanism that would have allowed ACS to be made whole upon the determination of a final rate. Having been denied that relief, ACS sustained almost $11 million in direct losses as result of underpayments from GCI. To remedy that loss, this court should declare the temporary and interim rates illegal and remand the case to the RCA with directions to require GCI to compensate ACS for the underpayments resulting from the illegal rates from August 2000 through June 2004.

## VIII. Conclusion and Prayer for Relief.

This court should:

1) find that the RCA violated the Act by failing to complete the arbitration within the statutory deadline and within a reasonable time;

2) find that the temporary and interim UNE loop rates were illegal under the Act; and

3) remand the case to the RCA with directions: a) to calculate the amount (consistent with the final UNE loop rate) that GCI should have paid ACS for leasing its loops from August 9, 2000, through June 24, 2004, and b) to require GCI to compensate ACS for the difference from the rate actually charged.

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ND AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536

49

DATED at Anchorage, Alaska, this 30ᵗʰ day of December, 2005.

TINDALL BENNETT & SHOUP
Attorneys for Respondent ACS
of Anchorage, Inc.

By: _____
        Richard W. Maki
        ABA No. 8211126

TINDALL BENNETT & SHOUP, P.C.
508 WEST 2ᴺᴰ AVENUE, THIRD FLOOR
ANCHORAGE, ALASKA 99501
(907) 278-8533
FAX (907) 278-8536