DAVE W. MÁRQUEZ
ATTORNEY GENERAL

Robert A. Royce
Assistant Attorney General
Attorney General's Office
1031 W. 4th Avenue, Ste. 200
Anchorage, Alaska 99501
Phone: 907-269-5200
Fax: 907-276-8554

Attorney for the Individually named Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GCI COMMUNICATIONS CORP., d/b/a GENERAL COMMUNICATION, INC. d/b/a GCI<br><br>Petitioner and Cross Petition Respondent,<br><br>v.<br><br>KATE GIARD, in her official capacity as Chairwoman of the Regulatory Commission Of Alaska; *et al.*,<br><br>Respondents and Cross Petition Respondents,<br><br>and<br><br>ACS OF ANCHORAGE, INC., d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and ACS,<br><br>Respondent and Cross Petitioner,<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.: A05-003 CV<br><br>BRIEF OF THE INDIVIDUAL COMMISSIONERS OF THE REGULATORY COMMISSION OF ALASKA |

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………….. 1

FEDERAL PROCEEDINGS ON UNE RATE METHODOLOGIES…………………6

    A.    The Telecommunications Act of 1996 ........................................................ 6

    B.    The FCC Establishes TELRIC Pricing (*Local Competition Order*) ............. 7

    C.    The Eighth Circuit Court of Appeals First Review of the *Local Competition Order* (*Iowa I*) ...................................................................................... 8

    D.    The Supreme Court's Reversal of *Iowa I* ..................................................... 9

    E.    The Eighth Circuit's Second Review of the *Local Competition Order* (*Iowa II*).................................................................................................... 9

    F.    The Supreme Court's Reversal of *Iowa I* ................................................. 10

    G.    The FCC's *Triennial Review Order* .......................................................... 11

CHRONOLOGY OF ANCHORAGE ARBITRATION PROCEEDING……………. 11

STANDARDS OF REVIEW…………………………………………………………..22

ARGUMENT………………………………………………………………………………23

I.    The Court Lacks Subject Matter Jurisdiction Over ACS' Cross-Appeal Alleging That The RCA Violated The Statutory Timeline Of The Act And Unreasonably Delayed The Determination Of A Final UNE Loop Rate………………………..23

    A.    The RCA Could Not Have Violated The Timeline In Section 252(b)(4)(C) Because The Timeline Is Inapplicable…………………………………………28

    B.    The RCA Did Not Violate The Act By Failing To Complete The Arbitration Within A Reasonable Time Period........................................... 31

II.    The RCA Did Not Violate The Act When It Established Temporary And Interim UNE Loop Rates.................................................................................................. 36

Brief of the Individual Commissioners of the       i
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

1.    The RCA's Temporary UNE Loop Rate Complied With Federal
      UNE Pricing Guidelines.................................................39

2.    The RCA's Interim UNE Loop Rate Complied With Federal UNE
      Pricing Guidelines.......................................................40

3.    ACS Failed to Present Sufficient Evidence to Support UNE Loop
      Rate Higher Than $14.92...............................................42

III.   The RCA's Calculation Of Permanent UNE Rates Complies With The Act And Is
       Supported By Substantial Evidence. ..........................................44

1.    The RCA's Cost of Capital Calculations Do Not Violate The Act. 45

2.    The RCA's Cost of Capital Calculations Comply With Federal UNE
      Pricing Guidelines.......................................................46

3.    The RCA's Cost of Capital Calculation Is Based on Substantial
      Evidence In The Record.................................................52

4.    The RCA's Use of a Lower Cost of Capital for Switching Elements
      Is Based on Substantial Evidence In The Record. ..........................55

5.    Federal Guidelines Allow State Commissions To Set A Different
      Cost of Capital For Different UNE Elements. ................................58

6.    The RCA's Nonrecurring Charge Cost Model Complies With
      Federal UNE Pricing Guidelines.......................................59

7.    The RCA's Finding That Trenching Costs Would Not Be Shared Is
      Based On Substantial Evidence In The Record. .............................65

8.    The RCA's Determination Of The Amount Of Feeder Plant Placed
      In The Road Prism Was Reasonable And Is Supported By
      Substantial Evidence In The Record. ...............................67

IV.    The RCA's Wholesale Rate Calculation Complies With Federal Law And Is
       Supported By Substantial Evidence. ..........................................72

CONCLUSION………………………………………………………………… 75

Brief of the Individual Commissioners of the        ii
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

# TABLE OF AUTHORITIES

## Cases

656 Northwest, Inc. v. Nelson, 969 F.Supp. 654, 656 (W.D. Wash. 1997) ..................... 27

Argentine Republic v. Amerada Hess Shipping Corp, 488 U.S. 428, 433, 109 S. Ct. 683 (1985) ................................................................................................................. 24

AT&T Communications of Illinois., Inc. v. Illinois Bell Tel. Co., 349 F.3d 402, 405 (7th Cir. 2003) ................................................................................................... 8

AT&T Communications v. Pacific Bell Tel. Co., 375 F.3d 894, 904 (9th Cir. 2003) ...... 36

AT&T Communications v. Pacific Bell Telephone Company, 375 F.3d 894, 904 (9th Cir. 2004) ................................................................................................... 22

AT&T Corp v. FCC, 220 F.3d 607, 615 (D.C. Cir. 2000) ............................................. 8, 9

AT&T Corp v. Iowa Utils. Bd, 525 U.S. 366, 371 119 S.Ct. 72 (1999)................................................................... 6, 9, 14, 15, 16, 39, 73, 74

Bell South Telecom., Inc. v. MCIMetro Access Transmission Services, LLC 425 F.3d 964, 966 (11th Cir. 2005) ............................................................................. 3

Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, 106 S.Ct. 1326 (1986) ....... 24

GTE., Inc. v. Morrison, 199 F.3d 733, 745-46 (4th Cir. 1999) ....................................... 22

MCI Telecomm. Corp. v. Bell, Alt-Pa., 271 F.3d 491, 516-17 (3rd Cir. 2002) .............. 22

MCI Telecomm. Corp. v. U.S. West Communications, 204 F.3d 1262, 1266-67 (9th Cir. 2000) ........................................................................................... 22, 23

Mich. Bell Tel. Co, v. Strand, 305 F.3d 580, 587 (6th Cir. 2002); MCI Telecomm. Corp., 271 F.3d at 515 ........................................................................................ 23

McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780 (1936).. 24

Nader v. FCC, 520 F.2d 182, 196 (D.C. Cir. 1975) ....................................................... 31

TDS Metrocom, LLC v. Bridge, 387 F.Supp.2d 935, 939 (W.D. Wisc. 2005) .............. 23

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

iii

Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 202, 114 S.Ct. 771 (1994) .................. 24

U.S. West Communications, Inc. v. Jennings, 304 F.3d 950, 958 (9th Cir. 2002) ........... 22

Verizon Communications, Inc. v. FCC ........................................... 6,10, 11, 15, 19, 46, 48

WorldCom, Inc. v. FCC, 308 F.3d 1, 7 (D.C. Cir. 2002) ..................................................... 8

## Statutes & Regulations

28 U.S.C. § 2342(1) ............................................................................................................ 27

47 C.F.R. § 51.505-515 .................................................................................................. 7, 43

47 C.F.R. § 51.507(e) ......................................................................................................... 66

47 C.F.R. §§ 51.501-51.511 .............................................................................................. 11

47 U.S.C. § 51.513(c) ......................................................................................................... 40

47 U.S.C. § 151 .................................................................................................................... 1

47 U.S.C. § 153(29) .............................................................................................................. 1

47 U.S.C. § 153(37) .............................................................................................................. 6

47 U.S.C. § 204 ................................................................................................................... 42

47 U.S.C. § 251(c)(3) ...................................................................................................... 6, 72

47 U.S.C. § 251(f) ................................................................................................................. 6

47 U.S.C. § 252 ........................................................................................................... 5, 6, 25

47 U.S.C. §252(b)(2)(A) ........................................................................................... 28, 29, 30

47 U.S.C. § 252(d)(1)(A)(i) ................................................................................ 7, 10, 11, 19, 73

47 U.S.C. § 252(e)(5) and (6) ............................................................................. 20, 24, 25,26, 27

47 U.S.C. § 253(a) ................................................................................................................ 3

Brief of the Individual Commissioners of the          iv
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

## Administrative Rulings

*Emergency Petition for Declaratory Ruling and Other Relief of ACS of Anchorage, Inc.
and ACS of Fairbanks, Inc., WC Docket No. 02-201, filed July 24, 2002* ....................25

*In the Matter of ACS of Anchorage, Inc. and ACS of Fairbanks, Inc. Emergency Petition
for Declaratory Ruling and Other Relief Pursuant to Sections 201(b) and 252(e)(5) of
the Communications Act (rel. October 22, 2002)*........................................................26

*In the Matter of Implementation of the Local Competition Provisions in the
Telecommunications Act of 1996 ("Local Competition Order"), CC Docket No. 96-98,
11 F.C.C. R cd 15499 (August 8, 1996)*...........7, 8, 27, 36, 39, 45, 46, 47, 58, 63, 64, 65

*In the Matter of Implementation of the Local Competition Provisions in the
Telecommunications Act of 1996, CC Docket No. 96-98, 11 F.C.C. R.cd 15499, 15509
¶12 (1996)*...........................................................................7, 8, 9, 11, 47, 50

*In the Matter of Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the
Communications Act for Preemption of the Jurisdiction of the Virginia State
Corporation Commission Regarding Interconnection Disputes with Verizon Virginia
Inc., and for Expedited Arbitration, CC Docket No. 00-218, DA 03-2738 18 F.C.C
R.cd 17722 (Aug. 29, 2003) (Verizon Virginia)*.................................................... 48, 49

*In the Matter of Procedures for Arbitrations Conducted pursuant to Section 252(e)(5) of
the Communications Act of 1934, as amended, 16 F.C.C. Rcd. 6231 ¶ 8 (FCC rel. Jan.
19 (2001)*............................................................................................25

*In the Matter of Review of Section 251, Unbundling Obligations of Incumbent Local
Exchange Carriers, Report and order and Order on Remand and Further Notice of
Proposed Rulemaking, CC Docket Nos. 01-338, 96-98, 98-147, 2003 WL 22175730,
18 F.C.C. Rcd 16, 978 at ¶ 669 (2003)*....................11, 49, 45, 47, 50, 51, 58, 63, 64, 65

Brief of the Individual Commissioners of the                    v
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

# INTRODUCTION

Petitioner GCI ("GCI") appeals Orders issued by the Regulatory Commission of Alaska[1] ("RCA" or "Commission") in an arbitrated proceeding conducted under the Telecommunications Act of 1996 ("the Act")[2] between GCI and Respondent Cross-Petitioner ACS of Anchorage, Inc. ("ACS").  Because GCI and ACS could not voluntarily reach an agreement on the terms of an interconnection agreement, the RCA was vested with the authority under the Act to set the rates that GCI - a competing carrier - must pay for access to unbundled network elements ("UNEs")[3] of ACS' local telephone network in Anchorage, Alaska.

GCI alleges that the RCA's final rates for UNE's are "exorbitant and unlawful." (GCI's Opening Br. at 16).  GCI requests this Court to vacate the alleged unlawful portions of the interconnection agreement and require a refund of the fees already paid to ACS under that agreement. *Id*.

ACS opposes GCI's challenges to the RCA's Orders setting the final rates and terms of the interconnection agreement. (ACS' Opposition and Cross-Petition Br. Re: Final Rates and Terms at 1).  ACS maintains that the RCA properly interpreted the

---

[1]     Only the Individual Commissioners of the RCA are named defendants in this action.

[2]     47 U.S.C. § 151 *et seq*.

[3]     A "network element" is defined as a facility or equipment used in the provision of a telecommunications services. 47 U.S.C. § 153(29). The unbundled network elements platform ("UNE-P") is composed of switching functions, shared transports, and loops. "Switches" are the facilities that route calls to their destinations. "Loops" are the wire and fiber facilities strung on telephone poles or buried underground that connect the individual customer locations to the network. "Transport" refers to cables which connect facilities that house switches.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                              1

requirements of the Act. *Id.* ACS, however, cross-petitions and seeks a correction of one issue regarding the RCA's permanent UNE loop rate determination.[4] ACS also separately cross-petitions and requests this Court to find that the RCA violated the Act by failing to determine a final "loop rate" within a reasonable time or by failing to impose meaningful "interim relief" to ACS. (ACS Cross-Petition Br. Re: Delay and Interim Rates at 2). ACS requests that this matter be remanded to the RCA "with directions: 1) to calculate the amount that GCI should have paid ACS from August 9, 2000, through June 24, 2004, and 2) to require GCI to pay ACS for the difference from the rate actually charged during that period." (*Id*. at 2).

To summarize, the appeal filed by GCI challenges aspects of the RCA's permanent UNE rate determination while ACS' cross-appeal primarily contends that the RCA's procedure for establishing permanent UNE rates was unreasonably delayed. This brief will demonstrate that all of GCI's and ACS' challenges to the RCA's Orders should be rejected. The Court has no subject matter jurisdiction over ACS' cross-appeal involving the delay issues. Additionally and independently, the rates established by the Commission comply with the Act and are supported by substantial evidence in the record. The Court should affirm the decisions of the RCA in all respects.

The Individual Commissioners of the RCA address the cross-petition of ACS first, as it will provide the Court with a very comprehensive historical perspective of

---

[4]     This is the so called "feeder" issue for the construction cost component of the loop rate calculation. (ACS Opposition and Cross-Petition Br. Re: Final Rates and Terms at 1).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                    2

the complexity of this case.  The Individual Commissioners will then address the challenges brought by GCI and ACS on the permanent rates established by the Commission.  But before turning to the merits of the appeals, the Individual Commissioners believe it would be helpful for the Court to review the overall state of telecommunications during the time this matter was pending with the RCA.

With the passage the Act in 1996, Congress sought to promote competition among telecommunications providers in an effort to improve the price and quality of service to consumers.  *Bell South Telecom., Inc. v. MCIMetro Access Transmission Services, LLC* 425 F.3d 964, 966 (11th Cir. 2005).  As it pertains to this case, the Act provided for competitive entry into the sacrosanct monopoly markets of incumbent local exchange carriers subject to state and local requirements consistent with universal service, the public safety and welfare and other factors as provided for under the Act.[5]

In 1996, telephone services were primarily concentrated into two distinct groups, long distance and local telephone. Long distance was already a competitive service in Alaska.  Local exchange telephone, however, remained a monopoly service throughout most of the United States.

