BOSTON
BRUSSELS
CHICAGO
FRANKFURT
HAMBURG
HONG KONG
LONDON
LOS ANGELES
MOSCOW
NEW JERSEY

# Latham & Watkins
ATTORNEYS AT LAW
WWW.LW.COM

DOCKET FILE COPY ORIGINAL
NEW YORK
ORANGE COUNTY
PARIS
SAN DIEGO
SAN FRANCISCO
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

July 24, 2002

**BY HAND DELIVERY**

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
445 Twelfth Street, S.W.
Washington, DC 20554

RECEIVED    WC 02 -201

JUL 2 4 2002

FEDERAL COMMUNICATIONS COMMISSION
OFFICE OF THE SECRETARY

Re:    ACS of Anchorage, Inc. and ACS of Fairbanks, Inc., Emergency Petition
       for Declaratory Ruling and Other Relief Pursuant to Sections 201(b) and
       252(e)(5) of the Communications Act

Dear Ms. Dortch:

Enclosed on behalf of ACS of Anchorage, Inc. and ACS of Fairbanks, Inc., are an original and nine (9) copies of ACS of Anchorage, Inc. and ACS of Fairbanks, Inc.'s Emergency Petition for Declaratory Ruling and Other Relief Pursuant to Sections 201(b) and 252(e)(5) of the Communications Act.

Please stamp and return to me the additional copy provided for that purpose. If you have any questions regarding this matter, please contact me at (202) 637-2262.

Very truly yours,

Karen Brinkmann

Enclosures

cc: Michael K. Powell, Chairman, Federal Communications Commission
   Kathleen Q. Abernathy, Commissioner, Federal Communications Commission
   Michael J. Copps, Commissioner, Federal Communications Commission
   Kevin J. Martin, Commissioner, Federal Communications Commission
   William Maher, Chief, Wireline Competition Bureau, Federal Communications Commission
   Nanette Thompson, Chair, Regulatory Commission of Alaska
   Joe D. Edge, Drinker Biddle & Reath, LLP, Counsel for General Communication, Inc.

DC_DOCS\470489.1[W2000]

Exhibit 3
Page 1 of 136

DOCKET FILE COPY ORIGINAL

Before the
FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C. 20554

RECEIVED

JUL 2 4 2002

FEDERAL COMMUNICATIONS COMMISSION
OFFICE OF THE SECRETARY

|  |  |  |
|---|---|---|
| ACS of Anchorage, Inc. and | ) | |
| ACS of Fairbanks, Inc. | ) | WC Docket No. 02-201 |
|  | ) | |
|  | ) | |
| Emergency Petition for Declaratory Ruling | ) | |
| and Other Relief Pursuant to Sections 201(b) | ) | |
| and 252(e)(5) of the Communications Act | ) | |

## EMERGENCY PETITION FOR DECLARATORY RULING AND OTHER RELIEF

Karen Brinkmann
Elizabeth R. Park
LATHAM & WATKINS
555 Eleventh Street, N.W.
Suite 1000
Washington, DC 20004-1304

Telephone:   (202) 637-2200
Facsimile:   (202) 637-2201

DC_DOCS\470153.2[W2000]

Exhibit 7
Page 2 of 136

# TABLE OF CONTENTS

Page

I.   Introduction and Summary ...................................................................................4

II.  Background ........................................................................................................6

    A.   Relevant Legal Authority ............................................................................6
        1.   The Communications Act of 1934 ........................................................6
        2.   The FCC's Local Competition First Report
            and Order and TELRIC Rules.............................................................6
        3.   Appellate Review of the TELRIC Rules .............................................8
    B.   Procedural History .....................................................................................10
        1.   Anchorage:  Prior Interconnection Agreement
            and Establishment of Interim Rates ...................................................10
        2.   Fairbanks:  Termination of Rural Exemption
            and Mandated Unbundling of the Network ........................................13
        3.   Use of the FCC's Synthesis Model in Fairbanks ...............................15
    C.   Current UNE Rates in Anchorage and Fairbanks .......................................18
        1.   Fairbanks ...........................................................................................18
        2.   Anchorage ..........................................................................................18
    D.   Subsequent Proceedings .............................................................................19
        1.   Fairbanks Litigation ..........................................................................19
        2.   Anchorage Proceedings ......................................................................21
    E.   ACS may have no opportunity to recover foregone revenues as
        a result of interconnection prices improperly set by the RCA......................22
    F.   ACS has suffered severe loss of market share affecting its primary lines.............23

III. The RCA Has Failed to Set UNE Prices
    In Accordance With the FCC's TELRIC Rules.................................................24

    A.   TELRIC Principles ....................................................................................24
        1.   The Commission's rules require UNE prices to be cost-based.................24
        2.   TELRIC assumes deployment of forward-looking
            technology at the location of the ILECs wire centers,
            not a reconfiguration of the network....................................................26
        3.   UNE prices must be based on *the ILEC's* costs,
            not a national average or a hypothetical carrier's costs .............................27
        4.   The TELRIC rules assume a hypothetical network design,
            but require actual costs incurred to construct such a network. ..................29
        5.   The U.S. Supreme Court has affirmed
            the FCC's TELRIC methodology. ..........................................................30
    B.   The RCA disregarded the TELRIC rules......................................................31
        1.   Anchorage ..........................................................................................31
         2.   Fairbanks ...........................................................................................32

(ii)

Exhibit _3_

Page _3_ of _136_

IV.   ACS Is Being Subjected To Confiscatory Rates....................................................36

    A.   The Commission should look to tariff law to determine
       whether UNE rates are confiscatory. ...................................................36

    B.   The Commission Can and Should Act to Prevent
       Irreparable Harm to ACS and the Public. ...........................................39
       1.   The Commission has jurisdiction to preempt the RCA ....................39
       2.   The FCC has demonstrated its willingness and
          authority to review UNE rates that may be confiscatory............................43
       3.   ACS's claim is ripe. ...................................................................45

    C.   The UNE rates set by the RCA are confiscatory and, therefore,
       effect an unconstitutional taking without just compensation.................46

V.   The Public Interest Will Be Harmed If the RCA's UNE Rates Continue To Apply.........47

    A.   The RCA's UNE prices cause immediate harm
       to all users of ACS's network. ............................................................48

    B.   The RCA's UNE prices thwart the long-term
       federal policy of encouraging facilities-based competition.....................48
       1.   The Commission strongly supports facilities-based competition. ............48
       2.   Economic studies support facilities-based competition. ...........................50
       3.   The RCA's application of the Synthesis Model
          is detrimental to facilities-based competition. ............................................50

VI.   Requested Ruling and Relief .......................................................................51

VII.  Conclusion .............................................................................................54

## Attachments

Attachment A        Affidavit of Thomas R. Meade

Attachment B        Affidavit of Steven A. Pratt

Attachment C        Affidavit of Timothy J. Tardiff

Attachment D        Affidavit of William J. Wilks

Attachment E         ACS Cost Study

DC_DOCS\470153.2[W2000]

Exhibit _3_

Page _4_ of _136_

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| ACS of Anchorage, Inc. and | ) | |
| ACS of Fairbanks, Inc. | ) | WC Docket No. 02-____ |
| | ) | |
| | ) | |
| Emergency Petition for Declaratory Ruling | ) | |
| and Other Relief Pursuant to Sections 201(b) | ) | |
| and 252(e)(5) of the Communications Act | ) | |

**EMERGENCY PETITION FOR DECLARATORY RULING AND OTHER RELIEF**

## I.    INTRODUCTION AND SUMMARY

ACS of Anchorage, Inc. ("ACS-Anchorage") and ACS of Fairbanks, Inc. ("ACS-Fairbanks") (collectively, "ACS"),[1] by their attorneys hereby request that the Commission: (i) declare that the determination of rates for unbundled network elements ("UNEs") by the Regulatory Commission of Alaska (the "RCA") for Anchorage and Fairbanks does not comport with sections 251 and 252 of the Communications Act of 1934, as amended (the "Act"),[2] the Commission's rules[3] or the decision of the U.S. Supreme Court in *Verizon Communications, Inc. v. FCC*;[4] (ii) declare that the UNE rates established by the RCA in Anchorage and Fairbanks are confiscatory; and (iii) promptly preempt the RCA under the Commission's authority, pursuant to sections 201(b) and 252(e)(5) of the Act, and establish cost-based UNE rates based on ACS's forward-looking cost study.  ACS urges the Commission to take swift action because of the

---

[1] ACS of Fairbanks, Inc., a rural telephone company within the meaning of the Telecommunications Act of 1996, and ACS of Anchorage, Inc. are a wholly-owned subsidiary of Alaska Communications Systems Group, Inc.

