Synthesis Model for non-rural carriers. However, the FCC and the U.S. Supreme Court have noted that this Model is inappropriate for determining UNE rates.[116]

ACS submitted a forward-looking cost study that complied with section 51.505(e) of the FCC's rules. The RCA disregarded this study and instead adopted the Synthesis Model with the FCC's default inputs or GCI's proposed inputs. GCI's proposed inputs selected by the arbitrator were essentially the same as the FCC default value but with a minor adjustment factor.[117] Such adjustments were not nearly enough to approximate realistic costs for a facilities-based LEC in Alaska. By acknowledging that costs in Alaska are higher, GCI merely attempted to give the appearance of fairness in offering a slightly increased cost input.[118] In reality, however, ACS's increased costs in Alaska are represented by the ACS cost study. Furthermore, GCI's adjustment factors were not based on any actual costs. As discussed in the Wilks Affidavit, GCI in some cases used its own actual costs, even though it does not maintain an area-wide network.[119]

Under the Commission rules, UNE rates should be determined based on the location of the ILEC's wire centers and the ILEC's costs to construct the otherwise hypothetical network. Therefore, ACS's UNE rates should be based on the most efficient network available *in Alaska* and on new technology that is compatible with existing infrastructure *in Alaska* and on

---

[116] See *Platform Order* at ¶ 12; *Iowa Utilities III*. Furthermore, the Synthesis Model represents the costs of a local carrier providing only narrowband service in a non-rural market, whereas ACS's actual forward-looking costs reflect the provision of services over a network with advanced capabilities. Affidavit of Timothy J. Tardiff, filed with the RCA in U-99-141, U-99-142, U-99-143 ¶ 5 (Feb. 11, 2000); Affidavit of Walter J. Haug, filed with the RCA in U-99-141, U-99-142, U-99-143 ¶ 8 (Feb. 10, 2000).

[117] See *In the Matter of Interconnection Agreement Between General Communication, Inc. and PTI Communications of Alaska, Inc. Telephone Utilities of the Northland, Inc. and Telephone Utilities of Alaska, Inc.*, Arbitration Decision on Model Inputs, Interconnection Arbitration U-99-141, U-99-142, U-99-143 (July 17, 2000). See also, Wilks Affidavit at ¶ 21; see generally, Tardiff Affidavit.

[118] See Wilks Affidavit; Tardiff Affidavit.

[119] Wilks Affidavit at ¶ 21.

DC_DOCS\470153.2[W2000]

Exhibit 3
Page 35 of 136

ACS's cost to construct that network *in Alaska*. If a state commission fails to take the location of the ILEC's wire centers and the ILEC's costs into account, the UNE price will be based on a purely hypothetical network, which the FCC explicitly rejected.[120]

By adopting the Synthesis Model and related inputs, the RCA implemented a hypothetical carrier model that did not reflect any costs specific to ACS's territory and therefore, did not take into account the location of ACS's wire centers. Because the FCC's rules require costs to reflect the actual location of the ILEC's wire centers and the cost to the ILEC, construction and related costs, will be actual forward looking costs of an Alaska carrier and are unaffected by the use of a most efficient, least cost hypothetical network model. Therefore, the RCA's use of hypothetical costs of constructing the hypothetical network is inconsistent with the TELRIC methodology.

Additionally, the RCA approved the arbitrator's decision to use these actual, or slightly adjusted, FCC Synthesis Model default inputs for almost all variables.[121] Like the Synthesis Model, the default inputs measure the wrong costs entirely because they were designed to measure costs for non-rural companies with lower costs than those of rural companies in Alaska.[122] The default inputs are largely based on the costs in the lower 48 states, which reflect lower labor rates and volume discounts available to the regional Bell operating companies.[123] Further, as indicated in the Tardiff Affidavit, because the FCC's inputs generally combine labor and material costs into a single value, there appears to be no way to properly adjust the inputs to

---

[120] *Local Competition First Report and Order* at ¶ 683.

[121] *See Order Approving, In Part, and Modifying, In Part, Arbitrator's Recommendation,* U-99-141(9), U-99-142(9), U-99-143(9) (Reg. Comm. of Alaska August 24, 2000).

[122] *Universal Service Report and Order* at ¶ 255.

[123] Wilks Affidavit; Tardiff Affidavit.

DC_DOCS\470153.2[W2000]

Exhibit     3
Page 36 of 136

reflect labor cost differences in Alaska.[124] Therefore, the RCA's failure to consider ACS's rural attributes violates TELRIC.[125]

In sum, UNE prices in Anchorage and Fairbanks were developed without reference to the ILEC's costs and therefore fail to comply with the FCC's TELRIC rules as affirmed by the U.S. Supreme Court.

## IV. ACS IS BEING SUBJECTED TO CONFISCATORY RATES.

### A. The Commission should look to tariff law to determine whether UNE rates are confiscatory.

There is not yet a body of case law on what constitutes a confiscatory UNE rate because UNEs are a relatively new creation of law. UNE rates differ from tariffed rates because UNE prices are meant to be governed by market forces. Where the market for UNEs fails, regulators substitute arbitration for the market determination of rates. UNE rates, however they are established, are embodied in an agreement between the parties approved by the state. On the other hand, tariffed rates are established solely by regulators.[126] The legal effect and structure of a tariff is different from that of an interconnection agreement. Nonetheless, it is helpful to look to case law governing tariffed rates to determine when UNE rates are confiscatory.[127]

---

[124] Tardiff Affidavit at ¶ 12.

[125] Furthermore, in calculating proxy costs for unbundled loop elements in the *Local Competition First Report and Order*, the Commission determined that "some upward adjustment is warranted as a safety margin to ensure that the [proxy] ceiling captures the variation in forward-looking economic costing prices on a state-by-state basis. [The Commission] therefore chose[] to adjust the hybrid cost estimates upward by five percent for each state." *Local Competition First Report and Order* at ¶ 794. The Commission cited the fact that the proxies were developed based on studies that were conducted by a small number of states. The RCA, however, did not build any type of cushion into the costs produced by the Synthesis Model and the default inputs, or otherwise attempt to reflect the higher than average costs in Fairbanks.

[126] In fact, in Alaska, the UNE rates were established solely by regulators, and in that sense, they are more like tariffed rates than contractual rates.

[127] The U.S. Supreme Court in *Iowa Utilities III* confirmed that the principle established in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) ("it is not theory, but the impact of the rate order which counts")

36

DC_DOCS\470153.2[W2000]

Exhibit 3
Page 37 of 136

In addition to violating section 252 of the Act, the UNE prices set by the RCA are confiscatory. The Fifth Amendment to the Constitution of the United States provides that "private property shall [not] be taken for public use without just compensation."[128] The United States Supreme Court has long held that this injunction applies not only to physical invasions or trespass, but also to governmental restrictions on the use of private property that amount to a taking.[129] Applying the Fifth Amendment to a regulated utility, if a rate set by a state public utility commission "does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments."[130] Similarly, in the context of regulatory ratemaking for public utilities, it is well-settled that "the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory."[131]

There is not one constitutionally mandated method for determining rates, for "circumstances may favor the use of one ratemaking procedure over another."[132] Nevertheless, "[i]t is not theory, but the impact of the rate order which counts,"[133] for "[t]he Constitution protects the utility from the net effect of the rate order on its property" and not against particular

---

applies to UNEs even though the Court declined to find TELRIC per se confiscatory. *Iowa Utilities III*, slip op. at 53, 54.

