However, there are two practical problems that make the use of the FCC's expense ratios problematic. First, the FCC used aggregated data for local exchange carriers—none of them from Alaska—freely admitting that it wanted a national average for universal service purposes. Second, the FCC used *actual* price data, supplied by local exchange carriers to convert book costs to current costs. In contrast, it used nationwide estimates of input costs to calculate the value of current investment in the model. Thus, there is no guarantee that expense factors properly align with the equipment price inputs.[29]

---

[29] To illustrate the issue, suppose that a company spends $12 per year to maintain poles with an average book value of $300. If the current cost of a pole is $500, then the forward-looking expense factor would be 0.024 (12/500). However, if the input price for a pole used in a model were only $400, application of the factor would underestimate the required annual maintenance. In general, (1) a mismatch between current prices used to calculate forward-looking factors and the input prices used in a model invalidate the former and (2) changing input prices requires a parallel adjustment to corresponding expense factors.

16

Exhibit    3
Page 103 of 136

Further Affiant Sayeth Not.

Dated: _July 22, 2002_                    _Timothy J. Tardiff_
                                          Timothy J. Tardiff

Subscribed and sworn to before me on this _22_ day of July, 2002.

                    _[signature]_
                    Notary Public
                    My Commission expires: _Sept 24, 2004_

D

Exhibit   3
Page 105 of 136

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, DC  20554

| | |
|---|---|
| ACS of Anchorage, Inc. and | ) |
| ACS of Fairbanks, Inc. | ) |
| | ) |
| | ) |
| | ) |
| Emergency Petition for Declaratory Ruling | ) |
| And Other Relief Pursuant to Section 201(b) | ) |
| And 252(e)(5) of the communications Act | ) |

WC Docket No. 02-_____

### Affidavit of William J. Wilks

William J. Wilks, being first duly sworn, deposes and states as follows:

1.        My name is William J. Wilks.  My business address is 600 Telephone Avenue, Anchorage, Alaska 99503.  I am employed by Alaska Communications Systems Holdings, Inc., ("ACS") in the capacity of Manager of Economic Analysis.  My resume is attached as Exhibit WJW-1, which details my qualifications and experience.

2.        The purpose of my affidavit is two fold.  First I will describe the cost model prepared by ACS under my supervision ("ACS v 7.2") for use in Docket No. U-96-89[1] for setting UNE loop rates in Anchorage, Alaska.  ACS also filed an earlier version of its v 7.2 model ("ACS v 6.2") in the interconnection arbitration proceeding in Fairbanks and Juneau

---

[1]        In the Matter of the Petition by GCI COMMUNICATIONS CORP. d/b/a GENERAL COMMUNICATION, INC., and d/b/a GCI for Arbitration under Section 252 of the Telecommunications Act of 1996 with the MUNICIPALITY OF ANCHORAGE d/b/a ANCHORAGE TELEPHONE UTILITY a/k/a ATU TELECOMMUNICATIONS for the Purpose of Instituting Local Exchange Competition.

1

Exhibit    3
Page 106 of 136

(Dockets U-99-141, U-99-142 and U-99-143)[2] for purposes of setting company specific UNE loop rates. I will describe how ACS approached developing its UNE loop cost and why this approach is fully compliant with both the Telecommunications Act of 1996 ("the Act") and the Federal Communications Commissions ("FCC") regulations in determining the cost of this network element. Second, I will provide a brief background of the orders issued by the Regulatory Commission of Alaska (RCA) that, among other things, selected the Hybrid Cost Proxy Model ("HCPM") for use in setting UNE loop rates for ACS' properties located in Fairbanks ("ACS-FBX") and Juneau ("ACS-AK") in Dockets U-99-141 and U-99-142. I will also compare and contrast the cost inputs that were advocated by the parties to these proceedings and the basis for the costs that were ultimately used to set loop rates in these locations. I will show how the cost inputs to the HCPM model selected by the arbitrator and approved by the RCA are not representative of ACS' forward-looking costs but are rather the cost of some hypothetical carrier.

### Section 1 – ACS UNE Loop Cost Model (ACS v. 7.2)

3.      Under my supervision ACS developed, among other things, a UNE loop cost model (ACS v 7.2), to be used in ACS-Anchorage ("ACS-ANC") arbitration interconnection proceeding (Docket U-96-89). In developing ACS v 7.2, I instructed my staff to follow the FCC's regulations specific to utilization of a forward-looking TELRIC methodology. I have fully reviewed this model and attest that it is fully compliant with the FCC's regulations using a forward-looking TELRIC methodology. This model has been independently reviewed by outside consulting firms that have also independently filed an affidavit in the ACS-ANC proceeding

---

[2]      In the Matter of the Interconnection Agreement Between GENERAL COMMUNICATION, INC. AND PTI COMMUNICATIONS OF ALASKA, INC. TELEPHONE UTILITIES OF THE NORTHLAND, INC. AND TELEPHONE UTILITIES OF ALASKA, INC.

Exhibit _3_
Page _107_ of _136_

attesting that the ACS v 7.2 model is compliant with the FCC's regulations using a forward-looking TELRIC methodology[3].

4.    As will be explained in further detail herein, the ACS v 7.2 model fulfilled the burden of complying with the FCC's regulations pursuant to section 47 CFR Part 51. ACS v 7.2 is also compliant with the most recent opinion of the United States Supreme Court that, among other things, effectively overturned some, but not all of the Eight Circuit court of Appeals July 2000 decision in <u>Iowa II</u>. Specifically ACS v 7.2 comports with the FCC's hypothetical network standard pursuant to section 51.505(b)(1) which was rejected by the Eighth Circuit in <u>Iowa II,</u> but upon review by the U.S. Supreme Court was overturned, thereby keeping intact this section of the FCC's rules.

