Martin M. Weinstein
GCI Communication Corp.
2550 Denali Street, Suite 1000
Anchorage, AK 99503
Telephone:  (907) 868-6561

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |  |
|---|---|---|
| GCI COMMUNICATION CORP., d/b/a GENERAL COMMUNICATION, INC. d/b/aGCI, | ) ) ) ) | |
| Petitioner, | ) ) | Case No.: A05-003 CV |
| v. | ) ) | |
| KATE GIARD, in her official capacity as Chairwoman of the Regulatory Commission of Alaska; *et al.*, | ) ) ) ) | |
| Respondents. | ) ) ) | |

## GCI'S  OPPOSITION BRIEF

Respectfully submitted this 5th day of June, 2006.

GCI COMMUNICATION CORP. d/b/a
GENERAL COMMUNICATION, INC. d/b/a GCI

/s Martin M. Weinstein
Regulatory Attorney
Alaska Bar No.  9306051
General Communications, Inc.
2250 Denali Street, Suite 1000
Anchorage, Alaska 99503
Phone:  907-868-6561
Email:  mweinstein@gci.com

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES ........................................................................... iii

FEDERAL STATUTES ................................................................................. iv

INTRODUCTION ............................................................................................ 1

BACKGROUND RE: TELECOMMUNICATIONS ACT OF 1996 .................... 2

THE ANCHORAGE ARBITRATION .............................................................. 2

- *THE INITIAL ARBITRATION IN 1996* ................................................. 2

- *THE IOWA UTILITIES I DECISION* ................................................... 4

- *ACS' ACQUISITION OF ATU AND ITS REQUEST TO ESTABLISH A FORWARD LOOKING COST METHODOLOGY TO REVISE THE LOOP RATE* ..... 5

- *ACS' FIRST MOTION FOR AN INTERIM RATE INCREASE* ............... 10

- *THE PROCESS TO REVISE THE ANCHORAGE AGREEMENT DRAGS ON AND THE SUPREME COURT ULTIMATELY CLARIFIES THE RULES* .............. 13

- *ACS FILES AN EMERGENCY PETITION WITH THE FCC TO PREEMPT THE RCA AND THE RCA ACCEDES TO ACS' DEMAND TO USE ITS MODEL* ... 15

- *ACS FILES A SECOND MOTION REQUESTING AN INCREASE IN THE INTERIM LOOP RATE* ......................................................................... 18

- *THE ARBITRATION CONTINUES UNTIL THE RCA ADOPTS AN ENTIRELY NEW HEARING PROCEDURE TO COMPLETE THE PROCEEDING* ................... 20

STANDARDS OF REVIEW ........................................................................... 22

ARGUMENT ................................................................................................. 22

I.    ACS' CLAIM THAT THE RCA FAILED TO ISSUE A TIMELY DECISION IS IMPROPER AND OTHERWISE LACKS MERIT .......................................... 22

      A.    THE COURT DOES NOT HAVE JURISDICTION TO HEAR ACS' CLAIM THAT THE RCA FAILED TO ISSUE A TIMELY DECISION ........................... 23

      B.    ACS IS BARRED BY PRINCIPLES OF *RES JUDICATA* FROM RELITIGATING ITS TIMELINESS COMPLAINT ................................. 25

*1.     The FCC Acted In A Judicial Capacity When It Reviewed ACS' Petition* ............27

*2.     The Issues Presented To The District Court Were Actually Litigated Before The FCC* ............................................................................................................28

*3.     The FCC's Resolution Of The Issues Was Necessary To Its Decision* ..................29

*4.     Res Judicata Applies and ACS Is Barred From Re-litigating Its Claim That The RCA Failed To Act In A Timely Manner* ........................................................29

**C.     THE STATUTORY TIMELINE IN § 252 DID NOT APPLY IN ANY EVENT TO ACS' REQUEST TO REVISE THE LOOP RATE** ............................................29

**D.     ACS IS RESPONSIBLE FOR THE DELAYS IN THE ARBITRATION** ............31

**II.     THE RCA'S INTERIM RATE DECISIONS WERE REASONABLE AND BASED ON THE BEST AVAILABLE INFORMATION** ...............................................35

**A.     THE INITIAL ARBITRATION AWARD IN 1996 WAS REASONABLE** ............35

**B.     THE RCA'S DECISION IN OCTOBER 2001 TO INCREASE THE LOOP RATE TO $14.92 ON AN INTERIM BASIS WAS REASONABLE** ......................37

*1.     The RCA's $14.92 Rate Decision Is Supported By Substantial Evidence* ..............38

*2.     The Final Loop Rate Does Not Prove That The Interim Rate Was Improper* .......42

*3.     There Is No Requirement That The RCA Adopt A True-Up Provision In Addition To An Interim Rate Increase* ....................................................................43

**C.     THE RCA'S DECISION IN APRIL 2003 TO DENY BOTH ACS' AND GCI'S MOTIONS TO CHANGE THE INTERIM RATE WAS REASONABLE** ............44

**D.     THERE IS NO BASIS TO SUPPORT ACS' CLAIM THAT GCI UNDERPAID ACS BY $11 MILLION** ........................................................................47

**CONCLUSION** ............................................................................................................**48**

**APPENDIX** ....................................................................................................................

# TABLE OF AUTHORITIES

## CASES

*AT&T Corp. v. Iowa Utils. Bd.*, 522 U.S. 1089 (1998) ........................................................ 5

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999) ("*Iowa Utilities I*") ......................... 5

*California Ass'n of the Physically Handicapped, Inc. v. FCC*, 833 F.2d 1333, 1334
    (9th Cir. 1987) .............................................................................................................. 26

*Exxon Corp. v. Fischer*, 807 F.2d 842, 845-46 (9th Cir. 1987) ......................................... 27

*Iowa Utils. Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996), *motion to vacate stay denied*
    519 U.S. 978 (1996) ....................................................................................................... 3

*Iowa Utils. Bd. vs. FCC*, 120 F.3d 753 (8th Cir. 1997) ...................................................... 5

*Iowa Utils. Bd. v. FCC*, 219 F.3d 744 (8th Cir. 2000) ("*Iowa Utilities II*") .............. passim

*Pacific Bell vs. Pac. West. Telecommunications, Inc.*, 325 F.3d 1114, 1125
    (9th Cir. 2003) .............................................................................................................. 24

*See West Coast Truck Lines,* 893 F.2d at 234-35 ............................................................. 29

*U.S. West Communications, Inc. vs. Hamilton*, 224 F.3d 1049, 1054-055
    (9th Cir. 2000) .............................................................................................................. 24

*U.S. West Communications, Inc. vs. Jennings*, 304 F.3d 950, 959 (9th Cir. 2002) .......... 42

*Verizon Communications, Inc. vs. FCC*, 535 U.S. 467, 122 S.Ct. 1646, 1666-79
    (2002) .......................................................................................................................... 14

*West Coast Truck Lines*, 893 F.2d at 234 *quoting United States  v. Utah Constr.
    & Mining Co.*, 384 U.S. 394, 422 (1966) .................................................................... 27

*West Coast Truck Lines, Inc. vs. American Industries, Inc.*, 893 F.2d 229, 234
    (9th Cir. 1990) .............................................................................................................. 26

# FEDERAL STATUTES

§ 252 ...................................................................................................... passim

§ 252(a) and (b) ............................................................................................ 30

§ 252(b)(1) .................................................................................................... 30

§ 252(b)........................................................................................................ 29, 30

§ 252(b)(1) .................................................................................................... 30

§ 252(b)(2) .................................................................................................... 30

§ 252(b)(4)(C) ............................................................................................... 23

§ 252(e)(5) .......................................................................................... 24, 25, 28

§ 252(e)(5). ................................................................................................... 29

§ 252,  § 252(e)(6) ........................................................................................ 25

28 U.S.C. § 2342(1) and § 2344 .................................................................... 26

47 C.F.R. § 51.505........................................................................................... 3

47 U.S.C. § 252(b)(4)(B) ........................................................................... 4, 43

47 U.S.C. § 252(b)(4)(B). ............................................................................. 37

47 U.S.C. § 252(d)(1)(A)(i). ......................................................................... 37

47 U.S.C. § 252(e)(5) and (6) .................................................................... 1, 24

47 U.S.C. § 252(e)(6) ................................................................................... 25

U.S.C. § 2342(1).......................................................................................... 24

# ADMINISTRATIVE RULINGS

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 FCC Rcd 15499 (1996) (*"Local Competition Order"*).................................................................. 3,5,24

*Order Granting the Federal Communications Commission's Motion For A
    Partial Stay of Mandate*, Docket No. 96-3321 (8th Cir. Sept. 22, 2000) ........................ 7

## LEGISLATIVE MATERIALS

*Pub. L. No. 104-104, 110 Stat. 56 (1996) (the "1996 Act")* ............................................... 2

## INTRODUCTION

GCI Communication Corp. d/b/a General Communication, Inc. and GCI ("GCI") herein files its Opposition to ACS of Anchorage's ("ACS") Cross-Petition Brief Re: Delay And Interim Rate Issues. In its Cross-Petition, ACS argues that the Regulatory Commission of Alaska ("RCA") failed to determine a final loop rate within a reasonable time and otherwise provide meaningful interim relief. ACS is wrong on both counts. With respect to ACS' claim that the RCA failed to act in a timely manner, this Court does not have jurisdiction to hear this challenge. ACS' exclusive remedy under 47 U.S.C. §252(e)(5) and (6) to complain about the timeliness of the RCA's actions lies with the FCC—a remedy that ACS exercised but to no avail. ACS filed a petition with the FCC regarding the RCA's conduct of the Anchorage arbitration, but the FCC rejected ACS' claim that the RCA's conduct of the arbitration case was untimely—a fact that ACS nowhere mentions in its brief. ACS did not appeal the FCC's determination and is therefore barred from re-litigating the issue under *res judicata* before this Court. Even if the Court were to determine that it had jurisdiction to hear ACS' claim and also determine that ACS is not otherwise barred, ACS totally ignores its own culpability for the slow progress in the arbitration. Most of the delays about which ACS complains were caused by ACS, not the RCA or GCI.

With respect to ACS' claim that the RCA failed to provide meaningful interim relief, this claim is based on a superficial and cursory review of the evidence. A closer and more comprehensive review of the record evidence on these issues demonstrates that the RCA's interim rate decisions were reasonable and supported by the best available

information in the record as the record existed at the time the RCA made its decisions. ACS is not entitled to any relief with respect to its misgivings regarding the RCA's interim rate determinations.

## BACKGROUND RE: TELECOMMUNICATIONS ACT OF 1996

In its Opening Brief challenging the RCA's final rate calculation, GCI sets forth a discussion regarding Congress' landmark legislation to promote competition in local telephone markets in the Telecommunications Act of 1996,[1] including various decisions by the Federal Communications Commission ("FCC") to implement the 1996 Act. GCI Opening Brief at 2-11. GCI will not repeat that discussion here, and instead, incorporates that discussion by reference.

