STATE OF ALASKA

THE ALASKA PUBLIC UTILITIES COMMISSION

Before Commissioners:
                                    Sam Cotten, Chairman
                                    Alyce A. Hanley
                                    Dwight D. Ornquist
                                    Tim Cook
                                    James M. Posey

| | | |
|---|---|---|
| In the Matter of the Application by ALEC ACQUISITION SUB CORP. for Authority To Acquire a Controlling Interest in TELEPHONE UTILITIES OF ALASKA, INC., Holder of Certificate of Public Convenience and Necessity No. 251 | ) ) ) ) ) ) ) ) ) | U-98-140<br><br>ORDER NO. 7 |
| In the Matter of the Application by ALEC ACQUISITION SUB CORP. for Authority To Acquire a Controlling Interest in PTI COMMUNICATIONS OF ALASKA, INC., Holder of Certificate of Public Convenience and Necessity No. 117 | ) ) ) ) ) ) ) ) ) | U-98-141<br><br>ORDER NO. 7 |
| In the Matter of the Application by ALEC ACQUISITION SUB CORP. for Authority To Acquire a Controlling Interest in TELEPHONE UTILITIES OF THE NORTHLAND, INC., Holder of Certificate of Public Convenience and Necessity No. 359 | ) ) ) ) ) ) ) ) | U-98-142<br><br>ORDER NO. 7 |

**ORDER HOLDING PROCEDURAL MATTERS IN ABEYANCE
AND APPROVING APPLICATIONS, SUBJECT TO CONDITIONS**

**Exhibit V
Page 1 of 26**

BY THE COMMISSION:

On August 25, 1998, ALEC Acquisition Sub Corp. (ALEC) filed applications to acquire a controlling interest in TELEPHONE UTILITIES OF THE ALASKA, INC. (TUA); PTI COMMUNICATIONS OF ALASKA, INC. (PTIC), and TELEPHONE UTILITIES OF ALASKA, INC. (TUNI).[1]

According to the applications, ALEC would acquire TUA, PTIC, and TUNI through the purchase of 100 percent of the shares of the voting securities of these utilities which are currently held by CenturyTel of the Northwest, Inc. Also according to the application, Fox Paine & Company, LLC, presently owns 100 percent of the shares of ALEC Acquisition Corporation, which owns 100 percent of the shares of ALEC. The applicant asserts that it does not propose to change personnel or equipment of TUA, PTIC, or TUNI and will assure adequate staffing of these utilities to maintain their current level of service.

On September 30, 1998, ALEC filed a supplement to the applications for authorization to acquire a controlling interest in PTI Communications. On November 3, 1998, ALEC filed supplemental information for each of its applications in these

---

[1]In these proceedings, TUA, PTIC, and TUNI will be collectively referred to as PTI Communications. TUA holds Certificate of Public Convenience and Necessity (Certificate) No. 251 authorizing it to furnish local exchange telephone service within/or around Juneau, Douglas, Eielson Air Force Base, and Fort Wainwright. PTIC holds Certificate No. 117 authorizing it to furnish local exchange telephone service within the Fairbanks area. TUNI holds Certificate No. 359 authorizing it to furnish local exchange telephone service within approximately 64 communities within Alaska.

proceedings.  On November 18, 1998, ALEC filed an amendment to the applications regarding corporate structure.  On November 19, 1998, ALEC filed an exhibit to the amendment regarding corporate structure.

**Outstanding Procedural Matters**

On March 12, 1999, GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC., and d/b/a GCI (GCI) filed an application for an order requiring disclosure of confidential information to certain decisionmakers and strategists.

On March 19, 1999, ALEC filed a petition to classify records as confidential.  On the same date, ALEC filed its response to GCI's request for an order requiring disclosure of information.  On March 19, 1999, the Commission issued a bench ruling denying GCI's application for an order requiring disclosure.[2]

On March 25, 1999, the Commission Staff (Staff) filed its opposition to classifying Exhibit JHH-5 attached to the prefiled testimony of James H. Huesgen, as confidential.

