Martin M. Weinstein
GCI Communication Corp.
2550 Denali Street, Suite 1000
Anchorage, AK 99503
Telephone:  (907) 868-6561


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |  |
|---|---|---|
| GCI COMMUNICATION CORP., d/b/a GENERAL COMMUNICATION, INC. d/b/aGCI, | ) ) ) ) ) | |
| Petitioner, | ) ) | Case No.: A05-003 CV |
| v. | ) ) | |
| KATE GIARD, in her official capacity as Chairwoman of the Regulatory Commission of Alaska; *et al.*, | ) ) ) ) | |
| Respondents. | ) ) ) | |

## GCI'S REPLY BRIEF AND OPPOSITION TO ACS CROSS PETITION BRIEF RE:  FINAL RATES AND TERMS

Respectfully submitted this 5th day of June, 2006.

GCI COMMUNICATION CORP. d/b/a
GENERAL COMMUNICATION, INC. d/b/a GCI

/s Martin M. Weinstein
Regulatory Attorney
Alaska Bar No.  9306051
General Communications, Inc.
2250 Denali Street, Suite 1000
Anchorage, Alaska 99503
Phone:  907-868-6561
Email:  mweinstein@gci.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iv

INTRODUCTION ............................................................................................... 1

PROCEDURAL HISTORY OF CASE: ACS' REMARKS REGARDING DELAY AND
INTERIM RATE ISSUES ARE IRRELEVANT ............................................................ 1

STANDARDS OF REVIEW ............................................................................................. 3

THE COURT MUST REVIEW THE UNDERLYING COMPONENTS OF THE RATE
CALCULATION TO DETERMINE WHETHER THE RATE IS LAWFUL AND MEETS THE
REQUIREMENTS OF THE ACT ......................................................................................... 3

ARGUMENT IN SUPPORT OF POINTS PRESENTED IN OPENING BRIEF ........................ 11

I.      ACS AND THE RCA FAIL TO SHOW THAT THE RCA'S COST OF CAPITAL
        DETERMINATION WAS THE PRODUCT OF REASONED DECISION-
        MAKING ......................................................................................................... 11

    A.  THE RCA'S DECISION TO AWARD ACS A HIGHER COST OF
        CAPITAL THAN ACS' CALCULATIONS WAS BASED ON A SERIES
        OF FLAWED ASSUMPTIONS AND MISCONCEPTIONS ............................... 12

        1.  The RCA Over-Compensated ACS To Account For Facilities Based
            Competition Without Realizing That ACS' Calculations Already Took
            This Risk Into Account ..................................................................... 13

        2.  The Virginia Arbitration Order Did Not Warrant An Upward Adjustment
            Based On Differences In Existing Competition Or ACS' Smaller Size .......... 15

        3.  An Upward Adjustment Cannot Be Justified By The Alleged
            Consolidation Of Competitive Risk Into The Cost Of Capital Calculation,
            Which Did Not Occur ....................................................................... 19

        4.  An Upward Adjustment Cannot Be Justified To Account For Stranded
            Costs As These Risks Too Are Already Included In ACS' Market Based
            Calculations And The Depreciation Rates Chosen By The RCA.................... 21

    B.  BASED ON ITS FLAWED ASSUMPTIONS, THE RCA PERFORMED A
        CALCULATION THAT IS PATENTLY UNREASONABLE AND MAKES
        NO FINANCIAL SENSE ........................................................................ 24

1.  The RCA Unreasonably Combined Inconsistent Assumptions And Inputs Regarding A Highly Leveraged ACS Company With Assumptions And Inputs Associated With A Hypothetical Company With A More Balanced Capital Structure ............................................................. 25

2.  The RCA Unreasonably Ignored The Decline In Interest Rates When It Adopted ACS' Historic 10.33% Cost Of Debt .................................................. 34

C.  NO RE-EXAMINATION OF DEPRECIATION RATES IS NECESSARY ....... 37

II.  THE RCA'S DECISION TO USE A DIFFERENT COST OF CAPTIAL INPUT FOR SWITCHING INVESTMENT WAS ARBITRARY .................................... 38

A.  THE COST OF CAPITAL INPUT IN THE SWITCHING MODEL COULD EASILY HAVE BEEN MODIFIED ........................................................................ 39

B.  THERE WAS A WAY TO RESOLVE THE RCA'S "INSTABILITY" CONCERN, BUT THE RCA DID NOT WANT TO LISTEN ............................. 42

C.  GCI'S PETITON FOR RCONSIDERATION OF ORDER NO. 49 WAS NOT IMPROPER ................................................................................................. 44

D.  THERE IS NO BASIS FOR APPLYING A DIFFERENT COST OF CAPITAL TO SWITCHING .................................................................................. 46

E.  THE FCC'S PREEMPTION OF SWITCHING DOES NOT JUSTIFY THE USE OF A LOWER COST OF CAPITAL IN THE SWITCHING MODEL ....... 48

F.  GCI'S CLAIM IS NOT BASED ON AN UNAPPROVED SWITCHING MODEL ...................................................................................................................... 49

G.  THE RCA'S REFUSAL TO FINALIZE THE RATES CORRECTLY IS NOT A SMALL MATTER .................................................................................... 50

H.  GCI'S REQUEST WAS TIMELY ...................................................................... 51

III.  THE RCA'S DECISION TO ADOPT A NO-SHARING OF TRENCHING COST ASSUMPTION WAS ARBITRARY ....................................................................... 53

A.  ACS NEVER EXPLAINED THE BASIS FOR ITS NO SHARING ASSUMPTION AND THE RCA BLINDLY ACCEPTED IT............................. 54

B.  THE RCA IGNORED FCC PRECEDENT CONFIRMING THE INDUSTRY PRACTICE OF SHARING.............................................................. 62

IV.    THE NUMBER PORTABILITY CHARGES ARE INDISPUTABLY
       UNLAWFUL……………………………………………………………...64

V.     THE RCA IMPROPERLY EXCLUDED SIGNIFICANT COSTS THAT ACS
       WILL ACTUALLY AVOID IN THE WHOLESALE CALCULATION............. 68

   A.  THE STATUTE DOES NOT RESTRICT THE TYPES OF AVOIDED
       COSTS THAT MUST BE SUBTRACTED FROM THE RETAIL RATE ......... 69

   B.  GCI OFFERED A COMPROMISE METHOD TO CALCULATE THE
       RATE AS PART OF A PACKAGE ...................................................... 74

ARGUMENT IN RESPONSE TO ACS CROSS-PETITION........................................76

VI.    THE RCA'S 53% ROAD PRISM ASSUMPTION WAS A COMPROMISE
       METHOD USED TO ESTABLISH FEEDER TRENCHING COSTS................ 76

CONCLUSION..........................................................................................................80

## TABLE OF AUTHORITIES

**CASES**

*AT&T Communications of Cal. vs. Pacific Bell Telephone*,
375 F.3d 894 (9th Cir. 2004) ........................................................................ 6, 74

*AT&T Communications of Illinois, Inc. v. Illinois Bell Telephone Co.*,
349 F.3d 402 (7th Cir. 2003) ......................................................................... 9

*Beard v. Gen. Servs Admin.*, 801 F.2d 1318, 1321 (Fed. Cir. 1986)................... 67

*Bell, Inc. v. Bridge*, 334 F.Supp.2d 1127, 1134 (W.D. Wis. 2004).................... 6, 7

*Bob's Big Boy Family Restaurants v. Nat. Labor Rel. Bd.*,
625 F.2d 850, 852 (9th Cir. 1980) ................................................................ 27

*Bolker v. Commissioner*, 760 F.2d 1039, 1042 (9th Cir. 1985) ........................... 66

*Citizens to Preserve Overton Park, Inc. vs. Volpe*,
401 U.S. 402, 416, 218 L.Ed.2d 136, 91 S.Ct. 814 (1971)................................. 4

*Duquesne Light Company v. Barasch*, 488 U.S. 299 (1989) ................................. 6

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944).............................................. 6

*FPC v. Natural Gas Pipeline Co. of America*, 315 U.S. 575 (1942) ..................... 6

*GTE South, Inc. v. Morrison*, 6 F.Supp.2d 517, 529 (E.D. Va. 1998) ................. 46

*Hormel v. Helvering*, 312 U.S. 552, 557 (1941) ................................................. 65

*Johnson v. Director, Office of Worker's Compensation Programs*,
183 F.3d 1169, 1171 (9th Cir. 1999) .............................................................. 65

*McKart v. United States*, 395 U.S. 185, 198-99 (1969) ...................................... 67

*Motor Vehicle Mfrs. Ass'n vs. State Farm Mutual Auto Ins. Co.*,
463 U.S. 29, 43 (1983)............................................................................... 12, 48

*Pacific Coast Federation of Fisherman's Associations vs. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005) ............................................ 4

*Peterson vs. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir. 1998) ............ 45

*Railway Labor Executives Ass'n v. Interstate Commerce Comm'n,*
  784 F.2d 959, 971 (9th Cir. 1986) ................................................35, 40, 48, 60

*Romain v. Shear*, 799 F.2d 1416, 1419 (9th Cir. 1986) .........................................66

*Sprint Communications Co., L.P. v. FCC*, 274 F.3d 549, 557 (D.C. Cir. 2001)...................9

*Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 557 (9th Cir. 1989)................................27

*U.S. West Communications, Inc. v. MFS Intelenet, Inc.,*
  35 F.Supp.2d 1221, 1236 (D. Or. 1998) ...........................................................7

*United States Telecom. Ass'n vs. FCC*, 227 F.3d 450, 460 (2000) ..................................4, 26

*Verizon Pennsylvania, Inc. v. Pennsylvania PUC,*
  380 F.Supp.2d 627, 639 (E.D. Penn. 2005)....................................................38

*WorldCom, Inc. v. FCC*, 308 F.3d 1 (D.C. Cir. 2002) ........................................8

## STATUTES AND REGULATIONS

47 C.F.R. § 1.1403(a) ...........................................................................56

47 C.F.R. § 51.501..............................................................................5

47 C.F.R. § 51.507(e) ..........................................................................58

47 C.F.R. § 51.609.............................................................................72

47 C.F.R. Part 36 ..............................................................................68

47 U.S.C. § 251(d)(3) ..........................................................................69

47 U.S.C. § 252(d)(1)(A) .......................................................................4

47 U.S.C. § 271 ..............................................................................5, 7

AS 42.05.381(j) ...............................................................................62

## ADMINISTRATIVE RULINGS

*Bell Atlantic New Jersey, Inc.*, 2004 WL 2492569 at * 17-18 (N.J.B.P.U. Sept. 22,
  2004) ...................................................................................22

*Century Telephone of Alabama, LLC*, 204 WL 3094811 at * 4 (Alabama Pub. Util.
  Comm'n, Nov. 29, 2004)....................................................................74

*Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Tenth Report and Order, 14 FCC Rcd, 20156 at ¶ 241 (1999 ("*FCC Inputs Order*") ............... 62

In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 ("Local Competition Order"), CC Docket No. 96-98, 11 F.C.C. R cd 15499 (August 8, 1996). ........................................................ 71, 72

*In the Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers,* Notice of Proposed Rulemaking, FCC 03-224 (rel. September 15, 2003) ("*Notice of Proposed Rulemaking)* .............................................. 7, 8

*New England Telephone and Telegraph Company d/b/a NYNEX,* 1996 WL 773774 at * 15-16 (Mass. D.P.U. 1996) .......................................................... 74

*Petition of WorldCom, Inc.,* 18 FCC Rcd 17,722, 2003 WL 22038242 (rel. August 29, 2003) ("*Virginia Arbitration Order*" or "*Virginia Arbitration*") ........................ 13, 17

*Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* CC Docket Nos. 01-338, 98-147, and 96-98, Report and Order and Order On Remand and Further Notice of Proposed Rulemaking, 18 FCC Fcd 19,020, 2003 WL 22175730 (rel. August 21, 2003) ("*Triennial Review Order*"), *vacated in part and remanded, USTA v. FCC,* 359 F.3d 554 (D.C. Cir. 2004) .............. 17

*Rulemaking on the Commission's Own Motion to Govern Open Access to Bottleneck Services and Establish a Framework for Network Architecture Development of Dominant Carriers,* Rulemaking 93-04-003 &  Investigation 93-04-002 (Verizon UNE Phase) at 77-79 (Cal. Pub. Util. Comm'n, March 15, 2006) ("*CPUC Order*") ...................................................................... 22

## INTRODUCTION

GCI Communication Corp. d/b/a General Communication, Inc. and GCI ("GCI")

herein files its reply to ACS of Anchorage Inc.'s ("ACS") Opposition and Cross-Petition

Brief and the Regulatory Commission of Alaska's ("RCA") Opposition Brief.  As

discussed in the Opening Brief and further elaborated below, there are serious errors in the

RCA's calculation of the loop rate that render the RCA's decision arbitrary, capricious, and

unreasoned.  The arbitration rulings underlying this calculation in many instances are

patently unreasonable – they are based on unexplained conflicting assumptions, are not

supported by evidence in the record, and are contrary to the FCC's TELRIC pricing rule.

As such, the RCA's rate calculation does not meet the requirements of sections 251 and

252 and must be vacated and remanded to the agency with instructions to correct the rates

and provide for a refund to GCI of the amounts it has over-paid since the unlawful rates

have been in effect.

## PROCEDURAL HISTORY OF CASE: ACS' REMARKS REGARDING DELAY AND INTERIM RATE ISSUES ARE IRRELEVANT

GCI disagrees with ACS' recitation of the procedural history set forth in its

Opposition Brief but agrees with the recitation set forth by the RCA in its Opposition Brief.

*See* RCA Brief at 11-22.  The RCA provides an accurate chronology of events relating to

the Anchorage arbitration.  GCI also sets forth a more comprehensive and detailed history

of the Anchorage arbitration in its Opposition Brief to ACS' Cross-Petition Brief Re: Delay

and Interim Rate Issues.  GCI offers just a few brief remarks in response to ACS'

recitation.

Although ACS complains bitterly about how long it took for the RCA to complete the arbitration proceeding, it ignores its own culpability for the slow progress.[1] These are subjects addressed at greater length in its Opposition Brief to ACS' cross-appeal from the RCA's decision on the interim rate. ACS also offers a lot of hyperbole about how much money it lost by having to lease UNEs to GCI at an allegedly below-cost interim loop rate and the alleged "subsidy" GCI received. ACS Opposition at 8.  GCI also addresses the lack of merit to this claim in its Opposition to ACS' appeal of the RCA's interim rate decision. Additionally, ACS presents a brief summary of the rate calculation GCI proposed at the arbitration claiming that "GCI's proposed rate was more than 50% lower than the $14.92 interim rate that GCI previously conceded fell within the range of reasonable UNE loop rates" ACS Opposition at 9-10.  This characterization of GCI's proposed rate as it relates to the testimony GCI presented during the interim rate phase of the proceeding below is neither accurate nor relevant.  GCI never "conceded" during the interim rate phase of the proceeding what the final loop rate would be.  The interim rate was calculated at a very early juncture in the proceeding – before discovery was completed and a final cost model had even been adopted by the RCA.  More to the point, GCI's interim rate calculation is not relevant to the serious flaws in the RCA's final rate determination, which is the subject of GCI's appeal.

---

[1]     Despite ACS' repeated attempts to blame everyone else for the delays, the RCA appropriately found that "ACS-AN itself has authored most of the delays in this case.  This history of this docket, detailed in the Background section of this order, shows that ACS-AN has continually changed directions over its preferred model platform and has substantially extended the litigation by disregard of our orders." Box 2 at 197 (Order No. 27).

## STANDARDS OF REVIEW

## THE COURT MUST REVIEW THE UNDERLYING COMPONENTS OF THE RATE CALCULATION TO DETERMINE WHETHER THE RATE IS LAWFUL AND MEETS THE REQUIREMENTS OF THE ACT

As discussed in the Opening Brief, the Ninth Circuit has articulated the type of judicial review that the district court must perform under section 252(e)(6) in assessing whether the interconnection agreements approved by the state commission meets the requirements of sections 251 and 252 of the Communications Act as amended by Telecommunications Act of 1996. *See* Opening Brief at 15-16.   The parties appear to be in substantial agreement regarding these standards although each party understandably articulates them with a different nuance. ACS Opposition Brief at 11-12; RCA Opposition Brief at 22-23.  ACS, however, additionally argues that because this appeal involves a review of the RCA's calculation of the loop rate, the Court should not examine the agency's decisions regarding the individual components of the rate calculation and instead should only review the reasonableness of the overall rate.  ACS Opposition at 12-15.  The RCA does not appear to support this argument; it simply claims that its decisions regarding the components of the rate calculation are entitled to deferential review. RCA Brief at 23. At the outset, ACS' argument is contradicted by its own cross-appeal of one aspect of the RCA's rate calculation regarding the agency's adoption of a 53% road prism assumption. *See* ACS Opposition/Cross-Appeal at 73-79.  ACS' hypocrisy is glaring.  Nevertheless, ACS is wrong on the law and the cases it cites are inapposite.

