STATE OF ALASKA

THE REGULATORY COMMISSION OF ALASKA

Before Commissioners:

G. Nanette Thompson, Chair
Bernie Smith
Patricia M. DeMarco
Will Abbott
James S. Strandberg

| | |
|---|---|
| In the Matter of the Investigation of the Local Exchange Revenue-Requirement, Depreciation, Cost-of-Service, and Rate Design Studies, and Tariff Rate Revisions Designated as TA429-120 and TA431-120 Filed by ACS OF ANCHORAGE, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and ACS | U-01-34<br><br>ORDER NO. 15 |
| In the Matter of the Consideration of the Access Charge Revenue Requirement of ACS OF THE NORTHLAND, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE and ACS | U-01-66<br><br>ORDER NO. 5 |
| In the Matter of the Investigation of the Intrastate Access Charge Revenue-Requirement Study Filed by ACS OF ANCHORAGE, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and ACS | U-01-82<br><br>ORDER NO. 11 |
| In the Matter of the Investigation of the Local Exchange Revenue-Requirement, Depreciation, Cost-of-Service, and Rate Design Studies Filed by ACS OF FAIRBANKS, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and ACS | U-01-83<br><br>ORDER NO. 11 |
| In the Matter of the Investigation of the Intrastate Access Charge Revenue-Requirement Study for ACS OF FAIRBANKS, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and ACS | U-01-84<br><br>ORDER NO. 11 |

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 1 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

Exhibit J
Page 1 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

| | | |
|---|---|---|
| In the Matter of the Investigation of the Local Exchange Revenue-Requirement, Depreciation, Cost-of-Service, and Rate Design Studies for ACS OF ALASKA, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and ACS | ) ) ) ) ) ) | U-01-85<br>ORDER NO. 11 |
| In the Matter of the Investigation of the Intrastate Access Charge Revenue-Requirement Study Filed by ACS OF ALASKA, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and ACS | ) ) ) ) ) ) | U-01-86<br>ORDER NO. 11 |
| In the Matter of the Investigation of the Local Exchange Revenue-Requirement, Depreciation, Cost-of-Service, and Rate Design Studies Filed by ACS OF THE NORTHLAND, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and ACS | ) ) ) ) ) ) ) | U-01-87<br>ORDER NO. 11 |

**ORDER ACCEPTING STIPULATION, AFFIRMING BENCH ORDER, SETTING DEPRECIATION RATES, GRANTING PETITION FOR CONFIDENTIALITY, SETTING PROCEDURAL SCHEDULE, AND DENYING ADMISSION OF EXHIBIT 39**

BY THE COMMISSION:

Summary

We accept a stipulation filed by the parties, confirm a bench order, set depreciation rates for the ACS LECs[1] and require ACS LECs to submit updated

---

[1]The ACS affiliated Local Exchange Companies (ACS LECs) are ACS of Anchorage, Inc. d/b/a Alaska Communications Systems, ACS Local Service, and ACS; ACS of Fairbanks, Inc. d/b/a Alaska Communications Systems, ACS Local Service, and ACS; ACS of Alaska, Inc. d/b/a Alaska Communications Systems, ACS Local Service, and ACS; and ACS of the Northland, Inc. d/b/a Alaska Communications Systems, ACS Local Service, and ACS.

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 2 of 37

schedules.  We allow GCI[2] and the PAS[3] an opportunity to comment on the revised depreciation schedules.  We grant ACS LECs' petition for confidentiality of ACS LECs' ACS network planning documents ACS07582 through ACS07608 and work order spending documents ACS06905 through ACS6907.  We set dates for Phase II.  We deny Hearing Exhibit 39 admission into the record.

<u>Background</u>

On July 2, 2001, the ACS LECs submitted a Depreciation Study proposing new rates and net salvage amounts for the majority of ACS LECs plant accounts.  GCI filed testimony opposing many of the changes proposed by the ACS LECs.

The parties filed a stipulation concerning cost of capital and pro forma adjustment to the ACS LECs' revenue requirements on March 1, 2002.  ACS LECs, GCI, and the PAS participated in a hearing on depreciation issues. The hearing began on March 4, 2002, and continued on March 5, 6, 11, and 12, 2002.  The parties filed a stipulation on March 11, 2002, regarding ACS-N's access charge submission to the Alaska Exchange Carriers' Association (AECA).  Also on March 11, 2002, the ACS LECs provided the Commission and the parties a five-page "Vision for the Regulated Network."

<u>Discussion</u>

<u>A.  Stipulations</u>

We have reviewed the stipulation concerning cost of capital and pro forma adjustments to the ACS LECs' revenue requirement.  We determine that it is

---

[2]GCI Communication Corp. d/b/a General Communication Inc., and d/b/a GCI.

[3]Public Advocacy Section.

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1  reasonable.  We accept this stipulation subject to the condition that, for purposes of

2  establishing future rates, no issue in this proceeding should be considered finally

3  determined or adjudicated by this acceptance.

4       We confirm the bench order issued March 12, 2002, accepting the

5  stipulation regarding ACS-N's access charge submissions to AECA.[4]

6  B.  Depreciation

7       We reviewed the record and accept the lives, net salvages, and transfers

8  proposed by the ACS LECs that were not contested by the parties.[5]  Our analysis of

9  the remaining accounts is discussed below.

10      1. Framework for Analysis

11      The FCC developed a range of projected service lives for various

12  categories of utility plant.  GCI relied upon these FCC lives to develop its depreciation

13  recommendation.  ACS LECs disputed the applicability of the FCC ranges arguing

14  they were developed for Bell Operating Companies and other large system

15  companies, and were not representative of the ACS LECs and future conditions they

16  may face.  ACS LECs argued that climate, competition, state modernization

17  requirements, and other factors made reliance on the FCC lives unreasonable.

18      We are not obligated to follow the FCC service life ranges but they

19  provide a useful check.  There may be valid reasons why ACS LECs service lives fall

---

[4]Tr. at 923.

[5]As part of its depreciation study, ACS LECs presented proposed depreciation rates for Alaska Communications Systems Holdings, Inc. (ACS Holdings).  No party disputed or addressed the rates proposed by ACS Holdings.  The record does not clearly inform us of whether ACS Holdings owns regulated assets for which we would set depreciation rates.  However, because the other parties did not dispute the proposed ACS Holdings rates, we accept them to the extent we hold jurisdiction over the listed plant investment.

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

Exhibit J
Page 4 of 37

1   outside of the federal ranges, but the FCC ranges are still useful in this proceeding.

2   The FCC ranges provide a historical perspective of service lives experienced

3   elsewhere in the nation.   This information is useful as we evaluate ACS LECs'

4   explanation of why its proposed depreciation lives are reasonable given conditions the

5   ACS LECs companies face in Alaska.  We consider the FCC ranges when evaluating

6   the various plant accounts, giving appropriate weight to the FCC data.    In each

7   disputed category, we faced a choice between ACS LECs' proposed life, GCI's

8   proposed life and the existing life.  Because ACS LECs bears the burden of proof in

9   this proceeding, we first determined whether the record demonstrated that the

10  currently approved life was not appropriate.  If the need for a change was justified, we

11  next weighed the evidence presented by the parties to set a new service life for each

12  category.

