ALJ/DOT/hl2                                          **Mailed 3/20/2006**

Decision 06-03-025  March 15, 2006

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Rulemaking on the Commission's Own Motion to Govern Open Access to Bottleneck Services and Establish A Framework for Network Architecture Development of Dominant Carrier Networks. | Rulemaking 93-04-003 (Filed April 7, 1993) |
| Investigation on the Commission's Own Motion into Open Access and Network Architecture Development of Dominant Carrier Networks. | Investigation 93-04-002 (Filed April 7, 1993) (Verizon UNE Phase) |

**OPINION ESTABLISHING UNBUNDLED NETWORK ELEMENT
RATES AND PRICE FLOORS FOR VERIZON CALIFORNIA AND MODIFYING
DECISION 99-11-050 REGARDING MONOPOLY BUILDING BLOCKS**

227227                              - 1 -

Exhibit L
Page 1 of 25

R.93-04-003, I.93-04-002  ALJ/DOT/hl2

# TABLE OF CONTENTS

| Title | Page |
|---|---|

OPINION ESTABLISHING UNBUNDLED NETWORK ELEMENT RATES
AND PRICE FLOORS FOR VERIZON CALIFORNIA AND MODIFYING
DECISION 99-11-050 REGARDING MONOPOLY BUILDING BLOCKS .........1

I.    **Summary** ......................................................................................... 2

II.   **Background** .................................................................................... 6

III.  **Applicable Standards** ................................................................. 9
    A.   The Consensus Costing Principles............................................. 9
    B.   The TELRIC Standard............................................................... 10
    C.   Supreme Court Review of TELRIC Standard ........................... 11
    D.   Updates to TELRIC ................................................................... 12
    E.   Commission Cost Modeling Criteria ........................................ 12
    F.   Burden of Proof ........................................................................ 13

IV.  **Overview of Cost Models** ......................................................... 14
    A.   VZ Cost ..................................................................................... 14
    B.   HM 5.3 ...................................................................................... 16

V.   **Analysis of Models**.................................................................... 18
    A.   Flaws in the Verizon Model...................................................... 18
        1.   Verizon Models a Network that is Not Forward-Looking ........... 19
        2.   Preprocessing Structural Flaws....................................... 26
        3.   Lack of Integration ......................................................... 29
        4.   Expense Modeling Flaws ................................................. 32
        5.   Switching Model Flaws .................................................... 36
        6.   Summary of Verizon Model Flaws .................................. 41
    B.   Flaws in HM 5.3........................................................................ 41
        1.   Inability to Modify Customer Location Process ............. 44
        2.   Ignores Engineering Standards....................................... 47
        3.   Efficiency and Productivity Assumptions........................ 50
        4.   Expert Opinions Require Adjustment.............................. 52
        5.   Investment Level Comparisons....................................... 53
        6.   Summary of HM 5.3 Flaws .............................................. 54
    C.   Adherence to Commission Modeling Criteria.......................... 55
    D.   The Commission Should Rely on HM 5.3 Because It is
        Less Flawed than VZCost ....................................................... 56

VI.  **Modeling Inputs and Other Changes**.................................... 58
    A.   Asset Lives and Depreciation................................................... 58
    B.   Cost of Capital ......................................................................... 61
        1.   Verizon........................................................................... 64
        2.   Joint Commentors .......................................................... 64

**Exhibit L**
**Page 2 of 25**

R.93-04-003, I.93-04-002  ALJ/DOT/hl2

## TABLE OF CONTENTS
### (cont'd)

| Title | Page |
|-------|------|

|  |  |  |  |
|--|--|--|--|
|  | 3. | TURN, XO, and ORA | 65 |
|  | 4. | Discussion | 65 |
|  | 5. | Summary of Weighted Average Cost of Capital | 79 |
| C. | IDLC/UDLC | | 80 |
| D. | Fill Factors | | 82 |
|  | 1. | Copper Distribution | 84 |
|  | 2. | Fiber Feeder | 84 |
|  | 3. | Copper Feeder | 85 |
|  | 4. | DLC Plug-In Equipment | 85 |
|  | 5. | DLC Common Equipment | 86 |
|  | 6. | Premise Termination | 86 |
|  | 7. | SAI Equipment | 87 |
| E. | Structure Sharing | | 87 |
| F. | Plant Mix | | 90 |
| G. | DLC Costs | | 92 |
| H. | Labor Costs | | 95 |
| I. | Cross-over Point and Maximum Copper Loop Length | | 100 |
| J. | Switching Inputs | | 101 |
|  | 1. | Price per Line | 101 |
|  | 2. | Rate Structure | 105 |
| K. | High Capacity Loop and Transport Inputs | | 106 |
| L. | Miscellaneous Adjustments to HM 5.3 | | 112 |
| M. | Shared and Common Cost Markup | | 113 |
| **VII.** | **Price Floors** | | **117** |
| A. | Background | | 117 |
| B. | Petition to Modify MBBs | | 119 |
| C. | Price Floor Proposals | | 123 |
|  | 1. | Verizon | 123 |
|  | 2. | MCI | 124 |
|  | 3. | AT&T | 125 |
|  | 4. | TURN | 125 |
|  | 5. | ORA | 126 |
|  | 6. | Discussion | 127 |
| **VIII.** | **Geographic Deaveraging** | | **131** |
| **IX.** | **Billing Adjustment Issues** | | **134** |
| **X.** | **Reexamination Process** | | **136** |

