Westlaw.

PUR Slip Copy                                                                                  Page 1
2004 WL 2492569 (N.J.B.P.U.)
(Cite as: 2004 WL 2492569 (N.J.B.P.U.))

H

Re Bell Atlantic-New Jersey, Inc.
Docket No. TO00060356

New Jersey Board of Public Utilities
September 22, 2004

*1 BY THE BOARD:

This Decision and Order memorializes the decision rendered by the Board of Public Utilities ('Board') at its public agenda meeting of September 13, 2004 regarding the cost of capital, depreciation and vertical feature cost inputs used in calculating the rates for unbundled network elements ('UNEs') that Verizon New Jersey Inc. ('Verizon,' 'VNJ or 'Company'), formerly known as Bell Atlantic New Jersey, provides to competitive local exchange carriers ('CLECs '). This Decision and Order are issued in response to motions for reconsideration, filed by Verizon and AT&T Communications of NJ, L.P. ('AT&T ') of the Board's Decision and Order issued on May 7, 2004 in this docket. Submissions in support of and in opposition to these motions were also filed by MCImetro Access Transmission Services, L.L.C. ('MCI') and the Division of the Ratepayer Advocate ('RPA'). The Board has reviewed in detail the submissions of Verizon, AT&T, MCI and the RPA and concludes that no grounds exist for reconsidering its May 7, 2004 UNE Order. Accordingly, the Board denies Verizon's and AT&T's Motions for Reconsideration, for the reasons stated below. This Decision and Order includes the Board's findings and determinations in support thereof.

BACKGROUND AND PROCEDURAL HISTORY

In its Generic Order  issued on December 2, 1997, [FN1] the Board set initial rates, terms, and conditions for access to UNEs consistent with the Total Element Long Run Incremental Cost ('TELRIC') methodology articulated by the Federal Communications Commission ('FCC') in its Local Competition Order. [FN2] AT&T Communications of NJ, L.P. ('AT&T') and MCI challenged the Board's decision in the United States District Court for the District of New Jersey ('District Court'). [FN3] On June 6, 2000, the District Court issued a decision that affirmed in part, reversed in part, and remanded in part issues addressed in the Generic Order. [FN4]

After careful consideration, the Board completed its review on remand on November 20, 2001, and issued its Final Order  on March 6, 2002, wherein it adopted modified inputs and assumptions used in the cost models to calculate recurring and non-recurring rates, and established the terms and conditions under which certain advanced services would be made available to CLECs. [FN5]

The Final Order  reduced many of the wholesale rates that VNJ had been charging CLECs pursuant to the Generic Order. Following the release of the Board's Final Order, MCI, AT&T and the Division of the Ratepayer Advocate filed motions for reconsideration alleging that the Board had erred in rendering its decision and did not fully follow the FCC's TELRIC requirements and applicable law. After a review of the reconsideration requests, the Board rendered its decision on reconsideration at its July 15, 2002 agenda meeting, which was set forth by the Board in its Order on Reconsideration dated September 13, 2002. [FN6]

Subsequent to the release of the Board's Order on Reconsideration, on November 7, 2002, VNJ filed a Complaint [FN7] in District Court pursuant to 47 U.S.C. § 252(e)(6) of the Telecommunications Act of 1996. [FN8] The Complaint filed against both the Board and individual Commissioners in their official capacities (collectively referred to herein as the ('Board'), consisted of three counts. Count One alleged that the UNE rates established by the Board failed to comply with the FCC's TELRIC methodology, as set out in the 1996 Act and its implementing regulations. Count Two alleged that the BoArd's UNE rates are below VNJ's actual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit M
Page 1 of 38

PUR Slip Copy                                                                    Page 2
2004 WL 2492569 (N.J.B.P.U.)
**(Cite as: 2004 WL 2492569 (N.J.B.P.U.))**

costs and constitute an unconstitutional taking under the Fifth and Fourteenth Amendments to the United States Constitution. Count Three alleged that the Board's action further constituted a violation of VNJ's civil rights under 42 U.S.C. § 1983. In its Complaint, VNJ requested that the case be remanded to the Board for further review of the inputs and assumptions used to develop the LINE rates for compliance with the FCC's TELRIC methodology. The Board filed an Answer to VNJ's Complaint on December 23, 2002. [FN9]

**\*2** Subsequently, on November 26, 2003, VNJ filed a Motion for Leave to File and Serve an Amended Complaint expanding its Complaint to include three additional counts. Proposed Counts Four and Five alleged that the UNE rates established by the Board violate the Fifth and Fourteenth Amendments on additional grounds. Proposed Count Six alleged that the UNE rates adopted by the Board in the Order on Reconsideration are inconsistent with the Board's findings and are arbitrary, capricious, and unreasonable. MCI, AT&T and the Board filed responses to the proposal by VNJ to amend its Complaint.

