PUR Slip Copy                                                            Page 11
2004 WL 2492569 (N.J.B.P.U.)
**(Cite as: 2004 WL 2492569 (N.J.B.P.U.))**

**\*13** 4. Advancement of Interests Of Consumers, Competition, And Telecommunications Network Investment In New Jersey

Positions of the Parties

According to the Company, the FCC lives fail to achieve the Board's stated goal of protecting consumers or competition. [FN121] In support of its position, VNJ avers that the use of the longer FCC lives discourages both CLEC and Verizon NJ investment in New Jersey because CLECs have no incentive to invest when they can purchase UNEs at below cost rates that result from what it describes as excessive FCC Lives for UNE rate setting. [FN122] Similarly, the Company argues that it has no incentive to make additional investment because the long FCC lives prohibit Verizon NJ from realizing a reasonable return on its investment. [FN123] VNJ also argues that the current asset lives proposed by AT&T would merely serve to perpetuate the high profit margins enjoyed by the CLECs. [FN124]

AT&T alleges that such considerations are irrelevant to the issue of TELRIC compliance, and should therefore not be considered by the Board. [FN125] AT&T also disagrees with VNJ's assertion that UNE rates set lower than those proposed by VNJ would have negative economic consequences for New Jersey. [FN126] AT&T further disputes VNJ's assertion that current rates produce windfall profits for AT&T through the service of local customers via UNEs, since VNJ's analysis purporting to illustrate this point fails to take into consideration actual costs of service incurred by AT&T. [FN127]

In reply to AT&T's opposition, VNJ asserts that the economic consequences of excessively low UNE rates are a highly relevant issue for consideration by the Board. It reiterates its argument that AT&T enjoys large profit margins through its service of UNE customers.

Board Discussion

The Board's analysis of VNJ's arguments leads it to conclude that such arguments merely reiterate positions previously taken by VNJ and rejected by the Board. The Board therefore declines to reiterate in depth its previous responses thereto. In short, Verizon offers no new evidence or argument demonstrating that GAAP lives should be substituted for the FCC regulatory lives in place since 2002, based on the need to protect the interests of New Jersey consumers. The Board disagrees with Verizon's claim that the increase in UNE rates caused by the adoption of shorter GAAP lives would not affect the rates CLECs charge to consumers. Nor do Verizon's claims regarding the CLEC's 'hefty' profit margins find support in the record, which is devoid of any informed evidence from VNJ demonstrating CLEC's internal costs of providing service. In fact, AT&T has demonstrated that Verizon's rate plan comparisons are unrealistic from both a revenue and cost perspective. [FN128] Without further compelling evidence rebuffing AT&T's submission, the Board declines to reconsider its previous findings.

COST OF CAPITAL

Positions of the Parties

In its Motion for Reconsideration, Verizon argues that the Board overemphasized conventional rate case concepts in its analysis of the cost of capital component of the UNE rate. [FN129] Verizon contends that by doing so the Board ignored the overriding presumption that UNE rates be set in light of the risks faced by a company which is actually subject to full competition from other facilities- based carders. [FN130] Verizon further contends that the Board ignored the highly relevant guidance of the Pennsylvania Commission and the FCC Wireline Bureau in the Virginia Arbitration Order, which made cost of equity determinations in UNE proceedings higher than that made by this Board. [FN131]

**\*14** Verizon also contends that the Board committed a critical error by not considering AT&T's internal cost of capital, or 'hurdle rate,' in determining an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appropriate cost of capital for VNJ, and by assigning VNJ a cost of capital well below that rate. [FN132] Verizon argues that the Board's failure to benchmark its determination to AT&T's hurdle rate was inconsistent with the FCC's clarification in the TRO that the cost of capital must reflect the competitive and technological factors associated with a market in which full competition exists among facilities-based carriers. [FN133] Verizon goes on to argue that the Board's rejection of its proposed proxy group of diverse industrial companies is particularly arbitrary since, in VNJ's view, AT&T's hurdle rate is the most relevant real-world cost of capital value available. [FN134]

