Federal Communications Commission    DA 03-2738

Before the
**Federal Communications Commission**
Washington, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| In the Matter of Petition of WorldCom, Inc. | ) |
| Pursuant to Section 252(e)(5) of the | )    CC Docket No. 00-218 |
| Communications Act for Preemption of the | ) |
| Jurisdiction of the Virginia State Corporation | ) |
| Commission Regarding Interconnection | ) |
| Disputes with Verizon Virginia Inc., and for | ) |
| Expedited Arbitration | ) |
| | ) |
| In the Matter of Petition of AT&T | ) |
| Communications of Virginia Inc., Pursuant to | )    CC Docket No. 00-251 |
| Section 252(e)(5) of the Communications Act | ) |
| for Preemption of the Jurisdiction of the | ) |
| Virginia Corporation Commission Regarding | ) |
| Interconnection Disputes With Verizon | ) |
| Virginia Inc. | ) |

## MEMORANDUM OPINION AND ORDER

**Adopted:** August 28, 2003                **Released:** August 29, 2003

By the Chief, Wireline Competition Bureau:

### TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................ 1

II.   PROCEDURAL MATTERS ............................................................................................... 6

    A.   HISTORY OF THE PROCEEDING ..................................................................................... 6
    B.   OUTSTANDING MOTIONS ............................................................................................. 12
        1.   Verizon's Motion for Leave to File Corrected Non-Recurring Cost Study and
            Errata to Testimony ........................................................................................... 13
        2.   Verizon's Submission of Additional Record Evidence .............................................. 15
    C.   STANDARD OF REVIEW ................................................................................................ 24
    D.   TRUE-UP ...................................................................................................................... 26

III.  OVERARCHING ISSUES ................................................................................................. 27

    A.   ECONOMIC THEORY OF TELRIC PRICING .................................................................... 27

that this ratio for incumbent LECs, based on book value weights, is 49 percent/51 percent. They determine that this ratio is 80 percent/20 percent based on market value.[295] For the reasons described above, we give no weight to the portion of AT&T/WorldCom's proposal that is based on incumbent LECs' book value capital structure. Based on the data on which the parties estimated their market value-based capital structures, a range of 78-80 percent equity and 20-22 percent debt could be justified. Therefore, as between the two proposals presented in this case, Verizon's 75 percent equity/25 percent debt is the better choice. Using this ratio, however, would create a mismatch with the data we use to calculate the cost of equity because those data assume an 80 percent/20 percent equity/debt ratio.[296] To be consistent, it is necessary for us to depart slightly from baseball arbitration and use an 80 percent/20 percent equity/debt ratio.

### d.    Overall Cost of Capital

104.    In our analysis above, we have selected a 7.86 percent cost of debt, a 14.37 percent cost of equity capital, and a capital structure that is 20 percent debt and 80 percent equity to estimate the cost of capital for UNEs. The WACC under these assumptions is 13.068 percent. Accordingly, as between the two proposals presented in this case, using baseball arbitration we adopt the 12.95 percent overall cost of capital proposed by Verizon to develop UNE rates.[297]

### D.    Depreciation

#### 1.    Overview

105.    Depreciation is the mechanism by which the investment in an asset is recovered over the life of the asset. The *Local Competition First Report and Order* contains a limited discussion of depreciation. Specifically, the Commission stated that properly designed depreciation schedules should take into account expected declines in the value of goods.[298] The Commission's rules simply require the use of "economic depreciation."[299] In upholding the TELRIC rules, the Supreme Court found that existing regulatory depreciation rates were an appropriate starting point that could be "adjusted upward if the incumbents demonstrate the need."[300]

106.    There are two components of depreciation – the useful life of the asset, and the

---

[295]    AT&T/WorldCom Ex. 5, at 36.

[296]    *See supra* paras. 88-89.

[297]    To achieve a 12.95 percent overall cost of capital, an implied cost of equity of 14.22 percent should be used in lieu of the 14.37 percent identified above when running the MSM and the Verizon cost models.

