Westlaw.

PUR Slip Copy                                                                   Page 1
1996 WL 773774 (Mass.D.P.U.)
(Cite as: 1996 WL 773774 (Mass.D.P.U.))

H

        Re New England Telephone and Telegraph Company dba NYNEX
                         D.P.U. 96-73/74
                        D.P.U. 96-75, 96-80/81
                      D.P.U. 96-83, 96-94 - Phase 2

            Massachusetts Department of Public Utilities
                        December 03, 1996

Before Howe, chairman and Besser, commissioner.

BY THE COMMISSION:

APPEARANCES: Bruce P. Beausejour, Esq., 185 Franklin Street, Room 1403, Boston, MA 02107, and Robert N. Werlin, Esq., Keegan, Werlin & Pabian, LLP, 21 Custom House Street, Boston, MA 02110. FOR: NEW ENGLAND TELEPHONE & TELEGRAPH COMPANY D/B/A NYNEX. Petitioner. Keith J. Roland, Esq., Roland, Fogel, Koblenz & Carr, LLP, 1 Columbia Place, Albany, New York 12207 and Paul Kouroupas, Esq., David Hirsch, Esq., One Teleport Drive, Suite 301, Staten Island, NY 10311. FOR: TELEPORT COMMUNICATIONS GROUP, INC. Petitioner. Todd J. Stein, Esq., 2855 Oak Industrial Drive, Grand Rapids, MI 49506-1277. FOR: BROOKS FIBER COMMUNICATIONS OF MASSACHUSETTS, INC. Petitioner. Jeffrey F. Jones, Esq., Jay E. Gruber, Esq., Laurie S. Gill, Esq., Palmer & Dodge, One Beacon Street, Boston, MA 02108 and Michael J. Mornssey, Esq., Eleanor R. Olarsch, Esq., 32 Avenue of the Americas, Room 2700, New York, NY 10013. FOR: AT&T COMMUNICATIONS OF NEW ENGLAND, INC. Petitioner. Robert Glass, Glass Seigle & Liston, 75 Federal Street, Boston, MA 02110 and Hope Barbalescu, Esq., One International Drive, Rye Brook, New York 10573. FOR: MCI TELECOMMUNICATIONS CORPORATION. Petitioner. Cathy Thurston, Esq., 1850 M Street, N.W., Suite 1110, Washington, D.C. 20036. FOR: SPRINT COMMUNICATIONS COMPANY L.P. Petitioner. L. Scott Harshbarger, Attorney General, By: Daniel Mitchell, Assistant Attorney General, Public Protection Bureau, Regulated Industries Division, 200 Portland Street, 4th Floor, Boston, MA 02114. Intervenor.

                           *1 PHASE 2 ORDER

                           I.   INTRODUCTION

  This is a proceeding being held pursuant to the federal Telecommunications Act of 1996 ('the Act') and regulations issued thereunder by the Federal Communications Commission ('FCC') in its First Report and Order dated August 8, 1996. [FN1] The Act and the FCC regulations are designed to facilitate the introduction of competition in the provision of telecommunications services throughout the United States. The Act recognized that many of the physical facilities and operating systems needed to provide local exchange service in a given geographic area are owned and controlled by the incumbent local exchange carrier ('ILEC') and that it would be difficult and inefficient for potential competitors to duplicate these facilities and systems. Accordingly, under procedures set forth in the Act, each ILEC is required to engage in good faith negotiations with each telecommunications carrier who wishes to compete against it. The purpose of the negotiations is to establish the terms and conditions of service for the resale of ILEC services, the provisioning of certain telecommunications services, and other matters necessary (together, an 'interconnection agreement') that would enable the potential competitor to enter the marketplace under conditions that would promote robust competition.

  The Act and the regulations further provide for binding arbitration in the event that negotiations cannot be concluded within a specified time, upon petition to the state public utility commission by either party to the negotiation. 47 U.S.C.§ 252. This proceeding is the result of such petitions.

            © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

II.  PROCEDURAL ISSUES

A.   Procedural History

On July 16, 1996, Teleport Communications Group ('TCG') and New England Telephone and Telegraph Company, d/b/a NYNEX ('NYNEX'), respectively, filed petitions requesting arbitration pursuant to the regulations. They were docketed as D.P.U. 96-73/74. On July 18, 1996, Brooks Fiber Communications of Massachusetts, Inc. ('Brooks') filed a petition requesting arbitration pursuant to the regulations, which was docketed as D.P.U. 96-75. On August 9, 1996, AT&T Communications of New England, Inc. ('AT&T') and NYNEX, respectively, filed petitions requesting arbitration pursuant to the regulations. They were docketed as D.P.U. 96-80/81. On August 29, 1996, MCI Telecommunications Corporation ('MCI') also filed a petition requesting arbitration pursuant to the regulations, which was docketed as D.P.U. 96-83. On September 19, 1996, Sprint Communications Company L.P. ('Sprint') filed a petition requesting arbitration pursuant to the regulations, which was docketed as D.P.U. 96-94.

Upon agreement by the parties, Paul F. Levy was designated by the Department of Public Utilities ('Department') as the arbitrator for each of these proceedings. At a procedural conference held on September 18, 1996, it was determined that there was sufficient overlap in the issues presented in the various petitions and they were consolidated for hearing.

*2 The proceeding has been divided into four phases: Phase 1 covered issues which were determined by the parties to be ripe for an abbreviated hearing format. In that phase, parties submitted statements of positions and reply statements, no discovery took place, and a short hearing was held without witnesses to permit the arbitrator to ask follow-up questions of the parties' attorneys. The Department issued an Order addressing the issues in Phase 1 on November 8, 1996.

Phase 2 covered the issue of the appropriate amount by which NYNEX retail services will be discounted for resale. As envisioned by the Act, such prices are to be based on the retail rates charged for such services, excluding the portion attributable to costs that would be avoided by the ILEC in the wholesale provisioning of such services. 47 U.S.C. § 252(d)(3). It is the review of avoided cost studies and other associated matters that was the subject of Phase 2 prefiled testimony, discovery, and evidentiary hearings. Phase 3 covered other non-cost study issues that were too complex to be handled in the abbreviated format of Phase 1, and consisted of prefiled testimony, discovery, and evidentiary hearings. Phase 4 covered the issue of the appropriate pricing for unbundled network services and combinations of unbundled network services, and these matters also were the subject of prefiled testimony, discovery, and evidentiary hearings.

In Phase 2 of this proceeding, prefiled testimony and exhibits were filed by NYNEX, AT&T, MCI and Sprint. TCG and Brooks did not participate in this phase. Those documents, plus all information responses, were introduced into evidence. This evidence was supplemented by oral testimony and record requests from a number of witnesses at hearings on October 21 and 22, 1996. At these hearings, NYNEX presented John H. Krzywicki, president of Cambridge Strategic Management group; Dr. William E. Taylor, senior vice-president of National Economic Research Associates, Inc.; and Paula L. Brown, managing director at NYNEX. AT&T presented Douglas K. Goodrich, from AT&T, and Dr. William B. Tye, principal at the Brattle Group. MCI presented Annette S. Guariglia, senior regulatory analyst, local competition policy at MCI. Sprint presented James O. Carlson, group manager, state external affairs, at Sprint. Briefs were submitted on November 13, 1996 and reply briefs on November 18, 1996.

