Martin M. Weinstein
General Communication, Inc.
2550 Denali Street, Suite 1000
Anchorage, Alaska 99503
Phone: 907-868-6561
Email:   **mweinstein@gci.com**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| GCI COMMUNICATION CORP., d./b/a GENERAL COMMUNICATION, INC. d/b/a GCI<br><br>        Petitioner<br><br>v.<br><br>KATE GIARD, in her official capacity as Chairwoman of the Regulatory Commission Of Alaska;<br><br>DAVE HARBOUR, in his official capacity as Commissioner of the Regulatory Commission Of Alaska;<br><br>MARK K. JOHNSON, in his official capacity As Commissioner of the Regulatory Commission of Alaska;<br><br>ANTHONY PRICE, in his official capacity As Commissioner of the Regulatory Commission of Alaska;<br><br>JAMES S. STRANDBERG, in his official Capacity as Commissioner of the Regulatory Commission of Alaska;<br><br>And, | Case No. A05-003 CIV(RRB) |

Case No. Case No. A05-003 CIV (RRB)
Memorandum of Law in Support of
Motion For Judicial Notice And Supplementation Of Record
June 5, 2006
Page 1 of 11

**GCI Communication Corp.**
2550 Denali Street, Suite 1000
Anchorage, AK 99503
(907) 265-5600

|   |   |
|---|---|
| ACS OF ANCHORAGE, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and, ACS; | ) ) ) ) ) |
| Respondents. | ) ) |

# **MEMORANDUM OF LAW IN SUPORT OF MOTION FOR JUDICIAL NOTICE AND SUPPLEMENTATION OF RECORD**

## **INTRODUCTION**

Pursuant to Rule 7.1(a) of the Local Rules and Rule 201(b)(2) of the Federal Rules of Evidence, Petitioner GCI Communication Corp. d/b/a General Communication, Inc. d/b/a GCI ("GCI"), by and through undersigned counsel, hereby moves the Court to take judicial notice of the debt costs ACS incurred when it re-financed its debt in the summer of 2003 as described more specifically in the pertinent pages from a certified copy of the Securities and Exchange Commission ("SEC") Form 10-K for the fiscal period ending December 31, 2003 that ACS filed with the SEC, which is attached to GCI's Reply Brief as GCI Exh. N. The exhibit consists of six pages and is certified by the SEC as an authentic filing made by ACS.[1]

GCI contends that the accuracy of the facts concerning the debt cost ACS incurred when it re-financed its debt in the summer of 2003 as more

---

[1] GCI has included Exh. N as an attachment to the motion and additionally has presented argument on the basis of this exhibit in its Reply Brief starting at the second full paragraph on page 35 with the word "Furthermore" and ending with the word "adopted" appearing at the end of the carry-over paragraph on page 36.

Case No. Case No. A05-003 CIV (RRB)
Memorandum of Law in Support of
Motion For Judicial Notice And Supplementation Of Record
June 5, 2006
Page 2 of 11

*Left margin:* **GCI Communication Corp.** 2550 Denali Street, Suite 1000, Anchorage, AK 99503, (907) 265-5600

specifically described in the certified copy of ACS' SEC Form-10 K filing cannot reasonably be questioned, and thus the Court may take judicial notice of such facts in accordance with Rule 201(b)(2) of the Federal Rules of Evidence.

Additionally, GCI maintains that the Court should have the complete facts concerning ACS' debt costs from the re-financing and that such facts are relevant and necessary for the limited purpose of establishing that the RCA did not have all of the relevant facts concerning ACS' debt re-financing at the arbitration, and further, to evaluate the merits of ACS' claim on judicial review that its "aggregate" 10.5% debt cost from the re-financing validates the reasonableness of the RCA's decision adopting its historical aggregate debt cost of 10.33% for calculating the cost of capital. ACS Opposition Brief at 26. The RCA also argues that ACS' testimony claiming that its "aggregate" 10.5% cost of debt from the re-financing supports its decision. RCA Opposition at 53.

At the arbitration, ACS briefly mentioned its debt re-structure stating that its "aggregate" cost of debt from that re-financing was approximately 10.5%. That number, however, only represents the cost of the approximately $187 million of unsecured notes it re-financed. ACS did not disclose the cost of the approximately $200 million secured credit facility that was part of its debt re-structure. This secured debt was at a variable LIBOR rate plus 3.25%, which in the summer of 2003 amounted to approximately 4.5% as stated in ACS' SEC Form 10 filing. ACS' "aggregate" cost of debt from the debt re-structure,

therefore, obviously was considerably less than the 10.5% number ACS claimed at the arbitration, which it also argues on judicial review confirms the reasonableness of the RCA's decision adopting its historical 10.33% aggregate cost of debt. ACS Opposition Brief at 26.

