Martin M. Weinstein
General Communication, Inc.
2550 Denali Street, Suite 1000
Anchorage, Alaska 99503
Phone: 907-868-6561
Email:  **mweinstein@gci.com**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| GCI COMMUNICATION CORP., d./b/a <br> GENERAL COMMUNICATION, INC.  d/b/a <br> GCI <br> <br>         Petitioner <br> <br> v. <br> <br> KATE GIARD, in her official capacity as <br> Chairwoman of the Regulatory Commission <br> Of Alaska; <br> <br> DAVE HARBOUR, in his official capacity as <br> Commissioner of the Regulatory Commission <br> Of Alaska; <br> <br> MARK K. JOHNSON, in his official capacity <br> As Commissioner of the Regulatory <br> Commission of Alaska; <br> <br> ANTHONY PRICE, in his official capacity <br> As Commissioner of the Regulatory <br> Commission of Alaska; <br> <br> JAMES S. STRANDBERG, in his official <br> Capacity as Commissioner of the Regulatory <br> Commission of Alaska; <br> <br> And, | Case No. A05-003 CIV(RRB) |

Case No. Case No. A05-003 CIV (RRB)
Reply In Support of Motion For Judicial Notice And Supplementation Of Record
June 23, 2006
Page 1 of 15

| | |
|---|---|
| ACS OF ANCHORAGE, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LOCAL SERVICE, and, ACS; | ) ) ) ) |
| Respondents. | ) ) ) |

# REPLY IN SUPPORT OF MOTION FOR JUDICIAL NOTICE AND SUPPLEMENTATION OF RECORD

## INTRODUCTION

Petitioner GCI Communication Corp. d/b/a General Communication, Inc. d/b/a GCI ("GCI"), by and through undersigned counsel, hereby files this reply in support of its motion requesting that the Court take judicial notice and allow supplementation of the record. ACS has filed an opposition to the motion but the RCA has not filed any response. In its opposition, ACS argues that the Court should not take judicial notice of the interest rates ACS reported in its SEC Form 10-K for its summer re-financing in 2003 because the matter "is, at best, a subject of dispute." ACS Opposition at 4. ACS contends that the stated interest rates in the SEC Form 10-K do not fully reflect all of the transaction costs associated with the debt and that it would be more accurate to focus on the "effective" interest rate to capture such costs. *Id*. ACS also argues that supplementation of the administrative record would be improper because there is no justification to depart from the normal rule that an agency's decision should be based on the administrative record. ACS Opposition at 6. Lastly, ACS

argues that GCI should have presented the information regarding ACS' debt costs from its summer re-financing to the RCA. ACS Opposition at 8-9.

GCI disagrees with each of these objections. First, although ACS claims that there is a dispute regarding the accuracy of the interest rates reported in its SEC Form 10-K for its summer 2003 re-financing, ACS' witness (Ms. Laurie Butcher) does not actually deny the accuracy of the interest rates reported in ACS' SEC Form 10-K for its summer re-financing in 2003. Instead, she tries to cloud the issue by offering a new debt cost analysis that purportedly shows ACS' "effective" debt cost for the entire year 2003. This new spreadsheet analysis, however, includes information about what ACS' effective debt cost was for the summer re-financing in 2003. By extrapolating the relevant numbers from Ms. Butcher's analysis relating to the summer refinancing, Ms. Butcher's analysis actually confirms the fact that ACS' cost of debt from the summer re-financing in 2003 was considerably less than the 10.5% number that ACS discussed at the arbitration. *See* Affidavit of Peter Pounds at ¶¶ 3-4. The Court should take judicial notice of the stated interest rates ACS reported in its SEC Form 10-K for its refinancing, and, moreover, should accept into the record as an admission by ACS the relevant portion of Ms. Bucher's analysis showing the effective interest rates for the refinancing.

