**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

GCI COMMUNICATION CORP., d/b/a )
GENERAL COMMUNICATION, INC., )
d/b/a GCI, )
                                       )
         Petitioner, )
                                       )
            -vs- )   Case No. A05-003 C/V (RRB)
                                       )
KATE GIARD, in her official capacity as )
Chairwoman of the Regulatory Commission )
Of Alaska; *et al.,* )
                                       )
         Respondents. )
_____ )

**ACS OF ANCHORAGE, INC.'S CROSS-PETITION
REPLY BRIEF RE: FINAL RATES AND TERMS**

Respectfully submitted this 10th day of August, 2006.

                              TINDALL BENNETT & SHOUP
                              Attorneys for Respondent and
                              Cross Petitioner ACS of Anchorage,
                              Inc.,

                              <u>/s/ Richard W. Maki</u>
                              Alaska Bar Association No. 8211126
                              Tindall Bennett & Shoup
                              508 W. 2nd Avenue, 3rd Floor
                              Anchorage, Alaska 99501
                              907/278-8533
                              Fax: 907/278-8536

# **TABLE OF CONTENTS**

Table of Authorities..................................................................................ii

I. Any Remand of the Cost of Capital Issue Would Also Require A
   Remand of Depreciation Rates............................................................1

   A. Introduction.......................................................................................1

   B. The RCA Did Not "Double-Count" the Impacts of Competition......................2

   C. Compensating Adjustments to the Depreciation Rates Would Be
       Appropriate.................................................................5

   D. Conclusion........................................................................................6

II. The RCA's Decision Respecting the Percentage of Feeder Plant
    to Be Placed in Pavement Should Be Remanded.............................................7

   A. Standards of Review...........................................................................7

   B. The RCA's Decision Was Based on a Misperception
      of the Evidence...............................................................................10

# TABLE OF AUTHORITIES

**Cases**

Mpower Commun. Corp. v. Illinois Bell Tel. Co., Inc., ___ F.3d ___,
2006 WL 2193493 (7th Cir. 2006)..................................................................8

Pacific Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,
426 F.3d 1082 (9th Cir. 2005).....................................................................14

Sprint Commun. Co. L.P. v. FCC, 274 F.3d 549 (D.C. Cir. 2001)...............................9

Wisconsin Bell, Inc. v. Bridge, 334 F.Supp.2d 1127 (W.D. Wis. 2004)....................8, 9

WorldCom v. FCC, 308 F.3d 1 (D.C. Cir. 2002).........................................................7

**Statutes and Regulations**

47 U.S.C. § 252(e)(6)..................................................................................8

47 U.S.C. § 271......................................................................................8, 9

**FCC Orders**

In the Matter of Application by Bell Atlantic New York,
15 F.C.C.R. 3953 (1999)............................................................................9

In the Matter of Implementation of the Local Competition Provisions
in the Telecommunications Act of 1996, First Report and Order,
CC Docket No. 96-98, 11 FCC Rcd 15499 (released Aug. 8, 1996)
("*Local Competition Order*")...............................................................3, 5, 6

In the Matter of Review of the Commission's Rules Regarding the
Pricing of Unbundled Network Elements and the Resale of Service by
Incumbent Local Exchange Carriers, Notice of Proposed Rulemaking,
Notice of Proposed Rulemaking, WC Docket 03-173,
18 FCC Rcd 18945 (released Sept. 15, 2003)("*NPRM*")........................................7, 9

In the Matter of Review of the Section 251 Unbundling Obligations
of Incumbent Local Exchange Carriers, Report and Order and Order
on Remand and Further Notice of Proposed Rulemaking,
CC Docket Nos. 01-338, 96-98, 98-147, 18 FCC Rcd 19020
(released Aug. 21, 2003)("*Triennial Review Order*")......................................2, 3, 5, 6

**State Commission Decisions**

In the Matter of the Local Exchange Revenue-Requirement,
Depreciation, etc., RCA Docket U-01-34, Order No. 15 (June 6, 2002)......................4

