# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| GCI COMMUNICATION CORP., d/b/a<br>GENERAL COMMUNICATION, INC.,<br>d/b/a GCI, | ) ) ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| -vs- | ) | Case No. A05-003 C/V (RRB) |
| | ) | |
| KATE GIARD, in her official capacity as<br>Chairwoman of the Regulatory Commission<br>Of Alaska; *et al.,* | ) ) ) | |
| | ) | |
| Respondents.<br>_____ | ) ) | |

## ACS OF ANCHORAGE, INC.'S CROSS-PETITION
## REPLY BRIEF RE: DELAY AND INTERIM RATE ISSUES

Respectfully submitted this 10th day of August, 2006.

TINDALL BENNETT & SHOUP
Attorneys for Respondent and
Cross Petitioner ACS of Anchorage, Inc.,

/s/ Richard W. Maki
Alaska Bar Association No. 8211126
Tindall Bennett & Shoup
508 W. 2nd Avenue, 3rd Floor
Anchorage, AK 99501
907/278-8533
Fax: 907/278-8536

# **TABLE OF CONTENTS**

Table of Authorities......................................................................................................iii

I. The RCA Erred by Failing to Grant ACS Interim Rate Relief.........................................1

    A. Introduction....................................................................................................1

    B. The Governing Legal Standards for Interim Rate Relief................................2

    C. The RCA Erred in Requiring ACS to Satisfy the "Probability of Success" Test....................................................................................3

        1. ACS' First Request for Interim Relief....................................................3

        2. ACS' Second Request for Interim Relief...........................................5

    D. ACS Satisfied the "Balance of Hardships" Test...........................................5

II. This Court Has Jurisdiction Over ACS' Claim of Unreasonable Delay........................8

    A. Introduction....................................................................................................8

    B. The Governing Statutes and Regulation........................................................9

    C. The FCC's Preemption Authority Does Not Extend to Claims of Unreasonable Delay.........................................................................10

    D. ACS' Petition to the FCC............................................................................11

    E. ACS' Claim of Unreasonable Delay is Not Preempted................................13

III. The RCA Unreasonably Delayed the Adoption of a TELRIC-Compliant
     UNE Loop
     Rate.................................................................................................15

     A.
     Introduction..............................................................................................15

     B. A Note on the Applicable Standard of
     Review...............................................16

     C. "Judicial Uncertainty" Did Not Justify the
     Delay............................................17

     D. ACS' Model Proposals Did Not Cause the
     Delay.........................................19

     E. ACS Was Not Responsible for the Delay in Reviewing its
     Model.................21
     F. The Delay Was Unreasonable and In Violation of the
     Act...........................23

# TABLE OF AUTHORITIES

## Cases

APUC v. Greater Anchorage Area Borough, 534 P.2d 549 (Alaska 1975)..............2, 7

AT&T Commun. of Ill., Inc. v. Illinois Bell Tel. Co., 349 F.3d 402
(7th Circuit
2003).......................................................................................................1

Global NAPS, Inc. v. FCC,  291 F.3d 832 (D.C. Cir.
2002)..........................................11

Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778 (9th Cir.
2001)........................14

Hydronautics v. Filmtec Corp., 204 F.3d 880, 885 (9th Cir.
2000)................................14

Iowa Utilities Board v. FCC, 219 F.3d 744 (8th Cir. 2000)
(Iowa Utilities
II).......................................................................................................17

MCI Telecommun. Corp. v. FCC, 627 F.2d 322 (D.C. Cir.
1980)................................18

Nader v. FCC, 520 F.2d 182 (D.C. Cir. 1975).......................................................16,
17

Re Alascom, Inc., 7 APUC 256
(1986).......................................................................6

Re Municipality of Anchorage dba Anchorage Sewer Utility,
3 APUC 64, 37 PUR 4th 97 (1980)............................................................................2,
7

Re Municipality of Anchorage dba Municipal Light and Power Dept.,
7 APUC 514
(1986).......................................................................................................3

U.S. West Commun., Inc. v. MFS Intelenet, Inc., 193 F.3d 1112 (9th Cir.
1999).........17

Verizon California, Inc. v. Peevey, 413 F.3d 1069 (9th Cir.

2005)................................1

<u>Verizon Commun., Inc. v. FCC</u>, 535 U.S. 467, 122 S.Ct. 1646
(2002)........................167

**<u>Statutes and Regulations</u>**

47 U.S.C. §
154(j)...........................................................................................16

47 U.S.C. §
251(c)(2)(D)..................................................................................15

47 U.S.C. § 252(b)(4)(C)......................................................................9,
13

47 U.S.C. §
252(e)(5)......................................................................9

47 U.S.C. § 252(e)(6).........................................................................9,
13

47 C.F.R. § 51.801(b)........................................................................9,
11

**<u>FCC Orders</u>**

<u>In the Matter of ACS of Anchorage, Inc. and ACS of Fairbanks, Inc.</u>,
WC Docket No. 02-201, Memo. Opin. and Order (Oct. 22, 2002).......................12, 13

<u>In the Matter of Core Communications, Inc. v. Verizon Maryland, Inc.</u>,
8 F.C.C.R. 7962
(2003)...........................................................................15

<u>In the Matter of Implementation of the Local Competition Provisions</u>
<u>in the Telecommunications Act of 1996, First Report and Order,</u>
CC Docket No. 96-98, 11 FCC Rcd 15499 (released Aug. 8, 1996)
("*Local Competition Order*")......................................................................4,
9

<u>In the Matter of Joint Petition of MCI WorldCom, et al.</u>,
18 F.C.C.R. 9473
(2003)..............................................................................10

In the Matter of Petition for Commission Assumption of Jurisdiction
of Low Tech Designs, Inc.'s Petition for Arbitration, 13 F.C.C.R. 1755
(1997)............11

