2003 WL 1917249 (F.C.C.), 18 F.C.C.R. 7962, 18 FCC Rcd. 7962, 28 Communications Reg. (P&F) 1333

Federal Communications Commission (F.C.C.)

Memorandum Opinion and Order

*1 IN THE MATTER OF CORE COMMUNICATIONS, INC., COMPLAINANT,

v.

VERIZON MARYLAND INC., DEFENDANT.
File No. EB-01-MD-007

FCC 03-96
Adopted: April 18, 2003
Released: April 23, 2003

**7962 By the Commission:

## I. INTRODUCTION

1. In this Memorandum Opinion and Order, we grant in substantial part a formal complaint [FN1] that Core Communications, Inc. ("Core") filed against Verizon Maryland Inc. ("Verizon") pursuant to section 208 of the Communications Act of 1934, as amended ("Communications Act" or "Act"). [FN2] In particular, based on the record as a whole, we grant Core's central claim that Verizon violated the parties' interconnection agreement, and thus the reasonableness standard of section 251(c)(2)(D) of the Act, [FN3] by failing to interconnect with Core on just and reasonable terms. [FN4] We otherwise dismiss or deny Core's other claims. [FN5]

**7963 II. BACKGROUND

A. The Parties

2. Core is a facilities-based competitive local exchange carrier ("LEC") providing telecommunications services in, among other locations, a region called LATA 236, which includes Washington, D.C. and parts of the States of Maryland and Virginia (the "Washington Metropolitan LATA"). [FN6] Verizon is an incumbent LEC providing telecommunications services in, among other locations, the Washington Metropolitan LATA. [FN7]

B. Statutory Background

3. Section 251(c)(2) of the Act requires incumbent LECs to physically link their networks with those of all competitive LECs who request such "interconnection." [FN8] Interconnection makes possible communication between an incumbent LEC's and a competitive LEC's customers. Because incumbent LECs still serve the great majority of subscribers in their home territories, [FN9] a competitive LEC cannot realistically provide facilities-based services until the incumbent LEC interconnects with it. Prompt interconnection, therefore, is essential to attaining the pro-competitive goals of the 1996 Act. [FN10] Accordingly, section 251(c)(2) requires that incumbent LECs interconnect with competitive LECs on "terms and conditions that are just [and] reasonable... in accordance with the terms and conditions of the [parties' interconnection] agreement...." [FN11]

4. Under the statutory scheme of the 1996 Act, the terms and conditions for interconnection typically appear in interconnection agreements that incumbent LECs and **7964 competitive LECs either negotiate or arbitrate pursuant to section 252. [FN12] The Bell Operating Companies, however, also have the option to effectuate interconnection agreements by "prepar[ing] and fil[ing] with a State commission a statement of the terms and conditions that such company generally offers within that State to comply with the requirements of section 251 and the regulations thereunder, and the standards applicable under [section 252]." [FN13] Such statements are referred to as "Statements of Generally Available Terms," or "SGATs." A state commission may not approve an SGAT unless the

EXHIBIT 18
PAGE 1 of 20

SGAT complies with, inter alia, section 251 and the regulations thereunder. [FN14]

C. Core's Interconnection Request

*2 5. During all periods relevant to this proceeding, competitive LECs in Maryland seeking to interconnect with Verizon could do so pursuant to Verizon's Statement of Generally Available Terms and Conditions for Interconnection for the State of Maryland ("Maryland SGAT"). [FN15] The Maryland SGAT provides, inter alia, that the parties may negotiate a schedule for interconnection and that, in the absence of such a negotiated schedule, interconnection would require not less than 45 days. The Maryland SGAT does not expressly establish a maximum period to complete interconnection. [FN16]

6. In early February 2000, pursuant to sections 251(c) and 252(f) of the Act, Core requested interconnection with Verizon in the Washington Metropolitan LATA under the terms of the Maryland SGAT. [FN17] In accordance with the terms of the Maryland SGAT, Core and Verizon signed a schedule to the SGAT entitled "Request for Interconnection," pursuant to which both parties "agree[d] to be bound by the terms of the Statement." [FN18] Thus, the Maryland SGAT served as the parties' interconnection agreement. [FN19] At that time, Core had not yet begun to provide service in the Washington Metropolitan LATA. Therefore, interconnecting with Verizon **7965 was an absolute prerequisite to Core providing any facilities-based service in that LATA. [FN20]

7. According to the record in this proceeding, interconnection between Core and Verizon would require three steps. First, Core had to provide Verizon with certain information regarding its interconnection request, including a forecast of the amount of Verizon network capacity that Core expected to utilize. Next, Verizon had to build an "entrance facility" (i.e., a dedicated fiber optic circuit) from Verizon's Damascus, Maryland end office to Core's Point of Presence ("POP") in Damascus, Maryland. Finally, Verizon had to establish an interoffice facility to carry traffic from its end users to Core's Damascus, Maryland POP. [FN21]

8. By February 28, 2000, Core had fulfilled its obligation to provide to Verizon a forecast of the amount of Verizon network capacity that Core would require; Core also had provided all the other information that Verizon needed to begin building the entrance facility. [FN22] Verizon completed construction of the entrance facility four months later, on June 28, 2000. [FN23]

9. As previously mentioned, the third and final step to complete the Core/Verizon interconnection in the Washington Metropolitan LATA was for Verizon to establish an interoffice facility on Verizon's network to Core's POP. Based on the forecast and other information submitted by Core, Verizon determined that it would need two DS-3 transport circuits and two DS-1 transport circuits to carry Core's traffic. [FN24] Towards that end, on June 29, 2000 (the day after completing Core's entrance facility), Verizon sent Core an Access Service Request form ("ASR") for the DS-3s. Verizon stated on the ASR that the "D[esired] D[ue] D[ate]" for providing the DS3s was July 14, 2000, a date established by Verizon. [FN25]

*3 10. Verizon did not provide the DS-3s on July 14, 2000, however. [FN26] On July 25, 2000, Core telephoned Verizon and asked when interconnection would be complete. [FN27] Verizon stated **7966 that it could not complete interconnection due to an interoffice facility issue on Verizon's network, but Verizon provided no specific description of the problem and did not state when it expected to complete interconnection. [FN28] Immediately thereafter, Core's counsel sent Verizon's counsel a letter asking when interconnection would be complete. Verizon did not respond to Core's letter. [FN29]

11. Between August 6, 2000 and August 25, 2000, Verizon experienced a union work stoppage (i.e., a strike). Verizon informed Core and other competitive LECs of the work stoppage and that Verizon would not process orders during the strike. [FN30]

12. On August 21, 2000, Core's counsel sent another letter to Verizon's counsel asking when interconnection would be complete. [FN31] Verizon did not respond to this letter, either. [FN32] On about September 11, 2000, Core telephoned Verizon, again asking when interconnection would be complete. Verizon stated that interconnection probably would not be completed until about November 15, 2000. [FN33]

13. Verizon completed interconnection with Core on November 15, 2000, more than four months after Verizon finished the entrance facility (on June 28, 2000), and four months after the July 14, 2000 "desired due date" stated by Verizon on the ASR. [FN34] Consequently, even though Core had provided all information necessary for Verizon to begin building the entrance facility by late February 2000, [FN35] Core could not provide any facilities-based service in the Washington Metropolitan LATA until about nine months later, when Verizon finally completed the interconnection on November 15,

EXHIBIT 18
PAGE 2 of 20

2000. [FN36]

**\*\*7967** D. Verizon's Capacity Exhaust on Key Equipment in the Washington Metropolitan LATA [FN37]

14. It was during discovery in this proceeding that Verizon revealed why it had failed to complete its interconnection with Core until more than four months after building the necessary entrance facility: two electronic digital cross-connect machines -- a K36 3x1 (the "K36") and a K43 3x3 (the "K43") [FN38] -- located in Verizon's Southwest Washington, D.C. transport hub ("Washington Hub") ran out of DS3 capacity during the pendency of Core's interconnection request. [FN39] Verizon had configured its network so that all competitive LEC-bound traffic originating in the Washington Metropolitan LATA had to travel through a tandem switch located in its Washington Hub. [FN40] From that switch, certain competitive LEC traffic had to travel through both the K36 and the K43, and, ultimately, onto trunks to individual competitive LECs' POPs. [FN41]

**\*\*7968** 15. The consequence of this network configuration was that, if and when either the K36 or the K43 ran out of capacity, Verizon's ability to transport additional traffic of competitive LECs in the Washington Metropolitan LATA would be significantly hampered. [FN42] As described below, that is precisely what befell Core here: while Verizon was building Core's entrance facility, the K36 and K43 ran out of capacity, rendering Verizon unable to complete Core's interconnection request and transport any Core traffic in the Washington Metropolitan LATA until Verizon solved the capacity problem. [FN43]

**\*4** 16. The K36 and K43 capacity exhaust was the result of two Verizon actions. With respect to the K36, on January 31, 2000, Verizon placed an order with a third-party vendor for equipment to increase the capacity of the K36. [FN44] Although Verizon forecast that the machine would exhaust in May, 2000, [FN45] Verizon set an August 30, 2000 date for the equipment to be installed. [FN46] The K36 was exhausted by early July, [FN47] well before the equipment was installed. [FN48]

