STATE OF ALASKA

THE REGULATORY COMMISSION OF ALASKA

Before Commissioners:          G. Nanette Thompson, Chair
                               Bernie Smith
                               Patricia M. DeMarco
                               Will Abbott
                               James S. Strandberg

| | |
|---|---|
| In the Matter of the Petition by GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC., and d/b/a GCI for Arbitration with PTI COMMUNICATIONS OF ALASKA, INC., under 47 U.S.C. §§ 251 and 252 for the Purpose of Instituting Local Exchange Competition | U-99-141<br><br>ORDER NO. 9 |
| In the Matter of the Petition by GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC., and d/b/a GCI for Arbitration with TELEPHONE UTILITIES OF ALASKA, INC., under 47 U.S.C. §§ 251 and 252 for the Purpose of Instituting Local Exchange Competition | U-99-142<br><br>ORDER NO. 9 |
| In the Matter of the Petition by GCI COMMUNICATION CORP. d/b/a GENERAL COMMUNICATION, INC., and d/b/a GCI for Arbitration with TELEPHONE UTILITIES OF THE NORTHLAND, INC., under 47 U.S.C. §§ 251 and 252 for the Purpose of Instituting Local Exchange Competition | U-99-143<br><br>ORDER NO. 9 |

### ORDER APPROVING, IN PART, AND MODIFYING, IN PART, ARBITRATOR'S RECOMMENDATION

BY THE COMMISSION:

Regulatory Commission of Alaska
1016 West Sixth Avenue, Suite 400
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

U-99-141(9)/U-99-142(9)/U-99-143(9) - (8/24/00)
Page 1 of 17

EXHIBIT 26
PAGE 1 of 17

We have the arbitrator's eleven proposed decisions before us for review.[1] We find that the arbitrator's recommended decisions are consistent with the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56 (the Act). We approve in part and modify in part his recommended decisions. We direct the parties to file a final, executed agreement consistent with this decision by September 5, 2000. We will either approve or reject the final agreement within thirty days under 47 U.S.C. § 252(e)(4).

Background

The Commission appointed an arbitrator to resolve the disputed terms of interconnection between GCI[2] and ACS[3] in ACS' Juneau, Fairbanks and North Pole service areas. U-99-141(1), U-99-142(1), U-99-143(1). The Commission directed the arbitrator to use a final offer arbitration model and to further define the procedures with the parties. The goal of the arbitration process was to produce a complete, integrated interconnection agreement comprised of arbitrated and negotiated provisions.

---

[1] Arbitration Decision on Quality of Service dated May 12, 2000; Arbitration Decision on Wholesale Discount dated June 7, 2000; Arbitration Decision on Term of Contract dated June 22, 2000; Arbitration Decision on Performance Standards dated June 26, 2000; Arbitration Decision on Model Inputs dated July 17, 2000; Arbitration Decision on Dispute Resolution dated July 25, 2000; Arbitration Decision on Performance Standards Penalty Provisions dated July 26, 2999; Arbitration Decision on Wholesale Line Testing dated July 26, 2000; Arbitrator's Decision on Multiplexing, Digital Access Cross Connects and Dark fiber dated July 27, 2000; and Arbitrator's Decision on OSS Interface and Nonrecurring Costs dated July 28, 2000; Arbitrator's Decision on Collocation dated July 28, 2000.

[2] GCI COMMUNICATIONS CORP. d/b/a GENERAL COMMUNICATION, INC. and d/b/a GCI (GCI).

[3] We approved name changes for the ACS subsidiaries on July 5, 2000, as follows: PTI COMMUNICATIONS OF ALASKA, INC. (PTIC) was changed to ACS OF FAIRBANKS, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LONG DISTANCE and ACS (ACS-F), Order U-00-37(1); TELEPHONE UTILITIES OF ALASKA, INC. (TUA) was changed to ACS OF ALASKA, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LONG DISTANCE and ACS (ACS-AK), Order U-00-40(1); TELEPHONE UTILITIES OF THE NORTHLAND, INC. (TUNI) was changed to ACS OF THE NORTHLAND, INC. d/b/a ALASKA COMMUNICATIONS SYSTEMS, ACS LONG DISTANCE and ACS (ACS-N), Order U-00-39(1).

