Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, DC 20554

| | |
|---|---|
| ACS of Anchorage, Inc. and | ) |
| ACS of Fairbanks, Inc. | ) |
| | )    WC Docket No. 02-201 |
| Emergency Petition for Declaratory Ruling | ) |
| and Other Relief Pursuant to Sections 201(b) | ) |
| and 252(e)(5) of the Communications Act | ) |

## OPPOSITION OF GENERAL COMMUNICATION, INC.

John T. Nakahata
Karen L. Gulick
HARRIS, WILTSHIRE & GRANNIS LLP
1200 Eighteenth Street, N.W.
Washington, D.C. 20036
(202) 730-1300

*Counsel for General Communication, Inc.*

August 20, 2002

EXHIBIT __27__
PAGE __1__ of __44__

## SUMMARY

ACS of Anchorage, Inc. and ACS of Fairbanks, Inc. (collectively "ACS") have filed an amalgam of complaints in the guise of an Emergency Petition for Declaratory Ruling and Other Relief. That "other relief" would entail this Commission preempting the Regulatory Commission of Alaska ("RCA") from an ongoing interconnection proceeding, as well as assuming jurisdiction over issues raised in the federal district court and now pending before the U.S. Court of Appeals for the Ninth Circuit. The wisdom of such extraordinary intervention need not be addressed because, simply stated, the Commission does not have the jurisdiction to do what ACS asks.

ACS alleges that the RCA has violated the Telecommunications Act of 1996, the Commission's implementing regulations, and the Fifth Amendment to the U.S. Constitution. ACS finds authority for the Commission to intervene through reasoning that "there is nothing in the language or legislative history of section 252(e)(5) to prevent the FCC from preempting state actions that clearly violate the pricing standards set forth in section 252(d)(1)."

ACS presumes that section 252(e)(5) confers a broad grant of federal jurisdiction to intervene in the states' negotiation, arbitration and approval of interconnection agreements. It does not. As the courts and this Commission have recognized, section 252(e)(5) authorizes the commission to act in narrow circumstances – only in the state's stead, and only when the state has failed to act – and it grants the Commission no discretion to act beyond those circumstances. In neither proceeding challenged by ACS has the RCA failed to act. In Anchorage, an interconnection agreement with UNE rates was arbitrated and approved by the RCA in January 1997. Subsequently, the RCA set new interim rates. And now the RCA is revisiting those rates in light of the Supreme Court's recent decision upholding the Commission's forward-looking

EXHIBIT 27
PAGE 2 of 44

TELRIC pricing methodology. Fairbanks presents an even simpler case, for the RCA approved a final arbitrated interconnection agreement in October 2000.

By its own formulation, ACS concedes that the RCA has acted. What ACS alleges is that the RCA has acted *incorrectly.* But as this Commission has repeatedly held, and the courts affirmed, the Commission's jurisdiction under section 252(e)(5) does not include appellate review of state commission decisions. Rather, the Act vests exclusive review of state commission decisions in the federal district courts. ACS has ceded this point as well – it has already sought judicial review of the Fairbanks interconnection agreement, and that review is now pending. Thus, ACS requests that this Commission not only preempt the RCA of an active interconnection proceeding, but also engage in a parallel administrative review of a final state commission decision – review Congress has entrusted exclusively to the federal district courts. ACS's allegation that the existing UNE rates are "confiscatory" is nothing more than a second bite at the apple.

GCI does not begrudge ACS its right to a substantive review of final RCA decisions. But ACS must pursue that review before the tribunal that has been vested with the authority to hear ACS's claims – the federal courts. This Commission has no jurisdiction either to review the legality of UNE rates established by the RCA or to appropriate an active interconnection proceeding, and it must decline ACS's invitation to do so.

EXHIBIT 27
PAGE 3 of 44

# TABLE OF CONTENTS

Page

SUMMARY

I.      INTRODUCTION ................................................................................1

II.     COUNTERSTATEMENT OF THE FACTS .......................................2
        A.    Parties to the State Proceedings .........................................2
        B.    The FCC's UNE Pricing Rules ...........................................4
        C.    The Anchorage Interconnection Proceeding........................5
        D.    The Fairbanks Interconnection Proceeding.......................16

III.    PREEMPTION OF THE RCA WOULD BE UNLAWFUL BECAUSE IN NEITHER
        PROCEEDING HAS THE RCA FAILED TO ACT....................................22
        A.    Section 252(e)(5) Grants the FCC Jurisdiction to Assume an
              Interconnection Proceeding Only Where A State Commission
              Fails to Act, And the RCA Has Already Acted .........................22
        B.    The Commission's Jurisdiction Under Section 252(e)(5) Does
              Not Encompass Substantive Review of a State Commission's
              Decisions ..............................................................................27

IV.     THE FEDERAL DISTRICT COURT – *NOT THE FCC* – HAS JURISDICTION TO
        REVIEW UNE LOOP RATES ESTABLISHED BY THE RCA.......................30
        A.    The Act Provides for Exclusive Review of State Commission Decisions by
              the Federal District Courts ...................................................30
        B.    A Defendant's Assertion of a Defense to Suit Cannot "Confer"
              Jurisdiction Where the Statute Does Not Provide It...................31
        C.    ACS's Attack on the RCA's Actions Is a Poorly Disguised
              Request for a Merits Based Review of an Ongoing State
              Proceeding ...........................................................................33

V.      ACS's CLAIM THAT THE RCA HAS ESTABLISHED CONFISCATORY RATES
        IS INSUPPORTABLE, UNRIPE AND BEFORE THE WRONG FORUM.................35

VI.     CONCLUSION....................................................................................39

i

EXHIBIT 27
PAGE 4 of 44

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| ACS of Anchorage, Inc. and | ) | |
| ACS of Fairbanks, Inc. | ) | |
| | ) | WC Docket No. 02-201 |
| Emergency Petition for Declaratory Ruling | ) | |
| and Other Relief Pursuant to Sections 201(b) | ) | |
| and 252(e)(5) of the Communications Act | ) | |

**OPPOSITION OF GENERAL COMMUNICATION, INC.**

## I.    Introduction

General Communication, Inc. ("GCI") hereby opposes the extraordinary and unlawful intervention the petitioners request. ACS of Anchorage, Inc. and ACS of Fairbanks, Inc. (collectively "ACS") have filed an amalgam of complaints in the guise of an Emergency Petition for Declaratory Ruling and Other Relief. That "other relief" would entail this Commission preempting the Regulatory Commission of Alaska ("RCA") from an ongoing interconnection proceeding, as well as assuming jurisdiction over issues raised in the federal district court and now pending before the U.S. Court of Appeals for the Ninth Circuit. ACS alleges that the RCA has violated the Telecommunications Act of 1996 (the "Act"), the Commission's implementing regulations, and the Fifth Amendment to the U.S. Constitution.

What this all boils down to is ACS's dissatisfaction with the substance of the RCA's decisions. Of course, ACS may voice its dissatisfaction and may seek review of those decisions. But it must do so before the appropriate tribunal – the Federal district court. This Commission has no jurisdiction either to review the legality of UNE rates established by the RCA or to appropriate an active interconnection proceeding, and it must decline ACS's invitation to do so.

EXHIBIT 27
PAGE 5 of 44

## II.    Counterstatement of the Facts

ACS's Emergency Petition addresses two distinct interconnection proceedings conducted by the RCA.  ACS urges this Commission to preempt both proceedings, which are at different stages procedurally:  one is an active proceeding before the RCA to establish new UNE rates for a previously arbitrated and approved interconnection agreement in Anchorage.[1]  The other proceeding concluded with the RCA's final interconnection order for Fairbanks,[2] issued nearly two years ago and now pending judicial review in the federal courts.[3]

### A.    Parties to the State Proceedings

*Alaska Communications Systems Group, Inc.*, is a group of companies providing local and long distance telephone, wireless, data and Internet services throughout the state of Alaska. It is the incumbent local exchange carrier ("ILEC") in Anchorage, Fairbanks, Juneau and surrounding areas, and it represents that it serves three-quarters of Alaska's population.[4]  ACS provides local telephone service in part through its subsidiaries ACS of Anchorage, Inc., and ACS of Fairbanks, Inc., the petitioners in this docket.

ACS established its local telephone operations through a series of ILEC acquisitions in 1999.  It acquired Anchorage Telephone Utility ("ATU"), the non-rural municipally-owned ILEC serving the Anchorage market (now ACS of Anchorage, Inc.); Telephone Utilities of

---

[1]    *In the Matter of the Petition by General Communication, Inc for Arbitration under Section 252 of the Telecommunications Act of 1996 with the Municipality of Anchorage for the Purpose of Instituting Local Exchange Competition*, Regulatory Commission of Alaska, Order U-96-89(26), dated July 29, 2002.  All RCA orders referenced are available online at www.state.ak.us/rea/order/index.html.

[2]    *In the Matter of the Petition by General Communication, Inc. for Arbitration with PTI Communications of Alaska, Inc., under 47 U.S.C. §§ 251 and 252 for the Purpose of Instituting Local Exchange Competition*, Regulatory Commission of Alaska, Order U-99-141(7), dated July 20, 2000.

[3]    See discussion *infra* pp. 20-22.

EXHIBIT  27
PAGE  6  of  44

Alaska, Inc., the ILEC in Juneau (now ACS of Alaska, Inc.); PTI Communications Inc., the

ILEC in Fairbanks (now ACS of Fairbanks, Inc.); and Telephone Utilities of the Northland, Inc.,

the ILEC serving the suburbs of Fairbanks and other, smaller areas of the state (now ACS of the

Northland, Inc.). The Alaska Public Utilities Commission ("APUC"), predecessor to the RCA,

terminated ACS of Alaska, Inc.'s and ACS of the Northland, Inc.'s rural exemptions in 2000,

and the RCA subsequently reconsidered and reaffirmed the termination.[5]  Accordingly, all of the

ACS companies are required to comply with the unbundling and pricing provisions of sections

251 and 252.