Historically, regulation of local telephone service has been premised on the belief that service could be provided at the lowest cost to the maximum number of

---

[5]    *See* 47 U.S.C. § 253(a) which provides for removal of barriers to competitive entry, while ensuring state authority to conditionally place requirements to preserve and advance universal service, protect the public safety and welfare, and ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

3

consumers through a regulated monopoly network. State and federal regulators devoted their efforts over many decades to regulating the prices and practices of these monopolies and protecting them against competitive entry. The Act passed in 1996 adopted precisely the opposite approach. Rather than shielding telephone companies from competition, the Act requires incumbent telephone companies to open their networks to competition. Such networks are hugely plant intensive. Combined with sizeable back office architecture, local telephone service is provided through an intricate series of wire centers, switches, trunk lines, feeder plant and distribution network. Incumbent local exchange telephone networks must adapt to the extemporaneous expansion of the subscriber base and are generally required by virtue of being the carrier of last resort to follow the customers into previously undeveloped areas, like StuckAgain Heights or Potter's Marsh in the ACS local exchange market. The resulting network is frequently comprised of miles upon miles of telephone infrastructure that is hung on poles or buried along the roadside, supported by back office elements including customer service, information systems and maintenance, all with the goal of delivering a telephone call to a subscriber's home or office.

How to share the incumbent's local exchange network, identifying which elements of the integrated network to break apart (called unbundling) and lease to competitors and creating the proper mechanism to compensate the local exchange carrier for elements leased, were among the multitude of highly complex and highly contested issues that the federal courts struggled with for the next eight years.

Brief of the Individual Commissioners of the            4
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

Alaska was not left behind in the race to provide subscribers with competitive choice in local exchange service.  In fact, over time, the Anchorage market became one of the most highly competitive, if not the leader, in local exchange competition in the nation.  Just five months after the Act became effective, GCI filed a petition for arbitration under Section 252 of the Act with ATU Telecommunications[6] ("ATU") (subsequently acquired by ACS) for the purpose of instituting local exchange competition in the Anchorage market.[7]   Unable to reach a voluntary negotiated interconnection agreement, GCI filed a motion with the Commission for the appointment of an arbitrator on September 6, 1996.

The Alaska Public Utilities Commission, the RCA's legal predecessor, in a September 17, 1996 Order stated, "[t]he Commission has reviewed the filings made in this proceeding and has determined that the Commissioners will act as final arbitrators in the arbitration process for interconnection of ATU and GCI as local exchange carriers under the Act"[8] and docket U-96-89 began.

With this general background in mind, the Individual Commissioners of the RCA now turn to the statutory and regulatory framework to further aid the Court in evaluating the appeals brought by GCI and ACS.

---

[6]     *See* Order U-96-89(1). Exhibit 1at 1.

[7]     Box 1 at 45-213.

[8]     Exhibit 1 at 2.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                          5

## FEDERAL PROCEEDINGS ON UNE RATE METHODOLOGIES

### A.    The Telecommunications Act of 1996

The Act is designed to foster competitive local exchange service in historically monopolistic markets. *Verizon Communications, Inc. v. FCC,* 535 U.S. 467, 488-89 122 S.Ct. 1646 (2002). *See also AT&T Corp v. Iowa Utils. Bd,* 525 U.S. 366, 371 119 S.Ct. 72 (1999). In order to accomplish the goal of fostering competition, the Act imposes affirmative duties on an incumbent local exchange carrier ("ILEC"), like ACS that has traditionally provided local telephone service in Anchorage, Alaska. The "foremost" duty imposed on ILECs is to share their networks with competing local exchange carriers ("CLECs") such as GCI. *Iowa Utils. Bd*, 525 U.S. at 371. The Act mandates that ILECs enter into interconnection agreements with CLECs.[9] 47 U.S.C. at § 252. The parties may arrive at an agreement as to the terms for providing interconnection services either by negotiation or arbitration. *Id*. at § 252(a)(b). If the parties cannot successfully negotiate a rate, State regulatory commissions have the authority to arbitrate rates. *Id*. at § 252(b).

The Act specifically requires ILECs to lease certain components of their local networks to CLEC's on an unbundled basis. 47 U.S.C. § 251(c)(3). In so doing, ILECs must charge rates for UNEs that are "just, reasonable and nondiscriminatory." *Id*. In addition, the rates must be "based on the cost (determined without reference to a rate-

---

[9]    There are circumstances under the Act where a rural ILEC may be exempt from an obligation to enter interconnection agreements to provide network sharing through sale of UNEs and wholesale services. 47 U.S.C. § 251(f). This exemption provision does not apply to this pending case as ACS does not meet the definition of a rural telephone company. 47 U.S.C. § 153(37).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                6

of-return or other rate based proceeding) of providing the interconnection or network element." *Id.* at § 252(d)(1)(A).

Although these standards provide only general guidance to State commissions, Congress delegated the Federal Communications Commission ("FCC") with the authority to promulgate rules "determining what network elements should be made available" to competitors and to otherwise implement the substantive requirements of the Act. *Id.* at § 251 (d)(1)-(2).

**B.    The FCC Establishes TELRIC Pricing (*Local Competition Order*)**

On August 8, 1996 the FCC released its "*Local Competition Order.*"[10]  The *Local Competition Order* enacted a comprehensive set of regulations to guide competitive entry, including establishing the method that State commissions must use in setting UNE rates.  The FCC determined that prices for interconnection and UNEs should be set using the Total Element Long-Run Incremental Cost ("TELRIC") methodology.  As asserted by the FCC, TELRIC attempts to measure the forward looking economic costs of providing a network element because those costs best replicate the conditions of a competitive market.[11]  The FCC stated that the TELRIC of a network element should be measured based on costs that assume that wire centers will be placed at the ILECs current wire center locations and that the reconstructed local network will employ the

---

[10]    *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996* ("*Local Competition Order*"), CC Docket No. 96-98, 11 F.C.C. Rcd 15499 (August 8, 1996).

[11]    *Local Competition Order*, ¶ 672, 679 (attached to GCI's Opening Br. as Exhibit A at 16, 18) S*ee also* 47 C.F.R. § 51.505-515.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                    7

most efficient telecommunications technology available for reasonably foreseeable capacity requirements (the "hypothetical network/most efficient carrier standard").[12] Thus, TELRIC measures costs in the long run and is not based on an ILECs actual network but instead on a hypothetical network that uses the least cost technology and most efficient design currently available given the existing location of the ILECs wire centers. *Id.* at ¶ 685.

Despite these technical features, TELRIC is not a specific, mathematical formula to provide uniform rates for UNEs across the country. Rather, it is a framework of methodological principles that State commissions retain flexibility to use in conjunction with local technological, environmental, regulatory, and economic conditions in order to arrive at forward-looking rates that are both just and reasonable. *AT&T Corp v. FCC,* 220 F.3d 607, 615 (D.C. Cir. 2000). *See also AT&T Communications of Illinois., Inc. v. Illinois Bell Tel. Co.*, 349 F.3d 402, 405 (7th Cir. 2003) (explaining that TELRIC is a "framework rather than a formula" and that there is "considerably play in the joints"). As one court has noted, "TELRIC is not a single rate but a ratemaking methodology that may yield a rather broad range of rates." *WorldCom, Inc. v. FCC*, 308 F.3d 1, 7 (D.C. Cir. 2002).

### C.    The Eighth Circuit Court of Appeals First Review of the *Local Competition Order* (*Iowa I*)

All federal court challenges to the FCC's *Local Competition Order* and its TELRIC methodology were consolidated by the United States Court of Appeals for the

---

[12]    *Local Competition Order*, ¶ 685, 690 (attached as GCI's Exhibit A at 19, 20).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                        8

Eighth Circuit ("Eighth Circuit") in *Iowa Utilities Bd. v. FCC* (*Iowa I*), 120 F.3d 753,

aff'd. in part and rev'd in part sub nom *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366,

119 S.Ct. 721 (1999).  In *Iowa I*, the Eighth Circuit invalidated several parts of the *Local*

*Competition Order*, and held that the FCC exceeded its authority to control the

methodology to be followed by State commissions when setting the rates ILECs could

charge CLECs for network elements.  120 F.3d at 800.  The Eighth Circuit's decision in

*Iowa I* was appealed to the United States Supreme Court.

  **D.**  **The Supreme Court's Reversal of *Iowa I***

    The United States Supreme Court reversed the *Iowa I* decision in part.

*AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S.Ct. 721 (1999).  The Supreme

Court reversed the holding in *Iowa I* that the FCC lacked authority to establish certain

regulations for State commissions to follow when setting UNE rates.  The Supreme Court

therefore upheld the FCC's jurisdiction to design a UNE pricing methodology that would

bind State ratemaking commissions and remanded the case back to the Eighth Circuit for

further proceedings.  *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. at 385, 119 S.Ct. at 721.

  **E.**  **The Eighth Circuit's Second Review of the *Local Competition Order* (*Iowa II*)**

    On remand, the Eighth Circuit reviewed the FCC's forward-looking pricing

methodology.  *See Iowa Utilities Bd. v. FCC* (*Iowa II*), 219 F.3d 744 (8th Cir. 2000).

While *Iowa II* did not invalidate the concept of a forward-looking cost methodology,[13]

the Eighth Circuit held that the use of a TELRIC methodology based on the most

---

[13]  219 F.3d at 751-53.

Brief of the Individual Commissioners of the   9
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

efficient technology available – regardless of the technology used by the ILEC – violated the plain meaning of the Act.[14]  In reaching that holding, *Iowa II* cited the Act's language indicating that Congress intended rates to be "based on the cost . . . of providing the interconnection or network element."[15]   Given the fact that the *Iowa II* decision would have impacted several existing interconnection agreements between ILECs and CLECs, the Eighth Circuit  stayed it's decision in *Iowa II*.  (Box 1 at 674)  As a result, the preexisting FCC rules remained in effect pending the Supreme Court's review of *Iowa II*.

**F.     The Supreme Court's Reversal of *Iowa II***

The Supreme Court reversed the Eighth Circuit's decision in *Iowa II* which had invalidated TELRIC as a method of setting rates under the Act.   *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 122 S.Ct. 1646 (2002).  The Supreme Court rejected the Eighth Circuit's conclusion in *Iowa II* that the Act required any forward looking methodology to be based on the actual rather than hypothetical cost of providing the network element.  The Supreme Court disagreed with the Eighth Circuit's conclusion that "the cost of providing the network element" as used in § 252(d)(1) can only mean the past cost to an ILEC of furnishing a specific network element.[16]  The Supreme Court determined that the term "cost" provides State ratesetting commissions with broad

---

[14]      *Id*. at 749-50.

[15]      *Id*. citing 47 U.S.C. §  252(d)(1)(A)(i).

[16]      122 S.Ct. at 1665.

Brief of the Individual Commissioners of the                    10
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

methodological leeway, and concluded that nothing in § 252(d)(1) requires reference to historical investment when pegging rates to forward-looking costs.[17]

### G.    The FCC's *Triennial Review Order*

In its continuing effort to implement and enforce the interconnection requirements of the Act, the FCC issued its *Triennial Review Order* in 2003.[18]  The *Triennial Review Order* noted that the Supreme Court's *Verizon Communications, Inc. v. FCC* decision reaffirmed the FCC's forward-looking cost methodology as the "most efficient technology" basis for determining the TELRIC price, stating:

> Specifically, TELRIC equates the current market value of an incumbent telecommunications provider with the cost the incumbent LEC would incur today if it built a local network that could provide all the services its current network provides, to meet reasonably foreseeable demand, using the least-cost, most-efficient technology currently available.

*Triennial Review Order*, ¶ 669, citing *Local Competition Order* at ¶ 685; *see also* 47 C.F.R. §§ 51.501-51.511.

### CHRONOLOGY OF ANCHORAGE ARBITRATION PROCEEDING

As will be demonstrated below, the judicial uncertainty over TELRIC impacted the Anchorage arbitration.  The Individual Commissioners provide the Court with the relevant events of the Anchorage arbitration proceeding.

---

[17]    *Id*. at 1666-67.

[18]    *In the Matter of Review of Section 251, Unbundling Obligations of Incumbent Local Exchange Carriers, Report and order and Order on Remand and Further Notice of Proposed Rulemaking*, CC Docket Nos. 01-338, 96-98, 98-147, 2003 WL 22175730, 18 F.C.C. Rcd 16, 978 at ¶ 669 (2003).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                11

**November 20, 1996**:  The primary arbitrator recommends that the RCA adopt GCI's UNE rate proposal.  While the primary arbitrator found that neither party developed forward-looking cost studies, he determined that GCI's proposed UNE rates were based upon a closer approximation of forward-looking costs than the rates proposed by ACS' predecessor, which impermissibly relied more heavily on historical embedded costs.  (Appendix E to Order U-96-89(8) at 4 (Arbitrator's Recommended Decision, Supplemental Item at 12834).

**November 26, 1996**:  The RCA holds a pre-hearing conference on the arbitrated interconnection agreement filed between ACS' predecessor (ATU) and GCI for the Anchorage market.  At this pre-hearing conference, ATU and GCI request that the RCA make no changes to the arbitrator's recommended decision.  (Exhibit 2 at 6-7).

**December 16, 1996**:  RCA Order U-96-89(8) accepts the primary arbitrator's recommendation on UNE rates and resolves all other arbitration issues, accepting an arbitrated interconnection agreement between ATU and GCI for the Anchorage market.  The Order clarifies that all prices in the arbitrated interconnection agreement were temporary in nature, and a full rate study would subsequently be required based upon a cost methodology that would be determined at a later date.  (Order U-96-89(8) at 29, Ordering Paragraph No. 2) (Supplemental Item at 12814).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

12

**January 24, 2000**:  ACS files a motion asking the RCA to establish a forward-looking economic cost model and methodology to price unbundled network elements.[19]

**March 6, 2000**:  RCA Order U-96-89(13) grants ACS' motion to establish a forward-looking economic cost model and methodology.  (Box 1 at 260-276).  Noting that GCI and ACS briefed the issue of the appropriate forward looking cost model in the Juneau, Fairbanks, and Northland arbitrations (Dockets U-99-141/U-99-142/U-99-143), RCA requests briefing to the extent the parties propose a cost model different from the model briefed in Dockets U-99-141, U-99-142 and U-99-143.

**March 31, 2000**:  ACS and GCI file briefs on the appropriate forward looking cost model, with both parties proposing the same cost models they advocated in Dockets U-99-141/U-99-142/U-99-143.  ACS submits ACS v6.2 model and a modified version of the FCC model, with both models being based on a hypothetical network/most efficient carrier standard that included modified inputs to reflect data and values specific to ACS' actual network.[20]  ACS argues that the RCA should adopt the same model in the Anchorage arbitration as it used in the Juneau, Fairbanks, and Northland arbitrations.[21]

---

[19]    Motion to Establish Forward Looking Economic Cost Models and Methodologies.  (Box 1 at 218).

[20]    Affidavit of William J. Wilkes at 2. (Box 2 at 2; 3361).

[21]    Alaska Communications Systems Response to Order No. 13 at 2. (Box 1 at 280).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

13

**May 30, 2000**:  RCA Order U-96-89(14) adopts the FCC cost model in the Anchorage arbitration and appoints an arbitrator, instructing the arbitrator to schedule a pre-hearing conference in Docket U-96-89 within ten working days of the adoption of interconnection agreements for Juneau, Fairbanks, and Kenai in Dockets   U-99-141, U-99-142, and U-99-143.  (Box 1 at 459-475).

**July 18, 2000**:  The Eighth Circuit issues *Iowa II*, holding that the use of a TELRIC methodology based on the most efficient technology available violates the plain meaning of the Act.