[2] 47 U.S.C. §§ 251, 252.

[3] 47 C.F.R. §§ 51.501, *et seq.*

[4] 535 U.S. ___, slip op., 122 S. Ct. 1646 (2002) ("*Iowa Utilities III*").

DC_DOCS\470153.2[W2000]

Exhibit __3__
Page __5__ of _136_

harmful effect of the rates to which ACS is currently subject, and because the RCA has failed to act and is now under scrutiny for its policies and procedures relating to telecommunications and other public utilities.[5] The RCA's charter provision was originally set to expire on June 30, 2003, with its operations winding down beginning on July 1, 2002. However, the Alaska legislature has extended the RCA's charter for one year so that it can review the RCA's operations and policies and has created a task force to make recommendations for action during its next session.[6] Due to the impending deadline and the legislature's study of its operations, the RCA will have little time to perform a cost study, as directed by the Commission's rules.[7]

In its *Local Competition First Report and Order*, the Commission indicated that "[i]ncumbent LECs may seek relief from the Commission's pricing methodology if they provide specific information to show that the [TELRIC] pricing methodology, as applied to them, will result in confiscatory rates."[8] As demonstrated in this petition, ACS is being subjected to confiscatory rates because the RCA disregarded the Commission's rules and did not consider ACS's forward-looking costs in setting UNE prices for Anchorage and Fairbanks. Rather the RCA relied on interim rates not supported by any cost study in Anchorage, and on the use of a model and inputs in Fairbanks that the FCC found inappropriate for determining forward-looking UNE prices. Therefore, ACS requests that the Commission assert its authority to preempt the RCA and establish rates based on ACS's forward-looking cost study in accordance with the Commission's rules. Further, ACS urges the Commission to act immediately in order to prevent

---

[5] The Judiciary Committee of the Alaska state senate held extensive hearings concerning the RCA and collected evidence regarding these issues in June 2002.

[6] Alaska Stat. § 66.010, amended by H.B. 3001 (June 26, 2002).

[7] 47 C.F.R. § 51.505(e).

[8] *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 FCC Rcd 15499 (1996) (subsequent history omitted) ("*Local Competition First Report and Order*").

5

Exhibit ___3___

Page __6__ of _136_

irreparable harm to ACS and to the public interest resulting from the RCA's erroneous approval of unlawful UNE rates in the interconnection agreements arbitrated between ACS and General Communication, Inc. ("GCI").

## II.    BACKGROUND

### A.    Relevant Legal Authority

#### 1.    The Communications Act of 1934

Sections 251 and 252 of the Communications Act of 1934, as amended, govern interconnection between local telephone exchange companies. These provisions include the requirements that incumbent local exchange carriers ("ILECs") permit requesting competitors to interconnect with the ILEC's existing network and to provide competitors with access to unbundled network elements ("UNEs").[9] Section 252(d)(1) establishes the standard governing the rates states may establish or approve for the use of the ILEC's network elements and the interconnection of facilities and equipment by a competitor.[10] The Act mandates that ILECs receive compensation "based on the cost . . . of providing the interconnection or network element . . . and may include a reasonable profit."[11]

#### 2.    The FCC's Local Competition First Report and Order and TELRIC Rules

In 1996, the Commission enacted regulations for the implementation of sections 251 and 252, including the pricing provisions of section 252(d)(1).[12] Among other things, the *Local Competition First Report and Order* details the pricing methodology for interconnection and UNEs. Specifically, the Commission adopted a forward-looking pricing methodology based

---

[9] 47 U.S.C. §§ 251(c)(2), (3).

[10] 47 U.S.C. § 252(d)(1).

[11] 47 U.S.C. § 252(d)(1).

[12] *Local Competition First Report and Order.*

Exhibit    7

Page    7    of 136

on the "total element long-run incremental cost" ("TELRIC") of providing the UNE. Under

TELRIC, UNE prices are based upon all forward-looking, economic costs directly attributable to

a specific network element, plus a reasonable allocation of forward-looking joint and common

costs.[13] TELRIC includes only costs that are incurred by the ILEC as a result of expanding

output of service or producing an additional quantity of services, and does not include embedded

costs, opportunity costs or universal service subsidies.[14] Costs of interconnection under this

method are based on the "use of the most efficient telecommunications technology currently

available and the lowest cost network configuration, given the existing location of the incumbent

LEC's wire centers."[15]

       TELRIC is intended to produce rates that reflect costs a carrier would incur in the

future,[16] so that CLECs' costs for UNEs would be similar to those incurred by the ILECs.[17] The

Commission's TELRIC rules require further that UNE prices be based on a "the most efficient

technology deployed in the incumbent LEC's current wire center locations."[18] In adopting this

approach, the FCC rejected alternative rules at both ends of the spectrum: On the one hand, they

rejected requiring that pricing be based on the "most efficient network architecture, sizing,

technology, and operating decisions that are operationally feasible and currently available to the

---

[13] *Local Competition First Report and Order* at ¶¶ 672, 682. "Directly attributable forward-looking costs include the incremental costs of facilities and operations that are dedicated to the element. Such costs typically include the investment costs and expenses related to primary plant and used to provide that element." *Id.* at ¶ 682.

[14] Marketing and other costs associated with the retail offering of the services are also excluded. *Id.* at ¶ 694. The Commission held, however, that TELRIC prices should include a reasonable return on investment, which is a "joint and common costs." *Id.* at ¶¶ 673, 700.

[15] 47 C.F.R. §51.505(b)(1).

[16] *Local Competition First Report and Order at* ¶ 683.

[17] *Id.* at ¶ 679.

[18] *Id.* at ¶ 685. *See also* 47 C.F.R. §51.505(b)(1).

Exhibit _3_

Page _8_ of _136_

industry;"[19] and on the other hand, the Commission rejected basing UNE prices on "existing network design and technology that are currently in operation."[20]  The Commission concluded that UNE prices should be developed from a forward-looking cost methodology "based on costs that assume wire centers will be placed at the incumbent LEC's current wire center locations, but that the reconstructed local network will employ the most efficient technology for reasonably foreseeable capacity requirements."[21]  The Commission noted that this "hypothetical network" approach assumes that, in making UNEs available to CLECs, ILECs will deploy efficient, new technology "that is compatible with existing infrastructure."[22]  Thus, the Commission said, this "mitigates incumbent LECs' concerns that a forward-looking methodology ignores existing network design."[23]

3.    **Appellate Review of the TELRIC Rules**

In 1997, the Eighth Circuit Court of Appeals reviewed challenges to the Commission's jurisdiction to promulgate these pricing rules and certain other Commission rules under sections 251 and 252 of the Act.  The court held that the Commission did not have authority to impose specific pricing rules on state commissions.[24]  However, the Supreme Court reversed the Eighth Circuit, finding that the Commission had jurisdiction to implement the Act's local competition provision, including the design of a pricing methodology, and remanded the case to the Eighth Circuit for a substantive review of the regulations.[25]  "While it is true that the

---

[19] *Id*. at ¶ 683.

[20] *Id*. at ¶ 684.

[21] *Id*. at ¶ 685.

[22] *Id*.

[23] *Id*.

[24] *Iowa Utilities Board v. FCC*, 120 F.3d 753 (8ᵗʰ Cir. 1997).

[25] *AT&T Corp., et al. v. Iowa Utilities Board*, 525 U.S. 366 (1999) ("*Iowa Utilities I*").