[128] U.S. Const. amend. V. Under the Fourteenth Amendment, "[no state] shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV.

[129] *See, e.g., Reagan v. Farmers' Loan & Trust Co.*, 154 U.S. 362, 410 (1894).

[130] *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 308 (1989).

[131] *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989); *FPC v. Texaco, Inc.*, 417 U.S. 380, 391-92 (1974); *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585 (1942).

[132] *Duquesne Light*, 488 U.S. at 315–16; *see also Wisconsin v. FPC*, 373 U.S. 294, 309 (1963); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944).

[133] *Hope*, 320 U.S. at 602.

DC_DOCS\470153.2[W2000]

Exhibit 3
Page 38 of 136

infirmities in the method actually employed.[134] Thus, so long as the rate fixed is within the "zone of reasonableness," the Constitution's protections against unjustly compensated takings are not implicated.[135]

A rate is confiscatory if it is "so unjust as to destroy the value of [the] property for all the purposes for which it was acquired," and thereby "practically deprive[s] the owner of property without due process of law."[136] In this regard, the Constitution requires the "return to the equity owner [to] be commensurate with returns on investments in other enterprises having corresponding risks,"[137] and "[a] public utility is entitled to such rates as will permit it to earn a return . . . equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties."[138]

Although a rate is not *per se* confiscatory because a utility would fail to make a profit or be forced to operate at a loss if subjected to such a rate,[139] "the due process clause has been applied to prevent governmental destruction of *existing* economic values."[140] Instead, "there must be a reasonable judgment having its basis in a proper consideration of all relevant

---

[134] *Duquesne Light*, 488 U.S. at 314.

[135] *Natural Gas Pipeline*, 315 U.S. at 585–86.

[136] *Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U.S. 578, 597 (1896).

[137] *Hope*, 320 U.S. at 603.

[138] *Bluefield Water Works & Improvement Co. v. Public Serv. Comm'n of W. Va.*, 262 U.S. 679, 692–93 (1923); *see also Duquesne Light*, 488 U.S. at 310 ("[W]hether a particular rate is 'unjust' or 'unreasonable' will depend to some extent on what is a fair rate of return given the risks under a particular rate-setting system, and on the amount of capital upon which the investor are entitled to earn that return.").

[139] The Supreme Court has held that regulation does not insure that the business shall produce net revenues or that the regulated business make a profit. *See Natural Gas Pipeline*, 315 U.S. at 590; *Market St. Ry. Co. v. Railroad Comm'n of Cal.*, 324 U.S. 548, 566–67 (1945).

[140] *Market St. Ry. Co. v. Railroad Comm'n of Cal.*, 324 U.S. 548, 566–67 (1945) (emphasis added). The due process clause "has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces." *See id.*

DC_DOCS\470153.2[W2000]

Exhibit ___3___

Page _39_ of _136_

facts,"[141] including "the economic impact of the regulation, the extent to which it interferes with investment-backed expectations, and the character of the governmental action."[142] Although in the end this inquiry is "essentially . . . ad hoc [and] factual in nature,"[143] it is a necessary component of the constitutionally mandated "balancing of the investor and the consumer interests."[144]

**B.     The Commission Can and Should Act to Prevent Irreparable Harm to ACS and the Public.**

**1.     The Commission has jurisdiction to preempt the RCA**

The Commission has the authority to grant ACS relief from the RCA's confiscatory rates.  Section 252(e)(5) of the Act provides that:

> if a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.[145]

This preemption authority is not limited to enforcing the states' obligations under section 252 to mediate or arbitrate interconnection agreements.

---

[141] *Minnesota Rate Cases*, 230 U.S. 352, 434 (1913).

[142] *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982).

[143] *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979).

[144] *Hope*, 320 U.S. at 603; *see also Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1177–78 (D.C. Cir. 1987) ("In reviewing a rate order courts must determine whether or not the end result of that order constitutes a reasonable balancing, based on factual findings, of the investor interest in maintaining financial integrity and access to capital markets and the consumer interest in being charged non-exploitative rates.  Moreover, an order cannot be justified simply by a showing that each of the choices underlying it was reasonable; those choices must still add up to a reasonable result.").  Although *Hope* primarily addressed a statutory requirement that rates set be just and reasonable, "the *Hope* test defines the point at which a rate become unconstitutionally confiscatory as well." *Jersey Central*, 810 F.2d at 1175.  The Supreme Court did nothing to alter this jurisprudence when it upheld TELRIC. *See Iowa Utilities III*, slip op. at 53, 54.

[145] 47 U.S.C. § 252(e)(5).

39

Exhibit ___3___
Page _40_ of _136_

a.    **Under the Starpower Preemption Order, the Commission may assert jurisdiction if a state fails to act under Section 252.**

In the *Starpower Preemption Order*, the Commission held that it may, under section 252(e)(5), preempt a state that fails to interpret and enforce an existing interconnection agreement.[146] There is nothing in the language or legislative history of section 252(e)(5) to prevent the FCC from preempting state actions that clearly violate the pricing standards set forth in section 252(d)(1). As in the *Starpower* case, ACS seeks resolution of confiscatory rates arising from interconnection agreements approved by the RCA. Although there is an interconnection agreement between ACS and GCI in Anchorage, the RCA approved the UNE rates as temporary and interim rates because they were not based on the TELRIC methodology. The agreement is silent as to the rates applicable after 1999, however, the RCA has still not arbitrated new UNE rates. ACS has repeatedly requested that the RCA perform a TELRIC-based cost study in Alaska, but the RCA has failed to carry out its responsibility under section 252(d)(1) of the Act and section 51.505(e)(2) of the FCC's rules.[147]

As described in section II.D.2 above, the RCA has subjected ACS-Anchorage to interim rates for the past five years. Despite ACS-Anchorage's repeated requests for a new proceeding, the RCA has not even set a schedule for arbitration of a new interconnection agreement. If the Commission refuses to preempt the RCA for its failure to set new UNE rates in the last five years, ACS-Anchorage will have no recourse against the RCA for the UNE rates that it believes are confiscatory. ACS must simply wait at the mercy of the RCA while it continues to lose primary lines and market share to GCI, who is taking advantage of the

---

[146] *Starpower Communications, LLC Petition for Preemption of Jurisdiction of the Virginia State Corporation Commission Pursuant to Section 252(e)(5) of the Telecommunications Act of 1996*, Memorandum Opinion and Order, 15 FCC Rcd 11277 (2000) ("*Starpower Preemption Order*").
[147] 47 U.S.C. § 252(d)(1); 47 C.F.R. § 51.505(e)(2).