5.    The ACS v 7.2  UNE loop cost model is  based upon a total cost approach that requires that all costs associated with providing the network element are included in the incremental cost of the network element being provided.  Additionally, the cost development was also grounded upon the FCC's goal that forward-looking pricing rules "most closely represent the incremental costs incumbents actually expect to incur in making network elements available to new entrants."[4]  ACS' cost model and associated inputs are based upon ACS' forward-looking costs.  Furthermore, the cost inputs to ACS' cost model (cable and wire, digital loop carrier systems etc.) are based upon the forward-looking cost ACS will actually pay for these network components that make up the telephone network.  The prices ACS pays for material is often

---

[3]    The independent consulting firms used by ACS to validate ACS' cost development methodology were: Parrish Blessing and Associates, National Economic Research Associates, Inc. and Network Engineering Consultants, Inc.

[4]    FCC, Local Competition First Report and order, CC Docket No. 96-325, August 7, 1996, at paragraph 685; id. at 679 (this approach "should facilitate competition on a reasonable and efficient basis by all firms in the industry be establishing prices for interconnection and unbundled elements based on costs similar to those incurred by the incumbents ...").

Exhibit ___3___
Page _108_ of _136_

competitively bid, therefore, the cost inputs also reflect the prices that ACS can garner through volume purchase contracts with its vendors.

### Genesis of the Cost Model:

6.    ACS chose to develop its company specific forward-looking TELRIC compliant loop cost model for a number of reasons. First, the ACS v 7.2 model was developed because ACS could not rely upon the FCC synthesis model to produce UNE loop rates that reflect ACS' actual UNE loop costs. The FCC model has serious flaws and ACS brought these flaws to the RCA's attention in the form of sworn affidavits by ACS' consultants, Mr. Walter Haug and Dr. Timothy Tardiff. These affidavits are a matter of record in both the ACS-ANC arbitration proceeding (Docket U-96-89) and in the ACS-FBX and ACS-AK arbitration proceedings (Dockets U-99-141 and U-99-142). Second, the FCC has cautioned that the synthesis model may not be appropriate for setting UNE prices as the synthesis model's intended purpose was for universal service support.

7.    Federal guidance for costing methodologies in a UNE context were defined in the FCC orders and several rulings on the 'Implementation of Local Provisions of the Telecommunications Act of 1996.' It was interpreted by the Economic Analysis Department at ACS that those series of 'pricing rules' were intended to provide a software tool, in the form of a cost model, that would allow State Commissions to determine prices for competitors to interconnect to and use telecom utilities' facilities and equipment. The specific UNE Pricing rules ACS applied in the UNE Cost Model v 7.2 for Anchorage, was based upon a detailed review during 1999-2000, FCC regulations including title 47 CFR §51.511,[5] 47 CFR §51.509,[6]

---

[5]    47 C.F.R. § 51.511 defines "Forward-looking economic cost per unit – (a) The forward-looking economic sot per unit of an element equals the forward-looking economic cost of the element, as defined in sec.51.505, divided by a reasonable projection of the sum of the total number of units of the element that the incumbent LEC is likely to provide to requesting telecommunications carriers and the total number of

Exhibit      3
Page 109 of 136

47 CFR §51.507[7] and 47CFR §51.505(b)(1).[8]  Section 51.505(b)(1) is specifically implemented in ACS v 7.2 for Anchorage.

8.    Version 7.2 is specifically based upon a "hypothetical network design based upon a least-cost 'most-efficient network technology'" both in the investment calculation and recovery of costs through specific pricing rules, again, pursuant to 47 CFR §51.505(b)(1)).

### Costing Methodology, Model Inputs, Model Structure, Output Results:

9.    ACS followed the TELRIC principles of UNE Costing, as modified specifically in Part 51 of the Commission's rules, in researching and developing ACS v 7.2 Anchorage UNE Local Loop Forward-Looking Cost Model.  The specific methodology is described below.

10.    ACS followed these steps in carrying out the development of ACS v 7.2. *(a):* Identify the network assets attributable to a loop, based on the most efficient selection of both hypothetical feeder routes emanating from existing wire centers in the network today and the

---

units of the element that the incumbent LEC is likely to use in offering its own services. Sec.(b)(1) With respect to elements that an incumbent LEC offers on a flat-rate basis, the number of units is defined as the discrete number of elements (e.g., local loops or local switch ports) that the incumbent LEC uses or provides. Sec.(b)(2) With respect to elements that an incumbent LEC offers on a usage-sensitive basis, the number of units is defined as the unit of measurement of the usage (e.g., minutes of use or call-related database queries) of the element." Other text continues in the statute.

[6]    47 C.F.R. § 51.509 defines "Rate structure standards for specific elements –In addition to the general rules set forth in Sec.51.507, rates for specific elements shall comply with the following rate structure rules. (a) Local loops. Loop costs shall be recovered through flat-rated charges.  (b) Local switching.  Local switching costs shall be recovered through a combination of flat-rated charge for line ports and one or more flat-rated or per-minute usage charges for the switching matrix and for trunk ports." Other text continues in the statute.

[7]    47 C.F.R. § 51.507 defines the "General rate structure standard.  (a) Element rates shall be structured consistently with the manner in which the costs of providing the elements are incurred.(b) The costs of dedicated facilities shall be recovered through flat-rated charges.  (c)The costs of shared facilities shall be recovered in a manner that efficiently apportions costs among users.  Costs of shared facilities may be apportioned either through usage-sensitive charges or capacity-based flat-rated charges, if the state commission finds that such rates reasonable reflect the costs imposed by the various users. (d) Recurring costs shall be recovered through recurring charges, unless an incumbent LEC proves to a state commission that such recurring costs are de-minimis.  Recurring costs shall be considered de-minimis when the costs of administering the recurring charge would be excessive in relation to the amount of the recurring costs".

[8]    47 C.F.R. § 51.505(b)(1) defines the "Efficient network configuration.  The total element long-run incremental cost of an element should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers."

Exhibit ___3___

Page _110_ of _136_

most efficient technology available. *(b):* Identify the revenue producing lines/demand number of customers served by particular loop assets. *(c):* Divide the assigned loop plant to specific demand, so that terminating plant is distinguished from transiting plant. *(d):* Cost the assigned investment assets at forward-looking economic costs. *(e):* Apply annual charge factors ("ACFs") to the investment of Census Block Groups ("CBG") area loops, in order to calculate a forward-looking long-run incremental economic cost of a UNE Local Loop in Anchorage.