## THE ANCHORAGE ARBITRATION

### *THE INITIAL ARBITRATION IN 1996*

As discussed in its Opening Brief, shortly after the 1996 Act was passed, GCI initiated negotiations with Anchorage Telephone Utility ("ATU"), the incumbent local exchange carrier in Anchorage, then owned by the Municipality of Anchorage. GCI Opening Brief at 12-15. As negotiations stalled, GCI on July 29, 1996 petitioned the RCA's predecessor, the Alaska Public Utilities Commission ("APUC"), to arbitrate an agreement with ATU under § 252 of the Act.[2] During the course of the arbitration, on

---

[1]    Pub. L. No. 104-104, 110 Stat. 56 (1996) (the "1996 Act"). The 1996 Act significantly amended the Communications Act of 1934 and is codified throughout Title 47 of the United States Code.

[2]    Box 1 at 45 (Petition For Arbitration). As explained in GCI's Opening Brief at 12, Note 11, most of the administrative record has been filed with the court on a single CD-
[FOOTNOTE CONTINUED]

October 15, 1996, the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") granted a temporary stay of the FCC's TELRIC pricing rules[3] pending full review on appeal.[4]  Thus, when the APUC accepted the arbitrator's recommendation on December 16, 1996 to adopt GCI's proposal to set the UNE loop rate at $13.85,[5] the FCC's TELRIC rules were not in effect, and the APUC was forced to adopt rates that it knew would need to be revisited once the uncertainty regarding the FCC's pricing rules was resolved.  When the APUC approved the interconnection agreement between GCI and ATU on January 14, 1997, it acknowledged that "all prices in the arbitrated agreement interconnection agreement are temporary in nature and will require a full study based upon a cost methodology to be determined by this Commission at a later date."[6]

ACS' grievance with the originally arbitrated interconnection agreement apparently starts with the arbitrator's – and ultimately the APUC's – rejection of ATU's proposed UNE loop rate of $14.35.  Significantly, under the "baseball style" of arbitration used in 1997, ATU had proposed this UNE loop rate based upon an embedded

_____

ROM disc containing seven PDF files (or boxes).  Citations to that portion of the record are to the PDF files and to the PDF pages within each file.  Those portions of the record filed in hard copy are cited the stamped record page, *e.g.*, Admin. Record 12800.

[3]     As explained in GCI's Opening Brief, the FCC adopted the TELRIC pricing rules in the *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 FCC Rcd 15499 (1996) ("*Local Competition Order*").  The TELRIC rules prescribe a specific methodology for the state utility commissions to use in setting UNE rates that is not focused on historical or embedded cost, but rather on the most efficient technology available and the lowest cost network configurations given existing wire center locations.  *See* 47 C.F.R. § 51.505.

[4]     *Iowa Utils. Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996), *motion to vacate stay denied* 519 U.S. 978 (1996).

[5]     Admin. Record 12800 – 12831-832 (Order No. 8).

[6]     Admin. Record 12869 (Order No. 9).

cost standard, while GCI proposed forward-looking rates.  As the APUC explained,

"ATU's proposal [on UNE pricing] was based largely on its existing local and interstate

access tariffs, without adjustment.  GCICC's proposed rates were an attempt to

approximate forward-looking costs based upon the best available evidence … GCICC's

proposed rates were based upon a closer approximation of forward-looking costs than

ATU's, which relied more heavily upon historical embedded costs."[7]  In view of the

Eighth Circuit's stay, ATU's tariff-based rate proposal, and the Act's authorization of a

state commission to "proceed on the basis of the best information available to it,"[8] the

original arbitrated rate was in full compliance with existing, albeit nebulous, statutory

law.  ATU, indeed, never sought judicial review of the APUC's final order approving the

Anchorage interconnection agreement, and the $13.85 UNE loop rate went into effect and

remained lawful until it was replaced by the RCA with an interim rate, as described

below.

### THE IOWA UTILITIES I DECISION

After the APUC approved the Anchorage interconnection agreement in January

1997, the Eighth Circuit heard the appeal of the *Local Competition Order* and held that

the FCC exceeded its jurisdiction when it adopted pricing rules to guide state

commissions under §252.[9]  Accordingly, it vacated the rules.  The United States Supreme

---

[7]     Admin. Record at 12800 (Order No. 8).

[8]     47 U.S.C. § 252(b)(4)(B).

[9]     *Iowa Utils. Bd. vs. FCC*, 120 F.3d 753 (8th Cir. 1997).

Court granted *certiorari* on January 26, 1998,[10] and subsequently reversed the Eighth

Circuit in relevant part, finding that the FCC's jurisdiction to implement the Act included

the authority to adopt a pricing methodology for the states to use when arbitrating UNE

rates.[11] With this decision on January 25, 1999, the case was remanded to the Eighth

Circuit for substantive review of the FCC's regulations.

### *ACS' ACQUISITION OF ATU AND ITS REQUEST TO ESTABLISH A FORWARD LOOKING COST METHODOLOGY TO REVISE THE LOOP RATE*

Meanwhile, the predecessor to ACS, the ALEC Acquisition Sub. Corp., sought

approval of the APUC to acquire ATU, Telephone Utilities of Alaska, Inc., PTI

Communications of Alaska, Inc., and Telephone Utilities of the Northland, Inc.  The

APUC approved the sales in April of 1999.[12]  Upon completing its acquisitions of the

different incumbent companies, and with the validity of the FCC's regulations still

uncertain, on January 24, 2000, ACS filed a motion requesting that the RCA establish a

new forward looking cost methodology to revise the loop rate from the original

Anchorage arbitration.[13]  ACS requested that its new proprietary models – which it

proposed to file later – be used in the proceeding as well as in the arbitrations for

Fairbanks and Juneau, which were also being conducted between ACS and GCI at that

---

[10]    *AT&T Corp. v. Iowa Utils. Bd.*, 522 U.S. 1089 (1998).

[11]    *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999) ("*Iowa Utilities I*").

[12]    Order U-98-140(7)/U-98-141(7)/U-98-142(7) (APUC April 19, 1999); Order U-98-173(7)/U-98-174(7) (APUC April 4, 1999).  Copies of these orders are attached as GCI Exhs. V and W respectively.

[13]    Box 1 at 218 (Motion To Establish Forward Looking Economic Cost Models and Methodologies).

time.[14]  On March 6, 2000, the RCA granted ACS' request to re-visit the UNE rates in the

Anchorage agreement, re-started the modeling and rate inquiry, and ordered the parties to

file briefs proposing specific, forward-looking cost models.[15]

ACS proposed a proprietary loop cost model (ACS v.6.2) and a modified version

of the FCC's Synthesis Model ("FCC Model"), which the RCA had adopted in the

Juneau and Fairbanks arbitration for setting the UNE rates,[16] while GCI proposed a

generic and widely known model known as the HAI Model, Release 5.1.[17] After

supplemental comments addressing the proposals in April, the RCA on May 11, 2000

adopted the modified, Alaska-specific version of the FCC Model that had by then been

developed in the ACS-GCI arbitrations for Juneau and Fairbanks.[18] The RCA appointed

an arbitrator and directed that a pre-hearing scheduling conference be held as soon as it

approved the final interconnection agreements in the ACS-GCI Fairbanks and Juneau

proceedings.[19]

Following the RCA's decision to use the Alaska-specific version of the FCC

Model to establish UNE prices, on July 18, 2000, the Eighth Circuit issued its order on

---

[14]     *Id*. at 222.
[15]     Box 1 at 260-276 (Order No. 13).
[16]     *Id.* at 280 (ACS Response to Order No. 13).
[17]     *Id.* at 438 (GCI Response to Order No. 13).
[18]     *Id*. at 459-475 (Order No. 14).  In the Juneau and Fairbanks arbitration, the RCA adopted the FCC Model but allowed the parties to propose changes they wanted with respect to the platform and inputs to reflect Alaska-specific characteristics.  The proposed changes were resolved through the arbitration process.  Box 1 at 462, Note 10 (Order No. 14 at 4, Note 10).
[19]     *Id.*

remand from the Supreme Court.[20] The Eighth Circuit affirmed the FCC's adoption of a forward-looking cost methodology but precluded the use of its TELRIC pricing rules. The court again vacated the rule and remanded to the FCC, creating yet more uncertainty as to the appropriate pricing standard for UNEs.[21]

At a pre-hearing conference with the arbitrator on October 19, 2000, ACS indicated that it would seek to have the RCA, not the arbitrator, receive evidence directly[22] and further reconsider issues related to the model selection and model inputs.[23] ACS subsequently filed a motion requesting that the RCA receive evidence directly and reconsider its decision to use the modified version of the FCC Model to set the rates – ACS effectively was seeking to re-open the RCA's May 2000 model decision.[24] GCI responded to the motion taking no position on ACS' request for the RCA to conduct the arbitration but objecting to ACS' attempt to re-open the RCA's model decision.[25] ACS filed a reply, and the RCA heard oral argument on December 6, 2000.[26] At the oral argument, ACS indicated that it wished to submit evidence concerning a new "in-house" model that it was in the process of developing to reflect the Eighth Circuit's decision in

---

[20]    *Iowa Utils. Bd. v. FCC*, 219 F.3d 744 (8th Cir. 2000) ("*Iowa Utilities II*").

[21]    The Eighth Circuit later partially stayed the mandate of its decision pending final review by the Supreme Court. *Order Granting the Federal Communications Commission's Motion For A Partial Stay of Mandate*, Docket No. 96-3321 (8th Cir. Sept. 22, 2000).

[22]    Box T-1 at 3-6 (Pre-Hearing Conference Transcript).

[23]    *Id*. at 6-8.

[24]    Box 1 at 509-515 (ACS Motion).

[25]    *Id*. at 548-557 (GCI Response).

[26]    Box T-1 at 22-112 (December 6, 2000 Oral Argument).