On March 31, 1999, ALEC filed a motion to bar GCI from introducing into evidence portions of the prefiled written testimony that are beyond the scope of proceeding and a motion for expedited consideration of its motion to bar.  On April 1, 1999, GCI filed its memorandum in opposition to ALEC's motion for

---

[2]The bench ruling was issued during the prehearing conference held on March 19, 1999.

U-98-140(7)/U-98-141(7)/U-98-142(7) - (4/19/99)
Page 3 of 26

**Exhibit V**
**Page 3 of 26**

expedited consideration.  On April 2, 1999, ALEC filed its reply to GCI's opposition to motion for expedited consideration.

On April 2, 1999, Staff filed a request for official notice of Century Corporation representations to the Commission in a public meeting.

On April 2, 1999, the Commission issued an oral ruling granting the petition to classify certain materials as confidential and denying the motion for expedited consideration of the motion to bar.[3]

At the onset of the hearing[4] held on April 6, 1999,  GCI moved to withdraw from further participation in these proceedings. Staff opposed GCI's withdrawal or, in the alternative, requested the Commission to allow the withdrawal on the condition that the prefiled testimony and exhibits filed by GCI would be entered as evidence in the record in these proceedings.  ALEC requested that, if the motion to withdraw was granted, the Commission delay convening the hearing for one day.

The Commission issued a bench ruling granting GCI's request to withdraw without condition and rescheduling the hearing to convene on April 7, 1999.

---

[3]All parties were telephonically of the Commission's rulings.

[4]By Order U-98-173(3)/U-98-174(3), dated January 29, 1999, the Commission, among other things, affirmed its oral ruling adopting a hearing and filing schedule including scheduling these matters for hearing on April 6, 1999.

**Exhibit  V**
**Page 4 of 26**

The hearing was held, as rescheduled, on April 7 and 8, 1999. During the hearing, ALEC presented the testimony of James H. Huesgen, Executive Vice President and one of the founding members of ALEC Holdings, Inc.; Dr. William E. Taylor, Vice President of National Economic Research Associates, Inc.; Wesley E. Carson, Vice President and one of the founding members of ALEC Holdings, Inc.; Michael L. Schuh, Vice President and Chief Information Officer of ALEC Holdings, Inc.; and Benjamin L. Jarvis, Vice President of Operations for ALEC Holdings, Inc. Staff presented the testimony of Parker J. Nation, Jr., Utility Financial Analyst; Mark A. Johnston, Chief Utility Financial Analyst; William E. Marshall, Utilities Engineering Analyst IV; Dr. Ben Johnson, President of Ben Johnson Associates, Inc.; and Agnes E. Pitts, Chief of Consumer Protection and Public Information.

According to ALEC, it is financially fit to acquire PTI Communications. (T-2, p. 7.) ALEC asserted that it will purchase PTI Communications for $435 million to be financed by a $65 million equity contribution and $370 million in debt financing. (T-2, p. 7.) ALEC maintained that it is prepared and able to make the substantial investment necessary to operate and maintain the network while keeping technology current with the demands of the marketplace. (T-2, pp. 9-10.) ALEC asserted that it had sufficient capital to meet its debt obligations, support

Exhibit V
Page 5 of 26

the network, and make any necessary network improvements.  (T-3, p. 7.)

ALEC projected four-year average annual expenditures of $22.8 million.  (T-3, p. 8.)  ALEC stated that no new major system updates are needed that would require new long-term financing. (T-3, p. 7.)  ALEC asserted that any revenue deficiencies for such improvements can be drawn down from ALEC's revolving credit agreement and/or produced from the operating cash flow of the utilities.  (T-3, pp. 7-8.)

ALEC asserted that its management team had experience successfully investing in the telecommunications infrastructure in Alaska, keeping consumer rates low, and providing advanced telecommunications services to Alaskans.  (T-2, p. 5.)  ALEC stated that the management team includes individuals who have played an integral role in evolution of this state's telecommunications infrastructure.  (T-1, p. 3.)

ALEC stated that the team includes individuals who participated in the launch of the Aurora II Satellite, the project to build the North Pacific Cable, and the sale of Alascom, Inc. to AT&T Corporation.  (T-1, pp. 4-6.)  ALEC stated that this management team also has experience with the White Alice Communications System, Alaska Communication System (the military long lines telecommunications network that first linked Alaska communities with the Lower 48), as well as the privatization and modernization of Alascom, Inc. d/b/a AT&T Alascom.  (T-1, pp.3-4.)