At bottom, ACS' argument flies in the face of basic administrative requirement of reasoned decision-making and compliance with the specific requirements of the

Communications Act and FCC rules.  As the United States Court of Appeals for the D.C.

Circuit has stated, "[f]undamental principles of administrative law require that agency

action be 'based on a consideration of the relevant factors," *Citizens to Preserve Overton*

*Park, Inc. vs. Volpe*, 401 U.S. 402, 416, 218 L.Ed.2d 136, 91 S.Ct. 814 (1971), and rest on

reasoned decision-making in which "the agency must examine the relevant data and

articulate a satisfactory explanation for its action including a rational connection between

the facts found and the choice made," *Motor Vehicles Mfrs.,* 463 U.S. at 43 (internal

quotation marks omitted)." *United States Telecom. Ass'n vs. FCC*, 227 F.3d 450, 460

(2000).  *See also Pacific Coast Federation of Fisherman's Associations vs. U.S. Bureau of*

*Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005).  It is well-established that:

> if the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation that runs counter
> to the evidence before the agency, or is so implausible that it
> could not be ascribed to a difference in view of the product of
> agency expertise . . .

the agency action may be overturned as unlawful.  *Pacific Coast Federation*, 426 F.3d at

1090 (*quoting Motor Vehicles Mfrs, Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856).

Under ACS' argument, the RCA decision would have to be upheld even if the RCA

selected its rates using a dartboard so long as the rates fell within a "range of

reasonableness."  But the Communications Act prescribes specific criteria that the RCA

rate determination must meet.  For example, Section 252(d)(1) requires UNE prices to be

set (i) based on cost, (ii) as determined without reference to a rate-of-return or other rate-

based proceeding, and (iii) be non-discriminatory. 47 U.S.C. § 252(d)(1)(A).  The FCC

goes further and prescribes specific rules for how UNE rates are too structured and how the rate levels must be determined. *See* 47 C.F.R. § 51.501 *et seq.* These rules place clear limits not just on what the rate is, but *how* the UNE rates must be determined. If the RCA had employed a dartboard, there is no question that such a methodology would violate the FCC's rules and otherwise violate basic principles of administrative law requiring reasoned decision-making and would require reversal, even if the dart hit within the "range of reasonableness."

Indeed, in considering the identical arguments as those presented by ACS, the District Court in Wisconsin rejected the "result-only" approach to judicial review under § 252(e)(6), and recognized that it had to determine whether or not the state commission had acted arbitrarily or capriciously or otherwise violated applicable federal law:

> However, plaintiff is correct that when the FCC and the courts have reviewed the FCC's decisions under § 271, they have considered individual factors in review the rates. Thus, the question is not whether carriers can challenge individual factors that influence a rate but whether they can show that an error in the calculation of one factor or multiple factors was so substantial that it made the commission's determination arbitrary and capricious. I agree with plaintiff and intervening defendants that a court cannot give meaningful review to a rate without looking at the factors that affect the rate. I agree also that requiring carriers to show how *each* factor was calculated is unduly burdensome and not required by the statute. If carriers can show mistakes serious enough to make a rate arbitrary and capricious on their own, the carriers should not have to demonstrate that those mistakes were not offset by other mistakes. If the *commission* wants to defend a particular calculation by arguing that it purposely understated (or overstated) a particular factor because it believed another factor was overstated (or understated), it may do so, but the commission should not be able to insulate itself from judicial review by making review an impossible task.

*Wisconsin Bell, Inc.*, v. *Bridge* 334 F.Supp.2d 1127, 1136 (W.Dis. Wis. 2004) (emphasis in original)

Moreover, the Ninth Circuit, when it has considered cases under § 252(e)(6), has exhibited no reluctance in reviewing the individual components of a state commission's rate calculation. *See, e.g., AT&T Communications of Cal. vs. Pacific Bell Telephone*, 375 F.3d 894 (9th Cir. 2004) (holding that California Public Utility Commission improperly calculated common cost markup to UNE rates). There is no other way that the reviewing court can logically ensure that (1) the RCA in fact calculated the rates in accordance with the specific requirements of the Communications Act and FCC rules, and (2) that the RCA exercised any discretion in an independent and reasoned manner.

Many of the authorities ACS cites do not even remotely relate to judicial review under §252(e)(6) of the Telecommunications Act of 1996. ACS cites *FPC v. Natural Gas Pipeline Co. of America*, 315 U.S. 575 (1942) and *FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), both of which are seminal Supreme Court cases involving challenges to the reasonableness of certain rate orders by the Federal Power Commission (FPC) under the Natural Gas Act. The focus of the judicial inquiry in these cases was whether the rates adopted by the FPC were sufficiently reasonable to avoid constitutional confiscation. *See also Duquesne Light Company v. Barasch*, 488 U.S. 299 (1989), also cited by ACS, which involves a determination whether a particular rate set by the Pennsylvania Public Utilities Commission for a monopoly electric utility was confiscatory in violation of the Takings Clause. The Fifth Amendment's protection against confiscation, however, does not direct

how rates are made, but instead focuses only on whether the rate has a confiscatory effect. In a § 252(e)(6) case, by contrast, the precise question is whether the rate was set in accordance with the Act and the FCC's pricing rules, not its effect. *See Wisconsin Bell, Inc. v. Bridge*, 334 F.Supp.2d 1127, 1134 (W.D. Wis. 2004) (declining to limit judicial review to a determination of whether the rate is reasonable); *see also U.S. West Communications, Inc. v. MFS Intelenet, Inc.*, 35 F.Supp.2d 1221, 1236 (D. Or. 1998).

ACS also cites cases and authorities that discuss the flexibility inherent in TELRIC but these authorities do not hold that judicial review of the individual factors underlying a TELRIC rate calculation is inappropriate, nor do they excuse the RCA from the basic requirement of reasoned decision-making. ACS Opposition at 14-15. ACS cites to the FCC's discussion of TELRIC in ¶ 26 of its *Notice of Proposed Rulemaking*,[2] in which the FCC explains its method for reviewing state commission UNE decisions under 47 U.S.C. § 271 in the context of reviewing applications by Bell Operating Companies (BOCs) for authority to provide inter-LATA long distance service. As part of the 271 review, the FCC must determine whether the BOC has adequately opened its market to competition before allowing the BOC to enter the long distance business, and the FCC must complete that review within 90 days.[3] Given the extremely short period of time to conduct this review, the FCC does not conduct a *de novo* review of state commission pricing decisions, and,

---

[2]     *In the Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*, Notice of Proposed Rulemaking, FCC 03-224 (rel. September 15, 2003) ("*Notice of Proposed Rulemaking).* A copy the relevant pages discussed in this brief are set forth in ACS Exhibit 6.

[3]     *See* 47 U.S.C. § 271 (d)(3).

instead, has developed a benchmarking method for the BOCs to demonstrate that their UNE rates fall within a reasonable range of prices that reflect TELRIC principles. Under the benchmarking alternative, "a BOC can demonstrate that its rates in a particular state, adjusted for known cost differences, are at or below the level in another state in its region that the Commission already has found to be TELRIC-compliant." *Notice of Proposed Rulemaking* at ¶ 27 (ACS Exh. 6). *See also WorldCom, Inc. v. FCC*, 308 F.3d 1 (D.C. Cir. 2002), also cited by ACS, which discusses the FCC's limited review of state commission pricing decisions under § 271 and the benchmarking method used by the FCC to verify whether the rates are TELRIC-compliant.

The FCC's review of state commission pricing decision under § 271, however, does not provide useful guidance to this Court on how it should conduct judicial review under § 252(e)(6). Notably, as just discussed, the FCC's review of state commission pricing decisions in a § 271 proceeding is extremely abbreviated given the 90-day review period within which the FCC must decide whether to grant the BOC application; there is virtually no time for the FCC to conduct a thorough review of the rate calculations performed by the state commission in that context. The Court is not under this type of time pressure in a proceeding under § 252(e)(6). Furthermore, there is no benchmarking method established by the FCC that could even be used by the Court in this case to review the reasonableness of the loop rate set by the RCA such as the one used by the FCC to assess the reasonableness of BOC rates in a § 271 application proceeding.

Furthermore, even in cases involving judicial review of the FCC's decisions under § 271, a party still "may point to specific factual errors made by the state commission, and

demonstrate either that the FCC failed to consider these errors or that it arbitrarily determined that the rates were nevertheless within the range acceptable under TELRIC." *Sprint Communications Co., L.P. v. FCC*, 274 F.3d 549, 557 (D.C. Cir. 2001).   Thus, even in the context of judicial review in a § 271 case, parties may challenge individual factors underlying the rate calculation.

Finally, ACS cites to *AT&T Communications of Illinois, Inc. v. Illinois Bell Telephone Co.*, 349 F.3d 402 (7th Cir. 2003) but this case, too, does not squarely hold that judicial review under § 252(e)(6) should exclude examining a state commission's decisions regarding the components of a rate calculation.   In *AT&T*, the Illinois Legislature passed a statute directing the Illinois Commerce Commission (ICC) to revise the UNE rates for incumbent local exchange carriers in the state by adopting the incumbent carrier's "existing" fill factors and depreciation rates based on the economic lives reflected on the incumbent's financial books.   *Id.* at 407.   Following passage of the statute, AT&T and other competitive carriers filed a lawsuit in the federal district court seeking immediate judicial review of the statute even before the ICC could act to revise the rates.   In this context, the Seventh Circuit observed that:

> the decision to file suit before the ICC had applied the statute and announced new rates has caused unnecessary troubles. Congress provided for federal judicial review of *rates* set by state commissions: it did not provide for review of individual factors that influence those rates.  A lower fill factor, which elevates the rate, may be offset by other factors that depress it. As long as the final rate comports with TELRIC, why should it matter what role particular intermediate factors play?  Any effort to analyze a factor in isolation poses a distinct risk of generating an advisory opinion, as well as a certainty of complicating review of the rate ultimately announced.

*Id.* at 408-09.   Although the Seventh Circuit upheld the Illinois Legislature's right to provide input into the TELRIC calculation, it preempted the state law because the statute only permitted the ICC to revise the rates based on two factors.  The Court held that the statute conflicts with the TELRIC methodology, which requires state commissions to examine every rate-influencing factor.  *Id.* at 411.

Notably, the holding of this case is quite narrow: state law that interferes with a state commission's duty to examine all factors in the TELRIC calculation is unlawful and preempted.  The Seventh Circuit's discussion about the role of individual factors in the above passage underlying the TELRIC calculation is *dicta*.  Additionally, the Seventh Circuit's discussion must be put in context of the unique facts of the case and the Court's concern that the district court had prematurely accepted judicial review of only two factors relating to the TELRIC calculation before the ICC could act to revise the rates.   In view of the unique facts and limited holding in the case, the Court's *dicta* discussion about reviewing individual factors in a rate calculation is not persuasive precedent for this Court to follow, particularly where the Ninth Circuit, by contrast, has exhibited no reluctance in reviewing the individual components of a state commission's TELRIC calculation.  *See AT&T Communications of Cal.*, 375 F.3d 894 (9th Cir. 2004).

To sum this discussion up, the judicial review ACS argues for is contrary to Ninth Circuit precedent and, moreover, is unreasonable because ACS essentially asks the Court not to consider the serious flaws and defects underlying the RCA's rate calculation. The Court should reject ACS' invitation to lawless and arbitrary agency action, and, should, as

§ 252(e)(6) requires, determine whether the RCA complied with the requirements of the

Communications Act and FCC rules, and whether the RCA did so exercising logically,

consistent reasoned decision-making.

**ARGUMENT IN SUPPORT OF**
**POINTS PRESENTED IN OPENING BRIEF**

**I.     ACS AND THE RCA FAIL TO SHOW THAT THE RCA'S COST OF**
**CAPITAL DETERMINATION WAS THE PRODUCT OF REASONED**
**DECISION-MAKING**

In the Opening Brief, GCI discussed the many flaws underlying the RCA's cost of

capital calculation.  In response, both ACS and the RCA attempt to justify this flawed

calculation, but none of the excuses they offer can hide or cure the unreasonable and

arbitrary calculation performed by the RCA.  The RCA's cost of capital calculation is the

result of a series of flawed and incorrect assumptions by the RCA that are contradicted by

the record evidence, FCC precedent, and even the agency's own arbitration rulings on other

aspects of the rate calculation, all of which (not surprisingly) led the RCA to perform a

calculation that is patently unreasonable and excessive.  While some of the explanations

offered by the RCA and ACS may sound reasonable standing alone, when the calculation is

viewed as a whole rather than in isolated parts, the RCA's cost of capital determination

suffers from three sets of flaws:

- The RCA made duplicative adjustments that double or triple counted the

  facilities-based competition in the competitive market that TELRIC assumes.

- The RCA, without any rational logic and based on a series of flawed

  assumptions and misconceptions, "mixed and matched" hypothetical and

actual components of the weighted average cost of capital determination, rather than consistently using a set of hypothetical components or actual components.  Additionally, the RCA calculated a "size premium" incorrectly and tries to justify it based on non-size considerations.

• While performing its flawed calculation, the RCA also ignored the significant decline in interest rates that occurred between 2000 and 2003.

Neither the RCA nor ACS provides a single, coherent, internally consistent explanation for the RCA's selection of a 13.89% weighted average cost of capital award – which was 163 basis points higher than the cost of capital calculation that ACS itself offered in the record.  Nor can the RCA's selection be justified on the basis of "agency expertise." No amount of "agency expertise" can correct the RCA's failure to clearly "examine the relevant data and articulate a satisfactory explanation between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n  vs. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

### A.  THE RCA'S DECISION TO AWARD ACS A HIGHER COST OF CAPITAL THAN ACS' CALCULATIONS WAS BASED ON A SERIES OF FLAWED ASSUMPTIONS AND MISCONCEPTIONS

In its Opposition Brief, the RCA goes to great length to explain that a cost of capital calculation under TELRIC should reflect "facilities-based" competition, and that it determined that a higher cost of capital than that requested by ACS was appropriate in order to reflect the type of "facilities-based competition" that TELRIC assumes. RCA Opposition at 46-52.  The RCA further argues that it used its "expertise" and, therefore, was not bound by any of the parties' calculations. RCA Opposition at 52.  ACS

additionally argues that there is record evidence to support the RCA's excessive award because after the FCC Wireline Competition Bureau issued its decision in the *Virginia Arbitration,*[4] it generally requested that the cost of capital should be "equal to or greater than what Verizon Virginia received [12.95%]."  ACS Opposition at 21.

GCI does not dispute that under the FCC's TELRIC rules, the RCA was required to determine ACS' UNE rates based on the forward-looking economic cost, including a forward-looking cost of capital that reflects the competitive market that TELRIC assumes. GCI Opening Brief at 9-10.  However, in justifying its selection of a weighted average cost of capital that exceeded ACS' own calculations by 163 basis points, the RCA's and ACS' explanations confirm that the RCA made upward adjustments that double if not triple counted the risks associated with facilities based competition. The RCA's upward adjustments are based on a series of flawed assumptions and misconceptions regarding the record evidence, the FCC's decision in the *Virginia Arbitration Order*, and even its own arbitration rulings on other components of the rate calculation.

> ### 1.  *The RCA Over-Compensated ACS To Account For Facilities Based Competition Without Realizing That ACS' Calculations Already Took This Risk Into Account*

In its Opening Brief, GCI explained that ACS at arbitration provided two specific calculations of its forward-looking weighted average cost of capital.  In the first calculation, ACS used its then-existing historical cost of debt of 10.33% a cost of equity of

---

[4]    *In re: Petition of WorldCom, Inc.*, 18 FCC Rcd 17,722, 2003 WL 22038242 (rel. August 29, 2003) ("*Virginia Arbitration Order*" or *"Virginia Arbitration"*).  Pertinent excerpts are set forth in Exh. C in the Appendix to GCI's Opening Brief.

25.05%, and its own extraordinarily highly leveraged capital structure (83% debt) to produce a cost of capital of 12.75%.[5]  ACS also submitted a second calculation—the one which it actually requested—that hypothetically assumed a more balanced capital structure (45 % of debt and 55 % of equity), and then added a 200 basis point risk premium adjustment to reflect the competition ACS expected from GCI in Anchorage—which at that time included GCI's announced plans for full facilities-based competition over GCI's cable plant.[6]

The RCA, however, apparently incorrectly assumed that the ACS calculations only reflected the current state competition in Anchorage in which GCI leases lines from ACS, rather than the type of competition that will occur when GCI serves customers over its own cable plant.[7] In its brief and in the underlying orders, the RCA wholly ignores the fact that at arbitration, ACS, itself, testified that its own cost of capital calculations were performed with full knowledge of GCI's plans to deploy cable telephony.[8]  In the calculations it presented, ACS clearly accounted for the presence of full facilities-based competition – which ACS did not deny in its Opposition brief.   This is also reflected in ACS' extremely high cost of equity of 25%.  Furthermore, unless ACS and the RCA are assuming that the debt market is irrational or stupid, both ACS' then-existing cost of debt and its refinanced debt would have also reflected GCI's already announced plans to deploy cable telephony.