13      *2. Buildings*

14          The current service life for each ACS LEC Buildings account ranges from

15  35 to 48 years.   ACS LECs proposed that the following service lives be used for

16  developing the Buildings account depreciation rates: [6]

|  Era  | Service Life |
|-------|--------------|
| 1969 and prior | 55 years |
| 1970 to 1989 | 45 years |
| 1990 and subsequent | 35 years |

[6]Throughout this order we use "service life" to mean the average expected life of the plant account or plant groups within the account.   The parties disputed the estimation of average service life from which ACS LECs derived its remaining life estimates and depreciation rates.   When we refer to "current" service life or "life," we refer to the last approved, currently prescribed service life for the account.

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 5 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1   ACS LECs stated that most of the buildings in this account were primarily

2   used to house company switching equipment.[7]  ACS LECs reported that during the

3   late 1970s digital switching systems were introduced and, in a relatively short time, the

4   entire industry's electro-mechanical and analog switching systems were replaced by

5   digital technology.[8]  ACS LECs indicated that most of the older buildings were built in

6   the era of mechanical switches when floor space and strength were of prime

7   importance.   With the advent of electronic switching, ACS LECs stated that the

8   importance of switching building floor space had become secondary to environmental

9   control (e.g., cooling and air handling systems and power requirements).  ACS LECs

10  asserted that the migration to packet switching reduces the need for building space.

11  ACS LECs further asserted that these technology changes justify varying service lives

12  based on the era of the investment.[9]

13  GCI disagreed with ACS LECs and argued that most technology

14  changes had already taken place and that it is unnecessary, unduly burdensome, and

15  abnormal to use a "three-curve splicing" approach to develop separate service lives

16  based on the era of the investment.  GCI recommended a 40-year life for the building

17  account, indicating the proposal was consistent with the average of the currently

18  prescribed lives and supported by GCI's historical life analysis.

19  ACS LECs' existing switching equipment is categorized as "Digital-Type

20  Switching."[10]   We conclude that ACS LECs has already largely eliminated its

21  dependence on mechanical switches.   The effects on the Buildings account of

22

23  [7]Depreciation Study at 30.

    [8]Depreciation Study at 16.

24  [9]Depreciation Study at 29.

25  [10]Depreciation Study, Results Section.

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 6 of 37

1    converting from mechanical to electronic switching has therefore already taken place

2    and is reflected in the historical life indications.  We also note that ACS LECs'

3    assertion that each of the ACS LECs building lives will be affected by technological

4    factors is inconsistent with the fact that ACS-AK has experienced only minimal building

5    retirements.

6    The record does not demonstrate how the migration to packet switching

7    technologies will materially affect building lives.  There was no consideration of the

8    potential for building space no longer used for switching equipment to be converted to

9    another purpose.  We therefore do not accept ACS LECs' proposed lives for the

10    Buildings account.

11    We reviewed information in the record to determine what service life may

12    be appropriate for the Buildings account.  ACS LECs indicated it only had adequate

13    data to perform a historical life analysis for Buildings for ACS-AN and for ACS-N.  In

14    both cases, that analysis showed a total band life of around 30 years.[11]  Yet ACS

15    LECs proposed service lives longer than 30 years.  ACS LECs did not rely on its

16    historical life analysis to develop the service life for buildings and neither will we.

17    GCI's life analysis indicated a 40-year life for ACS-AN and ACS-N and a

18    61-year life for ACS-AK.  Because ACS-F data was insufficient to conduct a life

19    analysis, GCI proposed a 40-year life for each of the ACS LECs.  GCI argued it was

20    consistent with the average of the currently prescribed lives and supported and

21    reasonable in the context of its life analysis.  We discount the GCI 61-year life analysis

22    for ACS-AK because there were minimal retirements from which GCI could make an

23

24    _____

25    [11]Depreciation Study at 29.

26
U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 7 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1  accurate estimate.  We accept a 40-year service life for the Buildings account for all of

2  the ACS LECs.

3      3. General Purpose Computers

4      ACS LECs asserted that the General Purpose Computers account was

5  composed primarily of small to large mainframe computers, personal computers and a

6  host of associated peripheral equipment (e.g., printers).[12]   The current lives for this

7  account for each of the ACS LECs range from five to six years.  ACS LECS stated that

8  it expected a two- to three-year life for small personal computers, with peripherals

9  lasting five years.   It therefore recommended a four-year overall life for equipment

10  installed during and after 1990, and a six-year life for equipment installed during and

11  before 1989.

12      GCI disagreed with ACS LECs' use of two different lives depending upon

13  the era of installation.  GCI recommended a six-year life for the entire account.  GCI

14  argued that the ACS LECs and GCI historical life analyses suggested a five- to nine-

15  year life and six years was at the low end of the FCC range of lives for this account.

16      We note that before making various reserve and plant transfers, ACS-AN

17  had a negative reserve ratio for the General Purpose Computer account.[13]   The record

18  does not explain why this negative reserve ratio occurred.  A negative reserve ratio

19  suggests that the existing depreciation factors, including the current five-year life, did

20  not allow for adequate recovery of investment.  GCI's proposal would raise the existing

21  life for ACS-AN from five to six years, reducing the depreciation rate.   That is not

22  appropriate under these circumstances.

23

24      [12]See Depreciation Study at 31.

25      [13]Depreciation Study, Results Section at 8.

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 8 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1    We find it reasonable that computer equipment would have a relatively

2  short average service life as explained by ACS LECs.  We will therefore accept ACS

3  LECs' proposed projected six- and four-year life for the General Purpose Computer

4  account, depending upon era of installation.

5    *4. Digital Switches*

6    The current ACS LEC lives for Digital Switches range from 10 to 17.9

7  years.    ACS LECs believed these lives would be affected by technological

8  obsolescence, competition, and demand for higher bandwidth services.  ACS LECs

9  stated that the industry is migrating to a network architecture similar to what is used for

10  data communications, allowing both voice and data traffic to be carried in packets of

11  data over large capacity (bandwidth) optical facilities and routed from point to point

12  through high capacity data switches (routers).[14]  ACS LECs stated that its proposed

13  service lives for the Digital Switching account were developed to model the impact of

14  migrating to a packet switched network.  ACS LECs offered lives that varied based on

15  the date of installation of the Digital Switching Equipment Plant:

16

17  | Era | Service Life |
   |---|---|
   | 1984 and prior | 12 years |
18  | 1985 to 1994 | 10 years |
   | 1995 and subsequent | 8 years |

19    ACS LECs stated that the above lives, along with the L2 Iowa-type

20  survival curve it chose for this account, would allow a transition to the packet network

21  over the next six to eight years, resulting in an average remaining life of four years.[15]

22

23

24    [14]Depreciation Study at 32.

25    [15]Depreciation Study at 33.

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 9 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1   ACS LECs' analysis distinguished between its existing circuit based

2   Digital Switching Equipment plant (discussed above) and the new Digital Packet

3   Switches it would deploy throughout its network. ACS LECs stated that its anticipated

4   packet switching equipment would consist of "Edge Switches" and "Core Switches."

5   ACS LECs indicated that the Edge Switches would be located at the periphery of the

6   network and would function to aggregate and bundle traffic for transport. ACS LECs

7   proposed an eight-year service life for Edge Packet Switches, claiming the switches

8   will experience a long life as they are used at the edge of the network. ACS LECs

9   indicated that the Core Switches would perform most of the routing of packet traffic

10  through the network. ACS LECs proposed a five-year service life for Core Switches,

11  believing these switches will be replaced or upgraded often in order to support traffic

12  growth.