Exhibit L
Page 3 of 25

R.93-04-003, I.93-04-002  ALJ/DOT/hl2

## TABLE OF CONTENTS
### (cont'd)

Title _____ Page

XI.     Comments on Draft Decision........................................................... 138
XII.    Assignment of Proceeding............................................................. 143
Findings of Fact................................................................................. 143
Conclusions of Law ........................................................................... 149

Appendix A:     Adopted UNE Rates
Appendix B:     Switching Rates Based on Minutes of Use
Appendix C:     Wire Centers by Zone
Appendix D:     Glossary of Acronyms
Appendix E:     List of Appearances

Exhibit L
Page 4 of 25

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

## I. Summary

This proceeding, known as the Open Access and Network Architecture Development (OANAD) proceeding, was initiated in April 1993 to set prices that California's two largest incumbent local phone companies, Verizon California (formerly GTE California) [1] and Pacific Bell Telephone Company d/b/a SBC California (SBC, formerly Pacific Bell[2]) charge competitors who lease specified portions of their network. By leasing network components known as "unbundled network elements" (UNEs), competitors are able to use portions of Verizon's network to offer competitive local exchange services.[3]

In this decision, in what is known as the "Verizon UNE Phase" of OANAD, the Commission adopts final rates for Verizon's UNEs, as set forth in Appendix A of this order. The newly adopted rates for the most frequently cited UNEs are:

Table 1
Adopted UNE Rates

| UNE | Adopted Rate[4] |
|---|---|
| Average 2-wire Loop | $ 13.94 |
| Average DS-1 Loop | $ 78.33 |
| Average DS-3 Loop | $ 596.57 |
| 2-wire Port | $ 3.17 |
| UNE-Platform[5] | $ 17.46 |

---

[1] This decision refers to GTEC as the incumbent local exchange carrier (ILEC) that existed at the time this proceeding was initiated and prior to GTE's merger with Bell Atlantic. The decision refers to Verizon as the successor to GTEC, following the merger with Bell Atlantic in July 2000.

[2] Pacific Bell adopted the name SBC for business purposes in late 2002. This order will refer to Pacific Bell as the entity involved in OANAD prior to 2002, and will refer to SBC as the current entity.

[3] *See* Appendix D for a glossary of common acronyms used in this order.

[4] These rates include an 8.93% shared and common cost markup, as set forth in Section VI.M of this order.

Exhibit L
Page 5 of 25

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

and Verizon, since forward-looking technology assumptions for the two carriers should be similar, if not identical. The lives Verizon proposes are quite similar to the lives we adopted for SBC in D.04-09-063, as shown in Table 3 above. Therefore, we have run HM 5.3 using the asset lives proposed by Verizon.

We reject TURN's suggestion that any increased depreciation expenses from shorter asset lives should be assigned to advanced services that create the need for Verizon to update its plant. We find that depreciation expense based on Verizon's asset lives properly compensates Verizon for the TELRIC costs associated with providing the UNEs at issue in this proceeding.

### B. Cost of Capital

A critical input to a TELRIC cost model is the estimated cost of capital, which is the cost a firm will incur in raising funds in a competitive capital market. The cost of capital is usually expressed as a weighted average of the cost of equity and the cost of debt for the firm, or a proxy group of firms, with a similar risk profile and in the same line of business as the firm. There are several key components used to calculate the weighted average cost of capital:

- Cost of equity –The Capital Asset Pricing Model (CAPM) and the Discounted Cash Flow (DCF) analysis technique are two quantitative financial models commonly used to estimate cost of equity, also called return on equity (ROE). These methods require assumptions regarding company growth rates, the premium that a stock of average risk commands over the risk free rate (market risk premium), the risk-free rate of return, and a measure of the risk of the company's stock (beta).

- Cost of debt – this involves estimates of the interest rates on long-term, and perhaps short-term, debt instruments.

- Capital structure of the firm – this refers to the ratio of debt and equity outstanding for the company, or proxy group.

- 61 -

**Exhibit L**
**Page 6 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

- Proxy group – this key assumption involves the composition of the group of companies used as comparables to the ILEC's UNE business.

Federal regulations require that a "forward-looking cost of capital shall be used in calculating the [TELRIC] of an element." (47 C.F.R. 51.505(b)(2).)

In its Triennial Review Order, the FCC provides clarification on the cost of capital component of a TELRIC analysis. The FCC states that there are two types of risk that should be reflected in the cost of capital. First, a TELRIC-based cost of capital should reflect the risks of a competitive market. Specifically, the FCC says:

> Because the objective of TELRIC pricing is to replicate pricing in a competitive market, [footnote omitted] and prices in a competitive market would reflect the competitive risks associated with participating in such a market, we now clarify that states should establish a cost of capital that reflects the competitive risks associated with participating in the type of market that TELRIC assumes. The Commission specifically recognized that increased competition would lead to increased risk, which would warrant an increased cost of capital. (TRO, para. 681.) (Footnote omitted.)