During the pendency of the litigation involving VNJ and the Board in the District Court, on August 21, 2003, the FCC released its Triennial Review Order, [FN10] providing new, additional guidance to states that may affect the LINE rates established by the states in following the FCC's TELRIC methodology. The FCC provided clarification on two key inputs used by states to set TELRIC-compliant rates: depreciation and cost of capital.

On December 19, 2003, VNJ and the Board entered into a Stipulation and Agreement whereby VNJ and the Board agreed to seek leave of the District Court to dismiss VNJ's Complaint, without prejudice, in exchange for an expedited review by the Board of the above-mentioned inputs that were used to calculate the current rates associated with UNEs that VNJ is required to provide to CLECs.

In accordance with the terms of the Stipulation and Agreement, and following a December 17, 2003 agenda meeting announcing its decision, the Board issued an Order on December 23, 2003, directing the reopening of the 'UNE proceeding to review the cost of capital and depreciation inputs that were relied upon by the Board in setting the current UNE rates.' [FN11] The Board's Review Order also established a procedural schedule in accordance with the terms of the Stipulation and Agreement and designated Commissioner Connie O. Hughes as the Presiding Commissioner in this matter. [FN12] On December 29, 2003, pursuant to Federal Rules of Civil Procedure 41(a)(2), VNJ filed with the Honorable Joel A. Pisano, U.S.D.J., a proposed form of Order of Dismissal, dismissing without prejudice VNJ's Complaint in accordance with the terms of the Stipulation and Agreement entered into between VNJ and the Board, dismissing the Board's pending motion to dismiss Counts Two and Three of the Complaint, dismissing VNJ's pending motion for leave to file an Amended Complaint without prejudice, and ordering that the District Court shall retain jurisdiction to enforce all provisions and obligations set forth in the Stipulation and Agreement. On January 14, 2004, Judge Pisano entered an Order approving the terms of, and retaining jurisdiction to enforce, the Stipulation and Agreement. [FN13]

On December 29, 2003, AT&T filed a petition for reconsideration, reversal or modification of the Review Order, [FN14] and on December 30, 2003, MCI filed a motion for a stay of the Board's decision to reopen the proceeding as set forth in the Review Order. [FN15] MCI requested that the Board hold all further proceedings in this docket in abeyance, and further sought a determination by the Board that when it reopens the UNE case, the proceeding will 'include an examination of the cost model, all current inputs and other data needed to develop a current TELRIC rate, in accordance with applicable FCC requirements.' [FN16] The Board conducted a thorough review of the arguments articulated by AT&T and MCI, and by Order dated January 26, 2004, the Board denied AT&T's Motion for Reconsideration and MCI's Motion for a Stay in their entireties, [FN17] and continued forward with the reopened UNE proceeding. [FN18]

**\*3** Active parties in the reopened UNE proceeding included the following: VNJ, RPA, AT&T, and MCI. All parties except MCI filed testimony and supporting documentation and cost models. [FN19] Evidentiary hearings were conducted before Commissioner

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                                Page 3
2004 WL 2492569 (N.J.B.P.U.)
**(Cite as: 2004 WL 2492569 (N.J.B.P.U.))**

Connie O. Hughes from February 17, 2004 through February 20, 2004. Following the close of evidentiary hearings, the parties filed their initial briefs on March 1, 2004 and filed their reply briefs on March 8, 2004. [FN20]

Following review of the testimony and evidence provided, on May 7, 2004, the Board issued its Decision and Order ('2004 LINE Order). [FN21] With respect to the two revised UNE inputs, the Board: 1) revised its finding on the appropriate weighted cost of capital to be used in calculating UNE rates to 9.88%, which consists of a cost of debt of 6.26%, a 12% cost of equity, and a debt/equity ratio of 37% debt and 63% equity; 2) affirmed its previous finding on depreciation lives, which established economic depreciation lives utilizing the mid-point of the FCC regulatory ranges; 3) rejected both VNJ's and AT&T's proposals to weight the vertical features cost for which there are no algorithms and found that the SCIS cost model must be modified by applying Staff's recommended alternative weighting methodology; 4) modified the switching cost study submitted by VNJ due to an incorrect switch mix in the Port and Usage studies to ensure consistency with the other switching modules utilized in developing switching costs; and 5) ordered the following loop and switching rates based upon the approved inputs and modifications:

```
2-Wire Loop
Density Cell 1      $8.81
Density Cell 2      $10.42
Density Cell 3      $11.82
Statewide Average   $10.32
Switching
Port Charge         $2.72
Originating Usage   $.001399
Terminating Usage   $.001364
```