Verizon further claims that the 12% cost of equity set by the Board in its 2004 UNE Order was set arbitrarily in a manner that merely balanced the competing costs of equity proposed by Verizon and AT&T. [FN135] VNJ contends that there exists no evidence in the record equating the risk factors encountered by electric distribution and water companies and those encountered by a provider of UNEs in a competitive market. [FN136] VNJ disputes that the Board possesses prior regulatory experience regarding determination of a fair return on equity in regulated utility cases that can be applied to UNE rate determinations, since most of these were the result of stipulated settlements. [FN137] Verizon cites prior Board Orders referenced in the 2004 LINE Order that, in VNJ's opinion, indicate a lack of actual analysis and expertise regarding cost-of-capital issues demonstrated by the Board therein. [FN138]

Verizon further argues that the Board's rejection of its proposed UNE risk premium is based on misunderstandings of the basis of the proposed adjustment, of Verizon's position and of the FCC's TRO. [FN139] Specifically, VNJ argues that the Board ignored the evidence submitted by VNJ allegedly demonstrating that VNJ faces numerous risks which are not captured in the standard models presented by the parties for estimating the cost of equity. [FN140] VNJ contends that when assessing the risks to Verizon in providing UNEs on a going forward basis, the Board erroneously ignored the FCC's requirement that state commissions assume the existence a forward-looking, ubiquitous network that uses the most efficient technology available in a competitive market, and compensate the ILEC accordingly. [FN141] VNJ also contends that the Board never considered whether such risks were actually captured in the cost models presented by the parties. Verizon presents new evidence in the form of excerpts from a paper recently presented to the FCC on behalf of Verizon by economist Robert S. Pindyck, not previously part of the record in this case, in support of its position regarding the deficiencies of current cost models in the record. [FN142]

Finally, Verizon argues that the Board was amiss in not relying on certain state decisions and over-relying on others. [FN143] VNJ contends that the state commission decisions referenced by the Board, those from New Hampshire and Maryland, did not rely on TELRIC principles and should be disregarded for that reason. Verizon opined that these decisions would soon be reversed. [FN144]

*15 In reply to AT&T's opposition to VNJ's motion, Verizon alleges that AT&T merely reargues its position regarding the relative risks of telecommunication holding companies that comprise AT&T's proxy group. [FN145] Verizon also alleges that AT&T's discounting of the relevance of its own hurdle rate in calculating cost of capital is baseless and not supported by the record, since AT&T faces actual competitive risks. [FN146] VNJ rejects AT&T's assertion that the hurdle rate is artificially inflated to compensate for overly optimistic profit predictions, stating that AT&T never suggested such an argument in discovery. [FN147] VNJ also alleges that AT&T has a strong economic incentive to accurately estimate its own cost of capital, and that reliance on said rate in setting UNEs would not change this incentive. [FN148] VNJ also argues that reliance on AT&T's hurdle rate would be consistent with AT&T's insistence on the use of telecommunications holding companies as risk proxies. [FN149]

VNJ further rejects AT&T's argument that the Board's application of the same methodologies used in the Pennsylvania state commission order, cited in the 2004 UNE Order, as well as the Virginia Arbitration Order, to current data would produce a weighted average cost of capital. [FN150] VNJ claims that AT&T's assertion that cost

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of capital would be reduced is based on short-term interest rate changes and amounts to nothing more than baseless speculation that such methodologies would be employed in the future. [FN151]

VNJ also reiterates its argument concerning its proposed risk premium and argues that AT&T has simply restated its own argument in opposition thereto. [FN152] VNJ further rejects AT&T's opposition to its arguments concerning whether cost of equity models incorporate and reflect the relevant risk factors faced by a hypothetical UNE provider. [FN153] VNJ also asserts that AT&T selectively quoted VNJ's own expert, Dr. Robert Pindyck, in a misleading way. [FN154]