[298]    *See Local Competition First Report and Order*, 11 FCC Rcd at 15849, para. 686.

[299]    47 C.F.R. § 51.505(b)(3).

[300]    *Verizon v. FCC*, 535 U.S. at 519.

Federal Communications Commission                    DA 03-2738

rate at which the asset is depreciated over the useful life. In a recent decision addressing the issue of asset lives, the Commission noted that more than twenty states have used FCC regulatory lives in calculating TELRIC-based UNE prices.[301] In the same decision, the Commission expressed some concerns about the use of asset lives used in financial reporting, although it did permit incumbent LECs to seek waivers that would allow them to use financial book lives.[302] That decision did not, however, specifically consider whether FCC regulatory lives or financial book lives are more appropriate for use in a TELRIC calculation. In the *Universal Service* proceeding, the Commission used FCC regulatory lives in running the SM.[303] In its section 271 decisions, the Commission has found both FCC regulatory lives and financial book lives to be consistent with TELRIC principles.[304] Similarly, in the *Triennial Review Order*, the Commission declined to mandate one set of asset lives or the other.[305]

107.    As to the timing of recovery over the life of an asset, the *Triennial Review Order* clarifies that, under the Commission's "economic depreciation" requirement, a carrier may accelerate recovery of the initial capital outlay for an asset over its life to reflect any anticipated decline in its value.[306] For example, an approach that accelerates cost recovery based on an index showing that equipment prices are declining over time may be consistent with the requirement to use economic depreciation.[307] Recovering more of the initial capital outlay for the asset in the early years would enable a carrier to recover less in later years, thereby allowing it to compete with carriers that have purchased new, lower-priced equipment in those later years.

---

[301] *See 1998 Biennial Review – Review of Depreciation Requirements for Incumbent Local Exchange Carriers*, CC Docket No. 98-137, Report and Order, 15 FCC Rcd 242, 257, para. 33 (1999) (*Biennial Review Depreciation Order*).

[302] *See id.* at 262-63, para. 48 ("We believe that giving incumbent LECs the right to select, for regulatory purposes, any depreciation rate allowed by GAAP [Generally Accepted Accounting Principles] is inappropriate as long as incumbent LECs reserve the right to make claims for regulatory relief based on the increased depreciation that would result from granting them that flexibility."); *id.* at 252-53, para. 25 (establishing waiver requirements).

[303] *See Inputs Order*, 14 FCC Rcd at 20344, para. 426.

[304] *See, e.g., Application by Verizon New England Inc., Bell Atlantic Communications Inc. (d/b/a Verizon Long Distance), NYNEX Long Distance Company (d/b/a Verizon Enterprise Solutions), Verizon Global Networks Inc., and Verizon Select Services Inc., for Authorization To Provide In-Region, InterLATA Services in Rhode Island*, CC Docket No. 01-324, Memorandum Opinion and Order, 17 FCC Rcd 3300, 3317, para. 30 (2002) (FCC lives) (*Rhode Island 271 Order*); *Joint Application by SBC Communications Inc., Southwestern Bell Tel. Co., and Southwestern Bell Communications Services, Inc., d/b/a Southwestern Bell Long Distance for Provision of In-Region, InterLATA Services in Kansas and Oklahoma*, CC Docket No. 00-217, Memorandum Opinion and Order, 16 FCC Rcd 6237, 6274, paras. 76 (2001) (financial lives) (*Kansas/Oklahoma 271 Order*), *aff'd in part, remanded in part sub nom. Sprint Communications Co. v. FCC*, 274 F.3d 549 (D.C. Cir. 2001).

[305] *Triennial Review Order*, para. 688.

[306] *Id.*, para. 690.