B.   Status of Rates Set in this Arbitration

1.   Introduction

On October 15, 1996, the Federal Court of Appeals for the Eighth Circuit issued a stay of certain portions of the FCC regulations, including those portions setting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                        Page 3
1996 WL 773774 (Mass.D.P.U.)
**(Cite as: 1996 WL 773774 (Mass.D.P.U.))**

forth the required methodology to be used by the states in determining the rates for resale of services and unbundled network elements. Iowa Utilities Board v. FCC, No. 96-332, Order Granting Stay Pending Judicial Review filed October 15, 1996, left stand by the United States Supreme Court on November 12, 1996. As the pricing testimony filed in this proceeding by all parties was predicated on the FCC requirements, it was necessary to reach an agreement among the parties as to the appropriate manner of proceeding in this case in light of the Court's order. At the hearing of October 21, 1996, all parties agreed that Phase 2 and Phase 4 of this proceeding would go forth as though the FCC regulations had not been stayed, in order to ensure a timely completion of this arbitration (Tr. 1, at 4-10). However, recognizing that the Court's ruling might affect the ultimate rules under which pricing of services and unbundled network elements would be determined, the arbitrator asked the parties to submit briefs on the following question: in light of the Court's ruling, what is the appropriate status of the rates determined in this arbitration? For example, should they be considered interim rates subject to reconciliation, should they be deemed interim rates not subject to reconciliation, or should they be deemed something else? (Tr. 2, at 53-54). Before addressing the issues raised in Phase 2 of the arbitration, we first turn to this question.

2.    Positions of the Parties

  *3 In its brief, NYNEX states that, in the absence of the FCC's Order, it would have submitted a significantly different case on the costs and prices for unbundled network elements, interconnection, and the resale of its services. It notes that the Department need not accept the methodologies used by the FCC. It therefore argues that it should be given an opportunity to present a case which it believes conforms with the Act as to all cost and pricing issues. Thus, it asserts that the rates established in this proceeding cannot be final rates; they should be effective only until the Department reviews the cost and pricing principles that NYNEX believes conform with the Act and Department policies. NYNEX suggests that this review take place as soon as reasonably practicable following a decision in this proceeding. The rates in this proceeding, it argues, should be expressly deemed temporary and subject to adjustment based on further Department consideration in a future proceeding of cost and pricing issues (NYNEX Initial Brief at 3-5). The language chosen by NYNEX leaves some ambiguity as to whether rates being 'subject to adjustment' refers to only a prospective adjustment or whether the company advocates a reconciliation, or true-up,

  AT&T states that the Department is free, notwithstanding the stay of the FCC Order, to adopt the FCC costing and pricing methodology as its own. It believes that the Department should do so based on the record in this proceeding. Thus, there would be no need to fix interim rates. If, on the other hand, the Department declines to make such a finding, says AT&T, any party to the arbitration will be able to seek to reopen these issues if and when there is any final decision changing the law. It would be in that proceeding, argues AT&T, that it would be appropriate to discuss whether any reconciliation between the prices established in this proceeding and the future proceeding is either necessary or appropriate (AT&T Initial Brief at 34-35).

  MCI opposes any true-up between the interim rates established in this proceeding and whatever final rates might be determined by the Department in a later proceeding. It states that such a true-up would create a large commercial burden on parties and companies that have relied on the rates established in this proceeding to conduct their businesses (Tr. 1, at 7).

3.    Analysis and Findings

  We face conflicting pressures in deciding this issue. Assuming the FCC order is stayed for the indefinite future or overturned, it is conceivable that the Department could, as part of a regular docket, establish costing and pricing methodologies for resold services and unbundled network elements that are different from those adopted by the FCC. Yet, this arbitration, which is facing a short statutory deadline, is relying on the FCC formulation to determine prices. There is a reasonable likelihood that the prices derived under these two methodologies would be different. Thus, using the arbitrated prices, it is possible that competing local

          ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exchange carriers will either be charged 'too much' or 'too little' for the services rendered by NYNEX, who in turn, will either collect 'too much' or 'too little' for those same services. This is a result of the legal situation facing the Department and all of the carriers.

***4** The major question facing the Department, given these circumstances, is whether the revenues collected pursuant to the rates established in this arbitration should be collected subject to reconciliation if the Department decides on its own costing and pricing methodologies. We conclude that they should not. While it is clearly important for NYNEX and the competitive carriers to have fair rates for the services in question, as a part of securing the benefits of competition to Massachusetts, it is equally important for all of the carriers to have a degree of certainty as the local exchange market is opened to competition. We cannot overstate the difficulties faced by NYNEX and the other carriers in carrying out the network logistics, the operational changes, and the marketing necessary to compete effectively in the Massachusetts local exchange market. If, in addition to those challenges, companies are told that the amount they pay or receive for services is subject to later refund or surcharge, it would create an untenable level of financial confusion. We conclude that such a level of confusion and uncertainty would be deleterious to our overall goal and that of the Act, to create an environment that encourages robust competition. Thus, we cannot agree with AT&T that the decision over whether rates should be subject to future reconciliation be left to a future proceeding. We reach that conclusion cognizant of the fact that the rates we set in this arbitration might not be the ones we would set based on the Department's own criteria, but we make the judgment that any interim inequities from the arbitrated rates would be more than offset by the logistical and financial nightmare created by announcing that such rates would be subject to reconciliation at some unknown time in the future.

We have considered whether, in this proceeding, we could and should reach conclusions concerning the appropriate pricing methodologies for resold services and unbundled network elements. We have determined that we could not and should not. There is no record on this proceeding on which to base such a determination. Indeed, the arbitrator and the parties agreed that this proceeding would go forward using the FCC's methodologies, and evidence was not presented as to the appropriateness of those methodologies or alternatives. Recognizing the importance of this issue, however, the Department will shortly conduct an investigation and give expedited consideration to these matters.

III.  ISSUES

A.   General Avoided Cost Study Issues

We now turn to the issues designated for Phase 2. In reviewing these issues, we are guided by two sections of the Act. The first, Section 251(c)(4), requires an ILEC to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers. See 47 U.S.C. § 251(c)(4). The second, Section 252(d)(3), states that a 'state commission shall determine wholesale rates on the basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collections, and other costs that will be avoided by the local exchange carrier.'See 47 U.S.C. § 252(d)(3). The importance of setting appropriate rates for resale to ensure fair competition is obvious. As noted by the FCC, 'resale will be an important entry strategy for many new entrants, especially in the short term when they are building their own facilities.'Local Competition Order  at ¶  907. Our goal should be to establish rates for resellers that only pay for the costs incurred by the ILEC to supply the wholesale services they are using and not the costs incurred by the ILEC to supply retail services with which they are competing.