## BACKGROUND

In its Opening Brief and Reply Brief, GCI has argued that the RCA's cost of capital calculation used in establishing the prices GCI must pay ACS to lease unbundled network elements (UNE) is legally flawed for multiple reasons. Notably, one defect pointed out by GCI concerns the RCA's failure to take into account the significant decline in interest rates that occurred from 2000 to 2003 when the agency chose to adopt ACS' older weighted average 10.33% cost of debt as reflected on its financial books as of May 21, 2003 for purposes of calculating the cost of capital under the FCC's TELRIC pricing rules. GCI Opening Brief at 31-32. GCI further pointed out that ACS conducted a re-financing of its debt in the summer of 2003 to take advantage of the lower interest rates. *Id*.

ACS, in its Opposition Brief, responded, in part, by citing to testimony it sponsored at the arbitration stating that it was allegedly "required to pay an aggregate debt cost of approximately 10.5% on its debt in the summer of 2003." ACS Opposition at 26. ACS argues that its debt re-structure in the summer of 2003 validates the reasonableness of the RCA's decision adopting its historical

10.33% aggregate cost of debt for calculating the cost of capital. *Id.* The RCA also argues in its Opposition Brief that the ACS testimony about its "aggregate" 10.5% cost of debt from the re-financing supports its decision. RCA Opposition Brief at 53.

In reality, ACS testified briefly but incompletely at the arbitration about its debt re-structure in the summer of 2003. ACS mentioned that its debt re-structure included the re-financing of approximately $175 million of unsecured notes and the simultaneous entering into a new bank credit agreement in a principal amount of approximately $200 million and a revolving credit facility in a principal amount of $50 million.[2] ACS further stated that its "aggregate" cost of debt from the re-structure was 10.5%.[3] As it turns out, this statement is undeniably false as evidenced by the debt cost numbers that appear in the relevant pages from ACS' Form 10-K for the fiscal period ending December 31, 2003, GCI Exh. N, regarding the debt costs associated with the different components of ACS' debt re-structure in the summer of 2003. The 10.5% cost number ACS testified about at the arbitration and highlights in its Opposition Brief was the yield to maturity cost of the approximately $182 million in

---

[2] Box 3 at 811 (testimony of David Blessing). Almost all of the administrative record has been filed with the court on a single CD-ROM disc containing seven PDF files (or boxes). Citations to that portion of the record are to the PDF files and to the PDF pages within each file. Thus, "Box 3 at 811" refers to the file on the CD labeled "Box 3" and "811" refers to the pdf page in that file.

[3] Box 3 at 746 (testimony of David Blessing).

unsecured notes that were re-financed. GCI Exh. N at 5. ACS did not disclose at the arbitration the cost of its $200 million secured senior credit facility, which had a cost in 2003 of approximately 4.5%. *Id.* Clearly, ACS' "aggregate" cost of debt from the debt re-structure in the summer of 2003, therefore, was considerably less than the 10.5% "aggregate" number that ACS argues on appeal validates the reasonableness of the RCA's decision adopting a 10.33% cost of debt. ACS Opposition Brief at 26.

## ARGUMENT

### I. JUDICIAL NOTICE UNDER FRE RULE 201(b)(2) OF ACS' TRUE COST NUMBERS AS EVIDENCED FROM A CERTIFIED COPY OF ITS SEC FORM 10-K IS APPROPRIATE

Rule 201(b)(2) of the Federal Rules of Evidence permits judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." Additionally, Rule 201(f) of the Federal Rules of Evidence permits a court to take judicial notice "at any stage" in a proceeding.

In this case, the certified copy of the Form 10-K ACS filed with the SEC for the fiscal year ending 2003, set forth as GCI Exh. N., qualifies as a record that contains financial facts regarding the debt costs ACS incurred from its re-financing in the summer of 2003 the accuracy of which cannot reasonably be disputed and is capable of easy determination by the Court. Therefore, this SEC filing made by ACS may properly be judicially noticed by the Court

Case No. Case No. A05-003 CIV (RRB)
Memorandum of Law in Support of
Motion For Judicial Notice And Supplementation Of Record
June 5, 2006
Page 6 of 11

pursuant to Rule 201(b)(2) of the Federal Rules of Evidence. *In Re: White Electronic Designs Corporation Securities Litigation*, 416 F.Supp.2d 754, 760-61 (D. Ariz. 2006); *In Re: Network Associates, Inc. II Securities Litigation*, __ F.Supp.2d. __, 2003 WL 24051280 at *1, Note 3 (N.D. Cal. , 2003) ("Judicial notice is appropriate for SEC filings, press releases, and accounting rules as they are 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" *citing Plevy v. Haggerty*, 38 F.Supp.2d 816, 821 (C.D.Cal. 1998)).