Second, supplementation of the record with these numbers is appropriate because both the RCA and ACS have argued on appeal in their

Opposition briefs that the testimony ACS provided at the arbitration about its "aggregate" cost of debt from the debt restructure in the summer of 2003 confirms the reasonableness of the 10.33% cost of debt the RCA chose for its cost of capital calculation. GCI Memorandum in Support Of Motion For Judicial Notice at 4-5.  As discussed in the motion and demonstrated even by the new numbers ACS submits in its opposition, ACS did not disclose the full facts to the RCA about its summer re-financing at the arbitration—a fact that ACS does not deny in its opposition.  Supplementation of the record is appropriate for the limited purpose of establishing that the RCA did not have the complete facts relating to ACS' summer re-financing, and, moreover, is relevant to rebut the argument offered on appeal that the aggregate "10.5%" cost of debt from the summer re-financing supports the RCA's decision.

Lastly, ACS' argument that GCI should have raised the issue of its cost of debt from the refinancing with the RCA glosses over the fact that ACS on appeal is attempting to use false testimony it sponsored at the arbitration to defend the RCA's decision.  Even if GCI should have raised the issue sooner, this does not justify permitting ACS (the party responsible for not disclosing the complete facts regarding its summer re-financing) to keep the truth from the Court and to use its incomplete and inaccurate testimony at the arbitration to defend the RCA's decision.  Notably, the RCA has not filed an objection.

**ARGUMENT**

**I.   JUDICIAL NOTICE OF THE INTEREST RATES ACS REPORTED IN ITS SEC FORM 10-K FOR ITS SUMMER RE-FINANCING IN 2003 IS APPROPRIATE**

In its Opposition, ACS argues that the interest rates it reported in its SEC Form 10-K for its summer re-financing in 2003 are not appropriate matters for judicial notice because "the aggregate cost of ACS' restructured debt is, at best, a subject of dispute." ACS Opposition at 4.  ACS cites cases in which courts have denied requests for judicial notice of SEC filings when such filings are offered for the truth of their contents and there is a dispute about the facts.  Thus, ACS argues that judicial notice is inappropriate. *Id.* at 2-5.  The premise for ACS' opposition, however, is wrong because there is no genuine dispute about the accuracy of the interest rates it reported in its SEC Form 10-K for its re-financing from the summer of 2003 because ACS has not denied their accuracy.

In this case, GCI is requesting that the Court take judicial notice of the interest rates ACS reported in its SEC Form 10-K for its debt re-financing in the summer of 2003, which is set forth as GCI Exh. N, attached to the Memorandum of Law in Support of Motion For Judicial Notice.  In this SEC filing, ACS told investors that:

> On August 26, 2003, the Company [ACS] completed refinancing of its old senior credit facility term loans.  The

> Company entered into a $250,000[1] new senior credit facility consisting of a term loan facility in an aggregate principal amount of $200,000 and an undrawn revolving credit facility of $50,000. The Company simultaneously issued $182,000 aggregate principal amount of 9 7/8% senior unsecured notes due 2011 at an issue price of approximately 96.7% for net proceeds of $175,970. . . .

GCI Exh. N at 3.  ACS further told investors in this SEC filing that:

> The term loan of $200,000 is repayable in quarterly principal payments of $500 which commence on March 31, 2004 with the balance due on maturity.  The final maturity of the term [is] loan is August 26, 2010 or February 14, 2009 if the Company's senior subordinated notes have not been refinanced.  The loan bears interest at an annual rate equal to (at the Company's option) to: (1) LIBOR plus 3.25% or (2) a rate equal to 2.25% plus the greater of the administrative agent's prime rate or the federal funds rate plus 0.50%.  ***The rate of interest in effect at December 31, 2003 was 4.50% and is based on the LIBOR rate option***.

*Id*. at 5 (emphasis added).

When ACS made these statements, its senior corporate officers (the Chief Executive Officer, Ms. Liane Pelletier and the Chief Financial Officer, Mr. David Wilson) certified the accuracy of these numbers in addition to all of the other financial numbers reported in the SEC filing subject to significant potential criminal penalties pursuant to Section 302(a) of Sarbannes-Oxley if the reported

---

[1] The numbers reported are in thousands, thus, for example, "$200,000" is actually "$250,000,000."

numbers are inaccurate.[2] Their Section 302 certifications are attached as GCI Exh. V.