In the Matter of the Local Exchange Revenue-Requirement,
Depreciation, etc., RCA Docket U-01-34, Order No. 20 (Feb.12, 2003)......................4

In the Matter of the Local Exchange Revenue-Requirement,
Depreciation, etc., RCA Docket U-01-34, Order No. 22 (May 23, 2003)....................4

In the Matter of the Local Exchange Revenue-Requirement,
Depreciation, etc., RCA Docket U-01-34, Order No. 24 (Aug. 22, 2003)....................4

## I. ANY REMAND OF THE COST OF CAPITAL ISSUE WOULD ALSO REQUIRE A <u>REMAND OF DEPRECIATION RATES.</u>

**<u>A. Introduction.</u>**

As set forth in ACS' opening brief, ACS proposed that the impacts of competition be reflected in both the cost of capital and depreciation rates, but the RCA expressly elected "to focus its risk analysis in one area" and to reflect the competitive risks "in the Cost of Capital, rather than in...depreciation." [Box 04, at 1839-40 (Order No. 46); <u>see</u> Box 04, at 1335-36 (Order No. 42).] Given that approach, there is a direct relationship between the RCA's decisions respecting the cost of capital and depreciation. Accordingly, any ruling by this court reversing and remanding the cost of capital decision should also encompass a remand authorizing the RCA to make any corollary adjustments to the depreciation rates that it deems appropriate.

In response, GCI argues that a reversal of the RCA's cost of capital decision would not require a remand of the depreciation issue since the RCA already factored the impacts of competition into the depreciation rates it adopted. Moreover, GCI contends that the RCA double-counted the competitive risks when it chose to reflect them in the cost of capital. In making these arguments, however, GCI overstates its case and misconstrues the RCA's decisions.

Given the RCA's decision to "focus its risk analysis" in the cost of capital, it would not be fair to reverse and remand the cost of capital decision without affording the RCA the opportunity to revisit its depreciation decisions as well.

1

**B. The RCA Did Not "Double-Count" the Impacts of Competition.**

In addition to factors such as evolving technology, the focus of concern in this instance was largely on the impacts arising from GCI's capture of 44% of the local phone service market and its announced plans to transfer its customers from ACS' network onto GCI's own cable telephony network. This migration of customers from ACS' network and the resulting loss of revenue impacts the UNE rate calculation in a variety of ways. Viewed as a depreciation issue, the loss of use of ACS' network and the loss of revenue results in a decline in the value of network assets, thereby impacting ACS' ability to recover the value of its investment in those assets over time. Viewed as a cost of capital issue, the loss of customers and revenue subjects ACS to more financial and business risk, thereby increasing the cost of its borrowing and increasing the returns demanded by investors.

ACS proposed that the competitive impacts operative in this case be factored into both the cost of capital and depreciation rates. To ensure a fair recovery of ACS' investment in the face of declining revenues, ACS proposed that depreciation rates be set by: 1) shortening the service lives of its network assets, i.e., the period over which the investment is recouped, and 2) increasing the annual rate of depreciation to ensure full investment recovery despite the loss of customers over time.[1] [Box 03,

---

[1] "There are two components of depreciation – the useful life of the asset, and the rate at which the asset is depreciated over the useful life." In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, CC Docket Nos. 01-338, 96-98, 98-147, 18 FCC Rcd 19020, at ¶ 686 (released Aug. 21, 2003)(hereinafter "*Triennial Review Order*").

2

at 1373-80, 1391-95, 2692-96 (Cooney Test.), 1406-08 (Meade Test.), 2549-52 (Weinert Test.); Box T1, at 2692-96 (Cooney Test.).] To ensure its ability to raise capital through borrowing and the attraction of investment, ACS also proposed that the cost of capital be increased. [Box 03, at 747-48 (Blessing Test.), 1404-06 (Meade Test.).]