In the Matter of Petition of Supra Telecommun. & Info. Systems, Inc.,
17 F.C.C.R. 22884
(2002).........................................................................................10

In the Matter of Petition of WorldCom, Inc., 16 F.C.C.R. 6224
(2001).........................10

In the Matter of Review of the Commission's Rules Regarding the
Pricing of Unbundled Network Elements and the Resale of Service by
Incumbent Local Exchange Carriers, Notice of Proposed Rulemaking,
Notice of Proposed Rulemaking, WC Docket 03-173,
18 FCC Rcd 18945 (released Sept. 15, 2003)("NPRM").........................................3,
5

In the Matter of Starpower Commun., LLC, 15 F.C.C.R. 11277
(2000).......................10

**State Commission Decisions**

In the Matter of the Petition by GCI Communication Corp.,
RCA Docket U-99-141, Order No. 9 (Aug. 24, 2000)................................................18

## I. THE RCA ERRED BY FAILING
## TO GRANT ACS INTERIM RATE RELIEF.

### A. Introduction.

> **[T]he possibility of repair in the future is no warrant for promulgating today a rate that deviates from the TELRIC standard. Federal law requires that any rate for unbundled network elements, adopted by a state commission, comply with the TELRIC standard when adopted**.

AT&T Commun. of Ill., Inc. v. Illinois Bell Tel. Co., 349 F.3d 402, 411 (7th Circuit 2003) (emphasis added). This rule applies to both final and interim UNE rates. Verizon California, Inc. v. Peevey, 413 F.3d 1069, 1071 (9th Cir. 2005). The RCA violated this rule of law and the Act when it refused to provide adequate interim relief. Given the final UNE loop rate of $18.64, it is indisputable that the temporary and interim rates of $13.85 and $14.92 were well below the range of rates a reasonable application of TELRIC principles would produce.

While the RCA and GCI argue that ACS failed to demonstrate that its interim rate proposals complied with the Act, their arguments are founded on a misapplication of the standards governing interim rate relief. Under those standards, ACS was not required to definitively prove the merits of its case. It was required only to satisfy the five-prong "balance of hardships" test and demonstrate that its claim was not frivolous or obviously without merit. ACS satisfied that burden in this case, and it should have been granted meaningful interim relief.

1

**B. The Governing Legal Standards for Interim Rate Relief.**

In APUC v. Greater Anchorage Area Borough, 534 P.2d 549, 554, 557-59 (Alaska 1975), the Alaska Supreme Court established a five-prong "balance of hardships" test for purposes of ruling on a request for an interim rate increase. The court began its analysis with the traditional three-prong test for injunctive relief, which requires a showing that: 1) the movant is faced with irreparable harm; 2) the opposing party will be adequately protected; and 3) there are serious and substantial questions going to the merits of the case, i.e., the issues raised cannot be frivolous or obviously without merit. Id., at 554. Recognizing that this test will "almost invariably favor" utilities seeking interim rate increases, the court deemed it appropriate to add two additional prongs to the test, requiring that the movant show: 4) the current rates are confiscatory; and 5) the interim rates are likely to remain in effect for an unreasonably long time. Id., at 557, 559. Considering this test as a whole, the court concluded, "In cases where there has been a substantial showing that the existing rates are confiscatory, an administrative decision which results in the prolonged continuation of such rates will rarely be found to have a rational basis." Id. at 559.

In later applying this standard, the RCA's predecessor (the APUC) made clear that "the 'not frivolous or obviously without merit' standard...'is not intended to be difficult to pass.'" Re Municipality of Anchorage dba Anchorage Sewer Utility, 3 APUC 64, 67, 37 PUR 4th 97 (1980)(citation omitted). Under the five-prong test,

> ...**a utility does not have to advance the same detailed proof which is required for a permanent rate increase or tariff change in order to secure interim rate relief.** The utility does not even have to

2

> demonstrate that it will probably succeed in all aspects of its proof at
> the time of the permanent rate increase decision.

Id. (emphasis added). The commission further observed that where rates are shown

to be confiscatorily low, "the remaining elements are generally established with

ease." Id.

## C. The RCA Erred in Requiring ACS to Satisfy the "Probability of Success" Test.

**1. ACS' First Request for Interim Relief.** Based on the conclusion that the

balancing test weighed against ACS, the RCA applied the more stringent "probability

of success" test. [Box 01, at 2702-03 (Order No. 23).] That test requires the movant

to establish "that it will more likely than not prevail on final hearing." Re Municipality

of Anchorage dba Light and Power Dept., 7 APUC 514, 517 (1986). To support its

finding that the balancing test weighed against ACS, the RCA speculated,

> If the UNE rates are set too high, GCI cannot be protected by a refund
> because its ability to offer competing service **may** be impacted....The
> damage is that the competing service GCI is offering **may** not be viable
> if interim UNE rates are set too high. The potential harm from
> establishment of a too high interim rate is that the Act's purpose of
> encouraging competition **may** be frustrated.

[Box 01, at 2702-03 (Order No. 23)(emphasis added).]

The RCA had no basis for that finding. GCI never argued or offered any

evidence to show that its viability as a competitor would be threatened if the loop rate

were raised. Instead, it argued only that it would have to consider building its own

3

facilities.[1]  [Box 01, at 981-83; Box T1, at 165-66.] In fact, at the argument held on

ACS' motion, a GCI executive stated, "[I]f the rate becomes too high we will do what

have to do to survive economically and still get service to our customers." [Box T1, at

166.] These are not the words of a competitor threatened with extinction. Absent an

evidentiary basis for its finding, the RCA should not have applied the "probability of

success" test.