17. With respect to the K43, by no later than December 1, 1999, Verizon had forecast that the K43 would exhaust in February, 2000. [FN49] On December 22, 1999, Verizon ordered equipment to increase the capacity of the K43 from its vendor, requesting that some of the equipment be installed by February 15, 2000, and that the remaining equipment be installed by April 30, 2000. [FN50] The vendor did not even begin installing the K43 in February. [FN51] Major portions of the machine were at capacity exhaust by about April 1, 2000, [FN52] and the machine suffered complete exhaust no later than late June, 2000. [FN53] On May 8, 2000 the K43 vendor informed **\*\*7969** Verizon that installation would not be complete until late October 2000. [FN54] The vendor did not complete installation of the equipment ordered for February, 2000 until August, 2000, and did not complete the rest of the order by installing the remainder of the equipment ordered (to be installed in April) until October 20, 2000. [FN55]

18. The K36 and K43 capacity exhaust conflicted with Verizon's internal engineering standards: Verizon states that its engineering objective was "to add capacity to digital cross-connect machines by the time the machine reaches 90% utilization." [FN56] In addition, the capacity exhaust had serious consequences for competitive LECs in the Washington Metropolitan LATA, including Core. In particular, because the capacity of the K36 and K43 cross- connect machines had exhausted, Verizon could complete neither Core's interconnection request nor numerous other competitive LEC requests for transport capacity in the Washington Metropolitan LATA. [FN57] By June 23, 2000, Verizon had 54 carrier capacity requests in "hold" status because of the cross-connect exhaust. [FN58] Verizon did not complete any of those 54 "held" orders until several months later, after new equipment was installed. [FN59] Accordingly, Verizon did not complete Core's interconnection until November 15, 2000, [FN60] after the new equipment was installed on about October 20, 2000. [FN61] Thus, the record establishes that the K36 and K43 were at capacity exhaust for not less than four months, from June 23, 2000 (when 54 carrier requests were on "hold") until October 20, 2000 (when the new equipment was installed). Similarly, the record reveals that the capacity exhaust caused Core's interconnection to be delayed by four months (from about July 14, 2000 -- the "[D]esired [D]ue [D] ate" in the ASR -- to November 15, 2000).

**\*5** 19. As stated above, between the time that Core provided all information necessary to enable Verizon to begin building the entrance facility in late February 2000 and the time that Verizon finally honored Core's request nine months later, on November 15, 2000, Core could not **\*\*7970** provide any facilities-based service whatsoever in the Washington Metropolitan LATA. [FN62] Meanwhile, throughout that period, Verizon's own traffic in the Washington Metropolitan LATA continued to flow

EXHIBIT _18_
PAGE _3_ of _20_

freely, because Verizon did not route its own traffic through the congested Washington Hub, and because the portion of Verizon's network that did transport Verizon's traffic had capacity sufficient to allow Verizon to increase its end-user customer base. [FN63]

III. DISCUSSION

20. Core's central allegation is essentially that Verizon violated the Maryland SGAT, and thus the reasonableness standard of section 251(c)(2)(D) of the Act, by failing to interconnect with Core promptly and by failing to notify Core of the likelihood and extent that interconnection would be delayed. [FN64] In response, Verizon asserts that (i) the Commission lacks jurisdiction over the Complaint; [FN65] (ii) the Complaint fails to state a claim; [FN66] (iii) comity with state commissions warrants dismissal of the Complaint; [FN67] and (iv) it interconnected with Core in a timely and otherwise just and reasonable manner. [FN68]

21. As discussed below, we reject all of the reasons Verizon asserts that we should dismiss Core's Complaint without reaching its merits. Moreover, we find that Verizon violated section 251(c)(2)(D) of the Act and section 51.305(a)(5) of our rules by failing to provide Core with interconnection "on rates, terms, and conditions that are just [and] reasonable, ... in accordance with the terms and conditions of [its interconnection] agreement" [FN69] with Core. Verizon allowed exhaust in the portion of its network through which Core's traffic had to travel, **7971 thereby delaying interconnection by four months. Verizon further aggravated the delay by repeatedly failing to provide information to Core as to the existence and probable duration of the delay. Finally, the record reveals that Verizon made little, if any, effort to solve the exhaust problem. Viewing all the facts as a whole, we find that Verizon did not provide interconnection to Core on just and reasonable terms.

A. The Commission Has Jurisdiction Under Section 208.

22. Verizon asserts that the Commission lacks jurisdiction under section 208 of the Act to adjudicate Core's claims alleging a violation of section 251(c)(2) of the Act. [FN70] The Commission recently addressed and rejected all of the same jurisdictional arguments that Verizon raises here. [FN71] Therefore, for the reasons stated in CoreComm v. SBC, [FN72] we deny Verizon's jurisdictional defense, and hold that we have jurisdiction under section 208 to adjudicate Core's claims alleging a violation of section 251(c)(2).

B. Core's Complaint States a Claim Under Section 208 of the Act.

*6 23. Verizon asserts two reasons why Core's Complaint fails to state a claim under section 208 of the Act. First, Verizon argues that Core's Complaint really alleges only a violation of the Maryland SGAT, not of the Communications Act. [FN73] In addition, Verizon argues that the Maryland SGAT establishes only a minimum interconnection interval (i.e. 45 days) and not a maximum, and that therefore, even under the Maryland SGAT, no claim lies for taking "too long" to complete interconnection. [FN74] As this latter issue is more an argument about the merits, we discuss it below in evaluating the substance of Core's Complaint. We begin, however, by rejecting Verizon's assertion that a violation of the Maryland SGAT would not violate the Communications Act.

24. As noted above, rather than negotiating its own individual agreement with Verizon, Core chose to accept the terms of Verizon's Maryland SGAT. In accordance with the terms of the Maryland SGAT, Core and Verizon signed a schedule to the SGAT entitled "Request for Interconnection," pursuant to which both parties "agree[d] to be bound by the terms of the Statement." Thus, the Maryland SGAT served as the parties' interconnection agreement. [FN75] To the extent that Verizon violated the terms of the Maryland SGAT, therefore, it violated the terms **7972 of an interconnection agreement entered into pursuant to sections 251 and 252.

25. Verizon essentially argues that nothing in the Act requires it to comply with the interconnection agreements that it enters into pursuant to sections 251 and 252. Verizon is incorrect. Section 251(c)(2) expressly requires Verizon to provide interconnection "on rates, terms, and conditions that are just [and] reasonable ..., in accordance with the terms and conditions of the agreement and the requirements of this section and section 252." [FN76] Similarly, section 51.305(a)(5) of the Commission's rules requires Verizon to provide interconnection "in accordance with the terms and conditions of any agreement." [FN77] Thus, both the Act and the Commission's implementing rules require Verizon not only to enter into interconnection agreements, but also to comply with their

EXHIBIT  18
PAGE  4  of  20

terms. We find below that Verizon failed to comply with its interconnection agreement with Core (i.e., the Maryland SGAT) by failing to provide interconnection on just and reasonable terms. This violation of the Maryland SGAT constitutes a violation of both 47 U.S.C. § 251(c)(2)(D) and 47 C.F.R. § 51.305 (a)(5). Thus, Core's Complaint states a claim pursuant to section 208 of the Act.

26. Verizon argues that Core's Complaint cannot possibly state a claim under sections 208 and 251(c) (2) of the Act, because "it is inconceivable that Congress would have elaborated a significant role for state commissions in the implementation of the 1996 Act while authorizing private parties to eliminate that role by filing a complaint with the Commission." [FN78] Verizon's argument is unpersuasive. Allowing formal complaints like Core's to proceed will hardly "eliminate" state commissions' roles in implementing the 1996 Act. State commissions will continue to exercise primary authority to arbitrate and approve interconnection agreements, and will continue to exercise concurrent authority to adjudicate interconnection and unbundling disputes arising from interconnection agreements. Thus, the state commissions' roles in arbitrating and enforcing the requirements of interconnection agreements will remain central, as Congress intended.