Regulatory Commission of Alaska
1016 West Sixth Avenue, Suite 400
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

The parties agreed to the arbitration procedures in an "Agreed Arbitration Model" dated March 2, 2000. They agreed to work on the unresolved issues separately, with the arbitrator functioning first as a mediator and finally as an arbitrator if the parties were unable to agree. The parties agreed to a schedule to complete the process within the deadlines set out in the Act. Those deadlines were later extended by agreement of the parties.[4] This arbitration procedure was designed to produce an agreement that included all of the terms of interconnection between ACS and GCI for Fairbanks, North Pole and Juneau.[5]

## Discussion

The Act enumerates the standards we must apply in this case. We must (1) ensure that the arbitrated agreement covers the incumbent's interconnection duties under section 251; (2) establish just and reasonable interconnection rates; and (3) set an implementation schedule. 47 U.S.C. § 252(c). To determine if the interconnection prices are just and reasonable, the rates must be cost-based, non-discriminatory and may include a reasonable profit. 47 U.S.C. § 252(d)(1).[6] We use these guidelines to evaluate the arbitrator's recommended decisions.

We are deciding this case under unique procedural circumstances. During this arbitration process, the Eighth Circuit Court of Appeals issued an opinion in a case remanded to it by the U.S. Supreme Court. *Iowa Utilities Board v. Federal*

---

[4] Order U-99-141(6)/U-99-142(6)/U-99-143(6), May 25, 2000; and Order U-99-141(7)/U-99-142(7)/U-99-143(7), July 20, 2000.

[5] A final agreement has yet to be filed with the Commission. The parties will be required to file a final, executed agreement consistent with this decision.

[6] We can reject an arbitrated agreement only if it is inconsistent with Section 251, including the Federal Communications Commission (FCC) regulations promulgated under Section 251, or the standards set out in Section 251(d). 47 U.S.C. § 252(e)(2)(B). *MCI Telecommunications Corp. v. U.S. West Communications*, 204 F.3d 1262, 1266 (9th Cir. 2000).
Regulatory Commission of Alaska
1016 West Sixth Avenue, Suite 400
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

*Communications Commission*, 2000 WL 979117 (8th Cir. July 18, 2000) Docket No. 96-3321 ("*Iowa Utilities Board II*"). The Eighth Circuit's opinion included a finding that the FCC regulations approving a pricing model based on a theoretical model network were inconsistent with the Act. *Id.* at 8.

The situation we face is similar to the one the Washington Commission faced when reviewing an interconnection agreement between US West and MCImetro. *MCI v. U S West, supra*. The Washington Commission declined to consider the impact of the original *Iowa Utilities Board*[7] decision, citing the press of time. We asked the parties to brief the impact of the Eighth Circuit's decision on our proceeding when they filed comments on the arbitrator's recommended decisions. GCI argued that the decision had essentially no effect on our proceedings, and ACS argued that the decision undercut our rulings terminating the rural exemption and selecting the pricing model. We have carefully considered the implications of *Iowa Utilities Board II* in this docket. We seek to set the stage for implementation of the Act's directives without further litigation and delay. This interconnection arbitration is nearly the final step in a process that began three years ago when GCI requested interconnection in TUA, TUNI and PTIC's service areas. The Act contemplates a process much swifter than has been achieved here for entry into local markets by a competitive provider.

The Act gives us adequate guidance to complete this interconnection proceeding. We lack the crystal ball that would forecast for us whether *Iowa Utilities Board II* will be reversed or upheld by the U.S. Supreme Court. We are mindful of the potential it creates for further litigation. That litigation would delay delivery of the benefits of competition to consumers and detract the parties' resources from the goal they have both stated of bringing competition to the Juneau, Fairbanks and North Pole

---

[7] *Iowa Utilities Board v. Federal Communications Commission*, 120 F.3d 753 (8th Cir. 1997) (*Iowa Utilities Board I*).

Regulatory Commission of Alaska
1016 West Sixth Avenue, Suite 400
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

markets.[8] Therefore, we issue this decision based on the directives of the Act, and rely on the existing FCC orders and regulations.