   *General Communication, Inc.* ("GCI") is a competitive provider of local exchange, long

distance and Internet access services to residential and business consumers in Alaska. GCI also

provides cable television service. GCI first entered the local telephone market in 1997 in

Anchorage – the only market in Alaska in which the ILEC is not a "rural telephone company,"

and thus the only market in which GCI could obtain interconnection and access to UNEs without

the state commission first lifting the rural exemption. GCI now serves 40 percent of the

residential and business lines in Anchorage, predominantly through a combination of ACS's

UNE-loop and GCI's own switch and transport fiber ring, although it serves approximately ten

percent of its local loops entirely with its own facilities.  After a lengthy legal challenge by ACS

to the RCA's lifting of the rural exemptions, GCI entered the Fairbanks market last year and the

Juneau market at the beginning of this year. GCI has sought and received ETC status in

Anchorage, Fairbanks and Juneau.

---

[4]   ACS website, at http://www.acsalaska.com/about/index.stm (August 20, 2002).

[5]   *See* 47 U.S.C. § 251(f)(1).

EXHIBIT __27__

PAGE __7__ of __44__

*The Regulatory Commission of Alaska* ("RCA") is the successor to the Alaska Public Utilities Commission ("APUC"), which was abolished on June 30, 1999. Accordingly, state regulatory actions taken before that date were taken by the APUC, and those subsequent were taken by the RCA.

### B.    The FCC's UNE Pricing Rules

In order to foster competition in local telephone markets between incumbents and new entrants, the Telecommunications Act of 1996 enables new entrants to lease elements of the incumbent carrier's local network ("unbundled network elements," or "UNEs").[6]  These elements must be provided "on rates, terms and conditions that are just, reasonable, and nondiscriminatory in accordance with . . . the requirements of [section 251] and section 252."[7]  Section 252 provides procedures for the state commissions to arbitrate and approve interconnection agreements, including terms and prices for UNEs, between the ILEC and the new entrant.[8]  Section 252 also contains standards for the pricing of interconnection and unbundled network elements.[9]

In August 1996, the Commission adopted the *Local Competition First Report and Order* implementing the Act.[10]  Among other things, the Commission prescribed a methodology for the state utility commissions to use in setting UNE rates.  The Commission decided that rates should be based on the forward-looking economic cost of an element, determined by the sum of the total

---

[6]    47 U.S.C. § 251(c)(3).

[7]    *Id.*

[8]    47 U.S.C. §§ 252(b), (e).

[9]    47 U.S.C. § 252(d).

[10]   *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* First Report and Order, CC Docket No. 96-98, 11 FCC Rcd 15499 (1996) ("*Local Competition First Report and Order*").

EXHIBIT 27
PAGE 8 of 44

element long-run incremental cost of the element ("TELRIC") and a reasonable allocation of forward-looking common costs that cannot be attributed directly to individual elements.[11] The Commission also established that TELRIC "should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent LEC's wire centers."[12] Thus the Commission adopted an "efficient network" standard, rejecting arguments that rates should be based on the ILEC's historical, or embedded, costs.

Both the Commission's jurisdiction to adopt these rules, as well as the legality of the pricing methodology, have been clouded by contentious and protracted litigation, recently concluded by the United States Supreme Court's decision this spring in *Verizon*.[13] The provisions of the Act, these rules, and the more than five years of uncertainty about their legality and effect, are at the center of ACS's dispute with the RCA.

### C.    *The Anchorage Interconnection Proceeding*

Shortly after the Act was passed, GCI initiated negotiations with Anchorage Telephone Utility ("ATU"), the incumbent local exchange carrier in Anchorage, then owned by the Municipality of Anchorage. As negotiations stalled, GCI on July 29, 1996 petitioned the APUC to arbitrate the agreement as provided in section 252. During the course of the arbitration, on October 15, 1996, the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") granted a temporary stay of the Commission's pricing rules pending full review on appeal.[14] Thus, when the APUC approved the arbitrated interconnection agreement between GCI and

---

[11]    *See* 47 C.F.R. §§ 51.505(a), 51.505(c)(1).

[12]    47 C.F.R. § 51.505(b)(1).

[13]    *Verizon Communs., Inc. v. FCC*, 122 S. Ct. 1646 (2002) ("*Verizon*").

EXHIBIT 27
PAGE 9 of 44

ATU on January 14, 1997, the Commission's TELRIC rules were not in effect, and the APUC

was forced to adopt rates that it knew would need to be revisited once the uncertainty regarding

the Commission's rules was resolved.[15]  With that agreement, the "temporary" UNE loop rate

was set at $13.85.  The APUC explained:

> Both [ATU and GCI] acknowledged their understanding that the proposed
> rates are temporary in nature and will be subject to further review: Full
> studies and further proceedings, in the Courts, before the Federal
> Communications Commission and this Commission, will dictate changes
> in the ultimate structure.[16]

ACS's grievance with the originally arbitrated interconnection agreement apparently

starts with the arbitrator's – and ultimately the APUC's – rejection of ATU's proposed UNE

loop rate of $14.35.  Significantly, under "baseball style" arbitration, ATU had proposed this

UNE loop rate based upon an embedded cost standard, while GCI proposed forward-looking

rates.  As the APUC explained, "ATU's proposal [on UNE pricing] was based largely on its

existing local and interstate access tariffs, without adjustment.  GCICC's proposed rates were an

attempt to approximate forward-looking costs based upon the best available evidence. . . .

GCICC's proposed rates were based upon a closer approximation of forward-looking costs than

ATU's, which relied more heavily upon historical embedded costs."[17]

Although ACS's Emergency Petition implies that the temporary rates were adopted in violation

of the Act and the Commission's rules, that simply is not true.  Given the Eighth Circuit's stay,

ATU's tariff-based rate proposal, and the Act's authorization of a state commission to "proceed

---

[14]   *Iowa Utils. Bd. v. FCC*, 109 F.3d 418 (8th Cir.1996), *motion to vacate stay denied* 519 U.S.
978 (1996).

[15]   Order U-96-89(8), dated December 16, 1996.

[16]   *Id.* at 3.

[17]   *Id.* at 16.

6

EXHIBIT  *27*
PAGE  *10*  of  *44*

on the basis of the best information available to it,"[18] the original arbitrated rate was in full

compliance with existing, albeit nebulous, statutory law. Furthermore, the RCA's adoption of

the rate was tempered by its acknowledgement that it would revisit the rate as soon as

clarification was forthcoming from the courts and the Commission. ATU did not seek review of

the final order approving the Anchorage interconnection agreement, and the $13.85 UNE loop

rate went into effect and remained lawful until it was replaced by the RCA with an interim and

refundable rate, as described below.

    After the RCA approved the final interconnection agreement, the Eighth Circuit heard

the appeal of the *Local Competition First Report and Order* and held that the Commission

exceeded its jurisdiction when it adopted specific pricing rules to guide state commissions under

section 252.[19]  Accordingly, it vacated the rules. The United States Supreme Court granted

*certiorari* on January 26, 1998,[20] and subsequently reversed the Eighth Circuit in relevant part,

finding that the Commission's jurisdiction to implement the Act included the authority to adopt a

pricing methodology for the states to use when arbitrating UNE rates.[21]  With this decision on

January 25, 1999, the case was remanded to the Eighth Circuit for substantive review of the

regulations.

    Meanwhile, the predecessor to ACS, ALEC Acquisition Sub Corp., sought the approval

of the APUC to acquire Anchorage Telephone Utility, Telephone Utilities of Alaska, Inc., PTI

---

[18]   47 U.S.C. § 252(b)(4)(B).

[19]   *Iowa Utils. Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997).

[20]   *AT&T Corp. v. Iowa Utils. Bd.*, 522 U.S. 1089 (1998).

[21]   *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999) ("*Iowa Utilities I*").

EXHIBIT 27
PAGE 11 of 44

Communications of Alaska, Inc., and Telephone Utilities of the Northland, Inc. The APUC approved the sales in April of 1999.[22]

Upon completing its acquisitions of the ILECs, and with the validity of the Commission's rules still uncertain, on January 24, 2000, ACS filed a motion requesting that the RCA establish new interconnection rates to replace those adopted in the original agreement. ACS requested that its proprietary models – which it proposed to file later – be used in this proceeding as well as the arbitrations for Fairbanks and Juneau also being conducted between ACS and GCI.[23] On March 6, 2000, the RCA granted ACS's request to revisit the UNE rates in the Anchorage agreement, re-started the modeling and rate inquiry, and ordered the parties to file briefs proposing specific forward-looking cost models.[24]

ACS proposed a proprietary loop cost model, while GCI proposed the HAI Model, Release 5.1. After supplemental comments addressing the proposals in April, the RCA on May 11, 2000, adopted a modified version of the FCC's Synthesis Model, subsequently referred to as the "FCC Model."[25] As explained below, this Alaska-specific version of the FCC's Synthesis Model had been developed in the ACS-GCI arbitrations for Juneau and Fairbanks.[26] The RCA explained that the FCC's default inputs would be used as a baseline, but that it would make modifications specific to the Anchorage market after briefing and consultation with the

---

[22]  Order U-98-140(7)/U-98-141(7)/U-98-142(7), dated April 19, 1999; Order U-98-173(7)/U-98-174(7), dated April 4, 1999.

[23]  These arbitrations were preceded by negotiations and the filing of Petitions for Arbitration by GCI on December 8, 1999.

[24]  Order U-96-89(13), dated March 6, 2000.

[25]  Order U-96-89(14), dated May 30, 2000.