**September 22, 2000**:  The Eighth Circuit grants the FCC's motion to stay the *Iowa II* decision on UNE pricing pending the disposition of petition for writs of certiorari in the United States Supreme Court.  (Box 1 at 674).

**October 19, 2000**:  At a pre-hearing conference conducted by the arbitrator shortly after the October 5, 2000 adoption of interconnection agreements for Juneau, Fairbanks, and Kenai, ACS states it will request that the RCA hear the evidence directly and consider a different model that complies with *Iowa II*.[22]

**October 20, 2000**:  ACS files a request for RCA Commissioners to act as the arbitrator panel and postpone the November 8, 2000 pre-hearing conference.[23]

---

[22]     October 19 Pre-hearing Conference, Tr. at 3-4.  (Box T-1 at 3-4).

[23]     ACS also filed a supplemental exhibit in support of its motion.  *See* Notice of Filing of Supplemental Exhibit to ACS' Motion for the Commission to Hear Evidence Directly and Act as the Arbitration Panel, filed October 27, 2000. (Box 1 at 535).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                        14

**December 6, 2000**:  The RCA hears oral argument on ACS' motion for the RCA to act as the arbitration panel.  ACS announces its intent to submit evidence on a new in-house model developed after *Iowa II* to "supplement rather than replace" the FCC model (ACS v8.0 model).[24]  ACS indicates that its model is a forward looking most efficient carrier model based on ACS' actual network rather than the hypothetical network placed in question by the *Iowa II* decision.[25]  In response to Commissioner inquiry on the applicability of the Act's arbitration deadlines, ACS states that the timeline did not apply since the permanent rate proceeding is not "a new negotiation or arbitration."[26]

**January 8, 2001**:  RCA Order U-96-89(15) reaffirms the RCA's intent to use the FCC model as the base for the Anchorage arbitration and requested briefing on proposed modifications to the FCC model to make it appropriate for use in the Anchorage market.

**January 22, 2001**:  The Supreme Court grants the petitions for certiorari filed in connection with the *Iowa II* decision.  *Verizon Communications, Inc. v. FCC*, 521 U.S. 1124, 121 S. Ct. 877 (2001).

**February 23, 2001**:  ACS and GCI file briefs in response to the RCA's January 8, 2001 ruling.  Citing *Iowa II*, ACS advocates hearing evidence on the ACS

---

[24]    ACS calls this model the ACS model v7.2, but later introduces the model as the ACS v8.0 model.

[25]    December 6, 2000 Oral Argument, Tr. at 37-38. (Box T-1 at 37-38).

[26]    December 6, 2000 Oral Argument, Tr. at 67. (Box T -1at 67).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                    15

v8.0 model, a model based on ACS' actual network rather than the FCC's "hypothetical network" approach to modeling,[27] with cost inputs based on the forward looking costs of ACS actual network elements and services rather than the costs of a "most efficient carrier."[28]  ACS also proposes that modification to the FCC model be considered in order to abandon a hypothetical network approach to modeling.  ACS also requests interim rates consistent with *Iowa II*.

**March 15, 2001**:  ACS and GCI file reply briefs on the appropriate modifications to the FCC model and the scope of arbitration.  GCI opposes ACS' proposal for an *Iowa II*-compliant model, noting that the TELRIC rules remained in effect since *Iowa II* had been stayed pending Supreme Court's review.  ACS advocates for interim rate relief based on ACS actual forward-looking costs in accordance with the *Iowa II* decision.[29] ACS declines to agree on the scope of issues or the appropriate model, stating it was more appropriate to "determine the procedural basis for proceeding for a new agreement."[30]

**May 11, 2001**:  RCA Order U-96-89(20) states that "forward-looking cost methodologies are in a state of flux," and requests briefing on alternative forward-looking cost methodologies to be used to determine unbundled network element prices.  (Box 1 at

---

[27]    ACS' Response to Order No. 15 at 4 (Box 1 at 604).

[28]    ACS' Response to Order No. 15 at 7-8. (Box 1 at 608).

[29]    ACS' Reply to GCI's Response to Order No. 15 at 5.  (Box 1 at 655).

[30]    ACS' Reply to GCI's Response to Order No. 15 at 8.  (Box 1 at 651).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                    16

783-794). The RCA requires the parties to immediately exchange all forward-looking cost studies or methodologies they wanted considered as an alternative to the FCC Model and to file briefs on those forward-looking cost studies or methodologies by June 29, 2001.[31]

      **May 31, 2001**: ACS files ACS v7.2 model, a model based on ACS existing wire centers but otherwise uses a hypothetical network/most efficient carrier approach to modeling.[32] ACS again states it is in the process of developing its v8.0 model to abandon the "hypothetical network" standard, and ACS v8.0 model would replace ACS v7.2 model. ACS-AN requests an extension of the deadline for exchanging models and filing briefs on the basis that it did not expect ACS model v8.0 to be completed until late June 2001.[33] ACS also confesses that each of its cost models are in a continuing state of evolution.[34]

      **June 29, 2001**: ACS files ACS v8.0 model, a model based on ACS' actual network configuration with loop costs based on then-current replacement costs.[35] ACS

---

[31]     Order U-96-89(20), dated May 11, 2001. (Box 1 at 783).

[32]     Notice of Filing in Compliance with Order U-96-89(2) and Petition for Clarification of Order U-96-89(20), filed May 31, 2001, at 3. (Box 1 at 795).

[33]     *Id*. at 6. (Box 1 at 795).

[34]     *Id*. at 3. (Box 1 at 795).

[35]     ACS Notice of Filing in Compliance with Bench Order filed June 29, 2001 at 4. (Box 1 at 1032).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

17

v8.0 model uses a statistical sampling approach to modeling, assessing forward-looking costs based on a representative range of UNE local loops in Anchorage.

**July 27, 2001**:  ACS and GCI file proposed forward-looking economic cost models and inputs.  ACS proposes that the RCA use two models to determine UNE rates – ACS v7.2 model (based on "hypothetical routes and technology that would be used by ACS if the network were entirely constructed today")[36] and ACS model v8.0 (based on ACS' actual network configuration).[37]

**August 8, 2001**:  ACS files a corrected brief on forward-looking economic cost models/inputs.

**February 8, 2002**:  RCA Order U-96-89(24) adopts the FCC's "most efficient carrier standard" for any forward-looking cost methodology that would be adopted, stating that any model adopted should determine the cost to ACS using its existing ACS network configuration but with the most efficient technology and an efficient ACS company.[38]  The RCA requests additional information from the parties as to whether their proposed models could produce results consistent with the efficient ILEC

---

[36]    ACS of Anchorage's Brief on Proposed Forward-Looking Economical Cost Models and Inputs, dated July 27, 2001 at 28-29.  (Box 1 at 1180).

[37]    ACS of Anchorage's Brief on Proposed Forward-Looking Economical Cost Models and Inputs, dated July 27, 2001 at 25.  (Box 1 at 1177).

[38]    Order U-96-89(24) at 11.  (Box 1 at 2722).

Brief of the Individual Commissioners of the          18
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

standard and how their proposed models comply with the FCC's TELRIC principles. The RCA schedules a February 15, 2002 hearing on those issues.[39]

**February 15, 2002**:  RCA hears argument on the issue of whether each party's proposed models could produce results consistent with the efficient ILEC standard and how its proposed modeling complies with the FCC's TELRIC principles. ACS acknowledges that assumptions behind its v7.2 model's design of a most efficient network were not reduced to writing and requests a model workshop to allow ACS to explain these assumptions to GCI.[40]

**April 8, 2002**:  The RCA grants ACS' request for a workshop with GCI to exchange information about ACS' v7.2 model, and instructs ACS and GCI to file written reports on the results of the workshop by May 22, 2002.

**May 13, 2002**:  The United States Supreme Court reverses the Eighth Circuit's decision to invalidate the FCC's decision to base UNE pricing on a hypothetical network most efficient carrier standard.  The Supreme Court determines that the term "cost" provides ratesetting commissions with broad methodological leeway, concluding that nothing in Section 252(d)(1) requires reference to historical investment when pegging rates to forward-looking costs. *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 122 S. Ct. at 1666-6.

**May 22, 2002**:  ACS and GCI file reports concerning the workshop on ACS v7.2 model.  GCI objects to ACS' v7.2. model, arguing that the model is not an

---

[39]     Order U-96-89(24) at 11-12.  (Box 1 at 2722-2723).

[40]     February 15, 2002 Hearing Tr. at 263, 311-312.  (Box T-1 at 263-311-312)

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                              19

open and integrated cost model.  GCI indicates that ACS v7.2 model requires extensive additional modification and documentation, and requires additional modeling for the balance of ACS' network.  GCI raises several other concerns with ACS 7.2 model, including that default assumptions are impermissibly based on embedded costs[41] and ACS' network designs increase loop costs beyond reasonable levels.[42]

**July 22, 2002**:  ACS files an emergency petition with the FCC to preempt the RCA and establish forward-looking costs based on ACS' cost study. (Exhibit 3)

**July 29, 2002**:   RCA Order U-96-89(26) adopts ACS' v7.2 model on condition that GCI be allowed to challenge and arbitrate proposed changes to the model platform.[43]  The RCA orders a two-phase process for developing interconnection rates; in Phase 1 GCI would advocate modifications to the v7.2 model and ACS would make required changes, while in Phase 2 model inputs will be arbitrated and final rates determined.

**October 22, 2002**:  The FCC issues its order denying ACS' petition to preempt the RCA. The FCC finds that ACS did not demonstrate that the RCA failed to act under § 252(e)(5) and that the RCA was not dilatory in its handling of the Anchorage arbitration proceeding.  (Exhibit 4).

---

[41]     GCI's Report on Workshop Results, filed May 22, 2002 at 2.  (Box 1 at 3022).

[42]     *Id*. at 14.  (Box 1 at 3034).

[43]     Order U-96-89(26), dated July 29, 2002.  (Box 1 at 3158).

Brief of the Individual Commissioners of the                    20
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

**April 14, 2003**:  RCA Order U-96-89(30) clarifies the standard to be used in any forward-looking cost methodology to set prices in the case.  (Box 2 at 1565-77)  The RCA states that it would follow the "efficient carrier" standard which requires UNE prices to be based on the most efficient telecommunications technology currently available (rather than the most efficient technology actually deployed in the incumbent's network) and the lowest cost network configuration while using ACS' existing wire centers location.

**June 20, 2003**:  RCA issues bench order adopting a hearing process to establish UNE rates.  The RCA notes that continuing to allow the parties to cooperatively design the pricing methodology for loop rates would "not yield a final decision on all of the necessary interconnection prices within a reasonable time."  (Box T - 1 at 2242).

**July 14, 2003**:  RCA Order U-96-89(35) adopts an interconnection hearing process, sets filing deadlines, and appoints a discovery master.  The RCA notes the delay caused by using the ACS approach to modeling and determines it is necessary to employ a traditional hearing process to establish UNE rates within a reasonable time.  (Box 2 at 1889-1901).

**July-August, 2003**:  Parties conduct discovery.  (Box 2 at 1909-1930, 1942-1952, 1956-1991).

**August 29, 2003**:  Parties file prefiled direct testimony.  (Box 2 at 2008-end, Box 3 at 1-1814).

**September 29, 2003**:  Parties file rebuttal testimony.  (Box 3 at 2433-3252).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

21

**October 13, 2003**: Parties file reply testimony. (Box 4 at 19-629).

**November 3-13, 2003**: The RCA conducts a hearing on appropriate UNE rates. (Box T-1 at 2385-end, Box T-2, at 1-end).

**June 25, 2004**: RCA Order U-96-89(42) sets UNE prices in the Anchorage market based on a modified version of ACS v7.2 model. (Box 4 at 1321).

With this history of the Anchorage arbitration proceeding, the Individual Commissioners of the RCA turn to the applicable standards of review.

## STANDARDS OF REVIEW

Courts consider *de novo* whether an interconnection agreement complies with requirements of the Act and its implementing regulations but apply a substantial evidence standard of review to factual findings made by a State commission. *AT&T Communications v. Pacific Bell Telephone Company,* 375 F.3d 894, 904 (9th Cir. 2004), citing *U.S. West Communications, Inc. v. Jennings*, 304 F.3d 950, 958 (9th Cir. 2002); *MCI Telecomm. Corp. v. U.S. West Communications*, 204 F.3d 1262, 1266-67 (9th Cir. 2000).

Under the substantial evidence standard, a reviewing court must affirm a State commission's factual findings if they have "substantial support in the record as a whole." *See e.g., MCI Telecomm. Corp. v. Bell, Alt-Pa*., 271 F.3d 491, 516-17 (3rd Cir. 2002); *See also GTE., Inc. v. Morrison*, 199 F.3d 733, 745-46 (4th Cir. 1999) (holding that the court does not "sit as a super public utilities commission" and that where a decision is supported by the record, "a court is not free to substitute its judgment for the agency's"). Essentially the same as the "arbitrary and capricious" standard, the

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                    22

substantial evidence standard is "the least demanding form of judicial review of administrative action" and requires only that an agency offer a reasoned explanation based on the record evidence for a particular outcome. *Mich. Bell Tel. Co, v. Strand,* 305 F.3d 580, 587 (6th Cir. 2002); *MCI Telecomm. Corp*., 271 F.3d at 515.

Because State regulatory commissions have technical expertise and because of "the flexibility built into" TELRIC, a deferential standard of review also applies to a State commissions' choice of rate components. *TDS Metrocom, LLC v. Bridge,* 387 F.Supp.2d. 935, 939 (W.D. Wisc. 2005) ("The question with respect to each challenged component is whether plaintiff can show that defendant commissioners erred in calculating one or more of them and that this error is so substantial it renders the rates established by the commission arbitrary and capricious"). The individual Commissioners of the RCA now turn to the merits of the challenges brought by both GCI and ACS.

## ARGUMENT

### I.    The Court Lacks Subject Matter Jurisdiction Over ACS' Cross-Appeal Alleging That The RCA Violated The Statutory Timeline Of The Act And Unreasonably Delayed The Determination Of A Final UNE Loop Rate

The Individual Commissioners of the RCA first address ACS' Cross-Petition Brief Re: Delay and Interim Rate Issues. ACS' cross-petition alleges that the RCA failed to determine a final UNE loop in a timely fashion. ACS claims that the RCA violated the Act by not complying with the federal statutory deadline[44] and by failing to complete the arbitration within a reasonable time. (ACS of Anchorage, Inc.'s Cross-

---

[44]    A nine month deadline is set out in the Act at § 252(b)(4)(c).

Brief of the Individual Commissioners of the          23
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

Petition Br. Re: Delay and Interim Rate Issues, at 2, 8-33).  The Court has no subject matter jurisdiction to entertain these issues.