8

Exhibit    3
Page    9    of   136

1996 Act entrusts state commissions with the job of approving interconnection agreement, . . . and granting exemption to rural LECs . . ., these assignments, like the rate-establishing assignment just discussed, do not logically preclude the Commission's issuance of rules to guide the state-commission judgments."[26]

On remand, the Eighth Circuit upheld the Commission's forward-looking "TELRIC" pricing methodology, but vacated section 51.505(b)(1) of the Commission's rules, which required costs to be based on a "hypothetical network."[27] The court also invalidated the Commission's default proxy prices for interconnection. Upon a request by the Commission, the Eighth Circuit stayed its mandate vacating the "hypothetical network" rule pending the filing and ultimate disposition of a petition for *certiorari* with the U.S. Supreme Court.

The Supreme Court granted *certiorari* on this issue[28] and on May 13, 2002 issued its ruling. The Court affirmed the FCC's jurisdiction to set TELRIC as the national pricing standard for UNEs and upheld as reasonable the TELRIC pricing promulgated by the Commission.[29] The Court deferred to the Commission on the substantive standard, holding that the Commission's forward-looking cost methodology, which is based on the most efficient telecommunications technology currently available given the existing location of the ILEC's wire centers, is a reasonable interpretation of "costs" in section 252(d)(1) of the Communications Act.[30] In the majority opinion, Justice Souter notes that in applying the TELRIC, state

---

[26] *Iowa Utilities I* at 385.

[27] *Iowa Utilities Board v. FCC*, 219 F.3d 744, 751 (2000) ("*Iowa Utilities II*").

[28] *AT&T Corp. v. Iowa Utilities Board*, 531 U.S. 1124 (2001).

[29] *Iowa Utilities III*, slip op. at 25.

[30] *Iowa Utilities III*, slip op. at 52.

9

Exhibit   3
Page 10 of 136

commissions should not make changes to the wire center configuration, such as assuming shorter loop lengths.[31]

**B.    Procedural History**

Alaska Communications Systems Group, Inc. was formed in 1999 through the acquisition of Anchorage Telephone Utility ("ATU"), a non-rural municipal telephone company serving the Anchorage market (now known as ACS of Anchorage, Inc.), as well as three rural telephone companies formerly owned by Pacific Telecommunications, Inc.: PTI Communications of Alaska, Inc. (which became ACS of Fairbanks, Inc.), Telephone Utilities of the Northland (ACS of the Northland, Inc.), and Telephone Utilities of Alaska (ACS of Alaska, Inc.) (collectively, the "Rural Companies").

**1.    Anchorage: Prior Interconnection Agreement and Establishment of Interim Rates**

On behalf of ATU, the municipality of Anchorage entered into an interconnection agreement on January 15, 1997 with GCI Communications Corp., a subsidiary of General Communications, Inc. ("GCI"), the local cable television system operator in Alaska and an Alaska interexchange carrier. The rates in this interconnection agreement were not based on the Commission's newly issued *Local Competition First Report and Order* and the APUC indicated that it would approve the rates as "temporary in nature and [would] require a full study based upon a cost methodology to be determined by [the APUC] at a later date."[32] The agreement does

---

[31] *Id.* at 33.

[32] *Order Approving Arbitrated Interconnection Agreement as Resolved and Modified by Order U-96-89(8)*, U-96-89(9) at 3 (Alaska Pub. Util. Comm. Jan. 14, 1997).

DC_DOCS\470153.2[W2000]

Exhibit    3
Page  11  of  136

not specify a termination date.[33]  The parties anticipated a new proceeding at a later date setting

new rates that would be based on the FCC's forward-looking cost methodology.

       After unsuccessful attempts to negotiate a new Anchorage UNE rate with GCI,

ACS filed a motion before the RCA seeking a new rate based on a forward-looking cost

methodology in January 2000.  On March 6, 2000, the RCA issued an order granting ACS's

request for a new rate based on a forward-looking cost model, but denying ACS's request for a

hearing and denying ACS's request to consolidate the matter with the then contemporaneous

UNE rate proceeding for Fairbanks and Juneau.[34]  On March 31, 2000, both parties filed

comments with the RCA on the appropriate model to be used; ACS also submitted a shortened

schedule that would have resulted in a decision by August 2000.  On May 30, 2000, the RCA

rejected ACS's schedule and ordered a pre-hearing conference ten working days after the RCA

adopts interconnection agreements for Fairbanks and Juneau.[35]  On August 9, 2000, following

the decision of the Eighth Circuit Court of Appeals in *Iowa Utilities II*, ACS requested

consolidated mediation of the UNE rates for Juneau, Fairbanks and Anchorage and

recommended two alternative compromises.  The proposed pre-hearing conference, which the

RCA ordered to take place ten days following the adoption of the Fairbanks and Juneau

interconnection agreements, never occurred.

       Instead, the parties engaged in a briefing regarding the appropriate model to use

for the Anchorage proceeding.  Finally, with no resolution in sight, ACS-Anchorage requested

---

[33] The Agreement establishes wholesale discount rates up to December 31, 1999.  It is silent concerning what rates apply after 1999.  Interconnection Agreement between GCI and Municipality of Anchorage.

[34] *Order Granting Motion to Establish Forward-Looking Economic Cost Models and Methodologies; Denying Motion for Consolidation; and Denying Request for Hearing*, U-96-89(13) (Reg. Comm. of Alaska Mar. 6, 2000).

[35] *Order Granting Motion to Adopt Forward-Looking Cost Model and Appointment Arbitrator*, U-96-89(14) (Reg. Comm. Of Alaska May 30, 2000).

11

Exhibit 3
Page 12 of 136

immediate establishment of interim and refundable rates in order to establish a reasonable UNE rate that took into consideration the effects of inflation and, more importantly, the Commission's rules regarding the forward-looking cost methodology for UNE pricing.[36]  On June 6, 2001, ACS proposed a UNE rate of $24.00, which it based on a detailed forward-looking cost study and actual cost information, which were documented and submitted into the record.  During the hearing to adjust interim rates, GCI's attorney stated at oral argument that a rate of $14.92 would be reasonable because this is what the FCC Synthesis Model yields using the inputs from the Fairbanks arbitration.[37]  GCI did not submit any cost data or documentation to support this proposed rate.  Additionally, GCI admitted that the $14.92 price was not based on a model approved for use in Anchorage.[38]  Nonetheless, GCI favored this rate because it was closer than ACS's proposed rate to the $12.94 that GCI calculated using the national average FCC default inputs and the $13.85 in the original interconnection agreement.[39]  The RCA agreed with GCI and on October 25, 2001, the RCA adopted an interim and refundable UNE rate of $14.92.[40]

On March 31, 2002, ACS again formally requested a hearing and a schedule to resolve the matter, and reiterated this position again on June 12, 2002.  As of the date of this filing, the RCA has refused to set a schedule to set an Anchorage UNE rate based on a forward-looking cost study.

---

[36] *Request for Immediate Establishment of Interim and Refundable Rates*, U-96-89 (Reg. Comm. of Alaska Jun. 8, 2001).

[37] Oral Argument in U-96-89, transcript at 150 (Reg. Comm. of Alaska August 17, 2001).

[38] Oral Argument transcript at 154.

[39] *See* Oral Argument transcript at 163.

[40] *Order Establishing Interim and Refundable Unbundled Network Element Loop Rate and Affirming Oral Ruling*, U-96-89(23) (Reg. Comm. of Alaska October 25, 2001).

Exhibit  3
Page  13  of  136

## 2. Fairbanks: Termination of Rural Exemption and Mandated Unbundling of the Network

In 1997 GCI filed a petition before the Alaska Public Utilities Commission ("APUC")[41] seeking termination of ACS's section 251(f)(1) rural exemption in Fairbanks, Juneau and the surrounding areas. On June 30, 1999, the APUC issued an order terminating the rural exemptions as to these LECs.[42] On October 11, 1999, the RCA granted ACS's motion for reconsideration of the APUC's order, but affirmed the termination of ACS's rural exemptions and ordered ACS to unbundle its network.[43] Therefore, pursuant to the mandate of the RCA, ACS engaged in negotiations and subsequent arbitration with GCI to determine the terms of the interconnection agreements for ACS of Fairbanks, as well as for ACS of Alaska and ACS of the Northland.