Exhibit    5
Page  41  of  136

confiscatory rates. Therefore, because the RCA has failed to act to carry out its responsibility under section 252, the Commission should preempt the RCA and implement the appropriate methodology to determine reasonable UNE rates. ACS asks the Commission to preempt the RCA immediately because five years of inaction demonstrates that the RCA will not act if given 90 days to comply with the rules. Based on the extreme and unprecedented hardship facing ACS, the Commission should preempt the RCA immediately.

> **b.     The state's assertion of sovereign immunity waives its right to object to FCC jurisdiction.**

The Commission has held that a state commission's refusal to apply federal rules to arbitration of an interconnection agreement is a failure to act to carry out its responsibility under section 252(e)(5).[148] In the *WorldCom Preemption Order*, the Commission preempted the Virginia Public Utilities Commission ("VA PUC"). The VA PUC indicated that it would arbitrate the interconnection agreement under state law instead of federal law because it would be waiving its sovereign immunity by arbitrating under federal law and subjecting itself to federal court review under section 252(e)(6).[149] The Commission held that this was a failure to act to carry out its responsibilities under section 252 of the Act and preempted the VA PUC. The RCA in this instance has failed to arbitrate the interconnection agreements between the Rural Companies and GCI in accordance with the Commission's rules and federal law regarding the determination of UNE pricing. The RCA did not apply TELRIC, but rather, it applied its own method of determining UNE rates. Therefore, ACS asks that the Commission preempt the RCA in this instance because it has failed to arbitrate the interconnection agreements between the

---

[148] *Petition of WorldCom, Inc. for Preemption of Jurisdiction of the Virginia State Corporation Commission Pursuant to Section 252(e)(5) of the Telecommunications Act of 1996 and for Arbitration of Interconnection Disputes with Verizon-Virginia, Inc.*, Memorandum Opinion and Order, 2001 FCC LEXIS 411 (Jan 19, 2001) ("*WorldCom Preemption Order*").

[149] *Id.* at ¶ 4.

DC_DOCS\470153.2[W2000]

Exhibit ___3___

Page __42__ of _136_

Rural Companies and GCI in accordance with the Commission's rules and federal law regarding UNE pricing.

Additionally, when ACS sought review of the UNE rates of ACS-Fairbanks in the District Court of Alaska pursuant to section 252(e)(6) of the Act, the RCA attempted to avoid judicial review, claiming sovereign immunity.[150] By applying its own rules in setting UNE rates instead of the Commission's rules, and then refusing to subject itself to federal court review under section 252(e)(6), the RCA effectively is submitting the matter to the Commission, as the VA PUC did in the *WorldCom* case.[151] Likewise, the RCA has failed to act to carry out its responsibilities under section 252 of the Act and therefore, the Commission should preempt the RCA.

### c.    In upholding the FCC's TELRIC methodology, the U.S. Supreme Court has upheld FCC preeminence in establishing standards for UNE pricing.

The U.S. Supreme Court has affirmed the authority of this Commission to interpret sections 251 and 252 and establish guidelines for the states in setting UNE pricing. Under section 201(b) of the Act, "[t]he FCC has rulemaking authority to carry out the 'provisions of this Act' which include §§ 251 and 252, added by the Telecommunications Act of 1996."[152] Because of this explicit authority, the Supreme Court in *Iowa Utilities I* rejected the argument that Commission jurisdiction was only conferred by the Telecommunications Act of

---

[150] *Memorandum of Support of Motion to Dismiss, ACS of Fairbanks, Inc. v. GCI Communication Corp.,* A-00-288-CIV (JKS) (October 17, 2001).

[151] The U.S. Supreme Court has recently decided that U.S. district courts have jurisdiction to hear suits for declaratory or injunctive relief against state commissioners in their official capacity for claims arising out of a State's review or enforcement of an interconnection agreement or arbitration under Section 252. *See Verizon Maryland, Inc. v. Public Service Comm'n of Maryland,* 122 S.Ct. 1753 (2002). However, the FCC remains the only forum that can provide effective relief to ACS. During the time it takes to obtain an adjudicated decision from a district court, ACS will suffer sever harm from the current UNE rates, which it believes are confiscatory.

[152] *Iowa Utilities I* at 378.

DC_DOCS\470153.2[W2000]

Exhibit   3

Page 43 of 136

1996 as to a few matters.  Further, the Supreme Court's opinion in *Iowa Utilities III* affirms the

Commission's authority to adopt a cost methodology to be applied by the state commissions.[153]

The limitation of the Commission's authority in section 2(b)[154] of the Act does not override the

explicit authority Congress grants to the Commission in sections 201(b), 251 and 252.[155]

Similarly, section 252(e)(5) does not narrow the Commission's authority to grant the relief that

ACS requests in this petition, but is an express mandate (as the title indicates) for the

"Commission to act if state will not act."[156]

### 2.     The FCC has demonstrated its willingness and authority to review UNE rates that may be confiscatory.

The Commission has expressed its willingness to review cases in which the UNE

pricing mechanism has failed, recognizing the possibility that the TELRIC pricing mechanism

could have a confiscatory effect.  In the *Local Competition First Report and Order*, the

Commission acknowledged that, even in promoting competitive entry, it would not establish a

pricing methodology that denies ILECs a reasonable opportunity to earn a lawful return on their

investment.[157]  The FCC recognized that, in some cases, TELRIC might produce inadequate

rates.  Therefore, the Commission indicated that "[i]ncumbent LECs may seek relief from the

Commission's pricing methodology if they provide specific information to show that the pricing

methodology, as applied to them, will result in confiscatory rates" and promised to revisit the

issue of confiscatory pricing, although it has not yet done so.[158]

---

[153] *See Iowa Utilities III.*

[154] 47 U.S.C. 152(b).

[155] *Iowa Utilities I* at 379.

[156] 47 U.S.C. §§ 252(e)(5), 251, 252.

[157] *Local Competition First Report and Order* at ¶¶ 682, 685.

[158] *Local Competition First Report and Order* at ¶ 739; *see also, id.* at ¶ 707 ("To the extent that any such
residual consists of costs of meeting universal service obligations, the recovery of such costs can and

DC_DOCS\470153.2[W2000]

Exhibit    3
Page  44  of  136

In its brief filed with the Supreme Court on June 8, 2001, the Commission reiterated the availability of a federal remedy for state-mandated rates that produced a confiscatory effect.[159] The Commission there indicated that ILECs may seek relief from the TELRIC pricing methodology if they provide specific information to show that the pricing methodology as applied to them will result in confiscatory rates. The Supreme Court in *Iowa Utilities III* cited the Commission's offer to consider a challenge to rates in advance of a rate order, resulting from the TELRIC methodology.[160] As demonstrated in this petition, ACS has suffered and will continue to suffer under the confiscatory rate scheme implemented by the RCA unless the Commission intervenes and establishes a proper methodology for setting appropriate UNE rates.