11.    Since Anchorage has several thousand loops, a sampling methodology of CBGs was used to select a random and representative sample of loops for the cost model. At the end of the process, a regression equation was used to interpolate and forecast both area wide and wirecenter specific UNE Local Loop Rates.

12.    In order to estimate the forward-looking customers served, the Engineering Staff consulted existing customer locations and demand within a particular CBG, then applied Bellcore System Practices Fill Factors to build the hypothetical plant to "ultimate" industry standards using the Bellcore 'Serving Area Concept' and the Bellcore 'Carrier Serving Area' standards.    The engineering network design standards mentioned above are documented in technical reference manuals, which ACS has filed with the RCA in Docket U-96-89 to provide support for the design of the ACS v 7.2 network.    These standards have been applied and modified to Anchorage over time.    The MARTENS database extract of loops in Anchorage represented revenue-producing lines by all classes of service.

13.    In order to calculate forward-looking costs, ACS gathered cost quotes for each component required to provision a *UNE loop element as determined by ACS' Outside Plant Engineers* using the design standards mentioned above.    For each of the components, ACS collected   cost quotes and provided all supporting work papers.    These cost quotes, which

Exhibit    3
Page /// of /36

collectively amount to 211 pages, were made a part of the record in the Anchorage UNE proceeding (Docket U-96-89). Next, ACS' purchasing department provided the unit cost of each component identified by the engineers to provision the UNE loop element. ACS' cost analysts then input this information into its ACS v 7.2 cost model, as will be further described below to determine the total investment of the UNE loop element. The above steps set the stage for ACS to be assured that its UNE loop model would produce forward-looking cost utilizing a "least-cost" most efficient network for the following reasons. First, the engineers designed an efficient network both in terms of routing of facilities and the materials necessary for the loop element. Second, the prices used for each component of the loop element were based on ACS' current and anticipated costs. ACS' cost for each of the components of the loop element were arrived at using the procurement policies set by ACS' purchasing department. These policies require that ACS competitively bid contracts with vendors that provide the necessary components of the loop element so that ACS garners the best prices possible given its geographic location and volume purchasing requirements. Therefore, the cost inputs in the ACS v 7.2 model represent ACS' current and anticipated cost as well as the best possible costs that can be responsibly achieved based on ACS' purchasing policies. Finally, ACS believes that the best indicator of its forward-looking cost was to base its input cost on its most current and anticipated costs.

14.    Once the Engineering Department had identified and had taken inventory of all loop assets for the CBGs, the ACS Economic Analysis Department entered all of the data into a Microsoft(c) Excel(C)™ collection of spreadsheets that comprise the "v 7.2 model."

15.    Economic Analysis calculated the allocation percentage of each section of the loop, based on the inventoried plant data. The costing approach, which was programmed into the spreadsheet, calculated investment on a per unit, per pair basis, times the discrete units

Exhibit    3
Page 112 of 136

inventoried, times the cost of items per unit, times the established allocation percentage to determine total investment per CBG. The data was then exported to and linked throughout the various spreadsheets in the model.

16.    Finally, the cost model spreadsheets produced the "A-Report.xls" file, a Microsoft(c) Excel(c)(TM) spreadsheet that details for each CBG sample of loops, the specific ACF and Overhead percentages that are applicable to that CBG to determine the final UNE loop rate. The ACFs reflect ACS' cost-of-capital, depreciation, inflation based on a composite producer-price-index applicable to telecom companies, maintenance "Expense to Investment Ratios," and applicable taxes.

17.    The result of the ACS v 7.2 Anchorage UNE Loop Rate, on a cumulative study-area basis is $ 24.59 per loop per month.

### Cost Input Comparison In The ACS-FBX and ACS-AK Proceeding

18.    This section of the affidavit compares and contrasts the contested cost inputs to the HCPM model that was selected in the interconnection arbitration proceeding between ACS (ACS-FBX & ACS-AK) and GCI in Docket No. U-99-141, U-99-142 and  U-99-143.[9] However, a brief background of the events leading up to the submission of each parties' recommendation of cost inputs is necessary to show that more than cost inputs were at issue in this proceeding.

19.    Initially, both ACS and GCI proposed different loop cost models in this proceeding. The RCA therefore ordered ACS and GCI to file briefs setting forth the method or model each party believed should be used to compute forward-looking cost figures for use in

---

[9]    In the Matter of the Interconnection Agreement Between GENERAL COMMUNICATIONS, INC. AND PTI COMMUNICATIONS OF ALASKA, INC. TELEPHONE UTILITIES OF THE NORTHLAND, INC AND TELEPHONE UTILITIES OF ALASKA, INC.

Exhibit 3
Page 113 of 136

developing rates. ACS proposed its own company specific loop cost model ACS v 6.2 as previously described herein.[10] GCI proposed that the Hatfield model, version HM 5.1, be used to compute forward-looking cost figures for use in developing rates in this arbitration. As part of its review the RCA hired a consultant to review the parties briefs and make a recommendation regarding an appropriate cost model to use in this arbitration proceeding. The Commission's consultant filed its report recommending that the Commission select the FCC's model to use to compute forward-looking cost figures. The consultant based its recommendation on a number of considerations. First, the consultant felt the FCC model, was familiar to both parties involved in the arbitration and their consultants and provided a neutral platform not subject to attack as being biased in favor of either party. In addition, the consultant felt that selection of the ACS model would place GCI at a "time and resource disadvantage" because GCI was not familiar with the ACS model while the FCC model, publicly available, had been tested and explained by the FCC. In no case did the RCA's consultant reject ACS' model on any economic principles or make any findings of fact that ACS' model is not TELRIC compliant and inconsistent with the FCC's rules on setting UNE rates.

20.    ACS' comments submitted in the record of the docket point out serious flaws in the FCC model for purposes of determining prices for unbundled network elements and further recommended ACS' company specific cost model be used in this proceeding. However, the Commission adopted the use of the FCC model on the recommendation of its consultants.