*Iowa Utilities II.*[27]  Additionally, at the oral argument, in response to RCA questions about the 9-month statutory timeline in § 252 of the Act, ACS admitted that it does not apply because the proceeding is not a "new negotiation or arbitration."[28]

On January 8, 2001, the RCA ruled on ACS' motion, concluding that it would retain use of the modified version of the FCC Model, but also allow immediate briefing on "propose[d] modifications to the existing model to make it appropriate for use in the current Anchorage market."[29]Notwithstanding the RCA's re-affirmation of its decision to use the modified version of the FCC Model to set the UNE prices, ACS subsequently filed a brief again indicating its intent to submit evidence regarding its own in-house models developed for the purpose of setting rates in accordance with the Eighth Circuit's decision in *Iowa Utilities II.*[30] GCI opposed ACS' repeated efforts to alter the RCA's model decision and specifically cautioned the RCA that embarking on a new effort to develop a pricing model to conform to the Eighth Circuit's decision would be time-consuming and wasteful given that the Eighth Circuit had issued a stay of its mandate vacating the FCC's TELRIC rule.[31]

By Order No. 20 dated May 20, 2001, the RCA acceded to ACS' demands and, once again "recogniz[ing] that forward looking cost methodologies are in a state of flux,"

---

[27]     *Id* at 36-37.
[28]     *Id* at 67.
[29]     Box 1 at 564 (Order No. 15).
[30]     *Id*. at 601-629 (ACS Briefing).
[31]     *Id*. at 651-673 (GCI Response).

seemed to agree to re-open its choice of UNE pricing methodologies.[32] Without

specifically overturning its previous decision to use the FCC Model, the RCA indicated

that it would consider ACS' in-house models and "other forward-looking cost

methodologies that parties wish us to consider."[33] Thus, at ACS' own instigation, the

RCA started anew at making a decision that had been concluded 15 months earlier.  The

RCA voiced concern that both its and the parties' time and resources be used efficiently

and reminded the parties of its previous order requiring "all information and or [sic] data

supporting the use of any particular study shall immediately be provided to the other

party."[34]  Despite the fact that ACS had been arguing for months that the RCA should use

ACS' own in-house models, the RCA admonished ACS that "we are not aware of any

information indicating that ACS provided GCI with a copy of its proposed cost study."[35]

On May 31, 2001, ACS filed its in house loop model ACS v.7.2 but explained that

it still had not finalized its 8.0 Model to implement the Eighth Circuit's decision in *Iowa

Utilities* II.[36]  ACS requested, and received, a month's extension of the deadline for

exchanging models.  In the order granting the extension, the RCA noted that "in

conjunction with filing three cost models and materials supporting the cost models,"

"ACS-AN wants us to consider its 8.0 Model which is presently incomplete."[37] Thus, a

---

[32]    *Id*. at 785 (Order No. 20).
[33]    *Id*. at 787.
[34]    *Id*. at 788.
[35]    *Id.* at 788, Note 16 (Order No. 20).
[36]    Box 1 at 795-96 (ACS Briefing).
[37]    *Id*. at 1114, Note 3 (Order No. 21).

full year and a half after requesting that the RCA establish new UNE rates using ACS'

own model, ACS itself still had not settled on a model for the RCA to use.

The RCA granted ACS' requested extension and directed the parties to file briefs

on alternative methodologies by July 27, 2001.[38] GCI supported use of the previously

selected FCC Model or, in the alternative, the HAI Model.[39] ACS offered two models:

ACS' Version 8.0 Model, which it advocated was in compliance with the Eighth Circuit's

decision in *Iowa Utilities II* vacating the FCC's TELRIC rule, and ACS Version 7.2,

which it advocated should be used if the Supreme Court again reversed the Eighth

Circuit.[40]

## ACS' FIRST MOTION FOR AN INTERIM RATE INCREASE

Meanwhile, in the midst of rearguing the choice of methodology for setting the

UNE rates and seeking extensions of time, ACS filed a Request for Immediate

Establishment of Interim and Refundable Rates on June 11, 2001.[41] This request, not

surprisingly, stemmed from the fact that ACS had successfully encouraged the RCA to

fully re-open the choice of pricing methodology that it had completed more than a year

before, thereby substantially stalling a final decision on revised permanent rates.  The

original model selection can scarcely be deemed dilatory, coming as it did within four

months of ACS' request for the adoption of new UNE rates.  Had ACS not fought the

RCA's selection of the FCC Model as a baseline, it is highly probable that the decisions

---

[38]    Box 1 at 1115 (Order No. 21).
[39]    *Id*. at 1514-538 (GCI Briefing).
[40]    *Id*. at 1157  (ACS Briefing).
[41]    *Id*. at 927 (ACS Request For Immediate Interim Rate).

on inputs and final rates would have been adopted and approved by the RCA in early

2001.[42]  Instead, having introduced significant delay, ACS demanded the immediate

setting of interim rates.

During the summer of 2001, then, the RCA essentially conducted parallel rate

proceedings for the Anchorage interconnection agreement, both at the request of ACS.

The RCA received briefing (1) on the need for interim rates, and (2) on "any and all

forward looking cost studies or methodologies they wish us to consider"[43] for the setting

of permanent rates.  Oral argument on interim rates was held on August 17, 2001.[44]

ACS argued then that the prevailing UNE loop rate was too low and had to be

immediately increased.  ACS offered UNE loop studies purportedly based on both the

FCC Model and its proprietary Version 7.2 Model, with resulting rates of $25 and $24.59

per loop per month, respectively.[45]  ACS requested a "compromise" interim UNE loop

rate of $24 – an immediate 80 percent increase from the $13.85 prevailing loop rate.[46]

GCI opposed ACS' request, cited the existing rates' consistency with other

arbitrated results, and presented the results of the previously approved FCC Model with

modifications to incorporate Anchorage-specific customer and wire center information.[47]

To simplify the process of demonstrating that the current rate of $13.85 was reasonable in

---

[42]    The RCA adopted the FCC Model in May 2000.  Assuming 6 months for
arbitration after the conclusion of the Fairbanks and Juneau arbitrations on October 6,
2000, a final rate would likely have been established by the RCA in the spring of 2001.

[43]    Box 1 at 787 (Order No. 20).

[44]    Box T-1 at 113 (Oral Argument Re: ACS' Interim Rate Request).

[45]    Box 1 at 942-43 (ACS Motion For Interim Rate).

[46]    *Id*. at 955 (ACS Motion).

[47]    *Id*. at 969 (GCI Opposition).

light of the evidence in the record at that stage in the proceeding, GCI used the recently approved inputs from the Fairbanks arbitration, despite the fact that costs in Fairbanks are demonstrably higher than those in Anchorage and would yield an artificially high UNE loop rate. Using the Fairbanks inputs, the FCC Model produced a loop rate of $14.92, while the model with the FCC defaults produced a rate of $12.94.[48] Thus, GCI argued that the prevailing rate of $13.85 was reasonable and should remain in place pending the RCA's final determination on the rates.

On June 21, 2001, ACS filed for the first time a final version of ACS 8.0, which is the model ACS developed that purportedly implemented the Eighth Circuit's decision in *Iowa Utilities II*.[49] Additionally, on July 3, 2001, ACS filed its reply to GCI's opposition in which it continued to argue for an interim rate increase but alternatively requested that the RCA provide for a true-up of revenues when final rates are established in the event the RCA does not provide an interim rate increase. ACS, however, discouraged the RCA from adopting a true-up provision expressing its clear preference for an interim rate increase.[50]

On October 25, 2001, the RCA granted ACS' request for an interim rate increase and established a UNE loop rate of $14.92.[51] In doing so, the RCA used the results of the FCC Model it previously approved with inputs recently adopted in the Fairbanks arbitration but with Anchorage-specific customer and wire center location information.

---

[48]    Box 1 at 991-92 (testimony of Frederick Hitz).
[49]    *Id*. at 1034 (ACS Compliance Filing).
[50]    *Id*. at 1082 (ACS Reply).
[51]    *Id*. at 2698 (Order No. 23).

Based on the best available information in the record that existed at that time, the RCA found that this was the most likely surrogate for the eventual permanent rate.[52]

### *THE PROCESS TO REVISE THE ANCHORAGE AGREEMENT DRAGS ON AND THE SUPREME COURT ULTIMATELY CLARIFIES THE RULES*

With interim rates in place, the RCA was able to return its resources to the permanent rate arbitration. On February 8, 2002, the RCA first addressed the choice of network configuration to underlie its reconsideration of a forward-looking cost methodology. Because of the Eighth Circuit's invalidation of the FCC's "efficient network" rule and until the Supreme Court issued its decision, the state commissions were left without concrete guidance on this fundamental question.[53] As discussed above, the FCC's regulations were based not on historical or embedded cost, but rather on the most efficient technology available and the lowest cost network configuration given existing wire center locations.[54]

The RCA found the Eighth Circuit's decision to be internally inconsistent because it approved the use of a forward-looking cost methodology but nonetheless required that UNE prices be based on the ILEC's "actual" cost of facilities and equipment.[55] The RCA adopted what it termed an "efficient ILEC" standard: "We decide against using a hypothetical network based on only current wire center locations. Instead, the network

---

[52]     Box 1 at 2707 (Order No. 23).

[53]     *Id*. at 2722 (Order No. 24). The RCA observed that "we cannot further delay our interpretation in hopes of getting clear guidance from the Supreme Court. We must fashion an economic costing method that embodies the forward-looking methodology embodied in the Act." Box 1 at 2719 (Order No. 24).

[54]     *See* Note 3 above.

[55]     *Id*. at 2716-17 (Order No. 24).

design should reflect a reconstructed most efficient technology ILEC network as it exists today."[56]

The RCA next convened a hearing on February 15, 2002 to address whether the multiple methodologies proposed by ACS and GCI would produce results consistent with its "efficient ILEC" standard.[57] After the lengthy hearing, the RCA concluded, "both parties have not had a full opportunity to understand the foundations for [ACS' proposed proprietary] model."[58] Nonetheless, finding it "important to adequately consider [ACS's] v7.2 model," the RCA on April 8, 2002 granted ACS' request to order the parties to conduct a workshop on the model.[59] ACS represented that it was "convinced that the 'black box' issues will disappear once GCI has an opportunity [to] analyze the v7.2 model and have its questions answered."[60] The RCA ordered the parties to file reports on the results of the workshop by May 22, 2002.[61]

On May 13, 2002, the U.S. Supreme Court reversed the Eighth Circuit's decision vacating the FCC's TELRIC rule in *Verizon Communications, Inc. vs. FCC*, 535 U.S. 467, 122 S.Ct. 1646, 1666-79 (2002).  With this decision, there was no more uncertainty regarding the RCA's duty to apply the FCC's TELRIC rules to set the UNE rates. On May 22, 2002, both GCI and ACS filed reports concerning the workshop on ACS' v7.2 model.  GCI explained that the ACS model is "not an integrated or flexible cost model. It

---

[56]     *Id* at 2721-272 (Order No. 24).
[57]     Box T-1 at 172 (Hearing Transcript).
[58]     Box 1 at 2743 (Order No. 25).
[59]     *Id*.
[60]     *Id*. at 2744 (Order No. 25).
[61]     *Id*. at 2745 (Order No. 25).

is instead merely a calculator that uses simple arithmetic to compute investments and costs for an outside plant design that has been manually developed."[62] GCI objected to using the ACS model, in part, because in order to validate the results of the model, GCI would have to perform its own extensive engineering analysis, which would be very expensive, time-consuming, and prone to error.[63]  ACS, on the other hand, extolled the virtues of its proprietary model claiming that it was the only model fully compliant with TELRIC and the RCA's own "efficient ILEC" standard.[64]

### ACS FILES AN EMERGENCY PETITION WITH THE FCC TO PREEMPT THE RCA AND THE RCA ACCEDES TO ACS' DEMAND TO USE ITS MODEL

During this time when the RCA was re-examining which forward-looking methodology to use at ACS' request to set the rates, ACS filed an emergency petition with the FCC on July 22, 2002 to preempt the RCA's from exercising any further jurisdiction in the Anchorage arbitration.[65] Notwithstanding this petition for preemption, the RCA on July 29, 2002 acceded to ACS' request by adopting ACS v.7.2 on the condition that GCI be permitted to challenge and propose changes to the model platform.[66]  The RCA observed that ACS' model is based on a manual engineering design by ACS engineers while the FCC Model uses algorithms to produce the material