**Exhibit V**
**Page 6 of 26**

ALEC maintained that the management team has also has expertise in legal and regulatory affairs, labor relations, human resources, and long distance and local exchange operations. (T-1, p. 4-5.)

ALEC argued that the determination regarding whether these transactions are affirmatively consistent with the public interest requires consideration of two issues: (1) whether the transactions reduce competition and increase market power and (2) whether the transactions increase the ability or incentive to cross-subsidize competitive services or to discriminate in favor of affiliates. (T-6, pp. 3, 8, 26, 27.)

ALEC asserted that it will consolidate the general and administrative (G&A) functions of the acquired utilities resulting in increased efficiency of operations. (T-2, p. 4.) In addition, ALEC argued that merging support services would result in cost savings. (T-3, pp. 1-2.) ALEC asserted that it planned to retain the experienced workforce of PTI Communications and reduce personnel through attrition and early retirement. (T-2, p. 17.)

ALEC argued that the consolidated utilities would have the ability to offer a wider range of complementary telecommunications services through its affiliates. (T-6, p. 4.) ALEC further argued that consumers would benefit through the utilities' increased ability to respond to growth in demand for traditional and new telecommunications services; reduction in costs, increased productivity, as well as a greater ability to compete in future long distance business in Alaska without

Exhibit V
Page 7 of 26

increasing the likelihood of discrimination or cross-subsidization by the incumbent local exchange carriers (ILECs).  (T-6, pp. 3-4.)

ALEC also asserted cost reductions would be achieved by eliminating duplicative systems and capital expenditures, as well as eliminating redundant expenses for information systems and advertising.  (T-6, pp. 3-4.)  Moreover, ALEC asserted capital costs would be reduced by volume discounts from suppliers, as well as elimination of duplicative management and administrative staff expenses.  (T-6, p. 4.)  ALEC stated that fixed costs would be apportioned over a larger volume of output or a larger complement of services.  (T-6, p. 4.)

ALEC proposed to consolidate the information technology infrastructures of all operations to provide enhanced services and operational efficiencies.  (T-5, p. 4.)  For example, all operations would utilize the ATU[5] Data Center and operating platforms as the primary foundation because ample environmental and systems expansion capabilities would be available in that data center.  (T-5, p. 4.)  ALEC stated that numerous benefits, including a significant reduction in capital costs would result by consolidating operating systems, including a projected annual savings in excess of $1 million dollars.  (T-5, p. 5.)

ALEC asserted that although data would be consolidated, it would be organized so that it could be identified and separated

---

[5]The Municipality of Anchorage d/b/a Anchorage Telephone Utility a/k/a ATU Telecommunications.

U-98-140(7)/U-98-141(7)/U-98-142(7) - (4/19/99)
Page 8 of 26

Exhibit  V
Page 8 of 26

for accounting, cost allocation, separation and regulatory reporting purposes. (T-5, p. 6.) Moreover, ALEC asserted that the security and confidentiality of information concerning the individual companies would be assured by stringent security mechanisms inherent in the operating systems and application environments. (T-5, p. 6.) ALEC stated that it will structurally separate the companies it would operate and develop cost-accounting safeguards to eliminate the risk of cross-subsidization between regulated and nonregulated entities. (T-2, p. 4.)

ALEC also argued that consolidation will promote competition. (T-5, pp. 6-7.) ALEC proposes to install a single Operations Support System (OSS) interface on an incremental basis for interconnecting competitive local exchange carriers (CLECs). (T-5, p. 7.) ALEC stated that $500,000 has been set aside from the 1999 budget to address this area of operations. (T-5, p. 7.)

ALEC asserted that in 1999, PTI business operations would be moved into the ATU Data Center from Washington and Louisiana. (T-5, p. 7.) ALEC proposed to convert to a new user-friendly billing system for customers that would include capabilities for future customer service enhancements such as electronic billing, web access, and interactive voice response. (T-5, p. 8.)