---

[5]      GCI Opening Brief at 27-28.

[6]      *Id.*

[7]      Box 4 at 1839-40 (Order No. 46).

[8]      GCI Opening Brief at 37-38; Box T-1 at 2535 (hearing testimony of David Blessing explaining that ACS' calculations were performed with knowledge of GCI's plans to deploy cable telephony).

Yet, when ACS refinanced its debt in the summer of 2003, its actual cost of debt went down, not up, in the face of GCI's announced cable telephony plans.[9]

The record evidence shows that in making its own cost of capital proposals, ACS incorporated the risk of full facilities based competition. Notwithstanding the fact that ACS' cost of capital calculations reflected competitive risk from GCI's plans to deploy cable telephony, the RCA and ACS nevertheless seek to justify the agency's upward adjustments from ACS' calculations based on the same risk. Additionally, both ACS and the RCA totally ignore the fact that ACS' calculations were abundantly generous (and indeed are over-stated) because they factored in a payment of taxes that ACS actually does not make given its net operating losses. ACS' calculations, in reality, provide a return on investment in excess of 18%.[10] In view of the full risks of competition factored into the ACS calculations and the assumed payment of taxes that in reality does not occur (which the RCA totally ignored), further upward adjustments were unwarranted.

## 2. *The Virginia Arbitration Order Did Not Warrant An Upward Adjustment Based On Differences In Existing Competition Or ACS' Smaller Size*

Both ACS and the RCA, however, attempt to justify the RCA's upward adjustments because the FCC awarded a 12.95% weighted average cost of capital to Verizon in the *Virginia Arbitration* and, *inter alia*, Verizon faces less competition in Virginia than ACS faces in Anchorage. ACS Opposition at 21. The RCA, indeed, used the 12.95% Verizon

---

[9]     *See* discussion below at 35.
[10]    GCI Opening Brief at 28, Note 62.

award as a benchmark to validate its original 14.28%[11] calculation reasoning that the greater competition in Anchorage justifies a higher award to ACS.[12]

The premise for this argument, however, is wrong.  The FCC in the *Virginia Arbitration Order*, like the RCA here, was awarding a cost of capital based on the hypothetically competitive market that TELRIC envisions and not based on the then existing state of competition that Verizon actually faces in the marketplace.  Verizon's cost of capital calculation in the *Virginia Arbitration* did not assume a continuation of the minimal competition that Verizon faced at that time; instead, Verizon's calculation reflected the higher risks it would face in the same type of competitive market assumed to calculate the network investment in a TELRIC cost study – *i.e.*, the existence of hypothetical facilities based competition.  The Wireline Competition Bureau specifically favored this aspect of Verizon's calculation over the AT&T calculation, which assumed that Verizon would continue to be the dominant firm in its market; *i.e.*, that Verizon would only confront minimal competition into the future.[13] Thus, the greater actual competition faced by ACS in Anchorage would not justify awarding ACS a higher number than

---

[11]    The RCA subsequently corrected this number to 13.84% on reconsideration based on a computational error.  Box 4 at 1836 (Order No. 46).

[12]    Box 4 at 1338-339 (Order No. 42).

[13]    *Virginia Arbitration Order* at ¶¶ 61 & 63 ("We agree with Verizon that the cost of capital used in this proceeding must reflect the risks of a market in which Verizon faces facilities-based competition, and that AT&T/WorldCom's assumption that Verizon is, and will remain, the dominant local telephone company cannot form the basis of our cost of capital decisions").

Verizon received in the *Virginia Arbitration* because that result already assumed 100% facilities based competition.[14]

As both the RCA and ACS ignore, both the FCC with respect to Verizon and the RCA here with respect to ACS should have been considering *the same* hypothetical level of competition consistent with the FCC's guidance in the *Triennial Review Order*.[15] In the *Triennial Review Order*, the FCC clarified that a TELRIC calculation must assume full facilities based competition for purposes of developing the cost of capital in order to be consistent with TELRIC's other assumptions in the calculation.[16] The RCA's upward adjustment to reflect a greater level of existing competition in Anchorage is a wholly irrelevant consideration and is at odds with the FCC's guidance in the *Triennial Review Order*. Furthermore, as discussed above, this upward adjustment is unnecessary, in any event, given that ACS fully accounted for the risks associated with GCI's plans to serve customers over its cable plant (including its use of a 200 basis point upward adjustment) so no further adjustment was necessary in light of the *Virginia Arbitration Order*.

---

[14]    As explained in the Opening Brief, GCI alone submitted a revised calculation using the methodology employed by the FCC Wireline Competition Bureau in the *Virginia Arbitration Order*, but the RCA ignored this analysis. GCI Opening Brief at 42 and Box 3 at 3127-3131 (testimony of Terry Murray).

[15]    *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket Nos. 01-338, 98-147, and 96-98, Report and Order and Order On Remand and Further Notice of Proposed Rulemaking, 18 FCC Fcd 19,020, 2003 WL 22175730 (rel. August 21, 2003) ("*Triennial Review Order*"), *vacated in part and remanded*, *USTA v. FCC*, 359 F.3d 554 (D.C. Cir. 2004). Pertinent excerpts are set forth in Exh. B in the Appendix of GCI's Opening Brief.

[16]    *Triennial Review Order* at ¶ 680 (GCI Exh. B).

Additionally, in relying on the *Virginia Arbitration Order* to justify an upward adjustment, both the RCA and ACS ignore the FCC Wireline Competition Bureau's explicit caution that the result obtained for Verizon in the *Virginia Arbitration* was based on specific facts and market data relating to Verizon and the financial market conditions in 2001. As explained in the Opening Brief, the Bureau warned "that applying the same methodology to current data could produce different results. To cite just one example, we note that there has been a significant decline in interest rates since this proceeding started. …" *See* Opening Brief at 44 & *Virginia Arbitration Order* at ¶ 64, Note 203. Notwithstanding the Bureau's explicit caution about its award, the RCA, nevertheless, inappropriately "validated" its own calculation by comparing its result to the Bureau's award without regard to the stale financial data underlying that award.

Lastly, ACS argues that the RCA's upward adjustment was appropriate in light of the Verizon award because ACS is smaller than Verizon. ACS Opposition Brief at 21. What ACS really is alluding to is a size premium adjustment. While the academic literature is divided on the question of whether a size premium adjustment is warranted to account for the additional risks associated with a small firm as compared with firms of larger size,[17] the Ibbotson procedure is at least an established and recognized method in the financial industry for objectively calculating such an adjustment. ACS explicitly included a size premium adjustment in its 12.24% cost of capital calculation based on the Ibbotson procedure. GCI Opening Brief at 33. Simply saying that the RCA's upward adjustment is

---

[17]     Box 3 at 3121 (testimony of Ms. Murray).

reasonable in light of Verizon's greater size, however, is hardly an analytical, sound, and objective method to propose or calculate a size adjustment. Such arbitrary reasoning contradicts ACS' own testimony regarding the proper method for correctly calculating a size adjustment. Furthermore, such reasoning overlooks the size premium already implicitly included in ACS' 12.75% calculation[18] and the one explicitly included in its 12.24% calculation. This reasoning yet again demonstrates the type of double counting that underlies the RCA's flawed calculation.

The RCA's misapplication of the FCC's precedent in the *Virginia Arbitration Order* demonstrates that its cost of capital calculation is not the product of reasoned decision-making and must be vacated.

### 3. An Upward Adjustment Cannot Be Justified By The Alleged Consolidation Of Competitive Risk Into The Cost Of Capital Calculation, Which Did Not Occur

The RCA and ACS next attempt to justify a higher cost of capital than ACS calculated on the alleged grounds that the RCA consolidated all competitive risk into the cost of capital calculation, rather than reflecting the risk of obsolescence through competition in determining forward-looking depreciation rates. ACS argues that "GCI misconstrues ACS' cost of capital by viewing it in isolation from other related aspects of ACS' UNE loop rate proposal." ACS Opposition at 22. More specifically, ACS argues that the RCA's excessive award is justified because "the RCA chose a different approach, electing to consolidate competitive risk into only the cost of capital calculation and leaving

---

[18]    ACS' actual cost of capital calculation, by its nature, already factors the actual risks associated with ACS' small size.

depreciation alone." *Id.*  The RCA, in its Opposition, similarly seeks to justify its excessive award by stating that it "considered all competitive risk, including any risk ACS may face from stranded plant" in the cost of capital calculation.  RCA Brief at 54.

GCI agrees that the agency, indeed, *assumed* that it had consolidated all competitive risk in the cost of capital calculation; this clearly was an important factor in the Commissioners' collective minds when they performed their calculation.[19] The problem, however, is that the RCA was factually wrong because it did not consolidate all competitive risk in the cost of capital calculation. With respect to depreciation, the RCA clearly took into account the impact of facilities-based competition when it set the depreciation rates.  In setting the depreciation rates, the RCA chose shortened asset lives at the lower end of the FCC's depreciation schedules to reflect the impact of facilities-based competition.  As the RCA explained:

> We therefore apply the depreciation schedules used in the recent rate proceeding. There was nothing presented in this record that has persuaded us that the asset value of ACS-AN's network will decline any more quickly than we then believed.  ***In that proceeding, we considered the prospective impact of facilities based competition. Depreciation rates for those elements of ACS-AN's network likely to be affected by competition were set in that proceeding at the low end of the FCC range to reflect the impact of competition faced by the incumbent***.[20]

---

[19]    Box 4 at 1839 (Order No. 46).

[20]    Box 4 at 1336 (Order No. 42 at 13) (emphasis added).  The RCA's decisions from the rate case proceeding setting depreciation rates for ACS are set forth in two orders both of which are attached as GCI Exh. J and GCI Exh. K.  As the RCA correctly explained above, the RCA clearly took into account the impact of competition when it set depreciation rates for ACS.  *See* GCI Exh. K at 6 ("We find ACS-AN's arguments to use a 9.2 year projection life and resultant 9.1 percent depreciation [for Digital Circuit Equipment] to be acceptable. This figure appears to best reflect ACS-AN's unique
[FOOTNOTE CONTINUED]

Thus, the RCA's upward adjustment in the cost of capital to account for its alleged consolidation of risk into the cost of capital calculation is completely unjustified and demonstrates another instance of double-counting – the RCA, having already accounted for the risks of facilities based competition in the depreciation rates, included an upward adjustment in the cost of capital to account for the same risk it believed it had not included. These duplicative, compounding adjustments cannot be considered to be reasoned decision-making and demonstrate that the RCA's cost of capital award must be vacated.

### 4. An Upward Adjustment Cannot Be Justified To Account For Stranded Costs As These Risks Too Are Already Included In ACS' Market Based Calculations And The Depreciation Rates Chosen By The RCA

Both the RCA and ACS also seek to justify the agency's upward adjustments based on the need to compensate ACS for "stranded plant" that allegedly would occur when GCI switches customers over to its own cable telephony facilities.[21] *See, e.g.* RCA Brief at 54. ACS also argues that the RCA's excessive award is justified because of the need to account for "stranded" plant. ACS Opposition at 29-30.

In its haste to compensate ACS for alleged stranded plant, the RCA failed to recognize that because ACS' cost of capital calculations are forward-looking and market-based, they already took into account the market risks associated with GCI's

_____

competitive position"); *Id*. at 11 ("We select from the low end of the FCC range [for Metalic Cable Accounts] because ACS-AN faces a high level of retail competition in much of its market"). The RCA also adopted service lives for switching at the lower end of the FCC's schedule governing switches to account for the impact of competition. GCI Exh. J at 9-12.

[21]    Box 4 at 1839-40 (Order No. 46).

plans to deploy cable telephony, including any risks associated with "stranded plant" that allegedly might result from GCI's cable telephony plans. *See* GCI Opening Brief at 37-38. A recent decision by the California Public Utilities Commission (CPUC) illustrates this point.

In a recent UNE proceeding in California, the CPUC rejected a request by Verizon to include an additional "risk premium adder" of 2.74% on top of its cost of capital calculation to compensate for the regulatory risks associated with providing UNEs and the possibility that competitors could choose to leave the incumbent's network. The CPUC rejected this special adder because Verizon's market-based cost of capital calculation, by its nature as a calculation intended to reflect the risks and forward-looking expectations of investors, would necessarily capture all of the regulatory risks associated with leasing UNEs to competitors.[22] Likewise, ACS' forward-looking cost of capital calculation also would necessarily take into account all of the regulatory risks associated with leasing UNEs, including the possibility that GCI would leave ACS' network.

---

[22]    *See Rulemaking on the Commission's Own Motion to Govern Open Access to Bottleneck Services and Establish a Framework for Network Architecture Development of Dominant Carriers*, Rulemaking 93-04-003 & Investigation 93-04-002 (Verizon UNE Phase) at 77-79 (Cal. Pub. Util. Comm'n, March 15, 2006) ("*CPUC Order*"). A copy of this decision is attached as GCI Exh. L *See also Re: Bell Atlantic New Jersey, Inc.*, 2004 WL 2492569 at * 17-18 (N.J.B.P.U. Sept. 22, 2004) (rejecting an additional risk premium on the grounds that the regulatory risks associated with leasing UNEs would be fully known and understood by investors and thus captured by the company's cost of capital calculation). A copy of the New Jersey decision is attached as GCI Exh. M.

Additionally, as just discussed, the RCA also chose depreciation rates to account for the impact of facilities-based competition.  Thus, the RCA's upward adjustment to account for "stranded costs," in reality, is simply another instance of double or triple counting for the risks associated with the impact of facilities based competition that have already been incorporated into the cost of capital calculations ACS submitted and the depreciation rates set by the RCA.

Furthermore, although the RCA claims (as does ACS) that the ACS network will become "less utilized" and generate less revenue for ACS when GCI deploys service over its own facilities, (RCA Opposition at 54), this fact does not mean that the loops become "stranded." The RCA blithely ignores the fact that ACS uses its network for purposes of serving and competing for retail customers – a fact the RCA, itself, observed when it adopted longer asset lives than what ACS had proposed in the depreciation calculation because ACS was continuing to increase its investments in and expand its network notwithstanding the facilities based competition it confronts from GCI. *See* Opening Brief at 39.   In the California UNE case, the CPUC also rejected the "risk adder" proposed by Verizon, in part, because Verizon does not incur "sunk investments" in the network solely to lease lines to carriers.[23]  In truth, there are no special risks of stranded investment associated with leasing UNEs to another carrier because the incumbent must make these network investments in any event to provide retail service and compete in the retail market.

---

[23]    *CPUC Order* at 79, GCI Exh. L.

When GCI takes a customer off of the ACS network, ACS still retains the line and can use it to compete to win back the customer, and can even use it for other purposes such as providing broadband Internet service or even video service – a fact the RCA totally ignores when it says the "loop no longer generates revenues for ACS once a customer migrate[s] to GCI facilities." RCA Opposition at 54.

In short, while it is certainly appropriate for a state commission to take into account the risks associated with facilities-based competition consistent with the FCC's guidance in the *Triennial Review Order*, discussed above, the RCA ignored the fact that ACS' market-based cost of capital calculations did exactly that, and further, the RCA took facilities based competition into account as well in setting the depreciation rates.  No further adjustments for "stranded plant" were warranted or reasonable.  In rushing to further compensate ACS for the loss of revenue it would lose when GCI serves customers over its own facilities, the RCA essentially added extra charges to the cost of capital that effectively penalize GCI for deploying its own facilities.  The RCA's over-zealous effort to further compensate ACS for "stranded plant," which in reality never becomes stranded in any event, is not the product of reasoned decision-making, is anti-competitive, and demonstrates yet again that the agency's cost of capital award is arbitrary and must be vacated.

## B.  BASED ON ITS FLAWED ASSUMPTIONS, THE RCA PERFORMED A CALCULATION THAT IS PATENTLY UNREASONABLE AND MAKES NO FINANCIAL SENSE

As just discussed, the RCA misunderstood the record evidence, FCC precedent, and even its own arbitration rulings when it chose to independently

perform its own calculation and award ACS a higher cost of capital than what the

ACS calculations would permit.   Not surprisingly, based on its flawed assumptions

and misconceptions, the RCA performed a calculation that is patently unreasonable

and makes no financial sense.  The following subsections explain this point in

greater detail.