13   GCI opposed ACS LECs' analysis arguing that it was both unnecessary

14  and unduly burdensome to set lives by era and to set different lives for the existing

15  circuit switching equipment and the packet switching equipment. GCI believed that the

16  Digital Switching account had been continuously impacted by technology and that the

17  historical indications provided useful information concerning its expected future life.

18  GCI's life analysis indicated a twelve- to sixteen-year service life for Digital Switching

19  depending upon the ACS LEC. GCI proposed a 12-year life for the Digital Switching

20  account as generally consistent with the average of the currently prescribed lives, well

21  under the historical indications, and at the low end of the FCC's 12- to 18-year range.

22   GCI also disputed ACS LECs' assertion that conversion to packet

23  switching would shorten the lives of circuit switches. GCI referred to ACS LECs'

24  statements made in discovery that "the packet switching deployment by ACS LECs will

25

26
U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 10 of 37

1  not replace any digital switching equipment.  Packet switching is a transport protocol,

2  which enhances the efficiency of the existing network."[16]

3      ACS LECs' proposed service lives for circuit switching equipment are

4  based on its plan to upgrade its facilities to a broadband capable network.  ACS LECs

5  did not provide evidence that they have built a packet switching network to replace its

6  existing circuit switched network.  We therefore find any prediction as to the useful life

7  of Packet Switching Equipment to be speculative.  We will apply a common

8  depreciation rate for all switching equipment, regardless of whether it may be packet

9  or circuit in nature.  Separate treatment of packet and circuit equipment may be

10  appropriate at some future time after the equipment has been installed.  We cannot

11  determine actual equipment retirements from a vision.

12      ACS LECs also stated that the "network transition from circuit to packet

13  will occur when the overall economics support this change."[17]  This suggests a level of

14  uncertainty as to when actual plant upgrade may occur, with possible delay depending

15  upon ACS LECs' future financial resources, actual demand for higher bandwidth

16  services, and possibly other factors.

17      In support of the timing of its upgrade plan and proposed service lives,

18  ACS LECs testified that it believed that by 2010 almost all customers would be

19  demanding at least 6 Mb/s service and many would want 20 Mb/s service.[18]  ACS

20  LECs' estimate of future demand is inherently speculative.  ACS LECs also did not

21  appear to consider that rural ACS LEC customers might not order locally provided

22

23      [16]Majoros testimony at 23-24.

24      [17]Cooney Reply testimony at 14.

25      [18]Vanston Reply testimony at 22.

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 11 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

**Exhibit J**
**Page 11 of 37**

1  broadband services if they rely on band-limited interexchange satellite or microwave

2  connections to reach an Internet Service Provider.

3  Furthermore, ACS LEC discovery responses indicate that the packet

4  switched network would overlay the existing circuit switches, with the circuit switches

5  remaining in use.  This seems to conflict with ACS LECs' proposed digital switch

6  service lives as these lives assume replacement of circuit switches with packet

7  switches in a rather short period of time.

8  The GCI proposal for the ACS-AK and ACS-N Digital Switching accounts

9  would lengthen the existing service life from ten to twelve years.  We do not find this

10  proposal reasonable.  We retain the current ten-year service life for ACS-AK and ACS-

11  N.  We believe that ACS LECs will face local competition for narrow and broadband

12  services that will increase incentives to upgrade the switching equipment. Also, the

13  switch vendor no longer supports some of the existing switches.

14  We adopt a twelve-year service life proposal for digital switching for

15  ACS-AN and ACS-F as generally reasonable.  This leads to a minor reduction in the

16  ACS-F service life and a material reduction in the ACS-AN service life.

17  *5. Circuit Equipment*

18  In general, Circuit Equipment is (a) equipment used to reduce the

19  number of physical lines otherwise required to serve a given number of customers by

20  utilizing carrier systems, concentration stages or combinations of both; (b) equipment

21  that provides for the simultaneous use of a number of inter-office channels on a single

22  transmission path; and (c) related inter-office equipment.[19]  ACS LECs characterized

23  its Circuit Equipment as the "transport" portion of the network and in the case of digital

24  _____

25  [19]47 C.F.R. § 32.2232.

26
U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 12 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

loop carriers systems (DLC) the "access" portion of the network. ACS LECs asserted that the inter-office and trunk portion of the Circuit Equipment will be converted to packet compatible equipment relatively quickly. ACS LECs stated that its DLCs equipment would be replaced with edge packet switches as ACS LECs upgraded its network to provide improved broadband services. ACS LECs proposed the following service lives for transport and access Circuit Equipment:

|  | Transport | Access | Composite |
|---|---|---|---|
| 1977 and prior | 8 years | 12 years | 11 years |
| 1978 to 1989 | 6 years | 10 years | 9 years |
| 1990 and subsequent: | 4 years | 8 years | 7 years |

ACS LECs proposed the following lives for analog Circuit Equipment:[20]

| 1969 and prior | 16 years |
|---|---|
| 1970 to 1985 | 12 years |
| 1985 and subsequent | 10 years |

GCI argued ACS LECs employed a "three-curve splicing" approach that was unnecessary, burdensome, and abnormal. GCI stated that technological changes experienced by Circuit Equipment over the years and the fungible nature of some of the equipment were reflected in the historical life indications. GCI's life analysis indicated a life range of 13 to 19 years for Circuit Equipment. GCI reported that the FCC range for digital Circuit Equipment was 11 to 13 years. GCI proposed a 13-year projected life for both digital and analog Circuit Equipment. ACS LECs argued that proposing the high end of the FCC range (i.e., 13 years) was unreasonable because of the heavy data transport demands and expected circuit equipment modernization.

---

[20]ACS-AK and ACS-N separate their digital and analog circuit equipment into sub-accounts. ACS-AN and ACS-F treat the digital and analog circuit equipment on a combined basis.

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 13 of 37

1      We have reviewed the record and find insufficient evidence or argument

2  to support changing the current service lives for Circuit Equipment.  We are not

3  convinced that ACS LECs' migration to a packet-based network will necessarily occur

4  at the rate projected by ACS LECs.  If it does, the depreciation rates can be adjusted.

5  If we allow ACS LECs to set its rates based on an expectation that ACS LECs will

6  replace its network, we are allowing the company to collect in advance from

7  ratepayers for an investment to which the company has not clearly committed.  There

8  was no evidence that the ACS LECs' board of directors approved the modernization

9  plan or expected the network to be replaced within any specific time period.

10      We also find ACS LECs has not adequately supported why its proposed

11  year bands ("eras") and era service lives are the correct ones.  For example, ACS

12  LECs failed to sufficiently justify using different era bands for analog versus digital

13  equipment; why three is the right number of bands; or why the demarcation point for

14  each band was reasonable.[21]  We also do not accept GCI's proposal for analog circuit

15  equipment because GCI did not adequately explain why analog and digital equipment

16  should have the same service life.