Second, the FCC states that a TELRIC-based cost of capital should reflect any unique risks (above and beyond the competitive risks discussed above) associated with new services that might be provided over certain types of facilities. The TRO specifies that states may establish UNE-specific costs of capital to reflect in UNE prices any risk associated with new facilities that employ new technology and offer new services. (TRO, para. 683.) Nonetheless, the FCC leaves states the option to adopt a single cost of capital for all UNEs. (TRO, para. 684.)

Table 4 summarizes the parties' proposals for the appropriate cost of capital to incorporate into Verizon's UNE prices. For reference purposes, the

- 62 -

Exhibit L
Page 7 of 25

R.93-04-003  I.93-04-002  ALJ/DOT/hl2

Commission adopted a cost of capital of 9.44% applicable to SBC's UNE rates. (D.04-09-063, *mimeo.* at 171.)

### Table 4
### Current and Proposed Cost of Capital for Verizon

| Verizon Current | Verizon Proposal | Joint Commentors Proposal | XO Proposal | ORA Proposal | TURN Proposal |
|---|---|---|---|---|---|
| 10.51% | 14.37%[22] | 7.64%[23] | No more than 8.63%[24] | 7.4%[25] | 7.93%[26] |

While these proposals differ by almost 700 basis points,[27] the methods used by all parties are remarkably similar. Verizon, JC, and TURN offered the most commentary concerning cost of capital. These parties calculated a weighted average cost of capital based on their own unique assumptions regarding the cost of equity, cost of debt, and capital structure of the firm. We will discuss each of these components of the cost of capital calculation separately. But first we will give a brief overall description of each party's proposal.

---

[22] Verizon initially proposed a cost of capital of 15.95%, which it adjusted to 14.37% in its reply comments on 8/6/04.

[23] JC initially proposed 7.12%. The proposal was updated to 7.64% on 11/9/04. (JC/Murray, 11/9/04, p. 42.)

[24] XO, 11/9/04, p. 29.

[25] ORA's proposal is based on Murray's methodology, but excludes short-term debt. (ORA/Litkouhi, 8/6/04, p. 12.) XO calculates that ORA's methodology would result in a 7.4% cost of capital. (XO, 11/9/04, p. 28.)

[26] (TURN/Loube, 8/6/04, Exhibit RL-8, Table 7.)

**Exhibit L**
**Page 8 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

## 1. Verizon

According to Verizon, the FCC has emphasized that the cost of capital in UNE cases should reflect the risks of a competitive market in which all facilities-based carriers would face the risk of losing customers to other facilities-based carriers. (TRO at para. 680.) Therefore, it proposes a cost of capital of 14.37 %, which is based on a weighted average cost of capital of 11.64% plus a risk premium of 2.74%. (Verizon, 8/6/04, p. 81, n. 425.) Verizon explains that its risk premium proposal compensates for the regulatory risks inherent in providing UNEs, particularly the risk that UNE leases may be canceled on short notice. Since a cancelable lease has an economic value, Verizon has quantified that value and reflected it in the 2.74% risk premium that it adds to its cost of capital calculations. (Verizon, 11/3/03, pp. 7-8.) Other key assumptions in Verizon's proposal are a cost of equity based on a DCF analysis of the S&P Industrials, and a capital structure of 25% debt and 75% equity based on an average market value for a proxy group of S&P Industrial companies and a group of telecommunications companies.

## 2. Joint Commentors

JC's witness Murray proposes a cost of capital of 7.64% based on an analysis using data from a proxy group of three ILECs, including Verizon, that are subject to facilities-based competition. Murray uses the CAPM, with a beta of 1.0 to determine the cost of equity, and corroborated her results with a three stage DCF analysis based on data for the three RBOCs. She develops long and short-term debt costs using forward-looking yield to maturity for publicly-traded debt of the Verizon companies. For capital structure, she uses a target capital

---

[27] A basis point equals one one-hundredth of a percent.

**Exhibit L**
**Page 9 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

structure based on the average of market and book capital structure for the three firms in her proxy group. (JC/Murray, 11/3/03, pp. 69-70; JC/Murray, 11/9/04, p. 3.)

### 3. TURN, XO, and ORA

TURN proposes a cost of capital of 7.93%, derived using the same method as JC's witness Murray, with updated inputs. (TURN/Loube, 8/6/04, p. 85.) Specifically, Loube updates short and long-term interest rates, using those published by the Federal Reserve on June 1, 2004. (*Id.*, pp. 70-86 and Exhibit RL-8.) TURN opposes Verizon's proposed cost of capital because it relies on a cost of equity method the FCC rejected in the Virginia Arbitration. (*Id.*, p. 78.)

XO disagrees with Verizon's proposed risk premium, claiming that Verizon falsely characterizes the competitive and UNE pricing environment as posing unusual risk for the company. XO maintains Verizon faces no different conditions than any firm in a fully competitive market and has not provided any actual data to show Verizon faces risk from cancellation of UNE orders. In other words, XO contends Verizon has not shown CLCs purchase UNEs for a shorter time period than Verizon's retail customers. (XO, 8/6/04, p. 45.)

ORA recommends the Commission adopt a cost of capital similar to one adopted for SBC because Verizon and SBC are similarly situated companies. (ORA/Litkouhi, 11/9/04, p. 2). The Commission should reject Verizon's proposed cost of capital as unreasonably high, overstating the degree of demand and competitive risk, and inappropriately including a risk premium adder. ORA prefers the method suggested by JC's witness Murray, but removes short-term debt from Murray's weighted average cost of capital calculations.