With respect to Staff's alternative weighting methodology and modifications to the SCIS cost model adopted by the Board in its 2004 LINE Order, the Board directed Staff to provide its spreadsheets used in developing its alternative methodology to actively participating parties to the proceeding. The Board further directed that any comments relating to the alternative methodology be submitted to the Board and participating parties. [FN22] Comments were received from Verizon and AT&T on May 14, 2004. [FN23]

On May 24, 2004, VNJ filed a Motion for Reconsideration and Request for Limited Reopening of the LINE Proceeding, requesting that the Board, inter alia: 1) revise its approved cost of capital and depreciation inputs; 2) modify its findings to establish vertical feature costs using the Telcordia SCIS Cost Model proposed by VNJ, and 3) reopen the proceeding to re-evaluate the Board's decision to base the LINE rates on the use of Integrated Digital Loop Carder ('IDLC') technology. [FN24]

Also on May 24, 2004, AT&T filed a Petition for 2 Reconsideration seeking Board reduction of the cost of capital and cost of debt. [FN25] AT&T also sought to defer implementation of any increase in Verizon's LINE prices until the parties had been afforded the opportunity to submit evidence on all material changes in costs since the close of the previous record.

*4 The Ratepayer Advocate and MCI submitted letter briefs in response to Verizon's motion and AT&T's petition on June 9, 2004. [FN26] On the same day AT&T filed a document styled as a 'reply' in opposition to Verizon's Motion, and Verizon filed a brief in opposition to AT&T's Petition. [FN27] June 18, 2004, both AT&T and VNJ filed briefs in reply to the opposition briefs filed by each party on June 9, 2004. [FN28]

In response to these June 18 replies, the RPA filed a written objection with the Board, [FN29] stating that Verizon's and AT&T's June 18 reply submissions were improper under the BPU's rules, and that said replies should be struck from the record. [FN30] Both AT&T and VNJ filed oppositions to the RPA's Motion to Strike, dated July 8 and July 7, 2004 respectively, [FN31] to which the RPA responded by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

letter to the Board dated July 14, 2004. [FN32]

AT&T also filed a Motion to Strike sections of VNJ's June 18, 2004 reply brief, accompanied by the Certification of Matthew D. Mercurio. [FN33] AT&T argued that pages 28 through 30 of VNJ's reply brief and the accompanying Certification of Eugene Goldrick, dealing with Staff's proposed methodology to calculate certain vertical feature costs, were not responsive to arguments made by the other parties and were therefore improper, and were in fact new defenses in support of Staff's vertical feature methodology. [FN34] In the alternative, AT&T argued that the certification of Dr. Mercurio should be admitted into the record. [FN35] VNJ replied by letter dated July 21, 2004, in which it opined that the portions of its brief sought to be struck by AT&T are directly responsive to positions advocated by AT&T and MCI in their briefs filed in response to VNJ's Motion for Reconsideration. [FN36] VNJ stated [FN37] that it had no objection to the admission of Dr. Mercurio's Certification in the event that the Board denied AT&T's Motion to Strike.

STANDARD OF REVIEW

As an initial matter, the Board notes that, with regard to this or any other proceeding, it has authority to 'order a rehearing and extend, revoke or modify an order made by it.'N.J.S.A. 48:2-40. This authority is part of the Legislature's 'comprehensive legislative design-of continuous supervision, with a mandate to the Board to resolve initial investigations, expeditiously, and yet granting to it concomitant authority to institute corrective proceedings and especially where experience furnishes evidence of failure of an earlier order to accomplish its intended purpose.'New Jersey Bell Telephone Company. Department of Public Utilities, Board of Public Utility Commissioners, 12 N.J. 247, 254-255 (1951). In New Jersey Bell, the Court stated that:

[W]here the petition for rehearing seeks to reopen the matter for the purpose of introducing evidence of changed circumstances, the Board's action in allowing or denying the rehearing is discretionary and may be set aside only for abuse of the delegated legal discretion. [ New Jersey Bell, supra, 12 N.J. at 582.]