With respect to cost of capital, AT&T argues in its petition and in reply to VNJ's opposition brief that the Board should have adopted a weighted average cost of capital of 8.23%. [FN155] AT&T contends that the Board improperly rejected its proxy group of five publicly traded telecommunications companies, which accurately estimates the risks of supplying UNEs in a competitive environment. [FN156] According to AT&T, the record showed that investors impute the same risks to the companies in its proposed proxy groups as those imputed to VNJ in a forward looking environment, and that VNJ itself has warned investors of these risks. [FN157] AT&T claims that the perception of risk is the relevant factor in UNE rate determination, rather than the actual risk faced by Verizon. [FN158] AT&T opines that Verizon has provided no basis for the Board's assumption that a competitive UNE business would be perceived as materially riskier than Verizon's non-UNE lines of business, since the risks of competition impact on both areas in a way that is widely disseminated and easily recognized by investors. [FN159]

*16 AT&T suggests that the Board's use of comparisons with other industries is procedurally improper, since the parties did not receive advance notice or opportunity to respond to same. [FN160] However, AT&T also responds substantively to these comparisons by arguing that the decisions cited by the Board are inapt or supportive of the relief sought by AT&T. [FN161]

AT&T further asserts that the Board improperly and arbitrarily 'split the difference' between the AT&T and VNJ proposals to reach its 12% cost of equity.' [FN162] As an example of this purported arbitrariness, AT&T cites the Board's reference to VNJ's S&P industrial proxy group which, according to AT&T, the Board should have dismissed outright as completely unreliable. [FN163] Moreover, AT&T rejects the Board's limited reliance on Verizon's one-stage DCF model specification for estimating earnings growth assumptions, which it claims have been widely rejected by the Board and other jurisdictions in the past. [FN164]

AT&T also argues that the Board erroneously adopted Verizon's proposed 6.26% cost of debt, a value based on current yield-to-maturity of Moody's A-rated industrial bonds. [FN165] AT&T claims that this choice in unsupported by the record and inconsistent with other Board findings. [FN166] AT&T argues that the Board's acceptance of this figure implies its reliance on a diversified industrial proxy group that is inconsistent with its rejection of a similar group in the Board's cost of equity calculation. [FN167] AT&T claims that the Board's conclusion that the lower debt estimates offered by AT&T do not fully capture the costs that a stand-alone UNE provider would face ignores the fact that investors impute the same risks to the Verizon parent entity that they would to the UNE company, whether in the context of debt or equity costs. [FN168] According to AT&T, the diversification of VNJ's parent company into wireless, Internet and foreign services cannot make the company less risky than the wholesale provider of UNEs. [FN169] Therefore, the economies of scale that arise from integrating related business operations should have been considered by the Board when determining the TELRIC cost of debt. [FN170]

In opposition to VNJ's motion, AT&T further reiterates its arguments, made in its motion for reconsideration, that VNJ's request for a higher cost of capital is without merit. In short, AT&T rejects Verizon's diverse proxy group and maintains its position that the risk associated with publicly traded RBOCs is greater than the risk associated with a hypothetical stand-alone UNE provider. [FN171] Thus, the cost of capital for the AT&T proposed proxy group is the same (or higher) than the cost of capital appropriate for VNJ UNEs. [FN172] AT&T also reiterates its arguments

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concerning its 'hurdle rate' which it claims is not comparable to the appropriate rate for a stand alone UNE business. AT&T argues that such a rate is often set at an overly high level to compensate for the possibility of overly optimistic profit projections. [FN173] AT&T also repeats its arguments in opposition to the imposition of Verizon's so-called 'risk premium.' [FN174] Finally, AT&T endorses the Board's limited references to other state commission decisions in support of its findings. [FN175]

*17 In reply to VNJ's and the RPA's opposition to AT&T's petition for reconsideration, AT&T argues that its petition properly invokes the Board's jurisdiction under N.J.A.C. 14:1-8.6. [FN176] AT&T also disagrees with the RPA that the legal doctrine of the law of the case applies in this proceeding, since, according to AT&T, the literal interpretation of this doctrine advocated by the RPA would eliminate the possibility any petition brought under NA.A.C. 14:1-8.6. [FN177] AT&T argues that, to the extent this discretionary, judge-made doctrine applies to administrative decision making, the recognized exception for clear errors in the earlier decision applies here. [FN178]