[307] *Id.*

Federal Communications Commission                           DA 03-2738

### 2.   Background

108.    Verizon advocates the use of financial reporting lives based on Generally
Accepted Accounting Principles (GAAP).[308]  It states that GAAP lives are appropriate for use in
a TELRIC model because they are reassessed annually to reflect the true economic life of the
assets.[309]  Verizon argues that GAAP lives are reasonable because they are comparable to those
used by competitive companies, such as IXCs and cable operators,[310] and they are longer than the
lives suggested in a study prepared by Technology Futures, Inc. (TFI).[311]  Verizon also argues
that the use of FCC regulatory lives is not appropriate in the context of UNE pricing because the
FCC regulatory lives were determined before the 1996 Act and could not possibly reflect the
competitive and technological environment assumed under TELRIC.[312]  Verizon argues that
competition reduces the life of an incumbent LEC's assets and increases the risk that assets will
become obsolete before the full investment is recovered.[313]

109.    Verizon asserts that the MSM proposed by AT&T/WorldCom fails to take
account of the change in price of capital goods, which is an important element of economic
depreciation.[314]  For example, Verizon identifies central office switches and fiber optic carrier
systems as types of equipment that have experienced declining prices in recent years.[315]
According to Verizon, failure to reflect declining prices in the depreciation calculation will result
in an understatement of depreciation expense, and TELRIC rates that are too low.[316]  Similarly,
Verizon states that the periodic revaluation of assets required by TELRIC means that carriers
must recover more of their investment in the early years of an asset's life in anticipation of
possible price reductions in the next rate proceeding.[317]  Although Verizon witness Dr. Hausman
suggests that this problem can be addressed by including a mark-up in the MSM to account for

---

[308]   Verizon Ex. 105 (Lacey Direct), at 3; Verizon Initial Cost Brief at 35.

[309]   Verizon Ex. 105, at 4-7; Verizon Initial Cost Brief at 35.

[310]   Verizon Ex. 106 (Sovereign Direct), at 12-15; Verizon Initial Cost Brief at 42.

[311]   Verizon Ex. 106, at 15-16.  Verizon does not rely on this study as the basis for its proposed asset lives.  Rather,
it refers to the study only in an attempt to demonstrate the reasonableness of its own proposal.  Verizon Reply Cost
Brief at 22.

[312]   Verizon Ex. 114 (Sovereign Rebuttal), at 4; Verizon Initial Cost Brief at 37-39.

[313]   Verizon Ex. 106, at 5-7; Verizon Initial Cost Brief at 38-39.

[314]   Verizon Ex. 111, at 12-14.

[315]   Id. at 14-15.

[316]   Id. at 14.

[317]   Id. at 16; Tr. at 3173.

economic depreciation of capital goods,[318] Verizon itself does not use such a mark-up in running its cost models or the MSM, nor does it use an accelerated depreciation mechanism that would more accurately reflect the effect of declining equipment prices.

110.     In response, AT&T/WorldCom argue that the proposal advanced by Dr. Hausman here is conceptually the same as the proposal he made on behalf of the United States Telephone Association in 1996, which was rejected by the Commission in the *Local Competition First Report and Order*.[319]  According to AT&T/WorldCom, its model uses forward-looking asset lives that reflect the technology and competition risks faced by Verizon, and there is no need for any additional mark-up to protect Verizon against the risk of under-recovery.[320]

111.     AT&T/WorldCom explain that the regulatory lives reflected in the MSM were forward-looking at the time the Commission adopted them, and the continued growth in incumbent LEC depreciation reserves suggests that those lives are more than adequate to reflect the impact of competition and technology in the current environment.[321]  AT&T/WorldCom argue that the intensity of competition does not change the useful life of the asset,[322] and that the ability to provide wholesale service through UNEs actually extends the life of an asset that otherwise might be stranded as a result of facilities-based competition.[323]  AT&T/WorldCom state that lives based on GAAP are inappropriate because GAAP is based on the principle of conservatism, which requires accountants to err on the side of using shorter lives (thereby increasing costs) in order to protect investors.[324]

### 3.     Discussion

112.     Based on the record before us, we agree with AT&T/WorldCom that FCC regulatory lives should be used for purposes of calculating UNE prices.  We adopt one modification to AT&T/WorldCom's proposal, however.  Specifically, we will use asset lives at the low end of the "safe harbor" range prescribed by the Commission in 1994 and 1995, and

---

[318]  Verizon Ex. 111, at 14-15.  Hausman also suggests a mark-up is needed to account for the effect of risk and uncertainty on sunk and irreversible investments.  *Id.* at 15-17.