***5** The FCC has defined avoided costs as 'those costs that an incumbent LEC would no longer incur if it were to cease retail operations and instead provide all of its services through resellers.'Local Competition Order  at ¶  911. The FCC sets forth specific Uniform System of Accounts ('USOA') categories that are presumptively

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                                Page 5
1996 WL 773774 (Mass.D.P.U.)
**(Cite as: 1996 WL 773774 (Mass.D.P.U.))**

avoidable or non-avoidable in paragraphs 917 through 919 of the Local Competition Order. In so doing, it permits the ILEC to rebut the presumption that certain expenses are not avoidable. Certain overhead and support accounts ('indirect expenses') are presumed to be avoided in proportion to the avoided direct expenses, based on a finding by the FCC that expenses recorded in these accounts are tied to the overall level of operations in which an ILEC engages. Local Competition Order at ¶ 918. In addition, plant-specific and plant on-specific expenses are presumptively not avoidable, and thus are subject to a demonstration by other parties that they can reasonably be avoided when an ILEC provides service for resale to a competing carrier.

The general methodology to be applied in this portion of the proceeding is to determine the percentage of NYNEX expenses (as a fraction of revenues) that are avoidable in sales for resale and apply that percentage discount to the retail rate for each service, deriving a wholesale rate that has the effect of excluding costs avoided by NYNEX. For this proceeding, NYNEX has used expense and revenue figures from calendar year 1995 in determining the wholesale rate discount.

This formulation is quite different from that which would generally be employed by the Department in a general rate case, in which a company's revenue requirement would be established and then allocated over various classes of service. In such a rate case, the Department would determine which costs are allowable or not allowable for purposes of setting rates, which categories and items of plant and equipment were used and useful, what level of depreciation was appropriate for each plant account, what cost of capital and capital structure should apply, and so forth. Then, using cost-based or non-cost-based allocators, the resulting revenue requirement would be apportioned across the variety of services and/or customer groups served by the company. Finally, a rate design for each customer class and service would be developed, reflecting to the extent possible, the marginal cost of each such service.

Here, we are not conducting a rate case. We are not reviewing the prudence of operating expenses, we are not reviewing the decisions of management with regard to plant investment, and we are not reviewing the level of risk of the company to determine the appropriate capital structure or cost of capital. We are not reallocating NYNEX's revenue requirement to determine what percentage should be allocated to a group of existing wholesale customers and what percentage should be apportioned to existing retail customers. We are not visiting the issue of the design of rates for each service. We are, instead, defining a ratio of avoided costs to revenues, in the aim of producing a percentage discount which will be applied to current retail rates to derive the wholesale rate for NYNEX's services. [FN2]

*6 In this sense, to carry out the Act and the FCC regulations, we must establish a hypothetical telecommunications company and impute the characteristics of that hypothetical to the current set of accounts of NYNEX (a set of accounts, we note in passing, that was not designed for this purpose at all.) How the accounts of that hypothetical company are 'constructed' is key to our determination on a number of issues. In this case, two versions of that construction are offered.

In the NYNEX version, the company examined each cost and determined which costs were sensitive to the volume or presence of retail services. Those costs which would decrease when a service is supplied through a wholesale channel were treated as avoidable costs. Costs that were insensitive to the volume or to whether they are provided at wholesale or retail were not treated as avoidable costs. Thus, NYNEX determined which costs it would avoid as it shifted from being a retail supplier to a wholesale supplier, and it states that this methodology is inherent in the use of the term 'avoided cost' in the Act and the FCC Order. It contrasts this 'top-down' methodology with a 'bottoms-up' approach that would be used to estimate the forward looking costs of a specific network element, such as is required elsewhere in the Act. NYNEX states that, under its approach, the rates for wholesale service would be established so that NYNEX would be indifferent to whether it sells its services at retail or at wholesale (Tr. 1, at 76-81).

In contrast, AT&T's approach creates a ratio based on those costs that NYNEX would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                                Page 6
1996 WL 773774 (Mass.D.P.U.)
**(Cite as: 1996 WL 773774 (Mass.D.P.U.))**

incur in providing wholesale service, excluding any costs (e.g., volume insensitive, or fixed, costs) incurred by the incumbent in supplying the retail services with which the other carriers compete. AT&T states that this 'bottoms-up' approach is appropriate because NYNEX should not have an automatic recovery of fixed costs from its competitors; it should be highly motivated to compete with new entrants and attempt to recover its fixed costs in the marketplace. To do otherwise, argues AT&T, would be to confer a competitive advantage on NYNEX at the expense of its competitors. Accordingly, under this approach the rates would be established to provide NYNEX with a clear incentive to sell at retail, rather than at wholesale, since it is through those retail sales that NYNEX would recover its fixed costs (Tr. 2, at 14-21).

The resolution of this debate is not informed by the Act or the Local Competition Order, where the terms 'avoided¢ =BQP:0018¢ =' and 'avoidable' are used without specific reference to the kind of definitional problem set forth so clearly by NYNEX and AT&T. As a finding on this conflict is determinative of some of the issues in this case, we turn to resolve this debate now.

We are trying to create a hypothetical wholesale telecommunications company and determine what its rates would be to resellers if it were run efficiently. In reaching this determination, we are not attempting to conduct a bottoms-up incremental cost study for resale of local exchange service. That, as we see in Phase 4 of this proceeding, would involve a determination of forward-looking technologies, investment levels, cost of capital, depreciation rates, and joint and common costs. Instead, our base is the current books of account of NYNEX, as the company now exists. Using these figures, we are trying to create a ratio that realistically reflects a forward-looking view of avoided costs, assuming a hypothetical company that delivers only wholesale services. Inclusion of fixed costs that are clearly related to the provision of retail services, but not to the provision of wholesale services, would be at variance with the purposes of this exercise. The fact that NYNEX has incurred volume insensitive retail-related costs in the past is not relevant to level of forward-looking fixed costs that would be faced by an efficiently operated wholesale company. While these retail-related costs might not be 'avoidable' in one sense of the word, i.e., they exist and are fixed for NYNEX as NYNEX today exists, they are certainly avoidable from the point of view of an efficiently operating wholesale company, the 'NYNEX' we must construct as the hypothetical. Thus, we conclude that it is appropriate to define previously incurred volume insensitive retail-related costs as avoidable for purposes of creating the avoided cost ratio in this proceeding, in that those costs would not have existed in a wholesale company.

B. Specific Avoided Cost Study Issues

1. Introduction

**\*7** In his request for briefing, the arbitrator asked that, at a minimum, the following issues be addressed with regard to estimating avoided costs for the purpose of establishing the prices for resold services:

(1) Advertising: (a) Should NYNEX's current retail rates contain advertising expenses?, and (b) If so, should these expenses and product management expenses be considered avoidable?