## II. ACCEPTING THIS DOCUMENT INTO THE RECORD IS APPROPRIATE AND IMPORTANT TO ASSIST THE COURT IN ITS REVIEW OF THE CASE

GCI is well aware that judicial review of an agency's decision ordinarily is confined to the administrative record before the agency at the time it made its decision. *Camp vs. Pitts*, 411 U.S. 138, 142 (1973). This rule, however, is not carved in stone. The Ninth Circuit Court of Appeals has recognized that there are exceptions to this rule that would justify allowing a district court to review materials outside of the administrative record. In *Asarco, Inc. vs. U.S. Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980), the Ninth Circuit has explained that a reviewing court may consider evidence outside the administrative record to obtain explanatory evidence to understand technical issues on review, or "for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of

GCI Communication Corp.
2550 Denali Street, Suite 1000
Anchorage, AK 99503
(907) 265-5600

conduct or grounds of decision." The Ninth Circuit, however, was clear that such inquiry is not permitted to determine the correctness or wisdom of the agency's decision. *Id*. In *Asarco*, the Ninth Circuit held that the district court went too far in its consideration of evidence outside the administrative record because it essentially conducted a *de novo* trial lasting four days to gather evidence outside the administrative record. *Id*.

In this case, GCI requests to supplement the record with GCI Exh. N for the limited purposes of establishing that the RCA did not have all the relevant facts at the arbitration concerning ACS' debt re-structure in the summer of 2003, and further, to allow the Court to fairly and accurately evaluate the merits of ACS' claim on judicial review that its "aggregate" 10.5% cost of debt from the re-financing validates the reasonableness of the RCA's decision to adopt a 10.33% aggregate debt cost for the cost of capital calculation. As discussed above, ACS did not disclose at the arbitration complete information regarding its debt costs from the re-financing in the summer of 2003. The 10.5% cost number ACS testified about at the arbitration and highlights in its Opposition Brief was the yield to maturity cost of the approximately $182 million in unsecured notes that were re-financed. GCI Exh. N at 5. ACS did not disclose at the arbitration the cost of its $200 million secured senior credit facility, which had a cost in 2003 of approximately 4.5%. *Id*. ACS' "aggregate" cost of debt from the debt re-structure in the summer of 2003, therefore, was considerably less than 10.5%.

On judicial review, ACS seeks to take advantage of its omission falsely claiming to the Court that its 10.5% "aggregate" cost of debt from the re-financing validates the reasonableness of the RCA's decision adopting its historical 10.33% aggregate cost of debt. ACS Opposition Brief at 26. On review, the RCA unwittingly also argues that ACS' "aggregate" 10.5% cost of debt supports its decision.[4] RCA Opposition Brief at 53.

Under these exceptional circumstances, GCI maintains that the Court should have the complete facts regarding ACS' debt re-structure. The Court should be permitted to understand that the RCA did not have all of the relevant facts concerning the debt costs associated with ACS' debt re-structure, and additionally, ACS should not be permitted to take advantage of its omission at the arbitration by claiming that its "aggregate" 10.5% cost of debt from the re-financing validates the reasonableness of the RCA's decision adopting its historical, aggregate 10.33% cost of debt. The Court should have the complete facts to consider the lack of merit to this claim.

## CONCLUSION

For the foregoing reasons, the Court should grant GCI's motion to take judicial notice of the debt costs associated with ACS' summer re-financing in the

---

[4] To be clear, GCI argues in its Reply Brief that the RCA's reliance on the brief testimony ACS sponsored about its re-financing in the summer of 2003 is improper because the agency did not previously rely on this information to support its decision to adopt ACS' historical aggregate cost of debt. GCI Reply Brief at 35.

Case No. Case No. A05-003 CIV (RRB)
Memorandum of Law in Support of
Motion For Judicial Notice And Supplementation Of Record
June 5, 2006
Page 9 of 11

GCI Communication Corp.
2550 Denali Street, Suite 1000
Anchorage, AK 99503
(907) 265-5600

summer of 2003 as reflected in ACS' SEC Form-10 filing, GCI Exh. N.

Additionally, such exhibit should be permitted into the record.

Respectfully submitted this 5th day of June 2006.

GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC. d/b/a GCI

/s Martin M. Weinstein
Martin M. Weinstein
Regulatory Attorney
Alaska Bar No. 9306051
General Communication, Inc.
2550 Denali Street, Suite 1000
Anchorage, Alaska 99503
Phone: 907-868-6561
Email: **mweinstein@gci.com**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically served on the counsel of record identified below this 5th day of June, 2006.

>Robert Royce
>Assistant Attorney General
>Department of Law
>1031 W. 4th Avenue, Suite 200
>Anchorage, Alaska 99501
>
>Richard Maki
>Tindall Bennett & Shoup
>508 West 2d Avenue, Third Floor
>Anchorage, Alaska 99501
>
>By:  /s Martin M. Weinstein
>     Martin M. Weinstein
>     Regulatory Attorney
>     Alaska Bar No. 9306051
>     General Communication, Inc.
>     2550 Denali Street, Suite 1000
>     Anchorage, Alaska 99503
>     Phone: 907-868-6561
>     **Email:**mweinstein@gci.com

**GCI Communication Corp.**
2550 Denali Street, Suite 1000
Anchorage, AK 99503
(907) 265-5600