Based on the information presented above in the SEC filing, the Court can readily and easily determine for itself that ACS' re-financing in the summer of 2003 consisted of two components: (1) ACS refinanced approximately $200 million of senior secured debt; and, (2) ACS refinanced approximately $182 million of unsecured debt. Furthermore, the Court can readily determine that the $200 million senior credit facility represents over half of ACS' re-financing in the summer of 2003 and that the stated interest rate associated with this particular credit facility was reported by ACS to be 4.5% in 2003. ACS, however, when it told the RCA at the arbitration that its aggregate debt cost from the debt restructure was 10.5%[3], was only referencing the cost of debt associated with the approximately $182 million of unsecured debt—a fact that ACS does not deny in its Opposition. Thus, the Court can readily determine, based on the interest rate of the senior credit facility and the amount of this debt (which represents over half of the refinancing) reported in the SEC filing that the "aggregate" cost of ACS' debt from the debt restructure was significantly less than the 10.5% number ACS discussed at the arbitration because that number only refers to the unsecured debt portion of the refinancing. Importantly, GCI is

---

[2]  See 18 U.S.C. §§ 1350(a)-(c).
[3]  The yield to maturity associated with the unsecured debt was approximately 10.5% because the bonds were sold at a discount from par value.

not requesting that the Court take judicial notice of precisely what ACS' debt cost was from the restructure.

In its Opposition, ACS does not deny the accuracy of the interest rates reported in the SEC filing. Nowhere does Ms. Butcher deny or contradict the accuracy of the interest rates stated and reported in the SEC filing in her affidavit. *See* Affidavit of Peter Pounds at ¶ 6. Instead, ACS argues that the stated interest rates reported in the SEC filing do not take into account certain transaction costs. Thus, ACS argues the "effective interest rate" is the better measure of a company's cost of debt because this would reflect the additional transaction costs. Affidavit of Ms. Butcher at ¶ 2, ACS Exh. A. ACS, therefore, provides a new debt cost analysis, but the analysis incredibly does not focus exclusively on the effective interest rate for the summer debt structure. The new analysis purportedly shows the effective weighted average cost of ACS' debt over the entire year of 2003. Affidavit of Peter Pounds at ¶ 2. ACS not only is trying to mask the accuracy of the interest rates it reported for its debt restructure, but it also tries to offer an entirely new debt calculation to validate the RCA's decision. This new analysis, however, strays way beyond the limited subject of GCI's request for judicial notice: *i.e.*, the facts concerning ACS' debt restructure in the summer of 2003 and ACS' claim (made both at the arbitration and on appeal) that its aggregate cost of debt from the debt restructure (which it claimed was 10.5%) supports the RCA's decision.

Despite ACS' attempt to detour the Court into a new realm of factual investigation, it is, nonetheless, possible to extrapolate from ACS' new spreadsheet analysis information relating to the effective interest rates for the summer debt restructure. ACS' new spreadsheet analysis shows that the effective (not just stated) interest rate for the refinancing in the summer of 2003 was approximately 7.93%—a fact that confirms GCI's claim that ACS did not disclose the full and accurate facts at the arbitration about its debt re-financing in the summer of 2003 when it told the RCA that its aggregate debt cost for the restructure was 10.5%. *See* Affidavit of Peter Pounds at ¶¶ 3-4. Thus, although ACS has tried to create the impression of a dispute with its new evidence, none really exists: both the interest rates stated and reported by ACS in its SEC filing (which ACS does not deny) as well as the new information ACS now offers about the effective interest rates demonstrate that ACS did not fully and accurately disclose the facts at the arbitration about its refinancing in the summer of 2003 when it told the RCA that its aggregate cost of debt from the restructure was 10.5%.