The RCA, however, elected to "focus its risk analysis" in this proceeding in the cost of capital, rather than in depreciation. [Box 04, at 1839-40 (Order No. 46).] Reasoning that it had already factored the impacts of competition into the service lives adopted in the rate case, the RCA decided to use the same depreciation rates adopted in that case. [Box 04, at 1335-36 (Order No. 42).] However, since the cost of capital adopted in the rate case was a "traditional cost of capital without the impact of TELRIC-style competition," the RCA determined that it was appropriate to adjust it in this case to "reflect the impact of the competitive market." [Box 04, at 1335, 1338 (Order No. 42).]

By reaching these decisions, the RCA did not double-count the impacts of competition. The FCC has made clear that the impacts of competition can appropriately be reflected in **both** the cost of capital and depreciation. *Local Competition Order*,[2] at ¶ 686; *Triennial Review Order*, at ¶¶ 671, 680-81, 688-91. In this case, it was appropriate to factor GCI's market capture and cable telephony

---

[2]  In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, CC Docket No. 96-98, 11 FCC Rcd 15499, (released Aug. 8, 1996)(hereinafter "*Local Competition Order*").

3

plans into the determination of both the cost of capital and depreciation. Competition and the loss of customers and revenues has a direct bearing on the financial and business risks faced by ACS (cost of capital) and on the decline in the value of its network assets over time (depreciation). While the ultimate UNE rates produced must fall within the range that a reasonable application of the TELRIC principles would produce, the RCA has broad discretion to adjust the cost of capital and depreciation rates to reflect these various competitive impacts.

      To the extent that the RCA may have already made some adjustments to the depreciation rates in the prior rate case, it still deemed it necessary to make additional adjustments in the UNE calculation to reflect competitive impacts[3] and it chose to do so in the cost of capital rather than in depreciation. In fact, GCI's own witnesses recognized that competitive impacts needed to be reflected in the cost of capital. [Box T1, at 3051 (Mercer Test.), 3177-79 (Murray Test.)] Thus, the real question before the RCA was to what degree those impacts should be factored into

---

[3]    The rate case was a dated proceeding based on incomplete information. The hearing in the rate case was conducted in March 2002, and the initial decision was rendered in June 2002, more than a year before the hearing conducted in this case. [In the Matter of the Local Exchange Revenue-Requirement, Depreciation, etc., RCA Docket U-01-34, Order No. 15 (June 6, 2002), Ex. J in the Appendix to GCI's Briefing.] While the RCA subsequently reopened the proceeding to correct errors in the underlying data that had been submitted [see RCA Docket U-01-34, Order No. 24 (Aug. 22, 2003), Ex. K in the Appendix to GCI's Briefing], the RCA refused to allow ACS to conduct discovery into GCI's cable telephony plans and refused to allow ACS to present new testimony addressing (among other issues) the impact of competition on depreciation rates. [RCA Docket U-01-34, Order No. 20, at 5, n.16 (Feb.12, 2003); RCA Docket U-01-34, Order No. 22, at 5 (May 23, 2003).] This UNE case was a separate proceeding, and the RCA was not bound by the evidence presented or the decisions reached in the older rate case.

the cost of capital, not whether it would constitute double-counting to factor them in at all.

At bottom, there was substantial evidence in the record supporting the RCA's determination of the cost of capital, and that decision was not arbitrary and capricious. The RCA made a conscious and reasoned decision to adjust the cost of capital based on a full awareness of how it had treated depreciation in the rate case. [Box 04, at 1335-36 (Order No. 42).] Contrary to GCI's claim, there was no double-counting.