Moreover, the merits of the RCA's reasoning is legally flawed. The competition

envisioned by the Act is a neutral goal. It does not favor either competitors (like GCI)

or incumbents (like ACS). *Local Competition Order,*[2] at ¶¶ 618, 705. In this instance,

however, the RCA violated that neutrality by favoring GCI. While expressing concern

about the impact on GCI if the interim loop rate were set too high, the RCA

completely ignored the impact on ACS if the rate were set too low. Thus, rather than

follow a competitively neutral course that would protect both parties' interests, such

_____

[1]     Since the ultimate goal of the Act is to foster the construction of facilities
and true facilities-based competition, GCI's argument provided no justification for
imposing a burden of proof that resulted in an improperly low loop rate. In the
Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled
Network Elements and the Resale of Service by Incumbent Local Exchange
Carriers, Notice of Proposed Rulemaking, Notice of Proposed Rulemaking, WC
Docket 03-173,18 FCC Rcd 18945, at ¶ 3 (released Sept. 15, 2003)(hereinafter
"*NPRM*").

        Except where otherwise noted, all cited FCC and state commission
decisions are included either in the appendix to ACS' opening briefs or in the
supplemental appendix to ACS' reply briefs.

[2]     In the Matter of Implementation of the Local Competition Provisions in the
Telecommunications Act of 1996, First Report and Order, CC Docket No. 96-98,
11 FCC Rcd 15499 (released Aug. 8, 1996)(hereinafter "*Local Competition
Order*").

as was proposed by ACS, the RCA chose to favor GCI's interests at ACS' direct expense. By requiring ACS to bear the entire risk of an improper interim rate and holding ACS to the more onerous "probability of success" test, the RCA committed an error of law and violated the Act.

The FCC has stated: "We have recognized in several contexts that the use of interim rates subject to true-up is an appropriate means of **protecting all parties' interest** [sic] when permanent rates under the governing cost methodology have not yet been set." *NPRM*, at ¶ 151 (emphasis added). Given this pronouncement, there was no justification for placing GCI's interests over ACS'. Under the neutral pro-competition policy of the Act, the RCA should not have employed a legal standard that favored GCI. ACS should not have been required to satisfy the "probability of success" test.

**2. ACS' Second Request for Interim Relief.** With respect to ACS' second motion for interim relief, the RCA simply refused to consider the request since the arbitration of the cost models and inputs was incomplete. [Box 02, at 1583-84.] Thus, the RCA applied no standard at all.

**D. ACS Satisfied the "Balance of Hardships" Test.**

ACS raised substantial questions regarding the legality of the original temporary rate of $13.85 arbitrated in 1996. Contrary to the opposing parties' arguments, that rate did not comply with federal pricing guidelines and it was not based on forward-looking costs. Though that rate was based on "an **attempt** to approximate forward-looking costs," [Record 12800 (emphasis added)], the RCA

5

acknowledged that it was based on embedded costs rather than on a TELRIC-compliant methodology. [Box 01, at 261 (Order No. 13); Box 02, at 184, n.17 (Order No. 31).] The rate did not comply with TELRIC, and the RCA had an obligation to correct it.

ACS also made a sufficient showing to establish that there were substantial, non-frivolous questions regarding the adequacy of the temporary and interim rates. ACS supported its first request for interim rate relief with runs of its 7.2 model, its earlier 6.2 model, and the FCC model, and it offered a cogent critique of GCI's competing model results. [Box 01, at 933-36, 953-55, 958-64 (Wilks Aff.), 1089-1104 (Blessing Aff.).] Similarly, ACS supported its second request with runs of its 7.2 model using alternative sets of cost inputs, and it documented how GCI had improperly manipulated the line counts in its prior run of the FCC model to produce the $14.92 interim rate adopted by the RCA. [Box 01, at 3259-60, 3266-69, 3275-85 (Wilks Aff.).]

The RCA and GCI make numerous arguments to support their claim that ACS did not carry its burden of demonstrating the illegality of the temporary and interim rates, but those arguments are founded on a misperception of that burden. Under the "balance of hardships" test, ACS only needed to show that its claims were "not frivolous or obviously without merit." As noted above, that standard is not difficult to pass. As long as ACS's requests for interim relief were "within the realm of fair dispute," those requests should have been granted. Re Alascom, Inc., 7 APUC 256, 259 (1986). A review of the record demonstrates that ACS comfortably carried that

6

burden in this instance.

In addition to showing that the temporary and interim rates were illegally low, ACS also satisfied the other prongs of the "balance of hardships" test. Since ACS was operating at a substantial loss, a significant portion of which was attributable to the inadequate UNE loop rate, it demonstrated that the rates were confiscatory. [Box 01, at 950-51, 1086-88 (Meade Aff.), 3269-70, 3333-35 (Meade Aff.).] As of June 2001, when ACS filed its first motion for interim relief, GCI was leasing 43,916 loops from ACS. [Box 01, at 3356.] That translates into a loss of $43,916 a month for every dollar that the loop rate was understated. By the time of ACS' second motion in October 2002, the number of lines leased by GCI had increased to 55,898. [Box 01, at 3269, 3357.] Thus, given the temporary and interim loop rates, ACS demonstrated that it was losing money on its network investment.[3]

In view of that fact, it followed that ACS was suffering irreparable harm. Not only did it receive less money from GCI for the lease of loops, but the low rates gave GCI an unfair advantage in the marketplace by allowing it to underprice ACS and take customers from ACS, resulting in a further loss of revenue to ACS. On the other hand, GCI could have been protected from harm either by raising the interim loop rate on a  refundable basis, thereby affording it reimbursement if the final rate was lower, or by leaving the existing rate unchanged and providing for a true-up once the

---

[3]    "Rates which do not afford a reasonable return" on investment are confiscatory, and rates which require the utility to operate at a loss are "necessarily" confiscatory.  APUC v. Greater Anchorage Area Borough, 534 P.2d at 558, n.26. See also Re Municipality of Anchorage dba Anchorage Sewer Utility, 3 APUC at 68 ("zero or negative returns are clearly confiscatory").

final rate was adopted. Finally, given the pace of the proceeeding, the likelihood that the interim rate would remain in place for an unreasonably long time was patent.