*7 27. Verizon further argues that allowing Core's Complaint to proceed would "make[] nonsense of the entire remedial scheme under section 252 and would deprive interconnection agreements of any binding effect - indeed it would deprive interconnection agreements of virtually all practical significance." [FN79] Verizon's argument is incorrect. As Verizon acknowledges, [FN80] Core's claim does not seek to hold the Maryland SGAT unlawful or to rewrite its terms. Instead, Core's Complaint essentially seeks to enforce the SGAT's terms (and, by definition, the Act's terms). Thus, far from vitiating the significance of interconnection agreements in the statutory scheme, allowing Core's Complaint to proceed actually emphasizes and reinforces the crucial status of interconnection agreements in implementing the statutory requirements, as well as incumbent **7973 LECs' statutory obligation to comply with their agreements. [FN81]

28. Finally, although Verizon does not cite it, we note that the United States Court of Appeals for the Second Circuit recently issued an opinion considering whether, under the particular circumstances at issue, an alleged breach of an interconnection agreement constituted an alleged violation of section 251 of the Act. In Trinko v. Bell Atlantic Corp., [FN82] a divided panel concluded, over a vigorous dissent, "that in this case it does not." [FN83] Trinko does not undermine our conclusion here, however. Trinko implies that an incumbent LEC has no obligation under the Communications Act to comply with an interconnection agreement; thus, an incumbent LEC's obligations would flow solely from contract law enforceable only in a court. In the case of interconnection, this conclusion conflicts with express statutory language obligating incumbent LECs to provide interconnection "in accordance with the terms and conditions of the agreement." 47 U.S.C. § 251(c)(2)(D). [FN84] In addition, the Second Circuit's conclusion is not consistent with the great weight of court and Commission authorities holding that state commissions have authority to enforce interconnection agreements. [FN85] Trinko does not discuss or distinguish those authorities. Indeed, as the dissenting opinion observes, the parties had not raised the issue before either the district court or the Second Circuit, and thus the Trinko Court did not have the benefit of any briefing or factual record. Finally, the Commission was not a party in Trinko, so the Trinko holding is not binding. [FN86]

C. The Comity Doctrine Does Not Warrant Dismissal of the Complaint.

*8 29. Verizon argues that, because the Commission and many courts have held that state commissions have authority to interpret and enforce interconnection agreements, we should decline to adjudicate Core's Complaint out of deference to the authority of the Maryland Public **7974 Service Commission to do so. [FN87] Verizon's argument lacks merit. First, the Maryland Commission does not have (and has never had) an open proceeding regarding this matter to which we could defer. Moreover, Verizon's argument unduly diminishes this Commission's role in enforcing the federal regime, as reflected in interconnection agreements. As discussed above. [FN88] Core has stated a claim under the Communications Act, and the Commission has jurisdiction to adjudicate that claim. Verizon has not raised any specific circumstances present here that make it appropriate to decline to exercise our jurisdiction to adjudicate Core's Complaint. Instead, Verizon essentially suggests that we abstain from exercising our jurisdiction under section 208 to enforce the Act where interconnection agreements are involved. [FN89] This argument suffers from several flaws, among them are that it appears inconsistent with Congress's decision to deny the Commission authority to forbear from section 208; would vitiate the Commission as a forum for enforcing federal interconnection and unbundling requirements; and, in these particular circumstances, would needlessly delay resolution of

EXHIBIT 18
PAGE 5 of 20

the dispute. [FN90]

30. In response, Verizon relies upon two orders in which the Commission deferred to state commission processes. [FN91] Verizon's reliance is misplaced. In both of those orders, the Commission deferred to state commission processes because those processes concerned the precise matter at issue and were complete or nearly complete. [FN92] Here, by stark contrast, there is no state commission proceeding at all - ongoing or completed - regarding the matters at issue here. [FN93] Thus, in sum, Verizon has failed to demonstrate that the comity doctrine warrants dismissal of Core's Complaint.

D. Verizon Violated the Reasonableness Standard of Section 251(c)(2)(D) of the Act.

**7975 1. The Maryland SGAT required Verizon to interconnect on rates, terms and conditions that are just and reasonable.

31. Verizon argues that, because the Maryland SGAT does not expressly establish a maximum time for providing interconnection, no claim can lie for taking too long. [FN94] We do not accept Verizon's position that it may take as long as it wants to honor an interconnection request. We find that Verizon was obligated - pursuant to section 251(c)(2)(D) and the terms of the Maryland SGAT - to provide Core with interconnection on rates, terms, and conditions that are just and reasonable, including within a reasonable period of time.
*9 32. An SGAT, as defined in the Act, is a Bell Operating Company's statement "of the terms and conditions that such company generally offers within [a] state to comply with the requirements of section 251 and the regulations thereunder ...." [FN95] Moreover, "[a] State commission may not approve such [SGAT] unless such [SGAT] complies with ... section 251 and the regulations thereunder." [FN96] Thus, the terms that Verizon offered through the Maryland SGAT were, by definition, intended to comply with the requirement of section 251(c)(2) to provide interconnection "on rates, terms, and conditions that are just [and] reasonable." [FN97] The Maryland Commission approved those terms, and Core accepted them. Accordingly, although the Maryland SGAT does not provide an express deadline for fulfilling interconnection requests, the Maryland SGAT does require Verizon to provide interconnection on just and reasonable terms, including within a just and reasonable period of time. [FN98] Here, the totality of the circumstances, which include not only a lengthy delay in providing interconnection, but also Verizon's refusal to provide any timely information about the reason for the delay or its likely duration, demonstrate that Verizon failed to provide interconnection on just and reasonable terms.

2. Verizon failed to interconnect on just and reasonable terms.

33. The facts and circumstances of this case, when viewed in their totality, establish that Verizon did not provide interconnection on just and reasonable terms. The length of delay in providing interconnection, Verizon's failure to provide timely information regarding the expected duration of the delay, and its failure to explore solutions for the delay, taken together constitute a violation of section 251(c)(2)(D). After carefully reviewing the record and considering all of the facts and circumstances as a whole, we conclude that Core has shown, by a preponderance of the **7976 evidence, [FN99] that Verizon did not interconnect with Core on terms and conditions that are just and reasonable and in accordance with the Maryland SGAT. Specifically, we find that Verizon's substantial delay in interconnecting with Core, together with Verizon's failure to timely inform Core of the delay and its likely duration, and its failure to make any significant effort to solve the cause of the delay, violated Verizon's statutory obligations.

a. Verizon failed to timely inform Core of the likelihood and extent that interconnection would be delayed.

34. When an incumbent LEC promptly informs a competitive LEC regarding an anticipated delay in interconnection, the requesting competitive LEC can then make rational and educated business decisions about how best to serve its end user customers. For example, when a requesting carrier learns in advance that interconnection will be significantly delayed, it may decide to find a different interconnection method or point, to enter the market by different means (such as resale), or to divert its resources to a different market altogether. This promotes efficient competition and fosters

EXHIBIT  18

PAGE  6  of  20

consumer choice.

*10 35. In analogous circumstances, the Commission has found that incumbent LECs have a duty to provide to competitive LECs information indicating the location and technical characteristics of the incumbent LEC's network. [FN100] In so concluding, the Commission reasoned that, "[w]ithout access to such information, competing carriers would be unable to make rational network deployment decisions and could be forced to make inefficient use of their own and incumbent LEC facilities, with anticompetitive effects." [FN101] That same reasoning applies to information regarding interconnection delays. Where the incumbent LEC knows that a delay in interconnecting will be significant, conveying that information promptly to the requesting carrier will enable the requesting carrier to "make rational network deployment decisions," so that it will not "be forced to make inefficient use of [its] own and incumbent LEC facilities, with anticompetitive effects." [FN102] In sum, information regarding the projected time of interconnection is very valuable to competitive LECs. Therefore, the manner in which an incumbent LEC conveys such information to a requesting competitive LEC is relevant in determining whether an incumbent LEC has provided interconnection on "terms and conditions that are just [and] reasonable" under section 251(c)(2)(D).

36. We find that Verizon did not timely inform Core of the likelihood and extent that interconnection would be delayed. By June 23, 2000, Verizon knew, or should have known, that completing Core's interconnection request would be significantly delayed. On that date, Verizon had 54 requests for capacity on "hold" because of lack of capacity on the K36 and K43 cross-connect machines. Further, Verizon knew, or should have known, that these 54 requests, as well **7977 as Core's, would be on "hold" for a significant amount of time, because its vendor had informed it on May 8, 2000 that the equipment needed to increase the capacity of the K43 would not be installed until at least October 19, 2000. Therefore, because Verizon's delay in interconnecting with Core was both severe and readily apparent, we find that, by at least June 23, 2000, Verizon should have informed Core that interconnection would be delayed, and provided a reasonable estimate of the extent of the delay.

37. Yet Verizon failed to do so. Although Verizon knew or should have known by at least June 23, 2000 that interconnection with Core would be severely delayed, Verizon sent Core an ASR on June 29, 2000 for DS-3 transport service with a "D[esired] D[ue] D[ate]," established by Verizon, of July 14, 2000. This ASR was tantamount to a representation by Verizon that DS3 service likely would be provided on or about July 14.

38. Verizon argues that the ASR's July 14 "D[esired] D[ue] D[ate]" was not a "firm order commitment." [FN103] Verizon's argument does not succeed. Although we agree that the ASR did not provide an absolute date for provisioning, the ASR did, in fact, indicate that Verizon expected to provision the DS-3s on or about July 14, and not as much as four months later. Verizon generated the ASR and the desired due date, [FN104] and Verizon knew all information regarding its network facilities.

*11 39. Moreover, the July 14 date in the ASR came and went, again without Verizon notifying Core of the interconnection problems. Finally, on July 25, 2000, in a phone call initiated by Core, Verizon stated merely that it was experiencing an "interoffice facilities issue" in interconnecting with Core. [FN105] Verizon did not give a sense of the seriousness of the problem, and refused to tell Core when it expected interconnection to be completed. Core's counsel wrote to Verizon's counsel two days later, and again on August 21, 2000, demanding to know when interconnection would be complete. Verizon did not respond to Core's letters. Indeed, it was not until September 11, 2000, almost three months after Verizon knew or should have known of the severity of the interconnection problem and its likely duration, that Verizon informed Core, in response to a call initiated by Core, that interconnection would not be completed until November 15, 2000. Thus, the record amply demonstrates that Verizon's notice to Core was late and insufficient.