The Eighth Circuit's ruling on the assignment of the burden of proof in a rural exemption proceeding does not persuade us to revisit that issue here. *Iowa Utilities Board II, supra,* at 16-17. In this docket the RCA was operating under a directive from the Superior Court to assign the burden of proof to the incumbent based on state law.[9] We are confident that this ruling is correct. To assign the burden of proof to the competitive local exchange carriers (CLEC) would be impractical. That would require the CLEC to provide proof of negatives with information in the control of the incumbent local exchange carrier (ILEC). If, however, the superior court now reviewing our remand decision on appeal[10] reverses its decision on the burden of proof and remands the case to the RCA, we can revisit the evidence based on the different burden of proof and hear additional evidence if necessary.

The discussion that follows successively addresses each of the arbitrator's eleven decisions resolving disputed issues in the order they were issued.

1. Arbitration Decision on Quality of Service

Neither party commented directly on the first arbitrator's decision that quality of service was an arbitrable issue in its brief. The issue presented to the arbitrator was whether the interconnection agreement should contain reporting, monitoring and performance standards. We agree with the arbitrator that these standards are essential

---

[8] *See,* for example, ACS-ANC's Request for Consolidated Mediation of Interconnection Pricing (Juneau, Fairbanks and Anchorage) Pursuant to 47 U.S.C. Sec. 252(a)(2) filed on August 9, 2000 in U-99-141, 142 and 143 and U-96-89; and GCI's Response filed August 18, 2000.

[9] Decision and Order, March 4, 1999, *GCI Communication Corporation v. Alaska Public Utilities Commission,* Superior Court Case Nos. 3AN-98-4759/ 4903/4905.

[10] Telephone Utilities of Alaska, Inc. v. Regulatory Commission of Alaska, Superior Court Case No. 3AN-99-3494 (Consolidated).

Regulatory Commission of Alaska
1016 West Sixth Avenue, Suite 400
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

EXHIBIT 26
PAGE 5 of 17

to a CLEC's ability to interconnect and must be part of an interconnection agreement. Without performance standards, the ILEC could render many of the obligations detailed in the interconnection agreement meaningless by delivering lower quality and less timely service to the CLEC's customers. The Act imposes on the incumbent the obligation to provide interconnection with its network to any requesting carrier ". . .that is at least equal in quality to that provided by the local exchange carrier to itself. . . " 47 U.S.C. § 251(c)(2)(C). The arbitrator aptly identified the correct standard as "parity" -- service at least as good as the ILEC provides to its own customers.

ACS argues that because it currently has no performance standards, comparable treatment for GCI would be no standards. ACS offered neither evidence of company-wide standards, nor evidence of a set of rules titled performance standards. The evidence therefore shows that ACS has no standards.[11] ACS argues that as long as ACS service requests do not receive priority over GCI, there is parity. However, in order to do business as a telecommunications provider, ACS directs its employees to respond to service requests from customers. ACS management must have guidelines for employees that define how to do their jobs. We do not find it plausible that ACS management has not communicated standards to its employees for responses to customer service requests and other internal operation services.

The arbitrator's May 12, 2000 ruling directed the parties to negotiate performance standards, and cited examples of how other states resolved this issue in a similar evidentiary vacuum. The arbitrator's decision put ACS on notice of their obligation to propose standards to the arbitrator when that issue was scheduled for decision. The arbitrator's decision regarding quality of service standards is approved.

2. Arbitration Decision on Wholesale Discount

---

[11] Testimony of Steve Pratt May 3, 2000, Transcript Volume 3, page. 191, lines 7-8.

U-99-141(9)/U-99-142(9)/U-99-143(9) - (8/24/00)
Page 6 of 17

EXHIBIT 26
PAGE 6 of 17

The arbitrator ruled that a ratio of separated avoided local costs to local revenue should be used to determine the wholesale discount. GCI argued in its August 7, 2000 filing that the arbitrator erred, and ACS did not comment on this decision. The arbitrator chose ACS' final offer on this issue.

This issue presents a policy issue that goes beyond the scope of this arbitration. Adopting GCI's final offer could have a significant effect on ACS' access charge revenues. Revisiting the jurisdictional cost allocation scheme to determine whether or not each cost was "functionally local" would require the parties to exercise judgments about how costs should be allocated. Those costs are the function of the separations procedures found in Part 36. Absent a cost study, we are not prepared to deviate from the allocations described in the current separations manual. We recognize them as imperfect, but the best choice in the absence of a record upon which to base an alternative separations method. These rules may be revised when the FCC, or this Commission decides to modify the access charge procedures. We adopt the arbitrator's recommendation.