[26]  Order U-99-141(5)/U-99-142(5)/U-99-143(5), dated April 14, 2000.

EXHIBIT  27
PAGE  12  of  44

parties and, if necessary, arbitration.[27]  The RCA appointed an arbitrator and directed that a pre-hearing scheduling conference be held as soon as it approved the final interconnection agreements in the ACS Fairbanks and Juneau proceedings.

Following the RCA's decision to use the new FCC Model to establish UNE prices, on July 18, 2000, the Eighth Circuit issued its order on remand from the Supreme Court.[28]  The court affirmed the Commission's adoption of a "forward-looking" cost methodology because it read the statute as ambiguous between rates based on "forward-looking" and "historical" cost. However, the court precluded the use of the Commission's TELRIC pricing rules.  The court again vacated the rule and remanded to the Commission, creating yet more uncertainty as to the appropriate pricing standard for UNEs.[29]

At a pre-hearing conference with the arbitrator on October 19, 2000, ACS indicated that it would seek to have the RCA, not the arbitrator, receive evidence directly and further reconsider issues related to the model selection and model inputs.  ACS subsequently filed a motion requesting that the RCA receive evidence concerning several ACS "in-house" models, effectively seeking to re-open the RCA's May 2000 decision.  GCI opposed the motions, noting that the RCA previously made its decision, there was no basis to reconsider that decision, and no new policy matters warranted the RCA's direct conduct of the proceeding in lieu of the arbitrator.  ACS filed a reply, and the RCA heard oral argument on December 6, 2000.

On January 8, 2001, the RCA ruled on ACS's motion, concluding that it would retain use of the FCC Model, but also allow immediate briefing on "propose[d] modifications to the

---

[27]   Order U-96-89(14), dated May 30, 2000.

[28]   *Iowa Utils. Bd. v. FCC*, 219 F.3d 744 (8th Cir. 2000).

[29]   The Eight Circuit later partially stayed the mandate of its decision pending final review by the Supreme Court. *Order Granting the Federal Communications Commission's Motion for a Partial Stay of Mandate*, Docket No. 96-3321 (8th Cir.) (Sept. 22, 2000).

EXHIBIT  27
PAGE  13  of  44

existing model to make it appropriate for use in the current Anchorage market"[30] to assuage ACS's concerns. ACS then requested or consented to four extensions of time for the filing of briefs and replies,[31] and during that time the Supreme Court granted *certiorari* to review the Eighth Circuit's second invalidation of the FCC's rules.[32]

By order dated May 11, 2001, the RCA acceded to ACS's demands and, once again "recogniz[ing] that forward-looking cost methodologies are in a state of flux,"[33] seemed to agree to re-open its choice of UNE pricing methodologies.[34] Without specifically overturning its previous decision to use the FCC Model, the RCA indicated that it would consider ACS's in-house cost studies and "other forward-looking cost methodologies the parties wish us to consider."[35] Thus, *at ACS's own instigation, the RCA started anew at making a decision that had been concluded 15 months earlier.*

The RCA voiced concern that both its and the parties' time and resources be used efficiently and reminded the parties of its previous order requiring "all information and or [sic] data supporting the use of any particular study shall immediately be provided to the other party."[36] Despite the fact that ACS had been arguing for months that the RCA should use ACS's

---

[30] Order U-96-89(15), dated January 8, 2001, page 4.

[31] *See* Order U-96-89(16), dated January 16, 2001; Order U-96-89(17), dated February 1, 2001; Order U-96-89(18), dated February 22, 2001; Order U-96-89(19), dated March 9, 2001.

[32] *Verizon Communs., Inc. v. FCC,* 531 U.S. 1124 (2001).

[33] Order U-96-89(20), dated May 11, 2001, page 3.

[34] The RCA indicated, "We . . . conclude that further inquiry into alternative methods for determining interconnection prices for unbundled network prices, in conjunction with an ongoing ACS [retail] rate case, is appropriate." *Id.* at 2.

[35] *Id.* at 5.

[36] *Id.* at 6.

EXHIBIT 27
PAGE 14 of 44

own in-house model, the RCA admonished ACS that "we are not aware of any information indicating that ACS provided GCI with a copy of its proposed cost study."[37]

ACS requested, and received, a month's extension for the briefing of proposed models. In the order granting the extension, the RCA noted that "in conjunction with filing three cost models and materials supporting the cost models," "ACS-AN wants us to consider its 8.0 Model which is presently incomplete."[38] *Thus, a full year and a half after requesting that the RCA establish new UNE rates using ACS's own model, ACS itself still had not settled on a model for the RCA to use.*

The RCA granted ACS's requested extension and directed the parties to file briefs on alternative methodologies by July 27, 2001. GCI supported use of the previously selected FCC Model or, in the alternative, the HAI Model 5.2a. ACS offered two models: ACS-AN Version 8.0, which it advocated was in compliance with the Eighth Circuit's most recent decision vacating the FCC's rules, and ACS-AN Version 7.2, which it advocated should be used if the Supreme Court again reversed.[39]

Meanwhile, in the midst of rearguing the choice of methodology for setting UNE rates and seeking extensions of time, ACS filed a Request for Immediate Establishment of Interim and Refundable Rates on June 11, 2001. This request, not surprisingly, stemmed from the fact that ACS had successfully encouraged the RCA to fully re-open the choice of pricing methodology

---

[37] *Id.* Discussing this issue in response to ACS's subsequent request for clarification, the RCA indicated that "we were aware that a previous order requiring parties to provide each other immediately with all information regarding or supporting proposed model modifications or additions had been ignored." Order U-96-89(21), dated July 5, 2001, page 3. Lest ACS still not understand, the RCA explained: "We will consider the use of any alternative methodologies only if all parties are given a fair opportunity to evaluate the alternatives." *Id.*

[38] *Id.* at 2.

[39] *See* Order U-96-89(23), dated October 25, 2001, page 3.

11

EXHIBIT 27
PAGE 15 of 44

that it had completed more than a year before, thereby substantially stalling a final decision on revised permanent rates. The original model selection can scarcely be deemed dilatory, coming as it did within four months of ACS's request for the adoption of new UNE rates. Had ACS not fought the RCA's selection of the FCC Model as a baseline, it is highly probable that the decisions on inputs and final rates would have been adopted and approved by the RCA in early 2001.[40] Instead, having introduced significant delay, ACS demanded the immediate setting of interim rates.

During the summer of 2001, then, the RCA essentially conducted parallel rate proceedings for the Anchorage interconnection agreement, both at the request of ACS. The RCA received briefing (1) on the need for interim rates, and (2) on "any and all forward-looking cost studies or methodologies they wish us to consider"[41] for the setting of permanent rates. Oral argument on interim rates was held on August 17, 2001.

ACS argued then, as it does now, that the prevailing UNE rates were "confiscatorily low." ACS offered UNE loop cost studies purportedly based on both the FCC Model and its proprietary Version 7.2 Model, with resulting rates of $25.00 and $24.59 per loop per month, respectively. Despite these results, ACS requested a "compromise" interim UNE rate of $24.00 – an immediate 80 percent increase in price per loop per month.

GCI opposed ACS' request, cited the existing rates' consistency with other arbitrated results, and presented the results of the previously approved FCC Model, with modifications to incorporate Anchorage-specific customer and wire center information. To simplify the process

---

[40]   The RCA adopted the modified Synthesis Model as the "FCC Model" in May 2000. Assuming 6 months for arbitration after the conclusion of the Fairbanks and Juneau arbitrations on October 6, 2000, a final rate established through use of the now familiar model could have been approved by the RCA in the spring of 2001 – a year and a half ago.

[41]   Order U-96-89(2o), dated May 11, 2001, page 9.

EXHIBIT _27_
PAGE _16_ of _44_

of demonstrating that the current rate of $13.85 was within the "zone of reasonableness," GCI used the recently approved inputs from the Fairbanks arbitration, despite the fact that costs in Fairbanks are demonstrably higher than those in Anchorage and would yield an artificially high UNE loop rate. Using the Fairbanks inputs, the FCC Model produced a loop rate of $14.92, while the model with FCC defaults produced a rate of $12.94.[42]

In October 2001, the RCA granted ACS's request for interim and refundable rates and established a UNE loop rate of $14.92. In doing so, it used the results of the FCC Model it previously approved, with inputs recently adopted in the Fairbanks arbitration but with Anchorage-specific customer and wire center location information. The RCA found that this was the most likely surrogate for the eventual permanent rate. Discussing the relative merits of the parties' proposals, the RCA observed that "ACS-AN's request is premised on an untested and unapproved methodology."[43] Furthermore, ACS "was unable to tie that request for a $24 UNE rate to any data filed with NECA."[44] The RCA explained its decision as follows:

> We must determine fair interconnection prices for ACS-AN and GCI in Anchorage. This is a request for interim relief while we fully adjudicate the issues. The first step in this process is the selection of an appropriate cost methodology for UNE pricing. We adopted the FCC model for use in this proceeding on May 30, 2000. While we have requested and received briefing on alternative cost methodologies, we have not adopted the ACS-AN Version 7.2 model as an appropriate model for use in UNE pricing. We have recognized that forward-looking cost methodologies are in a state of flux but believe our selection of the FCC model and the standards we applied in [the Fairbanks and Juneau arbitrations] were and are in compliance with the Act. We will decide whether a different model should be used before arbitration over inputs begins; but for purposes of

---

[42] *See* Affidavit of Frederick W. Hitz III, dated June 25, 2001, at pages 6-7 (attached as Exhibit A)(providing information and data establishing the reasonableness of the $13.85 UNE rate at that time).

[43] Order U-96-89(23), dated October 25, 2001, page 9.