Fundamental to federal court authority is the principle that federal jurisdiction is limited by the restrictions embodied in Article III of the United States Constitution.  *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326 (1986).  Subject matter jurisdiction of the district court is determined by Congress  "for the public good."  *Argentine Republic v. Amerada Hess Shipping Corp*, 488 U.S. 428, 433, 109 S. Ct. 683 (1985).  A finding that Congress intended to preclude review "prevents a district court from exercising subject-matter jurisdiction."  *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 202, 114 S.Ct. 771 (1994).

ACS, as the party asserting jurisdiction, bears the burden of proving that federal jurisdiction is proper.  *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780 (1936).  ACS suggests that this Court has jurisdiction to hear the delay issues under § 252(e)(6) of the Act. *Id.*  ACS, however, fails to provide the Court with the entire provisions of § 252(e)(5) and (6).  These provisions provide:

> **(5)    Commission [FCC] to act if State will not act:**
>
> If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice of) such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

Brief of the Individual Commissioners of the        24
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

**(6)    Review of State commission actions:**

In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section. (emphasis added).

47 U.S.C. § 252(e)(5) and (6)

Thus, the Act provides an exclusive remedy when a State commission fails to fulfill its duty to resolve a § 252 arbitration proceeding. If a State commission violates its obligation to arbitrate rates, the FCC will preempt the State commission's jurisdiction over the proceeding and assume the responsibility for the matter. § 252(e)(5). The FCC has delegated this authority to the Wireline Competition Bureau.[45]

While not disclosed in ACS' brief on the delay issues, ACS petitioned the FCC to exercise its authority under § 252(e)(5) and preempt the RCA in the Anchorage arbitration proceeding.[46] The FCC declined to preempt the RCA, finding that ACS had

---

[45]    *See In the Matter of Procedures for Arbitrations Conducted pursuant to Section 252(e)(5) of the Communications Act of 1934, as amended*, 16 F.C.C. Rcd 6231 ¶ 8 (FCC rel. Jan. 19 (2001).

[46]    *Emergency Petition for Declaratory Ruling and Other Relief of ACS of Anchorage, Inc. and ACS of Fairbanks, Inc.*, WC Docket No. 02-201, filed July 24, 2002. (Exhibit 3).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                    25

not demonstrated a failure to act by the RCA.[47]  The FCC found that the RCA had in fact arbitrated the initial 1996 interconnection agreement between ACS and GCI within the time limits for arbitration established in the Act.  The FCC also noted that ACS had conceded that the statutory timelines in the Act "were inapplicable to the reopened proceeding."[48]  ACS did not appeal the FCC's Order concerning the delay issues and now tries to resurrect those claims before the district court.

A State commission's "failure to act to carry out its responsibility under" § 252(e)(5), includes a State commission's failure to complete its duties in a timely fashion. The FCC has stated:

> Regarding what constitutes a State's "failure to act to carry out its responsibility under" Section 252, the Commission was presented with numerous options.  The Commission will not take an expansive view of what constitutes a State's "failure to act."  Instead, the Commission interprets "failure to act" to mean a State's failure to complete its duties in a timely manner.  This would limit Commission action to instances where a State commission fails to respond, within a reasonable time, to a request for mediation or arbitration, or fails to complete arbitration within the time limits of section 252(b)(4)(C).  The Commission will place the burden of proof on parties alleging that the State commission had failed to respond to a request for mediation or arbitration within a reasonable time frame.  We note the work done by States to

---

[47]    *In the Matter of ACS of Anchorage, Inc. and ACS of Fairbanks, Inc. Emergency Petition for Declaratory Ruling and Other Relief Pursuant to Sections 201(b) and 252(e)(5) of the Communications Act* (rel. October 22, 2002), ¶ 9 at 6. (Exhibit 4 at 2).

[48]    Exhibit 4 at 5.

Brief of the Individual Commissioners of the            26
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

> date in putting in place procedures and regulations governing
> arbitration and believe that States will meet their
> responsibilities and obligations under the 1996 Act.
> (emphasis added).

(*Local Competition Order*, ¶ 1285) (Exhibit 5 at 7).

Since ACS' claims of delay fall within the scope of § 252(e)(5), they are governed by the exclusive remedy provision of § 252(e)(6).  ACS' exclusive remedy concerning its claims of delay by the RCA was a timely appeal of the FCC's Order to the appropriate Court of Appeals.[49]  ACS failed to do so.  The Court has no subject matter jurisdiction to hear ACS' cross-appeal involving the delay issues.[50]  The remainder of § 252(e)(6) which provides for federal district court review of an agreement is inapplicable because ACS' claims of delay are governed by § 252(e)(5) and the exclusive remedy provision of § 252(e)(6).

If for some reason the Court finds that it has subject matter jurisdiction over ACS' cross-appeal involving the delay issues, it should , nevertheless, find that the RCA did not violate the deadlines in the Act or fail to act within a reasonable period of time.

---

[49]    *See* 28 U.S.C. § 2342(1).

[50]    *See* e.g. *656 Northwest, Inc. v. Nelson*, 969 F.Supp. 654, 656 (W.D. Wash. 1997) ("Where Congress has provided a procedure to obtain review of agency action that procedure must be followed.") (citations to authorities omitted).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                        27

### A.    The RCA Could Not Have Violated The Timeline In Section 252(b)(4)(C) Because The Timeline Is Inapplicable.

ACS argues that the RCA violated the Act by failing to apply the timeline in § 252(b)(4)(C).  (ACS Cross-Petition Br. Re: Delay and Interim Rate Issues at 31-33)  As stated earlier, § 252 of the Act directs ILECs to negotiate interconnection agreements with CLECs.  The parties may arrive at an agreement as to the terms of providing interconnecting services either by negotiation or arbitration.  § 252(a)-(b).  If the negotiating parties cannot reach agreement after 135 days, either party may petition the appropriate State commission to conduct a binding arbitration of the disputed issues.  Section 252(b).  The State commission must "resolve each issue set forth in the petition [for arbitration] not later than 9 months after the date" of the initial request.  § 252(b)(4)(C).

ACS contends that, even though it initially took the position that the statutory deadline did not apply since a new interconnection agreement was not being arbitrated, the statutory deadline would apply once GCI requested a new interconnection agreement.  (ACS Cross-Petition Br. Re:  Delay and Interim Rate Issues. at 31-32).  The record does not support this contention.  In its Order requiring arbitration, the RCA declared that the § 252(b)(4)(C) arbitration deadline did not apply, stating that there had not been a request for negotiation from a CLEC or a petition for arbitration sufficient to

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                   28

trigger the § 252(b)(4)(C) arbitration deadline.[51]  It is undisputed that ACS did not file a request for reconsideration or otherwise contest this determination.

A review of § 252(b)(4)(C) demonstrates its inapplicability with regard to ACS' request to revise temporary UNE rates and establish permanent UNE rates.  Section 252(b) addresses agreements arrived at through compulsory arbitration.   Section 252 (b)(1) allows a <u>party to a negotiation</u> to petition a State commission to arbitrate open issues between the 135th day to the 160th day after the ILEC receives a request for negotiation.  With regard to the RCA's proceeding to establish permanent UNE rates, that proceeding was instituted by ACS' motion to establish permanent UNE rates.   At the time ACS filed the motion, it was not involved in negotiations with GCI and had not received a request for negotiation from GCI within 160 days of filing the motion to establish permanent UNE rates.

It should also be noted that while § 252(b)(4)(C) establishes a deadline for State commissions, it provides:

> The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) of this section upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section.  (emphasis added).

Section 252(b)(4) references a petition and unresolved issues, requirements that are more fully described in § 252(b)(2).  That section imposes affirmative duties on

---

[51]     *See* Order U-96-89(15), dated January 8, 2001 at 4, n. 15 (citing December 6, 2000 hearing transcript at 67.  (Box 1 at 567; Box T-1).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                29

the petitioner as a condition precedent to triggering the timeline stated in § 252(b)(4)(C). Specifically, a party petitioning a State commission for arbitration must submit all relevant documentation concerning (i) the unresolved issues, (ii) the position of each party with respect to those issues; and (iii) any other issue discussed and resolved by the parties.[52]

ACS failed to file a petition setting out the unresolved issues in the Anchorage arbitration and each party's position with regard to each unresolved issue. Thus, even assuming arguendo, that the § 252(b)(4)(C) timeline applied to the RCA proceeding to establish permanent UNE rates, ACS failed to comply with the requirements of the Act necessary to trigger the timeline.

The RCA satisfied the § 252(b)(4)(C) timeline when it approved the 1997 interconnection agreement between ACS and GCI.[53] With regard to ACS' motion to establish permanent UNE rates filed in 2000, the § 252(b)(4)(C) timeline does not apply because ACS did not file a petition during the 135th to 160th period after receiving a request for negotiation in accordance with § 252(b)(1) and did not submit relevant documentation concerning the unresolved issues and the position of each party with

---

[52]    47 U.S.C. §252(b)(2)(A).

[53]    Exhibit 4 at 5.

Brief of the Individual Commissioners of the          30
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

respect to those issues.[54]   As a result, the RCA could not have violated the statutory

deadline in the Act.

> **B.     The RCA Did Not Violate The Act By Failing To Complete The Arbitration Within A Reasonable Time Period.**

ACS next argues that the RCA violated the Act by failing to adopt a

permanent UNE rate within a reasonable time period, arguing that a statutory scheme

may contemplate final action within a reasonable time even though the Act does not

establish express deadlines.[55]   (ACS Cross-Petition Br. Re:  Delay and Interim Rates

Issues at 33-36).

ACS' chronology that supposedly supports its arguments of delay is wholly

inaccurate.  It fails to note:  (1) the federal uncertainty on cost models that significantly

impeded the RCA's ability to adopt a permanent UNE rate for the Anchorage market; (2)

ACS' inconsistent advocacy of multiple cost models during the RCA's consideration of a

permanent UNE rate and (3) ancillary filings by ACS that significantly delayed the

establishment of an UNE rate.  The administrative record supports the conclusion that the

---

[54]     The RCA noted that the ACS did not argue that the Section 252(b)(4)(C) arbitration deadline applied, and found that this deadline did not apply because a new request for negotiation or petition for arbitration under the Act had not occurred.  See Order U-96-89(15) at 4, n. 15 (citing December 6, 2000 hearing transcript at 67. (Box 1 at 567).

[55]     While ACS couches this inquiry in terms of statutory interpretation (necessitating the less deferential *de novo* standard of review), this is an inquiry into the reasonableness of the pace of the RCA's proceeding to establish permanent UNE rates, and as such is subject to an "*arbitrary and capricious*" standard of review. *See Nader v. FCC*, 520 F.2d 182, 196 (D.C. Cir. 1975).

Brief of the Individual Commissioners of the                    31
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

RCA's UNE decision was delayed by both the unsettled nature of UNE cost models at the federal level and ACS' procedural tactics.

As previously noted, cost models are used to calculate UNE rates. Components used to calculate UNE rates fall within two broad categories: (1) those respecting the model and the hypothetical network it assumes, and (2) those respecting the cost inputs to be plugged into the model. ACS submitted numerous cost models throughout the Anchorage arbitration proceeding, each of which went through a process of evolution during the course of the proceeding. ACS' inability to present a complete cost model at the early stages of the case was the primary factor in the delay of this proceeding. This situation was exacerbated by the federal judicial uncertainty with regard to the appropriate forward-looking cost model which forced ACS to advocate the simultaneous consideration of two extremely complex internally generated cost models. (Box 1 at 1154,1157,1176-1184). ACS' approach was a primary factor in the delay in the RCA's determination of a permanent UNE rate.

The Anchorage permanent UNE rate proceeding involved a situation where federal guidelines for cost models were not settled until May 13, 2002 – almost 2½ years after ACS requested permanent UNE rates in the Anchorage market. During this 2½ year period, ACS advocated four separate cost models (a modified FCC model, ACS v6.2 model, ACS v7.2 model, and ACS v8.0 model). Meaningful review of any of the ACS

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                    32

models was significantly delayed due to the incomplete nature of the ACS models, with ACS conceding that each of its cost models was in a "continuing state of evolution."[56]

In addition, ACS continually advocated a right to have the RCA consider two incomplete costs models simultaneously.  ACS proposed models based on both the FCC's hypothetical network/most efficient carrier standard (ACS v7.2 model), and ACS' actual network and actual forward looking costs (ACS v8.0 model).  ACS continued to advocate its ACS v8.0 model in the event the U.S. Supreme Court invalidated the FCC's hypothetical network/most efficient carrier standard; an exercise which proved to be fruitless once the U.S. Supreme Court upheld the FCC's hypothetical network/most efficient carrier standard.  It was not until that time – 2½ years after ACS filed its motion for a permanent UNE rate – that ACS abandoned its dual model approach, allowing the RCA and GCI to focus solely on ACS v.7.2 model.

The RCA adopted the ACS v7.2 approach to modeling shortly after U.S. Supreme Court upheld the FCC's hypothetical network/most efficient carrier standard. When adopting the ACS v7.2 approach to modeling, the RCA relied on ACS' representations that it would fix the model to the RCA's satisfaction and cautioned ACS regarding the delay inherent in using the model.  *See* Order U-96-89(26) (7/29/02), at 5-6. (Box 1 at 3162-3163).  Despite the RCA's admonition with regard to the delay inherent in using the model and even though no meaningful review of the ACS v7.2 model occurred, ACS continued to pressure the RCA to conclude the proceeding, moving for

---

[56]     Notice of Filing in Compliance with Order U-96-89(2) and Petition for Clarification of Order U-96-89(20), filed May 31, 2001, at 3.  (Box 1 at 797).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska          33
GCI v. RCA, et al.
A05-003 CV (RRB)

the establishment of a deadline on September 9, 2002 and again on March 17, 2003. (Box 1 at 3188; Box 2 at 1197).

The RCA noted the inconsistency in ACS' posturing when it denied ACS' September 9, 2002 motion to establish a deadline, finding that ACS had authored most of the delays in the case and determining that GCI must have a fair opportunity to scrutinize and challenge the model.[57]

For the next six months, ACS provided information to GCI on its v7.2 model and GCI proposed changes to the model, but the progress of the parties was so protracted that the RCA adopted a hearing process to conclude the arbitration in an oral ruling on June 20, 2003. The RCA stated:

> The parties' objections to the two recent arbitration orders make clear that the process we established nearly a year ago on July 29th, 2002 for resetting interconnection prices in Anchorage is not progressing at a reasonable pace. Despite the arbitrators best efforts to move this dispute closer to conclusion the parties pleadings and the arbitrator's recommended schedule make it clear that continuing to use a process that requires the parties to cooperatively design the pricing methodology for loop rates will not yield a final decision on all of the necessary interconnection prices within a reasonable time. We can better achieve our goal of setting fair Anchorage interconnection prices that are consistent with the Telecommunications Act of 1996 by using a different process. We will use a hearing process to build a record upon which to decide interconnection issues. Each party may propose prices and other terms for all disputed interconnection elements and issues in prefiled direct testimony on August 29th, 2003.

June 20, 2003 Oral Bench Order, at 2-3 (Box T-1 at 2243-44).