The RCA mandated arbitration of the Rural Companies' interconnection agreements pursuant to section 252(b). The RCA directed the parties to submit briefs proposing an appropriate model or method to use in the arbitration for purposes of computing forward-looking costs and developing rates. In response, ACS proposed a cost study completed pursuant

---

[41] The APUC is the agency predecessor to the RCA.

[42] See Order Affirming Bench Rulings Denying Petition to Classify Records as Confidential and Striking Legal Briefs; and Terminating Rural Exemption, U-97-144(9) (Alaska Pub. Util. Comm. June 30, 1999). The APUC initially denied GCI's petition to terminate ACS's rural exemptions, however, GCI appealed this decision to the Alaska Superior Court. This court remanded the case to the APUC with instructions to place the burden of proof on ACS to show that it would suffer an undue economic burden if the rural exemption were terminated. See GCI Communications Corp. v. Alaska Pub. Util. Comm'n, No. 3AN-98-04759 CI (Alaska Super. Ct. Mar. 4, 1999) slip op. at 5.

[43] The RCA repeatedly relied upon the assignment of the burden of proof to ACS to conclude that the rural exemption should be terminated. See Order Granting Reconsideration and Terminating Rural Exemptions, U-97-82(11), U-97-143(11), U-97-144(11) at 12-13 (Reg. Comm. of Alaska, October 11, 1999). However, the Eighth Circuit has vacated the Commission's rule section 51.405(a) because it improperly assigned the burden of proof to the carrier claiming the exemption. See Iowa Utilities II, cert. denied, AT&T Corp. v. Iowa Utilities Board, 531 US 1124 (2001). The RCA's decision is currently under review by the Alaska Supreme Court. See ACS of Alaska, Inc. v. Regulatory Commission of Alaska, S-10466 (ACS Notice filed Dec. 16, 2001, ACS Opening Brief filed Apr. 18, 2002).

13

Exhibit 3
Page 14 of 136

to TELRIC under section 51.505(e) of the Commission's rules that was fully compliant with TELRIC and the hypothetical network rule. ACS's cost study employed the UNE Local Loop Forward-Looking Cost Model ACS v. 6.2. In accordance with TELRIC, this model was designed to identify the network assets attributable to the loop based on the most efficient selection of both hypothetical feeder routes emanating from existing wire centers in the network and the most efficient technology available, identify customer demand served by each particular loop asset, and determine the cost of assigned investment assets at forward-looking economic costs.[44] GCI proposed use of a proprietary model developed by Hatfield Associates, Inc., model HM 5.1 ("HAI Model"). As discussed further below, the RCA determined that the FCC's Synthesis Model (also known as the "High Cost Proxy Model") for universal service funding for non-rural carriers should be used to develop UNE costs.

Incidentally, during the rural exemption termination proceedings held just one year earlier, the RCA held that a UNE rate of $27.30 in Fairbanks would be unreasonably low after ACS's expert testified that terminating the rural exemption would be economically burdensome based on GCI's then-current estimated UNE price of $27.30 for Fairbanks.[45] The RCA held that the assumed UNE price of $27.30 for Fairbanks was unrealistically low and therefore gave little weight to ACS's testimony that termination the rural exemption would be

---

[44] Affidavit of William J. Wilks at ¶ 10 ("Wilks Affidavit"), Attachment D; *see also*, ACS Cost Study – Fairbanks Annual Charge Factors and Summary Report, Attachment E. The entire cost study is voluminous and could not be filed with this petition; however, the cost study will be provided on CD-ROM upon request.

[45] *Order Granting Reconsideration and Terminating Rural Exemption*, U-97-82 (11), U-97-143 (11), U-97-144 (11) (Reg. Comm. of Alaska Oct. 11. 1999); Prefiled Direct Testimony of Robert A. Smith in Docket No. U-97-82 at 26 (April 27, 1999, as modified May 7, 1999).

Exhibit ___3___
Page _15_ of _136_

economically burdensome.[46]  In fact, the $27.30 rate used in the 1999 economic burden analysis proved to be considerably more than the $19.19 rate ultimately set by the RCA in 2000.

### 3.   Use of the FCC's Synthesis Model in Fairbanks

The RCA hired Ben Johnson Associates, Inc. ("BJA") to review the parties' briefs and to recommend a cost model to use in the proceeding.  On March 20, 2000 the RCA issued a Consultant's Report, prepared by BJA, recommending a cost model to use in the Rural Companies proceeding and requested comment by the parties.  The Consultant's Report recommended use of the FCC's "Synthesis Model," which this Commission developed and adopted in the context of universal service funding for purposes of establishing the relative cost characteristics of different carriers, based on nationally averaged costs for non-rural companies.[47]  Although the FCC never suggested that this model could be used to predict actual costs of individual companies for the purpose of setting forward-looking prices, nonetheless, the RCA adopted BJA's proposal to use the Synthesis Model as a platform for determining UNE rates in ACS's rural markets.  In fact, the Commission explicitly stated that this "federal cost model was developed for the purpose of determining federal universal service support, and it may not be appropriate to use nationwide values for other purposes, such as determining prices for unbundled network elements."[48]  Recently, the Commission reiterated its warning against using

---

[46] *See id.* at 10-12.

[47] *Federal-State Joint Board on Universal Service; Forward-Looking Mechanism for High Cost Support for Non-Rural LECs*, CC Docket 96-45, Fifth Report and Order, 13 FCC Rcd 21323 (1998) ("*Platform Order*"); *Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd 8776 (1997) ("*Universal Service Report and Order*").

[48] *Federal-State Joint Board on Universal Service; Forward-Looking Mechanism for High Cost Support for Non-Rural LECs*, CC Docket 96-45, Tenth Report and Order, 14 FCC Rcd 20156, ¶ 32 (1999) ("*Inputs Order*"); *see also, Platform Order* at ¶ 12.

15

the results of the Synthesis Model to set rates.[49]  Further, the FCC's rules call for each state to study the costs of the individual carrier in developing UNE prices.[50]  This the RCA refused to do.

The RCA followed BJA's recommendation to use the FCC default inputs for the Synthesis Model as a baseline for submissions.  BJA advised the RCA that it should expect the parties to propose appropriate modifications to the default inputs to reflect the unique circumstances of Alaska and specifically cited Alaska's higher labor rates, higher shipping costs, and more severe climate in Alaska as modifying factors.[51]  The parties were asked to submit proposals to replace the default inputs with their own inputs and to explain their reasoning for such a replacement.

The input values, especially cost input values, are critical factors in determining the overall costs established by the model.  ACS proposed to replace the FCC national average default cost inputs preferred by the RCA with ACS's own forward-looking costs, developed using the FCC's TELRIC methodology.  GCI relied on the FCC default inputs with some adjustments; however, GCI's adjustments did not reflect ACS's actual costs.[52]  Although the arbitrator stated that the "the FCC default inputs are reflective of a theoretical least cost, efficient competitive carrier determined by nationwide averaging,"[53] he irrationally determined that these defaults were appropriate to measure ACS's costs in Alaska for purposes of pricing UNEs.  For

---

[49] *See Cost Review Proceeding for Residential and Single-Line Business Subscriber Line Charge (SLC) Caps*, CC Docket No. 96-262, Order, FCC 02-161, ¶ 36 (rel. Jun. 5, 2002).

[50] 47 C.F.R. § 51.505(e)(2).

[51] *Order Issuing Consultant's Report for Comment and Required Filings*, U-99-141(3), U-99-142(3), U-99-143(3), Appendix at 4 (Reg. Comm. of Alaska 2000).

[52] *See* Wilks Affidavit at ¶ 21.

[53] Arbitration Decision on Model Inputs, July 17, 2000 at 15.

16

Exhibit ___3___

Page _17_ of _136_

most inputs, the arbitrator selected the FCC default figure or GCI's proposed changes.[54] More than 85% of the approximately 1300 inputs required to run the Synthesis Model were the FCC default values without modification.[55] The RCA adopted nearly all of the arbitrator's decisions and ordered the resulting rates to be included in the interconnection agreements.