ACS requests that the Commission apply forward-looking UNE prices based on the forward-looking costs of ACS's current network. The RCA has refused to apply the FCC's rules on UNE pricing; these rules have now been upheld by the U.S. Supreme Court. The RCA's own faulty methodology has resulted in confiscatory rates. Therefore, ACS urges the Commission to apply the controlling law established by the Supreme Court and in the Commission's own rules in order to relieve ACS from being further subjected to these confiscatory rates.

With respect to ACS-Anchorage, section 252(e)(6) review in federal district court is not available because the RCA has not made a determination, as required under that

---

should be considered in our ongoing universal service proceeding. To the extent a significant residual exists within the interstate jurisdiction that does not fall within the ambit of section 254, we intend that to address that issue in our upcoming proceeding on access reform.").

[159] Brief for Respondent FCC at 28, *Verizon Communications, Inc. v. Federal Communications Commission*, 531 U.S. 1124 (2001) (Nos. 00-511, 00-555, 00-586, 00-590, 00-602).

[160] *Iowa Utilities III*, slip op. at n.39 ("The FCC, in other words, is willing to consider a challenge to TELRIC in advance of a rate order, but any challenger needs to go beyond general criticism of a method's tendency, and to show with 'specific information' that a confiscatory rate is bound to result.").

Exhibit ___3___

Page _45_ of _136_

provision.[161]  ACS is still, after over five years, waiting for a cost study to be conducted and permanent TELRIC-based rates to be established.  Although ACS-Fairbanks has brought an action in U.S. district court under section 252(e)(6) on the initial interconnection agreement, ACS does not have an avenue for redress for the confiscatory rates to which ACS currently is being subjected.  The RCA refuses to follow the Commission's rules and then asserts sovereign immunity from federal court review.  Because the RCA is unwilling to resolve these issues and state courts are explicitly excluded by the statute, ACS is left without a forum to review the confiscatory effect of the UNE rates currently in effect in Fairbanks and in Anchorage, unless the Commission asserts it authority under section 252(e)(5).  Therefore, Commission preemption of the state is the only effective remedy for ACS.  Due to the uniqueness of the situation in Alaska and the extreme hardship facing ACS, the Commission should step in where the RCA has failed to act to establish TELRIC-based UNE pricing.

### 3.    ACS's claim is ripe.

ACS's claim that these rates are confiscatory, unlike the takings claims addressed in *Iowa Utilities II* and *Iowa Utilities III*, are ripe for review by the Commission.  The Eighth Circuit declined to entertain claims that TELRIC effects a taking without just compensation in violation of the Fifth Amendment, reasoning simply that such claims as to the TELRIC *method* are not ripe because "it is not theory, but the impact of the rate order which counts" in a takings claim.[162]  The Supreme Court reiterated this general rule in *Iowa Utilities III*.[163]  In the case of ACS, however, the rates are already defined and have been implemented, and the uncompensated

---

[161] 47 U.S.C. §252(e)(6) states that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of Section 251 and this section."

[162] *Hope*, 320 U.S. at 602.

[163] *Iowa Utilities III*, slip op. at 54.

Exhibit ___3___
Page _46_ of _136_

taking is occurring.  As explained above, the RCA established the UNE rates in the

interconnection agreements based on a theoretical model that had no bearing on ACS's actual

network configuration or operation costs.  The RCA simply did not follow either the statute or

the FCC's rules, and the result is confiscatory rate-making.  Thus, ACS does not challenge

TELRIC itself under the Fifth Amendment, but rather the confiscatory *effect* of the rates actually

adopted by the RCA in Alaska.

C.    **The UNE rates set by the RCA are confiscatory and, therefore, effect an unconstitutional taking without just compensation.**

Essentially, the UNE rates in question do not aim to compensate ACS for any

measure of its actual costs.  In setting these rates, the RCA has not exercised "reasonable

judgment having its basis in a proper consideration of all relevant facts," as required by the U.S.

Constitution.[164]  Therefore, the effect of the UNE rates established by the RCA gives rise to a

regulatory taking without just compensation and, as explained above, the amounts lost may not

be recoverable under Alaska law.   The Tardiff Affidavit describes the large disparity between

the Synthesis Model inputs selected by the RCA and those proposed by ACS.[165]

Under the rates set by the RCA, there is no way that ACS's returns can be

"commensurate with returns on investment in other enterprises having corresponding risks."[166]

In Anchorage, ACS's return on investment is only 2.2%.  According to the Meade Affidavit, this

return is not high enough to cover ACS's cost of debt.[167]  Without a higher return, ACS will be

---

[164] *Minnesota Rate Cases*, 230 U.S. 352, 434 (1913).

[165] Tardiff Affidavit.

[166] *Hope Natural Gas Co.*, 320 U.S. at 603.

[167] Meade Affidavit at ¶ 10.

Exhibit  3
Page 47 of 136

unable to attract capital for investment, and will not be able to fund capital investment from earnings.[168]

The unreasonably low UNE rates set by the RCA disrupt investor expectations by creating a distorted market for UNEs. As discussed in section III.A.1 above, the Commission's rules reflect economic incentives that promote facilities-based entry into the market. Because the RCA's UNE rates are too low, market entrants will be biased towards UNE-based entry because of the windfall gains to these entrants. Therefore, ILECs and other facilities-based carriers will be harmed by this unfair competition. As a result, incentives for facilities-based carriers to upgrade their networks or offer advanced services to customers will be severely attenuated.

Finally, the RCA itself has declared that UNE rates that are as low as the UNE rates set in Fairbanks are unreasonable. As discussed above in Section II.B.2, the RCA indicated in its order terminating ACS's rural exemption in Fairbanks and Juneau, that GCI's proposed hypothetical UNE price of $27.30 for Fairbanks was unrealistically low.[169] Consequently, the RCA's order setting the UNE rate in Fairbanks at $19.19 is wholly inconsistent with its reasoning in terminating ACS's rural exemption in the first instance.

## V.    THE PUBLIC INTEREST WILL BE HARMED IF THE RCA'S UNE RATES CONTINUE TO APPLY.

The unreasonably low UNE rates paid by GCI will deny consumers the long-term benefits of having a competitor in the market. These low UNE loop rates have restricted ACS's capital spending and have retarded investment in LEC facilities for both basic and broadband

---

[168] *Id.*

[169] *Order Granting Reconsideration and Terminating Rural Exemption*, U-97-82 (11), U-97-143 (11), U-97-144 (11) (Reg. Comm. of Alaska, Oct. 11. 1999); Prefiled Direct Testimony of Robert A. Smith in Docket No. U-97-82 at 26 (April 27, 1999, as modified May 7, 1999).