21.    During the arbitration proceeding ACS presented its company specific cost inputs for use in the FCC's model. The record will reflect that ACS supported each contested cost input

---

[10]    ACS' first company specific cost model for UNE loops was developed for the ACS-FBX and ACS-AK interconnection and arbitration proceeding and was titled ACS v 6.2. ACS subsequently modified its v 6.2 model to make minor adjustments to how depreciation and annual charge factors where applied to total investment. This model is now referred to as ACS v 7.2 and is virtually the same as v 6.2 other than so noted in this footnote.

Exhibit ___3___
Page _114_ of _136_

using ACS' actual or anticipated forward-looking costs that it expects to incur in providing the network element. The supporting documentation included current contracts for material and labor for each cost input. GCI, on the other hand, presented its proposed cost input pitches for the FCC model relying upon one of three methods. First, GCI simply accepted the FCC default values. Second, GCI claimed to have adjusted the FCC defaults for labor and material cost differences between Alaska and the lower 48 states. Third, GCI used *its* actual costs. However, of critical importance in evaluating GCI's methods is that not one of these methods reflect ACS' actual or anticipated forward-looking costs to provide the network element. In fact, the record shows that the cost inputs used by GCI are substantially lower than ACS' actual and anticipated forward-looking costs. Furthermore, the HCPM model used in this proceeding contain approximately 1,300 inputs of which 85% remained at the FCC default levels for purposes to what was used to set the UNE loop rate in ACS-FBX and ACS-AK. Table 1.0 below compares the loop rate using the arbiters recommended decisions, which accepted all but two of GCI's proposed pitches for the FCC model, compared to a loop rate using ACS' pitches. The result of this decision by the arbiter and the RCA's subsequent acceptance of that decision result in a significant difference in the UNE loop rate set in this proceeding compared to the loop rate had ACS' actual and anticipated costs prevailed.

22. In arriving at his decision upon which pitch to accept (ACS' or GCI's) the arbiter set a threshold for evaluating the cost pitches by both parties. The arbiter determined, "As arbitrator, I find that it is permissible to use company specific information. However, consistent with the FCC's mandated forward-looking economic cost methodology, before the FCC default inputs should be replaced by company specific values, it must be shown that the proposed specific company inputs is *reflective of an efficient, least cost company in a competitive*



Exhibit ___3___
Page _115_ of _136_

*marketplace.*"[11]  Since this was the threshold standard upon which costs inputs were to be evaluated by the arbiter, ACS' pitches for all but two inputs were not selected, in the opinion of the arbiter, because ACS failed to prove its cost inputs were reflective of an efficient, least cost company.  Beyond the obvious that this standard is impossible to prove or disprove, what is even more disturbing is that the RCA never adopted this standard in this proceeding.  The RCA simply indicated in its order that selected the HCPM model was that FCC cost defaults were to be used as the baseline and that ACS could adjust the defaults but bore the burden of proof that changes to the defaults were based on evidence of ACS' costs.  I believe that the record in this proceeding will show that ACS did present more than sufficient evidence of its company specific costs but that the threshold standard effectively eliminated any possibility that ACS' pitches, based upon its costs would meet this impossible standard.  Furthermore, the first time ACS was made aware that it would be held to this standard was in the very decision by the arbiter which was issued after all testimony had already been heard in this proceeding.  As a result, even if ACS could prove that its cost inputs met the arbiters standard, the proceeding was over and ACS' subsequent objections to the RCA on this critical issue was ignored.

    23.    I also believe that the arbiters decision, and the RCA acceptance of those decisions to select GCI' cost inputs over ACS' was flawed and runs contrary to the FCC' own position on TELRIC.  In its reply brief in the United States, *Verizon Communications, Inc. v. FCC*, the FCC stated, "The costs measured by TELRIC are nonetheless those of the incumbent itself.  Those costs are based, moreover, on actual prices of equipment that is commercially available today - equipment that carriers are already using to upgrade and expand their network".  In its first report and order in the local competition docket the FCC provides additional support

---

[11]    See Arbitration Decision on Model Inputs in Docket Nos. U-99-141, U-99-142 and U-99-143 page 13 lines 3 through 7 dated July 17, 2000 (emphasis added).

Exhibit ___3___
Page _116_ of _136_

to use the ILEC's cost in determining the price of the network element and not the cost of FCC defaults, or minor adjustments for freight to Alaska, or another carriers cost as was recommended by GCI and accepted by the RCA.

24.    Table 1 below illustrates the significant rate variance that results from using the cost inputs awarded in the ACS and GCI interconnection arbitration proceeding (Dockets U-99-141, U-99-142 and U-99-143). Both rates were generated using the FCC model. The first rate of $19.19 represents the rate awarded in the ACS-FBX interconnection agreement. The basis of this rate reflects, except for two cost inputs, GCI's proposed cost inputs to this model. The second rate of $35.96 reflects running the exact same FCC model used in the same arbitration proceeding but with ACS' costs. The variance in the rate, both in terms of absolute dollars and percent variance is staggering. The affidavit of Mr. Thomas Meade, filed by ACS concurrently with this affidavit, describes the economic harm ACS faces by these actions of the RCA that imposes this rate for ACS-FBX.

25.

| Table 1 Loop Rate Comparison | | | |
|---|---|---|---|
| Arbitrated Rate | All ACS Pitch Rate | Gross Difference | Variance |
| $19.19 | $35.96 | (16.77) | -87% |

26.    Finally, I have developed an additional table to reflect the cumulative affects that each cost input has on the UNE loop rate (Table 2 "Cumulative Cost Input Analysis"). The first rate in table 2 ($19.19) represents the monthly loop rate as determined using the cost inputs awarded in the arbitration proceeding. All subsequent rates below the arbitrated rate of $19.19 represent each of the contested cost or engineering inputs in the ACS-FBX proceeding and what the UNE loop rate would have been had ACS' forward-looking

Exhibit    3
Page 117 of 136

costs been awarded.  For example, had ACS' forward-looking common support costs been used in the HCPM model, the rate produced by the model would total $25.90 per loop per month (line 2 of table 2).  The loop rate results in table 2 (except for the arbitrated rate of $19.19) are represented on a cumulative basis.  In other words, the monthly UNE loop rate produced by the HCPM model would have been $26.15 (line 3 of table 2) had ACS been awarded its common support costs and its NID Costs.  Finally, had ACS been awarded all its company specific forward-looking costs the rate produced by the model would have been $35.96.