---

[62]     Box 1 at 3023 (GCI Workshop Report).
[63]     *Id*. at 3025 (GCI Workshop Report).
[64]     Box 1 at 2750 (ACS Workshop Report).
[65]     A copy of the ACS filing with the FCC is attached as Exhibit 3 to the RCA Commissioner's Opposition Brief.
[66]     Box 1 at 3158 (Order No. 26).

requirements and costs for the hypothetical network that TELRIC assumes.[67] Given the

manual-engineering designs underlying the ACS model, the RCA cautioned that:

> We recognize that the ACS-AN approach poses a number of challenges. First, use of a manual network design process is slow, potentially error prone, and because it relies on the expertise of individual design engineers, may lack the uniformity of a model that relies strictly on algorithms. Second, the ACS-AN model will produce only one category of rate elements – loop rates. Third, the spreadsheet portions of the model do not yet have a simple front end for inputs and changes to other factors can be difficult and time consuming. Fourth, potential modifications to the model may take considerably more time than the FCC model would require.[68]

Nonetheless, the RCA was willing to adopt the ACS model provided that GCI is given an

adequate opportunity to fully understand and propose changes to the model.[69] The RCA

further pointed out that "ACS-AN, which has strenuously advocated for use of this

manual and potentially time consuming approach, is also the party that has been equally

strenuous in arguing for a quick resolution of this docket," and that "if ACS-AN is

willing to live with the delays inherent in using this model, we are willing to

accommodate their request that it be used in this proceeding."[70] The RCA appointed an

arbitrator to take evidence and recommend changes to the model platform as necessary

for it to render forward-looking prices based on an "efficient ILEC" standard.

---

[67]    Box 1 at 3161 (Order No. 26).
[68]    *Id*. at 3162 (Order No. 26).
[69]    *Id*.
[70]    *Id*. at 3163 (Order No. 26).

On October 22, 2002, the FCC issued its order denying ACS' petition to preempt the RCA.[71] The FCC rejected ACS' claim that the RCA erred by failing to apply the statutory timeline in § 252 on the ground that "ACS conceded on the record in that proceeding that the statutory limits were inapplicable to the reopened proceeding, and the Alaska Commission apparently relied on that concession."[72] Moreover, the FCC found no other basis to support ACS' claim that the RCA had failed to act.  On the contrary, the FCC determined that "the Alaska Commission has not been dilatory in its handling of this proceeding since January 2000."[73]

Not more than two months following the RCA's decision adopting the ACS model, which included the caveat and condition that ACS must be willing to live with the delays inherent in examining and modifying its model for use in the proceeding as just discussed, ACS filed a motion on September 9, 2002 to establish a deadline for the completion of the arbitration.[74] In the motion, ACS complained bitterly about the delays in the arbitration essentially blaming everyone but itself for its slow progress. GCI opposed the motion,[75] and the RCA denied it in on December 12, 2002.[76]  In Order No. 27, the RCA set forth a full chronology of events in the arbitration and concluded that:

> We find that ACS-AN itself has authored most of the delays
> in this case. The history of this docket, detailed in the
> Background section of this order, shows that ACS-AN has

---

[71]    A copy of the FCC Order is attached to the RCA's Opposition Brief as Exhibit 4.
[72]    *Id*. at 5.
[73]    *Id*. at 6.
[74]    Box 1 at 3188 (ACS Motion).
[75]    *Id*. at 3213 (GCI Opposition).
[76]    Box 2 at 178 (Order No. 27).

**GCI'S OPPOSITION BRIEF**
**RE:  DELAY & INTERIM RATE ISSUES**
*GCI v. RCA, et al.*, A05-003 CV (RRB)

> continually changed directions over its preferred model
> platform and has substantially extended the litigation by
> disregard of our orders.[77]

The RCA explained that the arbitration could have been completed much earlier if ACS had not demanded a change from the RCA's original selection of the FCC Model to set the rate – a model that ACS originally requested be used consistent with the Juneau and Fairbanks arbitrations.[78] The RCA directed ACS to complete the process it started to resolve the model platform issues associated with its proprietary model and abide by the delays associated with examining and modifying its model.[79]

### ACS FILES A SECOND MOTION REQUESTING AN INCREASE IN THE INTERIM LOOP RATE

While ACS was pressing for a deadline and ignoring its own culpability for the slow progress in the arbitration, ACS filed a second request for interim rate relief on October 24, 2002.[80]  In this motion, ACS alleged that GCI had improperly manipulated the line counts in the FCC Model run that produced the $14.92 UNE loop rate that the RCA adopted in Order No. 23.  ACS claimed that with proper line counts, the interim rate should be increased to $16.26.[81] ACS, however, requested that the rate be increased to $24.48 consistent with new model runs using the ACS v.7.2 model, which ACS populated with cost inputs that the parties had not previously agreed to and that the RCA

---

[77]    Box 2 at 197 (Order No. 27).
[78]    *Id.*
[79]    *Id.* at 197-98 (Order No. 27).
[80]    Box 1 at 3259 (ACS Second Motion For Interim Rate Relief).
[81]    *Id.* at 3259 & 3266 (ACS Motion).

had not yet approved.[82] Essentially, ACS was requesting yet another interim rate increase based on an unapproved model platform and unapproved cost inputs.  GCI obviously opposed this request pointing out that ACS' complaint about the line counts in the prior FCC Model run was untimely by more than 17 months,[83] that its allegations about GCI's lack of honesty regarding the line counts were baseless,[84] that a more reasonable run of the FCC Model with additional corrections using cost inputs from the Fairbanks arbitration (which were the only RCA-approved cost inputs at the time) yielded a rate in the range of $10.88 to $11.21,[85] that the ACS v7.2 model platform still contained significant flaws but that if the model were run with various corrections and populated with cost inputs from the Fairbanks arbitration, GCI's best estimate at that time was that the model would produce a rate in the range of $12.89 to $13.28.[86]  In light of these facts, GCI filed a cross-motion requesting that the RCA lower the interim rate to the original $13.85 and declare the rate refundable to a limit of $10.88.[87]

ACS filed a reply on December 20, 2002 in which it withdrew its request for an interim rate of $24.48 and requested instead that the rate instead be increased to $16.26 focusing only on the line count correction it believed should be made to the prior FCC Model run.[88]  ACS did not alternatively request a true-up provision in either its motion or

---

[82]    Box 1 at 3268 (ACS Motion) & Box 2 at 162-63 (GCI Opposition).
[83]    Box 2 at 160 (GCI Cross-Motion & Opposition).
[84]    *Id*. at 89-93 (testimony of Robert Mercer).
[85]    *Id*. at 114-15 (testimony of Robert Mercer).
[86]    *Id*. at 112 (testimony of Robert Mercer).
[87]    *Id*. at 142 (GCI Motion and Cross-Motion).
[88]    *Id*. at 219-220 (ACS Reply).

reply. GCI filed its reply in support of its request that the original $13.85 rate be reinstated based on corrections to the prior FCC Model run it explained in its cross-motion.[89]

On April 14, 2003, the RCA denied both parties' motions to change the interim loop rate.[90] The RCA essentially chastised the parties for submitting model runs of ACS v.7.2 before the platform had yet been approved, for using cost inputs that had not been subjected to scrutiny, and for arguing about different corrections to the prior FCC Model run that had been previously reviewed by both parties when the RCA set the rate at $14.92 more than a year earlier.[91]  The RCA urged the parties to stop devoting time and resources to advocating for further changes in the interim rate and instead focus on completing the arbitration to produce final rates.[92] Notwithstanding the RCA's clear message, ACS filed a petition for reconsideration repeating the same arguments it previously made to the RCA,[93] which GCI opposed, and the RCA summarily denied.[94]

### THE ARBITRATION CONTINUES UNTIL THE RCA ADOPTS AN ENTIRELY NEW HEARING PROCEDURE TO COMPLETE THE PROCEEDING

While the parties were arguing about changes to the interim rate, they continued to litigate other issues in the case on matters relating to discovery and other modeling platform issues.  ACS also continued to complain about the delays in the proceeding

---

[89]    Box 2 at 530-33 (GCI Reply In Support of Cross Motion).
[90]    *Id.* at 1578 (Order No. 31).
[91]    *Id.* at 1583-584 (Order No. 31).
[92]    *Id.*
[93]    *Id.* at 1617 (Petition For Reconsideration).
[94]    *Id.* at 1680 (Order No. 33).

always failing to acknowledge its culpability for such delays. ACS filed yet another

request for an immediate deadline in the arbitration again casting blame for the delays on

everyone but itself.[95]  The RCA denied this request but directed the arbitrator to meet

with the parties and submit a realistic schedule to complete the arbitration.[96] On April 14,

2003, the RCA clarified the standard to be used to set the UNE rates eliminating the

"efficient ILEC" standard that it had previously adopted after the Eighth Circuit vacated

the FCC's TELRIC rule but before the Supreme Court reversed the Eighth Circuit.  The

RCA stated that it would apply the FCC's TELRIC rules.[97]

     Finally, frustrated by the slow progress in the arbitration and ACS' repeated

complaints about the delays (for which ACS has never admitted any responsibility), the

RCA adopted a new interconnection hearing process on July 14, 2003.[98] In this new

process, the RCA established deadlines and appointed a discovery master.   The RCA

explained its decision as follows:

> When we adopted the ACS-AN approach [*i.e.*, the ACS
> model] we knew the process would be time consuming.
> However, we find that continuation of a process geared
> toward scrutiny and correction, if necessary, of the v7.2
> mapped network design platform will not yield a final
> decision on all of the necessary interconnection issues within
> a reasonable time.  Almost a year has passed since our
> original decision to use the ACS-AN approach, and despite

---

[95]     Box 2 at 1197 (ACS Motion For Deadline).

[96]     *Id*. at 1600 (Order No. 32).

[97]     *Id*. at 1565 (Order No. 30).  Incredibly, ACS filed a petition for reconsideration urging the RCA to adhere to its own "efficient ILEC" standard rather than strictly follow the FCC's TELRIC rule. Box 2 at 1606 (ACS Petition).  The RCA denied this petition. Box 2 at 1685 (Order 34).

[98]     Box 2 at 1889 (Order No. 35).

the arbitrator's and parties' diligent efforts, the first phase is not complete. If the time necessary to correct the network design is added to the parties' proposed schedule, this proceeding could extend for another year. To resolve this docket within a reasonable time we must change the process by which the parties build a record for decision. …

To build a good record for decision we shift our focus from a particular model platform or approach to prices and terms of service. We do so by employing our traditional hearing process and the use of prefiled testimony.[99]

Following this order, the parties completed discovery,[100] filed pre-filed direct testimony,[101] rebuttal testimony,[102] and reply testimony.[103] The RCA conducted a hearing in November of 2003[104] and issued a final order on June 6, 2004.[105]

## STANDARDS OF REVIEW

The standards of review that should apply are the same as those discussed in GCI's Opening Brief at 15-16 and are incorporated by reference.