ALEC proposed to adopt the existing rates of PTI Communications. (T-2, p. 18.) However, ALEC noted that by Order U-96-121(5), dated September 25, 1997, PTIC is required to file

revenue-requirement, cost-of-service, and rate design studies in July of this year. (T-2, pp. 10-11.) ALEC requested the Commission postpone this filing and incorporate such a filing into a rate review under 3 AAC 48.275 for all of ALEC Holdings' regulated operating companies within six months after the first calendar year of operations. (T-2, p. 11.)

ALEC contended that customers would see advantages by being serviced by a financially strong, responsive, locally-managed, and privately-owned company. (T-1, p. 9.) In addition to other benefits, ALEC argued that the consolidated utilities would have the ability to exchange expertise and support systems as well as increased service and cost benefits. (T-1, p. 11.)

ALEC also argued that the employees of the utilities would no longer be faced with job uncertainty, and would receive competitive benefits and compensation. (T-1, p. 12.) ALEC asserted that it shared certain goals with the International Brotherhood of Electrical Workers leadership including limiting future staff reduction to attrition and reassignments. (T-1, p. 13.) ALEC noted that the public interest benefitted by preservation of jobs in the state and transfer of general and administrative support to Alaska. (T-1, pp. 13-16.)

ALEC argued that these acquisitions will not preempt the potential of PTI and ATU to compete with one another because neither company entertained such plans therefore, no potential competition would be eliminated. (T-3, p. 2.) Specifically,

ALEC argued that ATU and PTI do not offer the same services, serve in the same geographic areas, or compete in any market. (T-6, p. 9.) Even if they did, ALEC argued that any possible reductions in competition would be offset by the cost reductions and other efficiency gains derived from the acquisitions. (T-6, p. 7.) ALEC maintained that it does not foresee any competitors other than carriers such as cable television or personal communications services (PCS) providers or those with facilities already in place. (T-3, pp. 12-13.)

ALEC stated that it will make plans to fulfill the obligations of CenturyTel including deployment of Integrated Services Digital Network (ISDN). (T-1, p. 8.)

ALEC asserted that it is committed to improve customer service including responsiveness to service requests. (T-3, p. 3.) In particular, ALEC asserted that it is committed to a larger capital spending program for its infrastructure than that planned by Century for the next five years. (T-6, pp. 9-10.) ALEC asserted that it is committed to use its resources to provide a high-quality, service-oriented telecommunications infra- structure, respond to growing customer needs, and emphasize universal and enhanced services. (T-4, p. 2.) ALEC asserted that it intends to contemporaneously utilize innovative ways within the existing network infrastructure to offer the broadest possible spectrum of services. (T-4, pp. 2-3.) ALEC asserted that it intends to use local market research, and focus groups and

**Exhibit V**
**Page 11 of 26**

customer education programs, to implement the provision of new market-driven products and services. (T-4, p. 3.)

ALEC stated that it intends to continue the following projects initiated by CenturyTel: (1) modification of its line-extension tariff in the Fairbanks service area; (2) provision of facsimile and Internet access in the Eielson Farm Road area of Fairbanks; (3) installation of fiber to free-up copper-wire facilities presently at capacity in the Soldotna area; and (4) provision of high-quality digital facilities to the Alaska Aerospace Development Corporation in a remote Kodiak area; among other projects. (T-4, pp. 5-10.)

ALEC asserted that it intends to improve quality, flexibility, and timeliness of service to its customers through interconnecting Customer Call Centers in Anchorage and Fairbanks, providing Internet Customer Care Interface, and reopening Customer Care Call Centers in Kenai, Kodiak, Fairbanks, Juneau, and Sitka. (T-4, pp. 11-13.)

In conclusion, ALEC maintained that the proposed acquisitions would bring more efficient telecommunications to Alaska and increase competition in competitive markets (i.e., local exchange market, resulting in lower prices to consumers). (T-7, pp. 2-3.)

Staff asserted that a significant reduction in effective competition for Alaskan telecommunications markets would result if ALEC acquired PTI Communications. (T-8, p. 2.) Staff agreed

with ALEC that the public would be better served if PTI Communications were owned and operated by Alaskans. However, Staff asserted that ALEC would be primarily owned by a Delaware corporation (i.e., 95 percent ownership would remain in Delaware, with 5 percent ownership based in Alaska). (T-8, p. 3.)