> **1.   *The RCA Unreasonably Combined Inconsistent Assumptions
>     And Inputs Regarding A Highly Leveraged ACS Company With
>     Assumptions And Inputs Associated With A Hypothetical
>     Company with A More Balanced Capital Structure***

As explained in the Opening Brief, the RCA unreasonably combined

inconsistent assumptions and inputs regarding a highly leveraged ACS company

with assumptions and inputs associated with a hypothetical company with a more

balanced debt and equity structure.  *See* GCI Opening Brief at 29-34.  More

specifically, the RCA committed two significant consistency errors in its

calculation: (1) the RCA erred by adopting ACS' historic 10.33% higher actual cost

of debt, which reflects ACS' highly leveraged (83% debt) capital structure, in

combination with the less leveraged and more balanced capital structure (45% debt)

the agency adopted for its calculation; and, (2) the RCA erred by calculating a size

premium based on ACS' actual 17% equity component rather than calculating the

premium based on the 55% equity component it assumed for the calculation. *Id*.  In

its Opposition, the RCA barely addresses these inconsistency errors.  RCA

Opposition at 53-54.  It merely explains that it selected the cost of capital

components from the parties. *Id*. at 54.  ACS goes farther and attempts to justify the

agency's flawed calculation by arguing that: (1) there is no required methodology for the RCA to follow; (2) the RCA followed the approach in *Verizon Virginia Arbitration*; (3) the RCA's calculation was consistent with basic financial theory; and, (4) the RCA's cost of capital calculation is justified by its judgment about the risks associated with facilities-based competition. ACS Opposition at 23-25. None of these arguments explains let alone justifies the RCA's flawed calculation.

First, while it is true that the FCC has not prescribed a specific methodology for calculating the cost of capital and leaves the matter open for state commissions to decide, the discretion afforded to state commissions, however, does not mean that a state commission's method for calculating the cost of capital is immune from judicial review or may be based on any method no matter how arbitrary or flawed it is. As explained above, it is a fundamental requirement of administrative law that "an agency must cogently explain why it has exercised its discretion in a given manner and that explanation must be 'sufficient to enable us to conclude that the [agency's action] was the product of *reasoned decision-making.*'" *United States Telecom. Ass'n vs. FCC*, 227 F.3d 450,460 (D.C. Cir.2000) (emphasis added). As discussed extensively in the Opening Brief, the RCA's hodge-podge calculation fails this test, making no financial sense because it adopts a hypothetical capital structure for a company with balanced debt and equity but then inconsistently adopts ACS' higher actual cost of debt (which reflects a highly leveraged company rather than one with balanced debt and equity) and adopts a size premium based on ACS' actual 17% equity component rather than the 55% equity

component it assumed for its calculation.  None of the genuine financial experts submitted evidence with this type of illogical mixing and matching of inputs and assumptions; indeed, both the ACS and GCI financial experts submitted calculations reflecting consistency between the assumptions chosen for the capital structure and the assumptions chosen for other inputs used in the calculation.  *See* GCI Opening Brief at 29, Note 65.

Furthermore, neither the RCA nor ACS addresses the fact that the RCA previously rejected an attempt by ACS in the Juneau and Fairbanks arbitration to mix and match assumptions regarding a hypothetical capital structure with actual cost inputs in a cost of capital calculation.  *See* Opening Brief at 30, Note 66.  The RCA's decision to do so in this case is a clear departure from its prior precedent, which the agency fails to explain.  RCA Opposition at 52-54.  This fact alone is sufficient to find that the agency's decision is arbitrary and capricious. *Bob's Big Boy Family Restaurants v. Nat. Labor Rel. Bd.*, 625 F.2d 850, 852 (9th Cir. 1980) (holding that agencies are required to explain departures from agency policies or rules so that a reviewing court is able to determine if the agency was acting in a reasoned, deliberate manner); *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 557 (9th Cir. 1989) ("It is an elemental tenet of administrative law that an agency must either conform to its own precedents or explain its departure from them").

Second, ACS argues that the RCA followed the approach of the FCC Wireline Competition Bureau in that the RCA selected components from the parties' proposals just as the Bureau chose different components from the proposals submitted by the parties in

the *Verizon Arbitration*. The RCA also seeks to justify its decision on the same basis. Their contentions, however, are inconsistent with the explicit language of that order.  In particular, they fail to recognize the emphasis that the Wireline Competition Bureau placed on the need for consistency among the various components of the TELRIC cost of capital. The Bureau conducted the Virginia arbitration under "baseball-style" rules that required it to choose, for each issue, the position of one of the parties.  *Virginia Arbitration Order,* ¶ 24.  The Bureau states that it could depart from these rules under only two circumstances: "if a final offer submitted by  one or more parties fails to comply with the requirements of the Commission's rules, or if we determine that unique circumstances warrant another result because it would better implement the [Telecommunications] Act [of 1996]."  *Id.* For the cost of capital, the Bureau chose to depart from the baseball-style rules *to ensure consistency between the adopted capital structure and the other cost of capital assumptions* (*Virginia Arbitration Order,* ¶ 103) – apparently deeming this need for consistency to be a "unique circumstance[] … [that] would better implement the Act."  By exercising this exception to the baseball-style arbitration rules, the Bureau signaled the importance of consistent cost of capital assumptions.

Third, ACS claims that the RCA's approach is consistent with basic financial theory because the agency reasonably rejected GCI's proposed calculation. ACS Opposition at 24-25.  This argument says nothing about the merits of the RCA's independent calculation. GCI's argument on appeal is not that the RCA should have adopted GCI's proposed calculation. Rather, GCI's argument is that the RCA, on its own, adopted an unreasonable and flawed methodology for calculating

the cost of capital that is not supported by any evidence in the record, is contrary to the agency's own precedent, and results in an unreasonably excessive award greater than any of the calculations ACS submitted into evidence. The RCA's rejection of GCI's calculation does not prove the soundness of the RCA's flawed calculation.

Additionally, ACS argues that GCI places too much emphasis on the "function of capital structure" and allegedly overlooks the importance of the risks associated with competition. ACS Opposition at 25. ACS advocacy on appeal is contrary to the testimony and the financial calculations it submitted into evidence. It is indisputable that a company's capital structure affects the financial risks associated with its cost of capital. ACS' own financial expert testified that the more debt a company has, the more risk to investors, and thus, lenders will demand a larger interest rate on money loaned to the company.[24] Conversely, the less debt a company has, the less financial risk to lenders, and lenders will demand a lower rate. As explained in the Opening Brief, the financial experts of both ACS and GCI proposed lower debt cost when proposing a cost of capital with a hypothetically more balanced capital structure having relatively low amounts of debt. *See* GCI Opening Brief and Note 69. The RCA disregarded this elementary financial principle when it chose ACS' higher actual debt cost (reflecting a highly leveraged company) in combination with the less leveraged hypothetical capital structure it adopted for its calculation.

---

[24]     Box 3 at 2475 (testimony of David Blessing).

GCI's demand for consistency between the capital structure adopted and other inputs and assumptions used in the calculation, however, does not preclude the possibility for taking into account the business risks (as distinguished from the financial risks related to a company's capital structure) associated with facilities based competition required by TELRIC. On the contrary, when ACS submitted its 12.24% calculation using a hypothetical capital structure with correspondingly lower debt cost, it generously included a 200 basis point risk premium adjustment to the cost of equity to fully take into account the impact of facilities based competition in Anchorage.  *See* GCI Opening Brief at 27.

With respect to the size premium consistency error, ACS additionally argues that: (1) it is too late for GCI to complain about the size premium because GCI initially argued that no size premium was justified; (2) there is no legal authority supporting GCI's position; and, (3) the size premium is not related to the hypothetical capital structure. ACS Opposition at 28.  The RCA simply attempts to rationalize its size premium calculation claiming that its decision was justified by increased competition in Anchorage and GCI's plans to deploy cable telephony. RCA Opposition at 53.

First, GCI argued at the hearing that a size premium was not appropriate in a TELRIC calculation for a hypothetically, efficient carrier, and further, that the manner in which ACS calculated the size premium adjustment was flawed.[25]

---

[25]    Box 3 at 3119-120 (Testimony of Ms. Terry Murray).

Notwithstanding this testimony, the RCA determined that a size premium should be adopted.[26] On reconsideration, GCI simply requested that the agency at least adopt a size premium that is consistent with the hypothetical capital structure adopted for purposes of the calculation.[27] There was nothing improper or tardy about GCI's request for consistency.

Second, in claiming that there is no authority to support GCI's demand for consistency, ACS continues to ignore the RCA's own precedent in the Juneau and Fairbanks arbitration wherein the RCA previously rejected ACS' attempt to mix and match a hypothetical capital structure with inputs associated with ACS' actual capital structure.  *See* GCI Exh. E at 11 & GCI Opening Brief at 30, Note 66.

Third, contrary to ACS' explanation, a size premium adjustment is directly related to the capital structure chosen for the calculation.  The premium is based on the size of the firm as measured by the company's market capitalization, which is the total value of the company's equity.[28] Based on the firm's market capitalization, the premium is then taken from the Ibbotson table.[29] As explained in the Opening Brief, by choosing a hypothetically balanced capital structure with 55% equity and 45% debt, it was incumbent on the RCA to correspondingly choose a size premium

---

[26]     Box 4 at 1347-350 (Order No. 42).

[27]     Box 4 at 1428-429 (GCI Petition To Reconsider).

[28]     The total value of the company's equity is obtained by multiplying the number of outstanding shares of the company by the market price per share.

[29]     *See* Box 3 at 816-818 (testimony of David Blessing); *see also* Box 4 at 1347-348 (Order No. 42) (discussing the nature of a size premium adjustment based on Ibbotson's method for calculating this adjustment).

consistent with the agency's 55% equity assumption. Stated differently, if ACS re-financed itself to achieve the 55% equity structure that the RCA assumed for its calculation, ACS' market capitalization would correspondingly be significantly larger. The RCA, however, skewed the size premium adjustment by calculating the market capitalization based on ACS' actual 17% equity component of its capital structure. This equity number significantly understates the market capitalization number that would result if the calculation were performed based on the 55% equity assumed for the calculation. If the RCA had calculated the size premium adjustment to reflect the 55% equity assumed for the calculation, the size premium adjustment would have been significantly smaller.[30]

The RCA, however, tries to justify this mismatch (just like it attempts to rationalize all of the errors in its calculation) simply by claiming that it was appropriate to reflect the competitive risks in Anchorage and GCI's plans to deploy cable telephony. This response highlights the lack of reasoned decision-making underlying the RCA's calculation because the size adjustment is intended to strictly reflect financial risks associated with a company's smaller size (not other business risk considerations), and thus, it is chosen from the Ibbotson table based strictly on the company's market capitalization as just discussed. The RCA made a mockery of the adjustment when it decided to calculate it incorrectly without regard to the hypothetical capital structure chosen for the calculation in order to reflect business

---

[30]    Box 3 at 1428-429 (GCI Petition For Reconsideration of Order No. 42).

risks unrelated to what ACS' market capitalization would be assuming a 55% equity capital structure. The RCA's adjustment is truly not a size adjustment as the Ibbotson method would permit; it is simply a device the RCA used to arbitrarily increase the cost of capital demonstrating yet again the unreasoned and unprincipled manner in which the agency calculated the cost of capital.

Lastly, ACS attempts to justify the RCA's size premium calculation simply by claiming that because ACS is smaller than Verizon it deserves a higher cost of capital than what Verizon received in the *Verizon Arbitration Order*. ACS Opposition at 28. This reasoning is superficial and totally ignores the gross inconsistency error underlying the RCA's calculation of the size premium just discussed. For purposes of the calculation, the "size" of ACS should not be based on a 17% equity capital structure; ACS' "size" should reflect what ACS' market capitalization would be if it had a 55% equity capital structure consistent with the 55% equity/45% debt capital structure adopted by the RCA for its calculation. ACS obviously would have a vastly different "size"/ market capitalization if it possessed a 55% equity capital structure.

To sum this discussion up, the RCA incorrectly calculated the cost of capital by failing to adjust the financial risks (*i.e.*, the cost of debt and the size premium adjustment) to reflect the capital structure it adopted for purposes of its calculation. The RCA's calculation truly is a bizarre concoction that neither reflects the risks associated with a hypothetical company nor an actual company (such as ACS) confronting facilities based competition. The RCA's failure to adjust the

financial risks to reflect the capital structure it assumed for its calculation

demonstrates un-reasoned and arbitrary decision making.

### 2. The RCA Unreasonably Ignored The Decline In Interest Rates When It Adopted ACS' Historic 10.33% Cost Of Debt

In the Opening Brief, GCI also pointed out that a further defect in the

RCA's calculation is that the agency ignored the declining interest rates that

occurred between 1999 and 2003 when it adopted ACS' actual weighted average

10.33% cost of debt as reflected on its financial books as of May 31, 2003. GCI

Opening Brief at 31-32.  The debt appearing on ACS' May 31, 2003 schedule

significantly includes a lot of older debt that ACS incurred in 1999 when its parent

acquired the various operating companies in Anchorage, Juneau, and Fairbanks.[31]

This older debt obviously does not reflect the decline in interest rates since 1999,

which GCI discussed in great detail.[32]  GCI also pointed out that ACS conducted a

refinancing in the summer of 2003 to avail itself of the decline in interest rates.[33] In

response, both ACS and the RCA argue that the agency did not ignore the

significant decline in interest rates because ACS allegedly "was required to pay an

aggregate cost of approximately 10.5% on its debt" in the summer of 2003.  ACS

Opposition at 26; RCA Opposition at 53. Both argue, therefore, that this re-

financing confirms the reasonableness of the RCA's decision to adopt the historical

10.33% cost of debt. *Id.*

---

[31]     *See* Box 3 at 811 (Blessing Testimony).
[32]     GCI Opening Brief at 31-32.
[33]     *Id.*

First, the RCA never discussed ACS' financing in the summer of 2003

when it adopted ACS' 10.33% historical cost of debt.[34] The RCA chose the 10.33%

cost of debt claiming that this number reflects the risks ACS will confront from

facilities-based competition and further that its decision was consistent with the

*Virginia Arbitration*.[35]  The agency's reasoning is flawed for the reasons previously

discussed above.[36]  Additionally, however, the agency cannot rely on ACS' summer

financing (which it did not discuss in Order No. 42) as a basis to justify its failure to

take the decline in interest rates into account. *Railway Labor Executives Ass'n v.*

*Interstate Commerce Comm'n*, 784 F.2d 959, 971 (9th Cir. 1986) ("a reviewing court

may only judge the propriety of an agency decision on the grounds invoked by the

agency").

Furthermore, ACS' public financing in the summer of 2003 does not prove

that the agency took into account the significant decline in interest rates and does

not otherwise validate the correctness of the 10.33% debt number. Contrary to the

---

[34]    Box 4 at 1341-343 (Order No. 42).

[35]    *Id*.

[36]    The RCA seeks to justify all of its errors simply by claiming the need to take into account the risks associated with facilities based competition, but this general claim ignores the serious incorrect assumptions and misconceptions and double if not triple counting of the risks associated with facilities based competition that underlie the RCA's calculation discussed above.  This general plea also overlooks the serious methodological mistake made by the agency when it chose a higher debt number without regard to the more balanced capital structure it adopted for its calculation, also discussed above.  Furthermore, as previously explained, the RCA grossly misinterpreted and misapplied the FCC's precedent in both the *Triennial Review Order* and the *Virginia Arbitration Order* in seeking to apply upward adjustments to take into account the greater business risks ACS confronts in Anchorage.

representations made to the Court, ACS' "aggregate" debt cost obtained in that financing was <u>not</u> 10.5%.  As demonstrated by ACS' publicly-filed Form 10-K, filed with the Securities and Exchange Commission (SEC), ACS' debt restructure in the summer of 2003 consisted of approximately $182 million in unsecured notes plus approximately $200 million in a new bank credit facility agreement.[37]  The cost of the unsecured notes (which is ACS' most expensive debt because it is unsecured and subordinated to other debt) was fixed at a yield to maturity of approximately 10.5%, <u>but</u> the cost of the new credit facility agreement was at a variable LIBOR rate plus 3.25%, which in the summer of 2003 amounted to approximately 4.5%.[38]  Thus, the 10.5% figure that both the RCA and ACS refer to only reflects the most expensive portion of ACS' debt refinancing in the summer of 2003.  The "aggregate" cost of the debt ACS acquired in the summer of 2003 plainly is considerably less than 10.5%.  Importantly, the summer re-financing by ACS does not confirm the reasonableness of the 10.33% historic debt number the RCA adopted.

The fact remains that GCI was the only party that presented evidence regarding the decline in interest rates since 1999.[39]  ACS ignored this decline and

---

[37]    *See* GCI Exh. N at 3-4.  This exhibit is the subject of GCI's Motion For Judicial Notice, which accompanies the filing of this brief.  *See also* Box 3 at 812 (testimony of David Blessing wherein he tells the Commission about ACS' announcement in August of 2003 to re-finance <u>both</u> the secured and unsecured debt). ACS, however, did not disclose the debt cost associated with the secured debt.