17      We will retain the existing 10-year service life for analog circuit

18  equipment.  Current lives for the generic circuit equipment accounts are 13 years

19  (ACS-AN), 12 years (ACS-AK, ACS-N) and 12.5 years (ACS-F).  All of these lives are

20  within the FCC range.  ACS LECs will face factors such as local competition and

21  _____

22      [21]We note that ACS LECs stated that 1969 and prior reflects the era in the
telephone industry before the use of electronics in the outside plant; 1970 to 1989

23  represented the era in outside plant construction when electronics were used to derive
circuits in the outside plant; and the 1990 and subsequent era reflected the migration

24  to a wideband-broadband network.  However, ACS LECs provides little explanation of
how this relates, if at all, to the bands it selected for circuit equipment.  Depreciation

25  Study at 7, 19.

26

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

higher demand for wider-band services that may increase incentives for it to upgrade its circuit equipment facilities and may lead to some stranded equipment in the future. We will therefore not lengthen the service lives to any of the ACS LECs circuit equipment accounts. We reject the GCI proposed 13-year life for ACS-AK, ACS-N and ACS-F general circuit equipment because we are not convinced this equipment will face a longer life than what was estimated when we last adjudicated ACS LECs depreciation rates. We conclude that the current lives for circuit equipment for the ACS LECs should remain unchanged.

### 6. Pole Lines

The pole line account includes the cost of poles, crossarms, guys, and other material used in construction of pole lines.[22] Current lives for pole lines range from 12.5 years (ACS-F) to 25 years (ACS-AN).

ACS LECs admitted that its data analysis of this account yielded service lives ranging from 22 to 40 years, but proposed an 18-year life. ACS LECs believed 18 years was appropriate, stating there was a general migration to non-aerial facilities and an expected increase in retirements in outside plant as the network is converted to fiber optics facilities. ACS LECs recommended a Net Salvage of -75 percent. This is the only account where ACS LECs and GCI dispute the level of Net Salvage.

GCI's life analysis yielded service lives ranging from 31 to 71 years, depending upon the ACS LEC involved. GCI reported that the FCC range is 25 to 35 years for the Pole Line account. GCI believed that the current lives for Pole Lines were understated and recommended a 30-year projected life. GCI argued that the overall Net Salvage experienced for Poles was -40 percent, with most recent

_____

[22]47 C.F.R. § 32.2411.

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

indications being far less negative.  GCI proposed a -40 percent Net Salvage for Pole Lines.

We are not persuaded that the service life for Pole Lines would be materially affected by competitive effects, the conversion to fiber optic technology or by an unspecified migration to non-aerial facilities.  Both the ACS LECs and the GCI historical life analyses suggest that the current lives and the ACS LECs proposed service life are understated.  We believe that GCI's proposed 30-year life for Pole Lines is reasonable, close to the observed life analysis, and within the FCC range.  We accept the 30-year life for the Pole account.

We are not convinced that the Pole Line account will experience the drastic decrease in Net Salvage estimated by ACS LECs.  ACS LECs did not adequately refute that a Net Salvage of -40 percent was consistent with past experience in this account and likely to occur in the future.  We accept the -40 percent Net Salvage level for Pole Lines.

   *7. Metallic Cable Facilities (Aerial, underground, buried, submarine)*

ACS LECs argued that Metallic Cable facilities face a limited life because of technological obsolescence.  ACS LECs stated it planned over time to convert much of its outside plant from metallic to wider band fiber facilities and move electronics outward into the network and closer to the subscriber.  ACS LECs stated this would provide for enhanced services and would concentrate traffic for transmission over what it argued were more reliable, cost effective, and higher quality optical facilities.  ACS LECs' proposed depreciation calculation reflected its position that Metallic Cable facilities would have limited remaining life.

ACS LECs employed a fairly complex, multi-step process for developing depreciation lives for Metallic Cable facilities.  First, ACS LECs analyzed its cable plant

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 16 of 37

1  by function and estimated service lives for Feeder[23] (10 years), Distribution (18 years),

2  and Customer Service Plant (22 years).[24]  ACS LECs then estimated the percent of

3  Feeder, Distribution and Customer Service Plant in each of its various Metallic Cable

4  accounts (e.g., metallic aerial, metallic buried).  For example, for the Metallic Aerial

5  account, ACS LECs estimated that 30 percent of the plant was Feeder, 55 percent

6  was Distribution, and 15 percent was Customer Service.  For each Metallic Cable

7  account, ACS LECs weighed the Feeder, Distribution and Customer Service lives by

8  the proportion of Feeder, Distribution, and Customer Service plant to derive an

9  estimated service life for that account.[25]   In the case of Metallic Aerial Cable, ACS

10  LECs derived a 15-year estimated service life.

11      As a last step, ACS LECs used the estimated service life for the account

12  (e.g., the 15 years for Metallic Aerial Cable), but only for "recent" plant.  ACS LECs

13  effectively defines recent plant as installed after 1989.  Older plant was given longer

14  lives depending upon the era the plant was installed.  For example, for Metallic Aerial

15  Cable, the following eras and lives were developed by ACS LECs:

16      Metallic (Aerial, Buried, Submarine):
       1969 and prior        25 years
17       1970 to 1989         18 years

18

---

19      [23]ACS LECs describes "feeder" as the cable between the company's switch and
20  the serving area access point.  Depreciation Study at 17.

       [24]ACS LECs estimated a 10-year life for Feeder, indicating it expected to
21  finalize replacement of its feeder circuits with "derived facilities" over the next five to
22  fifteen years.  Depreciation Study at 41.  ACS LECs estimated it would replace the
   metallic Distribution network with other technology over the next 15 to 25 years, giving
23  the Distribution portion of its network an 18-year life.  ACS LECs proposed that the last
   few thousand feet of cable (i.e., the Customer Service) would have a 22-year life as
24  this would likely be the last plant to be replaced.

25      [25]Depreciation Study at 18, 20.

26

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1    1990 and subsequent     15 years[26]

2    ACS LECs supported the lives it employed for past eras primarily by

3  discussing in general terms its understanding of what type of equipment was installed

4  during each era.

5    ACS LECs conducted the previously described analysis for each of its

6  metallic cable accounts.  Metallic aerial, buried, and submarine accounts were treated

7  virtually identically, resulting in the 25-, 18-, and 15-year lives shown above.  However,

8  ACS LECs believed that Metallic underground cable was more heavily comprised of

9  Feeder plant, yielding a weighted service life of 12 years for "recent" plant and the

10  following era life projections:

11    Metallic (Underground):
12    1969 and prior     25 years
       1970 to 1989     15 years
13    1990 and subsequent     12 years[27]

14    GCI disagreed with ACS LECs' general methodology for Metallic Cable.

15  GCI argued we should reject the approach as it was unnecessary, unduly

16  burdensome, and abnormal.  GCI believed the Feeder, Distribution, and Customer

17  Service plant percentages employed by ACS LECs were only estimates and that the

18  Uniform System of Accounts did not require such distinctions.[28]  GCI argued that ACS

19  LECs' proposal is based on unsupported estimates of final retirements by plant

20

21

22

23    [26]Depreciation Study at 19.

24    [27]Depreciation Study at 20.

25    [28]Prefiled Testimony of Majoros at 28.

26
U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 18 of 37

function, but companies do not account for their cable investment in a manner allowing the final retirements to be recorded by plant function.  GCI also claimed that ACS LECs' methodology was inconsistent with accounting practices for plant retirement.