### 4. Discussion

Despite the large variance in cost of capital proposals, all parties essentially used the same financial modeling techniques, but with differing

**Exhibit L**
**Page 10 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

inputs and assumptions.  We analyze each of their positions on the various components of the financial models below in order to determine the most reasonable inputs for financial modeling of the cost of capital.  A summary of the financial modeling with the inputs we select is found in Section VI.B.5.

It is important to note that while we will review the financial modeling presented by the parties, particularly where it estimates the cost of equity, we will use judgment as well as the models to render our decision.  As we stated in our order in 2002 where we established a return on equity for the four major energy utilities:

> In the final analysis, it is the application of informed judgment, not the precision of financial models, which is the key to selecting a specific ROE estimate.  We affirmed this view in D.89-10-031, which established ROEs for GTE California, inc. and Pacific Bell, noting that we continue to view the financial models with considerable skepticism.  (D.02-11-027, *mimeo.* at 19.)

Finally, although the FCC's TRO discusses the option to set unique costs of capital for each UNE, we will establish one cost of capital for all UNEs because we have no record to do otherwise.

We now turn to an examination of the inputs to the financial models used by the parties.

### a) Cost of Equity

Verizon, JC and TURN use different approaches to estimate the cost of equity. Verizon uses the DCF methodology to estimate the cost of equity, while JC and TURN use the CAPM approach.

According to Verizon, the DCF model is often used by economists to estimate a firm's cost of equity based on the assumption that the market price of a firm's stock is equal to the present value of the stream of cash flows that

**Exhibit L**
**Page 11 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

investors expect to receive from owning that stock. (Verizon/Vander Weide, 11/3/03, p. 17.) The DCF method requires assumptions about the future dividends and growth rate of the companies being studied to forecast the future cash flows that will accrue to shareholders into the indefinite future. (JC/Murray, 11/3/03, p. 59.)

    Verizon uses the DCF methodology applied to a proxy group of over 100 S&P industrial companies. Verizon justifies using this proxy group because there are no publicly-traded companies solely in the business of operating a telecommunications network to provide UNEs. Verizon believes a well-known sample of companies operating in competitive markets is the best available proxy. The proxy group includes a broad array of S&P companies as diverse as 3M Company, Avon Products, Coca Cola, Gap Inc., Halliburton, Marriot International, and Procter & Gamble. According to Verizon, although the proxy companies do not have subsidiaries in the UNE business, this is not important as long as they are of similar risk to the entity whose cost of capital is being estimated. (Verizon/Vander Weide, 8/6/04, p. 33.) Using the DCF method, Verizon calculates a weighted average cost of equity of 13.46% for its proxy group of S&P Industrials. (*Id.*, p. 70.)

    JC, ORA, TURN and XO claim Verizon's proxy group and DCF analysis are flawed. JC's witness Murray notes the extreme diversity in the proxy group and claims Verizon's witness Vander Weide offers no sound explanation for why such diverse firms form an appropriate proxy group for a cost of capital analysis. (JC/Murray, 8/6/04, pp. 49-50.) XO echoes these concerns noting that Verizon's proxy group is based on a subset of S&P 500 companies, none of which are telecommunications carriers or are primarily involved in the telecommunications industry. Further, Vander Weide excludes S&P companies that he defines as outliers, including those with negative growth and companies with low equity

- 67 -

**Exhibit L**
**Page 12 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

costs. (XO, 11/9/04, p. 25.) ORA claims Verizon's approach contradicts the outcome of the SBC UNE decision, where the Commission looked to a group of companies in a similar line of business to determine capital structure, cost of equity, and cost of debt for SBC. (ORA/Litkhouhi, 11/9/04, p. 3.) JC and TURN criticize Vander Weide's constant growth assumptions that underlie his DCF analysis. According to TURN, Vander Weide's average growth assumptions are 11.26%, while current estimates of the growth of the U.S. economy are only 6%. (TURN/Loube, 8/6/04, p. 79.)

JC propose a cost of equity of 9.14%. (JC/Murray, 11/9/04, p. 43.) To arrive at this cost of equity, Murray employs the CAPM, which requires assumptions regarding the historical and forward-looking market risk premium, risk-free interest rates, and beta.[28]

Murray performs several CAPM analyses with differing assumptions for these three main inputs and averages the results. For all her CAPM calculations, Murray uses a beta of 1.0 because the FCC's Virginia Arbitration rejected the use of ILEC specific betas below 1.0 as outdated and from the period when ILECs were predominantly near-monopolies whereas they now face increased competition for long-distance, local services, and broadband markets. (JC/Murray, 11/3/03, p. 53.) For her CAPM analysis based on historical inputs, Murray uses an estimate of the market risk premium from Ibbotson Associates ranging from 7.2% to 8.6%, resulting in a cost of equity of 11.17%. She then performs a second CAPM analysis based on an average of forward-looking

---

[28] The CAPM formula is:

Cost of equity = Risk free rate + (Market risk premium) x (Beta)

Exhibit L
Page 13 of 25

R.93-04-003  I.93-04-002  ALJ/DOT/hl2

estimates of the market risk premium, resulting in a cost of equity of 7.11%. The average of these two CAPM analyses results in Murray's proposed cost of equity of 9.14%. (JC/Murray, 11/9/04, Exh. TLM-REB-3.)