*5 Moreover, when the petition for rehearing appears merely to reiterate the facts and arguments contained in the petitioners' briefs already considered by the Board, and contains 'no clear indication of the nature of the 'material errors' the [petitioners] alleged were in the Board's decision ...the Board's denial of the petition [is] within their discretion.'Id. at 581-582. Absent a showing of a new development, new evidence relating to already established facts, or a material misapprehension by the Board concerning an essential matter which is critical to its final determination, the Board will not reconsider its final decision.  See  Order Denying Motion for Reconsideration, Re: Public Service Electric and Gas Company, 1999 W.L. 33178824, *6 (N.J.B.P.U.), BPU Docket Nos. E097070461, E097070463 (October 19, 1999), citing In re Trantino Parole Application, 89 N.J. 347, 365 (1982); Trap Rock Industries, Inc. v. Sagner, 133 N.J. Super. 99, 110 (App. Div. 1975)

DEPRECIATION LIVES

In its Motion, VNJ generally argues that the Board's decision in its 2004 UNE Order to retain the mid-point of the FCC's depreciation lives previously adopted by the Board is contrary to the both the TRO's clarification and the Virginia Arbitration Order  upon which the Board relied. [FN38] In support of its position, the Company raises several arguments which it believes provide the basis for reconsideration. The Company also believes that the lives are contrary to the interests of both New Jersey and consumers. [FN39] More specifically, the Company believes that the Board's decision must be reconsidered based upon the following contentions:

1) The Board's May 7, 2004 Order 'fundamental misapprehends TELRIC's mandate that depreciation lives must reflect a market in which full competition among facilities-based carriers already exist.' [FN40]

2) The Board's adoption of the mid-point of the FCC lives is inconsistent with the Virginia Arbitration Order  relied upon by the Board.' [FN41]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                                Page 5
2004 WL 2492569 (N.J.B.P.U.)
(Cite as: 2004 WL 2492569 (N.J.B.P.U.))

3) The Board's Order 'fails to address the undisputed principle that companies operating in fully competitive markets establish depreciation lives in accordance with GAAP.' [FN42]

4) The Board's retention of FCC lives is contrary to the interests of consumers, competition, and telecommunications network investment in New Jersey; the mid-point of the FCC lives protects only the hefty profit margins of CLECs.' [FN43]

Each of Verizon's arguments in favor of the Board's reconsideration of its findings regarding depreciation will be addressed individually below.

1. TELRIC-Mandated Assumptions Regarding State of Competition

Positions of the Parties

In its Motion, the Company argues that the FCC clarified that TELRIC's mandate requires that the depreciation inputs of LINE rates 'should reflect any factors that would cause a decline in asset values, such as competition and advances in technology.' [FN44] Specifically, the Company cites language in the TRO stating that in 'calculating depreciation expense, therefore, the rate of depreciation over the useful life should reflect the actual decline in value that would be anticipated in the competitive market TELRIC assumes.' [FN45]

*6 In further support of its position, VNJ argues that the TRO explicitly mandates that the various components of TELRIC -- including depreciation lives and cost of capital -- must be developed using a consistent set of assumptions about competition. The Company cites paragraph 680 of the TRO which states:

The objective of TELRIC is to establish a price that replicates the price that would exist in a market in which there is facilities-based competition. In this type of competitive market, all facilities-based carriers would face the risk of losing customers to other facilities-based carriers, and that risk should be reflected in TELRIC prices. [FN46]

Based on the foregoing, VNJ concludes that under TELRIC, depreciation lives must reflect forward-looking markets in which VNJ faces the real risk of losing customers to facilities-based competitors. [FN47]

However, according to the Company, the Board ignored the TRO's clarification and justified its retention of the midpoint of the FCC Lives by 'imposing on Verizon NJ an evidentiary burden that directly conflicts with TELRIC's mandate. ' [FN48] Specifically, the Company avers that the Board rejected Verizon's Generally Accepted Accounting Principles ('GAAP') lives because 'the Company was unable to identify any technological developments that would hasten the retirement of its assets or require it to accelerate its investment in new facilities in order to compete more efficiently against CLECs ... . [FN49]

Similarly, the Company argues that the Board erred by relying on the Virginia Arbitration Order and penalizing VNJ for not providing 'specific quantifiable evidence to support its position' or producing 'any documents or evidence that it in fact had actual business plans to retire any assets in response to competitive developments.' [FN50] In the Company's opinion, this is 'plain, reversible error, by imposing a burden of coming forward not a part of the law. ' [FN51] According to VNJ, the TRO does not require Verizon NJ to demonstrate increased competition to obtain forward-looking depreciation lives that would be used by a company operating in a fully competitive environment. [FN52] VNJ reiterates these arguments in its reply to the opposition briefs submitted by all other parties. [FN53]