In further reply to the RPA, AT&T rejects the assertion that the standard of review applied by the FCC in Section 271 cases is inapposite here. According to AT&T, the FCC utilized a highly deferential standard of review regarding the TELRIC compliance of LINE rates in its Section 271 proceedings, due to the numerous checklist items requiring review, as well as the short time-frame allowed under the 1996 Act. Thus, according to AT&T, the RPA incorrectly asserted that a range of reasonable rates were permissible under TELRIC. [FN179]

In its reply brief, AT&T reiterates its argument that the Board should reduce the weighted cost of capital from 9.88 percent to 8.23 percent. AT&T alleges that VNJ and the RPA offer no reason to believe that investors perceive the telephone holding companies in its proposed proxy group as less risky than the business of supplying UNEs in a competitive market. [FN180] AT&T affirms its assertion that the record amply demonstrates that investors attribute the risks of a competitive market to the telecommunications companies in its proxy group. [FN181] AT&T further restates its arguments concerning the Board's purported '50/50 split' of proposed cost of capital values and the Board's cost of debt determination. [FN182]

In support of AT&T's Motion for Reconsideration, MCI argues that the cost of capital set by the Board was too high because the Board improperly applied rate case principles and adopted a 'split the baby' approach to rate setting. [FN183] According to MCI, there is no reason to believe that investors do not perceive and understand the risks faced by Verizon in providing UNEs. [FN184] It therefore contends that the costs of equity proposed by AT&T, MCI and the RPA all fall with the 'zone of reasonableness.' The 12% adopted by the Board, on the other hand, was excessive in MCI's opinion. [FN185]

MCI also asserts that the Verizon's argument regarding AT&T's hurdle rate is simply a restatement of the same argument made in Verizon's Initial Brief. MCI argues that there is nothing in the record indicating that VNJ and AT&T face comparable costs of capital at the present time, and that strong evidence to the contrary was presented. [FN186] MCI also rejects the risk premium argument asserted by Verizon on reconsideration, seeing it as a repeat of the argument already considered and rejected by the Board. [FN187]

*18 In opposition to the motions of both Verizon and AT&T, the RPA argues as a threshold matter that under the doctrine of the 'law of the case,' the Board may decline to consider VNJ's and AT&T's motions for reconsideration. [FN188] The RPA further argues that both parties have failed to show that the Board misapplied the TELRIC standard in establishing the cost of capital in the UNE Remand proceeding. [FN189] The RPA rejects VINJ's assertion that the Board was improperly influenced by rate case concepts. Rather, the RPA notes that the Board engaged in such a discussion merely to focus on the difficulty in finding an appropriate proxy group for determining an adequate cost of equity. The RPA argues that the Board's cost of equity determination was not based on improper comparisons with regulated utilities but on its analysis of the record. [FN190] According to the RPA, the Board fully

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employed the TELRIC standard in making its cost of capital determination. It noted that there exists a range of cost figures which may fall within the TELRIC range, not simply one correct value. [FN191] The RPA argues that, accordingly, the Board properly exercised its lawful discretion to set a 12% cost of equity, which is above the 10% set by the Board in 1997 and accepted by Verizon as TELRIC compliant. [FN192]

The RPA also discounts Verizon's reliance on AT&T's internal hurdle rate, arguing that Verizon offered no evidence suggesting that this rate was TELRIC compliant. [FN193] The RPA further rejects Verizon's arguments concerning the Board's rejection of its risk premium as simply repetitive of prior arguments made at hearing. The RPA asserts that VNJ's reference in its reconsideration brief to the ex parte filing before the FCC of Robert S. Pindyck was improper in that it represented cumulative evidence submitted to the Board after the close of the record that should have been introduced, if at all, prior to the Board's decision on April 2, 2004. [FN194]

Finally, the RPA rejects both AT&T's and VNJ's arguments that the Board's cost of capital determinations were arbitrary and capricious. According to the RPA, the Board rationally weighed the competing proposals and compared them to determinations made by five other state commissions. The RPA further argues that the Board then made a reasoned determination based on its expertise and the record in the case, clearly explaining why it concluded that an increase in cost of equity to 12% was warranted to compensate Verizon for the risks associated with the provision of UNEs going forward. The RPA opines that the Board has offered valid reasons for its choices and is entitled to deference with respect thereto. [FN195]