[319]  AT&T/WorldCom Ex. 20 at 18-19 (citing *Local Competition First Report and Order*, 11 FCC Rcd at 15849, para. 686).

[320]  *Id.* at 26-27.

[321]  AT&T/WorldCom Ex. 3 (Lee Direct), at 6-8 (explaining how the shift to forward-looking projection lives has resulted in increased depreciation reserves); AT&T/WorldCom Initial Cost Brief at 95-96.

[322]  AT&T/WorldCom Initial Cost Brief at 105.

[323]  AT&T/WorldCom Ex. 9 (Lee Rebuttal), at 14-15; Tr. at 3362-62.

[324]  AT&T/WorldCom Ex. 9, at 4-6; AT&T/WorldCom Initial Cost Brief at 97-101.

Federal Communications Commission                           DA 03-2738

modified in 1999,[325] rather than the lives prescribed by the Commission for Verizon in Virginia in 1994. The safe harbor lives represent the Commission's most recent assessment of the forward-looking asset lives for each of the accounts. As explained below, we choose the low end of the safe harbor to be consistent with the competition and technology assumptions required under the Commission's TELRIC rules.

113.    We find that AT&T/WorldCom's proposal to use the asset lives prescribed by the Commission for Verizon in 1994 is not the best approach. In certain cases, the asset lives proposed by AT&T/WorldCom are too long to be consistent with the forward-looking principles upon which TELRIC is based. For example, they propose a 17-year life for digital switching equipment. Given that the Commission has allowed incumbent LECs to use a life as short as 12 years under the safe harbor, and as short as 10 years based on specific evidence presented by a carrier,[326] a 17-year life is inconsistent with forward-looking principles. Instead, Verizon should use the 12-year life that is the low end of the FCC safe harbor range.[327]

114.    Our determination to use FCC regulatory lives applies only where there is a dispute between the parties as to the appropriate asset life. In cases where the parties agree (e.g., a 30-year life for poles), there is no dispute for us to resolve. Similarly, we will adopt Verizon's proposal with respect to salvage percentages because it was not challenged by AT&T/WorldCom.[328] We note that there is no safe harbor range for buildings. Consequently, we will use the economic life of 46.93 years that the Commission used in the *Inputs Order*.[329] A complete list of the asset lives and salvage percentages to be used in establishing rates in this proceeding is found in Appendix A to this order.

115.    We reject Verizon's argument that FCC regulatory lives are not sufficiently forward-looking. The Commission has used forward-looking asset lives for some time in its regulation of incumbent LEC depreciation practices, and the asset lives that we adopt here are the most recent ones prescribed by the Commission. While Verizon asserts generally that technological advances and increased competition justify the use of shorter lives, it provides no

---

[325] *See Simplification of the Depreciation Prescription Process*, CC Docket No. 92-296, Second Report and Order, 9 FCC Rcd 3206 (1994); *Simplification of the Depreciation Prescription Process*, CC Docket No. 92-296, Third Report and Order, 10 FCC Rcd 8442 (1995). The Commission modified the range for digital switching in 1999. *See Biennial Review Depreciation Order*, 15 FCC Rcd at 247-48, para. 13.

[326] *See Prescription of Revised Percentages of Depreciation Pursuant to the Communications Act of 1934, As Amended, for GTE North, Inc./GTE South, Inc.*, FCC 99-369, Memorandum Opinion and Order, 15 FCC Rcd 1755 (1999); Verizon Ex. 114, at 9. Although the Commission allowed GTE to use a 10-year life for digital switches, we explain below that Verizon has not provided specific evidence in this proceeding that would justify the use of asset lives outside the safe harbor range.