(2) Indirect expenses: (a) Should the indirect-expense ratio used in the avoided cost study be based on the ratio of avoided direct expenses to total direct expenses, or on the ratio of avoided direct expenses to total expenses, or on some other measure?, and (b) What is the appropriate treatment of certain specific indirect expense categories, including executive, planning, accounting and finance, external relations, legal, other general and administrative, research and development, and uncollectible expenses?

(3) O&DA: Which accounts are properly includable in the operator and directory assistance ('O&DA') cost calculation? and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(4) Separations Issues: Should separated or unseparated costs and revenues be employed in the avoided cost study? (Tr. 2, at 51-53).

The arbitrator also invited parties to identify other issues for consideration by the Department. Issues submitted by the parties included the following:

(1) Does the NYNEX cost study rely on unreliable and unauditable data, as claimed by MCI?

(2) Are the avoided cost discounts established for residential and business services not sufficiently verifiable, as claimed by MCI?

(3) Should the Department establish five categories of service and determine a discount for each one, as recommended by Sprint? and

(4) What is the appropriate treatment of the customer services expense account?

2.  Do NYNEX's Current Retail Rates Contain Advertising Expenses ?

a.  Positions of the Parties

NYNEX claims that advertising expenses are not included in retail rates. Citing the Department's Order in its last general review of NYNEX's rates, NYNEX, D.P.U. 94-50 (1995), NYNEX asserts that retail customers are not paying for advertising expenses. Thus, it claims, these expenses should not be considered as potentially avoidable for purposes of determining the wholesale rate discount.

AT&T asserts that NYNEX is in error, that such expenses clearly were incurred by NYNEX in 1995, that they are financed by its current retail rates, and that they should be considered avoidable for purposes of establishing the wholesale discount.

b.  Analysis and Findings

To determine which party's proposal provides a better description of which costs are potentially avoidable costs for purposes of establishing the wholesale rate discount, we must carefully describe what is meant by the idea of expenses being 'in' retail rates. NYNEX takes the view that an expense is not in retail rates if the expense item was not approved by the Department for inclusion in rates paid by Massachusetts retail customers. AT&T takes the position that, regardless of the Department's determination in a prior rate proceeding, an expense is in retail rates if NYNEX is spending money in that category of expenses and if NYNEX is profitable (i.e., revenues exceed expenses).

*8 It is uncontroverted here that the Department established retail rates for NYNEX that excluded advertising expenses, but, notwithstanding this rate determination, NYNEX chose to spend money on advertising. In its price cap filing, D.P.U. 94-50, NYNEX was required to identify the level of advertising expenses it had incurred in its test year, to demonstrate -- absent such expenses -- the reasonableness of NYNEX's earnings. The Department determined in that case that NYNEX's current rates were reasonable as starting rates for price cap regulation, regardless of the amount it had spent on advertising. D.P.U. 94-50, at 366-367, 498.

While that determination was of interest in setting NYNEX's price cap, we are not here conducting a retail rate review to determine which expenses would be allowable under Departmental rules and policies. We have made this point at length above. We are, quite simply, looking at what NYNEX spent in 1995 and determining what portion of those expenses would be avoided in the provision of wholesale service, with the purpose of creating a ratio of avoidable expenses to 1995 revenues to determine an appropriate wholesale discount. The approach recommended by NYNEX on the advertising issue, if logically extended to other expense categories, would require the Department to undertake a rate-case-like review of every expense item included by the company in the 1995 calendar year figures. It would require a determination of whether each such item would have been deemed appropriate for inclusion in retail rates. As we have discussed above, notwithstanding the fact that such a review would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be infeasible in the limited amount of time available for this arbitration, we would in any event decline to conduct such an analysis because it is not germane to the issue at hand.

The company's operations are not regulated in the manner suggested by NYNEX's approach on this issue. Rates are set, and the company spends as it wishes into the future. In the instant proceeding, we must review how money was spent, not how it might be viewed by the Department in a future rate proceeding. NYNEX did spend the money in question. Accordingly, we find that advertising expenses are properly included in our analysis of NYNEX's avoidable expenses, and it is to the issue of whether they are avoidable that we now turn. [FN3]

3.  Are Advertising and Product Management Expenses Avoidable ?

a.  Positions of the Parties

NYNEX asserts that advertising costs are not avoidable, contending that product advertising is not merely a retailing function and that NYNEX would advertise to expand the developing market for its wholesale services. Thus, it argues that NYNEX would continue to advertise as a wholesaler and promote the use of its network services, since higher retail sales by resellers would translate into higher wholesale sales by NYNEX. It offered testimony by Dr. Taylor and Mr. Krzywicki in support of this viewpoint (NYNEX Exhs. 1, 2, and 3).

*9 AT&T and MCI argue that inclusion of retail advertising expenses in wholesale rates would effectively permit NYNEX, as a monopoly provider of wholesale service, to tax its retail competitors in order to finance advertising campaigns against it. They contend that the examples NYNEX has presented of wholesale advertisers are not relevant to this case, where NYNEX will have an essential monopoly over the provision of resold services. They argue that, in the examples given by NYNEX, wholesalers face competition and therefore have a commercial interest in helping their resellers distinguish the underlying wholesale provider.

NYNEX also states that the costs of product management functions are not avoidable. It argues that these functions -- market research, cost analysis, demand forecasting, and tariffing -- will be largely unchanged in a wholesale environment. For example, NYNEX states, it will have to undertake market research and demand analyses to determine the products and services that customers need and that resellers will want to offer.

AT&T disagrees, saying that resellers will have a sharp, compelling interest in determining market demand for new products and will provide such functions. It argues that it would no longer be efficient for NYNEX to spend scarce dollars on such activities. In any event, argues AT&T, since NYNEX will also be selling retail services, inclusion of these costs would represent an unwarranted subsidy by other competitors of NYNEX's retail offerings.

b.  Analysis and Findings

The FCC has determined that NYNEX bears the burden of rebutting the presumption that product advertising costs are avoidable. Local Competition Order at ¶ 917. As Dr. Taylor correctly notes, the standard of review set forth by the FCC for this issue is whether, if NYNEX were an efficiently run wholesale company, it would spend money on advertising the services it sells for resale (Exh. NYNEX-3, at 6). The question rises or falls on whether there would be commercial value to NYNEX in conducting such advertising under this scenario. We find below that, for the foreseeable future, where carriers are dependent on NYNEX for the underlying facilities that make possible the retail sale of residence and business exchange service, such commercial value is nonexistent. Thus, we conclude that NYNEX has not rebutted the presumption and that advertising expenses should be considered avoidable for purposes of determining the wholesale discount.

In a monopoly wholesale marketplace, the wholesaler has an interest in expanding its business, but retailers have precisely the same interest. Retailers also have an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                                  Page 9
1996 WL 773774 (Mass.D.P.U.)
**(Cite as: 1996 WL 773774 (Mass.D.P.U.))**

interest in promoting their service over those of other retailers, but the wholesaler is neutral with regard to those market share issues. Its market share, after all, will remain at 100 percent regardless of the distribution of customers among the retailers. If we envision a marketplace in which retailers are reasonably astute in determining how much they need to spend on advertising to maximize their profitability, that will be all the advertising that is required. There would be no need in such a market for NYNEX, as an efficient wholesaler, to advertise at all.