In its Opposition, ACS argues that courts have permitted judicial notice in securities fraud cases but not for the purpose of proving the truth of the contents in the SEC filing,[4] and that in non-securities fraud cases, courts have

---

[4] In securities fraud cases, it is understandable why courts would not permit a defendant company, in a motion to dismiss, to establish the accuracy of facts stated in SEC filings (the accuracy of which are in dispute) merely by requesting

refused to take judicial notice of SEC filings where there is a dispute about the contents of the SEC filing.[5]  ACS Opposition at 3-4.  ACS, therefore, argues that the Court should not take judicial notice of the interest rates in this case because GCI is requesting judicial notice on facts in the SEC filing that are in dispute. ACS, however, overlooks a key difference between the cases cited and this case: as just discussed, there is no genuine dispute about the accuracy of the facts for which GCI requests judicial notice.  As discussed above, ACS has tried to create the impression of a dispute but has not denied the accuracy of the interest rates stated and reported in the SEC filing.  Moreover, ACS has provided additional new information about its effective interest rates for the summer debt restructure that merely confirms that ACS did not fully and completely disclose the facts

---

judicial notice of the SEC filing. The plaintiff in these cases of course is alleging that the SEC filing contains misstatements of fact.  In these cases, many courts, nonetheless, have granted requests for judicial notice by the defendant in the context of a motion to dismiss in order to examine what was said in the SEC filing but not to prove the truth of the contents of the SEC filing. *E.g.*, *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999); *In re Cardinal Health Inc. Securities Litigation*, __ F.Supp.2d __, 2006 WL 932017 (S.D. Ohio 2006) ("when considering public documents in the context of a motion to dismiss … the court may not accept a document to decide facts that are in dispute").

[5]     ACS cites one non-securities fraud case, *Hennessy v. Penril Datacom Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995), in which the Court upheld the district court's refusal to take judicial notice of certain facts regarding the number of employees of the defendant as stated in an SEC filing because the SEC form covered "three parts of Penril – the Datacomm Networks unit involved in this suit and two other parts of Penril not involved here, its Electro-Metrics division and its Technipower branch." *Id*. at 1354-355.  The Court held that the district court had reasonably determined that the contents of the SEC filing were the subject of dispute, and therefore, the district's denial of judicial notice was reasonable given the "considerable argument over the significance of the 10-K form . . ." *Id*. at 1354.

when it told the RCA at the arbitration that its aggregate cost of debt from the refinancing was 10.5%.

Under these circumstances, the Court should take judicial notice of the stated interest rates ACS reported in its SEC Form 10-K for its refinancing, and, moreover, should also accept into the record as an admission by ACS the relevant portion of Ms. Bucher's analysis showing the effective interest rates for the summer refinancing. This information is extrapolated and set forth in the Affidavit of Peter Pounds. *See* Affidavit of Peter Pounds at ¶¶ 3-4.

## II. SUPPLEMENTATION OF THE RECORD WITH THESE NUMBERS IS APPROPRIATE AND RELEVANT

ACS argues that GCI's request to supplement the record is improper because: (1) the RCA did not rely on the debt cost numbers from ACS' re-financing in the summer of 2003 when it calculated the cost of debt; and, (2) GCI's reading of the Ninth Circuit's decision in *Asarco v. U.S. Environmental Protection Agency*, 616 F.2d 1153, 1159 (9th Cir. 1980) is too broad. ACS Opposition 6-7.

First, GCI agrees with ACS that the RCA did not rely on ACS' debt costs from the re-financing in the summer of 2003 when it made its decision. GCI has pointed this fact out in its Reply Brief and thus argued that the RCA should not be allowed to rely on ACS' debt re-financing to defend its decision. GCI Reply Brief at 35. Both the RCA and ACS, nevertheless, have argued on appeal in their respective Opposition Briefs that the testimony ACS provided

about its "aggregate" cost of debt from its re-financing in the summer of 2003 (which ACS claimed was 10.5%) confirms the reasonableness of the 10.33% cost of debt the RCA chose for its cost of capital calculation. GCI Memorandum in Support Of Motion For Judicial Notice at 4-5. In view of their arguments on appeal, GCI filed its request for judicial notice to expose the fact that ACS did not fully and accurately disclose all of the facts about its re-financing at the arbitration when it told the RCA that its aggregate debt cost from the restructure was 10.5%—a fact that ACS does not deny in its present opposition.