## C. Compensating Adjustments to the Depreciation Rates Would Be Appropriate.

GCI is also wrong in arguing that the RCA should not be permitted to adjust the depreciation rates since the impacts of competition were already factored into those rates in the rate case. Both in its original arbitration order in this proceeding and in its order denying GCI's petition for reconsideration on the cost of capital issue, the RCA made clear: 1) that adjustments to the UNE rate calculus beyond those already reflected in the depreciation rates were necessary to account for the impacts of competition, and 2) that the RCA's "strategy" was to "focus its risk analysis in one area" by factoring the competitive risks into the cost of capital instead of depreciation. [Box 04, at 1332-39 (Order No. 42), 1838-40 (Order No. 46).] Though it chose to focus its risk analysis in the cost of capital and leave the previously adopted depreciation rates alone, the RCA could have reasonably chosen to factor that risk into depreciation rates as well. *Local Competition Order*, at ¶ 686; *Triennial Review*

5

*Order*, at ¶¶ 671, 680-81, 688-91.

Since the RCA's decisions regarding the cost of capital and depreciation rates were made in tandem, it would not be fair to remand the cost of capital for redetermination without allowing the RCA to make any corollary adjustments it deems necessary to the depreciation rates.

GCI also argues that the depreciation rates should not be adjusted since the RCA based them on asset lives at the low end of the FCC range. However, there is no requirement that the RCA adopt asset lives within the FCC ranges. Under the Act and the FCC's regulations, state commissions have broad discretion to factor local conditions into the determination of UNE rates, and that discretion encompasses the flexibility to set depreciation rates. *Local Competition Order*, at ¶ 114; *Triennial Review Order*, at ¶¶ 688-90. The fact that the FCC lives have been adopted by other state commissions in other proceedings does not require that they be adopted in this proceeding as well.

GCI's argument also overlooks the fact that asset lives is only one component of depreciation. Irrespective of the lives adopted (whether within the FCC range or otherwise), the RCA would still have the additional discretion to adopt the rates at which particular assets are depreciated over their useful lives. *Triennial Review Order*, at ¶¶ 686, 690-91.

**D. Conclusion.**

The determination of UNE rates requires a careful balancing of many complex, interrelated factors. In presenting its challenge to the cost of capital, however, GCI

has failed to acknowledge the close relationship of that issue to depreciation rates. As a result, it has failed to establish that any alleged errors in the cost of capital were not compensated for in depreciation rates, nor has it demonstrated that the resulting UNE loop rate is unreasonable. To ensure against a one-sided revision of the UNE loop rate that ignores the relationship between cost of capital and depreciation, any remand that may be ordered should encompass the authority to re-examine both issues in tandem.

## II. THE RCA'S DECISION RESPECTING THE PERCENTAGE OF FEEDER PLANT PLACED IN PAVEMENT SHOULD BE REMANDED.

### A. Standards of Review.

By cross-petition, ACS has contested the RCA's determination of the amount of feeder plant placed in concrete or asphalt. In response, GCI asserts that this challenge hypocritically contradicts ACS' own arguments regarding the standards to be applied by this court in reviewing the RCA's UNE rate decisions. In making this assertion, however, GCI mischaracterizes ACS' position respecting the proper standards of review.

It is not ACS' contention that this court should ignore the individual components of the RCA's rate-making decision. Consistent with the authority cited in its opening brief, it is simply ACS' position that the ultimate focus must be on the final rate and that the court's review of the RCA's decisions respecting particular aspects of the rate calculation must be tempered by a recognition that TELRIC is a flexible methodology that can yield "a rather broad range" of acceptable results. WorldCom v.

7

FCC, 308 F.3d 1, 7 (D.C. Cir. 2002); see also NPRM,[4] at ¶ 26. Decisions respecting one part of the UNE rate calculus may be offset by decisions respecting other parts (e.g., as between the factoring of competitive risk into the cost of capital and depreciation rates). Other decisions may have an insignificant impact on the final UNE rate (e.g., GCI's claim that the loop rate should be reduced twenty-two cents to reflect a revised cost of capital input to the switching model). As stated in Wisconsin Bell, quoted in GCI's reply/opposition brief, the question is whether the challenging party "can show that an error in the calculation of one factor or multiple factors **was so substantial** that it made the commission's determination arbitrary and capricious." Wisconsin Bell, Inc. v. Bridge, 334 F.Supp.2d 1127, 1136 (W.D. Wis. 2004)(emphasis added.) See also Mpower Commun. Corp. v. Illinois Bell Tel. Co., Inc., ___ F.3d ___, 2006 WL 2193493, at *6 (7th Cir. 2006).