By requiring ACS to offer definitive proof of its proposed interim rate, the RCA placed ACS in an impossible position. While an interim rate was required because the RCA refused to set a deadline for arbitrating a final cost model and inputs within a reasonable time, the RCA refused to grant an interim rate increase because a final cost model and inputs had not yet been arbitrated. As a result of this approach, non-TELRIC-compliant rates remained in place for four-and-one-half years and GCI received a multi-million dollar from subsidy from ACS. Nothing in the Act requires an incumbent carrier to subsidize its competitors. This court should hold that the RCA erred by holding ACS to the more stringent "probabilty of success" test and by failing to grant it meaningful interim relief.

## II. THIS COURT HAS JURISDICTION OVER ACS' CLAIM OF UNREASONABLE DELAY.

### A. Introduction.

In protesting the RCA's delay in this case, ACS made two claims in its opening brief: 1) that the RCA violated the statutory nine-month deadline set forth in 47 U.S.C. § 252(b)(4)(C) for completing UNE arbitrations; and 2) that the RCA violated the Telecommunications Act by failing to complete the arbitration within a reasonable time. In opposition to these claims, the RCA and GCI argue that this court lacks jurisdiction because the FCC has the exclusive authority to remedy a state commission's failure to act. The RCA and GCI further argue that these claims were

resolved in their favor when the FCC's Wireline Competition Bureau denied a petition by ACS asking the FCC to preempt the RCA's authority over this proceeding.

ACS agrees that the FCC does have exclusive authority over the RCA's alleged failure to act within the statutory nine-month deadline and that the FCC's ruling against RCA on that specific issue is binding with respect to ACS' claim based on that deadline. Nonetheless, this court does have jurisdiction over ACS' alternative claim of unreasonable delay. The FCC and the courts have narrowly construed the FCC's preemption authority, and it does not extend to preclude federal court review of ACS' claim of unreasonable delay. That claim falls squarely within this court's jurisdiction.

**B. The Governing Statutes and Regulation.**

47 U.S.C. § 252(e)(5) and (6) establish the governing rule of preemption. Paragraph (5) provides:

> **COMMISSION TO ACT IF STATE WILL NOT ACT.**—If a State commission **fails to act** to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter...and shall assume the responsibility of the State commission.... [Emphasis added.]

In turn, paragraph (6) provides, in pertinent part:

> In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and judicial review of the Commission's action shall be the exclusive remedies for a State commission's failure to act.

The implementing regulation, 47 C.F.R. § 51.801(b) elaborates on the circumstances under which FCC preemption is authorized:

9

> For purposes of this part, a state commission fails to act if the state commission **fails to respond, within a reasonable time, to** a request for mediation, as provided in section 252(a)(2) of the Act, or for **a request for arbitration**, as provided in section 252(b) of the Act, or **fails to complete an arbitration within the time limits established in section 252(b)(4)(C)** of the Act. [Emphasis added.]

See also *Local Competition Order*, at ¶ 1285, attached as Ex. 5 to the RCA's Brief.

Section 252(b)(4)(C) establishes the nine-month deadline for completion of an

arbitration.

**C. The FCC's Preemption Authority Does Not Extend to Claims of Unreasonable Delay.**

The FCC has declared that it "will not take an expansive view of what constitutes a state's 'failure to act'" for purposes of assuming authority over UNE proceedings. *Local Competition Order*, at ¶ 1285. In a number of cases, the FCC has made clear that its preemption authority may be invoked only where a state commission either fails to meet the statutory nine-month deadline or refuses altogether to entertain a UNE mediation or arbitration. For example, the FCC granted petitions for preemption where the state commission has either declined to take jurisdiction over a UNE arbitration, In the Matter of Joint Petition of MCI WorldCom, et al., 18 F.C.C.R. 9473 (2003); In the Matter of Starpower Commun., LLC, 15 F.C.C.R. 11277 (2000), or refused to arbitrate under the Act, offering instead to proceed solely under state law. In the Matter of Petition of WorldCom, Inc., 16 F.C.C.R. 6224 (2001).

By contrast, the FCC denied preemption where the state commission had accepted the arbitration and provided a process, even though it took almost two years to complete the proceeding. In the Matter of Petition of Supra Telecommun. & Info. Systems, Inc., 17 F.C.C.R. 22884 (2002). The FCC rejected the argument that preemption was required because the state commission had "'failed to act' by violating Supra's procedural rights under the Act."[4] Id., at 22890. The FCC ruled that Supra's claims of procedural flaws should be addressed to a federal district court

---

[4]     The parties waived the statutory nine-month deadline, thereby precluding preemption on that basis. Id., at 22886.

pursuant to § 252(e)(6). <u>Id.</u>, at 22891. In another case, the FCC rejected the

argument that a state commission has not acted until it has ruled on the merits of the

issues raised in the arbitration petition, stating, "this argument does not provide a

ground for preemption under our rules." <u>In the Matter of Petition for Commission</u>

<u>Assumption of Jurisdiction of Low Tech Designs, Inc.'s Petition for Arbitration</u>, 13

F.C.C.R. 1755, 1774, n.22 (1997). <u>See</u> <u>Global NAPS, Inc. v. FCC</u>,  291 F.3d 832,

833-34 (D.C. Cir. 2002)(finding no failure to act and affirming the FCC's denial of

preemption where the state commission dismissed a UNE proceeding).