40. Verizon argues that it generally does not confirm the availability of interoffice facilities for a particular requesting carrier until it has completed the carrier's entrance facility and issued an ASR. [FN106] Verizon notes that it completed Core's entrance facility on June 28, and issued the ASR on June 29. Verizon argues, therefore, that it could not have given Core notice of the delay until early July. [FN107] The record reveals, however, that Verizon did not inform Core of the **7978 delay or its probable extent in early July. Verizon did not contact Core soon after issuing the ASR, and refused to inform Core during the July 25 telephone conversation initiated by Core of the likely duration of the interconnection delay. Moreover, Verizon ignored Core's July 27 and August 21 letters asking when interconnection would be completed, and refused to provide Core with that information until September 11. In any event, the fact that Verizon typically does not confirm the availability of interoffice facilities for a particular requesting carrier until it has completed the carrier's entrance

EXHIBIT 18

PAGE 7 of 20

facility and issued an ASR is not sufficient in the specific circumstances here. By at least June 23, 2000, Verizon had actual knowledge of all relevant facts: that Core had requested DS3 service, that 54 capacity requests remained on hold due to the capacity exhaust, and that the equipment to alleviate the capacity exhaust would not be installed until late October. Therefore, by at least June 23, 2000, Verizon knew, or should have known, that Core would experience a substantial interconnection delay, and should have provided notice to Core of that circumstance.

b. Verizon failed to interconnect with Core in a reasonably expeditious manner.

41. The length of time taken by an incumbent LEC to interconnect with a competitive LEC is a relevant factor in determining whether the incumbent LEC complied with its duty to provide interconnection on terms and conditions "that are just [and] reasonable." [FN108] As discussed above, an incumbent LEC's failure to interconnect expeditiously may frustrate accomplishment of Congress's goal of introducing facilities-based competition to the local telecommunications market. Where interconnection is delayed, a competitive LEC's resources may be wasted, and its reputation may suffer permanent damage because it does not provide the promised service in a timely manner. Core effectively explains the importance of timely interconnection as follows: "Core was trying to establish the initial interconnection with Verizon in order to get into business in [the Washington Metropolitan LATA]. This is critical to the success of a competitive LEC and time is usually of the essence .... Until the network is up and running, a competitive LEC can't exchange traffic with Verizon, can't sell to customers and ultimately can't get any revenues." [FN109]
*12 42. Core contends that the combined effect of three acts or omissions by Verizon unreasonably delayed Core's interconnection. First, Core argues that Verizon failed to take adequate steps to ensure that the K43 and K36 would not run out of DS-3 capacity well before additional capacity could be added. [FN110] Second, Core argues that Verizon should have pressed its vendors to expedite installation of the cross-connect equipment. [FN111] Third, Core asserts that Verizon should have asked its vendors whether smaller, alternative equipment could be installed **7979 to solve the K43 and K36 exhaust problem. [FN112] For the following reasons, we agree. [FN113]
43. First, with respect to Verizon's efforts to ensure that the K36 and K43 did not exhaust, the record suggests that two Verizon errors caused that exhaust. Verizon's first error concerned the K36. In January 2000, Verizon forecast that the K36 would exhaust in May, 2000. On January 31, 2000, Verizon placed an order for equipment to increase the capacity of the K36, but, despite predicting that the machine would exhaust in May, set an August 30 date for the equipment to be installed. Not surprisingly, the K36 suffered capacity exhaust well before Verizon's August 30 installation date.
44. Verizon also erred with respect to the K43. By no later than December 1, 1999, Verizon had forecast that the K43 would exhaust in February, 2000. On December 22, 1999 Verizon ordered equipment to increase the capacity of the K43 equipment, requesting that a portion of the equipment installation be "advance completed" by February 15, 2000, and that the remaining equipment be installed by April 30, 2000.
45. Given that Verizon expected the K43 to exhaust in February, Verizon's February "advance complete" date left Verizon and its vendor little room for error or mishap, particularly since Verizon placed the order shortly before a holiday period (on December 22) and, as Verizon admits, even after the equipment was installed, it would have to be "turned up" and tested. [FN114] Moreover, subsequent events establish that Verizon had indeed given its K43 vendor too little time to complete the job. The vendor did not begin work on the K43 in February, and the machine suffered capacity exhaust by June, 2000. The vendor did not complete the "advance complete" portion of the order (which Verizon requested be completed by February 15) until August 2000, [FN115] and did not complete the remainder of the order (to be completed by April 30) until about October 19, 2000. In sum, with respect to the "advance complete" order, Verizon gave its K43 vendor two months to complete work that required eight months, and, with respect to the remaining portion of the order, gave its vendor four months to complete work that **7980 ultimately required ten months. [FN116]
46. The record does not reveal why Verizon ordered the K36 equipment to be installed in August when it forecast that the machine would exhaust in May. Similarly, with respect to the K43, the record does not reveal whether Verizon ordered the equipment too late because Verizon misjudged the time it would take its vendor to complete installation, or because Verizon did not accurately forecast the machine's capacity utilization growth, and therefore did not realize until too late that the K43 was near exhaust.
*13 47. In any event, as Verizon acknowledges, Verizon must make reasonable efforts to plan for

EXHIBIT  18
PAGE  8  of 20

equipment vendor installation intervals, and to forecast future capacity utilization growth in order to prevent network capacity exhaust. [FN117] Moreover, by allowing the K43 and K36 to exhaust, Verizon failed to meet its own internal engineering objectives. Verizon further acknowledges that allowing the capacity of the K36 and K43 to exhaust significantly hindered Verizon's ability to handle additional traffic of competitive LECs in the Washington Metropolitan LATA, and delayed interconnection with Core for four months. Moreover, Verizon is a large, sophisticated, and experienced telecommunications provider. Core's expert expresses astonishment at the fact that the K43 and K36 were exhausted for four months, stating that the K43 and K36 are "gigantic units with lots of capacity," and noting that Verizon routinely monitors equipment usage, and forecasts future usage. "[I]t is nearly inconceivable to me that they could have exhausted these facilities without having known it was going to happen and without planning to already have the next unit installed." [FN118] Given all these circumstances, the fact that Verizon's K36 and K43 were at virtually complete exhaust for at least four months, standing alone, establishes a prima facie case that Verizon failed to make reasonable efforts to ensure that the equipment did not exhaust.

48. Because Core has established a prima facie case that Verizon's allowing the capacity of the K43 and K36 to exhaust was unreasonable, "it is incumbent upon [Verizon] to respond fully to [Core's] showing, with full legal and evidentiary support." [FN119] Moreover, the cause of the K36 and K43 capacity exhaust is within Verizon's exclusive knowledge. Therefore, Verizon has the burden to come forward with all facts establishing its defense with respect to the **7981 capacity exhaust. [FN120] Yet Verizon presents little evidence to rebut the prima facie showing of unreasonableness. Verizon's sole explanation for its mistakes is as follows: "The problems Verizon encountered in Core's interconnection came in the wake of exploding demand for high capacity service. During 1999 and 2000, demand for services requiring high capacity interoffice facilities increased tremendously with an unprecedented gain of 80% in installed/working high capacity services." [FN121]

49. Given the importance of timely interconnection, we find Verizon's explanation insufficient. Verizon's errors caused an exhaust problem that lasted - not for days or weeks but for months, four months. Verizon does not argue in its pleadings or briefs that it experienced other comparably lengthy exhaust problems during this period of increased demand. Furthermore, although Verizon states that there was an "explosion" in demand, Verizon does not state either that it was unaware of the "explosion" or, alternatively, that it did not learn of the explosion in time to react. Verizon states that its engineers retrieved and reviewed data as to capacity utilization of the K43 and K36 "at least once every two weeks," [FN122] but does not explain why, during those bi-weekly reviews, its engineers either did not detect the "explosion," or, having detected it, could not make appropriate adjustments. [FN123] Similarly, the record establishes that Verizon required Core and other interconnecting competitive LECs to provide forecasts of their capacity needs, [FN124] yet Verizon does not assert that those forecasts did not sufficiently foretell the increase in demand.

*14 50. Nor does Verizon's evidence adequately explain its failure to plan accurately for vendor installation intervals. Even if demand for facilities was "exploding," and, as Verizon also asserts, it vendors were "experiencing longer than usual ordering and installation intervals," [FN125] Verizon does not state that it was unaware of this problem, and does not assert that it made any attempt to adjust its equipment ordering processes to reflect the vendor delays. Moreover, the "explosion" in demand had begun by at least January 1999; [FN126] therefore, it appears that Verizon had some advance warning of, and time to adjust for, its vendors' delays. Verizon regularly communicated with its vendors, and routinely ordered equipment for its facilities located throughout the Northeast. [FN127] Yet, Verizon's ordering interval here proved to be far too short: as **7982 discussed, it gave its K43 vendor only two months to complete installation of equipment that ultimately required eight months. Finally, we note that Verizon does not argue that it has made comparable errors in forecasting capacity demand or vendor installation intervals regarding the flow of its own traffic.

51. In addition, we find that Verizon compounded its mistakes by failing to act assertively to resolve the capacity problem. For example, Verizon failed to press its vendors to expedite installation of the cross-connect equipment, and waited for the cross-connect equipment to be installed rather than exploring alternative means of interconnecting with Core, such as by obtaining different equipment. As discussed above, the capacity exhaust problem had significant ramifications to numerous competitive LECs, including Core. The Washington Hub bottleneck substantially stunted the growth of facilities-based competition in the Washington Metropolitan LATA. In other words, the state of competition in the Washington Metropolitan LATA had to remain constrained until Verizon solved the capacity problem.