3. Arbitration Decision on Term of Contract

The parties resolved all "term of contract" issues except the date for beginning negotiations for a new contract. The arbitrator chose GCI's final offer. GCI suggested that the negotiations should begin ten months before the initial contract ends. ACS did not comment on this decision in its August 7, 2000, filing.

We find that ten months is a reasonable window of time before the initial contract terminates for the parties to negotiate a new contract. The Act gives state commissions nine months after a request for interconnection is sent to an incumbent provider to resolve the interconnection issues that the parties cannot. 47 U.S.C. § 252(b)(4)(C). State commissions also have thirty days to approve or reject an arbitrated agreement

after it has been submitted in final form. 47 U.S.C. § 252(e)(4).[12] We adopt the arbitrator's recommended decision on term of contract.

4. Arbitration Decision on Performance Standards

The Act requires parity. ACS' testimony was that it has no standards by which we can judge that parity. The Act directs state commissions to make decisions based on the best available information from any source when a party does not provide necessary information. 47 U.S.C. § 252(b)(4)(B). Therefore, in the absence of evidence from the parties by which we can determine parity, the Act requires us to decide based on the best information available.

ACS suggests that we should adopt the guidelines in 3 AAC 52.280 *et seq* as affirmative standards. Their final offer to the arbitrator cited the regulations as the proposed standard on several issues. However, those regulations are irrelevant to a determination of parity. The relevant facts are the level of service that ACS provides to itself. ACS provided no information to describe how the level of service ACS provides to itself compares to the standards in the regulations.

Furthermore, the regulations are not specific enough to create measurable standards. For example, as its final offer on issue 17, DSL installation requirements, ACS proposed the regulations. The regulation that sets a minimum standard for installation refers to "primary service" which does not include DSL. 3 AAC 52.290. The regulation was drafted before DSL service was an option for customers. Effective

---

[12] The parties have yet to submit a final arbitrated agreement to the RCA for approval or rejection. Therefore the thirty days have not yet begun to run. A reasonable reading of these statutory provisions suggests a two step process. The negotiation, arbitration and commission decision on the arbitrator's decision must be complete within nine months. The parties are then required to submit a completed, executed agreement consistent with the commission's decision. The thirty-day review period begins when the final agreement is filed. In this case, where the parties have yet to submit a final agreement, we will require the parties to file a complete, executed agreement that is consistent with this decision. A decision on that final agreement will be issued within thirty days.

performance standards must state clear rules that can be used to measure performance. A standard that does not clearly apply to the service at issue is useless to measure performance.

We find that the arbitrator's decisions on performance standards are consistent with the Act. We adopt them. We recognize, however, that this decision may impose standards that are different than those ACS offers to itself. ACS was on notice that they would have to present evidence of performance standards, and on notice that the arbitration was a final offer process. ACS chose to present its case in a manner that left the factual record bare on these issues, and therefore it is ACS that should bear the risk of negative consequences of this record. ACS alone could have presented evidence of the standards of performance that it provides to itself. Having chosen to present no evidence on this issue, ACS risked an arbitration decision based on the standards suggested by GCI. We are making this decision based on the best available evidence. 47 U.S.C. § 252(b)(4)(B).

### 5. Arbitration Decision on Model Inputs

*Iowa Utilities Board II* potentially impacts the arbitrator's recommended decision on model inputs. ACS and GCI both briefed their positions on this legal issue. ACS argued that the arbitrator's recommended decision is flawed because the arbitrator applied the wrong legal standard to all the decisions where he did not accept ACS's final offer. GCI argued that the Eighth Circuit decision is not controlling and has no effect until a mandate is issued.

The Eighth Circuit decision in *Iowa Utilities Board II* does not provide clear guidance to help us resolve this issue. The Eighth Circuit suggests that the correct pricing standard is "the cost to the ILEC of carrying the extra burden of the competitor's traffic." *Iowa Utilities Board II*, p. 4. The court described short run incremental costs. Short run incremental costs are the additional current year cost that the incumbent

incurs if they carry the competitor's traffic. If prices were set based on incremental costs, then some network elements would be priced at zero, and others very expensive. This pricing scheme would encourage a competitor to lease all nominally priced services from the incumbent, and construct its own facilities for the other services. The incumbent would not be fairly compensated for the use of its facilities.