[44] *Id.* The RCA continued: "We also are unable to determine whether inputs used by ACS-AN in its model comply with the FCC pricing rules as we previously interpreted them." *Id.* at 10.

13

EXHIBIT __27__
PAGE _17_ of _44_

an interim rate increase, we will use the currently approved methodology.[45]

With interim rates in place, the RCA was able to return its resources to the permanent rate arbitration. The RCA first addressed the choice of network configuration to underlie its reconsideration of a forward-looking cost methodology. Because of the Eighth Circuit's invalidation of the Commission's "efficient network" rule, and until the Supreme Court issued its decision, the state commissions were left without concrete guidance on this fundamental question.[46] As discussed above, the Commission's regulations were based not on historical or embedded cost, but rather on the most efficient technology available and the lowest cost network configuration, given the existing location of the ILEC's wire centers.

The RCA found the Eighth Circuit's decision to be internally inconsistent because it approved the use of a forward-looking cost methodology but nonetheless required that UNE prices be based on the ILEC's "actual" cost of facilities and equipment. The RCA adopted what it termed an "efficient ILEC" standard: "We decide against using a hypothetical network based on only current wire center locations. Instead, the network design should reflect a reconstructed most efficient technology ILEC network as it exists today."[47] GCI believes that this standard, adopted before the Supreme Court's decision in *Verizon v. FCC*, could be interpreted and applied in such a way as to conflict with the Commission's rules. Unlike ACS, GCI is not seeking FCC's review of the RCA's decision. If need be, GCI will seek reconsideration or review within the framework established by the Act.

---

[45] *Id* at 10-11.

[46] "We cannot further delay our interpretation in hopes of getting clear guidance from the Supreme Court. We must fashion an economic costing method that embodies the forward-looking methodology embodied in the Act." Order U-97-89(24), dated February 8, 2002, page 8.

[47] *Id* at 10-11.

14

EXHIBIT 27
PAGE 18 of 44

The RCA next ordered a hearing on February 15, 2002, to address whether the multiple methodologies proposed by ACS and GCI would produce results consistent with its "efficient ILEC" standard. After the lengthy hearing, the RCA concluded, "both parties have not had a full opportunity to understand the foundations for [ACS's proposed] model."[48] Nonetheless finding it "important to adequately consider [ACS's] v7.2 model," the RCA on April 8, 2002 granted ACS's request to order the parties to conduct a workshop on the model. ACS represented that it was "convinced that the 'black box' issues will disappear once GCI has an opportunity [to] analyze the v7.2 model and have its questions answered."[49] The RCA ordered the parties to file reports on the results of the workshop by May 22, 2002.

On May 13, the U.S. Supreme Court decided *Verizon*, reversing the Eighth Circuit, upholding the Commission's use of the TELRIC forward-looking cost methodology, and rejecting the ILEC's arguments that forward-looking costs must nonetheless be calculated with reference to embedded costs rather than an efficient carrier's cost. With this decision, the RCA finally received the clarification necessary to proceed with revisiting the agreement's interim rates. Most recently, on July 29, 2002, the RCA moved ahead by selecting ACS's v7.2 model for use in establishing UNE rates. The RCA indicated that GCI would be permitted to advocate for changes to the model concerning issues such as sampling methodology, maximum length of copper loops, feeder route design, and method of allocating overhead. The RCA acknowledged certain "challenges" inherent in use of ACS's model, indicating that the manual network design

---

[48]   Order U-96-89(25), dated April 8, 2002, page 9.

[49]   *Id.* at 10. ACS's representation is curious given the RCA's repeated admonishments – dating back a year and a half – that it provide GCI with complete and accurate information on its proposed models.

EXHIBIT __27__
PAGE _19_ of _44_

process will be "slow" and modifications to the model "may take considerably more time than the FCC model would require."[50]   Specifically on the issue of delay, the RCA cautioned:

> [W]e believe it is necessary to point out that ACS-AN, which has strenuously advocated for the use of this manual and potentially time consuming approach, is also the party that has been equally strenuous in arguing for quick resolution of this docket.  If ACS-AN is willing to live with the delays inherent in using this model, we are willing to accommodate their request . . . . We rely on ACS-AN's representations, during the hearing and the workshop, of its willingness to devote the time and resources necessary to fix the model.[51]

The RCA appointed an arbitrator to take evidence and recommend changes to the model platform as necessary for it to render forward-looking prices based on an "efficient ILEC" standard.   In addition, because ACS's model addresses only UNE-loop rates, the arbitrator is to recommend platforms for use in non-loop UNE rates, non-recurring cost charges and collocation rates.  Once these issues are decided, the RCA has directed the arbitrator to address model inputs and final output prices.

Consistent with the RCA's decision, the arbitrator met with ACS and GCI on August 5, 2002, and on August 13, 2002, the parties exchanged lists of threshold issues to be resolved.  As of this filing, a further pre-hearing meeting has been scheduled for August 22, 2002.

**D.**    *The Fairbanks Interconnection Proceeding*

ACS also requests that this Commission preempt the RCA's final decision approving the ACS-GCI arbitrated interconnection agreement for Fairbanks, Alaska.  The Commission's

---

[50]   Order U-96-89(26), dated July 29, 2002, page 5.

[51]   *Id.* at 6.  In a footnote to this passage, the RCA further explained, "the major delays in adopting new rates have been due, in part, to ACS-AN's advocacy of its model over our earlier decision to use the FCC model."  *Id.* at n.13.  ACS now presents a different picture of the source of delay: "Despite ACS-Anchorage's repeated requests for a new proceeding, the RCA has not even set a schedule for arbitration of a new interconnection agreement.  If the Commission refuses to preempt the RCA for its failure to set new UNE rates in the last 5 years, ACS-Anchorage will have no recourse."  *ACS Emergency Petition* at 40.  Setting aside

16

EXHIBIT  27
PAGE  20  of  44

inquiry can end here. In this instance ACS actually has consulted the Act and availed itself of the statutorily prescribed remedy – judicial review. The case is now under consideration by the Ninth Circuit Court of Appeals on an interlocutory appeal. Thus, what ACS would have the Commission do is not preempt the RCA – for it has issued a judicially reviewable decision – but rather preempt an appeal of that decision that is legitimately pending in the federal courts. The procedural history that follows is unnecessary for the Commission's resolution of this petition. It is provided to establish a complete record, and to underscore that ACS is seeking a form of appellate review not authorized by statute.

The Fairbanks proceeding began in 1997 when GCI petitioned the APUC to lift the ILEC's rural exemption pursuant to section 251(f)(1). Without such an action, GCI could not have obtained access to UNEs in Fairbanks. After initial judicial review and remand concerning the burden of proof, on June 30, 1999, the APUC granted the petition,[52] and later that year, the newly constituted RCA reaffirmed the decision and ordered ACS to unbundle its network.[53] It also directed the parties to begin interconnection negotiations. On December 8, 1999, GCI petitioned the RCA to arbitrate interconnection agreements between it and the three ILEC's in Fairbanks, Juneau and surrounding areas (PTI Telecommunications of Alaska, Inc., Telephone Utilities of Alaska, Inc., and Telephone Utilities of the Northland, Inc.). By this time, ACS had completed its acquisition of all three companies.

---

the delaying effects of ACS's actions in the RCA proceeding, ACS did not even request the setting of new rates until January 2000 – certainly not 5 years ago!

[52]  Order U-97-82(9)/U-97-143(9)/U-97-144(9), dated June 28, 1999.

[53]  Order U-97-82(11)/U-97-143(11)/U-97-144(11), dated October 11, 1999.

EXHIBIT __27__

PAGE _21_ of _44_

The RCA granted the petition and, at ACS's request, consolidated the dockets.[54] It directed the parties to brief the issue of what model to use to develop forward-looking cost figures. It also indicated that the arbitration would be conducted using the FCC's "last best offer format, " or "baseball style" arbitration, which should have encouraged both GCI and ACS "to submit realistic 'final offers'" and thus bring the 'pitches' together.[55] As noted below, such rational behavior was not forthcoming because ACS clung to its belief that the model should use embedded costs.

ACS proposed its in-house cost study; GCI proposed the Hatfield v5.1 Model. An independent consultant hired by the RCA to evaluate the evidence recommended that the RCA not select either party's proposal but, instead, fashion an Alaskan-specific version of the FCC's Synthesis Model, which had been developed for universal service purposes with generic national inputs. The RCA concurred, finding that the model was neutral to both parties and it had undergone substantial national scrutiny.

Fully aware that the FCC's Synthesis Model was developed for use in universal service proceedings, the RCA clearly required that the model "be converted to produce an unbundled network element output."[56] In addition, the RCA cautioned that the FCC's national defaults should be used only as a baseline, and that the parties should propose modifications to appropriately shape the model for use in Alaska. ACS harps on these two points – that the FCC model was designed for universal service and based on national inputs – without acknowledging that the RCA used the FCC's Synthesis Model *only as a starting point* from which to develop a new "FCC Model." Both parties had a full opportunity to challenge and arbitrate the structure,

---

[54]    Order U-99-141(1)/U-99-141(2)/U-99-141(3), dated January 27, 2000.

[55]    *Local Competition First Report and Order,* 11 FCC Rcd at 16131 ¶ 1294.

[56]    Order U-99-141(5)/U-99-142(5)/U-99-143(5), dated April 18, 2000, page 4.

EXHIBIT 27
PAGE 22 of 44

its modifications, and all inputs. It is telling that the majority of the modifications to the model, but not the inputs, were stipulated between the parties.

Astoundingly, ACS now challenges certain inputs that it chose not to challenge during the arbitration. ACS raises the RCA's use of the default input for the costs of burying cable – which it acknowledges is "the most influential input category in total loop investment"[57] – even though it did not contest this input during the arbitration! Similarly, ACS declined to contest the inputs for copper and fiber cable for feeder and distribution – what it describes as "the next largest category" of loop investment[58] – but now raises the issue as apparent error on the part of the RCA. ACS had the opportunity to arbitrate these issues during the proceeding. By failing to do so, it waived them and estopped from arguing them for the first time here.