---

[57]    Order U-96-89(27), dated December 11, 2002, at 20-21. (Box 2 at 197-198; 3556-3557).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                    34

The RCA further explained its decision to switch to a hearing process on July 14, 2003, stating:

> When we adopted the ACS-AN approach we knew the process would be time consuming. However, we find that continuation of a process geared towards scrutiny and correction, if necessary, of the v7.2 mapped network design platform will not yield a final decision on all of the necessary interconnection issues within a reasonable time. Almost a year has passed since our original decision to use the ACS-AN approach, and despite the arbitrator's and parties' diligent efforts, the first phase is not complete. If the time necessary to correct the network design is added to the parties' proposed schedule, this proceeding could extend for another year. That length of time is unacceptable for resolving this docket. To resolve this docket within a reasonable time we must change the process by which the parties build a record for decision.
>
> To build a good record for decision we shift our focus from a particular model platform or approach to prices and terms of service. We do so by employing our traditional hearing process and the use of prefiled testimony.

Order U-96-89(35), July 14, 2003 at 7: (Box 2 at 1895; 5254).

The RCA then engaged in a formal hearing process allowing for discovery. The discovery process entailed numerous confidentiality requests with a hearing consisting of direct testimony from 14 ACS witnesses and 14 GCI witnesses, rebuttal testimony from 12 ACS witnesses and 18 GCI witnesses, reply testimony from 13 ACS witnesses and 13 GCI witnesses, and nine days of hearings. (Box 2 at 1909-end; Box 3 at. 1-1814; Box T-1 at 2385-end; Box T-2 at 1-end). Despite a contentious proceeding and voluminous testimony, the RCA completed the established permanent UNE rates for the Anchorage market less than one year later, on June 25, 2004. (Box 4 at 1321).

Brief of the Individual Commissioners of the                    35
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

The RCA did not unreasonably delay the proceeding establishing permanent UNE rates for the Anchorage market. ACS played a major role in delaying the proceeding with the submission of numerous untested and incomplete cost models and insisting on the simultaneous consideration of two pricing methodologies. The Individual Commissioners of the RCA acted reasonably in accommodating ACS' modeling proposals while also protecting GCI's rights to review and comment meaningfully on the evidence. ACS' cross-appeal on the delay issues should be rejected for these reasons in the event the Court determines it has jurisdiction to entertain them.

## II.    The RCA Did Not Violate The Act When It Established Temporary And Interim UNE Loop Rates

ACS next argues that both the 1996 temporary and 2001 interim UNE loop rates adopted by the RCA fail to comply with the FCC's forward-looking TELRIC standard. (ACS Cross-Petition Br. at Re: Delay and Interim Issues at 36). While the RCA granted ACS' initial request for interim rates, the RCA found that ACS failed to demonstrate the sufficiency of its proposed interim rate and established an interim rate below the amount ACS requested.[58]  It is also necessary for the Individual Commissioners of the RCA to provide an accurate chronology of the relevant events pertaining to ACS' requests.

**August 9, 1996**: The FCC issues the *Local Competition Order* adopting the forward-looking hypothetical network/most efficient carrier standard.

---

[58]    A substantial evidence standard of review applies to the RCA's finding that ACS failed to establish the reasonableness of its proposed UNE loop rate. (*AT&T Communications v. Pacific Bell Tel. Co*., 375 F.3d 894, 904 (9th Cir. 2003).

Brief of the Individual Commissioners of the                    36
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

**December 16, 1996**: RCA Order U-96-89(8) (Supplemental Items at 12785) establishes a UNE loop rate of $13.85, noting that all prices were temporary in nature and would require a full study based upon a cost methodology to be determined later.  ACS' legal predecessor, ATU, had proposed a UNE rate of $14.85.  (Supplemental Items at 12834).

**June 8, 2001**:  ACS requests an interim and refundable UNE loop rate of $24.00.  ACS presents the results of seven different cost model runs, each of which yielded an UNE loop rate exceeding $24.00.  (Box 1 at 927).

**June 25, 2001**:  GCI opposes ACS' interim rate increase request and presents two UNE rates based on the FCC cost model:  (1) a model using Anchorage customer/wire center information and the inputs from the Juneau-Fairbanks arbitration, yielding a UNE loop rate of $14.92, and (2) model using FCC default inputs, yielding a UNE loop rate of $12.94.[59]

**July 3, 2001**:  ACS files a reply to GCI's opposition, requesting interim rate relief, or alternatively a true-up of revenues once final UNE rates are established.  (Box 1at 1060).

**October 25, 2001**:  RCA Order U-96-89(23) establishes an interim and refundable rate of $14.92.  (Box 1 at 2698-2711).  This rate was above what ACS' predecessor, ATU, had proposed in the initial arbitration proceeding in 1996.

---

[59]     GCI Opposition to ACS' Requests for Interim and Refundable Rates.  (Box 1 at 969-1029).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                    37

**October 24, 2002**:  ACS requests an increase to the interim UNE loop rate to $24.48, presenting a run of ACS v7.2 model with Anchorage-specific cost inputs to support the request.  (Box 1 at 3259).

**November 20, 2002**:  GCI opposes ACS' proposed increase, moving to reduce the UNE loop rate to the original $13.85, with rates being refundable to a limit of $10.88.  (Box 2 at 142)**.**

**December 20, 2002**:  ACS files a reply to GCI's opposition to increase the UNE rate and proposes an interim UNE loop rate of $16.26.  ACS calculates the $16.26 rate by increasing customer line counts used in GCI's FCC model run for the $14.92 interim UNE loop rate.[60]

**April 14, 2003**:  RCA Order U-96-89(31) denies ACS' request to increase the interim UNE rate and denies GCI's request to decrease the interim UNE rate.  (Box 2 at 1578-90).

**June 25, 2004**:  RCA Order U-96-89(42) approves a permanent UNE loop rate of $19.15.  (Box 4 at 1321-1408).

**August 20, 2004**:  The RCA grants GCI's petition for reconsideration and decreases the UNE loop rate to $18.64 to account for computational errors.  (Box 4 at 1834).

---

[60]    ACS Petition for Reconsideration of Order Denying Motion for Establishment of Interim and refundable UNE Loop Rate at 11.  (Box 2 at 219).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska                    38
GCI v. RCA, et al.
A05-003 CV (RRB)

1.    **The RCA's Temporary UNE Loop Rate Complied With Federal UNE Pricing Guidelines**

ACS contends that the temporary UNE loop rate adopted by the RCA in 1996 did not comply with the FCC's TELRIC methodology.  (ACS of Anchorage, Inc.'s Cross-Petition Br. Re: Delay and Interim Rate Issues at 36-37).  The temporary UNE loop rate of $13.85 was recommended by the arbitrator on November 20, 1996.  (*See* Order U-96-89(8), Appendix E at 1, Supplemental Items at 12785).  The arbitrator noted that the ACS model was based on embedded costs and found that GCI's UNE loop rate proposal more closely approximated ACS' forward-looking costs.  The RCA accepted the arbitrator's recommended UNE loop rate and an arbitrated interconnection agreement between ACS and GCI on December 16, 1996, stating that all approved prices were temporary in nature and would require a full study based upon a cost methodology to be determined later.  *See* Order U-96-89(8), (Ordering Paragraph No. 2, Supplemental Items at 12813).

While the RCA's *initial* proceeding that established temporary UNE loop rate for the Anchorage market was pending, the FCC implemented regulations establishing TELRIC as the appropriate method for State commissions to follow when determining UNE rates.[61]  While the FCC encouraged State commissions to set UNE rates based on the FCC's TELRIC methodology, it also recognized that "it may not be possible for carriers to prepare, and State commissions to review, economic cost models

---

[61]    *See Local Competition Orde*r, ¶¶ 672-703; 47 C.F.R. § 51.505.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                      39

within the statutory time frame for arbitration."[62]  To address this situation, the FCC created default proxies to assist State commissions in adopting temporary UNE rates and permitted State commissions to use the default proxies when establishing UNE rates.[63] The FCC did not specify a default proxy price for UNE loops in Alaska (47 CFR 51.513). The *Local Competition Order* also allowed States to set UNE prices below the default proxy amount if the record before the State commission supported a lower price.[64]  Faced with no default proxy, the RCA adopted the proposed UNE loop rate that more closely approximated a forward-looking cost approach proceeding in the most reasonable manner possible given the eminent federal statutory deadline that existed for completion of the initial Anchorage arbitration.  (Order U-96-89(8) Supplemental Item at 12800).

## 2.    The RCA's Interim UNE Loop Rate Complied With Federal UNE Pricing Guidelines.

ACS also contends that the interim UNE rate adopted by the RCA in 2001 does not comply with the FCC's TELRIC methodology.  (ACS Cross-Petition Re:  Delay and Interim Rate Issues at 36).  The RCA was presented with several models that had not been reviewed for compliance with the TELRIC method of establishing UNE rates, and adopted an interim UNE rate based on the only proposed cost model that had been scrutinized to ensure compliance with TELRIC.  The RCA was also presented with only

---

[62]    *Id.* at ¶ 767.

[63]    The default loop rate was subsequently overturned by the Eighth Circuit in *Iowa II,* 219 F.3d 744, 757 (2000) and the default proxies set out in 47 U.S.C. § 51.513(c) were vacated on July 18, 2000.

[64]    *Id.* at ¶ 768.

Brief of the Individual Commissioners of the                    40
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

two sets of model inputs that had been found to comply with TELRIC and adopted the set of model inputs that was most favorable to ACS. (Order U-96-89(23), Box 1 at 2704-2708).

To support its interim rate request, ACS presented seven different cost models which either had not been reviewed by the RCA or included inputs that conflicted with the TELRIC methodology.[65] GCI submitted a cost study based on the FCC model adopted in the Fairbanks-Juneau arbitrations to establish TELRIC-compliant UNE rates, providing two sets of inputs for the model; one based on FCC default inputs and one based on Anchorage customer/wire center information with inputs from the Fairbanks-Juneau arbitration. (Box 1 at 969-1029). The later inputs yielded the higher interim loop rate of $14.92 [66]

When establishing the interim UNE loop rate, the RCA found that ACS failed to demonstrate that its proposed models and/or model inputs complied with FCC pricing rules.[67] Since ACS' cost model runs did not have a firm cost basis, the RCA adopted interim rates based on the only model that the RCA could verify complied with TELRIC – the FCC model. Recognizing the higher cost of UNE loops in Alaska, the

---

[65]    ACS' Request for Immediate Establishment of Interim and Refundable Rates. (Box 1 at 933-36, 942-43).

[66]    At pages 39-40 of ACS Cross-Petition Brief Re: Delay and Interim Rate Issues, misstates the record by indicating that GCI's $14.92 rate was based on default inputs based on national averages. GCI cited a $12.94 UNE ratebased on the FCC's default inputs. (Box 1 at 974) The $14.92 rate was based on inputs from the Fairbanks-Juneau arbitration. *Id.*

[67]    Order U-96-89(23) dated October 25, 2001at 10. (Box 1 at 2707).

Brief of the Individual Commissioners of the                    41
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

RCA appropriately selected the inputs to the FCC model that yielded a high UNE rate and more closely approximated the forward-looking cost of ACS' loops – the UNE loop rate that incorporated inputs from the Fairbanks-Juneau arbitration.  (Order U-96-89(23), Box 1 at 2706-08).

### 3.    ACS Failed to Present Sufficient Evidence to Support UNE Loop Rate Higher Than $14.92.

ACS argues that in applying either general equitable standards or the RCA's "balance of the hardships" test for interim tariff relief, the RCA should have granted ACS' request for a "sufficient" interim and refundable rate.  (ACS Cross-Petition Br. Re: Delay and Interim Rate Issues at 38-39).  ACS' main contention is that the interim rate was not set at a satisfactory level.

As the proponent of a change to the UNE rate, ACS had the burden of proving the reasonableness of its proposed rate.[68]  ACS presented seven different cost model runs to support its interim rate request.  Four ACS model runs were based on cost models that had been either rejected or not previously reviewed by the RCA, while the three models

---

[68]    This approach is consistent with the Act's rules relating to the change of tariffed rates, where the burden of proof to establish an increased rate is on the carrier proposing the rate increase.  47 U.S.C. § 204.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                  42

based on the FCC cost model were based on untested or non-TELRIC compliant inputs.[69]

Each of ACS' proposed cost models yielded UNE rates exceeding the permanent TELRIC UNE loop rate of $18.64 (a rate that ACS now defends as TELRIC-compliant) by more than $6.00, with one of ACS' cost model runs resulting in a UNE rate that exceeded the permanent UNE rate by $14.62.[70]  The RCA determined that ACS was required to show that its proposed interim UNE loop rate did not exceed the forward-looking economic cost per unit of providing the unit.[71]  Noting that ACS' request was premised on several untested and unapproved methodologies, the RCA found that ACS failed to demonstrate its interim rate proposal was based on a cost model and set of inputs that complied with FCC pricing rules.[72]  Given this failure of proof, the RCA did not adopt ACS' proposed interim UNE rate.  ACS' cross-appeal of the interim rate issues

---

[69]    Four of ACS' proposed models had been either rejected or not previously reviewed by the RCA: (1) ACS v6.2 model, with ACS' actual forward looking costs as inputs, (2) ACS' 7.2 model, using the hypothetical network standard; (3) an ACS modification of ACS v6.2 and v7.2 models, modified to bring ACS' existing embedded plant to present value, and (4) ACS model v.80, with inputs based ACS' actual network.  ACS also presented three FCC model with untested or non-TELRIC compliant inputs: (1) the FCC cost model using ACS actual forward-looking costs as inputs (2) the FCC cost model using "company-specific cost inputs", and (3) the FCC cost model using "compromised inputs" that incorporated some ACS' forward-looking company-specific costs and some costs adopted in the Juneau and Fairbanks arbitrations.

[70]    ACS' run of model v6.2, with ACS' actual forward-looking costs as inputs, yielded a rate of $33.26.  ACS Request for Immediate Establishment of Interim and Refundable Rates at 53; Affidavit of William J. Wilkes at 3-6.  (Box 2 at 2; 3361).

[71]    Order U-96-89(23) at 6, citing 47 C.F.R. § 51.505(e).  (Box 1 at 2703).

[72]    ACS' Request for Immediate Establishment of Interim and Refundable Rates at 7-10, 16-17; Affidavit of William J. Wilkes at 3-6.  (Box 2 at 2; 3361).  ACS v6.2 model, with ACS' actual forward looking costs as inputs, yielded an Anchorage UNE loop rate of $33.26.

Brief of the Individual Commissioners of the          43
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

should be rejected by the Court for this reason.[73]   The Individual Commissioners of the

RCA now respond to GCI's appeal concerning the permanent UNE rate calculation.

## III.   The RCA's Calculation Of Permanent UNE Rates Complies With The Act And Is Supported By Substantial Evidence.

GCI appeals several issues pertaining to the RCA's calculation of

permanent UNE rates.   First, GCI argues that the RCA's calculation of ACS' cost of

capital was contrary to both the law and evidence resulting in an excessive cost of capital.