Therefore, the model did not include any cost data relevant to ACS's actual costs, as the Commission instructs the states to do in its rules.[56] Instead, inputs were taken from the FCC's Synthesis Model for *non-rural* high-cost lines.[57] The RCA used the FCC's generic, nationwide cost inputs for universal service, despite the FCC's admonishment that interconnection rates in Alaska should be cost-based rates determined pursuant to a forward-looking cost study. On October 5, 2000, the RCA issued a final order affirming the interconnection terms resulting from the Fairbanks arbitration. ACS appealed these RCA decisions, however, all appeals have been blocked by the RCA's refusal to submit to federal court jurisdiction.[58]

---

[54] Although GCI's proposed adjustments generally increased values over the FCC's default costs, those adjustments reflected only a small fraction of the true costs. *See* Wilks Affidavit at ¶¶ 21-27.

[55] Wilks Affidavit at ¶ 21.

[56] 47 C.F.R. § 51.503.

[57] *Inputs Order;* In the *Universal Service Report and Order,* the Commission separated rural carriers from non-rural carriers in developing cost models for universal service purposes. In requesting comment on a rural costing mechanism, the Commission specifically stated, "the unique situation faced by carriers serving Alaska and insular areas may make selection of cost inputs for those carriers especially challenging. Thus, if the selected mechanisms include a cost model, the model should use flexible inputs to accommodate the variation cost characteristics among rural study areas due to each study areas unique population distribution." *See Universal Service Report and Order* at ¶ 255; *see also*, Rural Task Force, *A Review of the FCC's Non-Rural Universal Service Fund Method and the Synthesis Model for Rural Telephone Companies,* White Paper No. 4, 10-11 (September 2000).

[58] The RCA's claim to sovereign immunity is now pending before the Ninth Circuit Court of Appeals. *See ACS of Fairbanks, Inc. v. GCI Communication Corp.,* A00-288 CIV (RCA Notice of Appeal filed March 22, 2001) (USCA 01-35344). However, the U.S. Supreme Court recently held that U.S. district courts have jurisdiction to hear suits for declaratory or injunctive relief against state commissioners in their official capacity for claims arising out of a State's review or enforcement of an interconnection

**Exhibit** 3

Page 18 of 136

### C.   Current UNE Rates in Anchorage and Fairbanks

#### 1.   Fairbanks

The RCA's mandated arbitration for ACS of Fairbanks resulted in UNE rates that are unrealistically low. For ACS of Fairbanks, the RCA approved a UNE loop price of $19.19.[59] ACS's cost study determined the forward-looking economic cost of a UNE loop to be about $36.00. ACS's actual cost per loop is $33.51.[60] ACS receives $1.89 per line per month in long-term support, $5.32 in high-cost loop support and $2.19 in interstate common line support in Fairbanks. The resulting net cost per loop to GCI, after universal service payments based on ACS's existing network, is $9.79.

#### 2.   Anchorage

Under the interconnection agreement for ACS-Anchorage arbitrated in 1997, the temporary and interim UNE rate was $13.85. On October 26, 2001, the RCA adopted a new interim and refundable rate of $14.92 despite the fact that ACS submitted evidence that the forward-looking cost of an Anchorage loop is in excess of $24.00. ACS's monthly cost per loop is $18.59, however, this does not include certain operating costs to the loop, as computed pursuant to section 36.622 of the Commission's rules.[61] ACS receives no high-cost loop support or long-term support in Anchorage.

---

agreement or arbitration under Section 252. *See Verizon Maryland, Inc. v. Public Service Comm'n of Maryland,* 122 S.Ct. 1753 (2002).

[59] This cost is a uniform rate throughout the Fairbanks study area.

[60] Affidavit of Thomas R. Meade at ¶ 3 ("Meade Affidavit"), Attachment A; *see also,* 47 C.F.R. § 36.622.

[61] Meade Affidavit at ¶ 3.

18

Exhibit  3
Page 19 of 136

### D.    Subsequent Proceedings

#### 1.    Fairbanks Litigation

After the arbitrator's decision was issued, the RCA upheld the arbitrator's decisions on model and inputs and approved the arbitrated interconnection terms on that basis.[62] In an attempt to avoid irreparable harm from the RCA's erroneous rates, ACS requested that the RCA adopt interim interconnection rates pending final resolution of *Iowa Utilities II.*[63] In its order issued on October 5, 2000, however, the RCA approved the arbitrated interconnection terms but denied ACS's request for interim rates.[64]

ACS promptly sought review of the UNE rates of ACS of Alaska, ACS of the Northland and ACS of Fairbanks in the District Court of Alaska pursuant to section 252(e)(6) of the Act.[65] In that proceeding, ACS argued that the rates being charged under the Act were confiscatory, in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution, and that use of the FCC's Synthesis Model and default inputs was improper. However, the RCA attempted to avoid judicial review, claiming sovereign immunity under the Eleventh Amendment of the U.S. Constitution.[66] The District Court dismissed the sovereign immunity defense[67] but

---

[62] *Order Approving, In Part, and Modifying, In Part, Arbitrator's Recommendation,* U-99-141(9), U-99-142(9), U-99-143(9) at 13 (Reg. Comm. of Alaska August 24, 2000).

[63] *Request for Establishment of Interim and Refundable Rates Pursuant to the FCC Proposal to the Eighth Circuit* (September 13, 2000); *ACS's Request for Establishment of Interim and Refundable Rates for Non-Recurring Costs* (September 14, 2000).

[64] *Order Approving Interconnection Agreement and Denying Request for Establishment of Interim and Refundable Rates,* U-99-141(10), U-99-142(10), U-99-143(10) at 6 (Reg. Comm. of Alaska October 5, 2000).

[65] *Amended Complaint for Declaratory Judgment, Preliminary Injunction, And Permanent Injunction* (filed by ACS March 13, 2001); *ACS of Fairbanks, Inc. v. GCI Communication Corp.,* A00-288 CIV; *Plaintiff's Motion to Enjoin Implementation of Interconnection Agreements, ACS of Fairbanks v. GCI Communications Corp.,* A-00-288-CIV (JKS) (March 13, 2001).

[66] *Memorandum of Support Of Motion To Dismiss, ACS of Fairbanks, Inc. v. GCI Communication Corp.,* A00-288 CIV (October 17, 2001).

19

Exhibit    3
Page 20 of 136

the RCA appealed that decision to the Ninth Circuit Court of Appeals.[68]  The Court of Appeals

had scheduled oral argument on the sovereign immunity question but postponed argument when

the U.S. Supreme Court granted *certiorari* on some unrelated sovereign immunity claims in

other cases under Section 251.[69]  The Supreme Court recently decided that U.S. district courts

have jurisdiction to hear suits brought against state commissioners in their official capacity for

declaratory and injunctive relief arising out of a state's review or enforcement of an

interconnection agreement or arbitration under section 252.[70]  The Ninth Circuit has not

rescheduled ACS's case.

   In the meantime, the U.S. District Court still has not reviewed the merits of

ACS's challenge to the UNE rates and other interconnection terms imposed by the RCA.

Therefore, judicial review of the interconnection terms, including the UNE rates, is unlikely to

be concluded before the expiration of the three-year interconnection agreement in Fairbanks (this

agreement expires on October 5, 2003).  Under section 251(e)(4) of the Communications Act,

state courts have no authority to review the RCA's approval of section 251 interconnection

terms.[71]  As a result, ACS is left without a timely and effective judicial forum in which it can

challenge the erroneous and confiscatory rates that have been forced upon it by the RCA in the

interconnection agreements.  ACS is now asking the Commission to review these UNE rates that

ACS believes are confiscatory, as the Commission promised to do in its *Local Competition First

Report and Order.*

---

[67] *Order, ACS of Fairbanks, Inc. v. GCI Communication Corp.,* A00-288 CIV (March 20, 2001).

[68] *ACS of Fairbanks, Inc. v . GCI Communication Corp.*  USCA 01-35344 (July 3, 2001) (Notice of Appeal filed with District Court March 22, 2001).

[69] Order, *ACS of Fairbanks, Inc. v. GCI Communication Corp.,* USCA 01-35344 and USCA 01-35475 (October 24, 2001).

[70] *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland,* 122 S.Ct. 1753 (2002).