Exhibit    3
Page  48  of  136

services.[170]  ACS will be unable to upgrade services or even maintain the quality of the existing

network.  In the long run, consumers will suffer from lower quality services.  Additionally,

because the improper rates do not encourage CLECs to build new facilities, there will be no

facilities alternatives to those of ACS.  For both these reasons, in addition to the confiscatory

effect of these UNE rates on ACS, the FCC should preempt RCA's UNE rate-making decisions.

**A.  The RCA's UNE prices cause immediate harm to all users of ACS's network.**

ACS's capacity to invest in these networks and maintain service is undermined

when they are not compensated for their costs.  ACS will not satisfy the purpose of the Act itself,

to "accelerate rapidly . . . deployment of advanced telecommunications and information

technologies and services" if it cannot recover costs necessary to sustain, much less increase,

investment in the network.

**B.  The RCA's UNE prices thwart the long-term federal policy of encouraging facilities-based competition.**

**1.    The Commission strongly supports facilities-based competition.**

In its *Local Competition First Report and Order,* the Commission emphasizes the

importance of facilities-based competition, indicating that TELRIC is designed to promote

facilities-based competition.[171]  Moreover, the Commission has repeatedly emphasized its

commitment to promoting facilities-based competition in recent orders.[172]  The Commission has

---

[170] Meade Affidavit at ¶ 14.

[171] *Local Competition First Report and Order* at ¶ 685.

[172] *See, e.g., Review of Commission Consideration of Applications Under the Cable Landing License Act,* Report and Order, 16 FCC Rcd 22165 (2001) (adopting streamlined procedures for processing applications for submarine cable landing licenses designed to facilitate the expansion of capacity and facilities-based competition; ¶ 1); *Multi-Association Group (MAG) Plan for Regulation of Interstate Services of Non-Price Cap Incumbent Local Exchange Carriers and Interexchange Carriers,* CC Docket No. 00-256, Second Report and Order and Further Notice of Proposed Rulemaking, FCC 01-304 (rel. Nov. 8, 2001) ("By rationalizing the rate structure for recovery of interstate-allocated loop costs, we are fostering competition for residential subscribers in rural areas by facilities-based carriers." ¶ 11);

48

Exhibit ___3___
Page _49_ of _136_

stated that it is committed to "ensuring that facilities-based competitors have the incentive and ability to invest in alternative infrastructure and innovative technologies, while at the same time, ensuring that incumbents retain similar incentives and capabilities."[173]

Additionally, ensuring that facilities based competitors have the incentive and the ability to invest in the goal of promoting facilities-based entry has been discussed frequently in recent statements by the commissioners.[174] Despite its efforts to promote facilities-based competition, the Commission has recognized that some competitors may have the ability but not the incentive to build their own facilities because of the availability of UNEs.[175] ACS urges the Commission to address the ill effects of such competition in order to protect the public interest.

---

*Application of Verizon Pennsylvania Inc., Verizon Long Distance, Verizon Enterprise Solutions, Verizon Global Networks Inc., and Verizon Select Services Inc. for Authorization To Provide In-Region, InterLATA Services in Pennsylvania*, CC Docket No. 01-138, Memorandum Opinion and Order, FCC 01-269 (rel. Sept. 19, 2001) (evaluating facilities-based competition in the market in Pennsylvania is part of the determination; ¶ 124)

[173] *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, Fourth Report and Order, 16 FCC Rcd 15435 ¶ 14 (2001).

[174] *See, e.g.*, Separate Statement of Commissioner Michael K. Powell, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers* (Dec. 12, 2001)("[The review of unbundling obligations] underscores the Commission's ongoing commitment to the promotion of facilities-based competition..."); Separate Statement of Commissioner Kevin J. Martin, *Performance Measurements and Standards for Unbundled Network Elements and Interconnection*, Notice of Proposed Rulemaking, FCC 01-331 (rel. Nov. 19, 2001)("... the promotion of facilities-based competition should be a fundamental priority of the Commission. The goal of the Telecommunications Act of 1996 was to establish an environment that promotes meaningful competition and allows for deregulation. To get to true deregulation, we need facilities-based competition ..."); Competition Policy Institute Forum: *Keeping Telecom Competition on Track*, Address by Commissioner Kathleen Q. Abernathy (Dec. 7, 2001)("The Commission is now engaged in an effort to restore the incentives for facilities-based investment that Congress intended. The same facilities-based competitive model that has driven the success of the wireless and long-distance marketplaces. This means a shift away from policies that actively encourage resale as a long-term business strategy and force the unbundling of virtually every network element at TELRIC rates.").

[175] *See Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Deployment of Wireline Services Offering Advanced Telecommunications Capability*, Notice of Proposed Rulemaking, FCC 01-361, ¶ 23 (rel. Dec. 20, 2001).

49

Exhibit    3

Page 50 of 136

### 2.    Economic studies support facilities-based competition.

Economic experts have noted that facilities-based competition provides greater public interest benefits than does allowing competitors to take advantage of regulatory-created opportunities.[176] "Facilities-based competition promises far greater benefits than does competition through unbundled access and should never be displaced by unbundling rules."[177] A carrier who faces competition from rivals with their own networks will have an incentive to cut its own costs and offer new services as a means of gaining market share. A policy allowing substitution of UNEs for facilities-based entry when facilities-based entry is a reasonable possibility creates "the risk of supplanting the substantial benefits of facilities-based entry with the comparatively anemic returns, and potentially high costs, of unbundled access."[178]

### 3.    The RCA's application of the Synthesis Model is detrimental to facilities-based competition.

Due to the manner by which the RCA has applied the TELRIC methodology, new facilities-based entrants are not likely to exist in the relevant markets in Alaska because it will be more profitable to use ACS's network and exploit the arbitrage opportunity that exists here. GCI's participation in the local exchange markets in question demonstrates the adverse affect that the below-market UNE rates have on facilities-based competition. GCI is affiliated with the only local cable television franchisee, and offers a broadband cable modem platform providing high-speed Internet as well as video programming over facilities wholly independent from those

---

[176] Kahn & Tardiff Declaration at ¶19; Shelanski Declaration at 2.

[177] Shelanski Declaration at 2.

[178] Shelanski Declaration at ¶16.

50

Exhibit ___3___
Page _51_ of _136_

of ACS.[179] For some time, it has claimed it has the capability to offer "cable telephony" over its broadband cable TV platform.[180] It apparently has not deployed this capability for the mass market, however. Rather, it provides telephony using its own switching and transport capability but with UNE loops purchased from ACS. ACS believes this is due to the below-cost UNE pricing ACS has been required to offer its competitors in these markets. As a result, ACS-Anchorage is losing hundreds of customers daily. Since unbundling their networks, the Rural Companies have been experiencing a similar trend. ACS urges the Commission to step in to resolve the UNE pricing issues and prevent continued harm to ACS and detriment to consumers in Alaska.

## VI.    REQUESTED RULING AND RELIEF

ACS requests immediate action by the Commission to prevent further irreparable harm under the RCA's UNE rates. First, ACS asks that the Commission declare that the RCA violated the Commission's rules and sections 251 and 252 of the Act and has failed to carry out its responsibility to arbitrate an interconnection agreement with valid UNE prices that conform to section 252(d)(1) and the *Local Competition First Report and Order*. Second, ACS asks that the Commission declare that the UNE rates established by the RCA are confiscatory in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution.