| Table 2 Cumulative Cost Input Analysis | Per Loop Cost Fairbanks |
|---|---|
| Arbitrated Model Results | $          19.19 |
| ...+ACS Common Support Costs | $          25.90 |
| ...+ACS NID Costs | $          26.15 |
| ...+ACS Weighted Avg. Cost of Capital | $          28.27 |
| ...+ACS Engineering Fill Factor | $          28.85 |
| ...+ACS Drop Terminal Cost | $          30.29 |
| ...+ACS Digital Loop Carrier Cost | $          32.00 |
| ...+ACS Distribution Plant Mix | $          32.27 |
| ...+ACS Copper Feeder Plant Mix | $          33.02 |
| ...+ACS Fiber Feeder Plant Mix | $          33.76 |
| ...+ACS Duct Cost | $          33.76 |
| ...+ACS SAI Cost | $          33.77 |
| ...+ACS Drop | $          35.19 |
| ...+ACS Miscellaneous Costs* | $          35.96 |
| All ACS Pitch | $          35.96 |

* Miscellaneous includes Switching, Manholes, and E/I Ratios.

Exhibit      3
Page  118 of 136

Further Affiant Sayeth Not.

William J. Wilks

Subscribed and Sworn to before me this 22nd day of July, 2002.

OFFICIAL SEAL
State of Alaska
LELA M. KISTNER
NOTARY PUBLIC

Notary Public for the State of Alaska
My Commission Expires : 8/4/02

DC_DOCS\468091.1

14

Exhibit 3
Page 119 of 136

E

Exhibit____3____
Page _120_ of _136_

UNE Local Loop Forward-Looking Cost Model

ACS v. 6.2

Summary Report and Annual Charge Factors for Fairbanks

Exhibit ___3___
Page 121 of 136

F-REPORT.XLS
7/23/2002

Fairbanks CBC's
Jun 2000



| Wtd Avg % | 1 Wk Avg | Forward-looking Off | DRE Loop Rate |
|---|---|---|---|
| 18.24% | 3.73 | 22.40% | $ 4.08 |
| 6.68% | 1.51 | 22.40% | $ 1.51 |
| 18.05% | 3.00 | 22.40% | $ 7.00 |
| 9.00% | 3.84 | 22.40% | $ 4.77 |
| 14.51% | 2.82 | 22.40% | $ 3.46 |
| 8.67% | 2.81 | 22.40% | $ 3.30 |
| 17.66% | 9.66 | 22.40% | $ 3.79 |
| 11.19% | 7.10 | 22.40% | $ 22.16 |
| 100.00% | | 22.40% | $ 44.32 |

36.21
Rate

| Fairbanks CBC's | Inactive | Aborted | Carrying Cost | Demand | Cost/ea | Cost breakdown |
|---|---|---|---|---|---|---|
| 2004 | $2,127,351.02 | $938,075.83 | $285,922.57 | 1,172 | $ 243.96 | $ 20.33 |
| 5001 | $1,456,353.72 | $296,055.95 | $100,212.11 | 440 | $ 227.75 | $ 18.98 |
| 6001 | $3,140,518.26 | $1,015,418.55 | $299,009.48 | 1,000 | $ 299.01 | $ 24.92 |
| 6003 | $1,128,011.49 | $944,289.69 | $279,045.55 | 362 | $ 770.84 | $ 64.24 |
| 7003 | $2,142,464.36 | $679,183.85 | $200,665.96 | 948 | $ 211.67 | $ 17.64 |
| 8004 | $2,114,081.30 | $1,120,641.85 | $300,220.64 | 571 | $ 525.95 | $ 43.66 |
| 10002 | $5,107,929.38 | $2,504,207.49 | $765,254.41 | 1,143 | $ 667.76 | $ 55.65 |
| 12005 | $2,618,243.17 | $2,005,218.58 | $548,537.59 | 751 | $ 728.47 | $ 60.71 |

Total Demand    6,591

Exhibit    3
Page 122 of 136

Exhibit 3

Page 123 of 136

Depr, WACC & TAX Factors
ATU
7/23/2002
file Acf_plic

| | | GrUpROR 18.47% | | | | DefTax: | FALSE | Capital Annual Charge Factors (RegDeprec/TaxDeprec) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Account | USOA Category | Economic Life | Net Salvage Percent | Adjusted Projection Life | Regulatory Deprec Method | IRS Deprec Category | SL/SL | ELG/ELG | Selected KACF |
| 2112 | Motor Vehicles | 8.00 | 15.00% | 9.41 | elg | 2 | 21.60% | 21.12% | 21.12% |
| 2115 | Garage Work Equipment | 12.00 | 3.00% | 12.37 | elg | 3 | 19.55% | 19.91% | 19.91% |
| 2116 | Other Work Equipment | 15.00 | 5.00% | 15.79 | elg | 2 | 18.34% | 19.07% | 19.07% |
| 2121 | Buildings | 35.00 | 5.00% | 36.84 | elg | 6 | 17.24% | 18.66% | 18.66% |
| 2122 | Furniture | 15.00 | 5.00% | 15.79 | elg | 3 | 18.34% | 17.81% | 17.81% |
| 2123.1 | Office Support Equipment | 15.00 | 10.00% | 16.67 | elg | 3 | 18.14% | 17.75% | 17.75% |
| 2123.2 | Company Comm Equipment | 7.40 | 2.52% | 7.59 | elg | 2 | 23.84% | 23.91% | 23.91% |
| 2124 | Computers | 6.00 | 15.00% | 7.06 | elg | 2 | 24.73% | 24.70% | 24.70% |
| 2212 | Digital Switching | 10.00 | 7.00% | 10.75 | elg | 2 | 20.50% | 20.42% | 20.42% |
| 2220 | Operator Systems | 9.41 | -0.41% | 9.37 | elg | 2 | 21.64% | 21.60% | 21.60% |
| 2232.2 | Digital Circuit Equipment | 12.00 | 15.00% | 14.12 | elg | 2 | 18.83% | 18.49% | 18.49% |
| 2351 | Public Telephone | 7.60 | 5.12% | 8.01 | elg | 2 | 23.21% | 23.18% | 23.18% |
| | NID, SAI and Drop | | | 19.00 | elg | | 17.75% | 17.38% | 17.38% |
| 2411 | Poles | 18.00 | -50.00% | 12.00 | elg | 5 | 19.74% | 19.45% | 19.45% |
| 2421-m | Aerial Cable - Metallic | 18.00 | -38.00% | 13.04 | elg | 5 | 19.24% | 19.11% | 19.11% |
| 2421-nm | Aerial Cable - Non-Metallic | 20.00 | -15.00% | 17.39 | elg | 5 | 18.00% | 17.80% | 17.80% |
| 2422-m | Underground - Metallic | 15.00 | -10.00% | 13.64 | elg | 5 | 19.00% | 18.73% | 18.73% |
| 2422-nm | Underground - Non-Metallic | 20.00 | -5.00% | 19.05 | elg | 5 | 17.74% | 17.37% | 17.37% |
| 2423-m | Buried - Metallic | 18.00 | -5.00% | 17.14 | elg | 5 | 18.05% | 17.85% | 17.85% |
| 2423-nm | Buried - Non-Metallic | 20.00 | -5.00% | 19.05 | elg | 5 | 17.74% | 17.85% | 17.85% |
| 2426-m | Intrabuilding - Metallic | 18.18 | -15.09% | 15.80 | elg | 5 | 17.74% | 17.53% | 17.53% |
| 2426-nm | Intrabuilding - Non-Metallic | 26.11 | -10.43% | 23.64 | elg | 5 | 18.34% | 20.57% | 20.57% |
| 2441 | Conduit Systems | 40.00 | -4.00% | 38.46 | elg | 5 | 17.26% | 17.16% | 17.16% |