## ARGUMENT

## I.    ACS' CLAIM THAT THE RCA FAILED TO ISSUE A TIMELY DECISION IS IMPROPER AND OTHERWISE LACKS MERIT

ACS claims in its cross-petition that the RCA unreasonably delayed the determination of a final loop rate. ACS Cross Petition at 28. ACS contends that the

---

[99]     Box 2 at 1895 (Order No. 35).
[100]    *Id*. at 1909-1930, 1942-1952 & 1956-1991.
[101]    *Id*. at 2008-end & Box 3 at 1-1814).
[102]    Box 3 at 2433-3252.
[103]    Box 4 at 19-629.
[104]    Box T-1 at 2385-end & Box T-2 at 1-end.
[105]    Box 4 at 1321-1408 (Order No. 42). GCI will not address the subsequent history that follows pertinent to its petitions for reconsideration and challenge to the RCA's final rates. This part of the history is set forth in GCI's Opening Brief at 14-15.

RCA erred by not applying the 9-month statutory clock in § 252(b)(4)(C) when ACS first sent a letter to GCI on November 9, 1999 requesting negotiations to revise the Anchorage loop rate.  ACS Cross-Petition at 31.   Alternatively, even if the statutory time line in § 252(b)(4)(C) does not apply, ACS argues that the RCA failed to establish a final rate within a reasonable time.  *Id.* at 33-36.   Based in part on these alleged delays and in part on the retroactive application of the final $18.64 loop rate, ACS asks the Court to remand the case "for a precise calculation of the amount GCI should pay ACS to compensate for the almost $11 million in underpayments arising from the illegal UNE loop rate." *Id*. at 29.

In making this extraordinary claim, ACS ignores the fact that this Court does not have subject matter jurisdiction to hear its complaint about the length of time it took for the RCA to issue a final decision as the FCC has exclusive jurisdiction to hear such complaints.  ACS also ignores (and certainly does not disclose) the fact that it filed a petition with the FCC to address exactly the same grievance regarding the RCA's alleged failure to act in a timely manner but the FCC denied this petition on the merits.  ACS, therefore, is barred under the principles of *res judicata* from re-litigating these issues.  Additionally, ACS totally (but consistently) ignores its own culpability for the slow progress in the arbitration.

## A.     THE COURT DOES NOT HAVE JURISDICTION TO HEAR ACS' CLAIM THAT THE RCA FAILED TO ISSUE A TIMELY DECISION

In its Opposition Brief, the RCA articulates very well why this Court lacks subject matter jurisdiction to hear ACS' claim that the RCA's final decision was untimely.  RCA

Opposition Brief at 23-27.  GCI fully agrees with this argument and adopts it by reference.  Briefly, however, GCI would like to emphasize that ACS' claim about the RCA's failure to issue a timely decision is a matter over which the FCC has exclusive jurisdiction pursuant to 47 U.S.C. § 252(e)(5) and (6) and the FCC's interpretation that the "failure to act" in § 252(e)(5) includes "a State's failure to complete its duties in a timely manner." RCA Opposition at 26 and *Local Competition Order* at ¶ 1285.[106] The FCC's interpretation of its scope of authority and jurisdiction to hear such claims under § 252(e)(5) in the *Local Competition Order* is controlling and unassailable in this Court given that the district courts do not have subject matter jurisdiction to review the validity of an FCC order or regulation.

Under 28 U.S.C. § 2342(1), (generally referred to as the "Hobbs Act"), the courts of appeals have exclusive jurisdiction "to determine the validity" of all final FCC orders. Thus, a "district court must dismiss a complaint if it directly attacks an FCC order or if it raises only issues that were conclusively decided by the FCC order." *Pacific Bell vs. Pac. West. Telecommunications, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003).  The district court has jurisdiction only to interpret a final FCC rule or order to give it effect in the case before it; the court must accept and enforce the FCC's orders and rules even if it disagrees with them. *U.S. West Communications, Inc. vs. Hamilton*, 224 F.3d 1049, 1054-055 (9th Cir. 2000) (holding that consistent with Hobbs Act the Court must apply the

---

[106]     RCA Exh. 5 at 7.  *See also* 47 C.F.R. § 51.801(b).

FCC's interpretation of the Act in the *Local Competition Order* even though it disagrees with the FCC's legal analysis).

In view of the FCC's interpretation that its authority under § 252(e)(5) encompasses claims regarding the timeliness of a state commission's actions to complete an arbitration proceeding under § 252, § 252(e)(6) requires that any such complaints must be exclusively filed with the FCC and that "any judicial review of the Commission's [FCC] actions shall be the exclusive remedies for a State commission's failure to act."[107] Accordingly, this Court does not have subject matter jurisdiction to hear ACS' complaint that the RCA failed to complete the arbitration in a timely manner.

## B.    ACS IS BARRED BY PRINCIPLES OF *RES JUDICATA* FROM RELITIGATING ITS TIMELINESS COMPLAINT

As just discussed, the FCC has interpreted the scope of its authority under § 252(e)(5) to include claims regarding a state commission's failure to complete an arbitration in a timely manner.  ACS is well aware of this exclusive remedy and, indeed, filed an emergency petition under § 252(e)(5) with the FCC on July 24, 2002 to divest the RCA from jurisdiction to complete the Anchorage arbitration on the grounds that the RCA was taking too long.[108]  Both GCI and the RCA filed comments opposing ACS' emergency petition.[109]  On October 22, 2002, the FCC issued a Memorandum Opinion and Order in which it denied any relief to ACS concluding that:

---

[107]     47 U.S.C. § 252(e)(6).
[108]     RCA Exh. 3.
[109]     RCA Exh. 4 at 1, Note. 1.

> We do not understand ACS to argue that section 252(b)'s
> statutory limits apply to the reopened proceeding.  Indeed,
> ACS conceded on the record in that proceeding that the
> statutory time limits were inapplicable to the reopened
> proceeding, and the Alaska Commission apparently relied on
> that concession.  Thus, we conclude that no statutory time
> limit applies to the ongoing Anchorage rate proceeding.[110]

Additionally, the FCC determined that:

> The Alaska Commission [the RCA] has not been dilatory in
> its handling of this proceeding [the Anchorage arbitration]
> since January 2000.  In addition to overseeing and issuing
> frequent orders responsive to the parties' cost model dispute,
> the Alaska Commission set an interim and refundable rate
> promptly upon ACS' request (albeit not at the level ACS
> requested).  Under these circumstances, we do not believe
> there has been a failure by the Alaska Commission in
> Anchorage "to carry out its responsibility" under section
> 252.[111]

ACS did not seek judicial review of the FCC's order in the courts of appeal within

60 days after entry of the final order as required under 28 U.S.C. § 2342(1) and § 2344.

This time limitation is jurisdictional and cannot be modified by judicial action.

*California Ass'n of the Physically Handicapped, Inc. v. FCC*, 833 F.2d 1333, 1334 (9th

Cir. 1987).  As a consequence, the FCC's determinations are controlling and binding on

the parties and the district court under the Hobbs Act as discussed above. *West Coast*

*Truck Lines, Inc. vs. American Industries, Inc.*, 893 F.2d 229, 234 (9th Cir. 1990) (holding

that failure to seek appellate review bars a challenge to the validity of an ICC order).

---

[110]    *Id*. at 5.
[111]    *Id*. at 6.

Because ACS failed to file an appeal with the courts of appeal from the FCC's final order, it is barred from re-litigating the same claims under the principles of *res judicata*. "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *West Coast Truck Lines*, 893 F.2d at 234 *quoting United States  v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966).   Whether an administrative agency's decision should be given preclusive effect depends on three factors: "(1) whether the [agency] was acting in a judicial capacity; (2) whether the issue presented to the district court was actually litigated before the [agency]; and (3) whether its resolution was necessary to the [agency's] decision." *Id.* at 234-35 *quoting Exxon Corp. v. Fischer*, 807 F.2d 842, 845-46 (9th Cir. 1987).

## 1. *The FCC Acted In A Judicial Capacity When It Reviewed ACS' Petition*

In this case, the FCC clearly was acting in a judicial capacity when it reviewed ACS' petition alleging that the RCA had failed to complete the Anchorage arbitration in a timely manner.  ACS submitted legal briefing and evidence to support its allegations and even met on various occasions with FCC staff to present its views in support of the petition as permitted by the FCC's rules governing *ex parte* communications, and the RCA and GCI likewise did the same in opposition to the petition.[112] As discussed above,

---

[112]     The extensive briefing submitted by the parties to the FCC is evidenced by the references to the parties' briefing in the FCC's footnotes in the order. RCA Exh. 4.
[FOOTNOTE CONTINUED]

the FCC, acting under its authority in § 252(e)(5), denied any relief to ACS concluding that the RCA had not failed to act in a timely manner.

### 2. *The Issues Presented To The District Court Were Actually Litigated Before The FCC*

The issues presented to the FCC in the ACS petition are the same as those ACS now presents to the Court.  Before the FCC, ACS argued that the RCA had not acted in a timely manner in its conduct of the Anchorage arbitration, and hence, the FCC should immediately divest the RCA of jurisdiction over the arbitration pursuant to the "failure to act" provision in § 252(e)(5).  In this case, on the identical facts as those presented to the FCC, ACS again re-argues that the RCA failed to complete the Anchorage arbitration in a timely manner.  When it issued its decision, the FCC reviewed the procedural history of the Anchorage arbitration from 1996 through October 22, 2002.  ACS is relying on exactly these same facts to support its claim in this case that the RCA failed to act in a timely manner.  The only additional facts not reviewed by the FCC are the events subsequent to the FCC's decision on October 22, 2002.  ACS' claim regarding the un-timeliness of the RCA's final decision, however, is not based exclusively on the actions of the RCA following the FCC's decision on October 22, 2002; ACS' claim covers the full history of the Anchorage arbitration.  Thus, the overwhelming majority of the facts

---

Additionally, however, GCI has attached as GCI Exh. X a print out from the FCC's Electronic Comment Filing System displaying the records submitted to the FCC. The Court will note that the FCC history documents various *ex parte* communications by the parties with FCC staff on the issues. *See* GCI Exh. X at 7-9.

ACS relies on in this case are identical to the facts actually litigated before and reviewed by the FCC.

### 3. The FCC's Resolution Of The Issues Was Necessary To Its Decision

As discussed above, the FCC determined that the statutory timeline in § 252(b) did not apply to the reopened Anchorage arbitration, and, further, that the RCA had not acted in dilatory manner in its conduct of the Anchorage arbitration. Both of these issues were key issues in the proceeding and central to the FCC's decision to deny ACS any relief under § 252(e)(5). Stated differently, ACS' "failure to act" claim before the FCC turned on the FCC's resolution of these issues.