Staff asserted that there are inherent weaknesses in allowing a highly-leveraged, lightly-staffed, start-up company, to take possession of almost three-quarters of Alaska's access lines. (T-8, p. 7.) Staff argued that it would be dis-advantageous to allow a single firm to dominate the three largest LEC markets because such action would significantly reduce the prospects for effective competition in these and other markets. (T-8, pp. 2-3.) Staff asserted that increased competition represents a significant portion of the national telecommunications policy and argued that approval of these acquisitions would be a serious drawback running counter to public policy. (T-8, pp. 11, 18.) Staff argued that the issue was not whether the proposed acquisitions would reduce current competition, but whether they would reduce effective future competition. (T-8, pp. 2, 11, and 12.)

Regarding economies of scale, Staff argued that "if bigger is better," significant economies of scale would be lost by approval of the sale of the PTI properties from CenturyTel to ALEC. (T-8, p. 10.) In addition, Staff argued that ALEC's

**Exhibit V**
**Page 13 of 26**

technical and financial resources are not equal to those of CenturyTel. (T-8, p. 7.)

Staff recommended that the ALEC applications be disapproved to the extent those applications include acquisition of the telecommunications utilities serving Fairbanks and/or Juneau. (T-8, p. 12.) In addition, Staff argued that ALEC could be required to not acquire additional incumbent LEC operations in Alaska for a certain period of time. (T-8, p. 19.) Staff also argued that ALEC could be required to sell to a competing carrier the PCS license held by PTI. (T-8, p. 20.)

Staff agreed that ALEC has the financial resources to provide the proposed services and the financial ability to respond to changing technology and customer expectations. (T-9, pp. 5-6.) If the applications are approved, Staff recommended that the Commission require ALEC to issue notice under 3 AAC 48.400, submit a tariff filing within 90 days under AAC 48.410, forego any acquisition adjustments resulting from the proposed purchase, and include only the historical net book value of the purchased assets in rate base. (T-9, pp. 6-7.) In addition, Staff recommended that ALEC adopt existing rates and file revenue requirement, rate design, and cost-of-service studies (COSS) within six months after the first full calendar year of operation. (T-9, pp. 5-7.)

Staff asserted that ALEC would have a low debt to equity ratio and added that although the ratio was "somewhat low, similar levels have been accepted in a number of rate cases by the

Commission." (T-9, p. 14.) In addition, while Staff acknowledged the large debt aspect of ALEC's capital structure, Staff asserted that debt service will not impact the cash flow required to maintain, improve and expand the network. (T-9, pp. 16-17.) Staff noted that, even with a weak debt/equity ratio, ALEC could continue current operations without difficulty because no major system improvements are contemplated in the near future. (T-9, p. 20.) Staff concluded that ALEC was financially fit to acquire PTI Communications. (T-9, p. 20.)

Staff asserted that ALEC's proposal to provide consolidated G&A services to all companies was an efficient mechanism to provide similar services to several entities at the lowest possible cost. (T-10, p. 4.) Staff noted that these services would be provided by a "service company" and asserted that such a restructuring was an efficient mechanism by which to provide those services. (T-10, p. 4.)

Staff recommended that, to ensure that the cost-causer is the cost-payer, a Cost Accounting Manual (CAM) should be required. (T-10, p. 5.) Staff asserted that consolidation of administrative functions under a single entity allows the total costs of service to be tracked. (T-10, p. 5.) Moreover, the use of a CAM, based on Federal Communications Commission (FCC) Part 64 principles [47 C.F.R. § 64], is appropriate to allocate common costs to the actual cost-causer. (T-10, p. 5.)

Exhibit  V
Page 15 of 26

Staff recommended that the Commission require an annual compliance audit by an independent certified public accounting (CPA) firm of the CAM to ensure proper cost allocation, and to verify the lack of cross-subsidization. (T-10, p. 6.)

Staff agreed that ALEC's management is fit, willing and able to manage and operate PTI Communications. (T-11, p. 3.) Staff recommended that, if the applications are approved, all obligations that were imposed on PTI Communications should be imposed on ALEC, including the commitments set forth in ALEC's applications to expand and improve service. (T-11, pp. 3-4.)