[38]    GCI Exh. N at 4.

[39]    Box 3 at 172-73 (testimony of Terry Murray).

ultimately so did the RCA.  By ignoring this decline, the RCA, in yet another

significant way, failed to calculate the cost of capital properly under TELRIC,

which requires that costs are set on a forward-looking basis without regard to

historical costs. *See* GCI Opening Brief at 32.  As discussed above, the FCC

Wireline Competition Bureau specifically warned of the importance of calculating

the cost of capital based on current market data such as taking into account the

significant decline in interest rates.[40] The RCA ignored this caution and thus

performed the calculation incorrectly by failing to take into account the decline in

interest rates.  This error additionally demonstrates the lack of reasoned decision-

making underlying the RCA's cost of capital calculation.

## C.  NO RE-EXAMINATION OF DEPRECIATION RATES IS NECESSARY

Lastly, ACS argues that if a re-examination of the cost of capital is

required, then depreciation rates must also be adjusted. ACS Opposition at 32-33.

The premise for this argument is the incorrect assumption that the RCA factored all

competitive risk into the cost of capital calculation.  *Id*.  As discussed above, the

RCA clearly took into account the impact of competition when it set depreciation

rates, choosing asset lives at the lower end of the FCC depreciation schedules.  ACS

has not demonstrated any error in the RCA's adoption of depreciation rates based on

FCC schedules regarding service lives, and, thus, no further examination of the

depreciation rates is warranted simply because the RCA erred in calculating the cost

---

[40]        *Virginia Arbitration Order* at ¶ 64, Note 203 (GCI Exh. C).

of capital. Indeed, the FCC Wireline Competition Bureau set depreciation rates in the *Virginia Arbitration* based on the FCC's schedules governing asset lives.[41] The Bureau rejected Verizon's arguments claiming that the FCC's regulatory lives do not adequately take into account the impact of facilities-based competition.[42] Additionally, many state commissions, like the RCA, have set depreciation rates based on the FCC's regulatory lives to calculate depreciation. *Verizon Pennsylvania, Inc. v. Pennsylvania PUC,* 380 F.Supp.2d 627, 639 (E.D. Penn. 2005) (upholding PUC decision to use FCC regulatory lives to set depreciation rates noting that approximately 20 other states have used FCC regulatory lives to calculate depreciation).

## II. THE RCA'S DECISION TO USE A DIFFERENT COST OF CAPTIAL INPUT FOR SWITCHING INVESTMENT WAS ARBITRARY

In its Opening Brief, GCI explained that the RCA compounded the harm to GCI by unreasonably refusing to use the 13.89% cost of capital it adopted for all UNEs in calculating the UNE switching rate. The RCA, instead, used the lower cost of capital included in the switching model GCI had proposed. The lower of cost

---

[41]     *Virginia Arbitration Order* at ¶ 112, GCI Exh.O attached.

[42]     *Id*. at ¶¶ 115-118, GCI Exh. O, attached. In its discussion on depreciation, the Wireline Bureau expressed some concern that the FCC's straight-line method for calculating depreciation might not adequately compensate Verizon for the effect of declining equipment prices. *Id*. at ¶¶ 119-121. Based on the record before it, the Bureau was "not able to determine whether, and how much, certain types of equipment would be expected to decline going forward" *Id*. at ¶ 121. The declining equipment prices issue, however, is unrelated to the issue concerning the impact of facilities-based competition, the latter of which is the basis for ACS' claim that depreciation rates need to be re-visited if the Court vacates the RCA's cost of capital award.

capital in that model, of course, reflects the lower cost of capital GCI had proposed

for all UNEs; GCI did not propose a separate lower cost of capital for switching

alone.  The lower cost of capital used in the switching model has the effect of

allocating joint and common costs between switching and loop investments in an

arbitrary manner inconsistent with the RCA's adoption of GCI's method for

properly allocating costs between the loop and switching investments in the

network.  As a result, a higher percentage of overhead costs are being allocated to

the loop rate thereby arbitrarily increasing that rate. GCI Opening Brief at 44-49.

     In its Opposition brief, the RCA tries to justify its decision to use a lower

cost of capital for the switching model but none of the reasons it offers is plausible

or reasonable. ACS, likewise, attempts to justify the RCA's decision but

additionally attempts to cloud and complicate the issue with extensive discussion of

FCC orders.  ACS Opposition at 33-49.  As discussed below, the issue is not that

complicated.

### A.  THE COST OF CAPITAL INPUT IN THE SWITCHING MODEL COULD EASILY HAVE BEEN MODIFIED

     In its Opposition, the RCA makes the extraordinary post-hoc rationalization

that it was necessary to use the lower cost of capital inputs included in the GCI

switching model because "the lack of common models [*i.e.*, the parties proposed

different switching models] necessitated the adoption of one or the other party's

model along with all or most of that party's proposed inputs."  RCA Opposition at

55.   The RCA never made any such statement in its orders.[43] For this reason alone, this asserted justification is legally unacceptable. *Railway Labor Executives Ass'n v. Interstate Commerce Comm'n*, 784 F.2d 959, 971 (9th Cir. 1986) ("a reviewing court may only judge the propriety of an agency decision on the grounds invoked by the agency").

   Furthermore, this extraordinary claim is unsubstantiated by any evidence in the record and is patently untrue. The fact that each party proposed a different switching model most certainly did not require the agency to wholly adopt the cost inputs of one model or the other.  On the contrary, the RCA adopted GCI's switching model, which simply consists of a series of EXCEL spreadsheets, which like any ordinary spreadsheet, contains cells and numbers that may be easily modified at the press of a button.[44] The RCA, indeed, directed the parties to make two modifications to the GCI switching model: (1) one change concerned updating certain cost inputs relating to the purchase of a new switch;[45] and, (2) the second concerned computational errors to other costs inputs over which there was no

---

[43]    No such statement appears in Order No. 42 (Box 4 at 1372-374) or in Order No. 50 (Box 4 at 2000-2002) denying GCI's petition for reconsideration on this issue.

[44]    Attached as GCI Exh. P is a print out from the expense input screen of the GCI switching model submitted to the RCA in GCI's opening round of pre-filed testimony. These pages are print outs that come directly from the switching model filed on a CD with the RCA as RAM Exh. 9, attached to the opening testimony of Dr. Mercer in August 2003. The RCA apparently did not include this electronic CD as well as others in the administrative record filed with the court.  *See* Corrected and Supplemented Index at 55 (explaining that electronic CDs were not included in the administrative record).  If any party believes that a motion to supplement the record is necessary for the Court to accept these printouts, GCI will gladly file such a motion.

[45]    Box 4 at 1374 (Order No. 42).

dispute.[46]  These changes demonstrate the feasibility of making changes to cost

inputs in the GCI switching model.  There is no testimony by any of the parties'

genuine modeling experts stating that it was "necessary" to wholly adopt the cost

inputs of one model or the other.

Additionally, the RCA's post-hoc rationalization that it was "necessary" to

adopt the cost of capital used in the GCI switching model completely overlooks the

structural linkage between the switching and loop models, which GCI proposed and

the RCA adopted in order to properly allocate general and administrative overhead

costs that are common to both switching and loop investments in the network. GCI

Opening Brief at 45-46.  When GCI designed its switching model, it linked the

model to the loop model in order that there would be a proper allocation of joint and

common costs between the switching/transport UNEs and the loop UNE.  The

models were designed to be run in tandem so that the necessary cost outputs from

each model would flow to the other model and proper joint and common cost

allocation would occur.  The RCA explicitly adopted and endorsed this linkage and

method for allocating joint and common costs.[47] The RCA's claim that it was

---

[46]       *Id.*

[47]       Box 4 at 1331 ("We find that GCI's modification [to the loop model] results in a
more accurate calculation of common and general support costs") (Order No. 42).
Specifically, the loop model receives two values that are calculated by the switching
model: the "Switching and Transport Direct Cost per Loop" and the "Switching and
Transport Investment per Loop."  The loop model compares these two values to similar
loop cost and loop investment values in order to assign the proper amount of joint and
common costs to the loop.  Likewise, the GCI Switching model receives two values from
the loop model and uses those to properly allocate joint and common costs to the switching
[FOOTNOTE CONTINUED]

"necessary" to run the GCI switching model with the cost inputs GCI proposed in that model ignores its own decision adopting GCI's method of allocating common costs, which relies on the two models being run together with a common set of cost inputs to achieve a proper allocation of overhead costs. The RCA nowhere explains this inconsistency, which itself is evidence of unreasoned decision-making.

### B.  THERE WAS A WAY TO RESOLVE THE RCA'S "INSTABILITY" CONCERN, BUT THE RCA DID NOT WANT TO LISTEN

ACS makes a lot of fuss in its Opposition about varying FCC orders regarding whether an incumbent carrier must make switching available to competitors as an unbundled network element. ACS Opposition at 34-37. Both ACS and the RCA attempt to justify the agency's refusal to make any further changes to the switching model on the grounds that "stability" was needed in light of the varying FCC orders on switching. RCA Opposition at 56-57; ACS Opposition at 39. Both ACS and the RCA grossly overstate the problem posed by the flux in the FCC's different orders on switching and ignore the simple solution that GCI proposed to address the problem.

As both ACS and the RCA point out, the FCC issued new interim rules governing switching in August 2004 requiring that switching prices not be reduced by state commissions below the prices that were in place as of June 15, 2004. ACS Opposition at 37. The RCA then requested briefing from the parties in Order No. 47

_____

and transport elements. When the switching and loop models are operated properly, these values flow automatically between the two models.

regarding the impact of the FCC's interim decision.[48] In response to the FCC's interim rules, GCI initially took the position that the loop rate should be re-calculated to reflect the higher pre-arbitration price for switching required by the FCC's interim rules.[49] GCI took this position to be consistent with the FCC's interim decision and the RCA's decision in the arbitration regarding the proper manner to allocate joint and common costs between the switching and loop investments discussed above.

In Order 49, however, the RCA refused to re-calculate the loop rate based on the higher switching prices mandated by the FCC's interim rules.[50] For the first time, the RCA expressed its desire to sever the connection between the loop and switching models in order to avoid any further changes in the loop rate that might be required with changes in switching ordered by the FCC.[51]  While this goal was perfectly reasonable, the agency ignored entirely the critical fact that the GCI loop and switching models are structurally linked and were designed that way to properly allocate joint and common costs – which the RCA itself had endorsed. To address the agency's concern for stability, which the RCA expressed for the first time in Order No. 49, GCI filed a petition for reconsideration explaining that the RCA could remain consistent with GCI's method for allocating joint and common costs (which the RCA adopted in Order No. 42 as discussed above) and ensure stability in the

---

[48]     Box 4 at 1909-12 (Order No. 47).
[49]     Box 4 at 1927-28 & 1942-45 (GCI Response to Order No. 47).
[50]     Box 4 at 1961 (Order No. 49).
[51]     *Id.*

loop rate simply by revising the cost inputs in the switching model to conform to the agency's own TELRIC rulings in the arbitration.[52] GCI even requested oral argument before the Commission to explain the issue in detail and how easy it would be to fix the problem to avoid the "instability" associated with the FCC's decisions on switching.[53] The RCA, however, refused to listen and denied GCI's petition for reconsideration in Order No. 50 without further consideration of GCI's solution.[54]

## C. GCI'S PETITON FOR RCONSIDERATION OF ORDER NO. 49 WAS NOT IMPROPER

ACS claims that GCI presented "changing" positions on how to run the switching model and is seeking "to divert this court from its original position and the reasonableness of the RCA's decision with respect to the original position." ACS Opposition at 41.  In view of the "changing" positions, ACS argues that GCI waived the right to request a different method to finalize the rates in its petition for reconsideration of Order No. 49.  *Id* at 42.

ACS, alone, makes this argument. The RCA did not deny GCI's petition for reconsideration on waiver grounds[55] and does not appear to support this argument on

---

[52]    Box 4 at 1967-972 (GCI Petition For Reconsideration of Order No. 49).
[53]    Box 4 at 1995-996 (GCI Request For Oral Argument).
[54]    Box 4 at 2000-002 (Order No. 50).
[55]    *Id*.

appeal.[56] Furthermore, neither of the cases ACS cites remotely supports its waiver argument on the facts in this case. ACS cites *Peterson vs. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir. 1998) for the proposition that a party may waive a position through "sandbagging." In *Peterson*, the Court stated that it would have no hesitation finding a waiver in a situation where a defendant raises an issue of lack of personal jurisdiction in a motion to dismiss, then deliberately and strategically does not raise the issue again to the trial court in the hopes of obtaining a favorable ruling on the merits of the case, but then raises the issue on appeal. *Id.* That GCI proposed a different method to finalize the rates in its petition for reconsideration of Order No. 49 does not demonstrate "sandbagging" as described by the Ninth Circuit. GCI filed its petition for reconsideration in response to the agency's desire to ensure stability in the loop rate from further changes in switching, which as discussed above, the RCA expressed for the first time in Order No. 49. GCI, therefore, proposed a solution in the petition for reconsideration that would have allowed the agency to finalize the rates properly consistent with its rulings in Order No. 42 while avoiding any further changes to the loop rate. GCI was not "sandbagging" anybody; it was trying to address the agency's concern in a manner consistent with its arbitration rulings.

---

[56]    RCA Opposition at 56. To be clear, the RCA does argue that GCI's request to modify the cost of capital input in the switching model was untimely. GCI addresses this issue separately below.

ACS also cites *GTE South, Inc. v. Morrison*, 6 F.Supp.2d 517, 529 (E.D. Va. 1998), but this case, again, does not remotely support ACS' waiver argument. In *GTE*, the district court held that GTE had waived the right to argue on appeal that costs should be measured based on historical costs because GTE had not presented this argument to the agency below. *Id.* Unlike GTE, GCI did raise the issue with the agency regarding the need to finalize the rates in a manner consistent with the its decision adopting GCI's models and method for allocating joint and common costs and presented a way to accomplish this objective while avoiding further changes to the loop rate. There is no basis to hold that GCI waived the right to argue this issue on appeal.

## D. THERE IS NO BASIS FOR APPLYING A DIFFERENT COST OF CAPITAL TO SWITCHING

Both ACS and the RCA correctly argue that FCC guidelines permit a state commission to apply a different risk adjusted cost of capital to different UNEs in appropriate situations. RCA Opposition at 58-59; ACS Opposition at 45. Both the RCA and ACS further argue that a lower cost of capital for switching was appropriate on the basis that switching investments are less risky than loop investments because there is a greater likelihood that loops will become "stranded" by GCI's plans to deploy cable telephony. RCA Opposition at 57-58; ACS Opposition at 45, Note 23.

As explained in the Opening Brief, the FCC explained in the *Triennial Review Order* that a UNE-specific cost of capital may be warranted in some

instances to reflect unique risks associated with providing advanced services.[57]  In

this case, however, there was no basis to award a lower cost of capital for switching

investments because there is no record evidence demonstrating that switching

investments are less risky than other UNE investments such as investments in the

loop.  No party even argued that a different cost of capital should be used for

switching investments.[58]  Furthermore, the RCA never before attempted to justify its

decision to use a different cost of capital for switching on the grounds that switching

is a less risky investment[59]  That the agency did not do so before makes perfect

sense because there is no record evidence showing that switching investments are

more risky -- the RCA, when it set depreciation rates, adopted shorter asset lives at

the low end of the FCC schedules to reflect the impact of facilities based

competition for all equipment alike.[60] The RCA did not choose more accelerated

depreciation rates for loop plant to reflect greater risks associated with loops.[61]

The RCA's and ACS' attempt on appeal to rationalize, post-hoc, the

decision to use a lower cost of capital on the grounds that switching investments are

less risky than loop investments is misguided because it is not supported by record

evidence, and, moreover, is legally unacceptable in any event because the agency

did not rely on this reasoning in its decision. *Motor Vehicles Mfrs. Ass'n of U.S. v.*

---

[57]    GCI Opening Brief at 10; *Triennial Review Order* at ¶ 683.
[58]    *See* Box 3 at 780-84 (testimony of David Blessing); Box 3 at 168 (testimony of Terry Murray).
[59]    *See* Box 4 at 1961 (Order No. 49) & Box 4 at 2000-002 (Order No. 50).
[60]    *See* Note 20 above and GCI Exhs. J and K.
[61]    *Id.*

*State Farm Ass'n of U.S.*, 463 U.S. 29, 50 (1983) ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself"); *Railway Labor Executives*, *supra*, 784 F.2d at 969 ("generally, a reviewing court may only judge the propriety of any agency decision on the grounds invoked by the agency").