GCI disputed ACS LECs' expected rate of technological obsolescence for the Metallic Cable accounts, claiming ACS LECs was making no effort to significantly replace its copper plant with fiber.  GCI stated that between January 1990 and December 2000 ACS LECs deployed $20.6 M in fiber cable while also installing $135.1M in metallic cable.[29]

GCI's data analysis indicated lives for Metallic Cable ranging from 35 to 95 years, but GCI's proposal did not appear to rely upon this data analysis.  For the most part, GCI recommended that the current lives for ACS-AN and ACS-F be retained, claiming there was no reasonable basis to reduce them and the lives were within the FCC's depreciation range.  GCI proposed longer lives for the ACS-AK and ACS-N metallic cable accounts, proposing lives at the lower end of the FCC's recommended range.

ACS LECs argued that GCI's proposal was unreasonable, as it implied that metallic cable would remain useful to the company for the next 30 to 50 years.[30] ACS LECs believed that it faced factors that would require it to migrate the metallic plant to fiber optic circuits.  ACS LECs also contended that the 30-year life for buried cable was not representative of new plant.  ACS LECs stated that it believed that

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

---

[29]Prefiled Testimony of Currin on behalf of GCI at 32.

[30]Prefiled Reply Testimony of Weinert at 25.

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 19 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1  demand for high data speeds will require that by 2015 only short copper length plant

2  (under 1000 feet) would remain in place.[31]

3       Neither ACS LECs nor GCI have presented sufficient justification for us

4  to adopt the entirety of their respective proposals.  With minor exceptions, we will

5  make no change to the depreciation rates and methodology applied to the Metallic

6  Cable facilities.

7       We do not accept ACS LECs' proposals for Aerial, Underground, Buried,

8  or Submarine Metallic Cable[32] as the methodology used appears overly complex,

9  unnecessarily burdensome, difficult to audit and verify, and highly susceptible to error.

10  The overall accuracy depends upon ACS LECs' ability to successfully

11      a) predict lives for Feeder, Distribution, and Customer Service plant;

b) determine relative proportions of Feeder, Distribution, and Customer Service
12      plant in each metallic cable account;

c) determine appropriate era bands;
13  d) assign the Feeder, Distribution, and Customer Service plant to each era;

e) estimate lives for each era; and
14  f) perform the above steps for each ACS-LEC.

15       We are not convinced of the accuracy of ACS LECs' assumptions when

16  it conducted each of these steps.  ACS LECs' analysis assumes the lives and

17  proportion of plant for Metallic Feeder, Distribution and Customer Service to be

18  roughly the same for each of the ACS LECs.  ACS LECs offered little evidence why

19  this should be the case, nor do we find it a credible assumption given the different

20  characteristics of the service areas of the various ACS LECs.  For example, we are not

21  persuaded that the same lives and relative proportions of Metallic Feeder, Distribution,

22  and Customer Service plant apply to both ACS-AN (which serves primarily the large,

23       [31]Prefiled Reply Testimony of Vanston at 22.

24       [32]The described approach appears to apply primarily to all metallic cable
25  accounts with the exception of Intrabuilding Network Cable.

26
U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 20 of 37

1   densely populated, competitive urban area of the state) and ACS-N (which serves

2   primarily small rural locations where competition is less likely to occur).

3       Even if we were to agree that the four ACS LECs held common

4   characteristics for metallic cable, we are not convinced that ACS LECs used accurate

5   Feeder, Distribution, and Customer Service plant percentages.  We find it unlikely that

6   all Metallic aerial, buried, and submarine cable accounts share common

7   characteristics to the point where it would be appropriate and accurate to apply 30

8   percent Feeder, 55 percent Distribution, and 15 percent Customer Service plant

9   proportion factors.  ACS LECs have not adequately justified this conclusion and we

10  question the validity of ACS LECs' assumption.  We note that ACS LECs claimed 15

11  percent of submarine cable plant that would be proportioned to Customer Service,

12  which appears unusual, further lowering our confidence in ACS LECs' proposal.

13      We also find that ACS LECs' estimated service lives for Feeder,

14  Distribution, and Customer Service appear to be somewhat speculative.  For example,

15  ACS LECs provided little explanation supporting its 22-year life for Customer Service

16  outside of stating it would likely be the last plant to be replaced.  As previously stated,

17  we are also not convinced that the overall conversion of ACS LECs plant to broadband

18  services in all their service areas will occur at the rate anticipated by ACS LECs.

19      In summary, we conclude that ACS LECs' approach to the Aerial,

20  Underground, Buried, and Submarine Metallic Cable accounts is unpersuasive, overly

21  complex and unduly burdensome and we do not accept ACS LECs' estimated service

22  lives for these accounts.

23      We believe that ACS LECs will face factors such as local competition

24  and higher demand for wider-band services that may increase incentives for it to

25  upgrade its metallic cable facilities.  We will therefore make no change to lengthen the

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 21 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

service lives to any of the ACS LEC metallic cable facilities as we are not convinced these facilities will face longer lives than estimated when we last adjudicated ACS LECs depreciation rates.  With the exception of the Submarine and Intrabuilding accounts, we conclude that we will make no change from the current service lives for the Metallic Cable accounts.

We note a high reserve ratio (102 percent)[33] for ACS-AK for Account 2424.1 Metallic Submarine Cable.  This high reserve ratio suggests that ACS-AK has already recovered its investment in this account.  For the Submarine plant, ACS-AK reported a current service life of 18 years, though ACS LECs also reported 21.2 years as the average observed age of the ACS-AK plant.  It is likely that the current service life and depreciation rate for this account for ACS-AK is inaccurate.

ACS LECs proposed we use an ELG Average Service Life of 23.5 years based on the complex analysis we have rejected.[34]   GCI proposed we use 25 years for this account, incorrectly identified as the current projected life for the account.[35] GCI reported that the FCC has no life estimate for submarine plant, although the FCC lives for other metallic cable accounts range from 20 to 30 years.

We do not accept ACS LECs' life estimate for the ACS-AK Submarine account.  The high reserve ratio suggests ACS LECs previously overestimated the necessary depreciation rate for this account.  We believe that a 25-year service life is the best available and most reasonable service life for Metallic Submarine cable.

---

[33]Depreciation Study, Results at 2 and 4.  The reserve ratio is as reported by ACS prior to adjustment for reserve transfers.  The high reserve ratio is not explained by high net salvage.  ACS offers a proposed net salvage of -2 percent for Submarine Cable - Metallic.

[34]Depreciation Study, Results Section at 2.

[35]Majoros Testimony at 31.

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 22 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

*8. Metallic - Intrabuilding*

ACS LECs used a slightly different approach for Intrabuilding Network Cable than for the other Metallic Cable accounts. ACS LECs estimated a 15-year life for new Intrabuilding Network Cable and then assumed the following era lives:

| | |
|---|---|
| 1969 and prior | 25 years |
| 1970 to 1989 | 15 years |
| 1990 and subsequent | 15 years[36] |

ACS LECs stated that lives shown above were appropriate as the intrabuilding plant was subject to competitive loss because the customers involved were prime candidates for competitive carriers. Using the 25- and 15-year lives for the eras yields the following ACS LECs proposed ELG average service lives for the account:

| | |
|---|---|
| ACS-AK | 17.4 years |
| ACS-N | 17.4 years |
| ACS-AN | 16 years |
| ACS-F | 14.2 years |

In comparison, ACS-AK and ACS-N both currently have a 15-year service life for the Metallic Intrabuilding Network Cable account. Both ACS-AN and ACS-F have a 25-year current service life for this account.

GCI proposed a 20-year life for ACS-AK and ACS-N, stating the 20-year life is at the low-end of the FCC range. GCI proposed maintaining the 25-year service life for ACS-AN and ACS-F.