As a check on the reasonableness of her analysis, Murray performs a three stage DCF analysis using data for Verizon and two comparable ILECs, BellSouth and SBC. The three stage DCF model is a common alternative to Verizon's one-stage DCF model, and it assumes three stages with distinct growth rates that converge toward the future rate of overall economic growth. Murray's three stage DCF model provides a cost of equity of 9.41% (JC/Murray, 11/3/03, pp. 61-63.)

Verizon responds that Murray's three stage DCF is inferior to the single stage DCF model that Vander Weide used, primarily because it produces counterintuitive results wherein higher risk companies garner lower returns. (Verizon/Vander Weide, 8/6/04, p. 51.) Regarding Murray's CAPM analysis, Verizon criticizes the interest rates Murray uses as too short-term. Verizon also contends Murray should use a beta greater than 1.0, in line with the betas of other competitive telecommunications firms such as Level 3 and AT&T, with betas in the range of 1.5 to 2. (*Id.*, p. 62.) Finally, Verizon expresses general reservations with CAPM as not capturing all the risks that affect cost of equity and containing significant problems in estimating the model's basic inputs, i.e. the risk-free rate, the beta, and the expected return on the market portfolio. (*Id.*, p. 63.)

TURN reviewed both Murray's and Vander Weide's cost of equity analyses and contends that Murray's analysis is closer to FCC guidance from the Virginia Arbitration because it uses CAPM and a beta of 1.0. TURN performs its own analysis using CAPM, updating the short and long-term interest rates in

Exhibit L
Page 14 of 25

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

Murray's analysis to arrive at a cost of equity of 9.04% (TURN/Loube, 8/6/04, Exh. RL-8, Table 5.)

The debate over cost of equity first hinges on whether we should use CAPM or DCF. We have already faced this issue in the SBC UNE decision, where we discussed our reservations with the DCF model, which relies heavily on growth forecasts for firms. The growth forecasts can lead to a large disparity in DCF results depending on the time period and forecasters selected. We found the DCF model too dependent on this one forecasted input and opted instead to rely on CAPM results to set the cost of equity for SBC. (D.04-09-063, *mimeo*. at 159.) Here, we find the same issue arises again. Verizon proposes a cost of equity based solely on the DCF approach, using growth forecasts for a group of 100 S&P Industrials, and providing little explanation of how the growth forecasts were selected. Furthermore, Verizon provides scant information on why this particular proxy group of non-telecommunications firms was deemed to have the same risk profile and growth forecast as Verizon.

JC's witness Murray performs her own variation of a DCF analysis, using growth forecasts for her proxy group of three telecommunications firms, and arrives at a significantly lower cost of equity 9.41%, 405 basis points lower than Verizon's. Thus, we again see huge disparities in DCF results depending on the proxy group and growth forecasts. As in the SBC case, we will not rely on any DCF results to set the cost of equity for Verizon. We are comfortable ignoring the DCF analyses provided by both parties, because as TURN points out, the FCC Wireline Competition Bureau also chose to ignore DCF analyses, noting that "Verizon's use of the constant growth DCF model to estimate the cost of equity…stretches the reasonable limits of its use." (*Virginia Arbitration*, para 73.)

Even if we were open to using the DCF approach, we disagree with Verizon's choice to use a proxy group for its analysis that has no connection at all

- 70 -

**Exhibit L**
**Page 15 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

to the telecommunications industry. Verizon assumes that the companies in its proxy group have the same risk as a firm building a telecommunications network. Even though the companies in Verizon's proxy group are in competitive industries, Verizon has not provided any plausible support for its assumption that the risk of building a facilities-based telecommunications network equates to the risks faced by Marriot, Coca Cola, Halliburton, or any of the firms in the proxy group. When choosing a proxy group for a cost of equity analysis, we find it significantly more reasonable to choose a proxy group of firms in the same industry as Verizon. This allows comparison of what investors require for returns on telecommunications firms facing the same technological and regulatory conditions. Verizon's choice of a non-telecommunications industry proxy group leads us to reject Verizon's cost of equity DCF analysis.

Now that we have rejected the parties' DCF analyses, we turn to the CAPM analyses provided by JC and TURN. The CAPM is the approach we relied on in the SBC case to set a cost of equity of 11.78% for SBC.[29] In the SBC case, we relied on an historical estimate of the market risk premium to arrive at this result.

After reviewing the CAPM analyses provided by JC and TURN, we find it appropriate and reasonable to use SBC's 11.78% cost of equity for Verizon as a starting point. If we update our analysis from the SBC proceeding to use a beta of 1.0 rather than .93, the resulting cost of equity is 12.3%. The beta of 1.0 was used by JC's witness Murray in her various CAPM analyses, and by the FCC in its Virginia Arbitration Order. (Virginia Arbitration, para. 90.) We find it

---

[29] The cost of equity for SBC was calculated as follows: (7.4% market risk premium x .93 beta) + risk free rate of 4.9% = 11.78%. (*See* D.04-09-063, *mimeo.* at 159.)

**Exhibit L**
**Page 16 of 25**

R.93-04-003  I.93-04-002  ALJ/DOT/hl2

reasonable to use our CAPM analysis from the SBC proceeding, which is similar to the analyses performed here by JC's witness Murray, although we will update the beta in our analysis to 1.0.