AT&T, MCI and the RPA all submitted opposition briefs to VNJ Motion for Reconsideration. In its opposition brief AT&T asserts that VNJ's arguments have no merit, and that VNJ failed to meet its burden in arguing for shorter lives. [FN54] AT&T points out that VNJ's 'real grievance' is that the Board decided not to revert to the asset lives originally adopted in the Board's 1997 Generic Order. [FN55] In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

support of is position, AT&T explains that the Board's decision in 1997 stemmed from an arrangement between the Board and VNJ's predecessor, Bell Atlantic-New Jersey, to accelerate the deployment of broadband-capable fiber cable and facilities in New Jersey. [FN56] AT&T further argues that to base depreciation lives on the accelerated retirement of copper cable and other narrowband assets under Opportunity New Jersey would violate a key element of the FCC's Local Competition Order: cost causation. [FN57]

**\*7** AT&T also points out that the competitive risk assumption prescribed by the FCC was not meant to relieve VNJ of the burden of justifying the use of shorter asset lives. [FN58]

According to AT&T, even the FCC refused to mandate the use of financial lives because the Incumbent Local Exchange Carriers ('ILECs') had not provided any empirical basis on which the FCC could conclude that financial lives will be more consistent with TELRIC that regulatory lives. Rather, according to AT&T, the FCC left it to the states' discretion to select appropriate asset lives. [FN59]

The RPA asserts that VNJ provided no substantive or credible evidence, aside from hearsay, that its proposed GAAP lives are TELRIC-compliant. [FN60] Even accepting VNJ's argument, the RPA opines that the Company failed to demonstrate that GAAP lives are the only appropriate depreciation lives. [FN61] The RPA also points out that VNJ did not contest that the depreciation lives adopted by the Board in its March 6, 2002 UNE Order and in fact represented to the FCC that said rates were TELRIC-compliant in connection with the New Jersey 271 proceeding, as a result of which VNJ received authorization from the FCC to provide long distance telephone service in New Jersey. [FN62]

MCI also agrees that the FCC has not mandated the use of GAAP depreciation lives. [FN63] MCI opines that given the lack of evidence in the record suggesting any change in the rate of plant retirements, it was clearly reasonable for the Board to adhere to its prior use of FCC regulatory lives. [FN64]

Board Discussion

Verizon presents no new evidence or argument in support of its position regarding the appropriateness of GAAP lives in calculating its UNE rates. Moreover, its reiterated argument fundamentally misconstrues VNJ's own burden in this proceeding as well as the Board's findings in its 2004 UNE Order.

In its 2004 UNE Order the Board correctly noted that VNJ had failed to identify any technological developments that would hasten the retirement of assets or require it to accelerate its investment in new facilities in order to compete in the competitive LINE environment envisioned in the TRO. [FN65] Such a burden is not inconsistent with the assumptions set forth by the FCC in the TRO. Indeed, without such data it would be, and was, impossible for the Board to determine what the actual decline in value in VNJ assets will be on a going-forward competitive basis. The Board was further unable to discern how each of the proposed lives were developed and if they could reasonably be attributed to competitive developments in the marketplace that would cause an increased decline in asset values over the life of the asset.

In its 2004 UNE Order the Board implicitly rejected the testimony of Verizon witness Lacy regarding the suitability of GAAP lives for the purposes of setting TELRIC-compliant UNE rates. [FN66] The Board does so again explicitly herein, by finding such testimony to be lacking in probative value, given Mr. Lacy's relative inexperience with depreciation issues and lack of knowledge concerning VNJ's existing network. [FN67] Similarly, the Board reasonably gave no weight to the forecast provided by Technology Futures, Inc. ('TFI') on behalf of Verizon. The Board found TFI's forecasts, predicting 'waves' of plant replacements, to be so speculative in nature as to contain little probative value. [FN68] The Board notes, for example, evidence in the record indicating that TRI previously failed to predict the advent of DSL technology, allowing the extension of service lives for copper cable in Verizon's network. [FN69] No argument made by VNJ at this stage of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                                 Page 7
2004 WL 2492569 (N.J.B.P.U.)
**(Cite as: 2004 WL 2492569 (N.J.B.P.U.))**

proceeding warrants the Board's reconsideration of this conclusion.

**\*8** The Board agrees that the Company has no obligation to demonstrate the existence of a competitive UNE market, now or in the future. However, VNJ must still demonstrate how the existence of such a competitive market actually changes the value of assets and their depreciable lives. This Verizon failed to do to a sufficient degree. In the absence of such proofs, and in light of the availability of unbiased lives developed by the FCC for regulatory purposes, the Board reasonably deemed the latter more appropriate in a LINE rate context. Nothing presented by VNJ on reconsideration is grounds for changing this determination.