Verizon also submitted written opposition to AT&T's Motion for Reconsideration. Verizon asserts therein that the Board's rejection of AT&T's cost of equity and cost of debt positions is not based on any material misapprehension of law of fact, but rather amounts to no more than a rehash of the same arguments already made by AT&T in its testimony and briefs. [FN196] While VNJ agrees with AT&T that the Board's alleged 'split-the-difference' approach was inappropriate, VNJ disagrees that the Board's alleged errors resulted in an unduly high cost of capital. Rather, VNJ reiterates its position that the Board's cost of capital determination is too low, according to TELRIC principles. [FN197] in addition to reiterating its arguments regarding the appropriate proxy group for cost of capital calculations, VNJ rejects AT&T's position that debt cost should be determined assuming that the efficient supplier of UNEs would be part of a diversified or vertically integrated entity, rather than a stand-alone company. Verizon claims that this position to be inconsistent with FCC pronouncements on this issue. [FN198]

Board Discussion

*19 The Board rejects the arguments of AT&T and Verizon with regard to cost of capital. Specifically, the Board disagrees that its findings regarding the cost of equity and debt are not based on sound analysis firmly grounded in the TELRIC methodology and on evidence in the record.

Rate Case Proceedinas

As a preliminary matter, it is clear that Verizon, AT&T and MCI have misconstrued the Board's references to rate case proceedings for traditionally regulated services. Even the most perfunctory reading of the 2004 UNE Order reveals that the Board's references to conventional monopoly utilities do not evidence any intention to substitute rate-base/rate-of-return regulation for the analytical assumptions and parameters underlying TELRIC. Rather, it is clear that they were merely intended to illustrate the difficulty the Board faced in determining a TELRIC-com pliant cost of equity for Verizon UNEs in the absence of a comparable real-world proxy group of companies whose sole line of business is the sale of UNEs. [FN199] Faced with such difficulties, the Board cited its general regulatory experience in the area of traditional utilities in support of its reasonable exercise of discretion in determining an appropriate cost of equity based on the competing proxy groups put forward by the parties. [FN200]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

From the Board's limited references to its ratemaking expertise, Verizon somehow extracts the notion that the Board has 'ignored' the FCC's requirement that the cost of capital for UNE rate-setting must reflect the risks of a market in which Verizon faces facilities-based competition. [FN201] However, the Board repeatedly acknowledged that the cost of equity determinations shaped by the unique risks faced by electricity and gas utilities were not the same as those faced by a company selling UNEs in a competitive environment. [FN202] Moreover, the Board's cost of capital analysis was shaped throughout by the assumptions and analytical parameters of TELRIC, as clarified in the TRO.

The Board reasonably relied on its regulatory experience and expertise, derived from cost of capital determinations of all types, including those undertaken in other regulated and restructured industries, to enable it to establish a fair cost of capital for Verizon's UNE business according to TELRIC principles. VNJ, by focusing on the few rate cases cited by the Board as recent examples of Board action in this area, ignores the basic point that the Board has acquired extensive experience in setting the cost of capital over many years. This experience, though not necessarily acquired in the context of a TELRIC-based UNE proceeding, is still highly relevant to the basic task at hand: determining what cost of equity adequately compensates VNJ for the risk inherent in its provision of UNEs. Indeed, no party has offered any evidence demonstrating that the forward-looking assumptions underlying TELRIC conceptually alter the discrete cost of equity analysis that the Board must undertake to set UNE rates. Rather, the Board must still determine an appropriate risk assessment model and apply it to an appropriate proxy group of companies to assess forward-looking risk. Nor does the TRO, which mandates the assumption that Verizon provision of UNEs in a fully competitive environment, change this basic analysis, in which the Board is well versed.