[327] *See Biennial Review Depreciation Order*, 15 FCC Rcd at 247-48, para. 13.

[328] AT&T/WorldCom Ex. 9, at 2.

[329] *See Inputs Order*, 14 FCC Rcd at 20391, App. A, Part 3 (Capital Costs).

50

specific evidence to support its position.  For example, Verizon provides no studies or other documents explaining the anticipated technological advances that might cause it to retire plant more quickly than anticipated when the safe harbor was established (or modified in the case of digital switching), nor has it effectively rebutted AT&T/WorldCom's argument that new technology can extend the life of assets, as DSL technology has done with copper facilities.[330] Similarly, Verizon provides no evidence to demonstrate how increased competition has affected retirement rates since the asset lives we use were established, or how it might affect future retirement rates.

116.    We find that Verizon has not demonstrated that financial book lives are a more appropriate measure of the actual economic life of an asset.  Verizon did not document or explain in significant detail the methodologies, studies, or data that it, or its auditor, relied on in developing asset lives, nor did it demonstrate that these lives are in fact compliant with GAAP. As compared to our thorough understanding of the process by which the safe harbor lives were developed, Verizon has given us no real basis on which to conclude that the asset lives it proposes reflect the anticipated economic life of assets in a competitive market.

117.    For similar reasons, we find that Verizon's comparison of its proposed lives to the financial book lives used by IXCs and cable operators is unconvincing.  Even if we were to accept that the economic life of a LEC's assets is the same as the economic life of the assets of an IXC or a cable operator, we have no information on how those lives were developed and no basis upon which to find that they reflect the best estimate of the anticipated economic life of the assets.

118.    Verizon's argument that the TFI study validates its proposal is also unconvincing.[331]  As AT&T/WorldCom explain, the TFI study assumes that new technology will result in massive waves of retirements (e.g., replacement of copper cable by fiber-to-the-home facilities).  Although TELRIC assumes that the value of an incumbent LEC's network is constrained by the widespread deployment of the most efficient technology currently available, that does not mean it is appropriate to assume massive retirements of copper facilities.  Our finding here is entirely consistent with the Commission's most recent analyses of the TFI study.[332]  AT&T/WorldCom convincingly demonstrate that past TFI studies have been extremely aggressive in their projections, and that actual incumbent LEC retirements have proceeded at a

---

[330]  AT&T/WorldCom Ex. 9, at 14-15.

[331]  Verizon Ex. 106, at 15-16.

[332]  See Biennial Review Depreciation Order, 15 FCC Rcd at 249, para. 16 ("There is no evidence that the large wave of replacements forecast by TFI, which should result in increased retirements, has begun or is about to begin."); Inputs Order, 14 FCC Rcd at 20346, para. 428 ("[C]ommenters assert that technological advances and competition will have the effect of displacing current technologies, but offer no specific evidence that this displacement will occur at greater rates than the forward-looking Commission-authorized depreciation lives take into account.").

Federal Communications Commission                    DA 03-2738

much slower pace.[333]

119.    We agree with Verizon that, if equipment costs are falling, the effect of using straight-line depreciation in lieu of accelerated depreciation is an under-recovery of depreciation expense in the early years of an asset's life and an over-recovery in the later years.[334] Although the Commission's decision in the *Triennial Review Order* specifically authorizes state commissions to adopt an accelerated depreciation mechanism,[335] in this case neither of the parties to the arbitration proposed a measure of depreciation that uses accelerated depreciation to reflect the changing prices of capital goods over time.[336] Although Verizon witness Dr. Hausman suggests that a mark-up of Verizon's costs might cure this problem,[337] this was not part of Verizon's pricing proposal and Verizon did not provide sufficient information upon which we can assess the validity of the suggested mark-up.