**\*10** The examples of wholesaler advertising presented by NYNEX are not relevant to the case at hand. All of the companies mentioned by NYNEX witnesses face wholesale competition for their services. Thus, they have an interest in distinguishing their product from other wholesalers (see, e.g., Tr. 1, at 54). In contrast, the examples offered by Dr. Tye are more relevant (Tr. 2, at 32- 33). We note, for instance, NYNEX's current provision of wholesale access service to long-distance carriers. In this arena, NYNEX offers a virtual monopoly, and it does not spend advertising money to support the retail long-distance service of the interexchange carriers. Likewise, natural gas pipelines providing monopoly service to local gas distribution companies do not advertise to support the retail operations of those retailers.

For these reasons, we find NYNEX's evidence unpersuasive and conclude that advertising expenses should be considered an avoidable cost for purposes of calculating the wholesale discount for resold services.

The product management expenses are another matter. Here, AT&T is applying the wrong standard when it suggests that we should be concerned that other carriers would be subsidizing NYNEX's retail operations. For purposes of our hypothetical, we must assume that NYNEX is providing only wholesale services. Our standard of review, as in the case of advertising, is whether an efficiently run NYNEX wholesale company would be likely to spend funds on product management. We find that NYNEX has presented a persuasive case that it would be likely to do so (Exh. NYNEX-2, at 8). A wholesale company could be expected to engage in some marketing activities to better understand the underlying and potential demand for current and new services. By providing better and expanded lines of such services, it would create value for its retailers and thereby improved business opportunities for itself. In addition, such a wholesale company would continue to face tariffing and other regulatory requirements. Accordingly, we find that a portion of these costs should be considered not avoidable for purposes of constructing the wholesale discount.

In the Local Competition Order, the FCC addressed this issue and reached the same conclusion for purposes of establishing default wholesale discount ranges. Local Competition Order at ¶ 928. The FCC assumed that ten percent of costs in this account should be considered not avoidable, but unfortunately no reviewable support is given for this figure. The 'lack of evidence' cited by the FCC in its order is parallel to that presented here by NYNEX. NYNEX asserts that all of these costs are unavoidable because spending on product management will increase in a wholesale environment (Exh. NYNEX-1, at 4, 29). This assertion has no substantive support. It is vague conjecture about 'a whole new layer of product management complexity,' that, for example, gives no consideration to the potential for joint product management activities between the wholesale company and its resellers or to any other factors which might reduce rather than increase this level of expenditure. While we would be willing to treat a portion of these costs as unavoidable, we cannot accept an unsupported assertion that all of the costs are unavoidable. Accordingly, we must conclude that NYNEX has not met its burden of proof, and it has therefore not overcome the FCC's presumption that this account should be considered avoidable.

4.   Definition of the Indirect-Expense Ratio

a.   Positions of the Parties

**\*11** Indirect expenses include overhead and support expenses (Accounts 6121- 6124, 6711, 6612, 6721-6728, and 5301) that are difficult to allocate to specific functions within an ILEC. The FCC, recognizing that it is difficult to conduct an account-by-account analysis to distinguish among indirect costs as to which are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

avoidable and which are not, has stated that a surrogate may be used. Indirect costs are 'presume to be avoided in proportion to the avoided direct expenses' because 'expenses recorded in these accounts are tied to the overall level of operations in which an incumbent LEC engages.' Local Competition Order at ¶ 918. NYNEX uses the ratio of avoided direct costs to total costs as the allocation factor for determining indirect costs. AT&T says this is incorrect and that the appropriate ratio is the percentage of avoided direct costs to total direct costs.

b.  Analysis and Findings

We agree with the position set forth by AT&T. We recognize, along with Dr. Taylors at the design of an indirect expense allocator is somewhat arbitrary (Exh. NYNEX-3, at 11-12). The FCC, as noted, relies on the assumption that indirect costs are related to the volume of services sold. While that assumption may be wrong, it is not clear whether it overstates or understates the relationship between volume and sales. In any event, it is the surrogate determined to be appropriate by the FCC, on whose Order we are basing this portion of this proceeding. We are left to determine how to define the allocator.

Mr. Goodrich is correct that the NYNEX formulation is logically weak (Exh. AT&T-2, at 22). A ratio constructed by dividing avoided direct expenses by total expenses simply does not mean much. The 'total expenses' portion already contains all of the indirect expenses, the number we are seeking to divide into avoidable and unavoidable fractions. Its inclusion in this fraction therefore seems to have as its main virtue the production of a relatively low indirect cost ratio. In contrast, the ratio of avoided direct expenses to total direct expenses offers consistency in the numerator and denominator of the fraction. In the absence of a reason to believe that indirect costs would be differently divided between avoidable and unavoidable as direct expenses, it is reasonable to apply that same ratio to total indirect costs.

5.  Treatment of Certain Specific Indirect Expense Categories

a.  Positions of the Parties

i.  NYNEX

Although the FCC has determined that we may presume that the indirect-expense ratio properly sets which portion of the indirect cost accounts is avoidable, NYNEX has chosen to attempt to rebut this presumption with regard to a number of such accounts. It has sought to demonstrate that some indirect expenses will not be reduced at all as the company shifts from a retail to a wholesale operation. Other expenses, its states, may decline but will not necessarily be reduced in the same proportion as direct expenses. In support of this contention, NYNEX notes that the switch to wholesale service will not result in an underlying change in many of its physical facilities, nor in the usage of those facilities by customers. Thus, it argues, many of its costs will not be reduced because they are related to the volume of business rather than the distribution channel (i.e., wholesale versus retail.) NYNEX states that its case-by-case review of accounts is supported by economic theory, noting that there is no economic support for the notion that NYNEX's common or overhead costs will be reduced in the same proportion as its direct retail sales are reduced as a result of resale competition. NYNEX also argues that its common and overhead costs span all activities and would be avoided only if the company shut down substantially all of those activities.