Additionally, supplementation of the record is consistent with *Asarco* and should be permitted on the unusual facts presented in this case. As just explained, both the RCA and ACS have argued on appeal that ACS' debt cost from its refinancing in the summer of 2003 confirms the reasonableness of the RCA's decision. As ACS points out, however, the RCA did not even rely on this information when it made its decision. ACS, on the other hand, knows that its debt cost from the re-financing in the summer of 2003 was not 10.5%. Thus, ACS is trying on appeal to benefit from its lack of full disclosure about its debt restructure at the arbitration.

On these facts, GCI believes that supplementation of the record is appropriate and justified as an exception to the general rule confining judicial review to the administrative record consistent with *Asarco* to establish that the RCA did not have all of the relevant facts about ACS' debt restructure at the

arbitration because ACS did not fully disclose all of the relevant facts when it told the RCA that its aggregate debt from the refinancing was 10.5%. The Court, too, should have the complete facts about ACS' summer re-financing. ACS should not be permitted to argue on appeal that its debt restructure confirms the reasonableness of the RCA's decision while suppressing the truth regarding its lack of full disclosure about its refinancing at the arbitration. Judicial notice in this instance is appropriate to prevent a miscarriage of justice.

### III. ACS SHOULD NOT BE PERMITTED TO PERPETUATE ITS LACK OF FULL DISCLOSURE ON APPEAL TO DEFEND THE RCA'S DECISION

Lastly, ACS argues that GCI should have raised the issue about its debt restructure in the summer of 2003 with the RCA given that ACS' SEC Form 10-K was filed with the SEC on March 30, 2004 and the RCA did not issue its decision until June 25, 2004. ACS Opposition at 8-9.

On this point, it is difficult to say whether GCI should have raised the issue sooner before the RCA. The RCA hearing ended in November 2003 and ACS' SEC Form 10-K was released in March 2004. Even if GCI should have raised the issue sooner in some form of post-hearing motion to the RCA, GCI's delay does not justify permitting ACS (the party responsible for not disclosing the complete facts regarding its summer re-financing) to keep the truth from the Court and to use its lack of full disclosure at the arbitration to defend the RCA's decision. Notably, the RCA has not filed an objection.

## CONCLUSION

For the reasons set forth in the opening motion and above, GCI requests that the Court grant its request for judicial notice and allow supplementation of the record of the information set forth in ACS' SEC Form 10-K (GCI Exh. N) relating to its summer debt restructure in 2003. Additionally, as discussed above, the Court should also accept into the record as an admission by ACS the relevant portion of Ms. Bucher's analysis showing the effective interest rates for the summer debt restructure. This information is extrapolated and set forth in the Affidavit of Peter Pounds. *See* Affidavit of Peter Pounds at ¶¶ 3-4. As explained above, this new information confirms what the interest rates reported in the SEC filing show: *i.e.*, ACS did not disclose the full and accurate facts at the arbitration about its debt re-financing in the summer of 2003 when it told the RCA that its aggregate debt cost for the restructure was 10.5%.

Respectfully submitted this 23rd day of June 2006.

GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC. d/b/a GCI

/s Martin M. Weinstein
Martin M. Weinstein
Regulatory Attorney
Alaska Bar No. 9306051
General Communication, Inc.
2550 Denali Street, Suite 1000
Anchorage, Alaska 99503
Phone: 907-868-6561
Email: **mweinstein@gci.com**

**CERTIFICATE OF SERVICE**

   I hereby certify that the foregoing was electronically served on the counsel of record identified below this 23rd day of June, 2006.

   Robert Royce
   Assistant Attorney General
   Department of Law
   1031 W. 4th Avenue, Suite 200
   Anchorage, Alaska 99501

   Richard Maki
   Tindall Bennett & Shoup
   508 West 2d Avenue, Third Floor
   Anchorage, Alaska 99501

   By: /s Martin M. Weinstein
      Martin M. Weinstein