While GCI challenges ACS' citation to authorities concerning proceedings under § 271 of the Telecommunications Act,[5] the review standards applied in that context apply with equal force in this context. In Wisconsin Bell, the court rejected the

---

[4]  In the Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers, Notice of Proposed Rulemaking, Notice of Proposed Rulemaking, WC Docket 03-173, 18 FCC Rcd 18945 (released Sept. 15, 2003) (hereinafter "NPRM").

[5]  Under 47 U.S.C. § 271, an incumbent carrier may not offer long distance telephone service in its own state until the FCC has approved an application demonstrating, among other things, that the carrier has provided interconnection in accordance with the requirements of §§ 251 and 252 and at rates in compliance with the FCC's TELRIC method. Wisconsin Bell, 334 F.Supp.2d at 1135.

8

claim that § 271 proceedings did not provide a model for district court review of UNE rate decisions under § 252(e)(6). Id., at 1135-36. The court reasoned that just as "the FCC does not conduct *de novo* review of state commission rate determinations, neither do federal courts, at least with respect to determining whether a state commission has applied TELRIC correctly." Id., at 1135. Furthermore, the court concluded that all of the reasons for affording deference to FCC decisions in § 271 cases applied to justify deference to state commission decisions in cases like this:

> (1)'[T]he issues at stake [are] ones involving a high level of technical expertise in an area of rapidly changing technological and competitive circumstances'; (2) 'the Commission itself was reviewing a state agency with considerable expertise'; and (3) 'enormous flexibility [is] built into TELRIC.' Each of these reasons for deference applies to this case as well.

Id., 1135-36, *quoting* Sprint Commun. Co. L.P. v. FCC, 274 F.3d 549, 556 (D.C. Cir. 2001). Thus, the standards of review to be applied in determining TELRIC compliance are fundamentally the same in both § 271 cases and cases like this brought under 252(e)(6). TELRIC is TELRIC, regardless of the context.

> In § 271 proceedings,
>
> [T]he FCC will reject an application only if 'basic TELRIC principles are violated or the state commission makes **clear errors in factual findings on matters so substantial that the end result falls outside the range that the reasonable application of TELRIC principles would produce**.' [Emphasis added.]

Id., at 1135, *quoting* In the Matter of Application by Bell Atlantic New York, 15 F.C.C.R. 3953, at ¶ 244 (1999). The FCC also made that standard clear in its *NPRM*, at ¶ 27, declaring, "an error in one component of a pricing decision does not necessarily mean that UNE prices do not comply with TELRIC."

9

As GCI argues, a review of individual rate calculation factors is appropriate in both § 271 proceedings and cases like this. However, as GCI fails to acknowledge, that review must be conducted under the standards detailed above.

By asserting these standards of review, ACS is not taking a position inconsistent with its own cross-petition claim for relief. ACS' claim has merit. The RCA's decision was not supported by substantial evidence, and the RCA's error has a substantial impact on the final UNE loop rate,[6] which is not offset by any error committed in GCI's favor, for no such errors were made. Alternatively, to the extent this court should disagree with ACS and decide that errors were made in GCI's favor, then ACS' claim would serve to offset those errors, thereby yielding a UNE rate within the range that a reasonable application of the TELRIC principles would produce.

Contrary to GCI's assertion, ACS is not suggesting that the RCA could determine UNE rates using a dartboard so long as they fall within the range of reasonableness. To evaluate the propriety of the rates adopted, this court must of course examine the evidence and reasoning supporting the RCA's decisions. However, this court must also recognize the complexity of the rate-making process, afford due deference to the RCA, and allow some latitude to the RCA in balancing the complex judgments that factor into the determination of UNE rates.