Contrary to the RCA and GCI's claim, the FCC's preemption authority does

not encompass all claims regarding the timeliness of a state commission's actions.

Provided a state commission complies with the nine-month statutory deadline where

applicable, preemption is appropriate only when the commission "fails to respond" to

an arbitration request. 47 C.F.R. § 51.801(b). Where a state commission accepts

jurisdiction over a UNE proceeding, it has responded to the arbitration request, and

all its actions (both substantive and procedural) are then subject to review only by the

federal district court.

**D. ACS' Petition to the FCC.**

In July 2002, almost two years before the RCA rendered its June 2004

arbitration decision in this case, ACS petitioned the FCC to exercise its preemption

authority based on the RCA's alleged failure to act.[5] In their oppositions to ACS'

---

[5]     Emergency Petition for Declaratory Ruling and Other Relief of ACS of
Anchorage, Inc. and ACS of Fairbanks, Inc., WC Docket No. 020-201 (July 24,
2002), Ex. 3 to GCI's Opp. Brief.

petition, both the RCA and GCI took the position that there had been no "failure to

act" as that term had been construed by the FCC. GCI argued that preemption was

warranted only where the state commission declined the arbitration role granted it

under the Act and that the FCC had "no jurisdiction to appropriate an active

interconnection proceeding."[6] Similarly, the RCA argued that "preemption is only

justified where a state commission refuses to undertake duties conferred on the state

commission pursuant to section 252 of the Act" and that the mere failure to rule on

the merits of the issues raised in the arbitration did not constitute a failure to act.[7]

The FCC accepted the opposition arguments and denied ACS' petition. With

respect to the alleged failure to comply with the statutory nine-month deadline, the

FCC ruled that the RCA had complied with the deadline when it arbitrated and

approved the initial interconnection agreement in 1996 and 1997 and that no

statutory time limit applied to this "reopened" proceeding.[8] With respect to the

broader issue of delay, the FCC stated,

> We have not found it necessary to address whether or under what
> circumstances delay by a state commission in resolving an
> interconnection-related dispute can constitute 'failure to carry out its
> responsibility' under section 252. **We need not address that issue**

---

[6]     Opposition of General Communication, Inc., at 27, 39 (Aug. 20, 2002),
included in the appendix to ACS' reply briefs.

[7]     Comments of the Regulatory Commission of Alaska, at 12 & 13, n.31
(Aug. 19, 2002), included in appendix to ACS' reply briefs.

[8]     In the Matter of ACS of Anchorage, Inc. and ACS of Fairbanks, Inc., WC
Docket No. 02-201, Memo. Opin. and Order, at ¶¶ 3, 8 (Oct. 22, 2002), Ex. 4 to
the RCA's Brief.

**here.**[9]

Noting that the RCA was overseeing the parties' modeling dispute and had set an interim rate, the FCC concluded that "ACS can seek review of the merits of the Alaska Commission's decisions in federal court under section 252(e)(6)."[10]

### E. ACS' Claim of Unreasonable Delay is Not Preempted.

Given the FCC's ruling that the statutory nine-month deadline set forth in § 252(b)(4)(C) did not apply to this proceeding, ACS concedes that it cannot pursue a claim in this court for violation of that standard. However, ACS' broader claim of unreasonable delay under the Act is not preempted since that claim does not concern a "failure to act" as that term has been defined and applied by the FCC. The RCA did not refuse to entertain this proceeding and render a decision. Rather, it adopted non-TELRIC-compliant rates on a temporary or interim basis, refused to set any meaningful deadlines for the completion of the proceeding, and maintained the illegal interim rates for an unreasonably long time. Those alleged substantive and procedural failures are properly within the jurisdiction of this court under § 252(e)(6).

Contrary to GCI's argument, the FCC's denial of ACS' preemption petition does not pose a *res judicata* bar to the litigation of the claim of unreasonable delay in this court. As set forth above, the FCC declared that it "need not address" the question of "whether or under what circumstances delay...can constitute" a failure to act. It was beyond the scope of the FCC's preemption jurisdiction to decide whether

---

[9]       Id., at ¶ 9 (emphasis added).

[10]      Id., at ¶ 9 & n.36.

the RCA's actions violated the Act or the TELRIC methodology. To the extent the FCC commented on the issue of delay, its words were mere surplusage, not necessary to its decision.

Additionally, the FCC's comments on the issue of delay would not constitute a *res judicata*/collateral estoppel bar since those doctrines require that the claim or issue to be precluded be the same as or identical to the claim or issue previously litigated. Hydronautics v. Filmtec Corp., 204 F.3d 880, 885, 888 (9th Cir. 2000). In this instance, the issue before the FCC was whether the RCA's conduct of the proceedings constituted a "failure to act" sufficient to support the FCC's preemption jurisdiction. By contrast, the issue before this court is whether the RCA's delay violated the rule of reason and constituted a breach of the Telecommunications Act. The two issues or claims are very different, and any resolution of the former by the FCC cannot serve to preclude litigation of the latter in this court. Moreover, insofar as the FCC's decision was rendered almost two years before the RCA finally issued its arbitration decision, the issue of unreasonable delay could not have been fully litigated in light of all the relevant facts.

At bottom, the RCA and GCI seek to place ACS in a no-win position. When ACS sought relief through FCC preemption, they argued that ACS' only remedy was through the district court. Now that ACS seeks relief in this court, they argue that its claims are preempted. The RCA and GCI are engaging in procedural gamesmanship, and they should be judicially estopped from arguing now that preemption was ACS' only avenue of relief. See Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778,

15

782-83 (9th Cir. 2001)(judicial estoppel precludes a party from gaining an advantage by asserting one position then later seeking another advantage by asserting an inconsistent position).