52. Verizon argues that the affirmative steps suggested by Core (i.e., pressing the vendors, exploring

EXHIBIT 18
PAGE 9 of 20

interconnection alternatives) would likely have proven fruitless. [FN128] The record does not permit us to agree with Verizon on that score. In particular, the record contains no evidence that Verizon contacted its vendors to obtain alternative equipment, but was told that no such equipment was available. [FN129] Nor does the record contain evidence that Verizon complained to its vendors or otherwise urged them to accelerate installation of the equipment Verizon had ordered. For example, there is no evidence that Verizon protested when, having forecast that the K43 would exhaust by February, and having requested that a portion of the K43 equipment be installed by February, the K43 ran out of capacity in June, and the vendor had not even begun installing the equipment. [FN130] Indeed, as explained above, Verizon did not notify Core of the problem in a timely manner. In sum, especially given the magnitude of the capacity problem, Verizon should have made substantial efforts to expedite its resolution. Verizon's apparent passivity was an unreasonable response to Core's dilemma.

\* \* \*

*15 **7983 53. In sum, based on what the record reveals about the specific circumstances at issue here, we conclude that Verizon's acts and omissions, viewed as a whole, violated the Maryland SGAT, and thus the reasonableness standard of section 251(c)(2)(D) of the Act. In particular, Core has shown, by a preponderance of the evidence that Verizon acted unreasonably by taking too long to complete interconnection with Core and by failing to promptly notify Core of the likelihood and extent of the interconnection delay. Given the substantial magnitude and significant anticompetitive repercussions of Verizon's errors, taken together, we cannot excuse them as reasonable mistakes. [FN131]

E. We Dismiss or Deny Core's Other Claims.

54. Core alleges that Verizon violated sections 201(b), 202(a), and 251(c)(2) of the Act. As discussed above, we find that Verizon violated that portion of section 251(c)(2) which requires that Verizon provide "just" and "reasonable" interconnection. With respect to Core's claim that Verizon violated section 202(a) and that portion of section 251(c)(2)(D) which prohibits discrimination by incumbent LECs in favor of third parties, Core argues that Verizon provided more favorable interconnection to two other carriers situated similarly to Core than Verizon provided to Core. [FN132] In response, Verizon argues that section 202(a) does not govern interconnection provided pursuant to section 251 (c), [FN133] and that, in any event, Core has failed to provide record evidence of discriminatory treatment. [FN134] We agree with Verizon that the record falls far short of showing any discriminatory treatment against Core. [FN135] Accordingly, we deny Core's claim under section 202 (a) and that portion of section 251(c)(2)(D) which prohibits discrimination in favor of third parties. [FN136]
55. With respect to Core's remaining claims under section 201(b) and the remaining portions of section 251(c)(2), our ruling under the "just" and "reasonable" standard of section 251(c)(2)(D) will afford Core all of the relief to which it would be entitled were we to rule in its favor on these remaining claims. Accordingly, we need not address these claims, and dismiss them without prejudice. [FN137]

**7984 IV. ORDERING CLAUSES

56. ACCORDINGLY, IT IS ORDERED, pursuant to sections 4(i), 4(j), 208, and 251 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 208, and 251, that the portion of Core's Count 2 [FN138] that alleges violation of the "just" and "reasonable" standard of section 251(c)(2)(D) of the Communications Act, as amended, 47 U.S.C. § 251(c)(2)(D), IS GRANTED to the extent indicated herein.
*16 57. IT IS FURTHER ORDERED, pursuant to sections 4(i), 4(j), 202, 208, and 251 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 202, 208, and 251, that Core's Count 3, [FN139] which alleges that Verizon violated section 202(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 202(a), and those portions of Core's Counts 2 and 4, [FN140] which allege that Verizon violated that portion of section 251(c)(2)(D) which prohibits discrimination by the incumbent LEC in favor of third parties, are DENIED.
58. IT IS FURTHER ORDERED, pursuant to sections 4(i), 4(j), 201, 208, and 251 of the

EXHIBIT ___18___

PAGE __10__ of __20__

Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 201, 208, and 251, that the remaining portions of Core's Complaint are DISMISSED WITHOUT PREJUDICE.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

FN1. Formal Complaint of Core Communications, Inc., File No. EB-01-MD-007 (filed Mar. 21, 2001) ("Complaint").

FN2. 47 U.S.C. § 208.

FN3. 47 U.S.C. § 251(c)(2)(D).

FN4. See Part III (D), infra.

FN5. See Part III (E), infra

FN6. Joint Statement, File No. EB-01-MD-007 (filed May 2, 2001) ("Joint Statement") at 1, ¶ 1. LATAs are "Local Access and Transport Areas," which are geographic areas established by the AT&T Consent Decree between which the incumbent Bell Operating Company may not provide service except pursuant to section 271 of the Act. See, e.g., 47 U.S.C. §§ 271, 153(3), 153(25); Newton's Telecomm Dictionary (16th ed.) at 505-506.

FN7. Joint Statement at 1, ¶¶ 1-2.

FN8. 47 U.S.C. § 251(c)(2). Section 251(c) provides, in pertinent part, that "each incumbent local exchange carrier has the following duties: ... (2) The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network ...." 47 U.S.C. § 251(c)(2). See, e.g., 47 C.F.R. § 51.305 (rules pertaining to interconnection).

FN9. See Local Telephone Competition: Status as of June 30, 2002, Industry Analysis and Technology Div'n, Wireline Competition Bureau, Dec. 2002, http://www.fcc.gov/Bureaus/Common_Carrier/Reports/FCC-State_Link/IAD/lcom1202.pdf.

FN10. See, e.g., Preamble, Telecommunications Act of 1996, Pub. L. No. 104- 404, 110 Stat. 56 (1996) ("1996 Act") (stating that the 1996 Act was designed "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.").

FN11. 47 U.S.C. § 251(c)(2)(D). Section 251(c)(2)(D) provides, in pertinent part, that each incumbent LEC shall provide interconnection "on rates, terms, and conditions that are just [and] reasonable ... in accordance with the terms and conditions of the [parties' interconnection] agreement and the requirements of this section and section 252...." 47 U.S.C. § 251(c)(2)(D).

FN12. 47 U.S.C. §§ 251-252.

FN13. 47 U.S.C. § 252(f)(1).

FN14. 47 U.S.C. § 252(f)(2). The existence of an approved SGAT does not vitiate a Bell Operating Company's obligation to engage in negotiations for different terms, if a competitive LEC so requests. 47 U.S.C. § 252(f)(5).

FN15. Joint Statement at 1, ¶ 1.

EXHIBIT _18_
PAGE _11_ of _20_

FN16. Answer of Defendant Verizon Maryland, File No. EB-MD-01-007 (filed Apr. 10, 2001) ("Answer"), Ex. 1 (Maryland SGAT) at 7 § 4.4.4; Joint Statement at 2, ¶ 4. The Maryland SGAT provides, in pertinent part, that Verizon and the requesting competitive LEC "shall agree upon an addendum ... to reflect the schedule ... applicable to each new LATA requested by [the requesting competitive LEC]; provided, however, that unless otherwise agreed to by [Verizon and the requesting competitive LEC], the Interconnection Activation Date in a new LATA shall not be earlier than ... 45 days ...." Answer, Ex. 1 (Maryland SGAT) at 7 § 4.4.4. According to the record, Core did not seek to negotiate a different schedule for interconnection. See, e.g., Answer at 4, ¶ 5; Joint Statement at 1, ¶ 3.

FN17. Joint Statement at 1, ¶ 3. Answer, Ex. 1 (Maryland SGAT).

FN18. Answer, Ex. 1 (Maryland SGAT) at Schedule 3.1, "Request for Interconnection" (providing that Core and Verizon "agree to be bound by the terms of the Statement").

FN19. Joint Statement at 1, ¶ 3.

FN20. Complaint at 1; Complainant's Motion to Include the Affidavit of Douglas A. Dawson in the Record of this Proceeding, File No. EB-01-MD-007 (filed Nov. 13, 2001) at Attachment (Affidavit of Douglas A. Dawson dated Nov. 11, 2001) ("Dawson Aff.") at 14, ¶ 30; Joint Statement at 2, ¶ 7.

FN21. Answer, Ex. C (Declaration of Donald E. Albert dated Apr. 10, 2001) ("Apr. 10 Albert Dec'n") at 2-3, ¶¶ 4-6; Joint Statement at 2, ¶¶ 5-8.

FN22. Complaint at 3-4, ¶¶ 6-8; Answer at 5, ¶ 10; Joint Statement at 2, ¶¶ 5- 6.

FN23. Joint Statement at 3, ¶ 11.

FN24. Apr. 10 Albert Dec'n at 2, ¶ 4; Declaration of Donald E. Albert, File No. EB-01-MD-007 (filed July 23, 2001) ("July 23 Albert Dec'n") at 3, ¶ 5.