However, the Eighth Circuit also supported the FCC's use of a forward-looking pricing model. *Iowa Utilities Board II*, supra at 5-6. Prices for network elements are to be based on costs "determined without reference to a rate-of-return or other rate-based proceeding." 47 U.S.C. § 252(d)(1)(A)(I). Congress wanted state regulators to avoid rate-base methodologies to determine network element prices. Congress directed the state commissions to determine network element prices with reference to prospective and not historical costs. The Eighth Circuit agreed that forward-looking prices were appropriate under the Act, and confined its disagreement with the FCC to how the FCC defined forward-looking.

A careful reading of *Iowa Utilities Board II* and the FCC orders accompanying their regulations suggests that the Eighth Circuit misunderstood the FCC's intent. *Iowa Utilities Board II* at 3-5. The FCC explained that in adopting a forward-looking cost model, prices should not be based on a purely hypothetical network, but rather on the most efficient technology deployed in the incumbent's existing wire centers. *In the Matter of Implementation of the Local Competition Provision in the Telecommunications Act of 1996,* CC Docket 96-98, CC docket 98-185 (August 8, 1996), paragraphs 683-685, cited by arbitrator in footnote 16 of the Arbitration Decision on Model Inputs. The FCC did not expect that prices would be set based on a purely hypothetical network. Neither did the arbitrator's decision in this case. Despite ACS' characterization of the arbitrator's decision as wholly based on a hypothetically constructed network, it was not.

The arbitrator's decision described his understanding of the model's purpose. The arbitrator relied on the FCC's guidance, as stated in its orders, in deciding which model inputs were consistent with the Act. We find the Eighth Circuit's decision confusing and internally inconsistent and rely instead, as the arbitrator did, on the language of the Act as interpreted by the FCC in the orders issued with its regulations. The Act and the FCC's orders instruct that the model should produce prices for network elements that reflect the incumbent's cost to reconstruct their existing network using current efficient technology deployed in wire center locations. To reflect actual costs, any available discounts are included. By their nature, therefore, the prices generated by the model may vary from the incumbent's actual, documented costs because the best choice available now may be different than the best choice available when the network was designed and built.

The model used in this arbitration was the FCC synthesis model adopted by the Commission. Order U-99-141(5)/U-99-142(5)/U-99-143(5). We adopted this model knowing that it would produce prices that may vary from reality. We conclude it sets fair, not perfect, methods for determining prices. In lieu of conducting expensive and time-consuming cost studies to precisely determine costs, the FCC, consistent with the Act's directive to not use traditional ratemaking methodologies, approved the use of models to determine unbundled network element prices. Some of the prices generated may be too low and others too high, but overall they are reasonably accurate and fair.

The parties in this case were invited to make modifications to the FCC model to make it reflect Alaskan market conditions. They agreed to customize the model by including actual wire center and customer location data.

ACS and GCI submitted final offers on the inputs to the model used to produce network prices. ACS' final offers were generally based on the costs incurred to rebuild the current network as it exists. GCI's final offers were generally based on the model's

U-99-141(9)/U-99-142(9)/U-99-143(9) - (8/24/00)
Page 11 of 17

EXHIBIT 26
PAGE 11 of 17

default inputs, adjusted for uniquely Alaskan costs. ACS argued that the arbitrator consistently used the wrong standard to select a final offer. ACS asked the Commission to adopt its input proposals because they more accurately reflected actual costs.

The arbitrator picked the final offer that best replicated forward-looking costs. In some cases, the forward-looking costs are different than what ACS would incur to replace its existing network because ACS' current network was designed some time ago under different market conditions. A monopoly provider constructed ACS' network. A monopoly provider makes investment decisions differently than a competitive provider. This interconnection agreement must set network element prices for a competitive market.

The arbitrator's standard is consistent with the Act. Congress created a scheme to allow competitors to lease existing facilities constructed by the ILEC or construct their own. Network prices need, therefore, to be set based on what the incumbent would spend to replace the existing facility if the incumbent was making that decision now in a competitive market.