Ruling on the arbitrator's recommended decisions and without the guidance of the Supreme Court's pending ruling in *Verizon*, the RCA confronted the Eighth Circuit's invalidation of TELRIC and the "efficient network" rule. The RCA found the court's decision to be "confusing and internally inconsistent." It turned, instead, to the plain language of the Act and the FCC's orders, which "instruct that the model should produce prices for network elements that reflect the incumbent's cost to reconstruct their existing network using current efficient technology deployed in [existing] wire center locations."[59] The RCA adopted all of the arbitrator's recommended decisions concerning model inputs.

Noting that "ACS consistently argued that the arbitrator used the wrong standard to select a final offer," the RCA explained that ACS advocated use of embedded costs and thus its final

---

[57]  *ACS Emergency Petition,* Affidavit of Timothy J. Tardiff at 9.

[58]  *Id.* at 10.

[59]  Order U-99-141(9)/U-99-142(9)/U-99-143(9), dated August 24, 2000, page 11.

EXHIBIT 27
PAGE 23 of 44

offers "were generally based on the costs incurred to rebuild the current network as it exists."[60]
ACS was steadfast in its commitment to "embedded" and "historic" costs, despite the RCA's
clear rulings adopting a forward-looking cost methodology, its use of baseball style arbitration,
and its explanation that "the Act does not contemplate network prices based on what the
incumbent spent when the facilities were originally built."[61]

Before the agreement was finally approved, ACS took one last stab. Echoing things to
come, ACS challenged the arbitrated rates as "confiscatory." The RCA found no evidence to
support such an extreme claim. It concluded: "It would be unfair to the other party involved in
this arbitration, and inconsistent with the terms of the Act to delay adoption of the
interconnection agreement and allow ACS another opportunity to make its case because it is
dissatisfied with the outcome of this proceeding."[62] The arbitrated interconnection was approved
by the RCA on October 5, 2000.[63]

ACS next did what the statute permits "any party aggrieved" to do. On September 25,
2000, it filed a complaint against the RCA and GCI in federal district court.[64] Section 252(e)(6),
"Review of State Commission Actions," provides that "any party aggrieved by [a state
commission's] determination may bring an action in an appropriate Federal district court to
determine whether the agreement or statement meets the requirements of section 251 and this

[60] *Id.*

[61] *Id.* at 12.

[62] Order U-99-141(10)/U-99-142(10)/U-99-143(10), dated October 5, 2000, page 5.

[63] *Id.*

[64] *ACS of Fairbanks, Inc. v. GCI Comm. Corp.*, No. A00-22 CV (D.C. Alaska) (filed Sept. 25, 2000). ACS's original complaint appealed the RCA's *Order Approving, In Part, And Modifying, In Part, Arbitrator's Recommendation*, Order U-99-141(9)/U-99-142(9)/U-99-143(9), dated August 24, 2000. Accordingly, its complaint was filed prior to the RCA's *Order Approving Interconnection Agreement*, Order U-99-141(10)/U-99-142(10)/U-99-143(10), dated October 5, 2000. ACS subsequently amended its complaint.

EXHIBIT 27
PAGE 24 of 44

section."[65]  Not surprisingly, the claims now pending in federal court are *identical* to those it makes here – that the decisions of the RCA

(1)    "violate the plain meaning of the Telecommunications Act of 1996, other applicable federal law, and FCC regulations and orders,"

(2)    "violate ACS right to substantive and procedural due process under the Fifth and Fourteenth Amendments to the United States Constitution," and

(3) "result in rates that are confiscatory, and are an unconstitutional taking of ACS property."[66]

In response, the RCA asserted the jurisdictional defense of sovereign immunity under the Eleventh Amendment.  The court denied the RCA's motion to dismiss, and the RCA appealed to the U.S. Court of Appeals for the Ninth Circuit pursuant to the collateral order doctrine. Following the law of the circuit, the district court found that it was automatically divested of jurisdiction to proceed while the court of appeals addresses the claim of qualified immunity.[67] The court of appeals scheduled argument, but later postponed it when the Supreme Court granted *certiorari* in a case involving the Maryland Public Service Commission's assertion of immunity from suit over its interpretation of an interconnection agreement pursuant to sections 251 and 252.

On May 20, 2002, the Supreme Court decided *Verizon v. Public Serv. Comm'n of Md.*[68] In response to the Maryland Public Utilities Commission's claim that the Eleventh Amendment bars suit against it and its individual commissioners, the Court first held that Verizon could

---

[65]   47 U.S.C. § 252(e)(6).

[66]   *Amended Complaint for Declaratory Judgment, Preliminary Injunction, and Permanent Injunction*, No. A-00-288-CIV (D.C. Alaska) (filed March 13, 2001), at 50-51.

[67]   *Order, ACS of Fairbanks, Inc. v. GCI Comm. Corp.*, No. A00-288-CIV (D.C. Alaska) (March 20, 2001).

[68]   *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 122 S. Ct. 1753 (2002).

EXHIBIT __27__
PAGE __25__ of __44__

proceed against the individual commissioners pursuant of the doctrine of *Ex parte Young.*[69]  The

Court then declined to address whether the Public Utilities Commission is subject to suit in

federal court on the theory that it waived sovereign immunity when it voluntarily participated in

the regulatory regime established in section 252, finding it unnecessary to reach that issue.

On July 9, 2002, the Ninth Circuit directed the parties to file supplemental briefs

addressing the effect of *Verizon v. Public Serv. Comm'n of Md.* on the pending appeal.[70]  Those

briefs were filed on August 15.  Notably, although ACS named individual commissioners as

defendants in its original complaint, it did not do so in its amended complaint.   Argument in the

case is scheduled to be heard on September 30, 2002.

Dissatisfied with the Act's provisions on judicial review and unhappy about the amount

of time necessary to hear an appeal, ACS now petitions this Commission to resolve its claims of

error in the RCA's decisions.  As indicated above, the single fact relevant to this Commission is

the issuance, on October 5, 2000, of a final order by the RCA approving the arbitrated

interconnection agreement.

**III.    Preemption of the RCA Would Be Unlawful Because in Neither Proceeding Has the RCA Failed to Act**

**A.    Section 252(e)(5) Grants the FCC Jurisdiction to Assume an Interconnection Proceeding Only Where a State Commission Fails to Act, And the RCA Has Already Acted**

ACS anchors its request for relief in section 252(e)(5) of the Communications Act, which

provides that the Commission shall preempt a State commission where that State commission

---

[69]  *Ex parte Young,* 209 U.S. 123 (1908).

[70]  Order, *ACS of Fairbanks, Inc. v. GCI Comm. Corp.*, Nos. 01-35344, 01-35475 (9th Cir.) (July 9, 2002).  ACS's Petition, filed more than two weeks after the court issued its order, is in error when it represents that "the Ninth Circuit has not rescheduled the case."  *ACS Emergency Petition* at 20.

EXHIBIT  _27_

PAGE _26_ of _44_

"fails to act to carry out its responsibilities under [Section 252]."[71] Arguing that "there is nothing in the language or legislative history of section 252(e)(5) to prevent the FCC from preempting state actions that clearly violate the pricing standards set forth in section 252(d)(1),"[72] ACS presumes that section 252(e)(5) confers a broad grant of federal jurisdiction to intervene in the states' negotiation, arbitration and approval of interconnection agreements under section 252. It does not. Rather, as the Commission and the courts have recognized, section 252(e)(5) requires the Commission to act in narrow circumstances – only in the State's stead, only when the State has failed to act – and it grants the Commission no discretion to act beyond those circumstances.

Section 252(e)(5) is quite purposefully entitled, "Commission to act *if state will not act*" (emphasis added). In full, it provides as follows:

> COMMISSION TO ACT IF STATE WILL NOT ACT.—If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

Affirming the Commission's refusal to preempt a decision of the Massachusetts Department of Telecommunications and Energy, the U.S. Court of Appeals for the District of Columbia Circuit recently explained, "both the plain language and structure of this provision suggest that the remedies it authorizes are distinct and mutually exclusive."[73] *Either* a state

---

[71]  47 U.S.C. § 252(e)(5).

[72]  *ACS Emergency Petition* at 40.

[73]  *Global NAPS, Inc. v. FCC*, 291 F.3d 832, 836 (D.C. Cir. 2002). The court continued: "If a state commission fails to act, preemption is a viable option; however, if the state agency takes final action disposing of the pending claim, that action can be undone only by direct judicial review in the appropriate forum." *Id.* at 836-7.


EXHIBIT 27
PAGE 27 of 44

commission will act upon an interconnection agreement or request for arbitration or negotiation, *or* the FCC will. The court observed: "Only where there is such a failure does § 252(e)(5) obligate the Commission to step in. Otherwise – such as where the state agency actually 'makes a determination' under § 252 – *there is no statutory basis for FCC preemption.*"[74]

Not surprisingly then, where there is a failure to act, the FCC steps directly into the shoes of the state commission. The Act provides that the Commission "shall assume the responsibility of the state commission" and shall "act for the State commission." Less than a month ago the United States Court of Appeals for the Eleventh Circuit explained the statutory scheme as essentially appointing the FCC as the "second string" for the individual arbitration of interconnection disputes. Though the Commission has established the national framework with TELRIC pricing rules, the statute in the first instance authorizes the state commissions to apply those rules in the arbitration and approval of interconnection agreements. The Commission's preemptive authority exists because "a state commission is empowered, but not required, to arbitrate the remaining disputes. If the state commission *chooses* not to fill that role, the Federal Communications Commission is required to do so."[75]

The Commission has similarly – and consistently – interpreted section 252(e)(5) as granting it a circumscribed role, dependent upon a state's inaction. In the *Local Competition First Report and Order*, the Commission explained that it would "not take an expansive view of

---

[74] *Id.* at 836 (emphasis added).