Second, GCI argues that the RCA erred in using a different cost of capital input in its

switching models than it used in its loop model.   Third, GCI contends that the RCA's

adoption of ACS' proposed non-recurring cost charge cost model violated federal

guidelines on UNE pricing.   Fourth, GCI contends that the evidence did not support the

UNE model's assumption that trenching costs would be paid entirely by ACS rather than

shared with another utility sharing the trench.   All of GCI's challenges should be rejected

for the reasons stated in ACS' Opposition Br. Re: Final Rates and for the reasons set out

below.

---

[73]   ACS' also argues that the RCA should have granted ACS' request for a "true-up mechanism".   (ACS Cross-Appeal Br. Re: Delay and Interim Rates at 40).   ACS raised the issue of a true-up mechanism in its July 3, 2001 reply to GCI's opposition to the request for interim rate relief.   (Box 1 at 1085)   A true-up mechanism is not required by the federal guidelines for UNE pricing.

Brief of the Individual Commissioners of the                    44
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

1.      **The RCA's Cost of Capital Calculations Do Not Violate The Act.**

The TELRIC of a network element is the sum of three components – operating expenses, depreciation expenses, and cost of capital.[74]  Depreciation is the mechanism by which the investment in an asset is recovered over the life of the asset. Cost of capital reflects the rate of rate of return required to attract capital, i.e., the rate of return that investors expect to receive from alternative investments that have the same risk.[75]  Under TELRIC, cost of capital and deprecation are the primary vehicles by which any risks associated with new facilities and services may be reflected in UNE prices.[76]

Determining the appropriate cost of capital involves the review of three factors.  A company's capital structure is the blend of equity and debt used to fund the organization, and both have associated costs.  The use of equity requires a return to the investor (cost of equity), while the use of debt has an associated interest cost (cost of debt).  These concepts are blended to determine a company's cost of capital.

GCI alleges errors in the RCA's determination of the appropriate cost of capital for ACS.  GCI challenges the RCA's decisions to award a cost of capital that (1) exceeded ACS' request, (2) applied an actual cost of debt to a hypothetical capital structure and (3) based a size premium on a hypothetical capital structure.  The RCA's

---

[74]      *Local Competition Order*, 11 F.C.C. Rcd at 15856, ¶ 703; *See also Triennial Review Order*, ¶ 671.

[75]      *Triennial Review Order,* ¶ 671.

[76]      *Triennial Review Order*, ¶ 675.

Brief of the Individual Commissioners of the                45
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

decisions, however, are consistent with federal guidelines on UNE pricing and are based on substantial evidence in the record.

2.    **The RCA's Cost of Capital Calculations Comply With Federal UNE Pricing Guidelines.**

The FCC has stated that the currently authorized rate of return at the federal or state level is a reasonable starting point for TELRIC calculations and that State commissions may adjust cost of capital and depreciation rates to account for increased business risk associated with an increasingly competitive market.[77]    State commissions are provided substantial discretion in calculating the appropriate cost of capital and depreciation rate.    The Supreme Court has recognized the considerable discretion afforded State commissions on depreciation and capital cost matters:

> The argument [raised by ILECs], however, rests upon a fundamentally false premise, that the TELRIC rules limit the depreciation and capital costs that ratesetting commissions may recognize.  In fact, TELRIC itself prescribes no fixed percentage as risk-adjusted capital costs and recognizes no particular useful life as a basis for calculating depreciation costs.  On the contrary, the FCC committed considerable discretion to State commissions on these matters.

*Verizon Communications, Inc. v. FCC*, 122 S.Ct. at 1676-77.

In this case, the RCA used ACS' currently authorized rate of return as a starting point for its cost of capital calculation and then adjusted the cost of capital to account for the increased business risk associated with the competitive Anchorage market.  (U-96-89(42) at 14-15, Box 4 at 1334-35)  GCI questions the RCA's decision to

---

[77]    *Local Competition Order*, ¶¶ 686-87, 702-03; *Triennial Review Order*, ¶¶ 680-81, 689.

Brief of the Individual Commissioners of the    46
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

increase the cost of capital to reflect the higher risk associated a far more competitive Anchorage market.

The Act contemplated three competitive entry strategies:  use of a competitor's own physical facilities, use of the incumbent's network through UNEs and resale of the incumbents' services.[78]

These entry strategies were an important means of introducing competition and each presented very different risk profiles for the ILEC.  Under both resale of the incumbent's services and the UNE leasing scenario, the incumbent continues to receive revenue and cash flow when a customer is served by a competitor as the competitor is either buying the incumbent's services or leasing its network.  In sharp contrast, when the competitor provides telephone services over its own facilities, the incumbent loses all revenues and cash flow associated with that lost customer, impacting the risk profile of the incumbent substantially.  The FCC explained this concept:

> "[f]irst, we clarify that a TELRIC-based cost of capital should reflect the risks of a competitive market.  The objective of TELRIC is to establish a price that replicates the price that would exist in a market in which there is facilities-based competition.  In this type of competitive market, all facilities-based carriers would face the risk of losing customers to other facilities-based carriers, and that risk should be reflected in the TELRIC prices."[79]

---

[78]    *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, CC Docket No. 96-98, 11 F.C.C. Rcd 15499, 15509 ¶ 12 (1996).

[79]    *Triennial Review Order at* ¶ 680.

Brief of the Individual Commissioners of the          47
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

The FCC also stated, "we now clarify that states should establish a cost of capital that reflects the competitive risks associated with participating in the type of market that TELRIC assumes. The Commission [FCC] specifically recognized that increased competition would lead to increased risk which would warrant an increased cost of capital."[80] The FCC then concluded, "[e]stablishing UNE prices based on an unreasonably low cost of capital would discourage CLECs from investing in their own facilities and thus slow the development of facilities-based competition."[81]

When discussing the theory and policy issues associated with establishing a cost of capital for the TELRIC calculation, the FCC stated, "[t]he overall cost of capital is the minimal rate of return required to attract capital to an investment. It is the rate of return investors expect to receive from alternative investments having the same risk."[82] In response to arguments that commissions should look at the existing level of competition in calculating cost of capital, the FCC stated that "the cost of capital . . . must reflect the risks of a market in which the ILEC faces facilities-based competition.[83]

---

[80]    *Id*. at 681.

[81]    *Id*. at 682.

[82]    *In the Matter of Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia Inc., and for Expedited Arbitration*, CC Docket No. 00-218, DA 03-2738 18 F.C.C. Rcd 17722 (Aug. 29, 2003) (*Verizon Virginia*) ¶ 60.

[83]    *Id. at Virginia Verizon* at ¶¶ 62-63.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska                    48
GCI v. RCA, et al.
A05-003 CV (RRB)

In *Verizon,* the FCC affirmed that "TELRIC pricing is intended to replicate the rates in a market with facilities-based competition" and therefore the cost of capital should reflect the risk of losing customers to other facilities-based carriers.[84]

Until this case, ACS has had to confront two of the entry strategies discussed above, resale and UNE leasing. GCI testified that it would begin a five-year transition of its local UNE customers to its own stand alone cable telephony network, starting in 2004 with 10,000 customers. (Tindall No. 6, 2003 hearing testimony, Box T1 at 3073; Prefiled Rebuttal Testimony of Dana Tindall filed on September 9, 2003, Box 3 at 2821-2822).

Where there is greater shareholder or capital risk, there is a greater reward required by the shareholders. Compared to UNE based competition facilities based competition creates a higher risk profile for an ILEC and the shareholder would require substantial reward to justify the risk. (Order U-93-82(42) at 16, Box 4 at 1336).

The RCA discussed its assumptions on the type of competition justifying an increased cost of capital when addressing GCI's reconsideration petition:

> We disagree with GCI that ACS-AN already faces risk associated with facilities-based competition. TELRIC is based on a competitive market that does not exist currently in the United States. It is a hypothetical market where CLECs compete using their own plants (networks), not the plant owned by the incumbent, which is the competitive structure that exists today. The distinction between markets is critical in establishing TELRIC competitive risk.

U-96-89(46) at 6. (Box 4 at 1839; 11708).

---

[84]        *Virginia Verizon*  at ¶ 59.

Brief of the Individual Commissioners of the              49
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

GCI characterizes the RCA's view of facilities-based competition as being a situation with no leasing of UNEs by the competitor and contends that FCC rulings indicate that "facilities-based competition" includes situations where competitors lease at least some facilities to provide service. GCI concludes that ACS' proposed cost of capital calculation sufficiently reflected the level of competition in Anchorage and that the RCA violated federal guidelines by increasing the cost of capital to reflect the higher level of risk associated with GCI's transition from UNEs to its own cable platform.

The FCC requires State commissions to establish a cost of capital that "reflects the competitive risks associated with participating in the type of market that TELRIC assumes."[85] The FCC has stated that the TELRIC model "must reflect the risks of a market . . . which . . . faces facilities-based competition."[86] GCI focuses on the FCC's use of terminology ("facilities-based competition") to support a TELRIC presumption of stagnant risk levels, an approach that ignores the FCC's related guidance on the forward-looking TELRIC methodology.

The *Local Competition Order* states that "increases in competition . . . warrant an increased cost of capital."[87] In the *Triennial Review Order,* the FCC

---

[85]    *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket Nos. 01-338 et al., 18 FCC Rcd 16978 (2003) ¶ 681.

[86]    *Virginia Verizon  at* ¶ 63.

[87]    *Local Competition Order*, ¶ 702.

Brief of the Individual Commissioners of the                    50
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

expressly rejected contentions that State commissions are limited to considering the

actual competitive risk the ILEC currently faces in providing UNEs, stating:

> The objective of TELRIC is to establish a price that replicates the price that would exist in a market where there is facilities-based competition. In this type of market, all facilities-based carriers would face the risk of losing customers to other facilities-based carriers, and that risk should be reflected in TELRIC prices.

*Triennial Review Order*, ¶ 680.

The FCC went on to specify that State commissions should establish a cost

of capital that reflects the competitive risks associated with participating in the type of

market that TELRIC presumes and future competition must be considered in assessing

risk. *Id*. at ¶ 681.

The RCA's Orders demonstrate compliance with these directives. At the

time Anchorage UNE rates were established, GCI primarily competed by combining

loops leased from ACS with GCI's own switching and transport. The RCA's awarded

cost of capital assumed a transition from UNE loop competition to pure facilities-based

competition, with GCI providing service primarily through its own facilities. *See* RCA

Order U-96-89(42) at 16 (Box 4 at 1336) (Anchorage retail market is highly competitive

under a UNE pricing mechanism and stands poised to enter a facilities-based

competition); RCA Order U-96-89(46) at 14 (Box 4 at 1847) (there is an increased

financial risk in a TELRIC competitive market since the loss of GCI as a UNE customer

will substantially reduce ACS' cash flow and the stipulated cost of debt rate should be

adjusted to reflect this increased financial risk). In short, the RCA adopted the FCC's

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

51

approach to modeling financial risk by increasing the risk adjustment to account for the competitor migrating away from use of the incumbent's UNEs to providing service over the competitor's own facilities.

GCI also argues that ACS' proposed cost of capital based on ACS' actual capital structure should be viewed as the upper boundary of a TELRIC-based cost of capital and that the RCA erred in awarding a cost of capital that exceeded ACS' request. (GCI's Opening Br. at 26-28)  The Act and FCC UNE pricing rules require that State commissions apply their expertise to determine the appropriate forward-looking TELRIC-based cost of capital.  In reaching that determination, a State commission is not limited to choosing between competing cost of capital proposals.  Thus, the RCA's decision to deviate from the party's proposals does not violate the FCC UNE pricing guidelines.

> **3.     The RCA's Cost of Capital Calculation Is Based on Substantial Evidence In The Record.**

GCI objects to the RCA's cost of capital calculation that combined an actual cost of debt with a hypothetical capital structure.  GCI cites two examples of how it believes that the use of ACS' actual cost of debt with a hypothetical capital structure could cause imperfect results.  GCI argues that the RCA's use of ACS' actual debt rate ignores a decline in interest rates that preceded the RCA's decision on cost of capital. (GCI's Opening Br. at  29-34).

GCI further argues that the RCA's cost of debt calculation ignores ACS' debt restructuring plans, which would allow ACS to take advantage of lower interest

Brief of the Individual Commissioners of the                    52
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

rates. ACS presented testimony explaining that even after its recent debt restructuring during a period of low interest rates, its aggregate cost of debt was 10.5 percent. (Box 3 at 746). While GCI asserted that the RCA used an excessive costs of debt, ACS' aggregate cost of debt provided evidentiary support for the RCA's estimated 10.33 percent cost of debt.

GCI also questions the RCA's use of ACS' proposed size premium when calculating the cost of equity. GCI states that ACS' proposed size premium was based on ACS' actual market capitalization, which reflected a lower capitalization level of 16.47 percent. GCI notes that this low level of capitalization led to the highest possible size premium under the Ibbotson premium table and contends that the hypothetical capital structure including a 55 percent capitalization level would have resulted in a lower size premium of 1.52 percent under the Ibbotson table. ACS notes that in the context of a forward-looking cost methodology, a size premium is designed to compensate for the tendency to underestimate the market volatility of smaller firms. (ACS Opposition and Cross-Petition Br. Re: Final Rates and Terms at 28). The RCA's decision to use the highest size premium under Ibbotsen was justified by the increased level of competition that confronted ACS in the Anchorage market (where GCI's market share already exceeded 40 percent) and the probability that GCI's deployment of cable telephony would cause a migration of customers away from ACS' network.

GCI spends considerable effort arguing that the RCA's cost of capital calculation was not supported by substantial evidence in the record, and that none of the RCA's stated justifications for its cost of capital decision withstand scrutiny. In

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

53

determining the appropriate cost of capital, however, the RCA selected the cost of capital components from those proposed by the parties, choosing those most appropriate for TELRIC.[88]   The RCA's decision considered all competitive risk, including any risk ACS may face from stranded plant.  This factor was considered in the cost of capital rather than dispersed throughout the model (i.e., incorporated into the depreciation rate for ACS).[89]   While this approach led to a higher risk-adjusted cost of capital, the record contained ample evidence to support the RCA's risk-adjusted cost of capital.  (Order U-96-89(42), Box 4 at 1333-1344).

GCI also criticizes the RCA for considering ACS' risk of stranded investment once GCI serves customers over its own network rather than leasing ACS' network.  While GCI disputes whether this plant will become technically "stranded," it acknowledges the network will be "less utilized" as GCI deploys service over its own network  (GCI's Opening Br. at 39).  GCI thereby acknowledges the RCA's point on stranded investment.  While the network as a whole would not be stranded, individual loops would no longer be used by ACS to provide end user services.  These loops would be "stranded" in the sense that the loop would no longer generate revenues for ACS once a customer migrated to GCI's facilities.  GCI's challenge to RCA's cost of capital calculation should be rejected.

---

[88]     Order U-96-89(42), dated June 25, 2004.  (Box 4 at 1342).

[89]     *Id*. at 12.  (Box 4 at 1335; 11204).