[71] 47 U.S.C. § 251(e)(4).

Exhibit __3__

Page __21__ of __136__

## 2.    Anchorage Proceedings

ACS-Anchorage has been asking the RCA to establish new UNE rates for more than two years since January 2000.  On March 31, 2000, GCI and ACS-Anchorage submitted comments regarding the appropriate model to be used to determine forward looking costs for UNEs in Anchorage.  GCI recommended using the HAI Model, as it did in the Rural Companies proceeding, and ACS submitted a forward looking cost methodology based on the Commission's TELRIC rules, as submitted for Fairbanks.  The RCA adopted the same Synthesis Model used in the Rural Companies' proceedings, however, this order was revised and currently, it is unclear whether the RCA has decided to adopt the Synthesis Model for Anchorage.[72]  Additionally, the RCA appointed the same arbitrator as in the ACS Rural Companies proceeding and ordered the arbitrator to schedule a prehearing conference to convene ten working days after the RCA adopts the interconnection agreements for the Rural Companies.[73]

Although the RCA approved the Rural Companies' interconnection agreements on October 5, 2000, there is still no schedule for the resolution of forward-looking interconnection and UNE prices in Anchorage.  In the meantime, the original interconnection agreement remains in effect even though it did not establish UNE rates based on forward-looking costs.  The rates adopted over five years ago were intended to be "temporary and interim," and though they have recently been replaced with new interim and refundable rates, they remain non-compliant with the FCC's TELRIC rules.  Despite ACS-Anchorage's repeated requests, the RCA has not yet provided even a schedule for resolution of this matter.

---

[72] *Order Adopting Standard and Setting Hearing on Alternative Cost Methodologies,* U-96-89 (24) (Reg. Comm. of Alaska February 8, 2002).

[73] *Order Granting Motion to Adopt Forward-Looking Cost Model and Appointing Arbitrator,* U-96-89(14) (Reg. Comm. of Alaska May 31, 2000).

DC_DOCS\470153.2[W2000]

Exhibit   3

Page 22 of 136

The RCA's charter provision will sunset on June 30, 2004, with its operations winding down beginning on July 1, 2003.[74] During the period before the RCA begins winding down its affairs, the Alaska legislature intends to review the RCA's operations and policies so that it can make a recommendation for renewal of the charter during its next session. Due to the impending deadline and the legislature's study of its operations, and given the pace of the start of the arbitration proceedings, it does not seem feasible for the RCA to resolve the interconnection issues in Anchorage before it must begin winding down. There has effectively been no progress in arbitrating a new interconnection agreement and no establishment of forward-looking UNE rates based on the TELRIC methodology. Most importantly, the RCA has refused to conduct a cost study based on the Commission's TELRIC requirements for Anchorage.

### E.    ACS may have no opportunity to recover foregone revenues as a result of interconnection prices improperly set by the RCA.

ACS is suffering irreparable harm by being forced to charge the below-cost rates established by the RCA for interconnection in Fairbanks and Anchorage. Under Alaska law, ACS may be barred from recovering foregone revenues even if the current rates are subsequently found to be unlawfully low. Although ACS expects to seek damages from GCI after UNE prices are set at TELRIC levels, it anticipates a legal dispute over whether state law limiting public utilities from recovering past losses relating to state-approved retail tariff rates also would bar recovery for UNEs.[75] ACS intends to argue that carrier-to-carrier, non-tariffed UNE rates are

---

[74] Alaska Stat. § 66.010, amended by H.B. 3001 (June 26, 2002).

[75] See *A.J. Industries, Inc. v. Alaska Public Service Commission*, 470 P.2d 537 (Alaska 1970), *citing Ohio Public Utilities Commission v. United Fuel Gas Company*, 317 U.S. 546 (1943) (Alaska courts have held that a public utility may not recover past losses); *Far North Sanitation, Inc. v. Alaska Public Utilities Commission*, 825 P.2d 867, 872 (Alaska 1992) ("A fundamental rule in rate making is that rates are exclusively prospective in nature."); *U.S. v. RCA Alaska Communications, Inc.*, 597 P.2d 489, 508 (Alaska 1978) (ordering that interim rates be imposed to prevent the irreparable harm caused by

22

Exhibit    3
Page 23 of 136

sufficiently different from retail tariffed rates that this body of law should not apply.
Nevertheless, ACS is at considerable risk that the correct rates cannot be imposed retroactively,
and damages will not be an available remedy for these excessively low interconnection prices.

**F.     ACS has suffered severe loss of market share affecting its primary lines.**

Since the enactment of the Telecommunications Act of 1996, the Anchorage local
exchange market has experienced a level of competition that is unprecedented in other markets.
Nearly every Anchorage customer, business and residential, has a choice of facilities-based
providers.[76]  At the moment, ACS-Anchorage serves approximately 55% of all lines in the
Anchorage market.[77]  This level of competition imposes a unique hardship on ACS because,
despite the competition, ACS is required to continue to provision UNEs to its competitors at
rates that are well below cost, rendering ACS unable to obtain a return of its investment.  This
loss of market share is not just at the margins of ACS's business.[78]  The loss to ACS is suffered
on its primary lines.  ACS is losing an average of 100 customers per day in Anchorage alone.[79]
In addition to losses that ACS has suffered because of the unreasonably low UNE rates, ACS
must pay administrative costs and the salaries of full-time staff dedicated to transferring
customers to its competitors.  Moreover, GCI has complained that ACS-Anchorage is unable to

---

confiscatory rates); *see also Alaska Public Utilities Commission v. Greater Anchorage Area Borough*,
534 P.2d 549, 559 (Alaska 1975).

[76] In fact, the only Anchorage customers that are denied a choice are those that are being served on GCI's
LEC facilities.  GCI is not required under section 251 to share these facilities with ACS or other
carriers.

[77] *See* Affidavit of Stephen A. Pratt at ¶ 2 ("Pratt Affidavit"), Attachment B; Comments of General
Communications, Inc. filed in CC Docket 01-338 at 3 ("GCI Comments") ("GCI now serves 40% of all
business and residential lines in Anchorage").

[78] *See* Pratt Affidavit at ¶ 2.

[79] GCI Comments at 8.

DC_DOCS\470153.2[W2000]

Exhibit    3
Page 24 of 136

meet GCI's goal of transferring 500 customers per day.[80]  ACS's market share loss in Anchorage

foretells the inevitable result of the RCA's termination of ACS's rural exemption in Fairbanks,

as the Fairbanks market is beginning to experience a similar trend.  In the first nine months of

UNE-based competition in the Fairbanks market, GCI has captured approximately 15% of the

market share.[81]

III.     **THE RCA HAS FAILED TO SET UNE PRICES IN ACCORDANCE WITH THE FCC'S TELRIC RULES.**

     A.     **TELRIC Principles**

          1.     **The Commission's rules require UNE prices to be cost-based.**

          Section 252(d)(1)(A) of the Act states that UNE rates should be "just and

reasonable" and "shall be *based on the cost* . . . of providing the . . . network element."[82]  The

Commission has acknowledged that the purpose of sections 251 and 252 of the Act is to

encourage the opening of markets to economically sustainable competition.  The Commission

determined that in order to achieve these goals, UNE prices must be based on the economic cost

of providing UNEs.  In the *Local Competition First Report and Order*, the Commission justified

the adoption of a forward-looking cost methodology by reasoning that "new entrants should

make their decisions whether to purchase new unbundled elements or to build their own facilities

based on the relative economic cost of these options. . . . [I]n dynamic competitive markets,

firms take action based not on embedded costs, but on the relationship between market-

determined prices and forward-looking economic costs."[83]

---

[80] *Id.*

[81] Pratt Affidavit at ¶ 3, Meade Affidavit at ¶ 11.

[82] 47 U.S.C. § 252(d)(1)(A).

[83] *Local Competition First Report and Order* at ¶ 620.