The Commission has authority under section 252(e)(5) of the Act to order the RCA to arbitrate the terms of interconnection under the proper standards by conducting a

---

[179] *See* General Communication, Inc. SEC Form 10-K for the fiscal year ended December 31, 2001 (SEC File No. 0-15279) at 31-32, available on-line at:
http://www.nasdaq.com/asp/quotes_news.asp?symbol=GNCMA%60&selected=GNCMA%60

[180] *Id.* at 25, 27. *See also* RCA Order U-01-11(2) (granting GCI request to use its cable facilities to provide CLEC services as an eligible telecommunications carrier within the meaning of Section 214(e) of the Act), available on-line at:
http://www.state.ak.us/rca/orders/2002/u01011_2.pdf

Exhibit    3
Page 52 of 136

forward-looking cost study and adopting cost-based UNE rates within 90 days. However, ACS urges the Commission instead to preempt the RCA immediately, and establish UNE rates based on ACS's forward-looking cost studies.

ACS-Anchorage has already endured an unreasonably long delay in the establishment of UNE rates complying with TELRIC. The RCA should not be able to simply ignore the Commission's mandates and escape review by then asserting sovereign immunity. The RCA is not likely to complete the arbitration of new UNE rates in Anchorage or the review of ACS's forward-looking costs, given the fact that it has not been able to accomplish this in two and a half years and given that, under current law, it will have to wind down its affairs beginning on July 1, 2003. Therefore, it will be unable to comply with any such mandates from the Commission. While futilely awaiting the RCA's compliance, ACS will continue to lose market share to GCI. ACS urges the Commission to grant it immediate relief due to the extraordinary circumstances in this case.

Specifically, the Commission should:

(i) preempt the RCA for failing to carry out its responsibilities under section 252 of the Act;

(ii) immediately establish compensatory UNE rates on an interim basis, based on the forward-looking UNE cost data proffered by ACS; and

(iii) conduct a thorough review of ACS's forward-looking costs to confirm the interim rates or establish new rates.

ACS is willing to have new rates adopted on an interim basis, subject to a "true up" between ACS and UNE-based CLECs of any difference in price between such rates and the final rates established by this Commission. The Commission previously approved the use of

52

DC_DOCS\470153.2[W2000]

Exhibit 3
Page 53 of 136

interim UNE rates, subject to a truing up between the interconnecting carriers, when it first adopted TELRIC.[181]  The Commission recognized that UNE rates should allow ILECs to recoup a reasonable return on investments.[182]  ACS has demonstrated that its current UNE rates are confiscatory.  Therefore, the Commission should promptly replace those rates with prices supported by ACS's cost study, subject to Commission ultimate review of ACS's costs and determination of TELRIC-based rates for Anchorage and Fairbanks.

---

[181] *Local Competition First Report and Order* at ¶ 1066 ("States must adopt "true-up" mechanisms to ensure that no carrier is disadvantaged by an interim rate that differs from the final rate established pursuant to arbitration.").

[182] *Local Competition First Report and Order* at ¶ 673 ("the price of a network element should include the forward-looking costs that can be attributed directly to the provision of services using that element, which includes  reasonable return on investment (i.e., "profit"), plus a reasonable share of the forward-looking joint and common costs.").

Exhibit    3
Page 54 of 136

## VII.    CONCLUSION

For the foregoing reasons, ACS urgently requests that the Commission issue an Order granting the above-requested relief.  In granting this petition, the Commission will ensure that UNE prices in Alaska are set in compliance with the Commission's TELRIC rules.

Respectfully submitted,

ACS OF ANCHORAGE, INC.
ACS OF FAIRBANKS, INC.

Leonard A. Steinberg
General Counsel
ALASKA COMMUNICATIONS SYSTEMS
510 L Street
Suite 500
Anchorage, AK 99510
(907) 297-3000

Karen Brinkmann
Elizabeth R. Park
LATHAM & WATKINS
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200

*Their Attorneys*

July 24, 2002

54

DC_DOCS\470153.2[W2000]

Exhibit 3
Page 55 of 136

## CERTIFICATE OF SERVICE

I, Richard W. Smith, hereby certify that a copy of the foregoing Emergency Petition for Declaratory Ruling and Other Relief of ACS of Anchorage, Inc. and ACS of Fairbanks, Inc., was delivered to each of the following parties by first-class mail, unless otherwise indicated, on July 24, 2002:

Michael K. Powell*
Chairman
Federal Communications Commission
445 Twelfth Street S.W.
Washington, D.C. 20554

Kathleen Q. Abernathy*
Commissioner
Federal Communications Commission
445 Twelfth Street S.W.
Washington, D.C. 20554

Michael J. Copps*
Commissioner
Federal Communications Commission
445 Twelfth Street S.W.
Washington, D.C. 20554

Kevin J. Martin*
Commissioner
Federal Communications Commission
445 Twelfth Street S.W.
Washington, D.C. 20554

William Maher*
Chief, Wireline Competition Bureau
Federal Communications Commission
445 Twelfth Street S.W.
Washington, D.C. 20554

Nanette Thompson
Chair
Regulatory Commission of Alaska
701 West 8th Ave., Suite 300
Anchorage, Alaska 99501

Joe D. Edge
Drinker Biddle & Reath, LLP
Counsel for General Communication , Inc.
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209


Richard W. Smith


* Hand delivery


55

DC_DOCS\470153.2[W2000]

Exhibit _____3_____
Page _56_ of _136_

A

Exhibit    3
Page 57 of 136

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, DC 20554

| | | |
|---|---|---|
| ACS of Anchorage, Inc. and | ) | |
| ACS of Fairbanks, Inc. | ) | |
| | ) | WC Docket No. 02-_____ |
| | ) | |
| Emergency Petition for Declaratory Ruling | ) | |
| And Other Relief Pursuant to Section 201(b) | ) | |
| And 252(e)(5) of the communications Act | ) | |

### Affidavit of Thomas R. Meade

Thomas R. Meade, being first duly sworn, deposes and states as follows:

1.      My name is Thomas R. Meade, and I am employed by Alaska Communications Systems as the Vice President of Revenue Requirements. I have held this position since June of 1999. My job responsibilities cover areas of traditional rate of return regulation, competitive pricing, and other financial and regulatory analysis. I supervise the development of revenue requirement and jurisdictional separations cost studies for access rates and local rates, and the development of costs for unbundled network elements. My responsibilities include review and approval of cost studies used to calculate universal service fund (USF) payments from the federal high- cost fund.

2.      I am familiar with revenue generated by the subscriber loop, and with the cost of providing the loop. Loop revenues include USF (including high-cost loop support ("HCLS"), Long Term Support ("LTS") and Interstate Common Line Support ("ICLS")), state and interstate access, unbundled network element ("UNE") prices, and retail rates. I am familiar with calculating loop costs using both forward-looking and embedded methodologies.