Exhibit    3
Page 124 of 136

ACF by Account
file Acf_ptic

| File: | ACF_PTIC.xls | | | | | |
|---|---|---|---|---|---|---|
| Service Area: | ACS - North Pole | | | | | |
| | | | | | | |
| | | | | | | |
| | | a | b | | c | d | e |
| | | Cost of | Expense | | Total | Secndry | Total |
| Account | | Capital | PlantSpec | Nonspec | Cost | ACF | ACF |
| | | | | | | | |
| **Primary Accts** | | | | | | | |
| Switching | 2212 | 20.42% | 7.64% | 4.09% | 32.15% | 19.94% | 52.09% |
| Radio Systems | 2231 | 16.33% | 10.86% | 4.09% | 31.28% | 19.89% | 51.17% |
| Circuit Equip | 2232 | 18.49% | 10.66% | 4.09% | 33.24% | 20.01% | 53.25% |
| Aerial C&W Cpr | 2421C | 19.11% | 4.30% | 4.09% | 27.50% | 2.31% | 29.80% |
| Aerial C&W Fbr | 2421F | 17.80% | 4.30% | 4.09% | 26.19% | 2.30% | 28.49% |
| UG Cable Copper | 2422C | 18.73% | 7.82% | 4.09% | 30.64% | 2.33% | 32.97% |
| UG Cable Fiber | 2422F | 17.37% | 7.95% | 4.09% | 29.42% | 2.32% | 31.74% |
| Buried Cbl Copper | 2423C | 17.85% | 2.34% | 4.09% | 24.28% | 2.28% | 26.56% |
| Buried Cbl Fiber | 2423F | 17.53% | 19.21% | 4.09% | 40.83% | 2.42% | 43.25% |
| Poles | 2411 | 19.45% | 67.92% | 4.09% | 91.46% | 2.84% | 91.46% |
| Conduit | 2441 | 17.16% | 0.56% | 4.09% | 21.81% | 2.26% | 21.81% |
| | | | | | | | |
| | | | | | | | |
| **Secondary Accts** | | | | | | | |
| Land | 2111 | 0.00% | 7.99% | 4.09% | 12.08% | | 12.08% |
| Motor Vehicles | 2112 | 21.12% | 0.04% | 4.09% | 25.26% | | 25.26% |
| Specl Purp Veh | 2114 | 0.00% | 0.00% | 4.09% | 4.09% | | 4.09% |
| Garage Work | 2115 | 19.91% | 0.00% | 4.09% | 24.01% | | 24.01% |
| Other Work Equip | 2116 | 19.07% | 0.89% | 4.09% | 24.05% | | 24.05% |
| Buildings | 2121 | 18.66% | 6.57% | 4.09% | 29.32% | | 29.32% |
| Furniture | 2122 | 17.81% | 0.03% | 4.09% | 21.92% | | 21.92% |
| Gen Purp Comp | 2123 | 24.70% | 39.01% | 4.09% | 67.80% | | 67.80% |
| | | | | | | | |
| | | | | | | | |
| d | | Per Depr,WACC & TAX Factors Sheet | | | | | |
| e | | Per ExpFctrs Sheet | | | | | |
| f | | a+b | | | | | |
| g | | Per SecAcctFctrs Sheet | | | | | |
| h | | c+d | | | | | |
| | | | | | | | |
| Note: Radio=Ckt.Eq. | | | | | | | |
| *Reflects Iowa retirement curves (AUS data) for AK.* | | | | | | | |
| 1998 Capcost used based on 1998 Prop. Tax assumption | | | | | | | |