### 4. Res Judicata Applies and ACS Is Barred From Re-litigating Its Claim That The RCA Failed To Act In A Timely Manner

As just discussed, the legal test for applying *res judicata* is met and ACS, therefore, is barred from re-litigating its claim that the RCA failed to act in a timely manner in its conduct of the Anchorage arbitration. *See West Coast Truck Lines,* 893 F.2d at 234-35 (holding that carrier's failure to appeal an order by the Interstate Commerce Commission barred it from re-litigating issues that were the subject of that ICC's order).

### C. THE STATUTORY TIMELINE IN § 252 DID NOT APPLY IN ANY EVENT TO ACS' REQUEST TO REVISE THE LOOP RATE

Should the Court exercise jurisdiction to hear ACS' claim and otherwise determine that *res judicata* does not apply, GCI contends that ACS' claim that the RCA should have completed the Anchorage arbitration within 9 months of its request to GCI on November 9, 1999 to revise the Anchorage loop rate is wrong as a matter of law for

the reasons the RCA sets forth in its Opposition Brief at 28-31.  ACS did not make any

attempt to comply with the procedural requirements in § 252(b) for properly requesting

an arbitration under the statutory timeline in that section.  Even assuming that ACS' letter

to GCI on November 9, 1999 initially triggered the application of the timeline in § 252(a)

and (b) relating to voluntary negotiations and arbitration, ACS filed a "motion" on

January 24, 2000 requesting the RCA to adopt a forward looking cost methodology to

revise the Anchorage loop rate.[113] The soonest that ACS could have filed a petition for

arbitration (not a motion) under § 252(b)(1), however, would have been some time in

March 2000.[114] Furthermore, ACS did not submit a petition meeting the substantive

requirements in § 252(b)(2) such as identifying the unresolved issues, positions of the

parties, and open issues for arbitration.  ACS was correct when it originally conceded to

the RCA that the statutory timeline in § 252 did not apply to its request to re-open the

Anchorage arbitration.[115] ACS' later attempt to apply the 9-month time line in § 252 on

the grounds that the RCA subsequently agreed to revise the entire agreement, not just the

rates, (ACS Cross Petition at 31-32), does not change the fact that ACS never submitted a

timely petition for arbitration in accordance with the requirements in § 252(b).  The RCA,

therefore, did not err by not applying the statutory time limits in § 252 under these

circumstances.

---

[113]     Box 1 at 218 (ACS Motion).
[114]     § 252(b)(1) only permits a party to submit a petition for arbitration between the
135th to 160th day after a request for negotiation has been submitted.
[115]     Box T-1 at 67 (Dec. 6, 2000 Oral Argument).

### D.    ACS IS RESPONSIBLE FOR THE DELAYS IN THE ARBITRATION

Lastly, in the event the Court is willing to hear ACS' claim about the RCA's failure to act in a timely manner, the claim should be denied because ACS is the party principally responsible for the delays in the arbitration.  As recounted in great detail above, the delays in the case are largely the result of ACS' demand that the RCA use a version of the ACS proprietary model to set the UNE rates and the resulting delays associated with the review of that manually engineered, time-consuming model.

As explained above, early in the proceeding, after the RCA had granted ACS' motion to start the process for adopting a forward-looking cost methodology to revise the UNE rates, the RCA ordered the parties to file briefs proposing specific, forward-looking costs models.[116] ACS had proposed a proprietary loop cost model (ACS v.7.2) and a modified version of the FCC Model, which the RCA had adopted in the Juneau and Fairbanks arbitration for setting the UNE rates.[117] GCI had proposed the HAI Model, Release 5.1.[118] The RCA on May 11, 2000 adopted the modified, Alaska-specific version of the FCC Model.[119]  As previously explained, the RCA's original model selection can scarcely be deemed dilatory, coming as it did within four months of ACS' motion in January 2000 to start the process for adopting a forward-looking cost methodology to revise the rates.  If the parties simply had used the FCC Model as a baseline and

---

[116]    Box 1 at 260-276 (Order No. 13).
[117]    *Id*. at 280 (ACS Response to Order No. 13).
[118]    *Id*. at 438 (GCI Response to Order No. 13).
[119]    *Id*. at 459-475 (Order No. 14).

arbitrated cost inputs, it is highly probable that the RCA would have finalized the rates in early 2001.[120]

Instead of accepting the FCC Model as a baseline, however, ACS subsequently fought against the use of the FCC Model notwithstanding the fact that it had earlier proposed the FCC Model to the RCA as an alternative cost model for use in the case. ACS proceeded to fight vehemently for the right to use its own in-house cost model as a model platform to set the rates even after the RCA in January 2001 had re-affirmed its intent to use the FCC Model as a baseline to set the rates.[121] Notwithstanding the RCA's re-affirmation of its model selection, ACS subsequently filed a brief again indicating its intent to submit evidence regarding its own in-house models to set the rates to reflect the Eighth Circuit's decision in *Iowa Utilities II*.[122] GCI opposed ACS' repeated efforts to alter the RCA's model decision and specifically cautioned the RCA that embarking on a new effort to develop a pricing model to conform to the Eighth Circuit's decision would be time-consuming and wasteful given that the Eighth Circuit had issued a stay of its mandate vacating the FCC's TELRIC rule.[123]

The RCA finally acceded to ACS' demands on May 20, 2001 and re-opened the process for reviewing forward-looking cost methodologies to set the rates.[124] Without specifically overturning its previous decision to use the FCC Model, the RCA indicated

---

[120]    *See* Note 42 above.
[121]    Box 1 at 564 (Order No. 15).
[122]    *Id*. at 601-629 (ACS Briefing).
[123]    *Id*. at 651-673 (GCI Response).
[124]    *Id*. at 785 (Order No. 20).

that it would consider ACS' in-house models and "other forward-looking cost methodologies that parties wish us to consider."[125] Thus, at ACS' own instigation, the RCA started anew at making a decision that had been concluded 15 months earlier.

The RCA additionally sought to appease ACS when it adopted ACS' proprietary cost model on July 29, 2002 to set the rates on the condition, however, that GCI be permitted an opportunity to review the model and proposed modifications to the platform.[126] In that decision, the RCA recognized that ACS' model is based on a manual engineering design by ACS engineers that would take GCI engineers some time to review.[127] The RCA cautioned that:

> We recognize that the ACS-AN approach poses a number of challenges. First, use of a manual network design process is slow, potentially error prone, and because it relies on the expertise of individual design engineers, may lack the uniformity of a model that relies strictly on algorithms. Second, the ACS-AN model will produce only one category of rate elements – loop rates. Third, the spreadsheet portions of the model do not yet have a simple front end for inputs and changes to other factors can be difficult and time consuming. Fourth, potential modifications to the model may take considerably more time than the FCC model would require.[128]

The RCA stated very clearly that if "ACS-AN is willing to live with the delays inherent in using this model, we are willing to accommodate their request that it be used in this proceeding."[129]

---

[125]    *Id.* at 787.
[126]    Box 1 at 3158 (Order No. 26).
[127]    *Id.* at 3161 (Order No. 26).
[128]    *Id.* at 3162 (Order No. 26).
[129]    *Id.* at 3163 (Order No. 26).

ACS, however, has never accepted any responsibility for the delays associated
with its insistence that its model be used to set the rates.  Tired of ACS' repeated
complaints about the delays, the RCA issued Order No. 27 in which it set forth a detailed
chronology of events in the arbitration concluding that:

> We find that ACS-AN itself has authored most of the delays
> in this case. The history of this docket, detailed in the
> Background section of this order, shows that ACS-AN has
> continually changed directions over its preferred model
> platform and has substantially extended the litigation by
> disregard of our orders.[130]

To the present day, as evidenced by its argument in the Cross-Petition Brief,
ACS still does not acknowledge any fault for the delays in the arbitration. The facts,
however, show otherwise.  The real irony in the case, though, is that although ACS
vehemently argued that its model should be used rather than the FCC Model to set the
rates, and this demand caused substantial delay in the completion of the arbitration, ACS
admitted later in the proceeding that there really was no difference between the two
models and that what matters most are the cost inputs.  ACS' modeling expert, Bill
Wilks, testified:

> I ran both the GCI 7.2-G [which was a modified version of
> the ACS model] and modified FCC model using ACS'
> proposed cost inputs.  As can be seen in Exhibit WJW-7 and
> WJW-8, loading ACS costs into both the GCI models
> changes the rates from $4.84 and $7.08 to $25.56 and $24.53
> respectively.  ACS's two models filed August 29, 2003 (ACS
> 7.2 and the FCC-SM model) using ACS cost inputs produced
> rates of $25.88 and $25.45 respectively.  Therefore, as shown
> in exhibit WJW-7 and WJW-8, using both of GCI's models

---

[130]      Box 2 at 197 (Order No. 27).

but substituting ACS cost inputs results only in a $0.32 and
$.092 difference respectively in the rates.  GCI's redesign of
ACS 7.2 (its 7.2 G) had only a $.032 impact on UNE loop
rate.  ***The significant issues in this proceeding with respect
to the UNE loop element are cost inputs***.[131]

ACS generated approximately the same model results with both models using its cost

inputs.  The truth is that the battle ACS waged to use its proprietary cost model to set the

rates resulted in substantial delays for which it has only itself to blame, and worse, the

delays were a complete waste of time given that the FCC Model was perfectly adequate

to produce the UNE rates that ACS wanted when populated with its own cost inputs—a

fact that ACS admitted. Given its culpability for the wasteful delays in the case, ACS has

no right to complain about the time the RCA took to complete the arbitration.

## II.    THE RCA'S INTERIM RATE DECISIONS WERE REASONABLE AND BASED ON THE BEST AVAILABLE INFORMATION

        In addition to its complaint about the delays in the proceeding, ACS also

argues that the RCA failed to provide adequate interim rate relief in response to its

requests.   As explained below, the RCA's interim rate decisions were reasonable

and are supported by substantial evidence in the record as the record stood at the

time the agency made its decisions.

### A.  THE INITIAL ARBITRATION AWARD IN 1996 WAS REASONABLE

        ACS' first complaint is that the original Anchorage loop rate of $13.85

established by the former APUC in January 1997 was illegal and did not comply

---

[131]    Box 3 at 2742 (Bill Wilks testimony).

with TELRIC. ACS Cross-Petition at 36-37. The former APUC's approval of the original rate was lawful, and that rate remained in place without challenge by ATU, ACS' predecessor, until ACS bought ATU in 1999 and then subsequently sought to dramatically increase the Anchorage loop rate.