Staff described the principal managers of ALEC, as individuals with considerable experience in management and operation of several of the largest telecommunications utilities in Alaska, as well as telecommunications utilities in general. (T-11, p. 8.)

Staff recommended that the Commission impose all obligations required under Order U-96-121(5), dated September 25, 1997, regarding deployment of ISDN capability and other commitments associated with PTIC, as well as the commitments in ALEC's applications to expand and improve services. Those obligations and commitments should be prerequisites for approval. (T-11, pp. 16, 17.)

Staff reviewed complaints that had been filed against PTI Communications over the past four years. (T-12, p. 3.) Staff asserted that complaints have increased particularly in the areas

of billing practices and quality of service.  (T-12, p. 3.)  Staff asserted that most complaints were made by consumers whose installation dates for service were not met.  (T-12, p. 3.)

In addition, Staff asserted that the closure of seven payment centers in 1996 became a point of contention for many consumers who used a local bank of telephones to call Anchorage for service sign-up, account information, or credit card payment. (T-12, p. 4.)  Staff asserted that customers were also displeased that payment had to be by mail or drop box.  (T-12, p. 4.)

Staff stated that all complaints were resolved.  However, Staff also stated that TUNI and TUA demonstrated less responsiveness to Staff's investigation of informal consumer complaints because the utilities were frequently unavailable by telephone and did not timely respond to written, informal complaints.  (T-12, p. 5.)

Staff recommended that payment centers be reopened, especially in remote areas.  (T-12, p. 6.)  Staff also recommended that TUA and TUNI place a higher priority on customer perception, customer satisfaction, and service quality.  (T-12, p. 6.)

Discussion

**Outstanding Procedural Matters**

It is apparent from the foregoing recitation of outstanding pleadings that there are numerous procedural matters that must be addressed by the Commission.  According to AS 42.05.171, the Commission is required to dispose of those matters

**Exhibit  V**
**Page 17 of 26**

in writing by either order or by order affirming prior oral or bench rulings.  The Commission has taken into consideration the parties' interest in an expedited substantive order disposing of the merits of these cases and has determined that it will hold those procedural matters in abeyance in order to address the dispositive order in the most expeditious manner possible.  The Commission will issue a subsequent order addressing those procedural matters.

**Applications**

The Commission has determined that ALEC is fit, willing, and able to provide the proposed services and that approval of the applications is affirmatively consistent with the public interest.

ALEC has obtained  sufficient equity and debt financing through Fox Paine Capital Fund, LLP., and Chase Manhattan Bank, respectively, to maintain and expand current operations and make any necessary future investments to utility infrastructure.  (T-2, p. 7.)  Specifically, Fox Paine Capital Fund has committed to providing $65 million contingent upon ALEC's obtaining debt financing.  Chase Manhattan Bank has committed to providing $370 million in senior debt along with a revolving credit agreement.  (T-2, p. 7.)  The Commission has determined that this is a reasonable method to finance the acquisition of these utilities.

The Commission has further determined that ALEC will have sufficient capital to support the existing network and make

U-98-140(7)/U-98-141(7)/U-98-142(7) - (4/19/99)
Page 18 of 26

**Exhibit V**
**Page 18 of 26**

necessary improvements.  (T-3, p. 7.)  The Commission notes that no major system updates are anticipated at this time.  (T-3, p. 7; T-9, p. 20.)  If such improvements are necessary, ALEC should be able to finance them through its revolving credit agreement with Chase Manhattan Bank and/or through the operating revenues of the utilities. (T-3, pp. 7-8.)  Therefore, the Commission has determined that ALEC is financially fit to provide the proposed service.

The Commission has further determined that the management team of ALEC has expertise in the unique geographic, technological, and operating conditions necessary to manage telecommunications utilities in Alaska.  (T-2, p. 5; T-1, pp. 3-6.)  The Commission notes that this experience includes managing and operating several of the largest telecommunications utilities in Alaska.  (T-11, p. 8.)  Thus, the Commission has determined that ALEC has the necessary managerial fitness required to grant the applications.  Moreover, the Commission has determined that whether ALEC is fit, willing, and able to provide the proposed services is not in dispute.