### E.  THE FCC'S PREEMPTION OF SWITCHING DOES NOT JUSTIFY THE USE OF A LOWER COST OF CAPITAL IN THE SWITCHING MODEL

ACS argues that GCI's challenge to the RCA's decision to use a lower cost of capital for switching lacks merit because the FCC eliminated the incumbent's obligation to offer switching as an unbundled network element to competitors.  ACS Opposition at 44.  ACS also argues that the FCC's orders severed the connection between the loop model and the switching model. ACS Opposition at 45.

The defect in these arguments is that the FCC's orders regarding the availability of switching as a UNE or even how to price switching have no bearing whatsoever on the method for allocating joint and common costs adopted by the RCA in Order No. 42 discussed above.  Even if GCI does not order switching as a UNE, switches continue to be part of ACS' network, and some of ACS' common overhead costs must be allocated to switching.  Therefore, it is still necessary to run both the switching and loop models together with a common and consistent set of cost inputs in order to properly allocate joint and common costs between switching and loop investments in the network as previously discussed. The crux of the issue is the proper allocation of joint and common costs; the issue does not concern the availability of switching as a UNE.

Additionally, ACS focuses exclusively on the pre-arbitration rates mandated by the FCC but totally ignores the alternative GCI proposed in its petition for reconsideration of Order No. 49 – *i.e.*, that the RCA simply modify the cost inputs in the switching model to be consistent with the inputs used for the loop model reflecting the agency's TELRIC rulings. This solution would have allowed the agency to finalize the rates consistent with the agency's TELRIC rulings from the arbitration without being tied to the FCC rules governing switching.

## F.  GCI'S CLAIM IS NOT BASED ON AN UNAPPROVED SWITCHING MODEL

ACS, alone, argues that GCI's challenge on appeal is based on an unapproved switching model that included modifications beyond those ordered by the RCA.  ACS Opposition at 46.  This argument demonstrates the extent to which ACS seeks to cloud the issues on appeal.  The "unapproved" modifications ACS refers to were changes that GCI made to simplify the running of the two models to minimize the double entry of certain inputs in both models. These changes, which ACS amazingly objected to, are entirely irrelevant and distinct from the structural linkage that exists between the two models for purposes of allocating joint and common costs, which the RCA adopted in Order No. 42.[62] Simply stated, GCI's claim is not based on an "unapproved" switching model.

---

[62]    Box 4 at 1331 (Order No. 42).

## G. THE RCA'S REFUSAL TO FINALIZE THE RATES
##    CORRECTLY IS NOT A SMALL MATTER

ACS argues that the Court should ignore the agency's refusal to run the

models properly with a consistent set of cost inputs because the loop rate would

only drop from $18.64 to $18.42.  ACS argues that because TELRIC is imprecise,

this small overstatement in the rate is reasonable.  ACS Opposition at 47.

The RCA's refusal to use a consistent set of cost inputs in both the

switching and loop models in order to properly allocate joint and common costs in

accordance with the method adopted in Order No. 42 is a gross and blatant error that

the Court should not ignore or condone.  TELRIC may have some flexibility, but

such flexibility should not include an agency's deliberate decision to run the models

incorrectly.   There is no excuse for this type of arbitrary action on the part of the

agency.

Furthermore, while the difference in rates may appear small, the total

amount at issue is significant.  The exact cost varies each year depending on how

many loops GCI leases from ACS.  In 2004, for example, GCI leased approximately

60,000 loops each month, which means that GCI paid approximately an extra

$160,000[63] in 2004 due to the RCA's refusal to run the models correctly.  As GCI

switches customers over to its own cable facilities, it will lease less loops and the

cost associated with this error will decrease.  Nonetheless, over the 5-year term of

the contract, GCI will pays hundreds of thousands of dollars in extra charges due to

---

[63] ($60,000) * (.22) * (12).

the RCA's arbitrary decision not to run the models correctly. From GCI's

perspective, this is not an insignificant matter.

### H. GCI'S REQUEST WAS TIMELY

Lastly, and most gallingly, both the RCA and ACS argue that GCI's request

to run the models with a consistent set of cost inputs was untimely because GCI did

not raise the issue initially in its petition for reconsideration of Order No. 42. ACS

Opposition at 47; RCA Opposition at 56. The argument here is that when the RCA

issued Order No. 42, it adopted GCI's switching model with only two modifications

and otherwise "adopted" the lower cost inputs included in the model. When GCI

filed its petition for reconsideration of Order No. 42, it did not challenge the

agency's adoption of the GCI switching model, which included only two

modifications, and, thus, both the RCA and ACS argue that GCI waived the right to

contest the agency's adoption of the lower cost inputs in the switching model. This

argument grossly distorts the facts regarding the clarity of the RCA's order and

GCI's repeated attempts to encourage the agency to run the models correctly before

the interconnection agreement was completed and rates were finalized.

First, there is no requirement that GCI file a petition for reconsideration to

preserve an issue on appeal. GCI, therefore, had no obligation to even include in its

petition for reconsideration of Order No. 42 a challenge to the RCA's decision to

adopt lower cost inputs in the GCI switching model.

Second, the RCA truly provides a misleading picture of its alleged

"decision" to adopt lower cost inputs for switching. In Order No. 42, the RCA,

indeed, adopted GCI's switching model with two modifications (discussed above), but it also adopted a set of cost inputs based on its TELRIC rulings that were not specific to any one UNE.  For example, with respect to the cost of capital, nowhere in Order No. 42 does the agency purport to apply this input exclusively to the loop UNE and not to other UNEs such as the switching UNE.  On the contrary, as explained above, there was never any testimony in the record about creating a different cost of capital for switching.  Following Order No. 42, GCI, therefore, did not see a need to challenge the RCA's adoption of the GCI switching model because it reasonably expected that the switching and loop models would be run with the same cost inputs consistent with the agency TELRIC decisions applicable to all UNEs.  GCI's expectation was all the more reasonable in view of the RCA's decision adopting GCI's method for allocating joint and common costs in Order No. 42, which requires that the two models be run together with a consistent set of cost inputs.

GCI, therefore, first reminded the RCA about running both models with consistent cost inputs in a compliance filing.[64] GCI also raised the issue in response to the RCA's further briefing requested by the RCA in Order No. 47 regarding the FCC's decision on switching as discussed above,[65] and raised the issue yet again in a petition for reconsideration of Order No. 49.[66] GCI raised the issue repeatedly in

---

[64]     Box 4 at 1502-1507 (GCI Compliance Filing).
[65]     Box 4 at 1927-28 & 1942-45 (GCI Response to Order No. 47).
[66]     Box 4 at 1967-972 (GCI Petition For Reconsideration of Order No. 49).

an effort to remind and persuade the agency to run the models correctly as they were

designed in order to properly allocate joint and common costs.  Incredibly, the RCA

and ACS both ignore the fact that GCI repeatedly raised the issue well before the

interconnection agreement had been finalized and even before the RCA's 30-day

period for reviewing a final interconnection agreement under section 252(e)(4) had

begun to run.  At bottom, GCI raised the issue in a timely fashion so that the agency

could finalize the rates correctly, but the RCA was not interested.

### III.   THE RCA'S DECISION TO ADOPT A NO-SHARING OF TRENCHING COST ASSUMPTION WAS ARBITRARY

In its Opening Brief, GCI explained that a further defect in the RCA's

calculation of the loop rate was its assumption that no trenching costs would be

shared between ACS and other utilities in constructing the feeder routes in the

hypothetical network required by TELRIC. GCI Opening Brief at 49-54.  The RCA

adopted a "no-sharing" assumption despite the fact that the only testimony in the

record on the issue was from GCI, which explained that utilities commonly share

trenching costs.  *Id*. at 50-51.  GCI additionally explained that the significant

amount of fiber, which the RCA assumed would be used in the feeder portions of

the network, would make the sharing of trenching space among utilities even more

likely given that fiber is considerably less bulky than copper. *Id*.  GCI had proposed

a conservative 35 % sharing assumption, which means that on average

approximately 65% of the trenching costs would be included in the UNE rates. The

RCA's adoption of a no-sharing assumption, therefore, was not supported by substantial evidence in the record and is patently arbitrary.

In its Opposition, ACS claims that its proposed design of the network, which did not assume any sharing of trenching costs, was enough to provide the RCA with "substantial evidence" to support the agency's "no-sharing" decision and that no further testimony or evidence was needed to rebut GCI's testimony challenging the no-sharing assumption. ACS Opposition at 52-53. The RCA makes the same argument and further claims that GCI's testimony in support of a sharing assumption was not persuasive.  RCA Opposition at 66.  These arguments mask the agency's failure to critically examine the assumption ACS included in its model, which is inconsistent with the record evidence regarding the abundant use of fiber the agency assumed would be used in the feeder portions of the hypothetical network, is inconsistent with ACS positions taken earlier in the proceeding, contradict FCC precedent, and otherwise defies common sense and TELRIC given that even an inefficient carrier would have the incentive to share trenching costs as most carriers commonly do as GCI testified at the hearing.

## A.  ACS NEVER EXPLAINED THE BASIS FOR ITS NO SHARING ASSUMPTION AND THE RCA BLINDLY ACCEPTED IT

ACS submitted a proposed model run with a network design that assumed no sharing of trenching costs in the feeder routes – but ACS never offered any discussion or testimony to explain the basis for its no-sharing assumption or why this assumption was reasonable in light of prior model runs it had filed in the

proceeding that had assumed a 50% sharing of trenching costs for the feeder routes,[67] or why it differed even from the FCC Model run, which included a sharing assumption for feeder trenching costs,[68] with its no-sharing ACS Model run. ACS tries to mask its failure to explain the basis for its no-sharing assumption or the inconsistencies in its models by citing to several ACS witnesses. ACS cites to the testimony of Steven Cinelli, but Cinelli only testified generally that ACS' network design is based on accepted civil engineering standards; he did not offer any explanation or discussion regarding ACS' no-sharing assumption for feeder trenching costs.[69]

Typical of its silence on the issue, ACS cites to a diagram attached as an exhibit to Cinelli's pre-filed testimony,[70] (ACS Opposition at 53), but Cinelli did not even discuss the diagram in his testimony.[71] In the upper left hand corner, the diagram shows a picture of a trench without any specified dimensions with two four inch conduits. This unexplained, vague drawing does not shed any light on the

---

[67]     Box 3 at 2902 (testimony of Robert Mercer).  A copy of the structure sharing page from the May 23, 2003 version of the ACS model is set forth as GCI Exh. Q.  Although this version of the model certainly is part of the administrative record, it is not included in the record filed with the Court. If either ACS or the RCA believes a motion to supplement the record is necessary, GCI will gladly oblige.

[68]     Ironically, when ACS changed that sharing assumption to 0% in the model proposed to the RCA in August 2003, it also contemporaneously filed a model run using the FCC model, which assumed approximately 12% sharing of feeder trenching costs. *See* Box 3 at 2932 (testimony of Robert Mercer explaining the inconsistencies in the ACS models).

[69]     Box 3 at 1338-40 (Testimony of Cinelli).

[70]     Box 4 at 316 (diagram attached to testimony of Cinelli as Exh. SDC-11, p. 23).

[71]     Box 4 at 270-290 (testimony of Cinelli).

possibilities or impossibility for sharing space either within the conduits or elsewhere at the bottom of the trench. If anything, it tends to show that sharing can occur because each conduit is displayed with three inner-ducts through which fiber can be easily pulled through. Both the RCA and ACS ignore the critical fact that the loop model adopted by the RCA assumes a significant amount of fiber (which is considerably less bulky than copper) in the feeder portion of the network, which makes the potential for sharing either within the inner-ducts or elsewhere in the trench more likely.[72] Furthermore, both ACS and the RCA ignore the fact that the FCC explicitly requires incumbent carriers (like ACS) to share conduit space.[73] Notably, conduit space can be shared even after the trench is dug because fiber can be pulled through any time later. As a consequence, a no sharing assumption is highly implausible. GCI, indeed, testified that such sharing would likely occur because of the significant use of fiber in the feeder portions of the network[74]and that fiber may be efficiently placed in inner-ducts.[75]

Even if sharing within the two four inch ducts displayed by the ACS diagram were impossible (which is not at all clear from the diagram or otherwise addressed by ACS in the record), the diagram still demonstrates that only four

---

[72]     *See* GCI Opening Brief at 51 and Note 129.

[73]     *See* 47 C.F.R. § 1.1403(a): "a utility [which includes a LEC] shall provide a cable television or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right of way owned or controlled by it."

[74]     Box 3 at 2845 (testimony of Dean Fasset) (explaining that in a forward-looking network using fiber rather than copper feeder allows engineers to share feeder trenches similar to how smaller trenches for distribution lines are shared).

[75]     *See also* Box 4 at 496-97 (testimony of Dean Fassett).

inches of clearance between conduits was required for the project, in which case, a 24 inch trench bottom as assumed by the RCA in Order No. 42, at a minimum, would leave 12 inches of floor space to accommodate additional plant without even considering stacking.

ACS also cites to the testimony of Greg Schmid but he, too, said nothing in his testimony about the possibility or impossibility for sharing space in the feeder trenches, or why ACS was suddenly proposing a model run that assumed no sharing of feeder trench costs contrary to earlier versions of the model it had filed in the proceeding.[76] ACS Opposition at 53. Schmid only testified that there are two ducts in feeder routes of the ACS network design. This testimony (just like Cinelli's) says absolutely nothing about the possibility of sharing of space either within the ducts or elsewhere in the trench.

At bottom, the sum total of the evidence in the record to support a no sharing assumption is merely an unexplained, unsubstantiated number ("0%") that appears as a structure sharing percentage embedded in the loop model ACS proposed in August 2003. *See* GCI Exh. G, attached to GCI Opening Brief. ACS completely failed to explain the basis for its no-sharing assumption or why it changed the sharing assumption from its earlier version of the model in May 2003 or why its no-sharing assumption in the ACS loop model differs from the sharing assumption used in the FCC model run it contemporaneously submitted at the

---

[76] Box 3 at 891-92 (testimony of Schmid).

arbitration in August 2003.[77]  ACS remained silent on these issues even after GCI

challenged the no-sharing assumption and pointed out the contradictions and

inconsistencies in the ACS no-sharing proposal.  *See* GCI Opening Brief at 50-51.

Despite ACS' failure to provide any explanation for its no-sharing

assumption or its inconsistent positions, the RCA, nonetheless, argues that GCI

failed to prove that a sharing assumption was reasonable. RCA Opposition at 67.

This argument is baffling (if not hypocritical) given the agency's decision to blindly

accept ACS' unexplained and unsubstantiated no-sharing assumption.  Moreover,

this argument is patently unreasonable because it turns the FCC's burden of proof

regulation on its head. In these arbitrations, the FCC's Rule 51.507(e)[78] places the

burden of proof on ACS, not GCI, to prove the reasonableness of its forward-

looking costs.  In the absence of any explanation or testimony by ACS (the party

with the burden of proof) to support its no-sharing assumption and consistent with

Rule 51.507(e), the RCA cannot reasonably adopt a no-sharing assumption on the

grounds that GCI (the party without the burden of proof) failed to prove the

reasonableness of a sharing assumption.

---

[77]    ACS additionally failed to explain the discrepancy between the 49.1% sharing
assumption it proposed for distribution plant and the 0% sharing proposed for feeder plant.
*See* GCI Exh. G, attached to Opening Brief.  Because feeder plant is bigger and more
costly to build than distribution plant, there is more economic incentive to share costs in
building feeder plant.  ACS, paradoxically, proposed no sharing for feeder trenches but
sharing for the smaller, less costly distribution trenches.  This makes no sense
economically.
[78]    47 C.F.R. § 51.507(e).

In support of its claim that GCI failed to prove the reasonableness of a sharing assumption, the RCA faults GCI for not providing cost detail for stacking conduits in concrete encasements.  RCA Opposition at 67.  The RCA argues that a diagram (it is actually an ACS drawing) GCI filed with its petition for reconsideration of Order No. 42 displays multiple conduits stacked in a concrete encasement within a trench, and, the agency assumes, therefore, that stacking would be necessary in order to place a third conduit in the trench.[79] The RCA further claims that GCI contradicted itself in the petition by stating on one hand that a third conduit could be placed on the trench floor without stacking, but then on the other hand stating that "[i]f more than two conduits are placed in a 24" wide trench, they are installed in a stacked configuration." RCA Opposition at 67.   Based on the same diagram, ACS also argues that GCI's sharing assumption would have required a stacking of conduits that would have increased costs. ACS Opposition at 53.  These arguments misconstrue GCI's petition for reconsideration and raise issues the agency did not even discuss in its orders.