---

[36]Depreciation Study at 20.

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 23 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1    The record indicates that the Intrabuilding Network Cable account has

2 experienced only minimal retirements.[37]  We note high reserve ratios for both ACS-AK

3 (105 percent) and ACS-N (98.6 percent) for Intrabuilding Network Metallic Cable,

4 suggesting that both carriers have achieved or may soon achieve full capital recovery

5 in this account.[38]  ACS LECs reports that the average age for ACS-AK and ACS-N

6 intrabuilding metallic cable is 15.5 years.[39]

7    We do not accept ACS LECs' life estimate for Metallic Intrabuilding

8 Network Cable. ACS LECs did not adequately explain why employing a 15-year life

9 for 1969 and subsequent plant was reasonable in light of the conflicting evidence in

10 the record. ACS LECs' proposed 15-year life would appear inconsistent with other

11 data in the record: ACS-AK and ACS-N each have high reserve ratios generated

12 under current depreciation rates, which are based on a 15-year life. There were no

13 material retirements for intrabuilding plant. Finally, the existing average for ACS-AK

14 and ACS-N plant is 15.5 years.

15    If ACS LECs' arguments regarding competition were correct, we would

16 have expected some material retirements in the Anchorage service area where

17 competitive entry has occurred for a number of years. While we agree competition

18 and technological changes may have some effect on this account, ACS LECs have

19 failed to demonstrate the effect is as great as it argued. Nor do we necessarily agree

20 with ACS LECs' underlying assumption that intrabuilding plant will become stranded

21 _____

22    [37]Depreciation Study at 48.

22    [38]Depreciation Study, Results Section at 2, 4, 14, and 16. The reserve ratios
23 are those reported by ACS LECs prior to adjustment for reserve transfer. The high
   reserve ratios are not explained by high net salvage. ACS LECs offers a proposed net
24 salvage of zero percent for Intrabuilding Network Cable – Metallic.

25    [39]Depreciation Study, Results Section at 2 and 14.

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 24 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1  once a customer is lost to competition, and the customer will never be regained.  In

2  conclusion, we do not accept ACS LECs' proposals regarding service life for the

3  Metallic Intrabuilding account.

4         The high level of reserve accrual and lack of material retirements by

5  ACS-AK and ACS-N in this account suggests that the current depreciation levels are

6  not reasonable.  We believe that a 20-year service life, as proposed by GCI, is a

7  reasonable service life for Intrabuilding Network Cable for ACS-AK and ACS-N for the

8  reason cited by GCI.

9         We set a 20-year average service life for the intrabuilding account for

10 ACS-AN and ACS-F.  The 20-year level is at the low end of the FCC range, would

11 allow for consistent treatment of all the ACS LECs, and allows ACS-AN and ACS-F

12 reduced service lives.  We believe that this account may be somewhat affected by

13 competition and technological changes.

14     *9. Fiber Optic Cable (Aerial, Underground, Buried, Intrabuilding)*

15        The current ACS LECs' service lives for the various  fiber optic cable

16 accounts range from 20 to 30 years.  ACS LECs and GCI appear to agree there were

17 insufficient fiber optic facilities retirements to make a historical plant life analysis

18 possible.

19        ACS LECs believed that Fiber Optic Cable facilities have experienced

20 significant obsolescence since they were first introduced in the 1970s.    Citing

21 advancements in fiber optic technology every four to five years, ACS LECs proposed a

22 20-year service life for all fiber optic accounts except for  Intrabuilding Fiber Optic

23 Cable. ACS LECs proposed a 15-year life for Intrabuilding Fiber Optic Cable, stating

24 that the shorter life reflected the effect of competition.

25

26

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 25 of 37

1    GCI argued that the various advancements in fiber optic cable
2  technology cited by ACS LECs did not cause any appreciable retirement activity for
3  the ACS LECs.  GCI contended that ACS LECs' proposed 20- and 15-year lives for
4  Fiber Optic Cable were therefore arbitrary.  GCI proposed a 25-year life for the Fiber
5  Optic accounts, given that the FCC 25- to 30-year range for fiber.

6    ACS LECs' argument that regular technological advances have led to
7  reduced life for fiber facilities is not persuasive given the minimal fiber retirements
8  observed by ACS LECs.  We accept the GCI proposal of a 25-year life for the Fiber
9  Cable accounts, as the life appears reasonable and is within the FCC range.

10    *10. Underground Conduit  (Account 2441)*

11    The current service lives for the Underground Conduit account are:

12   
| ACS-AN | 50 years |
|--------|----------|
| ACS-AK | 40 years |
| ACS-N  | 40 years |
| ACS-F  | 25 years. |

15    ACS LECs stated there were only minimal retirements in this account,
16  and did not perform a statistical life analysis.  ACS LECs proposed a 40-year life for
17  this account.

18    GCI's statistical analysis indicated service lives ranging between 95 and
19  143 years.  GCI proposed a 60-year life claiming the proposal was at the top of the
20  FCC range (50 to 60 years) but still far below the historical life.

21    Because there have been no material retirements in this account, we do
22  not believe that GCI's statistical analysis has provided meaningful results.  GCI's
23  proposed life in this account appears to be based solely on the FCC range.  We view
24  that range as a guideline and not as affirmative proof that we should set lives within
25  that range.  In this instance, neither ACS LECs nor GCI has provided us with sufficient

26  U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 26 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1  reason to adjust the current lives for Underground Conduit for ACS-AN, ACS-AK, or
2  ACS-N.

3          We believe that the current 25-year service life for ACS-F may be too low
4  as it falls well outside the FCC range and is substantially different from lives for the
5  other ACS LECs.  No data suggests the current life of 25-years is reasonable.  We will
6  accept the ACS LECs proposed 40-year service life for Underground Conduit for ACS-
7  F.  The service life for ACS-F Underground Conduit will rise to levels more consistent
8  with the other ACS companies and closer to the FCC range.

9          *11.  Use of Remaining Life*

10         ACS-AK and ACS-N have used the remaining life technique since 1986
11  and ACS-AN has used the technique since 1995.[40]  ACS-F has not historically used
12  remaining life.  ACS LECs proposes that the remaining life technique be used to
13  calculate ACS-F depreciation rates.

14         We have regularly allowed telecommunications companies to employ
15  remaining life methods when setting depreciation rates.  We allow all the ACS LECs to
16  use the remaining life technique.

17         *12.  Use of Equal Life Group*

18         All ACS LECs have proposed using Equal Life Group (ELG) depreciation
19  procedures.  ACS-AK and ACS-N have used ELG since the approval of their 1989
20  depreciation studies and their rates have remained fairly stable over the last two
21  cycles.[41]   We allow ACS-AK and ACS-N to continue using ELG depreciation
22  procedures.

23

24         [40]Weinert Reply Testimony at 13.

25         [41]Weinert Reply Testimony at 33, 35.