The CAPM analyses provided here by JC and TURN corroborate and support this 12.3% figure. JC's Murray calculates a 12.03% long-term CAPM cost of equity, based on an historical market premium of 7.2%. This is almost identical to the CAPM analysis in D.04-09-063 except that Murray now uses a beta of 1.0. However, Murray takes the additional step of averaging her 12.03% projection with further CAPM analyses involving short-term and forward-looking inputs. We have less confidence in Murray's short-term and forward-looking CAPM results because we find a longer-term, historical approach more reliable and consistent with our analysis in the SBC case. Plus, forward-looking estimates of interest rates and market returns vary greatly and are highly disputed among financial experts, and a long-term projection of the cost of equity better matches the long-term investments required for a telecommunications network. The effect of Murray's additional CAPM runs is to water down her overall projection with lower estimates of the cost of equity based on disputed inputs. Therefore, we will use a cost of equity of 12.3% for Verizon, noting that JC's historical and long-term CAPM results of 12.03% support this outcome.[30]

---

[30]  Although Verizon criticizes Murray's CAPM analysis for not using a higher beta coefficient for telecommunications carriers, we find a beta of 1.0 in line with FCC guidance from the Virginia Arbitration and similar to the beta we used for SBC. Further, Verizon's criticism lacks credibility given it did not use comparisons with telecommunications firms for its own DCF analysis.

Exhibit L
Page 17 of 25

R.93-04-003  I.93-04-002  ALJ/DOT/hl2

In comments on the draft decision, the Joint CLCs[31] contend the Commission ignores Murray's CAPM analysis using an intermediate horizon historical risk premium, as described in her rebuttal declaration. (JC/Murray, 11/9/04, para. 91.) Murray's intermediate horizon proposal relies on five-year Treasury bond yields in the CAPM equation, which Murray contends reasonably match the time horizon over which the UNE prices adopted in this proceeding will be in effect. Verizon responds that the cost of capital should reflect investor expectations over the life of Verizon's assets, not simply until Verizon's UNE rates are reset. (Verizon, 12/21/05, p. 7.) Verizon requests we modify the beta in our CAPM analysis to 1.0. We agree with Verizon that CAPM analyses based on short term investor expectations are not appropriate when setting a cost of capital for a longer life telecommunications assets. We modify the beta in our CAPM from the SBC order to 1.0 for a revised cost of equity of 12.3%.

### b) Cost of Debt

Verizon's witness Vander Weide uses a 6.15% cost of debt for his analysis, based on the yields on Moody's A-rated industrial bonds as of April 2004. (Verizon/Vander Weide, 8/6/04, p. 70.) He contends this benchmark interest rate best approximates what Verizon would actually pay on debt issued to finance the construction of a new telephone network. He does not include short-term debt because Verizon does not generally finance investments in its long-term assets in this manner. Murray criticizes Verizon's approach as not industry specific and based on a bond maturity of 30 years, substantially longer than the

---

[31] The Joint CLCs are Cbeyond Communications LLC, Covad Communications, DMR Communications Inc., MPower Communications Corp, Navigator and XO, as explained in more detail in Section XI, Comments on the Draft Decision.

- 73 -

Exhibit L
Page 18 of  25

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

average 17-year asset life Verizon has used in its cost studies. (JC/Murray, 11/9/04, pp. 75-77.)

In contrast, JC's witness Murray developed long-term and short-term debt costs using the forward-looking yield to maturity for publicly-traded debt of the Verizon companies, similar to the approach used in the Virginia Arbitration. (JC/Murray, 11/3/03, p. 64.) She uses a long-term debt rate of 4.99% and short-term debt of 2.77% (*Id.*, 11/9/04, p. 43.) Murray supports her use of short-term debt by noting that SBC and BellSouth both recently announced or completed debt issuances that are quite similar to the data on Verizon and include a mixture of short and long-term debt maturities. (*Id.*, p. 78.)

Verizon criticizes Murray's use of short-term debt, contending it would not use it to finance the construction of a new telecommunications network and claiming Murray ignores the reality that Verizon's current long-term debt is near maturity and trading as short-term debt. (Verizon/Vander Weide, 8/6/04, p. 45.) Further, Verizon contends Murray ignores the average asset life of 17 years assumed in Verizon's TELRIC analysis. (*Id.*, p. 44.)

TURN urges the Commission to reject Verizon's cost of debt because Vander Weide relies on the industrial cost of debt rather than debt associated with the telecommunications industry. (TURN/Loube, 8/6/04, p. 79.) For its own analysis, TURN proposes a debt rate of 5.69%. This rate is calculated using Murray's short-term debt rate and an updated long-term debt rate of 6.57% based on 2004 telephone bond rates. (*Id.*, p. 83.)

We find it most reasonable to use the long-term debt cost for industrial companies proposed by Verizon, which is the 6.15% rate on Moody's A-rated industrial bonds cited by Verizon's witness Vander Weide in his update of August 6, 2004. Vander Weide's declaration attests that telecommunications companies such as Verizon are considered A-rated industrial companies and the

- 74 -

**Exhibit L**
**Page 19 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

20-year average term to maturity on the bonds is close to the 17 year average economic life of Verizon's forward-looking network. (Verizon/Vander Weide, 11/9/04, p. 26-8.) We prefer this rate because the longer term of this debt is a closer match to the asset life assumptions incorporated into our model runs.