2. Board's Adoption of the Mid-Point of FCC Asset Lives

Positions of the Parties

In retaining the FCC Lives, VNJ also argues that the Board erred by relying upon the Virginia Arbitration Order. [FN70] Specifically, the Company avers that the Board's Order referenced the Virginia Arbitration Order when concluding that:

(1) Verizon NJ failed to provide specific quantifiable evidence that increased competition and technological change warrant adoption of GAAP lives; and

(2) Verizon NJ's consideration of ILECs, CLECs, cable television providers and TFI depreciation rates as benchmarks to its GAAP rates is inappropriate. [FN71]

In support of its contention, VNJ asserted that Board Staff, when recommending the retention of depreciation rates based on the mid-point of the FCC Lives, erroneously stated that its recommendation was similar to decisions that were made in several other jurisdictions, including the Virginia Arbitration. [FN72]

In addition, the Company criticizes the Board's Order for not acknowledging that the Virginia Arbitration Order adopted the low end of the FCC Lives while both the FCC and Board's rationale were similar. [FN73] According to the Company, the Board's failure to acknowledge the substantial difference between the mid-points of the FCC Lives it retained and the shorter low-end of the FCC Lives adopted in the Virginia Arbitration Order constitutes a material error, which resulted in UNE rates that are inconsistent with the competitive and technological assumptions required under TELRIC. [FN74]

In response to briefs filed by other parties in opposition to its motion, Verizon asserts that AT&T incorrectly argued that the Virginia Arbitration Order applied the low end of the FCC's regulatory lives only to certain assets. [FN75] VNJ asserts that the FCC in fact applied the low end of the asset lives to all assets at issue in that proceeding. [FN76]

In AT&T's opinion, both the TRO and the Virginia Arbitration Order require VNJ to demonstrate, through empirical data, that technological advances and increased competition justify the use of shorter lives. [FN77] However, AT&T does not believe that VNJ has met its burden. AT&T questions the empirical data that VNJ purports to present, arguing that the recent trends in assets lives actually experience by VNJ require longer, not shorter lives. [FN78]

**\*9** With regard to VNJ's argument that the Board did not even consider the low end of the FCC's range, AT&T points out that nowhere in its testimony or briefs did VNJ propose the adoption of such lives and in arguing that the Board should now do so, omitted vital data in quoting the FCC's position. [FN79] Specifically, AT&T asserts that VNJ failed to preserve this issue for administrative review, and the Board should therefore not consider it on reconsideration. [FN80]

Moreover, according to AT&T, the Virginia Arbitration Order does not require that the state commissions adopt the low end of the FCC-approved lives. [FN81] In that decision, AT&T points out, the FCC's Wireline Bureau found that 'The safe harbor lives [prescribed by the FCC) represent the [FCC's] most recent assessment of the forward-looking asset lives of each of the accounts.' [FN82] Moreover, AT&T avers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the Wireline Bureau determined only that in 'certain cases,' were the mid-points of the asset lives proposed in that proceeding by AT&T and WorldCom too long to be consistent with forward-looking principles. [FN83] Specifically, according to AT&T, the Wireline Bureau only cited the 17- year life used for digital switching equipment proposed by the CLECs, which the Bureau rejected in light of the FCC's determination in 1999 -- five years after its originally prescribed depreciation lives -- that ILECs could use a life as short as 12 years for such equipment under the safe harbor, rather than the previously-prescribed low end of 16 years. [FN84] Therefore, AT&T concludes that the Virginia Arbitration Order requires use of the low end of the 'safe harbor' only upon a showing that the mid-point would be too long to be consistent with forward-looking principles. [FN85] AT&T claims that VNJ has not described any particular FCC-approved asset lives which meet that criterion.

The RPA argues that VNJ's assertion that the Board's adoption of the mid-point of the FCC lives is inconsistent with the Virginia Arbitration Order is misplaced, because the Virginia Order imposes no such requirement. [FN86] The RPA argues that under said Order the FCC's Wireline Bureau required Verizon to make a showing that technological advances and increased competition require shorter asset lives, which it failed to do. [FN87] VNJ has, according to the RPA, similarly failed to make such a showing in the instant proceeding. [FN88]

The RPA also argues that Verizon is precluded by waiver and estoppel from asserting that the mid-point of the FCC regulatory lives is not TELRIC-compliant, base upon its positions taken in the New Jersey 271 proceeding. [FN89] According to the RPA, VNJ essentially represented to the FCC that the UNE rates in effect at that time, which incorporated the mid-point of the FCC asset lives, were TELRIC-compliant. Moreover, the rates were reviewed by the FCC, which agreed with Verizon that the rates fell within the TELRIC range. [FN90] Thus, according to the RPA, VNJ is now precluded from taking an opposite position than that taken in the 271 proceeding. [FN91]