**\*20** Moreover, that fact that some of the rate case determinations cited by the Board were the result of stipulated settlements rather than formal adjudications does not mean, as Verizon suggests, that the Board did not review the discrete cost of capital element therein. Nor would the Board have approved the overall stipulated revenue requirement if the cost of capital element was not reviewed and determined to be reasonable. Thus, the Board's overall expertise, derived not merely from five recent rate cases but through years of adjudication of such cases (both settled by stipulation and litigated to completion) in which a cost of capital determination was an integral part, is relevant to determining what cost of capital is appropriate in a UNE proceeding applying TELRIC principles.

Proxy Groups

With respect to the cost of equity issue, there exists ample evidence in the record to support our conclusion that neither Verizon's nor AT&T's proxy groups of comparable companies adequately represents the risk profile of a business entity whose sole product is UNEs on a going forward basis. As we stated in the 2004 UNE Order, the broad selection of companies represented in Verizon's S&P Industrial proxy group, including automobile manufacturers, oil companies, producers of food and food ingredients, publishing, entertainment and pharmaceutical firms, represents a vastly diverse risk profile. [FN203] We agree with AT&T that any attempt to link the risk profiles of these companies to that of a stand-alone UNE company based on the existence of competition is simplistic. Given the range of perceived risk represented in such a group, and despite VNJ's assertion that the group is nonetheless an adequate proxy for a stand alone UNE provider because of the 'competitive' nature of the companies, the Board rightfully rejected this group as not reflective of the risk faced by a UNE provider going forward.

At the same time, the AT&T group of risk proxies, consisting of five publicly traded telecommunication holding companies, is of a smaller size than would typically be deemed adequate for the estimation of risk related to a cost of equity determination. [FN204] These companies may be seen as less risky than a stand-alone UNE provider because of their ability to diversify away many of the risks facing a company whose sole business is the provision of wholesale UNEs in a competitive environment. [FN205] We reject as unsupported AT&T's argument that such an ability to diversify into various retail services creates more, rather than less risk for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the diversifying company. While full-service, vertically integrated telecommunication companies may indeed face high risk in a competitive environment, we find that there is no evidence in the record suggesting that such risk would be higher than that of a UNE provider. In fact, AT&T provided no compelling evidence to rebut Verizon's assertion that the ability to diversify reduces, rather than increases, business risk. [FN206]

***21** In the 2004 UNE Order the Board also rejected, and explicitly does so again here, AM's argument that the Board may assume that the hypothetical stand-alone UNE provider is an integrated, diversified telecommunications company for the purposes of UNE rate setting. The Board finds no evidence in the record or support from the FCC for this assumption, Nor, contrary to AT&T's assertion, does the FCCs Local Competition Order support such a conclusion. [FN207]

The Board analyzed the conflicting evidence and determined that neither proxy group adequately reflected the risk profile of a hypothetical UNE provider. It rejected VNJ's group because of its obvious lack of comparability to the UNE firm and lack of common risk factors among the 200-odd firms in the group. By contrast, however, the firms in the AT&T group, while fewer in number than is ideal for risk comparison purposes, at least possessed some similarities with a UNE firm, including for some the actual provision of UNEs. Based on its expertise in setting the cost of capital in other rate cases and the requirements of the TELRIC methodology, the Board determined that unqualified acceptance of the AT&T proxy group would result in an understatement of the risk faced by Verizon on a long-run basis. Thus, the Board adjusted its cost of equity determination by the amount it considered necessary to adequately compensate Verizon. This adjustment also took into consideration recent changes in interest rates and inflation. [FN208] The fact ' that it was in some way compared to prior electric and gas cost of equity decisions does not mean, as Verizon and AT&T suggest, that the Board did not consider differences between those analyses and the LINE determination. Rather, the Board expressly acknowledged that 'the overall risk of providing LINE services is greater than the risk associated with traditional UtilitieS.' [FN209]

Risk Premium

The Board also rejects Verizon's renewed attempt to add a so-called 'risk premium' to its cost of equity calculation. Contrary to Verizon's assertion, the Board did not misunderstand the FCC's directives regarding UNE pricing assumptions in this context. Nor did it ignore the assertion that numerous risks facing ILEC UNE providers such as VNJ are allegedly not captured in the standard cost models presented by the parties.