120.    Similarly, Verizon has not demonstrated that the use of shorter asset lives is an appropriate substitute for using accelerated depreciation to reflect the effect of declining equipment prices.  The fact that switch prices are declining, as Verizon asserts, does not necessarily mean that the projected life of a switch will be shorter than it would be in a market with stable or rising switch prices.  Rather, the only conclusion we can draw from the declining prices is that a carrier should be able to recover more of its investment in an asset in the early part of the useful life of the asset.

121.    Based on the record before us, we are not able to determine whether, and how much, certain types of equipment prices would be expected to decline going forward,[338] and

---

[333]  *See* AT&T/WorldCom Ex. 9, at 8-11, Attach. 2.

[334]  If, on the other hand, equipment prices are expected to increase going forward, economic depreciation expenses would be lower in the early years of the assets' lives and greater in the later years.  A carrier in a competitive market could recover less of the initial capital outlay for such assets in the early years because they would compete in later years against entrants that have purchased new, higher priced assets in those years.  The effect of using straight-line depreciation in lieu of *decelerated* depreciation is an over-recovery in the early years of an asset's life and an under-recovery in the later years.

[335]  *Triennial Review Order*, para. 690.

[336]  The MSM includes an option to use accelerated depreciation, rather than straight-line depreciation, and AT&T/WorldCom used this option in running the MSM.  Because the MSM levelizes the amount of capital recovery (*i.e.*, the sum of depreciation and return on investment) so that it is the same each year, the effect of using the accelerated depreciation option is to reduce UNE rates.  This difference in UNE prices appears to be a result of the tax consequences of the two different depreciation options.  Consequently, because the levelization function in the MSM offsets the increased recovery that would be expected in the early years of the asset, running the MSM with the accelerated depreciation option is not the same as using accelerated depreciation to reflect the effect of declining equipment prices.

[337]  Verizon Ex. 111, at 14-15.

[338]  Similarly, we are not able to project whether, and how much, some equipment prices might be expected to rise going forward.

therefore we are not able to reflect economic depreciation in the rates we prescribe for Verizon. We do, however, consider the risk of under-recovery caused by the lack of economic depreciation in developing the cost of capital, and therefore our inability to establish economic depreciation rates does not mean the rates established in this proceeding are not compensatory.

### E.    Annual Cost Factors

#### 1.    Background

122.    The cost models presented by the parties convert investments into annual operating costs through the use of expense factors, or ACFs.  It is through the application of the ACFs to the amount of installed investment that we determine the annual costs (*i.e.*, expenses) of owning and operating the facilities and equipment needed to provide a particular network element.[339]

123.    The Commission addressed two types of expenses in the *Inputs Order*:  plant-specific expenses and common support services expenses.  Plant-specific expenses are the costs related to maintenance of specific kinds of telecommunications plant.[340]  In the *Inputs Order*, the Commission decided to calculate input values for plant-specific operations expenses as a percentage of investment, on an account-by-account basis.[341]  Common support services expenses include the cost of corporate operations (*e.g.*, legal and human resources), customer service (*e.g.*, marketing and billing), and plant non-specific expenses (*e.g.*, engineering and power).[342]  The Commission determined that common support services expenses should be calculated on a per line basis, rather than as a percentage of investment.[343]  For both types of expenses, the Commission determined that inputs should be based on nationwide averages, rather than the specific expenses of any individual carrier.[344]

#### 2.    Positions of the Parties

##### a.    Verizon

124.    Verizon's cost study presents a total of eight proposed ACFs:  (1) Depreciation, Return, Interest and Income Taxes; (2) Other Taxes; (3) Network; (4) Wholesale Marketing; (5)

---

[339]   Cost of capital and depreciation are discussed in sections III(C) and III(D).  The ACFs used in the cost models also include the cost of capital and depreciation expense.  In this section of the order we focus on operating expenses.

[340]   *Inputs Order*, 14 FCC Rcd at 20301, para. 341.

[341]   *Id.* at 20304, para. 346.

[342]   *Id.* at 20318-19, para. 377.

[343]   *Id.* at 20321, para. 382.

[344]   *Id.* at 20305, 20321, paras. 348, 382.