*12 In its cost study, NYNEX concludes that the following accounts are not avoidable: executive; planning; general accounting; connecting company relations; regulatory and governmental relations; legal; accidents, damages and settlements; other general and administrative; research and development; and uncollectibles.

ii.  AT&T

AT&T argues that NYNEX has not met its burden of rebutting the FCC's presumption. It states that NYNEX's approach treats 42 percent of the indirect accounts as not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

avoidable based on nothing more than an assertion that such expenses would continue. It argues that NYNEX has confused the fact that a type of expense will continue with an unsupported prediction that the level of the expense will continue. AT&T presents an account-by-account rebuttal to NYNEX's assertions.

iii.   MCI

MCI, too, finds fault with NYNEX's methodology, stating that it should have applied the indirect-expense ratio to the above-referenced accounts. It argues that the assertion by NYNEX that these account are unavoidable is unreasonable and contradicts the methodology and rationale set forth in the Local Competition Order. MCI believes that the rationale for the FCC's presumption that these accounts are avoided in a wholesale-only environment is sound.

b.   Analysis and Findings

The FCC properly recognized the difficulty of undertaking an account-by-account review of indirect expenses to determine which percent of each account is avoidable in a wholesale environment. Here, NYNEX has attempted to do so for the accounts mentioned, and its attempt illustrates the wisdom of the FCC's approach. As AT&T notes, NYNEX has postulated that entire indirect expense categories are not avoidable, and in so doing, it has confused the idea that a type of expense will continue with an unsupported prediction that the level of the expense will also continue. NYNEX is correct that the FCC's approach does not have strong economic support, but that is because there is no approach that does have a strong theoretical economic basis. We must recall the purpose of the exercise: looking at NYNEX's historical indirect costs under a retail environment, we are trying to calculate an appropriate measure of its indirect costs under a wholesale environment. This exercise is difficult enough to accomplish when viewing the company's direct expenses; how much more so when reviewing common costs. [FN4] NYNEX has attempted to provide a rationale, for each indirect cost account, as to why that account is not avoidable (Exh. NYNEX-5, at 20-21). We have considered the descriptions offered by NYNEX and find them uniformly unsupported and unsupportable. While we will not go through each account in detail, we will give several examples here to illustrate the point. The problem is not that NYNEX could make a more supportable case with more data. The problem is that data do not exist and that the company cannot present a supportable case given the nature of the expenses in question. It is for this precise reason that the FCC chose to create the indirect-cost ratio as a surrogate for an essentially unachievable account-by-account approach.

*13 Executive: NYNEX says that it will still need 100 percent of a company president and related officers in a wholesale environment. However, as AT&T notes, in a wholesale environment, a number of the responsibilities of management will be shed (e.g., advertising, and billing and collection from hundreds of thousands of accounts). Thus, with fewer responsibilities to discharge, fewer positions would be required in a resale environment. As we discuss below, NYNEX itself has recognized that over 89 percent of its customer services account (Account 6623) expenses would disappear in a wholesale environment. It is inconsistent to assert here that there would be no effect of this reduction on the executive expenses.

Planning: NYNEX claims that the costs of developing and evaluating long-term courses of action for the future operations of the company is required for any company and will not diminish in a resale environment. AT&T correctly asser,ts that this conclusion implies that none of NYNEX's current planning activities relates to marketing, sales, billing, collections, or any other retail functions. Such an assumption clearly has no merit.

General accounting: NYNEX states that the general accounting functions such as journals, ledgers and financial reports will continue to be required in a resale environment. This is, of course, true, in that the category of expenses will continue to exist, but, as AT&T argues, the level of expenses would be reduced. With the elimination of retail marketing, billing, collection and sales functions, there will be fewer functions and activities whose costs are recorded in the financial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reports and therefore fewer resources will be required to prepare them.

Regulatory and government relations: NYNEX states that these would continue at the same level in a resale environment. While there would certainly be a continuation of some level of expenses in these accounts, others would just as certainly be avoided, e.g., the cost of processing a large number of retail billing and collection complaints at the Department.

Accidents, damages and settlements: NYNEX asserts that all of these expenses will exist at the same level in a wholesale environment. This implies, as noted by AT&T, that there are absolutely no accident and damage claims that relate to retail functions. We agree with AT&T that this is implausible.

Finally, we turn to a last example, uncollectibles: NYNEX agrees that 100 percent of retail uncollectibles would be avoided in a resale environment but states that this would be offset by an increase in wholesale uncollectibles. In support of this proposition, NYNEX notes that its retail uncollectible rate is currently two percent of revenues, but that the experience of some interexchange carriers in selling to resellers indicates that the uncollectible and disputed billing adjustment can be over three percent.

We again are dealing with an uncertain situation with regard to this issue, but there is guidance from NYNEX's current experience. At present, NYNEX serves many retail customers, but it also provides carrier access service to interexchange carriers. For the latter, its uncollectible experience is .05 percent (Tr. 1, at 219). Ms. Brown indicated at this figure level of uncollectibles is 'an artificially low number' because it does not include large adjustments to carriers and billing disputes which go on for long periods of time, after which the money is written off. This may be true, but it is also true that NYNEX offers billing adjustments to retail customers that are not booked as uncollectibles, and that, as an accounting matter, after a certain period, disputed money must be written off for these customers as well.

**\*14** If we were conducting an account-by-account determination of avoided indirect costs, we would conclude that NYNEX's uncollectible experience with interexchange carriers is a more relevant indicator than its experience with retail customers because these customers are closer in character to the type of wholesale customers NYNEX will service in a resale environment. Accordingly, we would be justified in using the uncollectible avoided cost figure based on the uncollectible experience of NYNEX with its interexchange carrier customers, i.e., 99.5 percent avoidable. We do not do so, however, for the same reasons we have stated for the other indirect expense accounts.

In summary, it is the nature of indirect expenses that it is difficult to determine their causality. For example, it would be extremely difficult to hypothesize what percentage of executive salaries, legal expenses, and so on would be avoidable if NYNEX operated solely in a wholesale environment. Nonetheless, it is reasonable to expect that, were NYNEX's retail business to diminish, so would its accompanying overhead and support expenses. This uncertainty is the reason that the FCC proposed the use of an indirect expense allocator for these accounts, and this premise is the underlying basis for its choice of allocator. We cannot accept NYNEX's rebuttal to this presumption that these accounts represent unavoidable costs. Accordingly, we conclude that the FCC presumption should hold, that all indirect accounts should be subjected to the indirect-expense ratio to determine which portion is avoided for purposes of determining the wholesale discount.

6.   Operator and Directory ('O&DA') Assistance Cost Calculation

a.   Positions of the Parties

During the hearings, an agreement was reached among the parties concerning one aspect of O&DA avoidable costs and revenues, as follows. Since these call completion and number services (Accounts 6621 and 6622) produce directly attributable revenue for NYNEX, only the amount of expenses that exceeded the revenues from these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

services should be included in the numerator of the avoided cost ratio. There remained a disagreement, however, over which expenses should properly be included in the calculation of expenses less revenues.