**B. The RCA's Decision Was Based on a Misperception of the Evidence.**

---

[6] In his dissenting opinion on this issue, Commissioner Strandberg agreed with ACS that 89.7% of feeder construction would be in paved roadways. [Box 04, at 1401-05 (Order No. 42, Dissent).] Using that percentage, Commissioner Strandberg recalculated the UNE loop rate to be $20.32, or more than 6% higher than the $19.15 rate originally adopted by the RCA. [Box 04, at 1403-05.]

For purposes of determining the cost of constructing the feeder portion of ACS' network, the RCA determined that 53% of feeder plant would be placed in pavement. [Box 04, at 1360 (Order No. 42).] The question for this court is whether that determination was supported by substantial evidence.

GCI contends in its brief that the quantity and quality of its evidence was vastly superior to ACS' on this point. It was not. As elaborated below, the RCA's decision was founded on a misperception and mischaracterization of the evidence presented by both parties. The result was a decision that was not supported by substantial evidence.

As detailed in ACS' opening brief, ACS presented ample evidence to support a finding that 89.7% of feeder plant would be placed in pavement. While the RCA in its brief now faults various aspects of ACS' evidentiary presentation, the criticisms are unfounded, and they demonstrate the RCA's failure to properly understand and credit ACS' evidence. For example, the RCA charges that "no one from ACS' original design team" testified to sponsor the feeder design. [ACS Br., at 68.] The RCA asserts that ACS' primary witness on the issue, Steve Cinelli, did not do the original design, but only reviewed and sponsored the design team's work. The RCA unreasonably denigrates Cinelli's testimony. Cinelli did more than simply "sponsor" the design, but rather, was integrally involved in it. He independently reviewed and verified the design team's preliminary work, specifically visiting those locations with which he was not already familiar and making changes where appropriate. [Box 03, at 1328-31, 1340, 1354-57 (Cinelli Test.).] Moreover, as discussed below, Cinelli

prepared exhibits documenting the pertinent conditions of each feeder route segment and itemizing his evaluation of each route. [Box 03, at 1344-53 (Ex. SDC-3); Box 03, at 1354-57 (Ex. SDC-4).] ACS should not be faulted for failing to present additional witnesses to give testimony cumulative to Cinelli's.

In a related point, the RCA argues that it was not possible to cross-examine the designers of the preliminary design on any aspect of their work. However, the RCA has not cited anything in the record to suggest that questions went unanswered because other witnesses were not called to testify. Given Cinelli's close involvement in the design process, he was prepared to respond to any cross-examination, and in fact, he answered all questions posed to him respecting the feeder design. [Box T1, at 2628-57.]

The RCA also asserts that Cinelli's analysis was limited to cursory comments in a spreadsheet and that he failed to identify the feeder segments he found it necessary to inspect personally. This criticism, however, unfairly minimizes the nature and significance of ACS' exhibits and is unfounded. In one exhibit to his testimony (Ex. SDC-3), Cinelli detailed the results of his design review, itemized the areas where he adjusted the amount of road prism construction, and quantified the amounts of those adjustments (in linear feet). [Box 03, at 1344-53.] In another exhibit (Ex. SDC-4), he detailed the final feeder routes segment-by-segment, specified the percentage of road prism construction required, and described the nature of the conditions either permitting construction outside the road prism or requiring construction within it. [Box 03, at 1354-57.] Along with Cinelli's testimony, the exhibits

demonstrated a particularized familiarity with and careful consideration of each segment of the feeder routes.

Cinelli's testimony was also supported by that of Greg Schmid, a foreman in ACS' outside plant engineering department. [Box T1, at 2659.] Schmid and his department designed the distribution network used to calculate the UNE loop rate [Box T1, at 2660], but he also brought his real world expertise to bear on the issue of feeder plant design. Schmid's department had designed ACS' actual feeder network (as opposed to the hypothetical design used to calculate the loop rate), and since he had worked in the department since 1975, he had built most of it. [Box T1, at 2668, 2676.] He confirmed that, though they tried to stay out of paved areas when constructing feeder plant, there are "very few grassy areas" where that is possible. [Box T1, at 2663, 2665.] The presence of other utilities such as "storm drain, gas, power, [and] cable TV...strung out all over the place" limits the placement of facilities. [Box T1, at 2665.]