Even if the nine-month deadline does not formally apply, ACS can still maintain its claim that the RCA unreasonably and unfairly delayed the determination of a final, TELRIC-compliant UNE loop rate in violation of the Act. That claim is not preempted, and it is not barred by the doctrine of *res judicata*.

### III. THE RCA UNREASONABLY DELAYED THE ADOPTION OF A TELRIC-COMPLIANT UNE LOOP RATE.

**A. Introduction.**

The FCC has made clear that the obligation to complete actions within a reasonable time may be implied from the Act. In In the Matter of Core Communications, Inc. v. Verizon Maryland, Inc., 18 F.C.C.R. 7962, at ¶ 5 (2003), a competing carrier requested interconnection pursuant to the incumbent's Statement of Generally Available Terms and Conditions for Interconnection for the State of Maryland. Though that Statement did not establish a maximum period for completing interconnection, the FCC nonetheless found that the incumbent carrier violated the Act by failing to effect interconnection for nine months. Id.. at ¶¶ 5, 13, 31-33. Reasoning that the obligation set forth in § 251(c)(2)(D) to provide interconnection on just and reasonable terms included the obligation to provide interconnection "within a reasonable time," the FCC concluded,

> The length of delay in providing interconnection, [the incumbent's] failure to provide timely information regarding the expected duration of

16

the delay, and its failure to explore solutions for the delay, taken
together constitute a violation of section 251(c)(2)(D).

Id., at ¶¶ 31, 33.

In this instance, the RCA could have addressed the problem of non-TELRIC-compliant UNE rates in one of two ways. It could have adopted meaningful interim relief sufficient to protect both parties from loss, or it could have taken steps to ensure that final rates were determined within a reasonable time. Unfortunately, the RCA did neither. As a result, the Act's goal of promoting fair competition was frustrated, ACS sustained millions of dollars of losses, and GCI reaped an equivalent windfall. Under the circumstances, where ACS was denied adequate interim protection, the long duration of the proceeding constituted an unreasonable delay in violation of the Act.

In opposition to this claim, the RCA and GCI have offered a series of arguments largely designed to place the onus on ACS for the delay. As detailed both in ACS' opening brief and below, these arguments are without merit. They are founded on conclusory allegations not supported by the record. The four-and-one-half year delay in determining a final, TELRIC-compliant loop rate in this case was egregious and without justification. Under the unique circumstances of this case, this court should find that the delay violated the Act and remand the case to the RCA so that ACS may be compensated for the direct losses sustained as a consequence of that delay.

**B. A Note on the Applicable Standard of Review.**

In a one sentence footnote, the RCA asserts that an inquiry into the pace of

17

this proceeding poses a question subject to the arbitrary and capricious standard of review, but the case it cites – Nader v. FCC, 520 F.2d 182 (D.C. Cir. 1975) – does not support that proposition. [RCA Brief, at 31, n.55.] Rather than involving a state commission's conduct of a UNE proceeding under § 252 of the Act, Nader arose out of a challenge to a 1971 FCC investigation of AT&T rate increases. As such, the decision centered on the construction of 47 U.S.C. § 154(j), the paragraph of the FCC enabling statute that grants the FCC the authority to establish its own procedures. Id., at 195. Moreover, the cited part of the case involved a challenge to the manner in which the FCC "structured" its investigation, not a timeliness issue.[11] Id.

Thus, instead of taking guidance from Nader, this court should follow U.S. West Commun., Inc. v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999), a UNE case in which the Ninth Circuit held that courts should apply the *de novo* standard of review to all issues involving a determination of the state commission's procedural or substantive compliance with the requirements of the Act.

**C. "Judicial Uncertainty" Did Not Justify the Delay.**

The RCA argues that the delay in this case was in part caused by "federal judicial uncertainty with regard to the appropriate forward-looking cost model," which it contends was not settled until May 13, 2002, when the Supreme Court reversed the

---

[11]    It is noteworthy that, in another part of its decision, the court ordered the FCC to submit a schedule for the expeditious resolution of the case based on the *sua sponte* finding that the FCC had unreasonably delayed its investigation. Id., at 205-07.

18

Eighth Circuit's invalidation of the FCC's hypothetical network standard. [RCA Br. at 32.] See Verizon Commun., Inc. v. FCC, 535 U.S. 467, 122 S.Ct. 1646 (2002), *reversing* Iowa Utilities Board v. FCC, 219 F.3d 744 (8th Cir. 2000)(Iowa Utilities II). For the following reasons, this alleged uncertainty provides no excuse for the delay in this case.

First, this purported justification rings hollow in the face of the fact that, even after May 13, 2002, it still took more than twenty-five months (until June 25, 2004) for the RCA to issue an arbitration decision. [Box 04, at 1321 (Order No. 42).] The RCA should not be heard to rely on uncertainty as an excuse for delay when it failed to move the proceeding forward once the uncertainty was resolved.

Second, legal uncertainty is no excuse for agency paralysis. The challenge of evolving law is not unique to UNE proceedings, and courts and agencies must do the best they can based on the state of the law at the time of their decisions. See MCI Telecommun. Corp. v. FCC, 627 F.2d 322, 340 (D.C. Cir. 1980)(even though ratemaking theories may change or new information become relevant, there must be some reasonably prompt decisionmaking point).