FN25. Complaint, Ex. 2 (ASR dated June 29, 2000); Joint Statement at 3, ¶ 12. An ASR is a service order form developed by the United States telecommunications industry used, among other things, for ordering access to a local exchange carrier's network. Verizon asserts that it sent the ASR to Core (rather than Core sending the ASR to Verizon) because Core's clients included internet service providers, so that only Verizon would have originating traffic. Apr. 10 Albert Dec'n at 3-4, ¶¶ 8-9; Answer, Ex. 2 (Access Service Ordering Guidelines) at 3-14. The record does not reveal whether Core's only customers were internet service providers.

FN26. Joint Statement at 3, ¶ 13.

FN27. Complaint, Ex. I (Affidavit of Bret L. Mingo) ("Mingo Aff.") at 2, ¶ 6; Joint Statement at 3, ¶ 14.

FN28. Mingo Aff. at 2, ¶ 6; Joint Statement at 3, ¶ 14.

FN29. Complaint Ex. 2 (letter dated July 27, 2000 from Michael Hazzard, counsel to Core, to Steven Hartmann, counsel to Verizon); Joint Statement at 3, ¶ 15.

FN30. Joint Statement at 3, ¶ 18; Answer, Exs. 9-13.

FN31. Joint Statement at 3, ¶ 17; Complaint, Ex. 4 (letter dated August 21, 2000 from Michael Hazzard, counsel to Core, to Steven Hartmann, counsel to Verizon).

FN32. Joint Statement at 3-4, ¶¶ 17-18.

FN33. Joint Statement at 4, ¶ 19; Complaint, Ex. 5 (letter dated September 13, 2000 from Michael Hazzard, counsel to Core, to Steven Hartmann, counsel to Verizon, describing a September 11, 2000 conversation between Messrs. Hazzard and Hartmann).

EXHIBIT _18_

PAGE _12_ of _20_

FN34. Joint Statement at 4, ¶ 22.

FN35. Verizon does not assert that any acts or omissions by Core after February 28, 2000 delayed interconnection with Core. See Apr. 10 Albert Dec'n at 5, ¶ 12; Joint Statement at 2, ¶ 6 and 3, ¶ 14; Supplement to the Joint Statement, File No. EB-01-MD-007 (filed May 7, 2001) at 3, ¶¶ 5, 7.

FN36. Complaint at 3; Joint Statement at 4, ¶ 22.

FN37. A timeline setting out relevant dates regarding the capacity exhaust is attached as an appendix.

FN38. Digital cross-connect machines (often referred to as "DACs") connect telecommunications transport facilities that operate at different capacities or have different technical characteristics. They consist of ports - the physical interface to which the transport facility is connected - and a matrix, the internal device that makes connections and multiplexes and de-multiplexes traffic from one type of port to another (for example, from a DS-3 to an OC-12). Defendants' Supplemental Answer to Interrogatory Number 6 and Supplemental Response to Questions Posed by the Commission During the July 26, 2001 Status Conference, File No. EB-01-MD-007 (filed Aug. 10, 2001) ("Verizon's Supplemental Responses") at 7. See Newton's Telecomm Dictionary (16th ed.) at 231 (defining cross-connect equipment as "distribution system equipment used to terminate and administer communication circuits"). Core explains: "Think of these boxes as a huge collection of pre-wired connections. When a new connection is needed for a circuit ..., these boxes allow technicians to choose one of the pre-wired connections to implement the circuit quickly. Using a pre-wired connection is quicker than having a technician run wires ... to create the connections." Dawson Aff. at 7, ¶ 15. The K43 is an Alcatel iMTN and the K36 is a Tellabs Titan 550. Dawson Aff. at 7, ¶ 15.

FN39. Specifically, Verizon states, "[T]here was no DS-3 channel (capacity) available through the K36 ... into and through the K43.... That is, there was no available DS-3 capacity on the ports that already were providing service.... In addition, ... there also were no unused OC-12 ports on the K36 3x1 machine and no unused OC-12 ports on the K43 3x3 machine." Verizon's Supplemental Responses at 7-8. See Defendant Verizon Maryland Inc.'s Answers to Complainant Core Communications, Inc.'s Interrogatories, File No. EB-01-MD-007 (filed June 25, 2001) ("Verizon's Answers to Interrogatories 1-7") at 3-4 (Answer to Interrogatory no. 2); July 23 Albert Dec'n at 4, ¶¶ 6-7.

FN40. Defendant Verizon Maryland Inc.'s Answers to Complainant Core Communications, Inc.'s Interrogatories, File No. EB-01-MD-007 (filed Oct. 26, 2001) ("Verizon's Answers to Interrogatories 8-13") at 5-6 (Answer to Interrogatory no. 10(c)); July 23 Albert Dec'n at 2, ¶ 2.

FN41. July 23 Albert Dec'n at 2-3, ¶ 3. Specifically, Verizon's network transported certain competitive LEC-bound traffic to the K36, which multiplexed the signals into DS-3s and converted them from electrical to optical, and then carried the traffic, via OC-12 connections, to the K43. The K43 also multiplexed the traffic, and then carried it to an OC-48 multiplexer, from which the traffic ultimately was transported to the competitive LEC's POP. July 23 Albert Dec'n at 2-3, ¶ 3. Verizon describes the role of the K43 and K36 as follows: "After being switched by the tandem, the Core bound call goes to trunks that are connected to Verizon's K36 3x1 digital cross-connect machine. The K36 3x1 cross-connect machine multiplexes the trunks into DS-3's and converts the signals from electrical to optical. This cross-connect machine is then connected to Verizon's K43 3x3 cross-connect machine using OC-12 connections. The K43 3x3 is then connected to the OC-48 IOF fiber optic multiplexer using OC-12 connections." July 23 Albert Dec'n at 4, ¶¶ 6-7.

FN42. Supplemental Joint Statement at 4, ¶ 7; Verizon's Supplemental Responses, Ex. 9 (Status memo from Verizon's vendor) at 5; Verizon's Answers to Interrogatory nos. 8-13 at 3 (Answer to Interrogatory no. 8(f)).

FN43. July 23 Albert Dec'n at 3-4, ¶¶ 6-7; Verizon's Answers to Interrogatories 1-7, at 3-4 (Answer to Interrogatory no. 1).

EXHIBIT _18_

PAGE _13_ of _20_

FN44. Verizon's Supplemental Responses, Ex. 6 (Telephone Equipment Order).

FN45. Verizon's Supplemental Responses at 4, Verizon's Supplemental Responses, Ex. 2 (K36 Capacity Creation Request).

FN46. Verizon's Supplemental Responses at 4; Verizon's Supplemental Responses, Exs. 2 (K36 Capacity Creation Request), and 6 (Telephone Equipment Order).

FN47. Verizon's Supplemental Responses at 6, 7-8.

FN48. Verizon's Answers to Interrogatory nos. 8-13 at 7 (Answer to Interrogatory no. 11(b)).

FN49. Verizon's Supplemental Responses, Ex. 1 (K43 Capacity Creation Request).

FN50. Verizon's Supplemental Responses, Exs. 1 (K43 Capacity Creation Request), 5 (Telephone Equipment Order).

FN51. Verizon's Supplemental Responses, Ex. 8 (Status memo from the K43 vendor) at 4; Verizon's Answers to Core Interrogatories 8-13 at 7 (Answer to Interrogatory no. 11(c)).

FN52. Verizon's Supplemental Responses at 6.

FN53. Verizon's Supplemental Responses, Ex. 9 (Status memo from Verizon's vendor) at 5; Verizon's Answers to Interrogatories 8-13 at 3 (Answer to Interrogatory no. 8(f)).

FN54. Verizon's Supplemental Responses, Ex. 5 (Telephone Equipment Order); Verizon's Answers to Core's Interrogatories 8-13 at 7 (Answer to Interrogatory no. 11(c)).

FN55. Verizon's Answers to Interrogatories 8-13 at 3 (Answer to Interrogatory no. 8(f)), 7 (Answer to Interrogatory no. 11(c)); July 23 Albert Dec'n at 4, ¶ 8.

FN56. Verizon's Supplemental Responses at 2.

FN57. Verizon's Supplemental Responses at 6; April 10 Albert Dec'n at 6, ¶ 15.

FN58. Verizon's Supplemental Responses, Ex. 9 (Status memo from Verizon's vendor) at 5; April 10 Albert Dec'n at 6, ¶ 13. The record does not reveal how many requests for capacity in addition to Core's were placed in "hold" status after June 23, 2000.

FN59. Verizon's Answers to Interrogatories 8-13 at 3 (answer to Interrogatory no. 8(f)); Verizon's Supplemental Responses, Ex. 10 at 5. Although some of the 54 "held" orders may have been completed in September 2000, after a portion of the equipment for the K43 was installed, the rest of the 54 orders could not be completed until after the remainder of the equipment was installed on about October 20, 2000. Verizon's Answers to Interrogatories 8-13 at 3 (answer to Interrogatory no. 8(f)); Verizon's Answers to Interrogatories 8-13 at Attachments 1, 2.

FN60. Joint Statement at 4, ¶ 22.

FN61. Verizon's Answers to Interrogatories 8-13 at 3 (Answer to Interrogatory no. 8(f)), 7 (Answer to Interrogatory no. 11(c)); July 23 Albert Dec'n at 4, ¶ 8.

FN62. Core states that, as a result of Verizon's delay, Core "was unable to provide service to its current and prospective customers." Complaint at 1. As Core was only seeking a finding as to liability in this phase of the proceedings, Core's assertion has not been tested.