The Act does not contemplate network prices based on what the incumbent spent when the facilities were originally built. Because technology changes rapidly in the telecommunications world, incumbents would not construct their networks using historical design approaches. A pricing structure that rewards the incumbent for not deploying the most cost efficient technology is inconsistent with the Act's goal of improving the quality of services offered to customers. In regulated markets, incumbents constructed networks with different objectives than cost efficiency. If competitors were forced to pay for an inefficient network, incumbents would have little incentive to improve their network. Network prices should be set based on what the incumbent would spend in a competitive market employing new and efficient

technologies. Competitors then choose between constructing their own facilities, or using the existing facilities. If prices are set correctly, the competitor is encouraged to use the existing network, thus providing income to the incumbent as a competitor enters the market. Ironically, while ACS' strategy of arguing for network prices may provide a short-term benefit, in the long run, it is likely to decrease revenues. If competitors can construct their own facilities for less than the cost of leasing the incumbent's, they will eventually do so and leave parts of the incumbent's network as stranded investment.

We have reviewed the arbitrator's decisions on model inputs, and the arguments by GCI and ACS for modification of those recommended decisions. We adopt each of the arbitrator's recommended decisions on model inputs. Use of these inputs with the model will generate fair interconnection prices for the Fairbanks, North Pole and Juneau markets.

### 6. Arbitration Decision on Dispute Resolution

The parties resolved all of the issues relating to the dispute resolution procedures except whether GCI must pay ACS if there is a billing dispute. ACS did not comment on this provision in its August 7, 2000, filing and GCI argued that the arbitrator erred. GCI's discussion conceded that GCI's and ACS' final offers on this issue had the same revenue impact. GCI's criticism of ACS's final offer was that it would provide the opportunity for abuse because ACS might invent charges. We will not decide based on that possibility. If ACS invents charges to disadvantage GCI we are interested. However, we have no reason to believe that ACS will not operate consistently with the tone and purpose of this order and fairly implement its directives to effect competition as required by the Act. We adopt the arbitrator's recommendation.

### 7. Arbitration Decision on Performance Standards Penalty Provisions

The parties did not agree on appropriate penalty provisions for failure to comply with performance standards. The arbitrator chose GCI's last pitch, which described

graduated penalty provisions. ACS would incur no penalty for the first violation, have to explain to GCI how it intended to fix the problem if it recurred, and would be liable at the rate of $1,000/day if the violation recurred a third time within twelve months. ACS argues that penalty provisions are inappropriate and that a dispute resolution process would be fairer.

We agree with the arbitrator that penalties should be included in the agreement and are most effective if self-executing. Dispute resolution procedures between the parties are not likely to be effective in this case because a meeting to resolve the problem would be fruitless if solving the problem was entirely within ACS' control.

The third layer of penalty suggested by GCI may not always be fair. There may be circumstances where financial penalties of that magnitude are reasonable. However, there may also be mitigating circumstances in some cases. In lieu of adopting GCI's final offer as proposed, we modify it to change the third tier. Instead of automatic financial penalties, the parties shall report all instances where the same performance standard is violated three times within a twelve-month period to the Commission. That report shall include details about the first two violations and their consequences. The Commission can then investigate under AS 42.05.571 and decide what further penalty is justified under the circumstances.

8. Arbitration Decision on Wholesale Line Testing

The arbitrator found that allowing GCI to have access to ACS' Harris Line Test System was technically feasible and recommended that we adopt GCI's final offer requiring ACS to allow GCI access to that system when GCI leases wholesale circuits from ACS.

ACS argued in its August 7, 2000, filing that adopting the arbitrator's recommendation would allow GCI a higher standard of service than that provided to ACS' customers. Without citation to facts in the record, ACS' arguments cannot be the

basis for a ruling. ACS knew that this was an issue and did not present evidence to support its arguments.

The record does not support ACS' arguments about the security problems that allowing GCI to have access to this system will cause. Nor is there evidence about how GCI's proposal will give GCI's orders super-priority.[13] There is no evidence in this record to show that ACS is technically incapable of implementing GCI's proposal, or that ACS would be harmed, therefore, we adopt the arbitrator's recommendation on this issue.