[75] *MCI v. BellSouth*, 2002 U.S. App. LEXIS 15467 (11th Cir. 2002) at *2 (internal citation omitted) (emphasis added). *See also Indiana Bell Tel. Co. v. Smithville Tel. Co., Inc.*, 31 F. Supp. 2d 628, 637 (S.D. Ind. 1998) ("According to the statute, if the State commission fails to participate in the statutory scheme for resolving these disputes, the requesting party's exclusive remedy is to notify the FCC."); *US West Communs., Inc. v. TCG Seattle*, 971 F. Supp. 1365 (W.D. WA 1997) ("Congress, of course, cannot 'require States to govern according to Congress' instructions.' The Act thus permits states to 'opt out' of their regulatory roles" via Section 252(e)(5).") (internal citation omitted).

EXHIBIT 27
PAGE 28 of 44

what constitutes a state's 'failure to act'" in its implementing regulations.[76]  Section 51.803 of

the Commission's rules defines "failure to act," for purposes of the section, as a failure to

respond to a request for mediation or arbitration, or a failure to complete an arbitration within the

statutorily prescribed time limits.[77]  And even where a state commission fails to comply with the

statutory deadline but ultimately does resolve outstanding issues in an arbitration proceeding, the

Commission has declined to preempt, finding that "there is no further 'responsibility' left for the

Commission to assume."[78]

     In both interconnection proceedings that ACS brings to this Commission, it is absurd to

claim that the "RCA has failed to act."  The Fairbanks arbitration is a closed proceeding with a

final order subject to pending judicial review.  It was decided nearly two years ago, and, indeed,

there is nothing "pending" for either the RCA to act upon or the FCC to preempt.  The only

"failure" that ACS alleges in the Fairbanks proceeding was a purported failure to apply the law

*as ACS advocated*.[79]  Thus, what ACS seeks is a merits-based review of the RCA's decision – a

review, of course, that is pending in the federal courts.

     At the simplest level, one need go no further than count the twenty-six orders issued by

the RCA to dismiss ACS's claim of "failure to act" in the Anchorage proceeding.  A detailed

history of those actions, however, is provided above.  Importantly, UNE rates *were arbitrated*

---

[76]  *Local Competition First Report and Order*, 11 FCC Rcd at 16128 ¶ 1285.

[77]  Section 51.801(b) provides as follows:  "For purposes of this part, a state commission fails to act if the state commission fails to respond, within a reasonable time, to a request for mediation, as provided for in section 252(a)(2) of the Act, or for a request for arbitration, as provided for in section 252(b) of the Act, or fails to complete an arbitration within the time limits established in section 252(b)(4)(C) of the Act."  47 C.F.R. § 51.801(b).

[78]  *In the Matter of Global NAPs, Inc. Petition for Preemption of Jurisdiction of the New Jersey Board of Public Utilities Regarding Interconnection Dispute with Bell Atlantic-New Jersey*, Memorandum Opinion and Order, 14 FCC Rcd 12530, 12538 (1999).

EXHIBIT  27
PAGE  29  of  44

*and approved* by the RCA, within the statutory timeframe, in January 1997. ACS repeatedly

describes these rates as "temporary," suggesting that the RCA failed to complete its work. That

is not so. As described above, the RCA had no choice but to act within the uncertainty unleashed

by the Eighth Circuit's stay on this Commission's pricing rules. When it described the January

1997 rates as "temporary," the RCA was acknowledging its and the parties' understanding that

the rates would need to be revisited once there was clarity on the matters of jurisdiction and

pricing methodology from the courts and the Commission.

ACS did not seek to re-open the UNE rates issue until January 2000.[80] Within the legal

vacuum created by *Iowa Utilities* and its progeny and prevailing until the recent decision in

*Verizon,* the RCA forged ahead considering network standards and pricing models. Of course,

what emerges most prominently from the lengthy record between then and now is a clear picture

that many delays were caused by ACS's unrelenting battle to get the RCA to repudiate its May

2000 decision adopting the modified "FCC Model." After two years, ACS recently succeeded in

its quest. The RCA agreed to use ACS's in-house model to establish new interconnection rates,

but not without calling ACS on its inconsistent advocacy: "[W]e believe it is necessary to point

out that ACS-AN, which has strenuously advocated for the use of this manual and potentially

time consuming approach, is also the party that has been equally strenuous in arguing for quick

---

[79]  For example, ACS challenges that the RCA "disregarded" its cost study and failed to "reflect
any costs specific to ACS's territory." *ACS Emergency Petition* at 33-36.

[80]  Notably, ACS has indicated that it does not believe that the nine-month statutory deadline for
resolving disputed issues in an arbitration applies to its request to re-open UNE rates.
Statement of Kevin Callahan, Counsel for ACS, December 6, 2000, at a hearing before the
RCA, attached as Exhibit E to the Comments of the Regulatory Commission of Alaska, WC
Docket No. 02-201 (filed August 19, 2002). Nor does ACS suggest otherwise here. The
RCA satisfied the statutory deadline when it approved the arbitrated agreement on January
14, 1997.

EXHIBIT *27*
PAGE *30* of *44*

resolution of this docket. If ACS-AN is willing to live with the delays inherent in using this model, we are willing to accommodate their request."[81]

ACS cites the Commission's order in *Starpower* as supporting preemption here, but it does not discuss the case. ACS simply states: "In the *Starpower Preemption Order,* the Commission held that it may, under section 252(e)(5), preempt a state that fails to interpret and enforce an existing interconnection agreement."[82] True so far as it goes, but *Starpower* bears no resemblance to the Anchorage interconnection proceeding. In *Starpower*, like all of the Virginia cases, the Virginia State Corporation Commission expressly declined the arbitration role granted it under section 252(e) and directed the parties to the FCC for an application of the statute. This Commission explained such "unique circumstances," in which the state commission "explicitly declined to take any action," warranted its assumption of jurisdiction under section 252(e)(5). Here, the RCA has not declined jurisdiction, expressly or otherwise, and it certainly has not directed ACS and GCI to come to this Commission.

**B.    The Commission's Jurisdiction Under Section 252(e)(5) Does Not Encompass Substantive Review of a State Commission's Decisions**

Precisely because the Commission "act[s] in the place of the state commission,"[83] it does not sit in review of the state commission.[84] Accordingly, the Commission has been steadfast in its refusal to look behind a state commission's actions under section 252. In *Global*

---

[81]  Order U-96-89(26), dated July 29, 2002, pp. 5-6.

[82]  *ACS Emergency Petition* at 40, *citing Starpower Communications, LLC, Petition for Preemption of Jurisdiction of the Virginia State Corporation Commission Pursuant to Section 252(e)(5) of the Telecommunications Act of 1996,* Memorandum Opinion and Order, 15 FCC Rcd. 11277 (2000).

[83]  *MCI Telcom. Corp. v. Bell Atlantic-Pennsylvania Serv.*, 271 F.3d 491, 501 (3d Cir. 2001).

[84]  Section 252(e)(6), "Review of State Court Actions," provides that "in any case in which a state commission makes a determination under this section, any party aggrieved by such



EXHIBIT  27
PAGE  31  of  44

*NAPs/Massachusetts*, the Commission affirmed the Common Carrier Bureau's decision

declining to preempt the Massachusetts Department of Telecommunications and Energy after it

issued an order dismissing an interconnection complaint. The Commission observed:

> [T]he Bureau correctly declined to examine the underlying
> reasoning of the MDTE in its review of the GNAPs petition. . . .
> *[N]either section 252(e)(5) of the Act nor section 51.801 of the
> Commission's rules focuses on the validity of the state commission
> decisions.* [85]

In response to a second Global NAPs petition, the Commission again declined to preempt,

noting, "While Global NAPS may prefer to attack the validity of the New Jersey Board's final

order before this agency, we will not examine the substantive merits of that decision here."[86]

The DC Circuit has found the Commission's refusal to be both a "reasonable interpretation of

[section 252(e)(5)]" and "consistent with the Commission's past practices and precedents."[87]

The court stated unequivocally: "Even if the state agency's dismissal was premised on faulty or

incomprehensible legal reasoning, it nonetheless constituted final action."[88]

---

determination may bring an action in the appropriate Federal district court to determine
whether the agreement or statement meets the requirements of section 251 and this section."

[85]  *In the Matter of Global NAPs, Inc. Petition for Preemption of Jurisdiction of the
Massachusetts Department of Telecommunications and Energy Pursuant to Section 252(e)(5)
of the Telecommunications Act of 1996*, Order on Review, 16 FCC Rcd 4976, 4977 (2001)('
*Global NAPs/Massachusetts*"), aff'd sub nom. *Global NAPS, Inc. v. FCC*, 291 F.3d 832
(D.C. Cir. 2002). *See also In the Matter of Global NAPs, Inc. Petition for Preemption of
Jurisdiction of Virginia State Corporation Commission Regarding Interconnection Dispute
with Bell-Atlantic*, Memorandum Opinion and Order, DA 99-1552, at ¶18 (CCB 1999).

[86]  *In the Matter of Global NAPs, Inc. Petition for Preemption of Jurisdiction of the New Jersey
Board of Public Utilities Regarding Interconnection Dispute with Bell Atlantic-New Jersey*,
Memorandum Opinion and Order, 14 FCC Rcd 12530, 12539 (1999).

[87]  *Global NAPS v. Verizon*, 291 F.3d at 833.

[88]  *Id.* at 837.