Brief of the Individual Commissioners of the                    54
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

4.      **The RCA's Use of a Lower Cost of Capital for Switching Elements Is Based on Substantial Evidence In The Record.**

GCI states that the RCA erred by failing to apply a consistent cost of capital to all UNEs.  (GCI's Opening Br. at 44).  GCI makes this allegation despite the fact that the RCA adopted GCI's proposed switching model (with only a few minor modifications), including its proposed cost of capital.  (Box 4 at 1372-1374).

GCI argues that the RCA did not "rationally articulate" why it did not apply a consistent cost of capital to all UNEs.  (GCI's Opening Br. at 18)  GCI is wrong.  The RCA explained in Order 42 why it had taken a different approach to UNE-loops, compared to all other UNEs.  (Box 4 at 1327)  For most UNEs, each party presented their own models and own inputs, and insisted on the superiority of their own  proposals.  Furthermore, because of significant design differences, it was generally not possible to take the inputs *in mass* from one model and plug them into the other party's model.  Except for UNE-loops, the lack of common models necessitated the adoption of one or the other party's model along with all or most of that party's proposed inputs.

This was not the case with the UNE-loop models, where both parties were able to generate separate, and wildly divergent, UNE-loop rates from virtually identical models.[90]  This permitted an in-depth comparison of the inputs proposed by GCI and ACS for the common UNE-loop model.

_____

[90]     (GCI calculated a UNE-loop rate of $4.84 per month using the ACS 7.2 model (which GCI refers to as "ACS v7.2-G")) Box 3 at 9; (ACS calculated a UNE-loop rate of $25.56 using the GCI version of ACS 7.2 model (which ACS refers to as "GCI 7.2-G")) Box 3 at 2743.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska               55
GCI v. RCA, et al.
A05-003 CV (RRB)

In its arbitration, the RCA adopted GCI's switching model and proposed inputs with just two minor modifications and directed the parties to re-run the switching model with these modifications.  (Order U-96-89(42) at 51, Box 4 at 132).  Although GCI challenged other aspects of the arbitration decision, it did not challenge the RCA's decision to use its own cost of capital in its own switching model.   (Petition to Reconsider, July 16, 2004; Box 4 at 1420)   When GCI did eventually challenge the RCA's switching costs of capital decision in Order No. 42, it was well passed the deadline for doing so.[91]  On August 20, 2004, approximately two months after the RCA's (Order No. 42) arbitration decision, the FCC issued interim rules which froze ACS' switching rate at the rate in effect on June 15, 2004 - a rate not based on a TELRIC pricing model.[92]  At the time it was unclear how permanent switching rates would need to be computed (if at all) at the end of the interim period.[93]  In response, GCI proposed that the loop rate be recalculated to reflect both:  1) cost values associated with (frozen) pre-arbitration switching rates established by the FCC on an interim basis, and 2) costs

---

[91]    Pursuant to 3AAC 48.105, a party must file a petition for reconsideration of a RCA Order within 15 days of service of the Order.  GCI did not challenge the RCA's decision of cost of capital for switching until over 3 months later raising the issue in its Petition for Reconsideration of Order No. 49, (Box 4 at 1956).

[92]    Order and Notice of Proposed Rulemaking, FCC 04-179, Dockets WC 04-313 and CC 01-338, ¶¶ 1, 21.

[93]    These rates, terms, and conditions shall remain in place until the earlier of the effective date of final unbundling rules promulgated by the FCC or six months after Federal Register publication of this Order, except to the extent that they are or have been superseded by (1) voluntarily negotiated agreements, (2) an intervening Commission order affecting specific unbundling obligations (e.g., an order addressing a pending petition for reconsideration), or (3) (with respect to rates only) a state public utility commission order raising for network elements. *Id.*

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

56

inputs arbitrated in Docket U-96-89.[94]  GCI's proposal was problematic for two reasons:

1) it would require the RCA to recompute the UNE-loop rate each time that the FCC

changed the interim switching rate or adopted permanent rules for UNE-switching; and 2)

GCI did not explain how to re-run its UNE-switching model using two conflicting sets of

cost inputs (TELRIC and non-TELRIC).   The RCA resolved this problem by not re-

running the UNE-loops model, stating that it was necessary in the interest of stability to

decouple the loop rate from further fluctuations in switching that were outside of its

control:

> We decline to make further changes to the UNE loop rate we
> adopted in Order U-96-89(46) at this time.   Although the
> FCC's interim rules require a change in our arbitrated
> switching and transport rates, it does not require a recalculation
> of all other rates that may be indirectly affected by changes to
> the switching and transport in order to properly implement the
> June 15, 2004 switching and transport rate rollback.  As GCI
> noted, federally mandated changes to the switching and
> transport rates could result from FCC's reconsideration of its
> Interim Order, permanent or temporary changes to the federal
> rules, or remands from various federal courts.  We believe that
> it is appropriate at this time to provide some stability in the
> loop rate by decoupling it from further fluctuations in
> switching and transport that may occur from developments
> outside of our control.[95]

There is no error in the RCA's finding of using a lower cost of capital

for switching than for UNE rate models.

The RCA's rationale for using a lower cost of capital for switching

elements can be explained by examining the revenue ACS will lose when GCI

---

[94]     Box 4 at 1927-1928.

[95]     Box 4 at 1961.

Brief of the Individual Commissioners of the                57
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

transitions to its own facilities. The local loop connects the customer to the carrier's point of presence - these local loops are aggregated for delivery to a central point (usually a pedestal) that connects to feeder and distribution facilities to connect the customer to the carrier's switch. When a customer migrates from ACS to GCI's facilities, a portion of the loop no longer generates revenues. While ACS will continue to use the switches and feeder/distribution facilities, a portion of the loop (i.e. the loop dedicated to delivering service to the customer) is no longer in use or otherwise generating revenues for ACS and in that sense is "stranded." However, ACS' switches continue to generate revenues from other customers served by the switch. Given the higher incident of stranded investment at the loop level, it is appropriate to apply a higher cost of capital to loop costs than switching costs. This is particularly true in a market such as Anchorage, where the competitive entrant-GCI currently uses its own switches and transport facilities extensively but purchases most UNE loops from the incumbent, ACS.

> **5.    Federal Guidelines Allow State Commissions To Set A Different Cost of Capital For Different UNE Elements.**

While GCI challenges the RCA's decision to apply a lower cost of capital to switching elements, the FCC's *Local Competition Order* recognized that differing costs of capital may be appropriate for different UNE elements, stating that "the risk-

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                      58

adjusted cost of capital need not be uniform for all elements."[96]  The *Triennial Review Order* also recognized the possibility that State commissions may adopt different costs of capital for different network elements, stating that states should have the "option" to adopt a single cost of capital for all UNEs, "preserving flexibility . . . for State commissions with respect to implementation of our TELRIC rules."[97]   The RCA's decision to apply a lower cost of capital to switching elements is consistent with federal guidelines on UNE pricing.

### 6.    The RCA's Nonrecurring Charge Cost Model Complies With Federal UNE Pricing Guidelines.

Non-recurring costs ("NRCs") are one-time expenses incurred by the ILEC for work activities required to process service orders, and to install and configure network elements for the benefit of the competing carrier.  (Box 4 at 1372 (Order No. 42))  These costs are assessed to cover specific activities, and are intended to cover the cost of the labor associated with providing a network element not recovered through recurring charges.  GCI contends that the model used by the RCA to calculate NRCs improperly focused on the existing capability of ACS' network and thereby violates federal guidelines applicable to the UNE prices for NRCs.  (GCI's Opening Br. at 58)  GCI's argument is based on its allegation that the TELRIC's hypothetical network/most

---

[96]    *Triennial Review Order*, ¶¶ 680-81.  The FCC also stated "[t]he objective of TELRIC is to establish a price that replicates the price that would exist in a market in which there is facilities based competitive." *Id*. at ¶680.   The FCC also cited its conclusion in the *Local Competition Order* that increased competition leads to increased risk, which would warrant an increased cost of capital. *Id*. at ¶681, citing *Local Competition Order*, ¶ 702.

[97]    *Triennial Review Order*, ¶ 684.

Brief of the Individual Commissioners of the                    59
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

efficient carrier standard assumes a fully automated system for processing such service orders. The RCA adopted ACS' proposed NRC model because GCI's model lacked adequate documentation and was flawed in several respects. The RCA noted that GCI's proposed NRC included an assumption of 100 percent dedicated outside plant (DOP), meaning that all loops would be in place and dedicated to individual customer locations. The RCA viewed this as an unreasonable assumption that would not reflect reality. (Order U-96-89(42) at 53, Box 4 at 1376; 11245).

At hearing, GCI acknowledged that in certain circumstances an ACS technician would need to travel to the field to initiate service for GCI, but GCI's model did not include any NRCs to compensate ACS for the expenses of such field visits. (Box 4 at 65-66). The RCA's Order establishing UNE prices recognized that GCI's assumption of 100 percent DOP was unrealistic when explaining its reasons for selecting ACS' NRC model. (Order U-96-89(42) at. 77, Box 4 at 1399;11268).

The RCA found that GCI's model was not well documented or supported by explanation in the record. (Order U-96-89(42), Box 4 at 1372) ACS disagreed with GCI's allegation that changing the Dedicated Plant input in the GCI NRC model had no effect on output. (Eldred Testimony, Box 3 at 2524). At first, GCI alleged that its model was merely a series of Excel spreadsheets and resaving the model with a new name would unlock the password protection that had prevented changes to the Dedicated Plant input. (Weiss Surrebuttal, Box 4 at 65-66). However, at hearing GCI witness Weiss admitted that, even when unlocked, changes to the dedicated plant input produced no

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

60

changes in output. In fact, the only way to relax the 100 percent dedicated plant assumption was to use what amounted to an undocumented workaround.

> Q. (Mr. Shoup) Mr. Weiss, last night in my office I ran your NRCM and I changed the 100 percent to 50 percent and to zero and it didn't change the rate, that's the way the model's setup today?
> A. (Mr. Weiss) That's the way the model is -- is configured today. . . .
> Q. All right
> A. . . . but as I indicated in response to Ms. Eldred, I can change or any analyst can relax that assumption by going into the model and changing certain of the -- of the activities and so forth that are included there and the probabilities, the activities and the time estimates. (Box T-2 at 341).

In other words, the GCI NRC model included a crucial input that was essentially functionless, because changing the variable produced no change in output. Not only was this feature undocumented, so was Mr. Weiss' alleged workaround. The RCA was therefore justified in concluding that the GCI NRC model was flawed and lacked adequate documentation.

The other NRC issue raised by GCI involves the operations support system (OSS) that incumbents use to manage their networks, interface with customers and CLECs, and deploy services. GCI assumed a fully automated system and one set of prices reflecting the fully automated assumptions of its model. ACS assumed that the CLEC would have the option to choose either a fully automated or a partially automated interface. ACS included two price menus: one for fully automated NRCs and one for partially automated NRCs.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                     61

GCI believed that the FCC's general TELRIC requirement that rates be set assuming the "most efficient telecommunications technology currently available" precludes the RCA from finding that ACS-AN's model more accurately describes the way the network would be built if recreated today.

ACS' model did not preclude the use by a CLEC of a fully automated OSS; it merely offered the option of a partially automated system if the CLEC decides it does not want or cannot afford the fully automated system.  For a CLEC much smaller than GCI, the capital investment associated with a fully automated OSS interface could easily outweigh the benefits.  In this regard, ACS' proposal was more flexible and reasonable.

In addition, although GCI criticized the RCA's decision to take into consideration "the reality of ACS-AN's network" by considering a partially automated OSS.  GCI recognized that a fully automated system doesn't always work and that service orders sometimes "fallout" and have to be processed manually:

> The model includes 'default' (fallout) percentages of 2 percent and 5 percent respectively, for POTS and Complex order types. I have significantly increased those default percentages to 5 percent and 20 percent, respectively, in order to recognize that <u>ACS had not yet deployed a fully automated operations support system in Anchorage</u>.  (Box 4 at 387).

However, GCI witness Weiss' changes to the default fallout percentages in the NRC model were not shown to be based upon an empirical analysis.  Nevertheless, while his revisions were highly subjective and unsupported they took into consideration the reality of ACS-AN's current network i.e., "that ACS has not yet deployed a fully automated Operations Support System in Anchorage."

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                    62

Over time, ACS' two menu approach to NRC charges (i.e., automated and partially automated) is likely to be more accurate than GCI's single menu system. GCI's fallout percentages are essentially guesses about how often service orders will fallout. ACS takes the guesswork out of assessing NRC charges by charging fully automated rates when the process is fully automated and the partially automated rate when service order orders fallout.

When adopting ACS' model, the RCA noted GCI's contention that a forward-looking model will be more fully automated but found that ACS' model more accurately described the way the network would be built if created today.[98]  The RCA's approach was consistent with the FCC's guidelines on UNE cost modeling.

While GCI's position on UNE prices for NRC's is based on the FCC's proclamations on UNE pricing, GCI focuses on FCC general statements regarding UNE pricing and does not discuss other clarifying FCC statements regarding carrier-to-carrier service provisioning.   When discussing UNE pricing in a general sense, the FCC declares:

> Specifically, TELRIC equates the current market value of an incumbent telecommunications provider with the cost the incumbent LEC would incur today if it built a local network that could provide all the services its current network provides, to meet reasonably foreseeable demand, using the least-cost, most-efficient technology currently available.

*Triennial Review Order*, ¶ 669, citing *Local Competition Order* at ¶ 685.

---

[98]    Order U-96-89(42) at 53.  (Box 4 at 1376; 11268).

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                   63

GCI focuses on the FCC's use of the term "most-efficient technology currently available" and argues that the use of this term precludes consideration of an NRC model that does not include the most current state-of-the-art carrier interface systems possible.

In this regard, GCI assumes that only one proposed model reflects the most efficient technology currently available and thereby takes the FCC's comments out of context. Although the FCC has offered limited guidelines for the cost of providing a network element, additional guidance can be found from FCC statements on certain aspects of carrier-to-carrier service provisioning. The FCC's discussion of specific network elements reflects an understanding that no single network architecture characterizes the most efficient technology currently available.

One aspect of carrier-to-carrier provisioning addressed by the FCC is Operations Support System (OSS), which enables telecommunications companies to manage, monitor and control the telecommunications networks. ILECs are required to provide OSS, which includes billing, customer care systems, directory services, network element and network management, on an unbundled basis.[99] FCC discussions on OSS focused on the requirement that ILECs provide nondiscriminatory access to their OSS systems, recognizing that ILECs throughout the country utilize differing OSS systems and databases. The *Local Competition Order* provided that ILECs should provide nondiscriminatory access to "the functionality of any internal gateway systems the

---

[99]    *Local Competition Order*, ¶ 516; *Triennial Review Order*, ¶ 561.

Brief of the Individual Commissioners of the                    64
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

incumbent employs,"[100] while the *Triennial Review Order* required ILECs to "make modifications to existing OSS as necessary to offer competitive carriers nondiscriminatory access" and noted that "the specific systems, databases, and personnel used to provide OSS functions may vary by incumbent LEC and state."[101]

While the FCC's statements do not address UNE pricing for carrier-to-carrier provisioning, they reflect the recognition of limitations in the ILEC's network architecture. The recognition of the network limitations are incorporated into the FCC's guidelines on UNE pricing, instructing State commissions to equate the current market value with the cost an ILEC would "incur today if it built a local network." The RCA's finding that ACS' NRC model "more accurately described the way the network would be built if created today" complies with FCC guidelines on TELRIC-based UNE pricing.