Exhibit ___3___
Page _25_ of _136_

The TELRIC methodology embodies the importance of cost-based pricing. The Commission instructed that in using the TELRIC method, "states may not set prices lower than the forward-looking incremental costs directly attributable to provision of a given element."[84] Costs that are too low could distort economic investment decisions. As explained by one economic expert, "if UNE prices understate the total costs of unbundled entry, they will systematically bias entrants towards unbundling and away from facilities-based competition."[85] The short-term harm of such market distortion is that CLECs are encouraged to enter the market primarily via UNEs because the CLEC is guaranteed a steady revenue stream without building its own facilities even when facilities-based competition would otherwise be feasible. Competitors will enter the market solely to benefit from the disparity between the regulated UNE price and the true economic cost of the UNEs. The arbitrage opportunity created by this scenario results in a windfall to the CLEC, and cannot encourage CLECs to build their own facilities or contribute to improvements in services to end-user customers.[86]

The long-term effect of such distortions is the demise of the incumbent *and* the competitor. Over time, "prices that are too low will deter the incumbents from making investments in their own networks because they will have to share the benefits, although not the

---

[84] *Id.*

[85] Declaration of Howard A. Shelanski filed with the Comments of SBC in CC Docket 01-338, at ¶ 23 (*"Shelanski Declaration"*).

[86] "[G]reater public benefits flow from facilities-based competition than from the efforts of competitors reselling the ILEC facilities, taking advantage of regulatorily-created opportunities." Declaration of Alfred E. Kahn and Timothy J. Tardiff filed with Comments of Verizon in CC Docket 01-338, at ¶ 19 (*"Kahn & Tardiff Declaration"*).

DC_DOCS\470153.2[W2000]

Exhibit __3__
Page _26_ of _136_

full costs, with competitors using UNEs."[87]  Additionally, such prices will undermine those

CLECs that have invested in their own facilities.[88]

> **2.    TELRIC assumes deployment of forward-looking technology at the location of the ILECs wire centers, not a reconfiguration of the network.**

In developing the TELRIC methodology, the Commission expressly rejected a

cost model based on a purely hypothetically designed network.  Therefore, the Commission

intended states to take into consideration some inefficient characteristics of the ILEC's existing

network.  In its *Local Competition First Report and Order*, the Commission considered an

approach in which the forward-looking economic cost for interconnection and unbundled

elements are based on the "most efficient network architecture, sizing, technology, and operating

decisions that are operationally feasible and currently available to the industry."[89]  However, the

Commission concluded that this approach to network design "may discourage facilities-based

competition by new entrants because new entrants can use the incumbent LEC's existing

network based on the cost of a hypothetical least-cost, most efficient network."[90]

Instead, the Commission opted for a rule in which the "forward-looking pricing

methodology for interconnection and unbundled network elements should be based on costs that

assume that wire centers will be placed *at the incumbent LEC's current wire center locations,*

but that the design for the remainder of the reconstructed local network will employ the most

efficient technology for reasonably foreseeable capacity requirements."[91]  The Commission

---

[87] Shelanski Declaration at ¶24.

[88] *Id.*

[89] *Local Competition First Report and Order* at ¶ 683.

[90] *Id.*

[91] *Local Competition First Report and Order* at ¶ 685 (emphasis added); *see also,* 47 C.F.R. § 51.505(b)(1).

DC_DOCS\470153.2[W2000]

Exhibit   3

Page 27 of 136

reasoned that this "hypothetical network architecture" would most closely represent the incremental costs that ILECs "actually could expect to incur" in making UNEs available to new entrants.[92] Thus, while UNE prices may be based on a forward-looking network technology, which might require the states to hypothesize that the ILEC would in the future employ a technology it has not yet deployed, the states must also take into account the existing infrastructure – the current location of the ILEC's existing wire centers.[93]

### 3. UNE prices must be based on *the ILEC's* costs, not a national average or a hypothetical carrier's costs

Both the statute and the Commission's rules reference "*the* ILEC's costs," and neither makes any mention of "a carrier" or "average" or "hypothetical" costs. The *Local Competition First Report and Order* contains numerous references to the costs and attributes of a specific ILEC. "As a result of the availability to competitors of the incumbent LEC's unbundled elements *at their economic cost*, consumers will be able to reap the benefits of the incumbent LECs' economies of scale and scope, as well as the benefits of competition."[94] Additionally, the Commission explains that the TELRIC methodology aims to "establish[] prices for interconnection and unbundled elements *based on costs similar to those incurred by the incumbent*."[95] Further, as noted above, the Commission's requirement that states take into account the actual location of the ILEC's switches is an indication that UNE costs must reflect "existing network design [and] on efficient, new technology that is compatible with the *existing infrastructure*"[96] of the particular ILEC in question.

---

[92] *Local Competition First Report and Order* at ¶ 685 (emphasis added).
[93] *Id.*
[94] *Local Competition First Report and Order* at ¶ 679 (emphasis added).
[95] *Local Competition First Report and Order* at ¶ 679 (emphasis added).
[96] *Local Competition First Report and Order* at ¶ 685.

27

Exhibit 3
Page 28 of 136

Furthermore, the Commission's rules require that each state conduct a forward-looking cost study in order to properly establish UNE rates for each ILEC in accordance with TELRIC.[97]  The Commission intended that each state examine the costs of each ILEC as part of its obligation to adopt permanent, cost-based UNE rates to replace the FCC's interim proxy prices set forth in section 51.513 of the rules.[98]  The state may determine rates either in a rulemaking or in the context of a particular arbitration proceeding,[99] but the FCC left no ambiguity about the state's obligations to review the ILEC's costs.

By requiring states to replace the FCC's interim proxy prices with UNE rates based on a cost study, the Commission acknowledged that nationwide values are not an appropriate measure for UNE pricing.  Especially when dealing with costs in Alaska, nationwide values do not adequately approximate ILEC costs.  As evidence of this, the Commission, in setting default proxy prices and ranges for pricing UNEs in its *Local Competition First Report and Order*, did not establish such proxies for Alaska:[100]

> We are not establishing default loop cost proxies for these areas because we are unsure that comparisons of the population densities of the continental states and of Alaska and other non-contiguous areas subject to the 1996 Act fully capture differences in loop costs.  Regulatory authorities in those areas may seek assistance from this Commission should default loop cost proxies be needed before they have completed their investigations of the forward-looking costs of providing unbundled loop elements.[101]

---

[97] 47 C.F.R. § 51.505(e).

[98] *Local Competition First Report and Order* at ¶ 619 ("In setting a rate pursuant to the cost-based pricing methodology, . . . the state must give full and fair effect to the economic costing methodology we set forth in this Order and must create a factual record, including the cost study, sufficient for purposes of review after notice and opportunity for the affected parties to participate.").

[99] *Local Competition First Report and Order* at ¶ 693.

[100] *Local Competition First Report and Order* at ¶ 794.

[101] *Id.*

Exhibit ___3___
Page _29_ of _136_

Thus, the Commission recognized that there are unique factors in the Alaska market that makes the use of national averages wholly inappropriate.

> ### 4. The TELRIC rules assume a hypothetical network design, but require actual costs incurred to construct such a network.

The Commission's TELRIC methodology assumes a hypothetical network design, however, nowhere in the rule does the Commission refer to hypothetical costs of constructing such a network, or that costs be based on a hypothetical carrier. The rule indicates that "the total element long-run incremental cost of an element should be measured based on the use of the most efficient telecommunications technology *currently available* and the lowest cost network configuration, given the *existing location of the incumbent LEC's wire centers.*"[102] The language of the rule does not infer that the other components of TELRIC, the forward-looking cost of capital and depreciation rates, are based on anything other than those of the carrier in question.[103]

In support of this interpretation, the Commission stated in its *Local Competition First Report and Order* that TELRIC "is designed to permit incumbent LECs to recover their economic costs of providing interconnection and unbundled elements, which may minimize the economic impact of [the Commission's] decisions on incumbent LECs, including small incumbent LECs."[104] Further, TELRIC includes "a depreciation rate that reflects the true changes in economic value of an asset and a cost of capital that appropriately reflects the risks incurred by an investor."[105] It is clear that the Commission intended TELRIC prices to reflect carrier-specific cost inputs, not nationally averaged costs or other hypothetical costs. For instance, the costs of constructing a hypothetical network in Alaska would be higher than the

---

[102] 47 C.F.R. § 51.505(b)(1) (emphasis added).