1

Exhibit    3
Page 58 of 136

3.      Under the interconnection agreement between General Communication, Inc.
("GCI") and ACS of Fairbanks, Inc. ("ACS-F") (imposed on the parties by the Regulatory
Commission of Alaska), GCI's monthly cost per loop was set at $19.19. (Interconnection and
Resale Agreement Between ACS of Fairbanks, Inc. and GCI Communication Corp., entered into
Sept. 3, 2000, at Part C – Attachment 1, Table 1 (publicly available from the RCA)) ACS of
Fairbanks' actual monthly cost per loop as calculated pursuant to 47 CFR § 36.621 is $33.51
(Exhibit I (Letter from Sue Barrett, Director, National Exchange Carrier Association to Kathy
Dale, Supervisor – Revenue Requirements, Alaska Communications Systems (October 26,
2001))).

4.      ACS of Anchorage's ("ACS-ANC") monthly cost per loop as calculated
pursuant to 47 C.F.R. § 36.621 is $18.59 (Exhibit I). This calculation is conservative, in that it
does not assign certain necessary operating costs to the loop, such as the cost of vehicles and
other support assets. Theoretically, these categories of expenses were included in the
computation of GCI's UNE loop cost. ACS is only allowed to charge GCI $14.92 per month per
UNE loop in Anchorage. (*Order Establishing Interim and Refundable Unbundled Network
Element Loop Rate and Affirming Oral Ruling*, U-96-89 (23) (Reg. Comm. of Alaska October
25, 2001) (available at http://www.state.ak.us/rca/orders/2001/u96089_23.pdf))

5.      Current Alaska intrastate access regulations allow a CLEC such as GCI to
recover the same intrastate access revenue per line as the incumbent local exchange carrier
("ILEC") from the interexchange carriers. In Fairbanks this is currently $7.66 per line per
month. (*ACS of Fairbanks, Inc., Intrastate Access Charge Tariff,* effective January 1, 2001
(publicly available from the RCA)). In Anchorage this is currently $4.34 per line per month

2

Exhibit   3
Page 59 of 136

(ATU Telecommunications Intrastate Access Charge Tariff, effective January 1, 1999 (publicly available from the RCA)).

6.          GCI's CLEC interstate access tariff (Tariff FCC No. 3, effective March 1, 2002) shows that GCI charges an End User Common Line Charge (EUCL or Subscriber Line Charge).  GCI refers to this on its web site as a charge "established by the FCC to recover a portion of the loop costs that is not recovered through basic local rates." (*See* http://www.gci.com/Taxes_Invoice.pdf.)  The GCI EUCL revenue opportunity from a residential customer in Fairbanks is now $6.00 per month per line. The EUCL revenue opportunity from a multi-line business customer in Fairbanks is currently $9.20 per month per line. (*See* Interstate Access Service (FCC Tariff No. 5, Section 17, pp. 4, 98 (available at http://www.neca.org/T5index.htm.))

7.          Section 54.307 of the Federal Communications Commission ("FCC") regulations (47 C.F.R. § 54.307(a)(1)) states: "A competitive eligible telecommunications carrier shall receive universal service support to the extent that the competitive eligible telecommunications carrier captures the subscriber lines of an incumbent local exchange carrier (LEC) or serves new subscriber lines in the incumbent LEC's service area.") This would allow a competitive eligible telecommunications carrier ("CETC") such as General Communication, Inc. ("GCI") to recover the same USF per line as ACS of Fairbanks, Inc. ("ACS-F") in Fairbanks. Current data shows that the average monthly loop support per line in Fairbanks will be about $9.40 in 2002.  This includes HCLS, $5.32, LTS, $1.89, and ICLS, $2.19.  (Report HC01, *available at http://www.universalservice.org/overview/filings/default.asp (listing high-cost support by study area); Exhibit II (Letter from Carol A. Brennan, Vice President Industry Relations – West, and Richard R. Snopkowski, Vice President Industry Relations – East,

Exhibit    3
Page 60 of 136

National Exchange Carrier Association (May 3, 2002) (setting forth total ICLS per year and number of access lines))).

8.        Under the current FCC and RCA regulations, the monthly revenue GCI may generate from the loop alone in Fairbanks is $26.26 per multi-line business line.  This does not include revenue generated by billing the subscriber for local telephone service, or by billing IXCs a per-minute carrier common line charge.   The monthly loop-specific revenue GCI may generate in Fairbanks per single line business and residential line is $23.06, not including revenue generated by billing the subscriber for local telephone service, or by billing IXCs a per-minute carrier common line charge.  In other words, as is demonstrated in Exhibit III, without charging anything for the loop in its local rates, and GCI can still earn a substantial margin, since GCI's loop cost is only $19.19.

9.        Under the current FCC and RCA regulations, the monthly revenue GCI may generate from the loop alone in Anchorage is $11.63 (Exhibit IV) per multi-line business line.  This does not include revenue generated by billing the subscriber for local telephone service, or by billing IXCs a per-minute carrier common line charge.   The monthly loop-specific revenue GCI may generate per single line business and residential line in Anchorage is $10.49 (Exhibit IV), not including revenue generated by billing the subscriber for local telephone service, or by billing IXCs a per-minute carrier common line charge.

10.       Exhibit V reflects figures from the Form M Annual Report to the RCA filed by ACS-ANC.  The Annual Report contains revenue, expense and investment data.  An analysis of this data indicates that ACS–ANC's return on investment is only 2.2%.  This return is not sufficient to cover ACS's cost of debt.  Without a higher return, ACS will be unable to attract capital for investment, nor will it be able to fund capital investment from earnings.

4

Exhibit     3
Page 61 of 136

11.    In Anchorage, ACS raised residential retail rates 24% ($2.35 per line, from $9.70 to $12.05).  GCI did not raise its rates.  Within 6 months, ACS lost over 15% of its remaining residential retail lines.  This demonstrates that a $2.35 cost advantage can materially distort the retail market.  In Fairbanks, GCI has a cost advantage in excess of $14.00 when purchasing UNE loops.  In Anchorage, GCI has a cost advantage of about $3.50 when purchasing UNE loops.  In both markets, the cost advantage was generated by regulation, rather than by generating operating efficiencies.

12.    It is unlikely that ACS of Anchorage will be able to increase its return  by raising prices unless ACS's competitor also increases prices by a comparable amount, since increased prices are likely to lead to additional losses of market share that will decrease rather than enhance return.  However, by setting a UNE rate artificially low and below ACS's costs, the RCA has created a cost advantage that allows competitors to always price below any rational price level set by ACS.

13.    With CLEC market penetration in Fairbanks comparable to the level experienced in Anchorage, it is likely ACS's  return in Fairbanks will also drop below a level needed to attract capital.  Moreover, given the even larger cost advantage provided to GCI by the RCA, the competitor has the choice of earning extraordinary margins or cutting its price to gain significant market share.