Exhibit    3
Page 125 of 136

ExpFctrs
file Acf_ptlc

**Development of ACF Expense Factors**
Based on HCPM (HAI Model v 5/FCC)
Plant Specific Expense Factors
Primary Accts

| Account | | Investment | Account | | Expense | Factor |
|---------|-----------|-----------|---------|-----------|---------|---------|
| 2212 | Dig Switching | 20,180,010 | 6212 | Dig Switching | 1,541,285 | 7.638% |
| 2231.2 | Other Radio | 159,836 | 6231 | Radio Systems | 140,981 | 10.860% |
| 2232 | Circuit Eq | 3,572,525 | 6232 | Circuit Eq | 380,880 | 10.661% |
| 2421C | Aerial Cable | 20,746,365 | 6421C | Aerial Cable | 891,422 | 4.297% |
| 2421F | Aerial Cable | 205,159 | 6421F | Aerial Cable | 9,004 | 4.389% |
| 2422C | UG Cab Copper | 4,488,571 | 6422C | UG Cable Copper | 350,788 | 7.815% |
| 2422F | UG Cable Fiber | 44,557 | 6422F | UG Cabl Fiber | 3,543 | 7.952% |
| 2423C | Bur Cabl Copper | 50,608,885 | 6423C | Bur Cabl Copper | 1,185,196 | 2.342% |
| 2423F | Bur Cabl Fiber | 62,308 | 6423F | Bur Cabl Fiber | 11,972 | 19.214% |
| 2424 | Sub Cable | 0 | 6424 | Sub Cable | 0 | 0.000% |
| 2431 | Aerial Wire | 3,221 | 6431 | Aerial Wire | 0 | 0.000% |
| 2411 | Poles | 504,318 | 6411 | Poles | 342520 | 67.917% |
| 2441 | Conduit | 8,112,791 | 6441 | Conduit | 45,538 | 0.561% |

SubTotal (1) Study Plant in Service    108,688,546

Secondary Accts

| Account | | Investment | Account | | Expense | Factor |
|---------|-----------|-----------|---------|-----------|---------|---------|
| 2111 | Land | 59,464 | 6121L | Land Exp | 4,753 | 7.993% |
| 2112 | Motor Veh | 3,855,720 | 6112 | Motor Veh | 1,628 | 0.042% |
| 2113 | Aircraft | 0 | 6113 | Aircraft | 21,557 | 0.000% |
| 2114 | Specl Pur Veh | 369,351 | 6114 | Specl Pur Veh | 0 | 0.000% |
| 2115 | Garage Equip | 0 | 6115 | Garage Equip | 0 | 0.000% |
| 2116 | Oth Wrk Equip | 454,631 | 6116 | Oth Wrk Equip | 4,050 | 0.891% |
| 2121 | Buildings | 11,992,122 | 6121B | Bldg Exp | 787,405 | 6.566% |
| 2122 | Furniture | 2,754,431 | 6122 | Furniture | 700 | 0.025% |
| 2124 | Gen Purp Comp | 1,238,385 | 6124 | Gen Purp Comp | 483,064 | 39.008% |

SubTotal (2) Study Plant in Service    20,724,104

Plant Nonspecific Expense Factor                Common Overhead (Indirect) Factor

| Account | | Expense | Account | | Expense |
|---------|-----------|-----------|---------|-----------|---------|
| 6123 | Office Equip | 539,718 | 6710 | Executive | 446,586 |
| 6512 | Provisioning | 21,950 | 6721 | Acc&Finance | 666,477 |
| 6531 | Power | 199,752 | 6722 | Ext Relations | 207,842 |
| 6532 | Network Admin | 1,397,598 | 6723 | Human Resources | 591,491 |
| 6533 | Testing | 265,746 | 6724 | Information Manag. | 1,007,878 |
| 6534 | Plnt Operations | 737,678 | 6725 | Legal | 211,981 |
| 6535 | Engineering | 1,283,237 | 6727 | Research & Dev | 0 |
| | | | 6726 | Procurement | 405,803 |
| | | | 6728 | Other G&A | 1,044,887 |
| Total Exp | | 4,445,679 | Total Exp | | 4,582,945 |
| Prim Plant | | 108,688,546 | Tot Opr Exp | | 25,040,166 |
| Factor | | 4.09% | Net Opr Exp | | 20,457,221 |
| | | | Factor | | 22.40% O/H factor |

Exhibit 3
Page 126 of 136

ExpFctrs
file Acf_ptic

## Labor Factors
Use HCPM factors

| Account | | Expense |
|---------|---|---------|
| 6723 | Human Resources | 591,491 |

## Common & Power Factor

| | |
|---|---|
| Common | 0 |
| Power | 0 |
| COE | 0 |
| Com&Power | 0 |
| COE-C&P | 0 |
| C&P Factor | 0.0517 |

## Materials & Supplies Factor

| 1220 | Inventories | 914,231 |
|------|-------------|---------|
| | Prim Plant | 108,688,546 |
| | M&S Factor | 0.0084 |

## Telco Eng & Labor Factors (wp10)

| | Excl Vendor | Incl Vendor |
|---|------------|-------------|
| OSP | 0.2616 | 5.0259 |
| COE | 0.0178 | 0.0835 |
| CKT | 0.0454 | 0.1779 |

## Customer Service Factors

| Account | | Expense Retail | Whls Avoided** | Wholesale |
|---------|---|--------|----------------|-----------|
| 6611 | Product Mgmnt | 675,518 | 57.68% | 285,900 |
| 6612 | Sales | 7,300 | 99.35% | 48 |
| 6613 | Prod Advert | 53,785 | 0.04% | 53,762 |
| 6621 | Call Completion | 949 | 0.00% | 949 |
| 6622 | Number Serv | 469,488 | 12.17% | 412,328 |
| 6623 | Customer Services | 2,353,264 | 74.98% | 588,784 |
| 5300 | Uncollectibles | 84,873 | 12.83% | 73,985 |
| Total | | 3,645,177 | | 1,415,756 |