It is important to point out that the difference between the $13.85 loop rate that GCI proposed in the original arbitration and the $14.34 loop rate that ATU proposed was relatively small. So while ACS complains bitterly about the original $13.85 loop rate, ATU's proposed $14.34 loop rate was not much higher. As explained in the Background section, the original arbitration was conducted under "baseball style" rules, meaning that the arbitrator had to choose between the parties' competing proposals. ATU's proposed loop rate was based upon an embedded cost standard, while GCI's proposed loop rate was based on forward-looking costs. As the APUC explained, "ATU's proposal [on UNE pricing] was based largely on its existing local and interstate access tariffs, without adjustment. GCICC's proposed rates were an attempt to approximate forward-looking costs based upon the best available evidence … GCICC's proposed rates were based upon a closer approximation of forward-looking costs than ATU's, which relied more heavily upon historical embedded costs."[132] When the former APUC was conducting the original proceeding, the Eighth Circuit had stayed the FCC's

---

[132]     Admin. Record at 12800 (Order No. 8).

TELRIC rule.[133] Notwithstanding this fact, ATU's embedded cost rate proposal was inconsistent with the Act's requirement that rates must be set without reference to rate of return embedded costs.[134] Thus, although the APUC had not yet approved a forward-looking cost methodology to set UNE rates, GCI's proposed loop rate was reasonable because it was based on forward-looking costs, and the APUC had to decide upon a rate based on "basis of the best information available to it."[135]

Thus, the original arbitrated rate was in full compliance with the existing, albeit nebulous, statutory law.  ATU, indeed, never sought judicial review of the APUC's final order approving the Anchorage interconnection agreement, and the $13.85 UNE loop rate went into effect and remained lawful until it was replaced by the RCA with an interim rate.

### B. THE RCA'S DECISION IN OCTOBER 2001 TO INCREASE THE LOOP RATE TO $14.92 ON AN INTERIM BASIS WAS REASONABLE

ACS also argues that the $14.92 interim loop rate set by the RCA in October 2001 was inadequate because: (1) it had submitted model runs requesting a higher rate; (2) the final loop rate of $18.64 proves that the $14.92 rate was too low; and, (3) the RCA did not include a true-up provision. ACS Cross-Petition at 44-48.  ACS is wrong on all counts.

---

[133]     Note 9 *supra*.
[134]     47 U.S.C. § 252(d)(1)(A)(i).
[135]     47 U.S.C. § 252(b)(4)(B).

### 1.  The RCA's $14.92 Rate Decision Is Supported By Substantial Evidence

When ACS filed its motion requesting an interim rate increase, it requested a $24 loop rate.[136]  The fact that ACS requested a loop rate of $24, however, does not mean that it was entitled to that rate.  ACS, as the moving party requesting a change in the rate, had the burden of proving the reasonableness of its proposed interim rate request.  The problem with the model runs ACS filed in support of its $24 loop rate request, however, was that one run was based on an unapproved model platform (*i.e.*, ACS submitted a model run using ACS v.7.2) with cost inputs for which no cost support had been filed,[137]and the second run was from an unmodified version of the FCC Model (not the modified version of the FCC Model from the Fairbanks arbitration)[138] that similarly included cost inputs for which no support had been filed.[139] The RCA understandably had

---

[136]    Box 1 at 941-42 (ACS Motion For Interim Rate).

[137]    ACS admitted at the oral argument that it had submitted its 7.2 Model run but had not submitted any of the underlying cost support for the cost inputs.  Box T-1 at 143-44 (Oral Argument, August 17, 2001).

[138]    In its Cross-Petition at 40, ACS argues that the use of the FCC Model was inappropriate because it included default inputs based on national averages.  This statement is disingenuous because it overlooks the fact that when both parties modified the FCC Model in the Fairbanks arbitration, there was only a small set of cost inputs that were contested.  Both parties (ACS and GCI) did not contest the overwhelming majority of the default cost inputs in the FCC Model.  *See* Box T-1 at 147 (Oral Argument, August 17, 2001, GCI Attorney Mark Moderow explaining the process the parties went through to modify the FCC Model in the Fairbanks arbitration to make it Alaska-specific).

[139]    *See* Box T-1 at 148-49 (Oral Argument, August 17, 2001, GCI Attorney Mark Moderow explaining to the RCA that the FCC Model run produced by ACS does not include the modifications that were made in the Fairbanks arbitration and includes untested and undocumented cost inputs).

difficulty with the lack of cost support for ACS' request as evidenced by the

following colloquy at the oral argument:

> **COMMISSIONER STRANDBERG:**
>
> So then it is ACS's position that interim rates should be
> allowed without a firm cost base for them right now on the
> basis of them being interim?
>
> **MR. STEINBERG:**
>
> Well, I think that answer is yes, Commissioner Strandberg.
> And let me just clarify that the rate that we have today, the
> $13.85 rate is an interim rate was adopted without any cost
> support.  And, consequently, we don't feel that there's a huge
> change that we're asking for here.  We've already got an
> interim rate that was adopted without cost support.  We think
> it's appropriate to update that element.[140]

Mr. Steinberg was wrong, of course, when he claimed that the original

$13.85 loop rate was adopted without cost support as discussed above.

Additionally, by contrast, GCI sought to simplify the process of demonstrating

that the current rate of $13.85 was reasonable in light of the evidence in the record

at that stage in the proceeding. GCI used the modified version of the FCC Model

(which the RCA had approved in the Fairbanks arbitration) and populated it with

the cost inputs that the RCA had approved as TELRIC-compliant from the

Fairbanks arbitration, which were conservative given that costs in Fairbanks are

demonstrably higher than those in Anchorage. Using the Fairbanks inputs in

combination with the modified version of the FCC Model, GCI produced a model

---

[140]     Box T-1 at 146 (Oral Argument, August 17, 2001).

run with a loop rate of $14.92. GCI also ran the modified version of the FCC

Model with national default FCC cost inputs, which yielded a rate of $12.94.[141]

Thus, GCI argued that the prevailing rate of $13.85 was reasonable and should

remain in place pending the RCA's final determination of the rates because the

final rate, based on the information in the record at that juncture in the proceeding,

was likely to be in the range between $12.94 and $14.92.[142]

On October 25, 2001, the RCA granted ACS' request for an interim rate increase

and established a UNE loop rate of $14.92.[143] In doing so, the RCA relied on the GCI

FCC Model run using the TELRIC-compliant cost inputs recently adopted in the

Fairbanks arbitration but with Anchorage-specific customer and wire center location

information.  The RCA found that this was the most likely surrogate in the record for the

eventual permanent rate based on the best available information in the record at that

time.[144] Discussing the relative merits of the parties' proposals, the RCA observed that

"ACS-AN's request is premised on an untested and unapproved methodology."[145]  The

RCA explained its decision as follows:

> We must determine fair interconnection prices for ACS-AN
> and GCI in Anchorage. This is a request for interim relief
> while we fully adjudicate the issues.  The first step in this
> process is the selection of an appropriate cost methodology
> for UNE pricing.  We adopted the FCC model for use in this
> proceeding on May 30, 2000.  While we have requested and

---

[141]     Box 1 at 991-92 (testimony of Frederick Hitz).
[142]     *Id*. at 969-1029 (GCI Opposition).
[143]     Box 1 at 2698 (Order No. 23).
[144]     *Id*. at 2707 (Order No. 23).
[145]     *Id*. at 2706 (Order No. 23).

received briefing on alternative cost methodologies, we have
not adopted the ACS-AN Version 7.2 model as an appropriate
model for use in UNE pricing. We have recognized that
forward-looking cost methodologies are in a state of flux but
believe our selection of the FCC model and the standards we
applied in [the Fairbanks and Juneau arbitrations] were and
are in compliance with the Act. We will decide whether a
different model should be used before arbitration over inputs
begins; but for purposes of an interim rate increase, we will
use the currently approved methodology. We do not have an
adequate record to adopt the use of a new methodology for an
interim rate increase.[146]

Furthermore, the RCA explained that the ACS model runs were based on cost

inputs that the RCA had not yet determined were compliant with TELRIC. It explained:

We also are unable to determine whether inputs used by
ACS-AN in its model comply with the FCC pricing rules as
we have previously interpreted them. We will not order
interim UNE rates based on a UNE pricing model which has
not been adopted by us or on cost support data and inputs
which have not been subjected to scrutiny. As discussed
above, incorrectly set UNE prices could undermine the intent
of the Act in a manner that could not remedied by refundable
rates. Therefore, we must grant ACS-AN only what is
necessary under existing methodologies during the pendancy
of this rate case.[147]

The RCA could have justifiably and lawfully denied <u>any</u> interim rate relief to ACS

in light of GCI's opposition and evidence. The RCA was under no duty to approve an

interim rate at all.[148] Despite ACS' bitter complaints about the unreasonableness of the

$13.85 loop rate, GCI just as vehemently defended the reasonableness of that rate and

pointed out that ACS' claims of "confiscation" lacked merit and support. GCI provided

---

[146]     *Id*. at 2706-07 (Order No. 23).

[147]     *Id*. at 2707 (Order No. 23).

[148]     Box 1 at 977-78 (GCI Opposition).

substantial evidence to support leaving the original rate in place pending the

determination of the final rate.  Notwithstanding GCI's opposition, the RCA chose to

grant ACS an interim rate increase and did so based on the best available information it

had at that time, which was the GCI FCC Model run using the recently approved

Fairbanks cost inputs.  The RCA's preference for and reliance on this model run to set the

$14.92 was eminently reasonable and supported by substantial evidence in the record.

Thus, its interim rate decision must be affirmed. *U.S. West Communications, Inc. vs.*

*Jennings*, 304 F.3d 950, 959 (9th Cir. 2002)  (noting that the choice of which model

produces the most reliable results falls within the agency's expertise and upholding state

commission's determination of cable sheath mileage because the decision was supported

by substantial evidence).

### 2.  *The Final Loop Rate Does Not Prove That The Interim Rate Was Improper*

Contrary to ACS' claim, the final $18.65 loop rate approved by the RCA does not

validate the "legal inadequacy" of the RCA's $14.92 interim rate decision.  ACS Cross-

Petition at 44.  The $18.64 final rate (which GCI does not believe is lawful in any event,

a position more fully explained in GCI's challenge to the final rate calculation) does not

undermine the validity of the $14.92 interim rate decision because the latter must be

judged based on the record that existed when the RCA made its decision. The Act only

requires state commissions to make decisions based on the best available information

they have.[149] As explained above, the RCA could have lawfully and reasonably denied any increase in the interim loop rate based on the evidence GCI submitted in opposition to ACS' request. The rate increase chosen by the RCA was supported by substantial evidence as previously discussed, and therefore, was lawful.

### 3. There Is No Requirement That The RCA Adopt A True-Up Provision In Addition To An Interim Rate Increase

ACS also argues that the RCA should have provided a true-up provision in addition to the interim rate increase it approved in October 2001. ACS did not initially ask for a true-up provision in its motion[150] and only requested one in its reply as an alternative remedy to an interim rate increase.[151] ACS even discouraged the RCA from adopting a true-up provision expressing its clear preference for an interim rate increase.[152] Moreover, ACS did not even raise the issue of a true-up provision at the oral argument.[153] The RCA was under no duty to provide both an interim rate increase and a true-up provision. Indeed, there is no FCC regulation that requires state commissions to adopt a true-up provision. The decision to provide a true up provision is a matter left to the agency's discretion. In this instance, the RCA did not abuse that discretion or otherwise act arbitrarily when it provided ACS with the maximum interim rate increase it could based on the best available information it had at that time without a true-up provision. In

---

[149]    47 U.S.C. § 252(b)(4)(B).
[150]    Box 1 at 927-64 (ACS Request For Interim Rate Relief).
[151]    Box 1 at 1082 (ACS Reply).
[152]    *Id.*
[153]    Box T-1 at 113-170 (Oral Argument, August 17, 2001).

providing an interim rate increase, the RCA acted reasonably and fairly and no further relief was required as a matter of law.