The Commission has also determined that approval of the applications is affirmatively consistent with the public interest. Specifically, ALEC intends to maintain the current, experienced staff in the acquired utilities and reduce operating costs by reducing the workforce through attrition and retirement.  (T-1, pp. 12-13; T-2, p. 17.)

The Commission has determined that the public should benefit from local ownership of PTI, TUA, and TUNI. Under local ownership there should be better customer relations and greater knowledge of the needs of the local market. The Commission has also determined that local management, control, and retention of books is affirmatively consistent with the public interest. The Commission is cognizant that unions, consumers, and trade groups prefer local ownership.

The Commission has determined that the benefits of economies of scale that will be evident through the consolidation of certain administrative functions should be beneficial to the public interest. (T-5, p. 4.) Specifically, consolidation of G&A functions should eliminate duplicative services and the costs associated with provision of those services. (T-3, pp. 1-2; T-6, pp. 3-4; T-10, p. 4.)

The Commission has further determined that approval of the applications should promote efficient interconnection. Currently, each utility can develop its own system for interconnecting with CLECs. ALEC will install a common OSS system for competitor interface. (T-5, p. 7.) Therefore, CLECs will only need to develop one system for interconnection with ALEC resulting in cost savings.

The Commission has further determined that ALEC made a number of commitments in its applications that demonstrate that approval of the applications is affirmatively consistent with the

**Exhibit V**
**Page 20 of 26**

public interest.  First, ALEC made a commitment to not change employees, to open local offices, use the billing format of ATU, and to honor all agreements entered into by PTI, TUA, and TUNI.

In addition, ALEC made a commitment to reopen field offices to improve customer relations, fix Y2K problems, install a uniform OSS system in Alaska, and employ ISDN capability within 18 months of service.  The Commission has determined that these commitments are affirmatively consistent with the public interest. The Commission has determined that ALEC should be required to fulfill the commitments it represented in its applications.  To ensure that ALEC is making reasonable progress to fulfill its commitments, ALEC must file a report regarding the progress of its plans to improve customer service.

The Commission has determined that it is appropriate to approve the applications with the following conditions:

1.  ALEC shall file a CAM within 180 days of the date of Commission approval of the applications;

2.  ALEC shall retain an independent CPA firm to audit compliance with ALEC's CAM on an annual basis and provide the results of that audit to the Commission;

3.  ALEC shall neither attempt to nor recover any acquisition adjustment arising from, or in connection with, its acquisitions of PTI, TUA, and/or TUNI in rates;

4. ALEC shall adopt the existing rates of PTI, TUA, and TUNI, respectively;

5. ALEC shall file formal adoption notices of the PTI, TUA, and TUNI tariffs, respectively, and must prepare new title pages for the tariff sheets adopted;

6. ALEC shall file revenue-requirement, cost-of-service, and rate-design studies no later than six months after a full calendar year of operations, or by July 2001;

7. ALEC shall honor all contractual obligations currently imposed on PTI, TUA, and TUNI;

8. ALEC shall take reasonable steps to expand and improve service consistent with the representations made in its applications; and

9. the provisions regarding the original conditions imposed on ATU Long Distance, Inc., in Order U-96-40(1), dated September 10, 1996, shall apply as set forth in Order U-98-140/141/142(5), dated February 24, 1999.

The Commission has determined that it is appropriate to adopt measures to ensure that cross-subsidization does not occur between ALEC's regulated and nonregulated operations. (T-5, p. 6; T-10, p. 5.) The Commission has determined that adoption of a CAM is such a measure and ALEC must ensure that its data system is separated for accounting, cost allocation, separation and

**Exhibit V**
**Page 22 of 26**

regulatory reporting purposes. (T-5, p. 6.)   The CAM submitted by ALEC is subject to Commission approval.  ALEC shall submit its proposed CAM within 180 days of the date of this Order.

The Commission has further determined that it is an appropriate safeguard to require an independent CPA firm to conduct an annual audit to ensure compliance with the CAM and to file that audit with the Commission.  (T-10, p. 6.)   The independent audit shall be filed with the Commission at the time of filing ALEC's annual reports under AS 42.05.451(b).