First, the RCA did not even mention the GCI diagram or the issue of stacking when it denied GCI petition for reconsideration.[80] The agency focused narrowly on the issue relating to how strictly it should apply state and local under-grounding requirements; it said nothing about stacking as a reason for adopting a

---

[79]    Box 4 at 1450 (diagram attached to GCI Petition For Reconsideration).
[80]    Box 4 at 1859 (Order No. 46).

no-sharing assumption.[81] This is yet another improper attempt by the agency to defend its decision on grounds that it did not rely on its order. *Railway Labor Executives Ass'n v. Interstate Commerce Comm'n*, 784 F.2d 959, 971 (9th Cir. 1986) ("a reviewing court may only judge the propriety of an agency decision on the grounds invoked by the agency").

Second, the "contradiction" the RCA alleges is nothing more than an obvious error in the sentence it quotes from.  As the RCA observes, GCI clearly explained that a third conduit could easily be placed in the 24-inch wide trench floor without stacking.[82] Given this statement, the next sentence that follows logically only makes sense when read as:  "if more than [three] conduits are placed in a 24" inch wide trench, then they are installed in a stacked configuration . . ." Without this correction, both sentences make no sense, which is exactly how the RCA chooses to read them.  The RCA also misinterprets the diagram when it states that it reflects a stacking of conduits in a 24-inch wide trench.  RCA Opposition at 67.  The diagram shows stacking in a 17.22 inch wide trench, which is considerably narrower than the 24-inch wide trench assumed by the RCA.  The extra trench width assumed by the RCA could accommodate a third conduit without stacking just as GCI explained in the petition.  Furthermore, all of this fuss about whether the placement of an additional conduit would require stacking totally ignores the potential for sharing within the two conduits placed at the trench floor as previously discussed.  Again,

---

[81]     *Id.*
[82]     Box 4 at 1435 (GCI Petition For Reconsideration).

the potential for sharing within the conduits exists even after the trench is dug because additional fiber can be pulled through at any time.

Additionally, ACS argues that the diagram demonstrates that the placement of multiple conduits requires a trench depth of 46 inches, which is deeper than the 42 inch trench depth assumed by the RCA. ACS Opposition at 54. As a general proposition, a deeper trench is required to accommodate stacking. Like the RCA, however, ACS assumes that stacking would be required in order to place an additional conduit in the trench. As just explained, the diagram does not prove that stacking is required for the placement of an additional conduit when one considers the dimensions of the trench the RCA assumed. Put simply, the diagram does not reflect the actual configuration of the trench assumed by the RCA.

Furthermore, the RCA criticizes GCI for failing to submit actual sharing data for trenching in Anchorage. RCA Opposition at 67. The RCA, however, overlooks the actual Anchorage data in the record that supports a sharing assumption. In its petition for reconsideration, GCI highlighted for the RCA the fact that ACS had introduced evidence concerning GCI's Dowling Road construction project, which showed that approximately 87% of the trenching costs would be shared.[83] There was Anchorage data in the record that overwhelmingly supports a sharing assumption but the RCA chose to ignore that evidence. Additionally, GCI

---

[83]    Box 4 at 1436 at Note 24 (explaining the joint trenching costs for GCI's Dowling Road Construction Project set forth in SDC Exh. 9) (GCI Petition For Reconsideration). A copy of SDC Exh. 9 is also attached for the Court's review as GCI Exh. R. The undersigned could not locate a copy of this exhibit on the CD filed by the agency.

also explained how a sharing assumption is consistent with the City of Anchorage

municipal ordinance, AMC 21.90, which requires multiple utilities to underground

their equipment when one utility opens a trench to bury its equipment, and with AS

42.05.381(j), which similarly requires utilities to bury their equipment when another

utility undergrounds its equipment.[84] These state and local laws further support a

sharing assumption in Anchorage.

### B.  THE RCA IGNORED FCC PRECEDENT CONFIRMING THE INDUSTRY PRACTICE OF SHARING

Lastly, the RCA continues to ignore the fact that its no-sharing assumption

is flatly contrary to industry practice, which is confirmed by FCC precedent.  The

FCC has explicitly acknowledged that:

> Outside plant structures are generally shared by LECs, cable
> operators, electric utilities, and others, including competitive access
> providers and interexchange carriers.  To the extent that several
> utilities place cables in common trenches, or on common poles, it is
> appropriate to share the costs of these structures to the telephone
> company.

*Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Tenth

Report and Order, 14 FCC Rcd, 20156 at ¶ 241 (1999 ("*FCC Inputs Order*"),

attached to GCI Opening Brief as GCI Exh. D.  In accordance with this finding, the

FCC has established national structure sharing percentages, which it used in its

model for awarding universal service support to non-rural carriers. *Id*. at ¶ 243.

ACS, however, argues that reliance on the FCC's discussion of this issue in the *FCC*

---

[84]      Box 4 at 1436 (GCI Petition For Reconsideration).

*Inputs Order* is inappropriate because the FCC model was developed for universal service purposes and the FCC "cautioned parties from making any claims in other proceedings based upon the input values we adopt in this Order." *Id.* at ¶ 32. ACS Opposition at 51.

While it is true that the FCC cautioned parties about making claims regarding the input values adopted in the *FCC Inputs Order*, this does not mean that the FCC's discussion of the structure sharing issues in that order is irrelevant. On the contrary, ACS ignores the fact that the FCC Wireline Competition Bureau explicitly relied on the structure sharing percentages adopted in the *FCC Inputs Order* when it adopted structure sharing percentages in the *Virginia Arbitration*. The Wireline Competition Bureau compared the parties' respective proposals on structure sharing to the "reasonable structure sharing percentages that the Commission adopted on a nationwide basis in the *Inputs Order*" and then chose the proposal that was closer to the FCC's structure sharing percentages.[85]  The RCA's adoption of a no-sharing assumption flies in the face of the FCC's structure sharing percentages and the Wireline Competition Bureau's adoption of structure sharing percentages similar to the FCC default percentages in the *Virginia Arbitration Order*.

In short, the record evidence supporting a no-sharing assumption was non-existent while the evidence supporting a sharing assumption was un-rebutted and

---

[85]    *Verizon Arbitration Order* at ¶ 283.

substantial.  On this record, it is clear that the RCA did not really take a hard look at the evidence on this issue. The RCA merely assumed, on the basis of its "expertise," that no sharing would be possible because it had chosen a narrower width at the top of the trench.[86] As explained in the Opening Brief and above, this rationale says nothing about the potential for sharing either within the inner-ducts or elsewhere at the bottom of the trench.  The RCA ignored critical evidence and FCC precedent and arrived at a patently unreasonable conclusion without record support.  The RCA clearly failed to apply reasoned decision-making on this issue.

## IV.    THE NUMBER PORTABILITY CHARGES ARE INDISPUTABLY UNLAWFUL

In its Opening Brief, GCI also argued that the non-recurring charges adopted by the RCA unlawfully include charges for porting telephone numbers in violation of the FCC's carrier-specific number portability cost recovery rules.  GCI Opening Brief at 62-64.  In response, both ACS and the RCA do not dispute the fact that such charges assessed against competitors are unlawful.  Rather, they argue that GCI did not raise the issue at the arbitration, and therefore, waived the right to challenge the RCA's adoption of these charges on appeal.  ACS Opposition Brief at 67-68; RCA Opposition Brief at 74, Note 108.

As ACS points out, GCI testified against the number portability charges included among ACS' non-recurring charges but did not specifically argue that

---

[86]        Box 4 at 1366 (Order No. 42).

these charges violate the FCC's number portability cost recovery rules.[87] While not trying to excuse this omission, GCI would point out that the issue regarding the number portability charges was one among literally dozens of issues (both rate and non-rate issues) that were being litigated before the RCA in this complex arbitration, and, further, this issue received considerably less attention than the various issues regarding the calculation of the loop rate. That said, the rule regarding a party's failure to present an argument below does not automatically prohibit the Court from considering the issue on appeal as both ACS and the RCA (through its adoption of the ACS argument) suggest.

The rule that a court may refuse to consider an issue not raised before the administrative agency is a procedural rule, which a court has the discretion to ignore in appropriate cases. *Hormel v. Helvering*, 312 U.S. 552, 557 (1941); *Johnson v. Director, Office of Worker's Compensation Programs*, 183 F.3d 1169, 1171 (9th Cir. 1999). As the Supreme Court has recognized, "[r]ules of practice and procedure are devised to promote the ends of justice, not to defeat them." *Hormel*, 312 U.S. at 557. Thus, the Court acknowledged that "[t]here may always be exceptional cases or particular circumstances which will prompt a reviewing court or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below." *Id.* In determining whether "exceptional circumstances" exist, the Ninth Circuit

---

[87]        Box 3 at 2969-70 (testimony of Frederick Hitz).

balances "the agency's interests in applying its expertise, correcting its own errors,

making a proper record, enjoying appropriate independence of decision free from

deliberate flouting, and the interests of private parties in finding adequate redress for

their grievances." *Johnson*, 183 F.3d at 1171.

Similarly, the Ninth Circuit also has recognized three exceptions to the

general rule regarding an appellate court's refusal to hear an issue first raised on

appeal; they are: (1) in an "exceptional" case where review is necessary to prevent a

miscarriage of justice or to preserve the integrity of the judicial process; (2) when a

new issue arises while appeal is pending because of a change in law, or (3) when the

issue is purely one of law and the necessary facts are fully developed. *Romain v.*

*Shear*, 799 F.2d 1416, 1419 (9th Cir. 1986) *citing Bolker v. Commissioner*, 760 F.2d

1039, 1042 (9th Cir. 1985).

In this case, review of the issue regarding the unlawful number portability

charges is appropriate to prevent a miscarriage of justice and additionally because

the facts are fully developed such that the issue is purely one of law requiring no

agency expertise. First, as stated above, both ACS and the RCA do not dispute the

fact that these number portability charges are unlawful in that they violate the FCC's

carrier-specific number portability cost recovery rules as explained in GCI's

Opening Brief. Allowing these unlawful charges to continue without redress simply

because GCI inadvertently failed to precisely argue that the charges violate the

FCC's cost recovery rules would be manifestly unjust: essentially, it would provide

ACS with a windfall contrary to the FCC's specific rules prohibiting such cost

recovery by the incumbent.  This is not a case where GCI deliberately flouted agency review; it is truly an instance in which GCI inadvertently failed to remind the RCA of the FCC's specific rules prohibiting such charges.

Additionally, there are no facts that need to be developed by the agency on this issue and no agency expertise is required.  The RCA, indeed, offers no argument to support these unlawful charges other than its adoption of ACS' waiver argument.  RCA Opposition at 74, Note 108.  The issue is purely one of law concerning the FCC's number portability cost recovery rules on which there is no disagreement. *Beard v. Gen. Servs Admin.*, 801 F.2d 1318, 1321 (Fed. Cir. 1986) (rejecting waiver argument where issue involved only a question of law); *cf. McKart v. United States*, 395 U.S. 185, 198-99 (1969) (waiving exhaustion of administrative remedies requirement where issue solely involved question of law).

For the foregoing reasons, the facts of this case militate in favor of the Court's review of the issue regarding the unlawful number portability charges.  This situation is similar to *Hormel* in that the injustice in Hormel was that, absent resolution of the previously un-raised issue, the taxpayer "would escape payment of a tax which on the record before us he clearly owes." *Hormel*, 312 U.S. at 560. Likewise, the record before the Court indisputably establishes that the number portability charges violate the FCC's number portability cost recovery rules. Ignoring the issue simply would allow ACS to continue imposing number portability charges on GCI that all parties indisputably recognize are unlawful. Accordingly, the Court should address this injustice and vacate these charges.

## V.    THE RCA IMPROPERLY EXCLUDED SIGNIFICANT COSTS THAT ACS WILL ACTUALLY AVOID IN THE WHOLESALE CALCULATION

In the Opening Brief, GCI also explained that a further defect in the RCA's rulings was its wholesale rate calculation, more specifically, the agency's interpretation of section 252(d)(3) and its corresponding decision to consider only a subset of avoided costs in the numerator of the discount rate formula[88] referred to as "separated" costs.  In the arcane world of ratemaking, there is a method under FCC rules to "separate" costs between intrastate and interstate jurisdictions.[89]  The RCA determined that in the context of developing a wholesale rate under section 252(d)(3) it was necessary to apply the FCC's "separations" rules in order to consider only those avoided costs that are jurisdictionally related to the local service jurisdiction.[90]  The RCA argues on appeal that its interpretation of the statute is reasonable as does ACS.  As discussed in the Opening Brief and below, GCI maintains that the RCA's interpretation of the statute is neither reasonable nor fair, and it effectively makes resale uneconomically viable as a method for competitive entry contrary to the pro-competition goals under the Act.

---

[88]    As explained in the Opening Brief, the formula for calculating the discount rate is: AVOIDED COSTS/RETAIL REVENUE = DISCOUNT FACTOR. GCI Opening Brief at 65.

[89]    47 C.F.R. Part 36.

[90]    Box 4 at 1378 (Order No. 42).

## A. THE STATUTE DOES NOT RESTRICT THE TYPES OF AVOIDED COSTS THAT MUST BE SUBTRACTED FROM THE RETAIL RATE

The RCA maintains that its decision to consider only those avoided costs that are jurisdictionally allocated to the local service jurisdiction is consistent with the language in section 252(d)(3) directing state commissions to "**determine wholesale rates on the basis of retail rates** charged for the telecommunications service requested, **excluding the portion thereof** attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier." RCA Opposition at 73 (quoting language from statute) (emphasis in original). ACS, likewise, supports the RCA's interpretation arguing that GCI's broader interpretation of the statute would result in "inconsistent values for the numerator and denominator in the discount rate fraction." ACS Opposition at 70.

The language in section 252(d)(3), however, plainly does <u>not</u> restrict the types of avoided costs that must be considered in the calculation of the wholesale rate. The statutory language that the RCA highlights simply directs state commissions to start with the retail rate and then subtract (*i.e.*, "exclude the portion thereof") any and all costs "attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier."[91] There is no mention of "jurisdictionally separated costs" in the statute, and there is no other qualification or restriction in the statute regarding the types of avoided costs that must be considered in calculating the wholesale discount.

---

[91]    47 U.S.C. § 251(d)(3).

As explained in the Opening Brief, while the allocation of costs between intrastate and interstate jurisdictions may be relevant to establish a monopoly carrier's local retail rate under historical ratemaking procedures, this allocation has no sensible application in the context of determining the avoided costs for purposes of calculating an appropriate wholesale rate under § 251(d)(3) because costs are not avoided by the incumbent carrier (ACS) or incurred by the competitor (GCI) on a jurisdictional basis.  When ACS avoids retail costs associated with a customer switching service to GCI, it avoids these costs on a company-wide, non-jurisdictional basis.  Likewise, when GCI picks up the costs associated with serving the new retail customer, it incurs all of the retail costs on a company-wide, non-jurisdictional basis; GCI's costs are not limited to just the portion of the costs allocated to local service. For example, if ACS eliminates two customer service personnel when customers switch to GCI, ACS avoids these costs without regard to how such costs are allocated between interstate and intrastate jurisdictions. Likewise, if GCI must now hire two customer service personnel to provide retail services to the new customers, GCI incurs these costs without regard to how such costs may be allocated on a jurisdictional basis.

Because costs are neither avoided by the incumbent nor incurred by the competitor on a jurisdictional basis, the RCA's decision to consider only those costs that are jurisdictionally related to the local service jurisdiction has significant anti-competitive effects that the RCA totally ignored.  As a consequence of the RCA's decision, the wholesale rate does not include significant other costs (*i.e.*, costs that

would be allocated to intrastate and interstate access charge regime under the FCC's "separations" rules)  that ACS actually avoids when a customer switches to GCI, which GCI must fully absorb when it assumes the retail functions associated with the customer.

To illustrate the problem, if ACS actually avoids $10 of cost when a customer switches to GCI, the RCA's calculation only considers approximately $5 of jurisdictionally separated avoided costs. GCI, however, still must incur the full $10 of retail costs associated with serving the retail customer.  GCI winds up paying twice for certain retail functions: once in the wholesale rate to ACS (*i.e*., costs that ACS actually avoids but which are still included in the wholesale rate), and a second time by incurring the full costs to serve the retail customer.  This effectively means that GCI must be twice as efficient as ACS to compete on a resale basis.  The RCA's interpretation renders wholesale resale as an uneconomical means for competitive entry contrary to the pro-competition goals of the 1996 Act. *AT&T Communications of Cal. Inc. vs. Pacific Bell Telephone Company*, 375 F.3d 894, 905 (9th Cir. 2004) (holding that the 1996 Act and the FCC's regulations must be interpreted in light of Congress' pro-competitive goals); *see also Local Competition Order*[92] at ¶ 907 (discussing the importance of resale as an entry strategy for competitors).