26

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1    ACS-AN currently employs vintage group depreciation procedures while

2    ACS-F employs broad group procedures. ACS LECs proposed that both ACS-AN and

3    ACS-F be converted to ELG. ACS LECs supported the ELG methodology, stating that

4    it eliminates the longer-lived assets in an account from carrying the depreciation

5    burden of the shorter-lived assets. ACS LECs stated ELG ensured that the short-lived

6    assets, and the long-lived assets are appropriately recovered over their respective

7    lives. ACS LECs indicated that using ELG would increase the theoretical reserve by

8    $35.5 M, but this would not penalize ratepayers.[42]

9    GCI admitted that ELG has the benefit of providing a more precise cost

10   allocation assuming perfect foresight.[43] GCI argued, however, that use of ELG would

11   require annual depreciation rate changes and would produce the wrong answer as a

12   result of forecasting inaccuracies. GCI stated that vintage group (VG) was premised

13   on the averaging concept of offsetting underrecoveries with overrecoveries. GCI

14   stated that both VG and ELG have merit from a theoretical standpoint, but from a

15   practical standpoint, ELG will produce a depreciation expense increase. GCI stated

16   the ELG was not necessary, because both VG and ELG lead to full recovery.

17   GCI argued that a resulting abrupt increase in depreciation expense for

18   ACS-AN and ACS-F is caused primarily because ELG has never been used in the

19   past for these companies. Had ELG been historically used, the reserve for these

20   companies would have been substantially higher as a result of the use of higher

21   depreciation rates in the past. GCI stated that the reserve was a critical element in the

22   calculation of a remaining life rate given that the higher the reserve, the lower the rate,

23   _____

24   [42]Weinert Reply Testimony at 39, 40.

25   [43]Majoros Testimony at 34.

26   U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
     U-01-86(11)/U-01-87(11) - (06/06/02)
     Page 28 of 37

and vice versa.  GCI claimed that applying ELG to all prior vintages produced a composite remaining life for those vintages that is inconsistent with actual past depreciation practices.  As a consequence, using ELG would create a significant depreciation reserve deficiency merely from a change in depreciation grouping procedure.  GCI believed that allowing retroactive application of ELG would create a reserve imbalance that would penalize rate payers for prior use of a perfectly acceptable method of depreciation (i.e., vintage/broad group).  GCI claimed that the FCC has rejected proposals similar to what was proposed by ACS LECs because of this reserve issue.

GCI proposed that, if ELG was approved, the first ELG vintage would be 2000 for purposes of the next depreciation study.  In effect, ELG would be applied on a going-forward basis.  GCI also recommended that ACS LECs be required to file depreciation studies every 3 years to ensure that the ELG rates were properly managed.

We allow ACS-AN to use ELG as this method appears to provide an accurate assignment of depreciation expense over the actual observed life of facilities.  However, we allow ACS-AN to use ELG only on a going-forward basis.  The first ACS-AN ELG vintage will be 2000 for purposes of the next depreciation study.

We will not allow ACS-F to use ELG.  ACS LECs stated that the ELG service lives are determined from the property's survival, retirement, service life characteristics, and other factors such as ACS LECs' plans for the future.[44]  The record indicates that data for ACS-F only extends back to 1997.[45]  ACS LECs was

---

[44]Weinert Reply Testimony at 38.

[45]Majoros Testimony at 12.

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 29 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

generally unable to conduct historical life analysis for ACS-F. We therefore have no confidence that adequate ACS-F data exists to allow accurate application of the ELG method. ACS-F will remain under the broad group method of depreciation.

### 13. Potential Typographical Errors

#### a. Analog Circuit Equipment Net Salvage

There appears to be a typographical error on Depreciation Study, Results Section, schedule 6 (Results 6) affecting the calculation of the depreciation rate for ACS-AN Analog Circuit Equipment. On Results 6, ACS used a 5 percent Net Salvage rate for Analog Circuit Equipment instead of the -3 percent rate proposed in the body of the Depreciation Study.[46] ACS LECs should correct this error when it submits revised depreciation rates in compliance with this order or explain why 5 percent is the appropriate Net Salvage for this ACS-AN account.

#### b. Radio Systems

There may be a typographical error on Results 6 affecting the calculation of the depreciation rate for Radio Systems. The Depreciation Study text and Results Section schedules 10 and 14 indicate it is ACS LEC's intent to propose -5 percent Net Salvage for Non-Cellular Radio Systems and -5 percent Net Salvage for Microwave Radio Systems.[47] On Results 6, ACS used the Microwave Radio System Net Salvage

[46]Depreciation Study at 35.

[47]Depreciation Study at 34.

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1  (-5 percent) for ACS-AN although ACS LECs stated that only ACS-N had significant

2  investment in Microwave Radio Systems.[48]  ACS LECs should make a correction, as

3  appropriate, when it submits revised depreciation rates in compliance with this order or

4  explain why -5 percent is the appropriate Net Salvage for this ACS-AN account.

5      *14. Filings Required*

6          We have reviewed the record and reached a decision on the issues

7  brought before us concerning the proposed depreciation rates for the various ACS

8  LECs.  ACS LECs shall update the Depreciation Study Results Section schedules

9  consistent with the decisions reached in this order.  These schedules shall be filed by

10  July 22, 2002.  GCI and the PAS shall file any objections to those depreciation

11  schedules by August 6, 2002.

12  C.  Petition For Confidentiality

13          The ACS LECs ask that we grant confidential status to ACS Network

14  Planning documents ACS07582 through AS07608 and Work Order Spending

15  documents ACS06905 through ACS06907.[49]  These documents, previously produced

16  under seal to other parties through discovery, were filed in support of the ACS LEC's

17  Proffer to Support Admission of Hearing Exhibit 39.  The ACS LECs stated that the

18  planning documents contain a planned modernization budget plan for the ACS LECs'

19  non-Anchorage properties through 2003, and the work order spending documents

20  contain ACS LECs' expenditures for deploying technologies for competitive services in

21  Fairbanks.  The other parties have not opposed the ACS LECs' petition.

22

23

------

24      [48]Depreciation Study at 34 and Results at 13.

25      [49]*Petition for Confidentiality*, dated April 18, 2002.

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 31 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1  We have reviewed the documents submitted by the ACS LECs and find good cause to

2  classify them as confidential under 3 AAC 48.045(b).[50]

3         We have previously granted confidential status to similar planning

4  documents covering the ACS LECs' Anchorage properties.[51]   The work order

5  documents contain monthly information reflecting the ACS LECs' expenditures for the

6  deployment of technologies for competitive services in the Fairbanks area.

7         We find that release of the information contained in the planning and

8  work order documents might cause competitive harm to the ACS LECs and that the

9  need for confidentiality outweighs the public interest in disclosure.

10 D.  Procedural schedule

11        We set filing dates, discovery dates and a hearing date for Phase II of

12 these proceedings.

13 E.  Exhibit 39

14        During the course of this hearing Commissioners asked if a planning

15 document was the basis for the depreciation study.  Witnesses for the ACS LECs

16 acknowledged that there was no such plan.  GCI and the PAS sought such a

17 document through discovery and were consistently told that there was no such

18 document.  Near the end of the hearing, the ACS LECs recalled its witness Mr. Wes

19

20

21        [50]Good cause to classify a record as confidential under 3 AAC 48.045(b)
22 includes a showing that 1) disclosure of the record to the public might competitively or
   financially disadvantage or harm the person with confidentially interest or might reveal
23 a trade secret; and 2) the need for confidentiality outweighs the public interest in
   disclosure.

24        [51]Order U-01-34(12)/U-01-82(9)/U-01-83(9)/U-01-84(9)/U-01-85(9)/U-01-86(9)/
25 U-01-87(9), dated February 15, 2002.

26
   U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
   U-01-86(11)/U-01-87(11) - (06/06/02)
   Page 32 of 37

1  Carson to sponsor Hearing Exhibit 39, the five-page *Vision for the Regulated Network*

2  (Exhibit 39).