We decline to use Murray's analysis, which includes short-term debt costs because, as we stated in the SBC UNE case, we are not convinced that short-term debt has a place in a TELRIC-based cost of capital analysis where we prefer to use long-term financing assumptions to match asset lives. (D.04-09-063, *mimeo.* at 166.) Similarly, we decline TURN's proposal because it includes short-term debt.

### c) Capital Structure

Verizon recommends use of a market value capital structure, similar to the approach used in the Virginia Arbitration. According to Verizon's witness Vander Weide, a market value capital structure is more forward looking than book value because investors look only to the future to determine the value of their stocks and bonds, whereas book value is based on the embedded or historical costs of a company's assets. (Verizon/Vander Weide, 11/3/03, p. 40.) Based on his review of market value capital structures for both a proxy group of S&P Industrials and a group of telecommunications companies, he recommends a capital structure for Verizon of 25% debt and 75% equity. (*Id.*, p. 41.)

Murray opposes using a market value approach, stating it does not provide the best guide to Verizon's forward looking target capital structure. (JC/Murray, 11/3/03, p. 65.) Generally, Murray criticizes Verizon's approach on the basis that a historical review of market valuations of S&P Industrials does not represent the best available information concerning investors' expectations about how Verizon would finance forward-looking investments in UNE operations. (*Id.*, 8/6/04, p. 61.)

- 75 -

Exhibit L
Page 20 of 25

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

For her own analysis, JC's Murray cites several financial economists' views that ideally, a firm's target or optimal capital structure should be used in weighting the cost of equity and cost of debt. (*Id.*, 11/3/03, p. 66; 8/6/04, p. 62.) Murray says respected researchers, such as Prof. R. Glenn Hubbard and Dr. William H. Lehr, have found evidence that, in the long run, market equity tends to move toward book equity. (*Id.*, 8/6/04, pp. 62-63.) On the other hand, high market-to-book ratios predict future book profitability. Thus, on balance, this suggests the best prediction of a firm's target capital structure incorporates both book and market information. Murray, therefore, gives equal weight to the market and book capitalization of the companies in her proxy group. She recommends a capital structure of 66.44% equity, 28.63% long-term debt and 4.93% short-term debt. (*Id.*, p. 43.) Murray provides information that this capital structure is highly consistent with the publicly stated target capital structures of other major ILECs, corroborating the reasonableness of her approach. (*Id.*, 11/3/03, p. 69 and 8/6/04, p. 63.)

Verizon opposes Murray's approach, stating that economic research does not support the theory that market and book values of companies converge. (Verizon/Vander Weide, 11/9/04, p. 34.) Further, Verizon argues that target capital structures of other ILEC's have been misinterpreted by Murray. (*Id.*, 8/6/04, p. 42.)

TURN supports use of the target capital structure, as proposed by Murray, rather than a capital structure based solely on market value. (TURN/Loube, 8/6/04, p. 77.) ORA and XO support JC's proposal to average market and book value capital structure for a comparable group of companies, excluding short-term debt. (ORA/Litkouhi, 8/6/04, p. 11.) Both ORA and XO claim that Verizon's witness Vander Weide gives no support for his proposed capital structure of 75% equity and 25% debt. (*Id.*, p. 4; XO, 11/9/04, p. 25.)

- 76 -

**Exhibit L**
**Page 21 of 25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

Similar to the approach we used in setting a cost of capital for SBC, we adopt JC's approach of averaging market value and book value information for a proxy group of companies. As stated in D.04-09-063, we reject a capital structure based entirely on market value as too volatile and subject to fluctuations in stock prices. Rather, we have previously found that a forward-looking capital structure for a firm is based on a firm's target capital structure, and the best predictor of target capital structure for a firm uses both market and book value information, just as investors might do in valuing a company's assets. (D.04-09-063, *mimeo.* at 169.) JC have convincingly shown that the target capital structures of other telecommunications companies compare reasonably to the proposed capital structures developed from book and market value information for Murray's proxy group. Based on this evidence, we find Murray's proposed capital structure reasonable, although we will exclude short-term debt. As we did in the SBC case, we decline to adopt a capital structure that includes short-term debt. Instead, we will make a simplifying assumption that all debt is held at the long-term rate, consistent with our assumptions regarding asset lives. Therefore, we adopt a capital structure of 66.44% equity and 33.56% debt.

### d) Risk Premium Adder

Verizon proposes an adder of 2.74% to its cost of capital to compensate for the regulatory risks in providing UNEs. Vander Weide arrives at this adder amount by estimating the risk Verizon assumes in providing UNEs through a cancelable lease arrangement. According to Verizon, cancelable operating leases involve significantly higher risk for Verizon because its network investment is large, long-lived and largely sunk and its investments and operating expenses will remain the same even if CLCs are able to cancel their UNE leases as lower-cost substitutes become available. This increases the risk that Verizon will be able to earn a fair return on its UNE investments. (Verizon/Vander Weide,

- 77 -

Exhibit L
Page 22 of 25

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

11/3/03, pp. 48-49.)  Verizon provides examples of the risk involved in facilities-based network investments by citing investments by WorldCom, Global Crossing, Qwest, Teligent, and Covad where these companies have found telecommunications demand was overestimated and the companies have lost 80% to 100% of their market values.  (*Id.*, p. 51.)