Board Discussion

**\*10** In focusing to such a degree on the Virginia Arbitration Order, Verizon misconstrues the Board's 2004 UNE Order. In that Order, the Board adopted the mid-range of the FCC regulatory lives because the evidentiary record supported such a determination. Specifically, the Board implicitly accepted evidence put forth by AT&T demonstrating that such lives were based on updated assessments of company plans, retirement patterns, and current technological developments and trends. [FN92] The Board also notes the aggregate rise in VNJ's depreciation reserves, indicating that the depreciation lives currently in effect are appropriate. [FN93]

As stated above, the Board also rejected VNJ's request to alter the regulatory lives in place since 2002 because no evidence had been presented suggesting that those lives were not forward-looking, reliable estimates of the economic lives of assets in a competitive environment. [FN94] In fact, ample evidence of the opposite was presented. Verizon failed to demonstrate convincingly in the record, with credible, quantifiable evidence, that shorter GAAP lives were justified by expected technological retirements in a competitive environment. It also failed to show why SEC-derived financial reporting lives, used for an entirely different purpose than regulatory lives used to derive TELRIC-compliant UNE rates, should be mandated at this time.

It is thus irrelevant that the FCC chose the lower end of the FCC regulatory lives in its Virginia Arbitration Order. The Board's decision is not based exclusively, or even substantially, on the FCC Wireline Bureau's actions in Virginia. The Virginia Order was cited merely for the proposition that a substantial evidentiary showing is required to justify the use of GAAP reporting lives, and that the FCC's regulatory lives are forward- looking. [FN95] Based on the record before it, the Board determined that the mid-range of the FCC regulatory lives was appropriate in New Jersey. VNJ presents no new evidence in its Motion that requires reconsideration of this finding.

Even if the Board had 'relied' on the Virginia Arbitration Order to the extent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                              Page 9
2004 WL 2492569 (N.J.B.P.U.)
**(Cite as: 2004 WL 2492569 (N.J.B.P.U.))**

alleged by Verizon, it would have done so in a manner consistent with the actual content of that order. In fact, the FCC made clear in both the TRO and in the Virginia Order that the mid-range of its regulatory asset lives could be appropriate for the purpose determining depreciation expense barring credible evidence specifically demonstrating that specific asset lives were too long, pursuant to TELRIC principles. [FN96] As discussed above, VNJ presented no such evidence, beyond its general assertion that GAAP financial lives are more appropriate predictors of asset depreciation in a going-forward competitive environment than regulatory lives. The Board has already considered and rejected this argument. Moreover, the FCC's application of the low end of its asset life range to all plant assets at issue in the Virginia proceeding does not, as VNJ appears to now argue, relieve it of the burden of showing the specific need for shorter lives in New Jersey. Thus, Verizon's assertion that the Board's use of the mid-range of the FCC's regulatory lives constitutes a 'glaring fundamental error' in violation of FCC guidance in the Virginia Arbitration Order is simply incorrect. [FN97]

3. GAAP Lives v. FCC Regulatory Lives

Positions of the Parties

*11 VNJ also contends that the Board's May 7th UNE Order failed to account for the fact that fully competitive markets require the use of GAAP depreciation lives. [FN98] Verizon argues that it has demonstrated that GAAP lives are the depreciation lives utilized by companies that operate in fully competitive markets and are therefore the lives that best reflect the competitive and technological assumptions associated with such a market. [FN99] It bases its conclusion on its belief that GAAP lives are developed using up-to-date information to take into account the anticipated impact of future technologies and actual and anticipated competition. [FN100] VNJ further maintains that its lives are reviewed on an annual basis by both the Company and the outside auditors to ensure that they reflect the most recent information available. [FN101]

In support of its recommendation, the Company argues that is expert witness has worked with Verizon's depreciation personnel for several years, reviewed the methods used by Verizon NJ to formulate its GAAP lives and concluded that the Company applied the correct factors by considering future competition and technological change, as well as capital spending, budget and engineering plans in evaluating whether its calculated depreciation lives were reasonable and in conformance with GAAp. [FN102]

In addition, Verizon believes that it has presented substantial evidence demonstrating that in a competitive telecommunications markets, such as the one TELRIC requires, companies generally establish economic depreciation lives in accordance with GAAP. [FN103] In further support of its contention, VNJ points to the current trend of shorter depreciation lives in the telecommunications industry. which, in the opinion of VNJ, was also acknowledged by AT&T in a financial and operational overview presented on February 25, 2004. [FN104] The Company further maintains that its lives are reviewed on an annual basis by both the Company and the outside auditors to ensure that they reflect the most recent information. [FN105]