In rejecting the risk premium, the Board disagreed with Verizon's unsupported assertion that it was contractually required to make large sunk investments for the benefit of CLECs, which, according to VNJ, supported its claimed need for a higher cost of equity. [FN210] The Board correctly found that the FCC places no such obligations on the ILECs. Nor does the record support Verizon's assertion. [FN211] In fact, evidence suggests that VNJ provides UNEs from spare network capacity. [FN212] Even assuming that such future investments are made, Verizon has not indicated what portion, if any, will be in services that are subject to the FCC's unbundling requirements.

***22** Instead, Verizon now argues that the Board missed the point it attempted to make, namely that TELRIC pricing requires the assumption that facilities-based competition exists. [FN213] However, the Board quite clearly understands that, while it must assume that facilities-based competition exists when determining VNJ's cost of capital going forward, Verizon must still demonstrate that such a competitive environment would in fact demand the level of investment for which Verizon claims it must be compensated, whether it intends to actually deploy such technology or not. There is no evidence in the record indicating that VNJ's 'large sunk investments' requiring an extraordinary increase in cost of equity would actually be required in the competitive environment that the Board is required to presume. Given this lack of evidence, the Board reasonably rejected VNJ's request.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Board has also considered VNJ's reiterated assertion that the cost models presented by the parties do not capture the (as VNJ sees it) extraordinary business risks associated with the provision of UNEs going forward. As stated in the 2004 UNE Order, VNJ only quantified one of the so-called added risk factors that allegedly could not be captured in any cost model: the risk of unilateral cancellation of CLEC contracts by CLECs, to the detriment of VNJ. However, as the Board pointed out previously, the short-term unrestrictive nature of ILEC/CLEC contracts could just as easily benefit VNJ, since TELRIC-based rates could rise as well as fall in a forward-looking environment. Thus, the 'risk' that the cost models allegedly fail to capture is itself highly speculative in nature, and of no import to the Board's determination of cost of capital.

Moreover, the record does not contain compelling evidence suggesting that any regulatory or economic risk faced by a stand-alone UNE provider in a competitive environment would not be fully known and understood by investors, and therefore captured in a DCF risk/price analysis used in the models presented by all parties. Given the high level of dissemination of information among investors regarding the regulatory risks to ILECs (well documented in the record and largely unrebutted by Verizon) [FN214] the Board properly found that the lease-cancellation risk was part of the overall expected business risk faced by all ILECs, and known to investors, such that there was no reason to believe that it was not accounted for by standard cost models incorporating risk assessment components. Verizon provides no new argument requiring the Board to reconsider its conclusions. [FN215]

The Board further agrees with the RPA that Verizon's ex parte filing before the FCC by Dr. Pindyck, submitted in support of its Motion for Reconsideration, should have been submitted as part of the record in the prior proceeding. [FN216] Even considering the substance of this filing, the Board finds that it merely reiterates VNJ's core argument, already rejected by the Board, that the weighted cost of capital should be augmented with a risk premium to compensate for uncaptured risk factors. [FN217]

State Decisions

**\*23** Verizon's rejection of two state decisions cited by the Board in connection with its cost of capital determination, those of New Hampshire and Maryland, is not grounds for reconsideration. As a threshold matter, Verizon's objection is largely irrelevant because the Board did not rely on any other state decision in determining the appropriate cost of capital for Verizon's UNEs. Rather, citation to other jurisdictions was merely meant to illustrate the wide range of capital cost values derivable under TELRIC. [FN218] As the Board stated in its 2004 UNE Order, the decisions in those states are of interest to the Board merely for the purpose of trying to better understand the conflicting arguments presented by the parties as well as the divergent decisions; however, the totality of the record developed in this proceeding and the Board's expertise in examining cost of capital issues govern its decision. Verizon has erroneously interpreted the Board's reference to the decisions of two states that produced values similar to New Jersey's as an arbitrary and capricious rejection of the findings of other states. However, since no reference to any state decision served as an integral part of the Board's analysis, Verizon's emphasis on the Board's treatment of other state's decisions is misplaced.