The disagreement centers on whether operator systems expense (Account 6220) and the depreciation and amortization expenses associated with operator assets (Account 6560) are avoidable when a carrier chooses to provide such services itself, rather than buying them wholesale from NYNEX. Ms. Brown asserted that AT&T and other carriers should pay for these items even if they do not use the services, since they are fixed costs that cannot be avoided by NYNEX (Exh. NYNEX-4, at 8). Dr. Taylor agrees, saying that these costs are not part of a cost avoided due to resale. He distinguishes this as a case of competition, i.e., AT&T choosing to provide its own retail O&DA services, rather than a wholesaler avoided retail-related cost (Tr. 1, at 46-48). Mr. Goodrich states, to the contrary, that AT&T should not pay for such amortization and depreciation on equipment not used by it (Exh. AT&T-1, at 8-9). Dr. Tye agrees, noting that if the unamortized balance of such equipment is placed into wholesale rates, it would confer a permanent advantage on the ILEC because it could recover its fixed retail-related fixed costs through its wholesale charges to resellers (Tr. 2, at 20).

b.   Analysis and Findings

**\*15** Under the FCC regulations, Account 6220 and 6560 are presumed to be not avoided, but they may be treated as avoided costs to the extent that a party proves to a state commission that specific costs in these accounts can reasonably be avoided. We are dealing here with the situation in which a carrier has chosen not to avail itself of NYNEX's O&DA services. AT&T and NYNEX agree that the equipment related to these accounts was purchased to serve retail customers and will not be needed to serve this category of wholesale customers. Thus, in accordance with our discussion in Section III.B.3.b. above, we cannot agree with Dr. Taylor that these costs are not part of a cost avoided due to resale. We agree with Dr. Tye in that, if the unamortized balance of such equipment is placed into wholesale rates, it would confer a permanent advantage on NYNEX because it could recover its fixed retail-related fixed costs through a wholesale charges to resellers who are not using the services in question. Such a result is clearly contrary to the purposes of the Act. Accordingly, such costs should be considered avoidable for purposes of the O&DA avoided cost calculation for wholesale customers who choose not to purchase O&DA services from NYNEX.

7.   Separated vs. Unseparated Costs

a.   Positions of the Parties

i.   NYNEX

The separations process allocates certain of NYNEX's Massachusetts expenses to the interstate, rather than intrastate jurisdiction. NYNEX asserts that these separated costs should be used as the basis for developing an avoided cost study because the company's intrastate retail rates and revenue requirements were set by the Department on the basis of separated costs. It says that the wholesale discount should be calculated by subtracting out avoidable costs that have been allocated to the interstate jurisdiction in the separations process (Exh. NYNEX-4, at 5-6; NYNEX Initial Brief at 25).

ii.   AT&T

AT&T argues that the use of separated figures is inappropriate in that such figures do not give an accurate representation of the actual expenses incurred by NYNEX in the state. It argues that the Act and the Local Competition Order require that the numerator include all costs that will be avoided if the ILEC ceases retail operations. According to AT&T, the FCC never stated that only the portion of avoidable costs that are not allocated to the interstate jurisdiction should be used to compute the wholesale discount. It argues that, if the FCC had intended NYNEX's interpretation, it would have certainly mentioned the apportionment of interstate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

costs in the methodology set forth in the Local Competition Order. AT&T also cites other sections of the Local Competition Order as giving implicit support to its position. Finally, AT&T states that the NYNEX approach is contrary to the principles of the Act, in that it would result in a reseller paying more to the ILEC than it costs the ILEC to provide the wholesale service, after taking into account the subsidy that the ILEC is receiving from exchange access services (AT&T Initial Brief at 27-33).

iii.  Sprint

*16 Sprint agrees with AT&T, stating that the FCC never suggested using anything other than total company expenses. It asserts that, given the FCC's familiarity with the separations process, the lack of its commentary on this issue in the Local Competition Order suggests that it had determined that total company costs should be included in the avoided cost study. Sprint further argues that the intrastate/interstate distinction is a regulatory and not an accounting issue. It argues that costs will not be avoided based on jurisdiction, but in total, and so the avoided cost calculation should be based on total company costs. Finally, Sprint describes the historical practice of separating expenses into interstate and intrastate jurisdictions as being based on the policy of assigning intrastate (local) costs to the interstate (long distance) jurisdiction, and it argues that the FCC has specifically stated that the avoided cost study may not calculate avoided costs based on policy arguments (Sprint Brief at 4-5).

b.  Analysis and Findings

This issue is analogous to the advertising issue discussed above and must be decided within the overall context we have set forth in Section III.B.2.b. As noted by AT&T and Sprint, the purpose of this proceeding to look at the actual expenses incurred by NYNEX and to determine which of those expenses would be avoided if it were a wholesale company. We are creating a ratio, not determining a revenue requirement. Just as in the case of advertising, we do not seek to determine which expenses are allowable in retail rates. The jurisdictional distribution of those costs, whether based on an arbitrary interstate/intrastate separations process or, indeed, our own intrastate ratemaking methodology, is not relevant.

Sprint has succinctly stated the appropriate basis for resolving this issue: Costs will not be avoided based on jurisdiction, but in total. In addition, we agree that to base the avoided cost determination on the separations process would be to impute a policy of shifting avoided costs between jurisdictions, in the manner historically used to shift local costs to the long distance jurisdiction. The FCC has explicitly forbidden such a policy-based action. Local Competition Order at ¶ 914. We further agree with Sprint and AT&T that, if the FCC had meant us to consider avoided costs in this manner, given its deep understanding of the separations process, it would have so proscribed such a result. It has not done so. Indeed, we have been unable to find any mention of separations process at all in this portion of the Local Competition Order. Accordingly, NYNEX shall use total expenses in its calculation of the wholesale rate discount.

8.  NYNEX Cost Study Data

MCI claims that the data used by NYNEX in its avoided cost study are not publicly available and are not audited or monitored by any regulatory agency. In contrast, MCI uses publicly available Automated Reporting Management Information Systems ('ARMIS') data in its cost study.

*17 NYNEX does not respond to this argument on brief, but its witness explained that the figures used in the NYNEX cost study are subaccounts from the Financial Assurance Information System ('FAIS') which add up to the ARMIS line items (Tr. 1, at 120; Record Request 1).

We do not object to NYNEX's use of FAIS data in its cost study. The company was able to explain the various subaccounts to our satisfaction, and although the numbers in the FAIS reports are not generally available, they were made available

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

here, and there was ample opportunity for questioning them.

9.  Discount Categories

a.  Positions of the Parties

MCI notes that NYNEX's study assigns avoided costs to different customer classes, thereby producing different wholesale discounts for NYNEX's residential and business services. NYNEX allocates costs based on the number of business and residence lines. MCI accepts that there is nothing theoretically wrong with calculating different discount rates for different classes, but it argues that there is no way to verify the validity of the allocation used by NYNEX. MCI suggests that the remedy to this problem is to determine one discount rate for all services, as it does in its avoided cost study (Exh. MCI-1, Appendix II).

In contrast, Sprint argues that NYNEX should offer a specific wholesale discount for at least five separate categories of service to more accurately reflect the different underlying avoidable costs inherent in these categories. It suggests that the following five categories are appropriate: simple access (residential and business individual line rates); complex access (Centrex, Kay, and PBX); features (custom calling features, CLASS, and Centrex features); O&DA; and other (private line, intraLATA toll, etc.).

b.  Analysis and Findings

The FCC has addressed this issue, as follows:

We neither prohibit nor require the use of a single, uniform discount rate for all of an incumbent LEC's services. We recognize that a uniform rate is simple to apply, and avoids the need to allocate avoided costs among services. Therefore, our default wholesale discount is to be applied uniformly. On the other hand, we also agree with parties who observe that avoided costs may, in fact, vary among services. Accordingly, we allow a state to approve nonuniform wholesale discount rates, as long as those rates are set on the basis of an avoided cost study that includes a demonstration of the percentage of avoided costs that is attributable to each service or group of services.