On the other side of the coin, the RCA argues that GCI's estimate of road prism construction was more persuasive because it was based on a visual inspection and a "detailed record" of that inspection, including photographs. [RCA Br. at 69.] In contradiction to this argument, the two dissenting commissioners specifically found that GCI had not presented "enough data to conclude that the feeders can actually be placed outside the road prism" and found "inadequate record to conclude that the GCI alignments are workable." [Box 04, at 1403 (Order No. 42, Dissent), 1867 (Order No. 46, Separate Statement of Commissioner Johnson).] In fact, GCI's photographs

actually served to support Cinelli's testimony and ACS' estimate of required pavement construction by depicting many of the obstructions to the placement of feeder plant in dirt or grass. [Box 2, at 2691, *et seq.*]

For example, the photographs depicting the DeBarr Road segment of CBG 8014 depict all the types of obstructions to feeder placement described in Cinelli's testimony: light poles, electric poles, private property, landscaping, and sidewalk/bikepaths. [Box 02, at 2723-29.] At pages 69 and 70 of its brief, the RCA critically compares Cinelli's description of this feeder segment to GCI's, but a review of GCI's photos actually validates Cinelli's description. While Cinelli accurately described the obstructions requiring the placement of feeder plant in pavement ("Congested, sidewalks, utilities, paved parking and other private property apparent immediately behind the sidewalk"), GCI merely described the type of construction ("Cut/trench on either side of bike path between Patterson, Ermine & Turpin"), thereby begging the question of whether there are obstacles present that would prevent placement of feeder in that location. [Box 03, at 1355; Box 02, at 2721.] In contradiction to GCI's descriptions, its photos show that light poles, electric poles, landscaping, and private property would preclude the placement of feeder plant outside the paved roadway.

The RCA also argues that GCI's spreadsheet descriptions identified whether road prism construction was required. However, as noted in GCI's brief, the parties defined the road prism differently. While ACS defined it as those areas requiring construction under a paved surface, GCI defined it more broadly to include unpaved

14

dirt and grass areas adjacent to the paved road. [Box 04, at 1354, 1357 (Order No. 42).] The issue here is the percentage of feeder plant to be placed in pavement, not the percentage to be placed in the road prism as GCI defined it, so GCI's quantification of road prism construction is irrelevant and completely nonprobative.

Given the evidence, the RCA did not have a substantial basis for finding that only 53% of feeder plant would be placed in pavement. Agency action may be overturned as unlawful if the agency "offered an explanation for its decision that runs counter to the evidence before the agency." Pacific Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1090 (9th Cir. 2005). In this instance, the RCA's decision was based on a misperception and mischaracterization of the evidence before it. The RCA inaccurately discounted Cinelli's testimony by misstating his integral role in the design of the proposed feeder routes and it misconstrued the documentary exhibits presented by both parties.

The RCA's decision respecting the percentage of feeder plant placed in pavement should be remanded.

DATED at Anchorage, Alaska, this 10th day of August, 2006.

          TINDALL BENNETT & SHOUP
          Attorneys for Respondent and Cross-
          Petitioner ACS of Anchorage, Inc.

          By: /s/ Richard W. Maki
            Richard W. Maki
            ABA No. 8211126

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 10th day of August, 2006, a true and correct copy of the foregoing was served electronically on the following:

15

Martin M. Weinstein
Mark Moderow
GCI Communication Corp.
2550 Denali Street, Suite 1000
Anchorage, AK 99503

Robery A. Royce
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501


       /s/ Richard W. Maki
By: _____
     Tindall Bennett & Shoup

16