Third, in recognition of this principle, the RCA declared in this proceeding that uncertainty was no excuse. In May 2001, a year before the Verizon decision, the RCA acknowledged that even though "cost methodologies were in a state of flux" pending the Supreme Court's decision, "state commissions have a duty to establish just and reasonable rates for interconnection." [Box 01, at 785 (Order No. 20).] The RCA repeated the point nine months later in February 2002. Declaring that "[w]e

19

cannot further delay our interpretation in hopes of getting clear guidance from the Supreme Court," the RCA rejected the Eighth Circuit's reasoning as "internally inconsistent" and concluded that it would follow the Act and the FCC's TELRIC methodology. [Box 01, at 2716-22.] The RCA engaged in the same analysis and reached the same conclusions in the parties' Fairbanks/Juneau UNE arbitration **as early as August 2000**.[12] In view of these pronouncements, the RCA should not be heard to rely on "judicial uncertainty" as a justification for its inaction.

Fourth, to the extent uncertainty was an issue, ACS offered a solution by proposing that the RCA consider alternative cost models – one that complied with the Eighth Circuit's decision (8.0 model)  and one that complied with the FCC's hypothetical network rule (7.2 model). [Box 01, at 1155, 1167.] Unfortunately, having tried to provide a constructive solution to the problem, ACS now finds itself in a "damned if you do, damned if you don't" situation, since the RCA and GCI both fault it for offering alternative cost models. ACS should not be faulted and penalized for recognizing the Eighth Circuit's decision and attempting to respond to it.

Fifth, the Supreme Court's acceptance of review of Iowa Utilities II did not result in a nationwide halt of UNE proceedings. Other state commissions were able to move forward with their proceedings despite the pendency of the Supreme Court's review.

---

[12]    In the Matter of the Petition by GCI Communication Corp., RCA Docket U-99-141, Order No. 9, at 3-5, 11 (Aug. 24, 2000). See also ACS of Anchorage, Inc. and ACS of Fairbanks, Inc., WC Docket No. 02-201, Opposition of General Communication, Inc., at 19 (Aug. 20, 2002), included in the appendix to this brief.

For all these reasons, the RCA should not be permitted to rationalize its four-and-one-half-year delay on the grounds of judicial uncertainty.

## D. ACS' Model Proposals Did Not Cause the Delay.

The RCA argues that ACS caused delay by proposing four different cost models, but the RCA exaggerates its case. At the outset of this renewed proceeding and in response to the RCA's request for briefing on the issue, ACS proposed the use of whatever model was adopted in the parallel Fairbanks/Juneau UNE arbitration. [Box 01, at 280.] Since the decision in that arbitration had not yet been made, ACS submitted the two models under consideration in that proceeding (ACS 6.2 and the FCC model). [Box 01, at 280 & n.1.] In May 2000, the RCA ordered the use of the FCC model. [Box 01, at 462 (Order No. 14).]

One year later, having made no progress toward the determination of UNE rates, the RCA issued an order declaring the need for further inquiry on "alternative methods for determining interconnection prices" and requesting briefing on "any and all forward-looking cost studies or methodologies." [Box 01, at 784, 791 (Order No. 20).] In response to that express request, ACS proposed its 7.2 model. [Box 01, at 795.] That model upgraded the prior 6.2 model to reflect subsequent changes in factors such as the zoning requirements for the local loop. [Box 01, at 1487-88.] ACS also offered the 8.0 model as an alternative, proposing that evidence be taken on both the 7.2 and 8.0 models so as to avoid the need for a new hearing in the event Iowa Utilities II was reversed. [Box 01, at 1034, 1155, 1167.]

In February 2002, five months after ACS submitted its models, the RCA ruled

21

that it would follow the FCC's hypothetical network standard, and in view of that ruling, it requested more information on the models. [Box 01, at 2712-13 (Order No. 24).] A hearing was held a week later, and five months after that, the RCA selected the 7.2 model (subject to challenge and revision). [Box T1, at 172; Box 01, at 3158-65 (Order No. 26).] In making that decision, the RCA expressly found that the 7.2 model was preferable to the FCC model. [Box 01, at 316-61.] Thus, ACS now finds itself in the position of being faulted for proposing the best model.[13]

Evaluated in context, ACS' proposals were appropriate and reasonable and were not the cause of delay. The 7.2 model was an upgrade of the same basic 6.2 model, and the 8.0 model was offered as an alternative in response to the decision in Iowa Utilities II. The 7.2 and 8.0 models were offered in direct response to a specific request from the RCA for model proposals. Both were offered in a constructive effort to move the case forward. Even after the RCA selected the 7.2 model, it still took the RCA twenty-three months to issue an arbitration decision. The problem was not ACS' proposals, it was the RCA's failure to set a schedule or otherwise move the proceeding forward at a reasonable pace.

**E. ACS Was Not Responsible for the Delay in Reviewing its Model.**

---

[13]    GCI argues that the dispute over the model selection was a waste of time since the significant issues concerned the cost inputs to be used in the models. GCI overlooks that it asserted in the arbitration that the similarity of results was largely "fortuitous." [Box 01, at 2931-34 (Mercer Test.).] GCI expressly disagreed with the proposition that the key issues concerned cost inputs and not models. [Box 01, at 2934-35.] Also, the similarity of results does not negate the fundamental problems with the FCC model. [Box 01, 517-34 (Blessing report).] As GCI argues in its reply brief, a UNE rate produced by a dartboard cannot be justified on the ground that it falls within the range of a properly calculated rate.

The RCA also argues that ACS' inability to present a complete cost model delayed the review process, however, its conclusory argument is based on a false premise. ACS did not present incomplete models. It presented its 6.2 model at the outset of this proceeding in March 2000. [Box 01, at 280, 379.] While incorporating Anchorage-specific data, the model platform was the same as previously proposed and then under review in the Fairbanks/Juneau arbitration. [Box 01, at 379.] ACS submitted its 7.2 model in May 2001. [Box 01, at 795.] As noted above, that model simply upgraded the 6.2 model to reflect recent changes in such things as zoning requirements. [Box 01, at 1487-88.] ACS submitted its 8.0 model one month later. [Box 01, at 1034.]