FN63. Letter dated December 19, 2001 from Sherry A. Ingram, counsel to Verizon, to Commission staff, File No. EB-01-MD-007 (filed Dec. 19, 2001) ("Verizon's December 2000 Letter") at 1-2.

EXHIBIT  18
PAGE  14  of  20

Specifically, Verizon had direct trunking in the Washington Metropolitan LATA between end offices for its own traffic, and therefore, used the Washington Hub for its own traffic only on an overflow basis. Because these direct trunks were operating at an approximately 63% utilization rate in 2000, Verizon's own existing traffic, and its ability to add new dial-tone customers, were not affected by the K36/K43 capacity exhaust. Id. By "Verizon's own traffic," we mean traffic between Verizon's end-user customers, and traffic from Verizon end-user customers to long-distance carriers.

FN64. Complaint at 8-9, ¶¶ 22-31. Core states that it will, pursuant to section 1.722 of the Commission's rules, 47 C.F.R. § 1.722, file a supplemental complaint for damages if successful in establishing liability. Complaint at 9- 10, ¶ 33.

FN65. Answer at 12, ¶ 35; Answer, Ex. B (Verizon's Legal Analysis) at 9; Opening Brief of Verizon Maryland, Inc., File No. EB-01-MD-007 (filed Jan. 18, 2002) ("Verizon's Opening Br.") at 13-14; Reply Brief of Verizon Maryland Inc., File No. EB-01-MD-007 (filed Feb. 8, 2002) ("Verizon's Reply Br.") at 2.

FN66. Answer at 12, ¶ 36; Answer, Ex. B (Verizon's Legal Analysis) at 4-5; Verizon's Opening Br. at 9-10, 13; Verizon's Reply Br. at 2-8.

FN67. Verizon's Opening Br. at 11-12; Verizon's Reply Br. at 9-10.

FN68. Answer at 2; Answer, Ex. B (Verizon's Legal Analysis) at 2-3; Verizon's [Brief in] Opposition to Core's Initial Brief on Liability, File No. EB-01- MD-007 (filed Feb. 1, 2002) ("Verizon's Opp. Br.") at 35-43.

FN69. 47 U.S.C. § 251(c)(2)(D).

FN70. Answer at 12, ¶¶ 35-36; Answer, Ex. B (Verizon's Legal Analysis) at 9; Verizon's Opening Br. at 13-14; Verizon's Reply Br. at 2.

FN71. See CoreComm Communications, Inc. and Z-Tel Communications, Inc. v. SBC Communications Inc., et al., Memorandum Opinion and Order, -- FCC Rcd --, File No. EB-01-MD-017, FCC No. 03-83 (rel. Apr. 17, 2003) at ¶¶ 13-19.

FN72. CoreComm v. SBC, at ¶¶ 13-19.

FN73. Verizon's Opening Br. at 2-3; Verizon's Reply Br. at 2, 7-9.

FN74. Verizon's Opening Br. at 9-10.

FN75. 47 U.S.C. § 252(f); Joint Statement at 1, ¶ 3.

FN76. 47 U.S.C. § 251(c)(2)(D). We note that the Act also requires an incumbent LEC to provide unbundled access to network elements.

FN77. 47 C.F.R. § 41.305(a)(5) (emphasis added).

FN78. Verizon's Opening Br. at 13.

FN79. Verizon's Reply Br. at 8.

FN80. Answer at 4, 13; Verizon's Opening Br. at 9-10; Verizon's Reply Br. at 8- 9.

FN81. Contrary to Verizon's suggestion otherwise, Verizon's Reply Br. at 8, nothing in this order indicates that the Commission would ignore a valid forum-selection clause in an interconnection agreement.

FN82. Trinko v. Bell Atlantic Corp., 309 F.3d 89 (2d Cir. 2002), (dissenting opinion published at 309

EXHIBIT ___18___

PAGE ___15___ of ___20___

F.3d 71), Trinko v. Bell Atlantic Corp., 305 F.3d 89 (2d Cir. 2002), pet. for cert. granted in part on other grounds sub nom. Verizon Communications, Inc. v. Trinko, -- S.Ct. --, 2003 WL891459 (Mar., 2003).

FN83. 305 F.3d at 104 (emphasis added).

FN84. See also 47 U.S.C. § 251(c)(3), similarly requiring that unbundled elements also be provided "in accordance with the terms and conditions of the agreement."

FN85. See BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Services, Inc., 317 F.3d 1270, 1274 (11th Cir. 2003) (en banc); Global Naps, Inc. v. FCC, 291 F.3d 832 (D.C. Cir. 2002); Southwestern Bell Tel. Co. v. Connect Communications Corp., 225 F.3d 942 (8th Cir. 2000); Southwestern Bell Tel. Co. v. PUC, 208 F.3d 475, 479-80 (5th Cir. 2000); Southwestern Bell Tel. Co. v. Brooks Fiber Comm. Of Oklahoma, 235 F.3d 493, 497 (10th Cir, 2000); Starpower Communications, LLC, Petition for Preemption, Memorandum Opinion and Order, 15 FCC Rcd 11277 (2000). See also Verizon Maryland, Inc. v. PUC, 535 U.S. 635, 638 n.2 (2002), and Illinois Bell Tel. Co. v. WorldCom Techs., Inc., 179 F.3d 566, 573 (7th Cir. 1999), cert. dismissed, 535 U.S. 682 (2002) (assuming without discussion that state commissions have authority to construe and enforce interconnection agreements).

FN86. This order does not address whether the Commission would enforce obligations in interconnection agreements that do not relate directly to matters covered by sections 251 and 252 of the Act.

FN87. Verizon's Opening Br. at 11-12; Verizon's Reply Br. at 9-10.

FN88. See Part III (A)-(B), supra.

FN89. Verizon's Opening Br. at 11-12; Verizon Reply Br. at 9-10.

FN90. Indeed, in passing the 1996 Act, Congress considered (and then rejected) a proposal to allow the Commission to forbear from section 208. H.R. REP. No. 104-458, 184 (1996), reprinted in 1996 U.S.C.C.A.N. 1584. See CoreComm v. SBC, -- FCC Rcd --, at n.46.

FN91. Verizon's Opening Br. at 11-12 (citing AT&T v. Bell Atlantic Corp., 15 FCC Rcd 17066 (2000), aff'd sub nom. MCIWorldCom v. FCC, 274 F.3d 542 (D.C. Cir. 2001) and Global NAPs, Inc. Petition for Preemption of Jurisdiction of New Jersey Brd. of Pub. Util. Regarding Interconnection Dispute with Bell Atlantic-New Jersey, Inc., 14 FCC Rcd 12530 (1999)).

FN92. In AT&T v. Bell Atlantic Corp., the Commission dismissed the complaint on comity grounds because the complaint asked the Commission to duplicate complex rate-making proceedings that several state commissions had already completed or nearly completed. See AT&T v. Bell Atlantic Corp., 15 FCC Rcd at 17071, ¶ 12; MCIWorldCom v. FCC, 274 F.3d at 548-49. In Global Naps, Inc., the Commission rejected a carrier's petition for preemption of the authority of the New Jersey PUC to resolve an interconnection dispute under section 252, because the New Jersey PUC had already completed the proceeding at issue. Global NAPs, Inc., 14 FCC Rcd at 12538-39, ¶¶ 17-18.

FN93. As a result, addressing the merits of Core's Complaint here will not duplicate any efforts of the Maryland PUC. In fact, deferring to the Maryland PUC would only delay resolution of the dispute.

FN94. Answer, Ex. B (Defendant's Legal Analysis) at 5; Answer at 3-4, ¶ 5.

FN95. 47 U.S.C. § 251(f)(1) (emphasis added).

FN96. 47 U.S.C. § 252(f)(2).

FN97. 47 U.S.C. § 251(c)(2).

EXHIBIT  18
PAGE  16  of  20

FN98. See generally, 47 C.F.R. § 51.305(a)(5). Our approach here is consistent with general principles of contract law. See, e.g., Williston on Contracts § 30.19 (4th ed. 1999) (Except where a contrary intention is evident, "valid applicable laws existing at the time of the making of the contract enter into and form a part of the contract as fully as if expressly incorporated in the contract"); Restatement 2d of Contracts § 204 (where a contract is silent with respect to a term that is essential to a determination of the parties' duties, the court may supply terms that are "reasonable in the circumstances"). This principle applies with special force where, as here, the agreement at issue concerns a subject regulated by federal law. See, e.g., Williston on Contracts § 30.20.

FN99. See, e.g., AT&T v. Winback & Conserve Program, Inc., 16 FCC Rcd 16074, 16079, n.35 (2001) (holding that the "preponderance" standard applies in complaint proceedings brought under section 208).

FN100. Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Interconnection between Local Exchange Carriers and Commercial Mobile Radio Service Providers, First Report and Order, 11 FCC Rcd 15499, 15503, ¶ 205 (1996) ("First Local Competition Report and Order"); 47 U.S.C. § 51.305(g).

FN101. First Local Competition Report and Order, 11 FCC Rcd at 15503, ¶ 205.

FN102. First Local Competition Report and Order, 11 FCC Rcd at 15503, ¶ 205.