9. Arbitration Decision on Multiplexing, Digital Access Cross Connects and Dark Fiber

The arbitrator chose ACS's final offer on all of these issues except for the cost of dark fiber. GCI argued that their procedural rights were compromised by ACS' introduction of new cost information at the hearing. ACS argued that the arbitrator's selection of GCI's final offer on dark fiber pricing was incorrect because he mistakenly believed that ACS' final offer would allow ACS to recover the cost of fibers that were not used.

The arbitrator correctly analyzed the dark fiber issue. GCI's price proposal fairly compensates ACS for all of the fiber strands used. We adopt the arbitrator's recommended decision.

10. Arbitration Decision on OSS Interface and NonRecurring Costs

The arbitrator selected GCI's final offer to pay $.12 per transaction for OSS Interface, and contribute $500,000 to the original construction of the system. ACS' final

---

[13] ACS witness Robert Locke testified that he did not know whether GCI's web server based priority solution was possible. Transcript at 107-109 (Volume III). He did not say that ACS's system could not identify that someone else was running a test and who that user was. Instead he testified that he did not know if ACS's system could be modified to incorporate that capability. Transcript at 128-130.

U-99-141(9)/U-99-142(9)/U-99-143(9) - (8/24/00)
Page 15 of 17

EXHIBIT 26
PAGE 15 of 17

offer was not for a specific system or price. ACS argued that GCI should bear the entire cost of the OSS interface because it would not be constructed but for market entry by GCI.

We do not have enough of a record to make a final decision on this issue because neither GCI nor ACS could present evidence during the arbitration. There is no other source of information relevant to the cost of an OSS system for these markets. 47 U.S.C. § 252(b)(4)(B). Without a clearer understanding of the operational parameters of the system that will be constructed and the costs of that system, we cannot make a fair decision allocating those costs. As part of the implementation of this agreement, we direct the parties to continue to discuss the design of this system and report weekly to the arbitrator on their progress. If the parties are unable to agree on a fair allocation of the costs when they are known, they may present the issue for arbitration and we will review his recommended decision.

As guidance for the parties' discussions, we note that we agree with GCI that the cost of the OSS interface should be shared equitably amongst all users. We encourage the parties to resolve this issue, noting that in other states third parties have been hired at considerable expense to design, implement and monitor OSS interface systems. We are hopeful that GCI and ACS can design a system more appropriately scaled to the Juneau and Fairbanks markets.

The arbitrator selected GCI's final offer on non-recurring costs. That offer was based on a model submitted during the arbitration hearing. ACS argued that it was procedurally disadvantaged because it did not have adequate time to review the model. The model is one developed by other companies effecting interconnection that was adapted for Alaska by including ACS' loaded labor and fall out rates.

We adopt the arbitrator's recommendation. The parties were on notice that this issue was subject to arbitration. We distinguish non-recurring costs from OSS interface

costs because the parties could not reasonably be expected to know the cost of a system that has yet to be designed. GCI's final offer will fairly compensate ACS for the non-recurring costs of interconnection.

### 11. Arbitration Decision on Collocation

The arbitrator's last recommended decision was on collocation pricing. The parties resolved all of the issues except the cost of central office floor space. The arbitrator chose ACS' final offer. GCI argued that the arbitrator did not adequately consider power costs that were an element of the central office cost. ACS witnesses explained why the elements of their central office cost were necessary and reasonable. Consistent with the arbitration procedures, the parties were required to present final offers. The arbitrator chose ACS' final offer, explaining that the evidence in the record supported it. We adopt the arbitrator's recommendation.

### ORDER

THE COMMISSION FURTHER ORDERS:

1. The Commission adopts the arbitrator's decisions, as modified by the discussion in the body of this Order.

2. GCI and ACS shall submit a complete, executed interconnection agreement that is consistent with this order by September 5, 2000.

DATED AND EFFECTIVE at Anchorage, Alaska this 24th day of August, 2000.

BY DIRECTION OF THE COMMISSION
(Commissioners Bernie Smith and
Patricia DeMarco not participating)

(S E A L)

Regulatory Commission of Alaska
1016 West Sixth Avenue, Suite 400
Anchorage, Alaska 99501
(907) 276-6222; TTY (907) 276-4533

U-99-141(9)/U-99-142(9)/U-99-143(9) - (8/24/00)
Page 17 of 17

EXHIBIT 26
PAGE 17 of 17