EXHIBIT 27
PAGE 32 of 44

In light of this precedent, ACS's proposed foundation for Commission action – that there is "nothing in the language or legislative history of section 252(e)(5) to prevent the FCC from preempting state actions that clearly violate the pricing standards set forth in section 252(d)(1)"[89] – easily gives way. By its own formulation, ACS concedes that the RCA *has acted*. What ACS alleges is that the RCA has acted *incorrectly* – that its "actions . . . clearly violate the pricing standards" of the Act. Yet as indicated above, the Commission previously has addressed requests for preemption based on allegations that a state commission's actions violate the Act or disregard Commission rules, and it has always declined. Considering a petition for preemption of portions of the Arkansas Telecommunications Regulatory Reform Act of 1997, the Commission characterized as "mistaken" the petitioners' view that "a state commission 'fails to act' if it fails . . . to reach a result required by federal law."[90] Indeed, when it promulgated sections 51.801 *et seq* of its rules, the Commission considered and rejected one consumer advocate's suggestion that a state's "failure to act to carry out its responsibility" should go beyond "mere inaction" to encompass, for example, "willfully disregarding the standards in section 252(e)(2) for approving or disapproving [interconnection agreements]."[91]

---

[89]  *ACS Emergency Petition* at 40.

[90]  *In the Matter of American Communications Services, Inc.; MCI Telecommunications Corp., Petitions for Expedited Declaratory Ruling Preempting Arkansas Telecommunications Regulatory Reform Act of 1997 Pursuant to Sections 251, 252, and 253 of the Communications Act*, Memorandum Opinion and Order, 14 FCC Rcd. 21579, 21595 (1999). The Commission continued: "our current rules prevent preemption pursuant to section 252(e)(5), even if the state commission 'fails' to impose on incumbent LECs obligations required by federal law." *Id* at 21595-21596.

[91]  *Local Competition First Report and Order*, 11 FCC Rcd at 16124 ¶ 1274.

EXHIBIT 27
PAGE 33 of 44

IV.    **The Federal District Court** – *Not the FCC* – **Has Jurisdiction to Review UNE Loop Rates Established By the RCA**

A.    **The Act Provides for Exclusive Review of State Commission Decisions in the Federal District Courts**

ACS asserts no basis for Commission intervention other than section 252(e)(5) preemption and, indeed, there is none. But that does not mean that ACS is deprived of the substantive review it so urgently seeks. The statute quite clearly provides that "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court . . . ."[92] ACS expressly conceded this point when it sought review of the RCA's final order in the Fairbanks interconnection arbitration by filing a complaint with the United States District Court for the District of Alaska.[93] Furthermore, the courts are unanimous that appellate jurisdiction is exclusive in the district courts,[94] and "the statute does not authorize the Commission to sit as an appellate tribunal to review the correctness of state resolution of such disputes."[95]

This Commission need read no further than the first sentence of ACS's Emergency Petition to know that its request is beyond the scope of the Commission's jurisdiction. This

---

[92]    47 U.S.C. § 252(e)(6).

[93]    Amended Complaint for Declaratory Judgment, Preliminary Injunction and Permanent Injunction, *ACS of Fairbanks, Inc. v. GCI Comm. Corp.*, No. A00-288-CIV (D.C. Alaska) (filed March 13, 2001). At paragraph 13 of Amended Complaint ACS asserts, "This Court has jurisdiction of his action pursuant to 47 U.S.C. § 252(e)(6)." ACS filed its original complaint on September 25, 2000.

[94]    *See, e.g., Southwestern Bell Tel. Co., v. Pub. Util. Comm'n of Texas*, 208 F.3d 475, 479 (5th Cir. 2000) ("the Act confers jurisdiction on the district court to review the PUC's determination for compliance with the Act, specifically sections 251 and 252."); *Indiana Bell Tel. Co. v. Smithville Tel. Co.*, 31 F. Supp. 2d 628, 631 (S.D. Ind. 1998) ("A decision by the State agency approving or rejecting an agreement and implementing the 1996 Act, may be reviewed only by a federal district court."); *id.* at 636 ("Such review is presumed to be the exclusive means of challenging state commission determinations under § 252.").

[95]    *Global NAPs v. Verizon*, 291 F.3d at 837.

EXHIBIT 27
PAGE 34 of 44

Commission can no more "declare that the determination of rates for unbundled network elements by the Regulatory Commission of Alaska for Anchorage and Fairbanks do not comport with Sections 251 and 252 of the Communications Act,"[96] than it can assume the role of arbitrator in an active interconnection proceeding. To do so would usurp the role Congress expressly assigned to the federal district courts. Wisely this Commission has previously refused such a role, as it must do here.[97]

**B.    A Defendant's Assertion of a Defense to Suit Cannot "Confer" Jurisdiction Where the Statute Does Not Provide It**

Although it cites no legal authority, ACS proffers a novel jurisdictional theory – that by raising the issue of sovereign immunity in the Fairbanks litigation, the state "waives its right to object to FCC jurisdiction."[98] Administrative agencies are statutory creations and cannot act beyond the scope of their jurisdiction as defined and conferred by statute. Agency jurisdiction, like the jurisdiction of the courts, is not a matter of discretion; it is a matter of authority to act. Thus, it is well established that behavior by a party – in this instance, the assertion of a defense to suit pending before another body – cannot somehow create jurisdiction where the statute does not.[99] Parties can neither create nor waive jurisdiction by consent, or by conduct, or by

---

[96]    *ACS Emergency Petition* at (4) (actual first page of Emergency Petition for Declaratory Ruling and Other Relief).

[97]    *See, e.g., Global NAPs/Massachusetts.*

[98]    *ACS Emergency Petition* at 41.

[99]    *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934) ("lack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties").

EXHIBIT 27
PAGE 35 of 44

estoppel.[100]  Thus the content of the RCA's pleadings in federal court can have no bearing on this Commission's lack of jurisdiction to review the RCA's orders pursuant to section 252(e).[101]

Furthermore the RCA, a state agency and a defendant to a federal suit, cannot be precluded from raising a jurisdictional defense. The legitimacy of its claims – specifically whether the Eleventh Amendment shields a state from suit over actions it has taken pursuant to section 252(e) – is a question for the courts to resolve, not this Commission. As discussed above, the United States Court of Appeals for the Ninth Circuit is actively considering that question in light of the U.S. Supreme Court's decision in *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*[102]

Modifying its approach, ACS next argues that by its actions – allegedly disregarding the Commission's rules and asserting sovereign immunity – the RCA "effectively is submitting the matter to the Commission."[103]  It relies upon the *WorldCom Preemption Order* – one of a series of essentially identical cases, including the *Starpower* case discussed above, in which the Virginia State Corporation Commission ("Virginia SCC") has expressly refused to arbitrate interconnection agreements under the Act and has invited the Commission to stand in its stead. This is precisely the scenario contemplated by the grant of jurisdiction in section 252(e)(5) – a

---

[100] *See, e.g., Potomac Passengers Ass'n v. Chesapeake & Ohio Railway Co.*, 520 F.2d 91 (D.C. Cir. 1975); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3522. The one exception, of course, is a state's ability to waive its sovereign immunity.

[101] ACS offers another rationale as incentive for the FCC to assert jurisdiction over matters now pending before the district court and court of appeals: "The FCC remains the only forum that can provide effective relief to ACS. During the time it takes to obtain an adjudicated decision from a district court, ACS will suffer sever [sic] harm from the current UNE rates." *ACS Emergency Petition* at 42 n. 151. The inconvenience to ACS of the district court completing its review of an action ACS initiated cannot override the fact that neither the Constitution nor the Act allow the Commission to preempt a federal court.

[102] *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 122 S. Ct. 1753 (May 20, 2002).

[103] *ACS Emergency Petition* at 42.

EXHIBIT 27
PAGE 36 of 44

state commission may decline the jurisdictional grant, triggering the Commission's obligation to "act for the state commission."[104]  Again, the same critical facts render *WorldCom* inapposite here:  the state commission expressly declined to participate in the framework established by sections 251 and 252, indicating that it would apply state rather than federal law to any agreement coming before it.  Here, the RCA has actively participated in the role prescribed to it under section 252(e); ACS merely argues that it applied federal law *incorrectly*.  Further, consistent with its rejection of the federal law, the Virginia SCC *directed the parties to the Commission* for an application of federal law.  The RCA, in contrast, has proceeded under the Act and actively opposes preemption by this Commission.[105]  Clearly there has been no "effective submission" of these proceedings to the Commission.

### C.    ACS's Attack on the RCA's Actions Is a Poorly Disguised Request for a Merits Based Review of an Ongoing State Proceeding

At bottom, ACS is asking this Commission to substitute its judgment for that of the RCA.  ACS's Emergency Petition is replete with allegations that the RCA's actions do not comport with the requirements of sections 251 and 252 and the Commission's regulations.  As indicated above, these allegations invite the Commission's review as an appellate tribunal, not its action "in the place of" the RCA because of a failure to act.

ACS does not limit its invitation to intervention in the RCA and federal court proceedings – it further invites the Commission to wade into state political affairs.  One theme of the Petition is that the RCA is under scrutiny of the state's political leaders and may be "sunset" after a year of winding down its operations.  What ACS does not disclose is that this "hit job" has been

---

[104]  47 U.S.C. § 252(e)(6).

[105]  *Comments of the Regulatory Commission of Alaska*, WC Docket No. 02-201 (filed August 19, 2002), at 28 ("[T]here is no basis for the FCC to preempt the RCA's jurisdiction under these circumstances.  ACS' Petition should be denied.").