### 7.    The RCA's Finding That Trenching Costs Would Not Be Shared Is Based On Substantial Evidence In The Record.

GCI also challenges the RCA's finding that ACS would be solely responsible for the trenching costs incurred while constructing the feeder portion of the local network. (GCI's Opening Br. at 49). GCI contends that the RCA should have been convinced by its testimony that the sharing of trench space is common utility practice,[102] and adopted GCI's assumption that ACS would be able to recover 35 percent of its trenching cost through sharing arrangements. GCI contends that no evidence in the

---

[100]    *Local Competition Order*, ¶ 523.

[101]    *Triennial Review Order*, ¶¶ 562, 565.

[102]    Testimony of Dean Fassett. Box 3 at 2845.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                        65

record supports the RCA's no-sharing assumption and disputes the RCA's finding that the two feet of space at the bottom of a trench would leave little room for the placement of other equipment.  (GCI' Opening Br. at  49, 51).

GCI argues that pursuant to FCC regulations (47 C.F.R. § 51.507(e)), the ILEC bears the burden of demonstrating that its cost assumption complies with TELRIC. GCI argues ACS failed to demonstrate the reasonableness of its no-sharing assumption, and consequently the RCA should have adopted GCI's assumption that ACS would be able to recover 35 percent of its trenching cost through sharing arrangements.  As noted by ACS in its Brief on Final Rates and Terms at 52, ACS satisfied the burden imposed by 47 C.F.R. § 51.507(e) by presenting its feeder design and quantifying the cost of constructing that network, GCI had the burden of providing evidentiary support for its sharing assumptions and providing cost revisions to the ACS trenching cost model to establish the financial impact of trench sharing.

The record reflects that GCI did not provide evidentiary support for its sharing estimate or provide an estimate of the financial impact on trenching costs of ACS recovering 35 percent of its trenching costs through sharing arrangements.  Crucial to GCI's sharing argument is its presumption that more than two conduits can be placed in a two foot trench.  On reconsideration, GCI stated that two 4 inch conduits only take up 8 inches of trench space, leaving 16 inches for additional conduit and "easily accommodating a third [conduit] without stacking."[103]   However, GCI also contradicts

_____

[103]   GCI's Petition for Reconsideration filed July 16, 2004 at 16.  (Box 4 at 1435; 11304.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                          66

itself by stating that "[i]f more than two conduits are placed in a 24" wide trench, they are installed in a stacked configuration."[104]   The ACS engineering diagrams referenced by GCI showed stacked conduit in a 24" trench, with the diagrams reflecting two conduits per row rather than three.  One aspect that is not discussed by GCI is the fact that the stacked conduit require risers and concrete encasement rather than the simple dirt backfill be incorporated into the trenching cost calculation.  Modifying the calculation to include additional conduits would have had to incorporate this additional expense which GCI made no attempt to quantify.

In addition, GCI's approach requires assumptions about the percentage of trench sharing. Aside from testifying that it is not uncommon to have three or more utilities share the trench, GCI's proffered 35 percent sharing assumption was unsupported by the evidence.  GCI did not present evidence regarding the actual sharing data for utility trenching in Anchorage.  In short, GCI failed to present competent evidence to demonstrate that a 35 percent trench sharing estimate was reasonable.  All of GCI's challenges to the RCA's permanent UNE rates should be rejected.

### 8.   The RCA's Determination Of The Amount Of Feeder Plant Placed In The Road Prism Was Reasonable And Is Supported By Substantial Evidence In The Record.

ACS cross-appeals one aspect of the RCA's UNE rate calculation.  ACS argues that the RCA's UNE calculations were flawed by understating the amount of feeder plant that must be placed in the road prism (i.e., under paved surface) (ACS' Cross-Petition Brief Re: Final Rates and Terms at 73).  ACS argues that since the RCA

---

[104]   *Id.*

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

67

rejected GCI's proposed two-foot trench width in favor of 6.5-foot trench width,[105] it should not have adopted GCI's estimate that only 53 percent of the feeder system would be constructed in the road prism.  ACS argues that the RCA erred in discounting ACS' evidence on the amount of feeder plant to be placed in the road prism, and had no reasonable basis for favoring GCI's evidence on the appropriate amount of construction within the road prism.  ACS contends the RCA should have increased the 53 percent road prism estimate to account for the wider trench width.

ACS questions the RCA's conclusion that ACS' estimate of road prism construction was based on a review of plans rather than site inspections, arguing that this view understates the degree of analysis that went into ACS' feeder route design.  ACS overstates the quality of the evidence it presented on feeder construction.  ACS argues that it employed a team to design its feeder system and that design was based on "field inspections, engineers' knowledge of feeder routes, and a careful consideration of the constraints that limit construction outside the road prism."  (ACS Opposition Br. Re: Final Rate and Terms at 77)  However, no one from ACS' original design team sponsored testimony to verify those facts.  ACS' feeder design expert (Cinelli) was not involved in the original design, and had only reviewed the designers' work, made selective changes, and sponsored the design team's work.  ACS did not present any explanation of the design team's field inspections of feeder routes, and it was not possible to cross examine the original designers on any aspect of their work.

---

[105]    This refers to the width at the top of the trench, not at the bottom which remains two feet.

Brief of the Individual Commissioners of the                68
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

ACS argues that there was no reasonable basis for the RCA's finding that GCI's evidence on road prism construction was more persuasive than the evidence presented by ACS on that issue. This assertion is also refuted by the record. In adopting GCI's road prism construction estimate, the RCA found GCI's estimate based on visual inspections of each feeder route to be more persuasive than Cinelli's review of ACS' plans. While the RCA acknowledged that Cinelli visually inspected some unidentified parts of the feeder system, it gave ACS' visual inspection testimony limited weight given Cinelli's failure to document the parts of the network he inspected or presented thorough analysis of these site visits.

The qualitative aspect of each party's evidence on road prism construction is demonstrated by the record. GCI's testimony contains a detailed record of its field inspection of each of the model's feeder routes, including photographs. Cinelli's analysis of each feeder section was limited to cursory comments in a spreadsheet. For example, Cinelli's analysis of the feeder route in Census Block Group 8014 identifies three discrete subsections, and provides Cinelli's estimate of the percentage of road prism construction that will be required along with a short note supporting his estimate. The note included for the Debarr Road subsection of CDB 8014 feeder route states:

> Congested, sidewalks, utilities, paved parking and other private property apparent immediately behind sidewalk.

Cinelli's analysis does not identify the length of this subsection or whether it was based only upon review of plans or was supplemented by visual inspection. In contrast, GCI identified 19 separate subsections of the same route. Each section

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                           69

identifies the length and whether road prism construction is required, the type of proposed road prism construction, and additional notes such as:

> Cut/trench on either side of bike path between Patterson, Ermine & Turpin in dirt area, place MHs [manholes] opposite Marten St. and at Turpin St., place conduits

GCI also provided a photograph of each of the 19 subsections along that feeder route. The RCA reasonably found GCI's more thorough and detailed support for road prism construction to be the most persuasive evidence presented on road prism construction estimates.

ACS also argues that the RCA should have adjusted the 53 percent road prism estimate upward when it increased the trench width from GCI's proposed 2 feet to 6.5 feet. ACS misstates the RCA's decision in this regard; the RCA used 6.5' as the average trench width for computing the average cost per foot of trenching. The RCA recognized that the width of trench at any particular location would depend on the specific requirements of that location, and could well include 2' trenches, particularly outside the actual concrete or asphalt roadbed:

> One of the biggest differences between GCI's estimates and ACS-AN's is the width of trenching in pavement (asphalt or concrete). GCI proposed trenches that are 2 feet wide. ACS-AN proposed trenches that are 13 feet wide. We do not believe that trenches are always 13 feet wide or always 2 feet wide. Neither party provided completely reliable or convincing testimony on this issue; but rather relied primarily on the opinions of their experts. We believe that the most appropriate solution is to rely on GCI's analysis of the percentage of the various road and terrain conditions within the road prism and ACS-AN's basic engineering design for feeder trench. GCI's analysis shows that within the road prism 47 percent of construction was in dirt and grass. The

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                                                70

rest, 53 percent, was in various types of asphalt and concrete. We therefore assume that 53 percent of road prism construction had wider trenching requirements (i.e., 12.67 foot wide pavement cuts and 10.67 foot wide trenches, along the lines described by ACS-AN, and that 47 percent of road prism construction had narrow trenching requirements (i.e., 4 foot wide pavement cuts and 2 foot wide trenches along the lines described by GCI. Based upon our calculations we adopt a composite rate for feeder trenching within the road prism area of $84.06.

Order U-96-89(42) at 36. (Box 4 at 1359; 11228).

The RCA's conclusion on road prism construction demonstrates that the Commission methodically assessed the evidence, adopting a composite rate for feeder trenching within the road prism that reasonably estimated the forward-looking cost of feeder trenching. The RCA's decisions in this regard should be affirmed.

The RCA's permanent UNE rate calculation is consistent with federal UNE pricing guidelines and is supported by substantial evidence in the record. Federal authorities recognize the difficulty in determining a forward-looking UNE price and have repeatedly recognized the considerable discretion afforded State commissions when attempting to determine a forward-looking UNE price that reflects the cost characteristics of the ILEC and the market conditions the ILEC confronts. The RCA's approach to UNE pricing fully complies with federal UNE pricing guidelines and each aspect of the RCA's decision on UNE pricing is based on substantial evidence in the record. Accordingly, this Court should affirm the RCA's permanent UNE rate decision in all respects.

Brief of the Individual Commissioners of the         71
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

## IV.  The RCA's Wholesale Rate Calculation Complies With Federal Law And Is Supported By Substantial Evidence.

Finally, GCI challenges the RCA's calculation of a wholesale rate by arguing that it fails to include all costs avoided by ACS in providing wholesale services. (GCI's Opening Br. at 64-70)  ACS maintains that the RCA correctly calculated the wholesale rate.  (ACS Cross-Petition Br. Re: Final Rates and Terms at 68).

In addition to requiring an ILEC to provide a CLEC with access to UNEs, the Act also requires ILECs to sell to CLECs at discounted wholesale rates, any telecommunications services that the ILEC provides to its customers at retail rates, in order to allow the CLECs to resell their services (resale).  Section 251(c)(4).  The amount of the wholesale discount is based on the amount of costs the ILEC avoids when it loses the customer.  GCI contends that the RCA's calculation of the wholesale rate conflicts with the plain meaning of the Act, and further suggests that the Eighth Circuit has affirmed its interpretation of the Act.  (GCI's Opening Br. at 67-68)  GCI misinterprets the wholesale provisions of the Act and applies an interpretation that was not contemplated by the Eighth Circuit when it addressed wholesale rate issues.  The RCA's interpretation of the Act's wholesale rate provisions should be upheld by this Court.

GCI's interpretation of the wholesale rate provisions of the Act requires an explanation of some cost recovery principles applicable to the local exchange telecommunications market.  A federal separations process is utilized to allocate costs between interstate and intrastate jurisdictions in order to determine what share of costs must be recovered from federal versus state rates.  A state separations process allocate

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

72

costs between local and intrastate access, a necessary step to determine local retail rates.[106]   Local retail services are the services CLECs are entitled to purchase at an avoided cost discount under the Act's wholesale rate provisions.

GCI's argument focuses on the fact that the RCA's wholesale rate calculation was based on ACS' costs after the application of this separations process. GCI contends that Section 252(d)(3) of the Act requires State commissions to calculate the wholesale discount based on all costs that ACS actually avoids when it loses customers to GCI, including those costs which, through the separations process, have been allocated to the interstate jurisdiction.

Section 252(d)(3) of the Act addresses wholesale prices, and states:

> For the purposes of section 251(c)(4), a State commission shall **determine wholesale rates on the basis of retail rates** charged for the telecommunications service requested, **excluding the portion thereof** attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.  (Emphasis added)

GCI argues that this language does not restrict the types of avoided costs that must be considered, and requires a State commission to consider "all" costs that are avoided in providing wholesale services. However, the Act does not refer to "all" costs; rather it prefaces its comments by referring to retail rates, and requires wholesale rates to set based on "the portion thereof" (i.e., the portion of the retail rate) attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange

---

[106]   Access charges allow the local carrier to recover a portion of its network costs from long distance carriers in order to compensate the local carrier for the long distance carrier's use of the local network.

Brief of the Individual Commissioners of the
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)                                                 73

carrier.   Since retail rates are determined after carrier costs are separated among jurisdictions, it necessarily follows that the plain meaning of the statute requires State commissions to use the costs used to compute into the ILEC's retail rates as the starting point for determining the appropriate avoided-cost wholesale rate.[107]

GCI also contends that its interpretation of the Act's wholesale provisions is supported by the Eighth Circuit's *Iowa II* decision vacating the FCC's avoided costs rules.   In *Iowa II*, the Eighth Circuit reversed the FCC's definition of "avoided costs" as costs that "can reasonably be avoided," holding that the plain meaning of Section 252(d)(3) requires that wholesale rates exclude costs that are actually avoided rather than costs that could or might be excluded.   The Eighth Circuit's discussion on Section 252(d)(3) focused on actual versus hypothetical avoided costs, making a distinction between costs that are "actually avoided" versus those that "could" or "might" be avoided.   The *Iowa II* decision does not support GCI's extension of the term "all costs" to encompass the ILEC's costs that have been allocated to the interstate jurisdiction through the separations process. GCI's appeal on the wholesale rate issue should therefore be rejected.[108]

---

[107]     GCI's approach could result in an avoided cost that exceeds 100 percent of the retail rate by including non-jurisdictional costs, an unreasonable and anti-competitive result.

[108]     GCI also argues that ACS' non-recurring rates include charges that violate the FCC's number portability rules.   GCI's Opening Brief at 62.   The Individual Commissioners of the RCA join in the argument presented by ACS that GCI has waived its right to raise this issue.   ACS Opposition Brief Re: Final Rates and Terms at 67.

Brief of the Individual Commissioners of the                    74
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)

## CONCLUSION

For all the above reasons, the Court should affirm the Orders of the RCA setting the rates and terms of interconnection for GCI and ACS.

DATED this 7th day of April, 2006, at Anchorage, Alaska.

DAVID W. MÁRQUEZ
ATTORNEY GENERAL
Attorney For The RCA Commissioners

By: s/Robert Royce
    Robert A. Royce
    Assistant Attorney General
    1031 W. 4th Avenue, Ste. 200
    Anchorage, Alaska 99501
    Phone: (907) 269-5103
    Fax: (907) 276-8554
    E-mail: Robert_Royce@law.state.ak.us
    ABA No. 8511193

Brief of the Individual Commissioners of the                    75
Regulatory Commission of Alaska
GCI v. RCA, et al.
A05-003 CV (RRB)