[103] *See* 47 C.F.R. § 51.505(b)(2), (3).

[104] *Local Competition First Report and Order* at ¶ 697.

[105] *Id.* at ¶ 703.

29

Exhibit    3
Page  30  of  136

costs of constructing a hypothetical network in the continental U.S. because of Alaska's higher labor costs and the higher prices for components in this region.[106]

### 5.   The U.S. Supreme Court has affirmed the FCC's TELRIC methodology.

The U.S. Supreme Court has affirmed the FCC's forward-looking cost model for determining UNE prices.[107] The Court approved the Commission's adoption of a cost model that takes into consideration the existing location of the ILEC's wire centers. The Court recognized that this requirement built some "inefficiency" into the TELRIC standard. As a result, UNE rates should not be set as if the ILEC could always deploy the most efficient technology immediately upon its introduction.[108] Therefore, a state may not price elements, such as UNE loops, as if the ILEC's wire centers could be "relocated for a snugger fit."[109] The implication of the Court's example is especially apt in Alaska: UNE loop prices must be based on the ILEC's actual loop lengths and costs, based on where its wire centers are located, not some shorter loop length that may exist elsewhere in the country.

Additionally, the Court confirmed the conclusion that the universal service model is not appropriate for determining UNE prices. In *Iowa Utilities III*, the Court rejected an argument by the ILECs in which they compared an estimate of a TELRIC valuation of building a new and efficient national system of local exchanges providing universal service and the actual "total plant" value on the industry balance sheet for the same time period. The ILECs argued that the size of the disparity demonstrated that TELRIC would necessarily result in confiscatory rates. The ILECs used the same universal service model relied on by the RCA. The Supreme

---

[106] Affidavit of Timothy J. Tardiff at ¶ 12 ("Tardiff Affidavit"), Attachment C.

[107] *Iowa Utilities III.*

[108] *Iowa Utilities III*, slip op. at 34.

[109] *Iowa Utilities III*, slip op. at 33.

Exhibit     3
Page 31 of 136

Court disagreed with the ILECs, noting that the ILECs' TELRIC value in that example was unreasonably low because, it was "based on constructing a barebones universal-service telephone network, and so it fails to cover elements associated with more advanced telecommunications services that incumbents are required to provide by lease under 47 U.S.C. § 251(c)(3)."[110] The Court declined to guess the appropriate TELRIC value, however, it stated that it "can reasonably assume that [the ILECs' TELRIC value] is too low."[111] Likewise, the RCA's use of the universal service model (the Synthesis Model) results in an unreasonably low TELRIC estimate.

**B.    The RCA disregarded the TELRIC rules.**

    **1.    Anchorage**

The current UNE rates to which ACS-Anchorage is currently subject violate the cost-based pricing principle of the TELRIC methodology. The current UNE rate of $14.92 in Anchorage is based on a statement by GCI's attorney during oral argument regarding the result of the FCC Synthesis Model substituting inputs used in the Fairbanks arbitration.[112] GCI did not submit documentary support for this proposed rate. Therefore, as these are national average default-based inputs (inadequately adjusted to account for Alaska conditions), the current rate is in no way based on ACS's costs in Anchorage. The RCA set this rate as an interim rate in order to relieve ACS of even lower interim UNE prices established by the RCA's predecessor agency, the APUC, in 1997.

At the time the parties arbitrated the original interconnection agreement, the Commission's *Local Competition First Report and Order* had been recently released, and the

---

[110] *Iowa Utilities III*, slip op. at 54-55 (citing the Commission's explanation in the *Inputs Order* that the universal-service model may not be appropriate for determining prices for unbundled network elements).

[111] *Id.* at 55.

[112] Oral Argument in Docket No. U-96-89, transcript at 150 (Reg. Comm. of Alaska August 17, 2001).

Exhibit    3
Page 32 of 136

1997 rates were not determined in accordance with TELRIC.  The RCA's predecessor agency agreed to approve the rates in the interconnection agreement on a temporary basis, to give it time to conduct a forward-looking cost study, as the Commission's rules instruct state commissions to do.  However, neither the APUC nor the RCA have developed forward-looking cost-based UNE rates for Anchorage that are compliant with the Commission's TELRIC methodology.  In Anchorage, where ACS has lost approximately *half* of the residential market primarily to one UNE-based competitor, Alaska never even purported to conduct a study of ACS's costs, but promised it would do so – a promise still unfulfilled six years after passage of the Telecommunications Act.  Moreover, despite repeated requests for a schedule to resolve the matter, the RCA has failed to calendar a hearing in this proceeding.  While the RCA complies with the nine-month timeframe mandated by the Act when CLECs seek arbitration, ACS's request with respect to rates in Anchorage has been pending at the RCA for two and a half years.

## 2.     Fairbanks

### a.     The UNE rates for Fairbanks are not cost-based.

During arbitration, the RCA hearing officer stated that "before the FCC default inputs should be replaced by company specific values, it must be shown that the proposed specific company inputs is [sic] reflective of an efficient, least cost company in a competitive marketplace."[113]  The hearing officer concluded that ACS had not met this burden of showing that their proposed company specific cost inputs were those of an "efficient, least cost company in a competitive marketplace."  However, the Commission explicitly rejected this approach in

---

[113] *See Arbitration Decision on Model Inputs*, U-99-141, U-99-142, U-99-143 (Reg. Comm. of Alaska July 17, 2000).

DC_DOCS\470153.2[W2000]

Exhibit ___3___
Page _33_ of _136_

adopting the TELRIC model.[114]  Therefore, the arbitrator selected the input values based entirely

on the wrong standard.

Because the UNE rates were based on purely hypothetical costs, the RCA

approved below-cost UNE prices that result in a windfall to GCI and encourage behavior, which

would be justified neither under market conditions, nor TELRIC-based pricing.  Since the price

GCI pays per UNE loop ($19.19) is well below both the embedded cost ($33.51) and ACS's

forward-looking cost (about $36.00), GCI is presented with an arbitrage opportunity (further

exacerbated by the portability of the high-cost support) it would be foolish not to seize.[115]

**b.    The UNE rates in Fairbanks do not take into consideration ACS-specific costs.**

During the Fairbanks arbitration, the RCA went through the motions of

conducting a cost study but instead of considering the cost *to ACS* of providing the UNEs in

question, a set of nationally averaged costs was the starting point, using the universal service

---

[114] *Local Competition First Report and Order* at ¶ 683.

[115] Further exacerbating the confiscatory rates is the fact that under existing FCC rules, GCI is entitled to significant USF subsidies.  Although its costs of providing service are unknown, its costs appear to be significantly below the FCC benchmark for high cost loop support.  High cost loop support for competitive carriers is currently based on the underlying carrier's costs, and not the cost of the competitive carrier.  *See* 47 C.F.R. § 54.307.  The RCA certified GCI as an Eligible Telecommunications Carrier ("ETC") even though it did not comply with requirements to disclose the uses of support money.  *See Commission Compliance with Federal Requirements to Certify Proper Use of Federal Universal Service Funds by Telecommunications Carriers*, U-01-90 (6) (Reg. Comm. of Alaska Apr. 18, 2002); *Request by GCI Communications Corp d/b/a General Communication, Inc., and d/b/a GCI for Designation as a Carrier Eligible to Receive Federal Universal Service Support Under the Telecommunications Act of 1996 for the Fairbanks, Fort Wainwright, and Juneau Areas*, U-01-11 (1) (Reg. Comm. of Alaska Feb. 19, 2002); *Request by GCI Communications Corp d/b/a General Communication, Inc., and d/b/a GCI for Designation as a Carrier Eligible to Receive Federal Universal Service Support Under the Telecommunications Act of 1996 for the Fairbanks, Fort Wainwright, and Juneau Areas*, U-01-11 (2) (Reg. Comm. of Alaska Aug. 28, 2001).  The RCA reasoned that because GCI's rates equaled ACS's rates, there must be no improper use of funds, even though the RCA never reviewed GCI's costs.  The RCA's flawed logic allows GCI to continue to take advantage of the below-market UNE rates.

Exhibit     3
Page  34  of  136