14.    The adjudication of a low UNE loop rate in Fairbanks, and refusal of the RCA to grant a compensatory UNE loop rate in Anchorage has restricted ACS's capital spending, and retarded investment in LEC facilities for both basic and broadband services.  *Exhibit VI reflects a recent analysis of capital investment for all four of ACS's local exchange companies showing a clear and steady downward trend.*

5

Exhibit___3____
Page _62_ of _136_

15.     Neither USF disaggregation nor UNE disaggregation will eliminate arbitrage problems in Fairbanks.  I have provided examples to explain why disaggregation does not resolve the issues I have raised in Exhibit VII.  The top half of Exhibit VII illustrates the results of a three-zone USF disaggregation plan assuming retention of the flat UNE rate of $19.19 per line per month.  In that case, GCI loses its cost advantage in Zone 1 (GCI would have a cost disadvantage of $1.81), but gains significant cost advantages of $11.32 and $59.10 in Zones 2 and 3 respectively.  The bottom half of Exhibit VII illustrates the results if the UNE rate, as well as the USF support, is disaggregated.  In that case, GCI would continue to have a cost advantage in all three zones of $7.43, $13.04, and $33.46 in Zones 1, 2 and 3 respectively.  Since GCI's rate is based on a UNE rate that is far less than ACS-F's actual cost in every zone, disaggregation simply shifts the arbitrage opportunities from one zone to another.  Disaggregation results in GCI's average cost advantage remaining the same.

DC_DOCS\470173.2[W2000]

Exhibit    3
Page 63 of 136

Further Affiant Sayeth Not.

Dated: ___7/23/02___                          _Thomas R. Meade_
                                              Thomas R. Meade

Subscribed and sworn to before me on this _23rd_ day of July, 2002.

                                              _Freddo J. Shook_
                                              Notary Public
                                              My Commission expires: _03/24/2004_

[Notary seal: Fredda J Shook — NOTARY — ★ — PUBLIC — State of Alaska]

7

Exhibit ___3___
Page _64_ of _136_

# EXHBIT I

## NECA LETTER STATING

## LOOP COST CALCULATION

## FOR ACS OF FAIRBANKS, INC. AND

## FOR ACS OF ANCHORAGE, INC.

Exhibit     3
Page 65 of 136



**NECA** NATIONAL EXCHANGE
CARRIER ASSOCIATION

80 South Jefferson Road
Whippany, NJ 07981

October 26, 2001

Kathy Dale
Supervisor -Revenue Requirements
Alaska Comm. Systems
600 Telephone Avenue - MS8
Anchorage, AK  99503-6091

**Subject:  2002 Universal Service Fund (USF) Payment Projections**

Dear Kathy Dale,

Enclosed is a report showing the 2002 Universal Service Fund (USF) payment projections for
your study area as filed with the FCC on October 1, 2001.  These amounts are taken directly
from the annual submission filed with the FCC.

The attached projections for 2002 were based on information that NECA had available at the
time of the filing.  We anticipate there may be changes due to pending FCC proceedings as well
as changes due to data updates.

The projections for hold harmless non-rural carriers are pre-phase down and do NOT include
phase down adjustments which do not affect rural carriers.  Non-rural companies will see
adjustments when the phase down is implemented by USAC.  When the phase down information
becomes available it may change the attached 2002 projection figures.

This information will be reported to your State Commission by USAC.  If you have any
questions, please contact your NECA Region Member Service Manager at (800) 223-8495.

Sincerely,

*Susan M Barrett*

Sue Barrett
Director

Attachment

Exhibit ___3___
Page _66_ of _136_

# UNIVERSAL SERVICE FUND

## 2002 HOLD HARMLESS SUPPORT PROJECTIONS

| Company Name | Study Area | NECA Region |
|---|---|---|
| ACS OF ANCHORAGE | 613000 | PACIFIC |

On October 1, 2001, NECA filed Universal Service Fund data with the Federal
Communications Commission. This included amounts reported to NECA by your
company as required by FCC rules, as well as calculated amounts for unseparated
revenue requirement, loop cost and projected support. NECA will also provide this data
to your state commission, as requested by the FCC.

| USF URR | USF LOOPS | SACPL |
|---|---|---|
| 40,922,863 | 183,484 | $223.03 |

The annual support shown below, which is scheduled to take effect January 1, 2002, is
the pre-phasedown amount based on a National Average Cost Per Loop of $272.63. This
amount may be adjusted throughout the year due to changes in data reported by your
company or reconciliation and Errors and Omissions. Support may be further adjusted to
maintain the fund within limits imposed by the fund cap of $936.9 million.

2002 ANNUAL SUPPORT
$0

Exhibit     3
Page 67 of 136

07/23/2002  12:23    9075641329                    ACS                              PAGE  04

# UNIVERSAL SERVICE FUND

## 2002 RURAL FUND SUPPORT PROJECTIONS

<u>Company Name</u>                 <u>Study Area</u>         <u>NECA Region</u>
ACS-FAIRBANKS, INC.              613008              PACIFIC

On October 1, 2001, NECA filed Universal Service Fund data with the Federal
Communications Commission. This included amounts reported to NECA by your
company as required by FCC rules, as well as calculated amounts for unseparated
revenue requirement, loop cost and projected support. NECA will also provide this data
to your state commission, as requested by the FCC.

<u>USF URR</u>            <u>USF LOOPS</u>          <u>SACPL</u>
17,215,794           42,811                $402.13

### 2002 PROJECTION BASED ON CURRENT RULES

The annual support shown below, which is scheduled to take effect January 1, 2002, is
based on a National Average Cost Per Loop of $259.27. This amount was calculated
using the current rules, which require the 2002 fund cap to be based on total payments in
2001, adjusted by the Rural Growth Factor.  It may be adjusted throughout the year due
to changes in data reported by your company for reconciliation, Errors and Omissions
and quarterly updates. Support may be further adjusted to maintain the fund within limits
imposed by the fund cap of $944.9 million as calculated under the current rules.

<u>2002 ANNUAL SUPPORT – CURRENT RULES</u>
$2,949,792

### 2002 PROJECTION BASED ON RECONSIDERATION PETITION

The annual support shown below is based on a National Average Cost Per Loop of
$249.39. This amount was calculated using the interpretation of the rules proposed by
NTCA in its Petition for Reconsideration filed with the FCC July 5, 2001, which would
require the 2002 fund cap to be based on the annualized payments for the second half
2001, adjusted by the Rural Growth Factor.  If the FCC agrees with the petition, your
payment may be adjusted throughout the year due to changes in data reported by your
company for reconciliation, Errors and Omissions and quarterly updates. Support may be
further adjusted to maintain the fund within limits imposed by the fund cap of $1,021.5
million as calculated under this proposed interpretation of the rules.

<u>2002 ANNUAL SUPPORT – RECONSIDERATION</u>
$3,329,410

Exhibit ___3___
Page _68_ of _136_