### Factors                    (wp 9)

| | | |
|---|---|---|
| Customers | N/A | N/A |
| Lines | N/A | n/a |
| Prim Plant | | 108,688,546 |

| | |
|---|---|
| Cost/Customer | n/a |
| Cost/Line | n/a |

** Per Avoided Cost Model

### Sales Tax (wp3)

| | |
|---|---|
| Alaska | 0.0500 |

Exhibit ___3___
Page _127_ of _136_

SecAcctFdrs
file Acl_plc

## Secondary Plant

| Primary Acct | Prim Plant | Land | Motor Vehicles | Spcl Purp Vehicles | Garage Equip | Other Wk Equip | Buildings | Furniture | Gen Purp Cmptrs |
|---|---|---|---|---|---|---|---|---|---|
| | | 59,464 | 3,855,720 | 369,351 | 0 | 454,631 | 11,992,122 | 2,754,431 | 1,238,385 |
| Switching | 20,180,010 | | | | | | 20,180,010 | 20,180,010 | 20,180,010 |
| Radio Systems | 159,836 | | | | | | 159,836 | 159,836 | 159,836 |
| Circuit Equip | 3,572,525 | | | | | | 3,572,525 | 3,572,525 | 3,572,525 |
| Aerial C&W Cpr | 20,746,365 | | 20,746,365 | 20,746,365 | 20,746,365 | 20,746,365 | | | 20,746,365 |
| Aerial C&W Fib | 205,159 | | 205,159 | 205,159 | 205,159 | 205,159 | | | 205,159 |
| UG Cable Copper | 4,488,571 | | 4,488,571 | 4,488,571 | 4,488,571 | 4,488,571 | | | 4,488,571 |
| UG Cable Fiber | 44,557 | | 44,557 | 44,557 | 44,557 | 44,557 | | | 44,557 |
| Buried Cbl Copper | 50,608,885 | | 50,608,885 | 50,608,885 | 50,608,885 | 50,608,885 | | | 50,608,885 |
| Buried Cbl Fiber | 62,308 | | 62,308 | 62,308 | 62,308 | 62,308 | | | 62,308 |
| Poles | 504,318 | | 504,318 | 504,318 | 504,318 | 504,318 | | | 504,318 |
| Conduit | 8,112,791 | | 8,095,447 | 8,095,447 | 8,095,447 | 8,095,447 | | | 8,095,447 |
| Total Eff Plant | 108,685,325 | | 84,755,610 | 84,755,610 | 84,755,610 | 84,755,610 | 23,912,371 | 23,912,371 | 108,667,981 |

| | Land | Motor Vehicles | Spcl Purp Vehicles | Garage Equip | Other Wk Equip | Buildings | Furniture | Gen Purp Cmptrs |
|---|---|---|---|---|---|---|---|---|
| Sec/Prim Plant Ratio | 0.0547% | 4.5492% | 0.4356% | 0.0000% | 0.5384% | 50.1503% | 11.5189% | 1.1396% |
| Secondary ACF | 12.08% | 25.26% | 4.09% | 24.0% | 24.05% | 29.32% | 21.92% | 67.80% |
| Sec ACF Ratio | 0.01% | 1.15% | 0.02% | 0.00% | 0.13% | 14.70% | 2.53% | 0.77% |

Sec ACF (per account):
Switching 18.01%, Radio Systems 18.01%, Circuit Equip 18.01%, Aerial C&W Cop 2.08%, Aerial C&W Fib 2.08%, UG Cable Copper 2.08%, UG Cable Fiber 2.08%, Buried Cbl Copper 2.08%, Buried Cbl Fiber 2.08%, Poles 2.08%, Conduit 2.08%

| | a | b | c | d=(b+c)*a | e | f | d+e |
|---|---|---|---|---|---|---|---|
| Primary Acct | Prim ACF | M&S Load | C&P Load | Load ACF | Sec ACF | Sec ACF | Total Sec ACF |
| Switching | 32.15% | 0.84% | | 1.93% | | 18.01% | 19.94% |
| Radio Systems | 31.28% | 0.84% | 5.17% | 1.88% | | 18.01% | 19.89% |
| Circuit Equip | 33.24% | 0.84% | 5.17% | 2.02% | | 18.01% | 20.01% |
| Aerial C&W Cop | 27.50% | 0.84% | 5.17% | 2.00% | | 2.08% | 2.31% |
| Aerial C&W Fib | 26.19% | 0.84% | | 0.22% | | 2.08% | 2.30% |
| UG Cable Copper | 30.64% | 0.84% | | 0.26% | | 2.08% | 2.33% |
| UG Cable Fiber | 29.42% | 0.84% | | 0.25% | | 2.08% | 2.32% |
| Buried Cbl Copper | 24.26% | 0.84% | | 0.20% | | 2.08% | 2.28% |
| Buried Cbl Fiber | 40.83% | 0.84% | | 0.34% | | 2.08% | 2.42% |
| Poles | 91.46% | 0.84% | | 0.77% | | 2.08% | 2.84% |
| Conduit | 21.81% | 0.84% | | 0.18% | | 2.08% | 2.26% |

a, e   Per ACF by Account Sheet
b, c   Per ExpFdrs Sheet

7/23/2002
Page 1 of 1

Exhibit 3
Page 128 of 136

CSRS/Combined
ATU
7/25/2002
Ron Gamble

7/25/2002
Page 1 of 4

Exhibit 3
Page 129 of 136

CSSCurves
ATU
7/23/2002

Page 2 of 4

7/23/2002
Page 2 of 4

Exhibit 3
Page 130 of 136

Exhibit 3
Page 131 of 136

7/23/2002
Page 4 of 4

Exhibit    3
Page 132 of 136

KCCFactor
7/12/2002

| Account | 2113 | 2115 | 2116 | 2121 | 2122 | 2123 | 2131 | 2124 | 2212 | 2220 | 2231 | 2351 | 2411 | 2421 | 2421-cm | 2422 | 2422-cm | 2423-cm | 2426 | 2426-cm | 2441 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Exhibit 3
Page 133 of 136

KCCFactor
ATU
7/30/2002
fee Act_etc

Reg ELiG / IRS ELiG
KCCFact
NPV-BaP
NPV-BaP
Pmt-EaP
Pmt-BaP

Yrne

Exhibit 3
Page 134 of 136



Exhibit _____3_____
Page _135_ of _136_

InputsPlant
file Acf_ptic

| Plant Inputs | | Plant Account Values | | | | | | | Adjusted |
|---|---|---|---|---|---|---|---|---|---|
| Account | | Beg. of Year | End of Year | Average | Adjustments | GSF | Allocator | Current | Values |
| 1220 | Inventories | 914,231 | 914,231 | 914,231 | | | | | 914,231 |
| 2001 | Current Value TPIS | 129,412,650 | 129,412,650 | 129,412,650 | | | | | 129,412,650 |

7/23/2002
Page 1 of 1

Exhibit _3_
Page _136_ of _136_