### C. THE RCA'S DECISION IN APRIL 2003 TO DENY BOTH ACS' AND GCI'S MOTIONS TO CHANGE THE INTERIM RATE WAS REASONABLE

ACS also argues that the RCA's refusal to change the $14.92 interim loop rate in April 2003 was unreasonable.  ACS Cross-Petition at 41-46.   As explained in the Background section above, ACS filed a motion for a second interim rate increase on October 24, 2002 at the same time that it was advocating the use of its manually-engineered in-house model, which substantially prolonged the length of the arbitration. In its motion, ACS alleged that GCI had improperly manipulated the line counts in the FCC Model run that produced the $14.92 UNE loop rate that the RCA adopted in Order No. 23.  ACS claimed that with proper line counts, the interim rate should be increased to $16.26.[154] ACS, however, requested that the rate be increased to $24.48 consistent with new model runs using the ACS v.7.2 model, which ACS populated with cost inputs that the parties had not agreed to and that the RCA had not determined was compliant with TELRIC.[155]

GCI opposed this request pointing out that ACS' complaint about the line counts in the prior FCC Model run was untimely by more than 17 months,[156] that its allegations

---

[154]     Box 1 at 3259 & 3266 (ACS Motion).

[155]     *Id*. at 3260 & 3267-68 (ACS Motion).

[156]     Box 2 at 160 (GCI Cross-Motion & Opposition).

about GCI's lack of honesty regarding the line counts were baseless,[157] that a more reasonable run of the FCC Model with additional corrections using cost inputs from the Fairbanks arbitration (which were the only RCA-approved cost inputs at the time) yielded a rate in the range of $10.88 to $11.21,[158] that the ACS v7.2 model platform still contained significant flaws but that if the model were run with various corrections and populated with TELRIC-compliant cost inputs from the Fairbanks arbitration, GCI's best estimate at that time was that the model would produce a rate in the range of $12.89 to $13.28.[159] In light of these facts, GCI filed a cross-motion requesting that the RCA lower the interim rate to the original $13.85 and declare the rate refundable to a limit of $10.88.[160]

ACS filed a reply on December 20, 2002 in which it withdrew its request for an interim rate of $24.48 and requested instead that the rate be increased to $16.26 focusing only on the line count correction it believed should be made to the prior FCC Model run.[161] Also, significantly, ACS did not alternatively request a true-up provision in either its motion or reply. GCI filed its reply in support of its request that the original $13.85 rate be reinstated based on corrections to the prior FCC Model run it explained in its cross-motion.[162]

---

[157]    *Id*. at 89-93 (testimony of Robert Mercer).
[158]    *Id*. at 114-15 (testimony of Robert Mercer).
[159]    *Id*. at 112 (testimony of Robert Mercer).
[160]    Box 2 at 142 (GCI Motion and Cross-Motion).
[161]    *Id*. at 219-220 (ACS Reply).
[162]    *Id*. at 530-33 (GCI Reply In Support of Cross Motion).

On April 14, 2003, the RCA denied both parties' motions to change the interim loop rate.[163] The RCA essentially chastised the parties for submitting model runs of ACS v.7.2 before the platform had yet been approved, for using cost inputs that had not been subjected to scrutiny, and for arguing about different corrections to the prior FCC Model run that had been previously reviewed by both parties when the RCA set the rate at $ 14.92 more than a year earlier.[164] The RCA urged the parties to stop devoting time and resources to advocating for further changes in the interim rate and instead focus on completing the arbitration to produce final rates.[165] Notwithstanding the RCA's clear message, ACS filed a petition for reconsideration repeating the same arguments it previously made to the RCA,[166] which GCI opposed, and the RCA summarily denied.[167]

The RCA's decision to deny both parties' requests to change the interim loop rate was reasonable.  The RCA understandably did not want to devote its resources and those of the parties to re-examine the interim rate yet again while both the agency and the parties were trying to complete the arbitration.  ACS, in particular, is the party that least has the right to complain about this decision in light of the fact that it was the principal culprit responsible for the substantial delays in the arbitration given its demand to use its proprietary cost model – delays that the RCA warned ACS about when it adopted ACS'

---

[163]     *Id*. at 1578 (Order No. 31).
[164]     *Id*. at 1583-584 (Order No. 31).
[165]     *Id*.
[166]     Box 2 at 1617 (Petition For Reconsideration).
[167]     *Id*. at 1680 (Order No. 33).

model.[168]  The RCA's refusal to re-visit the interim rate and instead prompt the parties to

move forward with completing the arbitration to arrive at a final permanent rate was

reasonable and not arbitrary or capricious.  Furthermore, ACS has no right to complain

about the lack of a true up provision because ACS never requested one at any time in

connection with its second request for an interim rate increase.

### D.  THERE IS NO BASIS TO SUPPORT ACS' CLAIM THAT GCI UNDERPAID ACS BY $11 MILLION

Lastly, GCI wishes to respond to the extraordinary assertion by ACS that

"[a]s a result of the improperly low rate [*i.e.*, both the original $13.85 loop rate

and the subsequent $14.92 interim loop rate], GCI was permitted to underpay ACS

by almost $11 million from January 2000 (when ACS first asked for a final loop

rate) through June 2004 (when a final rate was finally established)." ACS Cross-

Petition at 45.  ACS' claim that GCI underpaid ACS by $ 11 million is based on

the retroactive application of the final $18.64 loop rate back to January 2000 when

ACS first filed a motion for the RCA to adopt a forward looking cost methodology

to revise the original $13.85 loop rate.[169]

ACS' claim that GCI underpaid it by $11 million utterly lacks a basis in

law.  GCI has consistently paid ACS a lawful loop rate as first established by the

APUC and subsequently by the RCA.  The original $13.85 loop rate approved by

the APUC was lawful when the APUC adopted it in the original arbitration,

---

[168]     Box 1 at 3163 (Order No. 26).
[169]     ACS Exh. 1.

discussed above, and it remained lawful until the RCA adopted an interim

substitute rate of $14.92 in October 2001.  Furthermore, as discussed above, the

RCA's interim rate decisions also were reasonable and lawful.  Because there is no

merit to any of ACS' grievances regarding these rates, its claim that GCI

underpaid ACS by $11 million, likewise, is completely without merit.

Furthermore, ACS' $11 million dollar claim ignores the substantial delays that it

caused in the arbitration that prevented the RCA from establishing a final

Anchorage loop rate on a more timely basis, discussed in detail above, and further

ignores the fact that ACS did not even file a motion requesting an interim rate

increase until June 11, 2001,[170] a matter that the RCA did not conclude until it

issued its decision on October 25, 2001.[171] Thus, calculating the alleged

"underpayment" from January 2000 is ridiculous.

   At bottom, there is no legal basis to retroactively apply the RCA's final

rate calculation (which GCI disputes in any event) given that GCI has always paid

ACS lawful, Commission-approved rates.

## **CONCLUSION**

   For the reasons set forth above, ACS is not entitled to any relief with respect to the

claims it asserts in its Cross-Petition Brief Re: Delay And Interim Rate Issues.

Specifically, the Court should dismiss Cross-Petition claims on the grounds that:

---

[170]    Box 1 at 927.
[171]    Box 1 at 2698.

(1)     The Court does not have subject matter jurisdiction to hear ACS' claim that the RCA violated the Act by failing to complete the arbitration either within the statutory timeline in § 252 or within a reasonable time.

(2)     Alternatively, ACS is barred under the doctrine of *res judicata* from re-litigating the claim that the RCA violated the Act by failing to complete the arbitration within the statutory timeline in § 252 or within a reasonable time.

(3)     Alternatively, the RCA acted reasonably in its conduct of the Anchorage arbitration given that the statutory timeline in § 252 did not apply to ACS' request to re-open the Anchorage arbitration to revise the UNE rates, and further, ACS' actions were the principal cause for the delays in completing the arbitration.

(4)     The original $13.85 loop rate adopted by the APUC in January 1997, which ATU (ACS' predecessor) did not even challenge, was a lawful rate and remained so until the RCA replaced it with an interim $14.92 loop rate in October 2001.

(5)     The RCA's decision adopting a $14.92 interim loop rate in October 2001 was reasonable and supported by substantial evidence in the record that existed when the agency made its decision.

(6)     The RCA did not abuse its discretion or otherwise act arbitrarily when it granted ACS a $14.92 interim rate increase in October 2001 without a true up provision.

(7)     The RCA's decision in April 2003 to deny the parties' respective motions to re-visit the interim loop rate yet again was reasonable and not arbitrary and capricious.

(8)    The RCA's decision not to include a true-up provision when it refused to re-visit the interim rate in April 2003 was reasonable given that ACS never requested such relief in its request.

(9)    ACS is not entitled to any retroactive relief based on the RCA's final rate award in June 2004 given that the APUC's original rate order was lawful and unchallenged and the RCA's subsequent interim rate orders were lawful.

**DATED** at Anchorage, this 5th day of June, 2006.

Respectfully submitted this 5th day of June 2006,

GCI COMMUNICATIONS CORP d/b/a
GENERAL COMMUNICATION, INC. d/b/a GCI

/s Martin M. Weinstein
Regulatory Attorney
Alaska Bar No.  9306051
General Communications, Inc.
2250 Denali Street, Suite 1000
Anchorage, Alaska 99503
Phone:  907-868-6561
Email:  mweinstein@gci.com

CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically served on counsel of record identified below this 5th day of June, 2006.

| Robert Royce | Richard Maki |
| Assistant Attorney General | Tindall Bennett & Shoup |
| Department of Law | 508 West 2nd Avenue, Third Floor |
| 1031 W. 4th Avenue, Suite 200 | Anchorage, Alaska 99501 |
| Anchorage, Alaska 99501 | |

By: /s Martin M. Weinstien
      Regulatory Attorney
      Alaska Bar No.  9306051
      General Communications, Inc.
      2250 Denali Street, Suite 1000
      Anchorage, Alaska 99503
      Phone:  907-868-6561
      Email:  mweinstein@gci.com

## APPENDIX

*Alaska Public Utility Commission order in 1999 Approving*
*ACS Acquisition of Various Incumbent Utilities* ....................................................Exhibit V


*Second Alaska Public Utility Commission Order in 1999 Approving*
*ACS Acquisition of Various Incumbent Utilities* ................................................Exhibit W

*Copies of Federal Communications Commission's Record Sheet*
*Listing Records Filed in Proceeding 01-201*........................................................Exhibit X