The Commission has determined that it is appropriate to exclude any acquisition adjustment from the rates ALEC intends to charge its consumers.   (T-9, pp. 6-7; AS 42.05.441.)   The Commission notes that ALEC has not requested approval of any such adjustment.

The Commission has further determined that it is appropriate for ALEC to adopt the existing rates of PTI, TUA, and TUNI at this time.  (T-2, p. 18.)  By Order U-96-121(5), dated September 25, 1997, the Commission required PTIC to file revenue-requirement, rate-design, and cost-of-service studies in July 1999.  Given approval of these acquisitions, those filing requirements should be vacated and consolidated with a filing by all companies held by ALEC.  (T-2, p. 11; T-9, pp. 5-7.) Accordingly, absent an earlier filing, ALEC shall file revenue-requirement, cost-of-service, and rate-design studies after a full calendar year of operations.  Those filings are due within

**Exhibit  V**
**Page 23 of 26**

six months after the first full calendar year of operations, or by July 2001. Those studies shall use calendar year 2000 as the test year.

The Commission has determined that it is reasonable for ALEC to file formal adoption notices of the PTI, TUA, and TUNI tariffs, respectively, within thirty days of the date of closing. In addition, ALEC must file new title pages reflecting the name of the utility that will now be providing service.

Based on foregoing, the Commission has determined that the evidence in the record clearly supports a finding that ALEC is fit, willing, and able to acquire a controlling interest in PTI, TUA, and TUNI and that such acquisition is affirmatively consistent with the public interest. Accordingly, the applications of ALEC to acquire controlling interest in PTI, TUA, and TUNI are approved subject to the conditions set out in the body of this Order and discussed above.

In addition, the Commission observes that PTI, TUA, and TUNI are parties to several other Commission proceedings (e.g., Dockets U-97-82/U-97-143/U-97-144.[6]) With the acquisition of PTI,

---

[6]Dockets U-97-82/U-97-143/U-97-144 are entitled: *In the Matter of the Petition by GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC., and d/b/a GCI for Termination of the Rural Exemption of and Arbitration with PTI COMMUNICATIONS OF ALASKA, INC., under 47 U.S.C. §§251 and 252 for the Purpose of Instituting Local Exchange Competition; In the Matter of the Petition by GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC., and GCI for Termination of the Rural Exemption of and Arbitration with TELEPHONE UTILITIES OF ALASKA, INC., under 47 U.S.C. §§251 and 252 for the Purpose of Instituting Local Exchange Competition; In the* (continued...)

**Exhibit V**
**Page 24 of 26**

TUA, and TUNI, ALEC assumes the duties and obligations of those utilities, contractually, regulatory, and otherwise. Accordingly, ALEC must fulfill the responsibilities of PTI, TUA, and TUNI in such ongoing proceedings, and all conditions and limitations placed on the Certificates of those utilities continue to attach.

**ORDER**

THE COMMISSION FURTHER ORDERS:

    1.  Outstanding procedural matters are held in abeyance as more fully discussed in the body of this Order.

    2.  The applications filed by ALEC Acquisition Sub Corp., to acquire a controlling interest in Telephone Utilities of Alaska, Inc.; PTI Communications of Alaska, Inc.; and Telephone

---

[6](...continued)
*Matter of the Petition by GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC., and GCI for Termination of the Rural Exemption of and Arbitration with TELEPHONE UTILITIES OF THE NORTHLAND, INC., under 47 U.S.C. §§251 and 252 for the Purpose of Instituting Local Exchange Competition,* respectively.

U-98-140(7)/U-98-141(7)/U-98-142(7) - (4/19/99)
Page 25 of 26

**Exhibit V**
**Page 25 of 26**

Utilities of the Northland, Inc., are approved, subject to the conditions and filing requirements more fully discussed in the body of this Order.

DATED AND EFFECTIVE at Anchorage, Alaska, this 19th day of April, 1999.

BY DIRECTION OF THE COMMISSION

( S E A L )

U-98-140(7)/U-98-141(7)/U-98-142(7) - (4/19/99)
Page 26 of 26

Exhibit  V
Page 26 of 26