---

[92] In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC Docket No. 96-98, 11 F.C.C. R cd 15499 (August 8, 1996) ("Local Competition Order").
[FOOTNOTE CONTINUED]

ACS argues, however, that the FCC has accorded state commissions "broad latitude" in choosing an appropriate methodology to calculate the wholesale rate, and that such methodologies should be "consistent with the manner in which it [the state commission] sets retail rates." ACS Opposition at 70.  ACS infers too much from the FCC's discussion regarding the latitude given to state commissions in adopting a particular avoided cost study.  In the paragraph cited by ACS, the FCC simply stated that state commissions could use different types of cost studies (embedded cost studies, TSLRIC cost studies, or other) consistent with the manner in which retail rates are set.[93]  The FCC did not discuss whether these cost studies should be based on jurisdictionally separated versus un-separated costs.  Notably, ACS ignores the fact that FCC nowhere instructs state commissions to use its separations rules to determine avoided costs either in the *Local Competition Order*[94] or in its regulations on the subject.[95]  The FCC is obviously familiar with its own "separations" rules in Part 36, and if it had intended for state commissions to use these rules in determining avoided costs, the FCC surely would have said so.

Additionally, ACS argues that GCI's interpretation would result in a mismatch between total company costs in the numerator of the discount formula with local revenue in the denominator.  ACS Opposition at 69.  The discount rate formula is a convenient tool that the parties have used to calculate a discount factor,

_____

[93]    *Local Competition Order* at ¶ 915 (GCI Exh. A).
[94]    *Local Competition Order* at ¶¶ 911-920 (GCI Exh. A).
[95]    47 C.F.R. § 51.609.

which in turn, is applied to the retail rate to arrive at a wholesale rate.  There is no

discount rate formula, however, in the statute.  As discussed above, the language in

the statute simply and broadly requires that all avoided costs must be deducted from

the retail rate.  Furthermore, this "mismatch" argument overlooks the fact that

avoided costs are neither avoided by ACS nor incurred by GCI on a jurisdictional

basis and the resulting unfairness to the competitor of applying the FCC's

jurisdictional rules to the calculation as discussed above.

ACS also argues that the RCA's interpretation is consistent with certain

state PUC decisions, including the RCA's prior decision in the Juneau and

Fairbanks arbitration. ACS Opposition at 71.  There are only a few reported state

commission decisions that address the issue regarding whether it is appropriate to

apply the FCC's separations rules to determine avoided costs under section

252(d)(3).  Of those few, some state commissions, like the RCA and those cited by

ACS, have interpreted the statute narrowly as limiting the avoided costs only to

those related to the local service jurisdiction. Other state commissions have

interpreted the statute broadly to include all avoided costs rejecting the proposition

that the FCC's jurisdictional separations rules in Part 36 apply to the calculation.

*See Re: Century Telephone of Alabama, LLC*, 204 WL 3094811 at * 4 (Alabama

Pub. Util. Comm'n, Nov. 29, 2004);[96]  *Re: New England Telephone and Telegraph*

---

[96]    A copy of this decision is attached as GCI Exh. S.

*Company d/b/a NYNEX*, 1996 WL 773774 at * 15-16 (Mass. D.P.U. 1996).[97]  These

few reported decisions do not fairly reflect how state commissions across the

country are interpreting the Act on this issue.  None of these decisions, of course, is

binding on the Court. The issue is one of law, and, therefore, it is up to the Court to

decide how to interpret section 252(d)(3) consistent with the pro-competition goals

of the 1996 Act.  *AT&T Communications of Cal. Inc.*, 375 F.3d at 905.

### B.  GCI OFFERED A COMPROMISE METHOD TO CALCULATE THE RATE AS PART OF A PACKAGE

ACS argues that GCI's position at the arbitration differs from the position

presented to the Court regarding what avoided costs should be considered in

calculating the wholesale rate under section 252(d)(3).  ACS Opposition at 69-70.

ACS is correct in part but does not tell whole story.  GCI has always maintained that

it is inappropriate to apply the FCC's separations rules to limit the avoided costs that

must be considered for purposes of calculating the wholesale rate.  GCI, however,

recognized that if all avoided costs are used in the calculation, then ACS' revenue

requirement for purposes of recovering federal access charges under that cost

recovery regime would be lowered and ACS, therefore, would recover less under

that regime.[98] GCI also explained, however, that if the interstate share of avoided

costs is excluded from the calculation, then ACS over-recovers these costs in the

interstate access charge regime, and GCI would unfairly incur these costs twice (by

---

[97]    A copy of this decision is attached as GCI Exh. T.

[98]    Box 3 at 968-69 (testimony of Richard Cabe).

paying for these costs in the wholesale rate and by incurring these costs to serve the customer) as discussed above.[99] The relationship between the avoided cost calculation and the federal access charge regime and the consequences of not considering all avoided costs is a complex issue that GCI alone presented to the RCA in great detail.[100] ACS, on the other hand, totally ignored the complexity of the issue.[101] GCI alone proposed a compromise method to calculate the rate that strived to balance all of the competing considerations and in doing so went beyond the requirement in the statute, which simply requires that all avoided costs be deducted from the retail rate.  GCI's wholesale rate calculation included all of the avoided costs but included a deduction of interstate access costs (but not intrastate access costs) to prevent harm to ACS in the federal access charge arena.[102] Importantly, however, GCI presented its wholesale rate model (including the compromise deductions just described) as a package.

        The RCA, however, like ACS, ignored the complexity of the relationship between the avoided cost calculation and the federal access charge regime and also ignored the effects on GCI of only considering avoided costs related to the local service jurisdiction.  It simply to chose to consider only those avoided costs related to the local service jurisdiction without regard to the adverse consequences to GCI

---

[99]     *Id.*
[100]     *See* Box 3 at 968-78 (testimony of Richard Cabe).
[101]     *See* Box 3 at 785-87 & 2477-80 (testimony of David Blessing) & Box 4 at 126-27 (testimony of David Blessing).
[102]     Box 3 at 975-77 (testimony of Richard Cabe).

based on its prior determination in the Juneau and Fairbanks arbitration.[103] The RCA did not take a hard look at the issue.  Moreover, although the RCA adopted the GCI wholesale rate model it did not accept all of GCI's adjustments.[104] The RCA, for example, included depreciation expense whereas the GCI model excluded this category of expense from the calculation.[105]  Under these circumstances, GCI should not be held to its compromise position, which went beyond the requirements of the statute, given the RCA's decision to only accept a part of the GCI model.  GCI maintains that the Court should strictly interpret the statute as requiring the consideration and deduction of all avoided costs in the calculation.  This is what the statute says and requires.

## ARGUMENT IN RESPONSE TO ACS CROSS-PETITION

### VI.    THE RCA'S 53% ROAD PRISM ASSUMPTION WAS A COMPROMISE METHOD USED TO ESTABLISH FEEDER TRENCHING COSTS

ACS cross-appeals one aspect of the RCA's calculation of the loop rate concerning the agency's decision to adopt a 53% assumption that feeder plant would be placed in the "road prism" of the hypothetical new network required by TELRIC. ACS Opposition Brief at 73. At the outset, as discussed in the beginning part of this brief, ACS' challenge to the RCA's 53% road prism assumption contradicts its argument that the Court should only review the overall reasonableness of the loop rate and not otherwise examine the agency's decision with respect to individual

---

[103]    Box 4 at 1378 (Order No. 42).
[104]    Box 4 at 1381 (Order No. 42).
[105]    Box 4 at 1378 (Order No. 42).

components of the rate calculation.  *See* ACS Opposition at 12-15.  ACS obviously believes that challenges to the components of the rate calculation are fine so long as it is the challenger.  For the reasons discussed above, GCI does not contest ACS' right to challenge the RCA's 53% road prism assumption.

ACS' discussion of the road prism assumption used by the RCA in determining feeder trenching costs, however, is not accurate.  ACS claims that the RCA adopted a 53% road prism assumption based on GCI's proposed feeder design, and that this assumption is unreasonable given the agency's decision to adopt a 6.6 foot trench width, which is greater than the 2 foot wide trenches GCI assumed in its feeder design. ACS reasons that because the RCA chose a wider trench width, there is no record evidence to support the assumption that only 53% of the feeder routes would be placed under pavement. ACS Opposition Brief at 78.  ACS also argues that the RCA was too heavily persuaded by the field inspections GCI conducted and failed to recognize that ACS also had conducted field inspections when it designed its feeder portion of the model. ACS Opposition Brief at 77.  ACS ignores two critical facts in its argument: (1) the RCA's 53% road prism assumption does not reflect GCI's position regarding the percentage of feeder plant that must be placed under the paved surface; and, (2) the RCA's 53% road prism assumption was not tied to one trench width; it was a compromise costing mechanism the agency adopted for purposes of pricing trenching costs in between the parties' sharply divided positions.

To begin with, the parties used the term "road prism" differently at the arbitration. ACS defined the term as the amount of feeder plant that must be placed under paved surface, whereas GCI defined the term more broadly consistent with the Municipality of Anchorage's definition that considers factors regarding the slope from the edge of the road bed in determining what constitutes the "road prism."[106] The critical difference between the two definitions is that under GCI's definition, the "road prism" could extend beyond the road bed and include grassy areas along the side of the road bed.[107] When GCI assumed that 53% of the feeder plant would be placed in the "road prism" in its feeder design, GCI was <u>not</u> proposing that 53% of the plant would be placed under the paved surface. On the contrary, GCI proposed that only approximately 28% of the feeder plant would need to be placed under asphalt.[108] ACS, on the other hand, claimed that approximately 90% of the feeder plant would be placed under asphalt.[109] The RCA determined that 53% of the feeder plant would be placed in the road prism,[110] and further, that all of this road prism construction would be placed under pavement.[111] This determination by the

---

[106]    Box 4 at 1357 at Note 134 (Order No. 42); *see also* Box 2 at 2614 (testimony of Dean Fassett).

[107]    Box 2 at 2693(diagram of road prism attached as Exh. DRF-6).

[108]    Box 4 at 1854 (Order No. 46). In Order No. 46, the RCA correctly sets forth GCI's position regarding the percentage of feeder plant that would need to be placed under asphalt, which is 53% of 53%.

[109]    *Id*. In Order No. 46, the RCA also sets forth ACS' asphalt assumption.

[110]    Box 4 at 1360 (Order No. 42).

[111]    That 100% of the road prism construction is placed under pavement is evidenced by the RCA's worksheet calculation for road prism construction, which was attached to Order No. 42 as Appendix G. The appendices to Order No. 42 apparently are not included in the
[FOOTNOTE CONTINUED]

RCA clearly was a compromise between the parties' respective proposals that 28%

(GCI) and 90% (ACS) of the feeder plant would be placed under pavement.

Additionally, the RCA made it clear that its determination is not tied to one

particular trench width.  With respect to the width of the pavement cuts, the RCA

determined that:

> [d]ue to the parties' sharply conflicting positions on this matter and
> the absence of persuasive evidence one way or the other, we decided
> to apply GCI's analysis of the road and terrain conditions to allocate
> the size of the pavement cuts.  Therefore, we determined that 53
> percent of the pavement cuts would be at the size proposed by ACS-
> AN and that 47 percent of the pavement cuts would be at the size
> proposed by GCI.[112]

The RCA again essentially adopted a compromise between the parties' divergent

views regarding how wide the pavement cuts would be. For costing purposes, the

RCA adopted a blended 6.6-foot trench width consistent with the foregoing

determination to size 53% of the pavement cuts at the wider width proposed by ACS

and 47% of the pavement cuts at the narrower width proposed by GCI.[113]

ACS' argument on this issue completely overlooks these critical facts.

Thus, it is not correct, as ACS asserts, that the RCA rejected GCI's trench width

assumption and that this rejection means "that more construction would be required

in the road prism and that GCI's original 53% estimate would have to be increased."

ACS Opposition at 78.  As just explained, the RCA adopted a blended average

_____

record on the CD filed with the court.  A copy of the RCA's worksheet calculation is
attached as GCI Exh. U.

[112]    Box 4 at 1854 (Order No. 46).

[113]    Box 4 at 1359 & 1361 (Order No. 42).

trench width assumption using both GCI's and ACS' trench width assumptions for different percentages of the pavement cuts. The RCA's calculation is not tied to one trench width.

With respect to ACS' claim that the RCA failed to recognize that it, too, conducted field visits with respect to its feeder design, GCI concurs with the RCA's discussion of this issue at pages 69-70 of its Opposition Brief. The quantity and quality of evidence GCI provided documenting the field visits and inspections it conducted in support of its network design were vastly superior and more comprehensive relative to the scant evidence ACS submitted regarding its inspections.[114] The RCA reasonably preferred GCI's testimony over ACS' regarding how much feeder plant would be placed in the road prism given the extensive field work GCI documented and presented to the agency.[115] Again, remember that the 53% number, adopted by the RCA does not reflect GCI's estimate of the percentage of feeder plant that would be placed in asphalt.

## **CONCLUSION**

For the reasons set forth in GCI's Opening Brief and above, the RCA clearly failed to apply reasoned decision-making in:

(1)    calculating the cost of capital;

---

[114]    *Compare* Box 2 at 2691-3044 (Exh. DRF-6, attached to testimony of Dean Fassett) *with* Box 3 at 1354-57 (Exh. SDC-4, attached to testimony of Steve Cinelli).
[115]    Box 4 at 1360 (Order No. 42).

(2)      in refusing to use a consistent set of cost inputs in both the switching and

loop models to correctly allocate common overhead costs between the switching and loop

investments in the network;

(3)      in refusing to adopt a sharing percentage assumption for trenching costs

associated with the feeder routes in the hypothetical network;

(4)      in refusing to consider all of the costs that ACS actually avoids when

customers switch to GCI (costs which GCI must fully absorb to serve the new customer) in

setting the wholesale rate for resale.

Additionally, no party disputes the fact that the number portability charges included

among ACS' non-recurring charges unlawfully violate the FCC's specific cost recovery

rules governing the number portability charges an incumbent may charge a competitor. The

Court should not ignore these unjust and unlawful charges because GCI did not discuss the

FCC's number portability cost recovery rules at the arbitration.

Accordingly, as requested in the Opening Brief, GCI asks that the Court vacate the

unlawful portions of the interconnection agreement, remand to the RCA with instructions

to modify the unlawful portions of the agreement, direct the agency to calculate and award

GCI a retroactive refund for the unlawful charges it has been paying ACS including

interest since the agreement went into effect, and grant such other relief as the Court deems

just.

Additionally, as discussed above, GCI maintains that ACS is not entitled to any of

the relief it requests either with respect to its request to re-calculate depreciation rates (for

which ACS has offered absolutely no proof that such rates are unlawful) or its claim that

the RCA erred when it used a compromise 53% road prism assumption to determine the

trenching costs associated with pavement cuts.

Respectfully submitted this 5th day of June 2006.

GCI COMMUNICATION CORP. d/b/a
GENERAL COMMUNICATION, INC.
d/b/a GCI

/s Martin M. Weinstein
Martin M. Weinstein
Regulatory Attorney
Alaska Bar No.  9306051
General Communication, Inc.
2550 Denali Street, Suite 1000
Anchorage AK 99503
Phone:  907-868-6561
Email:  mweinstein@gci.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically served on the counsel of record identified below this 5th day of June, 2006.

Robert Royce
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501

Richard Maki
Tindall Bennett & Shoup
508 West 2nd Ave, Third Floor
Anchorage AK 99501

By:   /s Martin M. Weinstein
Martin M. Weinstein
Regulatory Attorney
Alaska Bar No.  9306051
General Communication, Inc.
2550 Denali Street, Suite 1000
Anchorage AK 99503
Phone:  907-868-6561
Email:  mweinstein@gci.com

## <u>APPENDIX</u>

*RCA Order From ACS Depreciation Case* …………………………..     Exhibit J

*Second RCA Order From Depreciation Case* ……………………..     Exhibit K

*Excerpts From California Public Utility Commission Order*
*Re: Verizon Request for Risk Premium Adder*…………………………. Exhibit L

*New Jersey Board of Public Utilities Order Setting UNE Rates*
*For Bell Atlantic New Jersey* ………………………………………….. Exhibit M

*Excerpts From Certified Copy of Form 10-K For Fiscal Period*
*Ending December 31, 2003 ACS Filed With SEC (Subject of Motion*
*For Judicial Notice And Supplementation of Record)* ……………… Exhibit N

*Additional Excerpts From FCC Wireline Competition Bureau*
*Decision in the Verizon Arbitration* …………………………………… Exhibit O

*Spreadsheets From GCI Switching Model* …………………………… Exhibit P

*Structure Sharing Percentages From ACS Model Submitted*
*In May 2003* ……………………………………………………….. Exhibit Q

*Copy of Exhibit SDC-9 From Cinelli Pre-Filed Testimony*…………… Exhibit R

*Alabama Public Service Commission Order Re: Wholesale Rate*
*Calculation* ………………………………………………………… Exhibit S

*Massachusetts Department of Public Utilities Decision* …………….. Exhibit T

*Worksheet From RCA Appendix G to Order No. 42* ………………….     Exhibit U