3        In introducing Exhibit 39, ACS LECs' counsel represented that "[t]his isn't

4  new information."[52]  It was presented as an "integrated plan for ACS's technology so

5  that the Commission can track if it were to adopt the proposal of ACS, the retirements

6  and the adoption of technology that ACS has submitted through its prefiled

7  testimony."[53]  GCI and the PAS were given a brief opportunity to review the proposed

8  Exhibit 39.  They both entered strong objections to allowing this exhibit.  The hearing

9  officer very specifically asked ACS counsel "[w]hat your representation is that it's a

10  compilation of either direct testimony or oral testimony that's already been presented

11  and it's simply putting it in one five page document form?"[54]  ACS LECs' counsel

12  responded affirmatively.

13        This document that ACS LECs has represented on the record as a plan

14  is not a plan but a vision as the title states.  This vision could operate to initiate a

15  planning process or be an executive summary to an integrated plan.  We applaud Mr.

16  Carson, the ACS LECs' witness, for recognizing that the ACS Depreciation Study

17  needed some formalized planning guidance to be credible and that the corporate

18  leadership needed to review that guidance and give it their support.  However, for two

19  reasons we cannot allow Exhibit 39 into the record.

20

21

22

    _____

23        [52]Tr. at 732.

24        [53]Tr. at 732.

25        [54]Tr. at 834.

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 33 of 37

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1    First, ACS LECs' counsel overrepresented what they chose to call a plan

2  by stating that its contents had been presented in prefiled testimony or discovery.

3  Under cross examination the ACS LECs witness admitted that estimated costs on

4  switching upgrade was new testimony and that the ACS LECs did not provide as much

5  specificity regarding timelines in other testimony as in Exhibit 39.  The representation

6  made to the hearing officer that Exhibit 39 contained no new information was refuted

7  by the ACS witness.[55]

8    Second, it is improper to allow any party to manufacture evidence during

9  a hearing in order to fill a perceived void in its case.  Exhibit 39 has not been subject to

10  the same scrutiny as other evidence and it is not reliable as evidence that the other

11  parties have had full opportunity to investigate.  In this case after almost a week of

12  hearing the ACS witness stated generally that over the past week they had been

13  working on an integrated plan to be responsive to questions and comments from the

14  Commission.[56]  We cannot allow a party to manufacture evidence as the need arises

15  during a hearing.  If the Commission seeks additional information there are appropriate

16  avenues to gain that information and to protect the parties' due process rights.  In this

17  case the Commission cannot allow a document that clearly contains new information

18  not previously revealed to the other parties to be entered into the record.

19    Commissioners may accept additional exhibits that summarize testimony

20  offered at the hearing.  However, that testimony cannot provide new substance in the

21  case.  We have accepted testimony that would not pass a strict test for admissibility

22  when we have been capable of discerning the useful or admissible from the

23

---

24    [55]Tr. 862.

25    [56]Tr. at 839.

26

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 34 of 37

Regulatory Commission of Alaska
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

**Exhibit J**
**Page 34 of 37**

1    inappropriate or inadmissible.  In this case we would be accepting new and untested
2    information that was admittedly manufactured during a hearing for the purpose of filling
3    a perceived gap in the evidentiary record.  We have not given the other parties an
4    opportunity to investigate Exhibit 39 and determine how it affects their case.

5        For these reasons Exhibit 39 will not be accepted into the record.

6

7    **ORDER**

8    THE COMMISSION FURTHER ORDERS:

9        1.  The stipulation filed by the ACS LECs, Public Advocacy Section, GCI
10   Communication Corp. d/b/a General Communication Inc., and d/b/a GCI, and
11   Alascom, Inc. d/b/a AT&T Alascom on March 1, 2002 is accepted, subject to the
12   express condition that for purposes of establishing future rates, no issue should be
13   considered finally determined or adjudicated by virtue of our acceptance of the
14   stipulation.

15       2.  The bench order issued March 12, 2002, accepting the stipulation
16   filed by ACS of the Northland, Inc. d/b/a Alaska Communications Systems, ACS Local
17   Service, and ACS; Public Advocacy Section; GCI Communication Corp. d/b/a General
18   Communication Inc., and d/b/a GCI; and Alascom, Inc. d/b/a AT&T Alascom on March
19   11, 2002, is affirmed.

20       3.  By 4:00 p.m. on July 22, 2002, ACS of Anchorage, Inc. d/b/a Alaska
21   Communications Systems, ACS Local Service, and ACS; ACS of Fairbanks, Inc. d/b/a
22   Alaska Communications Systems, ACS Local Service, and ACS; ACS of Alaska, Inc.
23   d/b/a Alaska Communications Systems, ACS Local Service, and ACS; and ACS of the
24   Northland, Inc. d/b/a Alaska Communications Systems, ACS Local Service, and ACS
25   shall jointly file revised depreciation schedules as explained in the body of this order.

26

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

1      4.  By 4:00 p.m., August 8, 2002, GCI Communication Corp. d/b/a

2  General Communication Inc., and d/b/a GCI, and the Public Advocacy Section shall

3  file any objections to the revised depreciation schedules.

4      5.  The *Petition for Confidentiality*, filed by ACS LECs on April 18, 2002,

5  is granted as set forth below;

6      a.  Confidential status is granted to ACS Network Planning documents

7  ACS07582 through AS07608 and Work Order Spending documents ACS06905

8  through ACS06907.

9      6.  The Phase II procedural schedule is amended to read as follows:

10

| a. | 4:00 p.m. | August 6, 2002 | ACS-LECs file cost-of-service and rate design studies |
| b. | 4:00 p.m. | August 20, 2002 | ACS-LECs shall file prefiled direct testimony in their respective dockets |
| c | 4:00 p.m. | September 9, 2002 | Last day to file petition to intervene in Phase II |
| d. | 4:00 p.m. | October 21, 2002 | PAS/Intervenor shall file prefiled responsive testimony and initial witness list |
| e. | | November 18, 2002 | Phase II discovery closes |
| f. | 4:00 p.m. | December 12, 2002 | ACS-LECs shall file prefiled reply testimony and initial witness list |
| g. | 4:00 p.m. | December 26, 2002 | Discovery limited in scope to ACS-LECs' Phase II reply prefiled testimony closes; final witness lists and issue statements due |
| h. | | January 2, 2003 | Hearing on cost of service and rate design – Phase II |

**Regulatory Commission of Alaska**
701 West Eighth Avenue, Suite 300
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 36 of 37

1        7.  Hearing Exhibit 39, entitled *Vision for the Regulated Network*, is

2   denied admission into the record.

3

4   DATED AND EFFECTIVE at Anchorage, Alaska, this 6th day of June, 2002.

5                          BY DIRECTION OF THE COMMISSION
                           (Commissioners Patricia M. DeMarco
6                          and James S. Strandberg, not participating.)

7

8

9

10  ( S E A L )

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Regulatory Commission of Alaska<br>701 West Eighth Avenue, Suite 300<br>Anchorage, Alaska 99501<br>(907) 276-6222; TTY (907) 276-4533

U-01-34(15)/U-01-66(5)/U-01-82(11)/U-01-83(11)/U-01-84(11)/U-01-85(11)/
U-01-86(11)/U-01-87(11) - (06/06/02)
Page 37 of 37