JC counter Verizon's UNE risk adder by maintaining there is no need for such an adder and that similar proposals by Verizon and other ILECs have been rejected numerous times.  JC provide key reasons that Vander Weide's analysis of the risks of  UNE leases is faulty, including (1) investors have presumably reflected this risk in the prices they are willing to pay for Verizon securities, (2) any risk, if it did exist, is retail rather than wholesale, because Verizon does not incur sunk investment costs specifically for UNEs, (3) if there is no risk adder to Verizon's retail cost of capital, there is no need for one for the UNE cost of capital, and (4) Verizon's network assets have other revenue generating uses that Vander Weide has ignored in his lease cancellation analysis.  (JC/Murray, 8/6/04, p. 66.)  Moreover, Murray notes that other agencies have found that any regulatory risk is captured by the market-based cost of capital.  Murray cites as examples several FCC orders, this Commission's earlier OANAD decision for SBC (D.99-11-050), and decisions by other state commissions.  (*Id.*, pp. 67-69.)

TURN opposes Verizon's risk premium adder because cost of equity analyses already incorporate assumptions about competition.  (TURN/Loube, 8/6/04, p. 80.)  Further, Loube contends Verizon's justification for requiring a risk premium is speculative and unsupported, relying on assumptions that may not occur in the future.  (*Id.*, p. 77.)

ORA and XO both note the Commission has already rejected the idea of a risk adder for Pacific Bell in the earlier OANAD proceeding.  (*See* D.99-11-050, *mimeo.* at 37-43.)   In D.99-11-050, the Commission described how Pacific Bell's

- 78 -

**Exhibit L**
**Page 23 of  25**

R.93-04-003 I.93-04-002 ALJ/DOT/hl2

arguments for a "sunk cost" adder were really a collateral attack on the TELRIC methodology and inconsistent with a federal court ruling finding that an adder such as the one proposed by Pacific in OANAD was inconsistent with the basic pricing standards contained in Section 252(d)(1) of the Act. (*Id.*, pp. 37 and 43.) Further, the decision found that Pacific Bell had not shown that an adder for future stranded plant is appropriate. (*Id.*, pp. 42-43.)

We agree with Murray that Verizon has not justified a premium over the market based cost of capital calculated using CAPM and a weighting of the portion of debt and equity in the company's capital structure. We maintain the view that quantitative models, such as CAPM, do a reasonable job of capturing investors' views of the risks facing Verizon in the UNE market. Further, we agree with Murray that any risk from UNEs is no greater than the risk Verizon faces in its retail operations, particularly since Verizon does not have to incur "sunk investments" solely for UNE purposes. As pointed out by ORA and XO, the Commission has already rejected previous risk adder proposals. Verizon's arguments here echo Pacific Bell's proposal that was rejected in D.99-11-050. Therefore, we reject Verizon's proposal for a risk adder of 2.74% to its cost of capital.

### 5. Summary of Weighted Average Cost of Capital

The results of our cost of capital analysis are summarized in the table below. In short, we derive the capital structure for our analysis based on Murray's proposed 50/50 weighting of market and book values for her proxy group of firms, although we exclude Murray's use of short-term debt and will consider all debt as long-term. We use a 12.3% cost of equity based on Murray's long-term, historical CAPM analysis and our findings in the SBC UNE case updated to a beta of 1.0. We give no weight to the parties' DCF analyses. The 6.15% cost of debt is based on Moody's A-rated industrial bond yields.

**Exhibit L**
**Page 24 of 25**

R.93-04-003  I.93-04-002  ALJ/DOT/hl2

Altogether, these inputs result in a weighted average cost of capital for Verizon of 10.23%.

### Table 5

### Weighted Average Cost of Capital

| Component | Percent of Total | Cost | Weighted Cost |
|---|---|---|---|
| Equity | 66.44% | 12.3% | 8.17% |
| Debt | 33.56% | 6.15% | 2.06% |
| | 100% | | 10.23% |

## C. IDLC/UDLC

A key modeling input involves the technology choice for digital loop carrier electronics.  Digital loop carriers (DLCs) are the electronics that connect fiber feeder cable to copper distribution cable, and which allow telecommunications services to pass from copper to fiber and back, and between the fiber feeder and the switch.

JC propose that all DLC systems should be modeled as "integrated" or IDLC systems.  In an IDLC system, voice signals remain digital all the way from the remote terminal to the switch.  JC contend that IDLC is the more recent and forward-looking technology, and is more efficient and reliable than "universal" (UDLC) systems.  (JC/Donovan-Pitkin-Turner, 8/6/04, p. 116.)  According to JC, an IDLC system can be used to provision a stand-alone unbundled loop at the DS-1 level using an interface known as GR-303.  (*Id.*, p. 118.)  JC claim that this capability exists today in the DLC systems Verizon has deployed throughout its network.  (*Id.*, p. 119.)

In contrast, Verizon has modeled a portion of its DLC systems as UDLC. Specifically, Verizon assumes use of 90% IDLC systems, and 10% UDLC systems. (Verizon Recurring Costs Testimony, 11/3/03, p. 50.)  In a UDLC system, voice signals are converted from analog to digital at the remote terminal, then

- 80 -

**Exhibit L**
**Page 25 of 25**