The Company believes that the Board ignored the substantial evidence provided by Verizon NJ that GAAP-based depreciation lives are appropriate for companies operating in fully competitive markets. The Company also criticizes the Board's discounting of the fact that VNJ's GAAP lives have been accepted by the Securities and Exchange Commission ('SEC') by concluding that 'the SEC has statutory duties the differ from the requirement imposed by the 1996 Act and were not designed to protect ratepayers, but designed to protect investor interests.' [FN106] According to the Company, the SEC requires companies to file financial statements that are materially accurate and conform with GAAP. Therefore, VNJ alleges that its lives are compliant with SEC regulations. [FN107] VNJ also argues that its benchmarking of asset lives to those of other ILECs, CLECs and cable television companies was entirely appropriate. [FN108]

AT&T contests VNJ's position that competitive markets require the establishment of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

depreciation rates based upon GAAP-According to AT&T, in competitive markets, economic depreciation lives are not determined by accounts or accounting principles, but by markets. [FN109] In addition, AT&T points out that GAAP lives, while properly benchmarked, reviewed by auditors and approved by the SEC, are still financial lives used for a purpose other than setting TELRIC rates. [FN110] AT&T also asserted that GAAP lives produce a conservative bias that would artificially inflate costs and possibly impede competition. [FN111]

***12** The RPA argues that VNJ has failed to present any new arguments not already considered by the Board and believes that the lives should be longer, not shorter. [FN112] The RPA also argued that FCC-prescribed lives are forward-looking. [FN113]

Board Discussion

The Board is aware that many companies use GAAP lives for financial reporting purposes. The Board also acknowledges that TELRIC-compliant depreciation lives must be developed based on the assumption that VNJ operates in a market in which there is full competition among facilities-based carriers. However, VNJ has not addressed the overarching issue herein: whether GAAP lives are more appropriate as an element of TELRIC-compliant UNE rates supplied on a wholesale basis to CLECs than the FCC's regulatory lives. In its 2004 LINE Order the Board concluded, based on the record, that GAAP lives were biased in a manner designed to protect the interests of investors. [FN114] This ensures that the Company is able to recover the depreciable expense associated with an asset as soon as possible before it is replaced or becomes obsolete. However, such a recovery may not correspond with the actual useful life of the asset for the purpose of setting UNE rates. Nor would such a focus, which may result in faster depreciation and greater cost from an accounting Perspective, protect ratepayers whose rates are based on the cost of providing service. [FN115] No evidence provided by Verizon effectively rebutted this distinction.

For the reasons stated above, the Board also agreed with AT&T and other parties that the testimony of Verizon witness Lacy and the TFI study offered in support thereof were not due substantial probative weight. [FN116]

We note that the application of the TELRIC methodology does not necessarily result in only one appropriate set of asset lives. Rather, TELRIC is capable of producing a range of appropriate outputs for rate setting purposes. [FN117] With this in mind, we have found that the evidentiary record fails to demonstrate, at the very least, that GAAP lives are more TELRIC-compliant than the FCC's regulatory lives. At the same time, ample evidence exists in the record demonstrating that the FCC's regulatory lives are forward looking and account for ongoing changes in technology and retirement patterns. Thus, Verizon has failed to demonstrate any grounds for reconsideration of the Board's retention of FCC regulatory depreciation lives.

It should also be noted that VNJ's blanket assertion that GAAP lives are always superior to FCC regulatory lives ignores such evidence and ignores the FCC's refusal to take such an absolute position. Rather, the FCC has acknowledged that regulatory lives may be more appropriate in the UNE rate context by permitting the states to determine, on an individual basis, whether GAAP or regulatory lives should be applied in their own markets. [FN118]

Finally, we reject VNJ's renewed argument that its proposed GAAP lives are accurate as benchmarked against the asset lives used by a wide range of telecommunications companies, including other ILECs, CLECs and cable television companies. The record demonstrates that the actual assets used by such a diverse group of entities is too dissimilar to be of use as an appropriate benchmark for UNE depreciation lives. [FN119] It is apparent, for example, that an interexchange carrier ('IXC') uses different types of switches and cables than either an ILEC or a stand-alone UNE provider would. [FN120] Moreover, cable television company assets are used in part to provide video services that have no relevance to the voice services at issue in this proceeding. Thus, VNJ has failed to demonstrate that the Board's rejection of GAAP-compliant asset depreciation lives constitute a material mistake or misapplication of the law.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.