It follows that, contrary to the arguments of VNJ, AT&T and MCI, the Board did not merely 'split the baby' in its determination of an appropriate cost of capital for Verizon UNEs. Rather, as the RPA has pointed out, the Board carefully considered and appraised the evidence put forward by the parties. [FN219] For the reasons stated above and in the 2004 UNE Order, the Board determined that a 12% cost of equity would adequately compensate VNJ for the risks it would face in a competitive environment. This finding took into account the difference between the historically low interest rates and levels of inflation in the current economic environment and the more normal levels in effect in the past. [FN220]

Moreover, the parties' fixation on the word 'balance,' which is claimed to indicate arbitrary action by the Board, is not warranted given the context in which the word was used in the Order. It is clear from that context that the Board was not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

referring to a literal balancing, or 'splitting the difference' between the cost figures proposed by AT&T and VNJ. Rather, the Board used the term merely to denote the inadequacies of both figures as polarized opposites, and the Board's attempt to discern the appropriate figure in light of these inadequacies. [FN221] Thus, given the plethora of analysis provided in the 2004 UNE Order, the Board rejects the parties' arguments that its cost-of-capital determination was a mere compromise between competing proposals.

Cost of Debt

The Board also reviewed the parties' proposed costs of debt within the TELRIC framework, and determined that Verizon's 6.26% to be the most predictive of the actual cost of debt faced by a UNE provider on a going forward basis. In response, AT&T reiterates its argument that a lower cost of debt is appropriate. AT&T argues that the Board has improperly used bond yields from the Moody survey as the basis for its cost of debt determination, when it used a narrower, less diverse proxy group to determine the TELRIC-compliant cost of equity for VNJ's provision of UNEs. However, AT&T misconstrues the Board's analysis. A hypothetical UNE firm has no market cost of debt from which to gauge the accuracy of the Board's determination. However, it is reasonable to assume that debt generating capacity of the UNE firm would more closely resemble that of an industrial company than that of a vertically integrated telecommunications provider. Thus, a greater cost of debt than that proposed by AT&T is justified.

**\*24** Moreover, the Board made clear in the 2004 UNE Order that it does not accept AT&T's debt calculations based on Verizon's current diversified business strength as a valid way to capture the costs of a stand-alone UNE provider in a facilities-based competitive environment. [FN222] The FCC's TRO makes clear that such a provider would generally face heightened risks in a going-forward environment, which the Board is satisfied are not adequately accounted for by AT&T's calculations. [FN223] Nor does the Board accept AT&T's reliance on debt issuances that have expired or will shortly expire to calculate cost of debt. AT&T did not effectively rebut VNJ's assertion that short-term debt used to finance short-term assets is not appropriate for determining the cost of long-term debt used to finance long-term assets, such as telephone network assets. The Board also found that AT&T's conclusions regarding cost of debt are based on an assumption that, as stated above, is not clearly endorsed in the TRO or supported in the record, that the hypothetical UNE supplier may be viewed as a diversified or vertically integrated telecommunications entity for cost of debt purposes. The Board declines to embrace such a position in the absence of evidentiary support in the record.

Hurdle Rate

The Board similarly rejects VNJ's lengthy argument regarding the relevance and importance of AT&T's internal 'hurdle rate' in determining the appropriate cost of capital in this proceeding. Verizon essentially reiterates is previous assertions and presents no new evidence in support thereof or to rebut AT&T's claim that its internal hurdle rate is deliberately set at an abnormally high level to compensate for overly optimistic profit projections. Nor does Verizon adequately explain why the Board must accept the particular hurdle rate it presents as appropriate for LINE facilities when it is clear from the record that AT&T (or any 2 firm) varies its hurdle rate according to the specific projects/investments at issue. [FN224] No support exists for equating, per se, this single AT&T hurdle rate with the expected returns demanded for a VNJ stand-alone UNE business.

Most importantly, as stated by the RPA, whatever the relevance of the AT&T hurdle rate to the Board's determination (and AT&T argues there is little or none) Verizon has not even attempted to demonstrate to the Board that the rate itself is TELRIC-compliant. [FN225] Without this threshold showing, the Board declined to give the rate any weight in its cost of capital determination, and continues to do so now in the absence of new evidence presented by Verizon.

SCOPE OF REVIEW

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.