Local Competition Order at ¶ 916.

In this proceeding, the only difference in avoided costs among services that has been demonstrated is the difference between those services which include O&DA versus those which do not include O&DA. MCI is correct that the allocation of avoided costs by lines, although having an intuitive appeal, has not been demonstrated to be a correct allocation. The proposal by Sprint has likewise not been demonstrated to be appropriate. Accordingly, in light of the FCC order, we direct NYNEX to recalculate its study using a uniform discount rate for business and residential services, in one case for services including O&DA and in a second case for services excluding O&DA.

10.  Customer Services Expense Account

a.  Positions of the Parties

i.  NYNEX

*18 Customer service expenses (Account 6623) represent expenses associated with establishing and servicing customer accounts. NYNEX has treated portions of this account as fully avoidable: those attributable to customer instructions and non-public telephone commissions. It has determined that other subaccounts should be divided between avoidable and not avoidable. For instance, NYNEX says that 89.8 percent of the customer accounting subaccount is avoidable, the expenses associated with bill postage and end-user billing and collection activity. However, it asserts, billing functions relating to billing the resellers on a bulk billing basis will not be avoided. In addition, customer accounting functions such as recording, rating,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                         Page 16
1996 WL 773774 (Mass.D.P.U.)
**(Cite as: 1996 WL 773774 (Mass.D.P.U.))**

and service and equipment processing will still be required in the wholesale environment. Likewise, NYNEX has determined that 86.3 percent of the service order processing subaccount expenses are avoidable, those expenses associated with preparing, changing, and handling customer relater service orders, with collected revenues, handling miscellaneous customer relations, annoyance call complaints, and updating records. However, it states that expenses associated with the Annoyance Call Bureau, which handles inquiries and complaints about abusive, threatening and obscene calls, and the premises management information/street address guide bureau will be extended to resellers and are not avoidable. It further states that the costs incurred by employees who are engaged in public telephone operations are not avoidable because this function is not available for resale. Finally, it asserts that the expenses associated with the message investigation function are not avoidable. This is the function that investigates problems within the billing system, provisioning system or fraud, and, says the company, will be used by NYNEX when the company attempts to resolve problems reported by resellers.

ii.   AT&T

AT&T states that a number of the expenses in these accounts should be treated as avoided. For example, it states that toll message and local message operations will be eliminated in the resale environment, for they will only be conducted in response to toll-related usage related inquiries by reseller, and if any are required they should be charged on a transaction specific basis. Likewise, AT&T states that expenses associated with service and equipment operations will not be avoided unless NYNEX is planning to provide resellers nondiscriminatory access to the data that associates an end user's record information with the network facilities assigned to that customer. Regarding the annoyance call bureau, AT&T states that network related costs such as traps and traces should be recovered from resellers on a transaction-specific basis. Regarding the coin subaccount, AT&T says these costs are avoidable because NYNEX will have to offer public telephone services for resale.

AT&T also states that, even if NYNEX's view with regard to these subaccounts is accepted, the specific numbers it presents in its cost study are not supported.

iii.   MCI

*19 MCI's arguments parallel those of AT&T. It, too, believes that more of the customer services account expenses should be considered avoidable.

b.   Analysis and Findings

The FCC has determined that the costs in the customer services account are presumed to be avoidable.  Local Competition Order  at ¶  917. Thus, NYNEX has the burden of proof in demonstrating that portions of these costs are not avoidable. We find that NYNEX has met its burden of proof. Its explanation of those costs that are not avoided in a wholesale environment are cogent and persuasive. For purposes of this study, we cannot accept AT&T's premise that a number of these functions should be charged on a usage or transaction-specific basis and should therefore be considered avoidable. We find that these services will be generally available and useful to all resellers and are therefore appropriately considered part of the resale of local exchange service. We are not, in this proceeding, determining issues of rate design, i.e., whether components of local exchange service might be unbundled for pricing purposes, where those components are clearly part of the generally available service. (This contrasts with O&DA, which as mentioned, is a clearly separable service offering and therefore has warranted a different treatment in this order.)

On AT&T's assertion with regard to NYNEX's calculation of costs, we agree with NYNEX that it has presented the expenses in a reviewable and consistent manner (NYNEX Reply Brief at 6).

IV.   ORDER

After notice, hearing and consideration, it is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                        Page 17
1996 WL 773774 (Mass.D.P.U.)
**(Cite as: 1996 WL 773774 (Mass.D.P.U.))**

   ORDERED: That the issues under consideration in this Phase 2 be determined as set forth above; and it is

   FURTHER ORDERED: That New England Telephone and Telegraph Company, d/b/a NYNEX shall calculate the wholesale rate discount based on the findings in this Order and submit those calculations, along with supporting documentation, in a compliance filing, to be filed with the Department within fourteen days of the date of this Order; and it is

   FURTHER ORDERED: That the parties incorporate these determinations into a final agreement, setting forth both negotiated and arbitrated terms and conditions, to be filed with the Department pursuant to the Section 252(e)(1) of the Act, by January 10, 1997; and it is

   FURTHER ORDERED: That the parties comply with all other directives contained herein.

   By Order of the Department,

                                  FOOTNOTES

FN1 First Report and Order, Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC Docket No. 96-98, FCC 96-325, adopted August 1, 1996 (released August 8, 1996) (hereinafter 'Local Competition Order').

FN2 Even if we had the time to conduct a rate-case-like analysis in the abbreviated period available for this arbitration, we would not undertake it, for it would not be relevant to the issue at hand, given the FCC's formulation of this issue.

FN3 In reaching this determination, we also note that AT&T's definition of 'profitable' is not one used by the Department. The Department regards return on capital, reflecting both the cost of debt and equity, as legitimate costs of business and has generally included them in a revenue requirement established for NYNEX. Thus, a simple calculation showing that revenues exceed non-cost-of-capital related costs does not imply profitability. Accordingly, this portion of AT&T's analysis of the issue is not helpful. NYNEX's relative profitability, with or without advertising expenses, is not an issue in this proceeding. Contrary to Mr. Goodrich's point of view (Tr. 1, at 184-185, 221-222), even if NYNEX were showing a loss for 1995, if it had chosen to spend money on retail advertising that year, that amount would have to be considered an expense simply because it was an actual expense. Indeed, the advertising expenses might have reduced the actual loss by promoting sales that would otherwise have not occurred.

FN4 Even in a traditional rate case, when the Department is allocating common costs among existing customers, it has a wide variety of allocators among which to choose. It is the nature of such common costs that it is extremely difficult to assign cost-causation to given customer classes, and there is no theoretically perfect way to accomplish the task.

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.