Since no action had been undertaken in this proceeding to review the 6.2 model, the delay cannot be attributed to the filing of the updated 7.2 version or the 8.0 model.  The real review process did not begin until after February 8, 2002, when the RCA declared that it would not follow the Eighth Circuit's decision, effectively removing the 8.0 model from consideration. [Box 01, at 2712-24 (Order No. 24).] One week later, the RCA then conducted a hearing on the model selection issue, and five months after that in July 2002, it issued its order selecting the 7.2 model (subject to challenge and revision). [Box T1, at 252; Box 01, at 3258-65 (Order No. 26.)] From that point, it still took almost a full two years for the RCA to issue an arbitration decision. [Box 04, at 1321 (Order No. 42).]

The RCA also seeks to justify its delay by arguing that it relied on ACS representations that it would revise the 7.2 model to the RCA's satisfaction, however,

23

the record irrefutably demonstrates that GCI – not ACS – frustrated that process. At ACS' suggestion, the parties convened a workshop with their respective experts in April 2002 so that ACS could explain the model and answer any questions. [Box 1, at 254, 348-49, 2750, 2773-2940.] GCI proposed no changes to the model at the workshop [Box 01, at 2810], and despite repeated requests from ACS, GCI failed to identify any needed modifications thereafter. [Box 01, at 2808, 2811; Box T1, at 1101-11.] Then, at a hearing held finally in April 2003 to litigate changes to the model, GCI was not prepared to identify any needed changes, but asked only for the right to propose changes – a right already established nine months before when the RCA adopted the model. [Box T1, at 1038, 1040-43, 1052, 1065-69, 1077-78, 1081-85.] Astonishingly, the arbitrator acquiesced to GCI's delay and refused to hold it responsible for its lack of preparedness. [Box 02, at 1665-71.] ACS was fully prepared to address and arbitrate any challenges to its model, but GCI stalled and the RCA let it. This court should reject the allegation that ACS was the party responsible for the delay in reviewing its model.

**F. The Delay Was Unreasonable and In Violation of the Act.**

The real issue in this case is not whether there was unreasonable delay. In June 2003, when the RCA took the case from the arbitrator and ordered that the arbitration be heard by a panel of commissioners, the RCA specifically found that the case was "**not progressing at a reasonable pace**." [Box T1, at 2244 (emphasis added).] Consistent with that finding, neither the RCA nor GCI argue that there was no delay. Nor do they argue that the delay was not sufficient to violate the

24

requirements of the Telecommunications Act. Instead, they argue that ACS was the party responsible for it. They are wrong, and their conclusory arguments are not supported by the record.

From the time ACS filed its motion in January 2000 to determine "non-temporary" TELRIC-compliant rates, it took the RCA **five months** to select the FCC model. [Box 01, at 462 (Order No. 14).] It then took **five months** (until October 19, 2000) for the RCA to hold a pre-hearing conference. [Box T1, at 1.] **Three months** after that and one year after ACS's initial motion (January 8, 2001), the RCA asked for briefing on the scope of the arbitration and on proposed modifications to the FCC model. [Box 01, at 564 (Order No. 15).] **Four months** after that (May 11, 2001), the RCA requested briefing on "any and all" cost models the parties wished to propose. [Box 01, at 783, 791 (Order No. 20).] **Nine months** after that and six months after the parties submitted their briefing (February 8, 2002)), the RCA asked for additional information on the proposed models. [Box 01, at 2712 (Order No. 24).] **Five months** after that (July 29, 2002), the RCA selected the 7.2 model. [Box 01, at 3158 (Order No. 26).]The hearing to address changes to the model was not held until **nine months** after that (April 29, 2003), and even then, GCI was not prepared to make any specific revisions. [Box T1, at 1021.] **Two months** after that (June 20, 2003), the RCA finally found that the case was "not progressing at a reasonable pace" and took the case from the arbitrator to be heard before a panel of commissioners. [BoxT1, at 2242.] After that, it still took another **twelve months** for the RCA to issue an arbitration decision (June 25, 2004). [Box 4, at 1321 (Order No. 2).] These periods of

delay were not justified or excused, whether by ACS' actions in seeking TELRIC-compliant UNE rates or otherwise.

As detailed above and in its opening brief, ACS' actions were reasonable. It arbitrated the case in an appropriate manner designed to advance its legitimate interest in obtaining fair UNE rates in compliance with the law. From the outset of this proceeding, it consistently asked that a schedule be established or a deadline set so that the case could be resolved, but those efforts were just as consistently rebuffed. ACS' requests for fair interim relief were also denied.

As a result, ACS remained subject to non-TELRIC-compliant UNE loop rates for four-and-one-half years. From January 2000 through June 2004, GCI was permitted to purchase access to UNE loops at a significant discount from the final loop rate of $18.64. Given the duration of the delay and the number of loops involved, that discount translated into a direct-out-of pocket loss to ACS and a corollary windfall to GCI of almost $11 million. To remedy this unlawful delay and the unlawful temporary and interim loop rates, this court should remand this case to the RCA with directions to calculate the loss and require GCI to compensate ACS for it.

DATED at Anchorage, Alaska, this 10th day of August, 2006.

TINDALL BENNETT & SHOUP
Attorneys for Respondent and Cross-Petitioner ACS of Anchorage, Inc.

By:  /s/ Richard W. Maki
        Richard W. Maki
        ABA No. 8211126

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 10th day of August,

26

2006, a true and correct copy of the foregoing was served electronically on the following:

Martin M. Weinstein
Mark Moderow
GCI Communication Corp.
2550 Denali Street, Suite 1000
Anchorage, AK 99503

Robery A. Royce
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501


                 /s/ Richard W. Maki
By: _____
                Tindall Bennett & Shoup

27