FN103. Answer at 6-7, ¶ 12; Verizon's Opp. Br. at 9-12. Verizon explains that the instructions for the ASR state, "The actual due date may be different from that desired because of factors such as the availability of facilities and the quantity, complexity, and impact on local service of the circuit(s) involved." Id.

FN104. Joint Statement at 3, ¶ 12.

FN105. Joint Statement at 3, ¶ 14.

FN106. Verizon's Opp. Br. at 28.

FN107. Verizon's Opp. Br. at 28.

FN108. See, e.g., 47 C.F.R. § 51.305(a)(5) (inquiry into whether interconnection is "just" and "reasonable" includes "the time within which the incumbent LEC provides such interconnection.")

FN109. Dawson Aff. at 14, ¶ 30.

FN110. Initial Brief [of] Core Communications, Inc., File No. EB-01-MD-007 (filed Feb. 1, 2001) ("Core's Initial Br.") at 7-9; Reply of Core Communications, Inc. to Verizon's Opposition, File No. EB-01-MD-007 (filed Feb. 8, 2002) ("Core's Reply Br.") at 8-9.

FN111. Core's Initial Br. at 8; Core's Reply Br. at 17.

FN112. Core's Initial Br. at 15-20; Core's Reply Br. at 20-21.

FN113. Core also alleges that Verizon delayed unreasonably in building the entrance facility. Core's Initial Br. at 15-20; Core's Reply Br. at 20-21. Yet, Core has failed to provide probative evidence supporting this allegation. Specifically, Core's Complaint provided no evidence to support its assertion. This failure, standing alone, could warrant disregard of Core's allegation. See 47 C.F.R. §§ 1.720(c), 1.721 (a)(5), (a)(11). In any event, in subsequent briefing, Core relied on a single e-mail sent to Core by Verizon. Core's Initial Br. at 15-17 (citing Answer, Ex. 4 (Verizon e-mail to Core)). Yet this e-mail is reasonably read in the manner suggested by Verizon, see Verizon's Opp. Br. at 21, particularly given Core's failure to cite it until final briefing in this proceeding. See Complaint (failing to cite or attach Verizon's e-mail); [Core's] Responses to [Verizon's] Interrogatories, File No. EB-01-

EXHIBIT ___18___

PAGE ___17___ of ___20___

MD-007 (file June 25, 2001) at 1 (failing to cite the e-mail or its June 7 date in response to Verizon's request that Core state the basis for its expectation that the entrance facility would be completed before June 28). Accordingly, in determining whether Verizon violated section 251(c)(2)(D), we do not consider Verizon's conduct in constructing the entrance facility to have been flawed.

FN114. Verizon's Answers to Interrogatories 8-13 at 2 (Answer to Interrogatory no. 8(b)).

FN115. Verizon's Answers to Interrogatories 8-13 at 3 (Answer to Interrogatory no. 8(f)).

FN116. Thus, Verizon's assertion that the August strike contributed to the length of the capacity exhaust, Verizon Opp. Br. at 26, is not supported by the record. As discussed, when ordering equipment to increase the capacity of the K36, Verizon requested that installation be completed by August 30 - after the Verizon strike. With respect to the K43, Verizon's vendor informed it, before the Verizon August strike, that it would not be able to complete installation until October 2000.

FN117. Verizon's Supplemental Responses at 2-3.

FN118. Dawson Aff. at 8, ¶ 17 (stating that cross-connect machines such as the K36 and K43 "are gigantic units with lots of capacity. ... For Verizon to have run out of capacity in these units means there is something wrong in their system. They ... do routine forecasts and monitoring of equipment usage, and I have to say that it is nearly inconceivable to me that they could have exhausted these facilities without having known it was going to happen and without planning to already have the next unit installed").

FN119. Implementation of the Telecomm. Act of 1996, Amendment of Rules Governing Procedures to be Followed When Formal Complaints are Filed Against Common Carriers, Report and Order, 12 FCC Rcd 22497, 22617 at ¶ 295 (1997) (subsequent history omitted).

FN120. Implementation of the Telecomm. Act of 1996, Amendment of Rules Governing Procedures to be Followed When Formal Complaints are Filed Against Common Carriers, Report and Order, 12 FCC Rcd at 22615 n.782, 22617, ¶ 295.

FN121. July 23 Albert Dec'n at 5, ¶ 10.

FN122. Verizon's Supplemental Responses at 5.

FN123. See April 10 Albert Dec'n at 2, ¶ 5; Verizon Opp. Br. at 8; Joint Statement at 2, ¶¶ 5-6; Dawson Aff. at 9, ¶ 20.

FN124. See April 10 Albert Dec'n at 2, ¶ 5; Verizon Opp. Br. at 8; Joint Statement at 2, ¶¶ 5-6; Dawson Aff. at 9, ¶ 20.

FN125. Verizon's Answers to Interrogatories 1-7 at 7 (Answer to Interrogatory no. 6).

FN126. July 23 Albert Dec'n at 5, ¶10.

FN127. Verizon's Supplemental Responses, Exs. 8-10.

FN128. Verizon's Opp. Br. at 39-41.

FN129. For example, Core proposes two alternatives that Verizon could have considered that would have involved Verizon's obtaining alternative equipment, such as multiplexers or smaller cross-connect machines. Core's Initial Br. at 20-21. Verizon effectively admits that these alternatives were technically feasible. Verizon's Opp. Br. at 41.

FN130. Verizon has not produced a single written communication from Verizon to its vendors urging them to act more quickly to install the equipment, despite Core's interrogatory requesting that it do so. Nor does Verizon assert that any such documents ever existed. Verizon's Answers to

EXHIBIT __18__

PAGE __18__ of __20__

Interrogatories 8-13 at 5 (Answer to interrogatory no. 10(b)). Verizon does state that it "held numerous telephone conference calls with its digital cross-connect vendors...," and that it had weekly conference calls with the vendor for the K43. Verizon's Supplemental Responses at 8. Yet these calls concerned dozens of installation orders throughout Verizon's territory, not just the orders pertaining to the Washington Hub K36 and K43. Id. Further, Verizon provides no evidence that, during these calls, it pressed the vendors to act more quickly with respect to the K36 and K43; indeed, Verizon states that the calls were simply to "manage th[e] situation and prioritize the jobs." Verizon's Supplemental Responses at 8.

FN131. The imposition of liability here is limited to the particular facts presented in this case. We do not hold here that a provisioning delay of four months is per se unreasonable.

FN132. Complaint at 8-9, ¶ 29; Core's Initial Br. at 21-23.

FN133. Verizon Opening Br. at 2-9; Verizon's Reply Br. at 1-7.

FN134. Verizon Opp. Br. at 32-35.

FN135. Core alleges that Verizon unlawfully discriminated against it by providing more favorable treatment to two carriers who likewise requested entrance facility interconnection with Verizon in the Washington Metropolitan LATA during this same period of time. Core's Initial Br. at 21-30. The record indicates, however, that Verizon actually took longer to interconnect with these two carriers than it took to interconnect with Core. See Verizon's Opp. Br. at 35 (citing Verizon Answer to Interrogatory No.1 and Attachment).

FN136. Given this conclusion, we need not decide whether section 202(a) applies to interconnection provided pursuant to section 251(c).

FN137. Given this conclusion, we need not address Verizon's assertion that section 201(b) does not apply to interconnection provided pursuant to section 251(c). See Verizon Opening Br. at 2-9.

FN138. Complaint at 8.

FN139. Complaint at 8-9.

FN140. Complaint at 8, 9.

**\*\*7985** Appendix

Timeline with respect to the K43 and K36 Cross-Connect Machines

1999
December
22nd: Having forecast that the K43 will exhaust in February 2000, Verizon orders equipment to increase the capacity of the K43, requesting that a portion of the work be completed on February 15, 2000 and the remainder on April 30, 2000.
2000
January
31st: Having forecast that the K36 will exhaust in May 2000, Verizon orders equipment to increase the capacity of the K36, requesting completion by August 30, 2000.
April
1st: The last spare K43 OC-12 port is used.
May
8th: The vendor for the K43 informs Verizon that installation will not be complete until October 20, 2000.
June
29th: Verizon sends Core an "Access Service Request" form ("ASR") for DS-3 transport, stating that

EXHIBIT _18_

PAGE _19_ of _20_

the "D[esired] D[ue] D[ate]" is July 14, 2000.

July

1st: The last OC-12 port on the K36 suffers DS3 capacity exhaust.

14th: The "D[esired] D[ue] D[ate]" on Verizon's ASR arrives: Verizon does not provide the DS-S transport or contact Core.

25th: Core telephones Verizon to ask when interconnection will be completed; Verizon does not describe the cause of the interconnection delay or state when it expects interconnection to be completed.

27th: Core writes to Verizon, asking when interconnection will be completed; Verizon does not respond to Core's letter.

August

6th-25th: Verizon strike.

21st: Core writes to Verizon and asks when interconnection will be completed; Verizon does not respond to Core's letter.

September

11th: Core telephones Verizon and is informed that interconnection will be completed on about November 15, 2000.

**7986** October

20th: Installation of equipment for the K36 and K43 is completed.

November 15

Core's interconnection is completed.

2003 WL 1917249 (F.C.C.), 18 F.C.C.R. 7962, 18 FCC Rcd. 7962, 28 Communications Reg. (P&F) 1333

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT _18_

PAGE _20_ of _20_