EXHIBIT  27  
PAGE  37  of  44

"executed on behalf of [ACS]."[106]  The Anchorage Daily News has provided extensive coverage

of the reauthorization battle.  Noting that ACS is "one of [the] political patrons" of Senate

Judiciary Chairman Robin Taylor, the newspaper observed that "Sen. Taylor's assault on the

regulatory commission is naked special-interest politics at its worst."[107]  The newspaper has

revealed that the introduction of competition in the local exchange is the source of ACS's, and

therefore Senator Taylor's, ire.  It explained that the growth of "healthy competition" was

"further threatened when Sen. Taylor's controlled 'hearings' this month in Anchorage both failed

to reveal significant new problems and hinted the RCA's troubles might disappear if some new

arrangement were made in "phone wars" decision-making."[108]

        ACS represents that "due to the impending deadline and the legislature's study of its

operations, the RCA will have little time to perform a cost study,"[109] but fails to report that

"throughout this fiasco, legislative vote-counters tallied an overwhelming majority – probably

three-fourths in both houses – for reauthorizing the RCA."[110]  Mere hypotheses about the RCA's

operations cannot support "preemptive preemption" of the RCA's implementation of section

252.  As the Commission has indicated, it will review each request for preemption of a state

commission on the individual facts of the case.  As to any potential impediment to the RCA's

operations, there are no facts at present, and ACS should not be rewarded for manufacturing a

self-serving strategy to create them.  Should something truly occur to prevent the RCA from

---

[106] "Hit Job by Sen. Taylor", Anchorage Daily News, May 25, 2002, at B6 (attached as Exhibit B).

[107] *Id.*

[108] "Adequate in Overtime," Anchorage Daily News, June 30, 2002 (attached as Exhibit C).

[109] *ACS Emergency Petition* at 5.

[110] "Adequate in Overtime," Anchorage Daily News, June 30, 2002 (attached as Exhibit C).

EXHIBIT __27__
PAGE __38__ of __44__

carrying out its responsibilities under section 252, the Commission can address an appropriate request for relief at that time.

ACS's wistful imaginings do not seem likely to come to pass. The Legislature has reauthorized the RCA for an additional year and is reviewing the RCA's authorization as part of an ongoing renewal process.[111] The RCA's authorizing legislation has always contained a sunset provision that requires the legislature to take affirmative action to renew the RCA, and the present review is no exception. Recently recognizing the "overwhelming political support for renewal,"[112] even Senator Taylor has changed his public stance and indicated that there is no intent in the legislature to abolish the RCA.[113] ACS's actions to politicize regulation must not be indulged.

## V.    ACS's Claim That the RCA Has Established Confiscatory Rates Is Insupportable, Unripe and Before the Wrong Forum

Unhappy with the rates the RCA has established – whether final arbitrated rates in Fairbanks or interim rates in Anchorage – and knowing that the Communications Act does not afford them *Commission* review of state arbitrated rates, ACS raises a constitutional takings claim in hope that the Commission will bite. "In addition to violating section 252 of the Act, the UNE prices set by the RCA are confiscatory," it asserts.[114]

By its own admission, the constitutional claim is a poorly disguised re-hash of ACS's primary argument that the RCA's actions pursuant to section 252 violate the standards of the Act. ACS argues that the rates are confiscatory because they were established by an illegal

---

[111] HB3001, signed into law on August 14, 2002.

[112] "Utility Dispute," Anchorage Daily News, June 11, 2002 (attached as Exhibit D).

[113] *See* Alaska Senate Judiciary Committee RCA Hearings, June 20, 2002, Anchorage, Alaska, at pages 21-22.

EXHIBIT 27
PAGE 39 of 44

methodology. That is, "the RCA did not apply TELRIC, but rather, it applied its own method of determining UNE rates" – a method otherwise known as this Commission's Synthesis Model.[115] Thus, what ACS really argues is that this Commission must preempt the RCA and "apply the controlling law established by the Supreme Court and in the Commission's own rules."[116]

If ACS's allegations were correct – if the RCA failed to apply TELRIC correctly – ACS's remedy lies in a federal district court's review of the RCA's actions. Should a district court agree, it would remand for further proceedings to set new rates. And regardless of a claim that an illegal methodology was used, ACS could separately allege that the rates as adopted were confiscatory within the meaning of the Fifth and Fourteenth Amendments. Federal district courts have jurisdiction to hear claims of violations of federal law. There is neither need nor jurisdiction for this Commission to review two sets of rates, one interim and one final, for constitutional infirmities.

ACS nonetheless points to the *Local Competition First Report and Order* to suggest this Commission's "willingness and authority to review UNE rates that may be confiscatory."[117] When it adopted implementing regulations, the Commission addressed the ILEC's claims that use of a forward-looking cost methodology was *per se* violative of the Fifth Amendment's protection against uncompensated takings. Applying the Takings Clause to rate-setting cases, "[t]he guiding principle has been that the Constitution protects utilities from being limited to a

---

[114] *ACS Emergency Petition* at 37.

[115] On the development of an Alaska based variant of the FCC's model, see the discussion above at 8-9, 18-19.

[116] *ACS Emergency Petition* at 44.

[117] *Id.* at 43.

36

EXHIBIT 27
PAGE 40 of 44

charge for their property serving the public which is so 'unjust' as to be confiscatory."[118]   Citing

well established case law, the Commission explained that "the determination whether a rate is

confiscatory depends on whether that rate is just and reasonable, and not on what methodology is

used."[119]   The Supreme Court's recent decision in *Verizon* affirmed this view: "this Court has

never considered a taking challenge to a rate setting methodology without being presented with

specific rate orders alleged to be confiscatory."[120]

　　　Nonetheless, the Commission did not wish to foreclose all opportunity for an ILEC to

petition the Commission for permission to use a different methodology in the event that the

TELRIC methodology, when properly applied, could lead to a confiscatory result.  Although it

could not then conceive of a specific instance in which the application of TELRIC would result

in a constitutional violation, the Commission indicated that it would consider petitions for waiver

of the pricing methodology rules: "Incumbent LECs may seek relief from the Commission's

*pricing methodology* if they provide specific information to show that the *pricing methodology*,

as applied to them, will result in confiscatory rates."[121]

　　　ACS relies on this precise language as the basis for this Commission's review and

preemption of the actions of the RCA.  But ACS is not seeking "*relief from the Commission's*

*pricing methodology.*"  Instead, ACS seeks to have this Commission "correct" the application of

its pricing methodology – a task expressly assigned by statute to the federal district courts.

---

[118] *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989) ("*Duquense*").

[119] *Local Competition First Report and Order*, 11 FCC Rcd at 15870 ¶ 734.

[120] *Verizon*, 122 S. Ct. at 1679.  The Court further cited *Federal Power Com. v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944) ("The fact that the method employed to reach [just and reasonable rates] may contain infirmities is not . . . important.").

[121] *Local Competition First Report and Order* at 15872 ¶ 739.

EXHIBIT 27
PAGE 41 of 44

Interestingly, ACS observes that the Supreme Court in *Verizon* referenced the language quoted above from the *Local Competition First Report and Order*. It did. ACS suggests, however, "The Supreme Court in [*Verizon*] cited the Commission's offer to consider a challenge to rates in advance of a rate order." [122] It did not. The Court observed that the Commission "is more hospitable to early takings claims than any court would be under *Duquesne*."[123] This is true, as the Commission is willing to consider a waiver of its rules specifying use of a particular methodology in individualized circumstances, whereas the courts refuse to entertain challenges to methodologies because "It is not theory, but the impact of the rate order which counts."[124] This distinction reflects the differing roles and authority of administrative agencies as opposed to courts. But rather than stating that the FCC is willing "to consider a *challenge to rates* in advance of a rate order," as ACS represents, the Supreme Court stated that the FCC is "willing to consider a *challenge to TELRIC* in advance of a rate order."[125]

ACS's misrepresentation is self-serving and important because it erroneously suggests that the Supreme Court has acknowledged authority in this Commission to review rates established by the state commissions. Should ACS wish to take advantage of the language in the *Local Competition First Report and Order*, it should file a request for waiver of the Commission's rules demonstrating how TELRIC, as applied to them, would affect a takings. Of course, that is not what ACS is seeking here. Rather, it is asking the Commission to sit in review of the RCA's orders and apply TELRIC, as it alleges, in the first instance. As established above, the Commission can do neither.

---

[122] *ACS Emergency Petition* at 44.

[123] *Verizon*, 122 S. Ct. at 1681 n. 39.

[124] *Id.* at n. 36, *citing Duquesne*.

[125] *Verizon*, 122 S. Ct. at 1681 n. 39 (emphasis added).

38

EXHIBIT 27
PAGE 42 of 44

## VI.    Conclusion

ACS's Petition is nothing more than a plea for this Commission to review the decisions of a state commission made pursuant to Section 252. Because the Act affords ACS judicial review of final state commission decisions, and the Commission has no jurisdiction to appropriate an active interconnection proceeding, the Commission must reject ACS's extraordinary and unfounded request and deny the Petition.

Respectfully submitted,

By: _____/S/_____
         John T. Nakahata
         Karen L. Gulick
         HARRIS, WILTSHIRE & GRANNIS LLP
         1200 Eighteenth Street, N.W.
         Washington, D.C. 20036
         (202) 730-1300

         *Counsel for General Communication Inc.*

August 20, 2002

EXHIBIT 27
PAGE 43 of 44

## CERTIFICATE OF SERVICE

I, Karen L. Gulick, hereby certify that on this 20th day of August, 2002, the following Opposition of General Communication, Inc., was served electronically on the following person:

Ms. Karen Brinkmann
Latham & Watkins
555 11th street, N.W.
Suite 1000
Washington, DC 20004
karen.brinkmann@lw.com
Counsel to ACS of Anchorage, Inc. and ACS of Fairbanks, Inc.

Karen L. Gulick  /S/

EXHIBIT 27
PAGE 44 of 44